## PUBLICATIONS

- "Are Discounts on Closed-End Funds Really a Proxy for Lack of Control?"
  Business Appraisal Practice, Fall 2002.

- "A Case Study Analysis of the Differences Between Lost Profits and Firm Value"
  Business Valuation Review, March 2002.

- "Exposing the Overreaching Plaintiff Economist", For the Defense, February 2002.

- "An Evaluation of Real Earnings Growth Based on U.S. Census P-60 Data", Journal of
  Legal Economics, 10 (1).

- "Rates of Return to Education/Occupation: U.S.-Canada", International Advances in Economic
  Research, Research Notes, 7 (3).

- "Divorce Settlements Involving a Closely Held Business: Are They Fair?", Fair Share, March 1999.

- "A Note on Formulating and Corroborating Discount Rates For Small Firms", Journal of Legal
  Economics, 7 (3).

- "Calculating the Earnings Base for a Self-employed Individual", Journal of Legal Economics, 7 (2).

- "The Daubert/Robinson Factors From the Perspective of An Expert Witness", San
  Antonio Lawyer, May-June 1998

- "Medical Practice Valuation Dependent on Various Factors", The Medical Gazette,
  September 21, 1995

- "The Wheel Concept to Starting a Law Practice", Texas Bar Journal, February 1994

- "The Hedonic Valuation Model", Texas Lawyer, January 31, 1994

- "Business Valuation Can be Useful in Many Situations", San Antonio Business Journal,
  December 6, 1991

## LANGUAGES

- Fluent in Spanish (speak, read, and write)

**CLAIMANT'S EXHIBIT E**
(Texas Physical Medicine & Rehabilitation Life Care Plan and Projections for Rene F. Mata  )

## Texas Physical Medicine & Rehabilitation
### INSTITUTE
☆

Joe G. Gonzales, M.D

Angel M. Roman, M.D.

*Diplomates, American Board of Physical Medicine and Rehabilitation*

PHYSICAL MEDICINE
& REHABILITATION

PAIN MANAGEMENT

ELECTROMYOGRAPHY

OCCUPATIONAL
INJURIES

SPORTS MEDICINE

NONSURGICAL
SPINE CARE

# LIFE CARE PLAN

# AND

# COST PROJECTIONS

# FOR

# RENE F. MATA

**Prepared by:  Joe G. Gonzales, M.D.**

**September 4, 2002**

Santa Rosa Northwest
Tower Two

2833 Babcock Rd.

Suite 315

San Antonio, TX 78229

210/692-2000

Fax 210/692-2010

# TABLE OF CONTENTS

I.      LIFE CARE PLAN INTRODUCTION

II.     MEDICAL HISTORY

III.    MEDICAL EXAMINATION

IV.     PROJECTED MEDICAL SERVICES NEEDS

V.      COST ANALYSIS

VI.     RESEARCH AND REFERENCES

# I. LIFE CARE PLAN INTRODUCTION

The physicians of Texas Physical Medicine and Rehabilitation Institute are please to provide you with this Life Care Plan, which has been produced specifically for Mr. Rene F. Mata. Life care planning is a process in which a careful analysis has been utilized in determining the medical condition and the necessary medically related goods and services by an individual because of a disabling injury or a disease process. Every effort has been made to use a systematic and logical approach in an effort to determine all of the needs related to the specific conditions commencing from the time of our introduction to the patient to the end of life expectancy, if applicable. This process of life care planning has included information obtained from the available medical records of prior health care providers and includes my professional opinions following an interview and examination of Mr. Rene F. Mata.

While life care planning is often provided by a variety of health care professionals within the field of rehabilitation and case management, the physicians of Texas Physical Medicine and Rehabilitation Institute have been tasked with the development of Life Care Plans since 1988 because of our unique position based on our medical speciality and experience to care for the complex problems that arise with such serious or catastrophic medical conditions. Where necessary, other medical and therapeutic specialists may be consulted and their expertise utilized according to their clinical specialty for optimal representation of the needs of various medical goods, services, and procedures.

Our best effort is made to utilize and consider all past medical, social, psychological, vocational, educational, and rehabilitation data to the extent that they are available and applicable. When possible, the goals and the desires of the patient are expressed within the plan if they are known and consistent with this patient's best interest. Medical literature germane to the critical issues in the plan is surveyed in an effort to reflect the most current concepts in patient care.

1

*Life Care Plan*
*Rene F. Mata*
*September 4, 2002*

Consideration is also given to phase changes due to aging and the progression of the medical conditions and disabilities. Potential complications, which are commonly associated and identified with the principal diagnosis, are also discussed, and the care needs for these complications will also be projected. The range of services in the geographic area or region and the prevailing community costs and standards are utilized as available to provide an analysis of costs. These costs are typically expressed in present day costs derived from available data and resources.

It is our hope that this plan will serve as a guide for Mr. Mata and his family, case managers, and health care providers with the expectation that it will assist in providing optimal medical care and minimize unnecessary complications. It should be understood that this is not a prescription for care; rather, it represents a logical blueprint for medically necessary services and goods and may be utilized for purposes of validating appropriate financial reserves. Also, the information contained may serve those charged with the fiduciary responsibility to provide for future care. As such, this type of analysis is often utilized and taken into account by financial professionals who are tasked with setting reserves and selecting appropriate investment strategies to meet needs and to preserve the funding over the lifetime of the patient. Life Care Plans are typically requested by life insurance carriers, litigants in personal injury or medical malpractice claims, Workers Compensation boards, trust officers, annuity planners, economists, and other rehabilitation specialists.

Based on my careful review of the available medical records, my interview and examination of Mr. Mata, as well as my medical education, background, and specialty training along with extensive experience in dealing with similarly diagnosed patients, this Life Care Plan has been prepared utilizing the following established diagnoses:

1.    Closed-head injury with resultant cognitive and personality changes.
2.    Posttraumatic stress disorder manifested with major depression and anxiety.
3.    Cervical spine injuries, now status post C7-T1 diskectomy with C7 corpectomy along with bone grafting from C6 through T1 and instrumentation utilizing plate and screws also from C6 through T1.
4.    Thoracic wedge compression fracture (T3) currently with residual thoracolumbar pain, lumbar spine inadequately evaluated.

2

*Life Care Plan*
*Rene F. Mata*
*September 4, 2002*

5.   Left knee sprain, history of lateral meniscal injury and left fibular head fracture.
6.   Right ankle/foot pain, history of talar dome/neck fracture.
7.   Left wrist contusion and sprain with residual symptoms suggestive of carpal tunnel syndrome.
8.   Chronic pain syndrome.

In conjunction with the above-established diagnoses, the following critical assumptions have also been taken into consideration for the preparation of this Life Care Plan:

1.   Mr. Mata has moderately severe and permanent orthopedic conditions which are permanent and will remain problematic throughout the remainder of his life and will have an adverse impact on his physical and emotional health and will impose limitations in his vocational and avocational pursuits. It is anticipated that with appropriate and effective therapeutic intervention there will be an opportunity for stabilization and satisfactory symptom management and reduction of significant complications.

2.   As a result of his posttraumatic stress disorder, it is essential that Mr. Mata receive appropriate psychological and psychiatric evaluation and adhere to an appropriate plan of care which will result in optimal cognitive, behavioral, and physical health.

3.   It is not anticipated that Mr. Mata will have a reduced life expectancy because of his multiple injuries and conditions. Based on the U.S. Life Tables, he expected to live to age 74.8, which leaves a residual of approximately 46 years of life. As such, the Life Care Plan has considered his needs to end of life.

3

*Life Care Plan*
*Rene F. Mata*
*September 4, 2002*

# II. MEDICAL HISTORY

Patient's medical history was obtained from the patient himself. He appeared to be a reliable historian, and he was interviewed on 06-13-02. His interview was supplemented by the available medical records which included those from the following:

South Texas Emergency Care Foundation – ambulance
E. M. Care – emergency physician, Dr. Hector Guerra
Valley Baptist Medical Center
Cardiology Associates of Harlingen – Ruben M. Lopez, M.D.
Valley Orthopedic Surgery – Jefferson J. Cartwright, M.D.
Neurology Surgery Associates – Helson Pacheco Serrant, M.D.
Medical Home Care, Inc.
T. Walter Harrell, Ph.D. – psychologist

Mr. Rene F. Mata is a 28-year-old, right-hand-dominant male who reports, and the records confirm, that on 09-15-01, he we the driver and was involved in a motor vehicle accident, apparently sustained at approximately 2:00 o'clock in the morning when he drove off of the Queen Isabella bridge after it collapsed. He described his accident with some degree of anxiety and reports being a restrained driver with one friend as a passenger, who ultimately perished. He recalls that it was very dark. At the summit, upon driving over, his passenger screamed as they went over the edge. Upon hitting the water, he recalls striking his head presumably on the roof of his car, although he did not experience any loss of consciousness. He was driving a 2001 Mustang and recalls that his auto was submersing and apparently was unable to revive his friend. Ultimately, he was capable of opening his car door, causing his car to sink quicker; however, he was ultimately capable of exiting the vehicle and treading water for a period of time, although he felt extreme pain in his left leg and right foot as well as a searing pain of his upper back and recalls having a bloodied head and face. He apparently began to scream. Four people in a small boat, who were apparently fishing nearby, attempted to pull him in. However, there was great difficulty as their attempts increased his spinal pain. He was apparently able to hang onto the side of the boat, eventually being pulled into the boat, and he was laid down. He feels that he possibly came in and out of

4

consciousness but, for the most past, was cognizant of all activities which were occurring.

Mr. Mata was apparently taken to a Coast Guard station where he was placed on a gurney. He was apparently strapped in and later by Life Flight was taken to the Harlingen Valley Baptist Hospital. The patient reports and the records confirm that there he was cared for and evaluated by Dr. Hector Guerra, who identified a closed-head injury with lacerations to the left forehead. Mr. Mata complained of pain between his shoulder blades, neck, left knee, right ankle, left chest, and left wrist. There he was closely observed and was immobilized. His laceration was eventually sutured. His abrasions were also cleaned and bandaged. He received a diphtheria/tetanus booster.

A Foley catheter was inserted, and two large-port intravenous accesses were also started. He was given IV antibiotics, placed in a left knee immobilizer, and a series of diagnostic evaluations were performed. This included a chest x-ray which suggested fractures of the left 5th and 6th ribs; an x-ray of the pelvis which was negative; a left knee x-ray which revealed a fibular head fracture; and a right ankle x-ray which revealed soft tissue swelling. A cervical spine x-ray revealed a questionable fracture of C2, although C5-7 were not visualized. Because of this, a CT scan of the cervical spine was obtained which revealed a fracture of the C7 pedicle without displacement. CT scans of the brain, chest, abdomen, and pelvis were reported to be negative.

Lab studies revealed an elevated WBC at 16.5. A urine drug screen was positive for alcohol with an alcohol serum level of 0.050. Later, because of his thoracic spinal pain, a T spine x-ray was obtained which suggested that there may be compression fractures of the upper thoracic vertebral bodies. This later was confirmed with the presence of a thoracic wedge compression fracture at T3.

Mr. Mata was admitted to the intensive care unit by his admitting physician Dr. Ruben Lopez. There neurosurgical and orthopedic consultations were obtained. Dr. Jefferson Cartwright, an orthopedic surgeon, evaluated Mr. Mata and suggested that he had a C7, T1 compression fracture, a nondisplaced, left fibular head fracture, a left knee lateral meniscal injury, and a talar dome and neck fracture of the right ankle. The neurosurgical

5

consultation was provided by Dr. Helson P. Serrant. An MRI obtained suggested fractures of C7 and T3 with approximately 50 percent compression fracture at T3.

Eventually on 09-18-01, Mr. Mata underwent a C7-T1 diskectomy, a C7 corpectomy with bone grafting, plate and screw instrumentation for fusion between C6 through T1. His postoperative course was uncomplicated. Throughout his hospitalization, he received Lovenox 30 mg subcutaneously twice per day for the prevention of deep venous thrombosis. He wore a short-legged splint and was given intramuscular and oral analgesics as well as antibiotics and limited physical therapy. A follow-up study of his left knee suggested the presence of a horizontal tear of the lateral meniscus. He was eventually discharged on 09-21-01 on Vicodin, Robaxin, and Celebrex and was scheduled for follow-up visits by his orthopedic and neurosurgical physicians.

A follow-up cervical spine x-ray on 09-27-01 suggested the presence of postsurgical changes with cervical fusion of C6 through T1 and found to be in satisfactory position. The latest x-ray records available of 01-08-02 were of the cervical and thoracic spine and also suggested satisfactory postsurgical appearance of his C6 through T1 fusion. The presence of the wedge T3 fracture was also noted.

Orthopedic follow-up visits with Dr. Jefferson J. Cartwright were also noted with entries on 09-28-01, 10-08-01, 10-18-01, and 12-19-01. Generally, he was noted to have well-healing fractures, although medial and lateral malleolar arthritic changes were identified. Mr. Mata's symptoms have improved and no definitive plans have been made for any orthopedic surgical intervention as of the date of this evaluation.

Following Mr. Mata's discharge from the hospital, he returned home where he lives with his father and sister. He received limited physical therapy and nursing care until early November of 2001. He last saw Dr. Serrant, his neurosurgeon in February 2002, and apparently there are plans to see a spinal specialist in Dallas.

At the present time, Mr. Mata complains of persistent neck, shoulder, upper back, left knee, and right ankle pain. He describes a constant, deep, dull, achy sensation of his neck with intermittent episodes of sharp pain exacerbation. He also reports restricted

6

cervical motion particularly with extension and rotation. He does report that with forward flexion he experiences paresthesias of both arms and hands, although he does not have any focal weakness. He complains of bilateral shoulder pain, which by description appears to be muscular. He does not report any episodes of shoulder dislocation. His upper back pain is described also of a deep, near constant achy sensation which varies in intensity. He does not report any shortness of breath, chest pain, or feeling of spinal instability. He denies any lower extremity paresthesias, weakness, pain radiation, and bowel or bladder dysfunction. His left knee does feel unstable, and he does not feel he can rely on it for any aggressive activity such as running. He continues to use a left knee brace, which is helpful. His right ankle frequently pops and locks up on him. His pain does intensify with any sustained weight-bearing activities, such as walking or standing. He denies any recurrent effusions. There has been no joint heat or erythema. He does report that he feels depressed especially when he is alone and that he feels extreme guilt about the death of his friend, who was a passenger in his motor vehicle accident. He does not report feeling suicidal, although he feels very frustrated, is easily irritated, and at times takes it out on his younger sister, who is 16 years of age. At times he does feel anxious and reports intermittent difficulty with sleeping. He does report that he has been seeing counselors at the Valley Comprehensive Pain Management Center. They have prescribed an antidepressant; however, he reports that he stopped going to this counselor because he felt uncomfortable and did not feel that there was consistent followup with an individual health care provider. In addition, he feels very uncomfortable talking about his accident and the death of his friend. He was most recently evaluated by Dr. Walter Harrell, who confirmed persistent symptoms of depression and recommended individual psychotherapy and bereavement therapy.

*Life Care Plan*
*Rene F. Mata*
*September 4, 2002*

**PAST MEDICAL HISTORY:**  Mr. Mata denies any preexisting past medical Illnesses, injuries, or operations.

**ALLERGIES:**  Pollen and dust.

**MEDICATIONS:**  Currently none.

**SOCIAL HISTORY:**  He is single and currently lives with his father who is 58 years old and healthy. His sister is 16 years of age and is a 10th grader in high school. His father is employed as an assistant superintendent with the school district. He reports that his mother died in August of 2001 from a cerebral aneurysm. He is currently not employed. He previously worked as a bartender in Houston. He does report having approximately one year of college. He smokes one to two cigarettes per week and reports using alcohol primarily on the weekends. He does report difficulty sleeping because of neck, shoulder, and upper back pain as well as occasional nightmares and anxiety.

8

*Life Care Plan*
*Rene F. Mata*
*September 4, 2002*

# III. MEDICAL EXAMINATION

Mr. Mata is a pleasant male who appears his stated age and who was examined in my office at 2833 Babcock, Suite 315, San Antonio, Texas. Blood pressure is 110/62. Height - 5'9". Weight - 225. His gait is noted to be normal with only slight antalgia, favoring his right lower extremity. He is pleasant throughout the examination. He has a flat affect; and during the exam, he became teary on a couple of occasions when recounting his accident. He is alert and oriented x 3. He is a good historian. His speech is clear. His face is symmetrical. He does have a large, well-healed scar in the left forehead area. No other cephalic abnormalities are present. Cranial Nerves II through XII are intact.

His neck examination reveals that he has a right anterior scar, which is well healed, from his prior cervical operative procedure. He has reduced lordosis. There is diffuse, palpable paravertebral muscular pain with distinct myofascial bands present. His range of motion is at approximately 80 percent of normal. He complains of discomfort at terminal range of extension and rotation. I do not detect any crepitus. Spurling's maneuver was not attempted. There is no atrophy or fasciculation of the neck or parascapular musculature.

The upper extremities are symmetrical. There are some well-healed scars of the right forearm and elbow. The joints are supple with normal range of motion and without crepitus. Significant findings are a positive Tinel's sign at the left wrist, suggestive of possible carpal tunnel syndrome. I do not detect any atrophy. There are some very mild sensory changes, particularly with light touch of the thumb, index, and middle fingers. Lungs are clear. Heart is regular. Abdomen is soft and benign with positive bowel sounds.

Thoracolumbar spine examination reveals that there is mild kyphotic posturing which easily corrects with cueing. There is diffuse, palpable myofascial pain along the paraspinal musculature bilaterally, perhaps greater on the right than on the left. There is also palpable pain in the midline from approximately T4 to T8 consistent with supraspinous ligamentous injury. I do not detect any heat or erythema. Spinal range of

9

*Life Care Plan*
*Rene F. Mata*
*September 4, 2002*

motion is incomplete. He lacks approximately six inches to toe touch. He is very tight at the hamstrings. However, straight-leg raise sign is negative, and the neurological examination is within normal limits for motor, sensory, and deep tendon reflex function. Left knee, no effusion. Near normal range of motion with mild pain on flexion. No instability is present.

## DIAGNOSTIC IMPRESSIONS:

1.  Closed-head injury with resultant cognitive and personality changes.
2.  Posttraumatic stress disorder manifested with major depression and anxiety.
3.  Cervical spine injuries, now status post C7-T1 diskectomy with C7 corpectomy along with bone grafting from C6 through T1 and instrumentation utilizing plate and screws also from C6 through T1.
4.  Thoracic wedge compression fracture (T3) currently with residual thoracolumbar pain, lumbar spine inadequately evaluated.
5.  Left knee sprain, history of lateral meniscal injury and left fibular head fracture.
6.  Right ankle/foot pain, history of talar dome/neck fracture.
7.  Left wrist contusion and sprain with residual symptoms suggestive of carpal tunnel syndrome.
8.  Chronic pain syndrome.

## RECOMMENDATIONS:

1.  Mr. Mata was counseled and my preliminary recommendations were discussed at length.
2.  For symptom management, we will initiate treatment with Celebrex 200 mg one daily; Soma one at bedtime and every eight hours p.r.n. muscular spasms; and Celexa 20 mg one daily for symptoms of depression.
3.  Psychological evaluation.
4.  Follow up for further rehabilitation and pain management recommendations as well as review of psychological evaluations at a later date.

*Life Care Plan*
*Rene F. Mata*
*September 4, 2002*

# IV.  PROJECTED MEDICAL SERVICES NEEDS

**DISCUSSION:**  Upon review of the available medical records along with my personal interview and clinical examination of Mr. Rene F. Mata, it is evident that he has had significant orthopedic injuries and suffers from posttraumatic stress disorder as a result of his serious motor vehicle accident which occurred on 09-15-01. As a result, Mr. Mata will require a variety of health care professionals, services, and goods in an effort to provide timely and thorough evaluations, provide necessary comfort, and prevent secondary physical, behavioral, and psychological consequences. His future care should focus on improving his level of understanding of both physical and psychological consequences from his traumatic injuries and prevent behavior which may ultimately have adverse consequences on his physical and psychosocial health. As such, his therapeutic program should follow an anticipatory model of care to minimize such complications which, in effect, will reduce the overall cost of health care goods and services required throughout the remainder of his life.

**COST PROJECTIONS:**  An itemization of costs is prepared within the cost analysis of this Life Care Plan. These projections include recommendations for health care goods and services which can reasonably be expected to improve his comfort, function, and quality of life to the extent possible. Where appropriate, these services are CPT code and ICD9-CM code specific based upon the most recent publications of the *Physicians Current Procedural Terminology* and the *International Classification of Diseases, Ninth Revision, Clinical Modification*.

The cost analysis and correspondent summaries are presented in specific categories designed to aid economic or financial experts with long-term financial planning and resource allocation. No consideration is made within the context of this plan for future price changes associated with inflation or industrial growth factors. Likewise, no attempt has been made to discount to present value as this is not within the scope of my expertise.

**AGING WITH DISABILITY:**  Aging takes on a special significance when combined with chronic disability. In the case of Mr. Mata, there are specific concerns and

provisions for the anticipated accelerated changes of his cervical and thoracic spine as well as his knee, wrist, and ankle. Individuals with these known injuries experience accelerated degenerative changes which result in chronic pain of those areas involved, cause physical and emotional stress, and impose significant physical limitations as may be required for both vocational and avocational activities. As such, there are adverse implications to his general health and quality of life with interference in his ability to live and work independently at an optimal capacity. It is not likely that he will recover fully from this orthopedic injuries, and as such, this will be need to be considered in his vocational choices.

**LIFE EXPECTANCY:** The normal life expectancy of a 28-year-old, Hispanic male is to age 74.8. This information is provided based upon the *National Center for Health Statistics, Vital Statistics of the United States, Volume 47, No. 13, December 24, 1998.* It is not anticipated that Mr. Mata will have a shortened life expectancy as a result of his orthopedic injuries. However, in patients with depression, suicide remains a substantial risk, although it is not anticipated in Mr. Mata's case with appropriate psychological and psychiatric care.

**OUTPATIENT PHYSICIAN AND THERAPEUTIC CARE:** Mr. Mata will require for the majority of his life physician specialists and therapeutic services. These will be listed within the Cost Analysis section of this Life Care Plan. Unless otherwise specified, this category represents routine outpatient medical and therapeutic services. Inpatient services which may be required or anticipated for potential complications will be listed separately and include professional facility and ancillary care services and their associated costs.

**DIAGNOSTICS:** Only those diagnostic studies which are expected to be performed routinely or for extended periods of time specific to his current known condition are projected in this plan. These studies are performed for the purpose of early identification of treatable complications and deterioration of function. Routine studies are usually required to evaluate for frequently occurring complications and to initiate appropriate preventative measures. Diagnostic studies required for unexpected acute complications cannot be anticipated with a reasonable degree of accuracy and are, therefore, not included in this plan.

**MEDICATIONS:** It is anticipated for the management of both his physical and emotional symptoms that Mr. Mata will require medications intermittently thorough the remainder of his life. These will be listed within the appropriate category of the Life Care Plan.

**REHABILIATION SERVICES & SUPPLIES:** With the extensive orthopedic injuries, posttraumatic changes and stage changes which will occur throughout Mr. Mata's life, he will require intermittent rehabilitation services, supplies, and equipment to achieve specific therapeutic goals, minimize secondary complications, and optimize functional skills and activity tolerance, thereby facilitating his personal opportunities in all phases of his life.

**SURGICAL CARE NEEDS:** Those known diagnoses as they relate to his cervical spine, left knee, left wrist, and right ankle have been listed in the appropriate category and represent global fees for hospital, physician, anesthesiologist, and pathological services. Postoperative rehabilitation needs have been listed in the preceding category.

# V. COST ANALYSIS
Rene F. Mata

Report Date: 09-04-02
Date of Injury: 09-15-01
Current Age: 28

Normal Life  Expectancy: 74.8
Residual Life Expectancy: 46

*Diagnosis:*    *Cervical Spine Injuries*
*Cervical Fusion C6-T1*
*T3 Compression Fracture*
*PTSD*

| Service/Item | Begin At Age | Duration Years | Frequency per Year | Average Unit Cost | Annual Cost | Life Time Cost |
|---|---|---|---|---|---|---|
| **Outpatient Physician Services** | | | | | | |
| PM&R | 28 | 40 | 3 | $82.50 | $247.50 | $9,900.00 |
| Orthopedics | 28 | 40 | 1 | $125.00 | $125.00 | $5,000.00 |
| Neurosurgery | 28 | 40 | 1 | $150.00 | $150.00 | $6,000.00 |
| Anesthesiology (ESI) | 28 | 6 | 3 | $1,020.00 | $3,060.00 | $18,360.00 |
| Psychiatry | 28 | 5 | 6 | $150.00 | $900.00 | $4,500.00 |
| **Therapeutic & Case Management Services** | | | | | | |
| Individual Psychological Counseling | 28 | 2 | 12 | $145.00 | $1,740.00 | $3,480.00 |
| Individual Psychological Counseling | 30 | 1 | 6 | $145.00 | $870.00 | $870.00 |
| Vocational Evaluation | 28 | 1 | 1 | $1,050.00 | $1,050.00 | $1,050.00 |
| Vocational Conseling | 28 | 1 | 6 | $450.00 | $2,700.00 | $2,700.00 |
| Case Management | 28 | 10 | 12 | $126.00 | $1,512.00 | $15,120.00 |
| Physical Therapy | | | | | | |
| Periodic | 28 | 40 | 30(6wks) | $147.00 | $4,410.00 | $176,400.00 |
| Post-op | 58 | 2 | 40(8wks) | $147.00 | $5,880.00 | $11,760.00 |
| Occupational Therapy | | | | | | |
| Periodic | 28 | 1 | 20(4wks) | $147.00 | $2,940.00 | $2,940.00 |
| Post-op | 29 | 1 | 10(2wks) | $147.00 | $1,470.00 | $1,470.00 |
| Pain Management Prog. | 28 | 1 | 1 | $19,900.00 | $19,900.00 | $19,900.00 |
| Heating Pad | 28 | 40 | 0.2 | $87.00 | $17.40 | $696.00 |
| TENS Unit | 28 | 40 | 0.2 | $495.00 | $99.00 | $3,960.00 |
| Lumbar Brace | 28 | 40 | 0.5 | $125.00 | $62.50 | $2,500.00 |
| Knee Brace | 28 | 40 | 0.5 | $400.00 | $200.00 | $8,000.00 |
| Ankle Support | 28 | 40 | 1 | $60.00 | $60.00 | $2,400.00 |
| **Diagnostics** | | | | | | |
| X-ray  C-Spine | 28 | 40 | 0.5 | $173.00 | $86.50 | $3,460.00 |
| T-Spine | 28 | 40 | 0.5 | $173.00 | $86.50 | $3,460.00 |

| Service/Item | Begin At Age | Duration Years | Frequency per Year | Average Unit Cost | Annual Cost | Life Time Cost |
|---|---|---|---|---|---|---|
| **Diagnostics** | | | | | | |
| X-ray  Left Knee | 28 | 30 | 0.5 | $150.00 | $75.00 | $2,250.00 |
| X-ray  Right Ankle | 28 | 30 | 0.5 | $150.00 | $75.00 | $2,250.00 |
| MRI  C-Spine | 28 | 40 | 0.2 | $1,175.00 | $235.00 | $9,400.00 |
| MRI  T-Spine | 28 | 40 | 0.2 | $1,175.00 | $235.00 | $9,400.00 |
| MRI  Left Knee | 28 | 30 | 0.2 | $1,000.00 | $200.00 | $6,000.00 |
| MRI  Right Ankle | 28 | 30 | 0.2 | $1,000.00 | $200.00 | $6,000.00 |
| EMG/NCV | 28 | 40 | 0.2 | $760.00 | $152.00 | $6,080.00 |
| **Medication** | | | | | | |
| NSAID | 28 | 40 | 6 | $45.00 | $270.00 | $10,800.00 |
| Muscle Relaxant | 28 | 40 | 6 | $50.00 | $300.00 | $12,000.00 |
| Analgesic | 28 | 40 | 6 | $60.00 | $360.00 | $14,400.00 |
| Antidepressant | 28 | 5 | 12 | $115.00 | $1,380.00 | $6,900.00 |
| Topical Analgesic | 28 | 40 | 6 | $15.00 | $90.00 | $3,600.00 |
| **Labs** | | | | | | |
| CBC | 28 | 40 | 2 | $21.00 | $42.00 | $1,680.00 |
| Chem Profile | 28 | 40 | 2 | $78.00 | $156.00 | $6,240.00 |
| U/A | 28 | 40 | 2 | $19.00 | $38.00 | $1,520.00 |
| **\*Surgical Care Needs** | | | | | | |
| Cervical Procedure | 28 | 1 | 1 | $30,000.00 | $30,000.00 | $30,000.00 |
| Knee Arthroscopic Proc. | 28 | 1 | 1 | $11,000.00 | $11,000.00 | $11,000.00 |
| Carpal Tunnel Release | 28 | 1 | 1 | $7,600.00 | $7,600.00 | $7,600.00 |

*Includes:  Surgeon, Assistant Surgeon, Hospital, Anesthesia, Pathology

## COST ANALYSIS SUMMARY
Rene Mata

| SERVICE/ITEM | LIFE TIME COST TOTALS | PERCENT OF TOTAL |
|---|---|---|
| Outpatient Physician Services | $43,760.00 | 9.88% |
| Theraputic & Case Management | $253,246.00 | 57.11% |
| Diagnostics | $40,350.00 | 9.10% |
| Medication | $47,700.00 | 10.76% |
| Labs | $9,440.00 | 2.13% |
| Surgical Care Needs | $48,600.00 | 11.00% |
| **TOTAL** | **$443,366.00** | 100% |

# VI. RESEARCH & REFERENCES

1. Roger O. Weed, Life care Planning and Case Management Handbook, CRC Press, 1999 Chap. 2, 14.
2. Joint Injury in Young Adults and Risks for Subsequent Knee and Hip Osteoarthritis, 2000. American College of Physicians – American Society of Internal Medicine.
3. Essentials of Musculoskeletal Care, Robert K. Snider, M.D., American Academy of Orthopedic Surgeon.
4. Diagnosis and Treatment of the Spine; Non Operative Orthopedic Medicine and Manual Therapy.
5. Principles of Orthopedic Practice; Dee, Mango and Hurst, McGraw-Hill Book Company.
6. Gualtieri T, Cox D. The delayed neurobehavioral sequelae of traumatic brain injury. *Brain Injury,* 1991, 5, 2: 219-232.
7. National Center for Health Statistics, National Vital Statistics Report, Vol. 47, No. 13, Table 3, Expectation of life at a single years of age, by race and sex: United States, 1996, December 24, 1998.
8. Physicians Current Procedural Terminology, American Medical Association, 1999.
9. Physician Fee Reference 2002.
10. Physician Fee Reference 2002 Pricing Program
11. 2002 Physician's GenRX
12. . 2002 Drug Topics Red Book
13. Physician Fee Reference 2002 Pricing Program
14. Health South
15. Braddom RL. *Physical Medicine & Rehabilitation.* W.B. Sauders Co. 1996; Ch. 49, 53.

# MEDiSYSREHABILITATIOₙ,INC.



*7307 Creekbluff Drive*
*Austin, Texas 78750*
*mri@jump.net*

*P.O. Box 160026*
*Austin, Texas 78716*
*Tele 512/459-4315*

| | |
|---|---|
| **NAME OF PATIENT:** | **RENE FRANCISCO MATA** |
| **FILE NUMBER:** | **5-2168-02** |
| **DATE OF BIRTH:** | **2/22/74; AGE 28** |
| **DATES OF EVALUATION** | **JULY 8, 2002** |

## DIAGNOSES:

| | | |
|---|---|---|
| Axis I | – | **Posttraumatic Stress Disorder; Major Depressive Disorder, Moderate, Single Episode** |
| Axis II | – | **No diagnosis** |
| Axis III | – | **Deferred to physician; status post motor vehicle accident with orthopedic injuries** |
| Axis IV | – | **Psychosocial Stressors: problems related to the social environment; occupational problems; other psychosocial and environmental problems** |
| Axis V | – | **55** |

## I.    IMPRESSIONS:

Mr. Mata's profile on psychological testing revealed moderate to severe symptoms of depression, moderate anxiety associated with past trauma, and a very low perceived quality of life. These psychological symptoms are likely to interfere with his optimal cognitive functioning. Testing designed to screen for cognitive difficulties did not reveal problems, suggesting that cognitive complaints are associated with depressed mood. These findings have implications for recommendations.

## II.    RECOMMENDATIONS/FUNCTIONAL IMPLICATIONS:

### A.    *Clinical Correlation:*
Mr. Mata's responses in interview and on psychological measures indicate that he is experiencing significant psychological distress associated with the accident in which he was driving and his friend died. The psychological distress described herein does appear to be directly related to the accident on 9/15/01.

### B.    *Medical Management:*
Mr. Mata indicated that he is followed for ongoing physical complaints approximately once per month. Until his orthopedic injuries have healed adequately, continued medical management is

*This information is being provided in strict confidence. Further reproduction and disclosure is prohibited.*

recommended. An evaluation for physical therapy is also recommended, given his ongoing physical complaints. Management of psychiatric drugs is also recommended for the duration of time that Mr. Mata is prescribed psychotropic agents.

### C. Psychotherapy:

Although Mr. Mata noted that he has not benefited from his recent psychotherapy, he indicated an interest in psychotherapy if he has the opportunity to develop a relationship with one practitioner whom he may see on a regular basis. Given the severity of Mr. Mata's symptoms of anxiety and depression, cognitive therapy for depression and interventions designed to target posttraumatic stress symptoms are recommended. Mr. Mata will likely benefit from structured, supportive interventions aimed at developing and maintaining healthy coping skills and a comprehensive social support network. Bereavement counseling is also recommended. Mr. Mata has indicated that he is not comfortable in a group therapy setting. Given his stated preference, individual psychotherapy is recommended.

### D. Vocational Implications and Independent Living

At present, Mr. Mata's physical and psychological symptoms interfere with his ability to live and work independently to his optimal ability. If Mr. Mata receives the services detailed above and recovers fully from his orthopedic injuries, there will be no psychological barriers to employment or independent living.

## III.  BACKGROUND HISTORY:

### A. Current Medical History:

Mr. Mata stated that on 9/15/01, he was the driver in a motor vehicle accident in which he sustained multiple orthopedic injuries and his friend was killed. He stated that at approximately 2:00 am, after being out with friends, he was on his way to a friend's house when he drove over a bridge. Apparently, shortly before he reached the bridge it had been damaged by a tugboat and part of the bridge had collapsed. Mr. Mata stated that he saw the damage to the bridge too late, and although he applied the brakes, he was unable to stop his vehicle from driving off the damaged bridge into the water. He stated that a female friend in the passenger seat lost consciousness in the accident, and he was unable to awaken her or remove her seatbelt. He reported that he was unable to break the windshield or the side window, and that the car was rapidly filling with water. Mr. Mata stated that he forced the door open and removed himself from the car, but that the car and his friend sank in the bay.

Mr. Mata noted that he had difficulty treading water, but that his screams brought a fishing boat. The fishermen were ultimately able to pull him into the back of their boat, and the Coast Guard was called. Mr. Mata noted that at this time, his memories of the incidents are less clear, but that he knows that after approximately a 2 hour wait he was life-flighted to Valley Baptist Medical Center in Harlingen, Texas. Mr. Mata stated that he believed he had no loss of consciousness from the accident, and no retrograde amnesia. Mr. Mata remained at Valley Baptist for approximately 2 weeks, where he was treated for a broken fibula, shattered meniscus in his left knee, a fractured right ankle, carpal tunnel syndrome of the left wrist, 2 compressed fractured vertebrae (at the T level), and a gash on his head.

*This information is being provided in strict confidence. Further reproduction and disclosure is prohibited.*

**B.    *Current Medications:***
Celebrex, Soma, Celexa, and Alleve.

**C.    *Current Complaints:***
Mr. Mata stated that at present, he has several remaining physical complaints, including an ankle and vertebrae that have not healed properly, knee pressure, back and neck pain, difficulty sleeping due to pain, and that his neck pops audibly approximately every 15-20 minutes. He stated that he is unhappy because he is unable to work in bartending or restaurants, and that he feels "useless." He noted that he is depressed when alone, but that his mood lifts at times when he is with others. He stated that his moods range from feeling very depressed, to very angry, to being in a good mood. He noted recent nightmares, anxiety, difficulty concentrating, poor short-term memory, difficulty remembering conversations, a poor attention span, and difficulty reading.

On a symptom checklist, Mr. Mata noted severe problems with the following: sequencing, changing a plan or activity in a reasonable amount of time, being easily frustrated, word finding, staying with one idea, distractibility, losing his train of thought easily, concentrating, becoming easily confused or disoriented, his mind going blank, aura (strange feelings), forgetting where he leaves things, forgetting names, forgetting what he should be doing, finding his way around places he has been before, not being aware of time, frequently forgetting appointments or meetings, fine motor control problems and difficulty holding onto things (with his injured hand), feeling stiff, problems dropping things or using tools, loss of feeling or numbness, tingling or strange skin sensations. He noted moderate difficulty with the following: doing more than one thing at a time, forgetting where he is or where he is going, forgetting the time of day, forgetting events that happened quite recently, needing hints to remember things, and forgetting the order of things. In addition, he noted difficulty reaching, seeing, walking, bending, kneeling, lifting, driving, climbing, and stooping. He noted that he has problems in the following environments: inside, wetness or humidity, dusty or dirty, noisy, and with heights (severe problems). He noted problems with headaches, dizziness, and excessive tiredness. Finally, he noted severe difficulties with sadness or depression, anxiety or nervousness, stress, sleep, becoming angry easily, euphoria, emotionality, loss of interest, change in attitudes, and loss of inhibitions.

**D.    *Past Medical History:***
Mr. Mata stated that he believes he was born late, but that he has no information about his biological mother's pregnancy or his birth, except that he knows that his biological mother died in delivery. Mr. Mata was then adopted by his mother and father. He reported that he walked and talked early, and that his toilet training and overall development were average. He noted that as a child, he had difficulty with attention and clumsiness. He noted no significant childhood illnesses or injuries. As an adult, he stated that he has had environmental allergies and acute bronchitis (prior to his accident). His family medical history is significant for hypertension in his father, and an aneurysm in his mother.

**E.    *Psychosocial History:***
Mr. Mata is single, and currently lives with his father and 16-year-old sister in a suburban home. He noted that his mother died last year of an aneurysm. His mother was a beautician with a high

*This information is being provided in strict confidence. Further reproduction and disclosure is prohibited*

school education.  Mr. Mata's father is living; he is an assistant superintendent with a Master's degree in Education.  His father enjoys golf, swimming, and poker in his leisure time.  Mr. Mata noted no physical, academic, or psychological problems in his sister.

Mr. Mata's primary language is English; he noted that he also speaks some Spanish.  He noted that he is currently under financial stress due to being unemployed and being supported financially by his father.  He stated that he has been under the care of psychotherapists since the accident, but that this has not been helpful to him because he has seen different mental health practitioners at different visits, and has not had continuity of care with one provider whom he trusts and who knows his case well.  He denied past or present suicidal ideation.  He stated that his best characteristic is that he is fun, and that his worst characteristic is that he is impulsive.  Mr. Mata noted that he was convicted of Driving Under the Influence 7 years ago.  He noted that prior to the accident, he enjoyed tennis, swimming, biking, weight lifting, and reading books, magazines, and the newspaper.  Since the accident, in his leisure time he plays video games and reads magazines.  Mr. Mata noted that he drinks 4-5 mixed drinks 1-2 days per week.  He denied any personal or family history of alcohol or drug abuse or dependence.

### F.   *Educational History:*
Mr. Mata reported that he completed high school and has 10 college credits.  He stated that he has not taken any college courses recently; but that when he was in college his major was Art History.  He stated that he was a C-D student in school.  He noted that his best subjects were art and literature, and that his worst subjects were math and science.  He denied any history of learning disability, repeated grades, or special education.

### G.   *Occupational History:*
Mr. Mata is not currently employed or on medical leave.  He stated that his most recent job title was Guest Service Assurance, in the service industry.  He noted that he has also had jobs in restaurants and bars as a bartender and trainer.  He stated that his highest level of occupational achievement was as a corporate trainer, and that his ideal job in the future would be working in the service industry.  He stated that he has skills in inventory control, scheduling, and instructing, and that he is TABC certified.

## IV.   BEHAVIORAL OBSERVATIONS:

| | |
|---|---|
| Ambulation: normal | Appearance: appropriate |
| Language: fluent | Orientation: X 4 |
| Mental Control: adequate | Attention and Concentration: adequate |
| Affect/Mood: flattened/dysphoric | Sensory/Motor: adequate for testing |
| Motivation: persistent | Cooperation: responsive |
| Results: valid. | |

Mr. Mata was 2.5 hours late for his first scheduled appointment.  As a result, a scheduled interview and examination with Dr. Harrell did not take place.  He was scheduled to return to the office the next day and did not show up.  Therefore, some testing was not completed and the only contact with this office was with Dr. Blackmon.

*This information is being provided in strict confidence.  Further reproduction and disclosure is prohibited.*

## V.    TESTS ADMINISTERED:

Beck Anxiety Inventory, Beck Depression Inventory II, Quality of Life Inventory, Sternbach Pain Inventory, Minnesota Multiphasic Personality Inventory II, Wechsler Adult Intelligence Scales (verbal scales), California Verbal Learning Test II, Rey Complex Figure Test, clinical interview/examination, and review of medical records.

## VI.    RESULTS:

### A.    Intellectual/Cognitive

The patient's verbal intelligence was in the Average range (VIQ: 102).  Subtest scores were as follows:

| | |
|---|---|
| Vocabulary | (SS = 12) |
| Similarities | (SS = 13) |
| Arithmetic | (SS = 10) |
| Digit Span | (SS = 8) |
| Information | (SS = 10) |
| Comprehension | (SS = 10) |
| Letter-Number | (SS = 10) |

Index Scores were as follows:

| | |
|---|---|
| Verbal Comprehension: | (SS = 109) |
| Working Memory: | (SS = 95) |

### B.    Memory and Learning

The patient was oriented able to relate an age appropriate history.  Retrospective questioning determined no loss of consciousness at the time of the accident, no retrograde amnesia, and no immediate posttraumatic amnesia.  The ability to organize and maintain complex focused attention to task was adequate for testing.  Subtest scores were as follows:

1. High Average Verbal Learning and Memory          (T = 58)
   a.    Average Recognition                                   (raw = 15/16)

2. Visual Memory
   a.    High Average immediate recall                       (T = 56)
   b.    Low Average delayed recall                          (T = 41)
   c.    Low Average recognition                             (T = 41)

### B.    Psychosocial

Mr. Mata began, but did not finish, the MMPI II.

Mr. Mata completed the Beck Anxiety Inventory.  His responses were consistent with moderate symptoms of anxiety.  To a severe degree, he reported fear of dying and feeling scared.  To a

moderate degree, he reported numbness or tingling, feeling hot, inability to relax, fear of the worst happening, dizziness or lightheadedness, feeling terrified, nervousness, and fear of losing control. To a lesser degree he reported heart pounding or racing, flushed face, and sweating (not due to heat).

On the Beck Depression Inventory II, Mr. Mata's responses were consistent with severe symptoms of depression. To a severe degree, he reported problems with guilty feelings, agitation, and worthlessness. To a moderate degree, he reported tiredness or fatigue, difficulty concentrating, irritability, sleeping less than usual, indecisiveness, self-criticalness, punishment feelings, pessimism, feelings of past failure, and loss of pleasure. To a lesser degree he reported sadness, self-dislike, crying, loss of interest, loss of energy, and decreased appetite.

On the Quality of Life Inventory, Mr. Mata's responses were consistent with a very low perceived quality of life at present. He indicated severe dissatisfaction with his current creativity, home, and community. He indicated moderate dissatisfaction with his work, love, money, and health. Areas of greatest satisfaction included his friends and relatives.

On the Sternbach Pain Inventory, Mr. Mata's suggested that he does not view himself as an invalid. Responses were consistent with moderate symptoms of depression, a severe pain experience, and responses were moderately consistent with pain games.

If you have any questions or would like to discuss this case in more detail, please to not hesitate to contact me.

Sincerely,

T. Walter Harrell, Ph.D., ABPP              Amy D. Blackmon, Ph.D.
Licensed Psychologist                        Licensed Psychologist

*This information is being provided in strict confidence. Further reproduction and disclosure is prohibited.*

**CLAIMANT'S EXHIBIT F**
(Economic Valuation of Life Care Plan Cost Analysis for F. Mata )

# ECONOMIC VALUATION OF
# LIFE CARE PLAN COST ANALYSIS

## FOR

## MR. RENE  MATA

JULY  23,  2004



# VALUATION ASSOCIATES, INC.

### BUSINESS VALUATION AND FORENSIC ECONOMICS

25607 BLANCO RD., SUITE 1505 ♦ SAN ANTONIO, TEXAS 78232 ♦ TEL. (210) 479-8999 ♦ FAX (210) 479-8974

July 23, 2004

Mr. Andres H. Gonzalez, Jr.
Kittleman, Thomas, Ramirez, & Gonzalez, L.L.P.
4900-B North 10th Street
McAllen, Texas 78504

Dear Mr. Gonzalez,

   In accordance with your request, an independent economic valuation of the life care plan cost projections for Mr. Rene Mata has been performed. The values pronounced in this analysis are subject to any limiting assumptions or conditions reported herein. The values presented are as of the trial date. Should this date change, an update to this report should be requested.

   After performing the valuation, the monetary amounts presented below fairly estimate the present value for the medical expenditures as of February 7, 2005.

| Service/Item | Present Value |
|---|---|
| Outpatient Physician Services | $41,062 |
| Therapeutic & Case Management Services | $229,749 |
| Diagnostics | $36,741 |
| Medications | $43,097 |
| Labs | $8,392 |
| Surgical Needs | $48,600 |
| Total | $407,642 |

If you have any questions, please do not hesitate to contact me.

Sincerely

*Gene A. Trevino, Ph.D.*
*Chartered Financial Analyst*

# Table of Contents

I.      Valuation Report

II.     Exhibits

III.    Certification

IV.     Resume of Senior Valuation Analyst

Valuation Report

Mr. Rene Mata
July 23, 2004
Page one

## Overview

The purpose of this analysis is to adduce the present value of the future medical expenditures that Mr. Rene Mata is expected to incur as a result of the incident on September 15, 2001.  The primary sources of information used in this analysis were sundry facts provided by Kittleman, Thomas, Ramirez, & Gonzalez, L.L.P.  and the "Life Care Plan" prepared by Joe G. Gonzales, M.D.  This information was used in conjunction with other published sources of data in order to arrive at a conclusion.  The rationale and methodology is discussed in the remainder of this report.

## Background

The life care plan prepared for Mr. Mata on September 4, 2002 outlines the cost of the medical services that Mr. Mata is expected to need for the remainder of his life. The expected costs in the life care plan, are stated in current dollar terms.  As per the life care plan Mr. Mata's projected life expectancy is 46 years.

## Itemized Cost Projections

As per the life care plan, projected expenditures were grouped in the following categories and for the purposes of this analysis each category was assigned an exhibit number, the table below depicts the corresponding exhibits for each category:

| Service/Item | Exhibit | Corresponding Exhibits |
|---|---|---|
| Outpatient Physician Services | I | I-A thru I-C |
| Therapeutic & Case Management Services | II | II-A thru II-G |
| Diagnostics | III | III-A thru III-B |
| Medications | IV | IV-A thru IV-B |
| Labs | V | V-A |
| Surgical Care Needs | VI | VI-A |

The following steps were taken in the analysis:
- Each service/item within each category was reproduced to list only the service/item, the age in which the service/item commences, the duration, the annual cost, and the lifetime cost.
- The services/items were analyzed to identify which categories needed to be sorted in order to group the services/items with the equivalent commencement age and duration. These sorted services/items are identified with a letter "A" following the corresponding exhibit number in each category.

## Economic Valuation of Itemized Cost Projections

Beginning in the year 2004 the annual cost for the future medical costs were ajusted for an estimated annual medical cost inflation rate of 4.8%. The estimated average medical care rate of inflation was estimated by applying a historical medical cost premium to an expected rate of inflation. The medical cost premium was estimated based on Consumer Price Index data for the years 1962 to 2002. The geometric average increase for the medical care component of the Consumer Price Index was 6.4%. The average increase for all items in the Consumer Price Index, (i.e., inflation in general) was 4.6% for the same period. The represents a historical 180 basis point spread over general inflation over the past 40 years.

In forecasting the Mr. Mata's future medical costs, an inflation estimate of 3.0% was used. This estimate is consistent with historical and forecasted inflation (Ibbotson, 2002; Philadelphia Federal Reserve Board, 2004). Moreover, this inflation estimate is consistent with implied forecasted inflation as measured by the differential between long-term Treasury bond yields an inflation indexed Treasury securities of comparable maturity. The aforementioned medical cost inflation estimate was calculated as follows:

| | |
|---|---|
| Estimated Annual Inflation Rate | 3.00% |
| Medical Care Premium | 1.80% |
| Medical Care Growth Rate | 4.80% |

Historically, the medical components of the Consumer Price Index have increased at a faster rate than inflation in general. This phenomenon is depicted in the graph below.



Moreover, this estimate of medical care inflation is conservative vis-à-vis a published survey of practicing forensic economist and historical rates of medical cost inflation (Brookshire, 1999).

The adjusted costs were the discounted at the 2028 Treasury Bond yield of 5.29% (Treasury Bonds, Notes & Bills, 2004). The present values of the adjusted cost are presented in the columns entitled "PRESENT VALUE". These costs are valued for their respective duration and summed at the foot of the present value column.

Mr. Rene Mata
July 23, 2004
Page three

## Conclusion

A summary of the life care plan's cost projections are presented in Exhibit VII.  After performing the analysis, the monetary amounts presented below fairly estimate the present value of Mr. Rene  Mata's life care plan's cost projections as of February 5, 2005.

| Service/Item | Present Value |
|---|---|
| Outpatient Physician Services | $41,062 |
| Therapeutic & Case Management Services | $229,749 |
| Diagnostics | $36,741 |
| Medications | $43,097 |
| Labs | $8,392 |
| Surgical Needs | $48,600 |
| Total | $407,642 |

Mr. Rene Mata
July 23, 2004
Page four

# References

Brookshire, M. & Slesnick, F. (1999).  A 1999 survey of forensic economists: Their
    methods and their estimates of variables, <u>Litigation Economics Digest, (IV)</u>, 28,
    65-96.

Bureau of Labor Statistics (2004). Consumer Priced Index, online: [http:// data.bls.gov]

Ibbotson Associates (2002).  <u>Stocks, bonds, bills, and inflation</u>, Ibbotson Associates: Chicago.

Philadelphia Federal Reserve Board (2004).  <u>Survey of Professional Forecasters</u>, <u>Livingston
    Survey</u>.

Treasury Bonds, Bills, Notes & Bills (2004).  <u>Wall Street Journal</u>, July 22, C9.

Exhibits

EXHIBIT I

## OUTPATIENT PHYSICIAN SERVICES

| SERVICE / ITEM | BEGIN AT AGE | DURATON | ANNUAL COST | EXHIBIT |
|---|---|---|---|---|
| Psychiatry | 28 | 5 | $   900.00 | I-A |
| Anesthesiology (ESI) | 28 | 6 | 3,060.00 | I-B |
| PM & R | 28 | 40 | 247.50 | I-C |
| Orthopedics | 28 | 40 | 125.00 | |
| Neurosurgery | 28 | 40 | 150.00 | |

EXHIBIT I-A

OUTPATIENT SERVICES
BEGIN AT AGE 28
DURATION  5

NAME: RENE MATA

DATE OF VALUATION: JULY 22, 2004

DATE OF REFERENCE: FEBRUARY 7, 2005

| YEAR | ANNUAL COST | ADJUSTED COST | PRESENT VALUE | CUMULATIVE TOTAL | PVIF | TIMELINE (YEARS) | AGE | DURATION |
|------|------------|---------------|---------------|------------------|------|------------------|-----|----------|
| 2002 | 900 | 900 | 900 | 900 | 1.00000 | 0.00000 | 28 | 1 |
| 2003 | 900 | 900 | 900 | 1,800 | 1.00000 | 0.00000 | 29 | 2 |
| 2004 | 900 | 900 | 900 | 2,700 | 1.00000 | 0.00000 | 30 | 3 |
| 2005 | 90 | 90 | 90 | 2,790 | 1.00000 | 0.10000 | 31 | 4 |
| PAST | 2,790 | 2,790 | 2,790 | | | | | |
| 2005 | 810 | 845 | 807 | 3,597 | 0.95467 | 0.90000 | 31 | 4 |
| 2006 | 900 | 943 | 855 | 4,452 | 0.90670 | 1 90000 | 32 | 5 |
| FUTURE | 1,710 | 1,788 | 1,662 | | | | | |
| TOTALS | $   4,500 | $   4,578 | $   4,452 | | | | | |

EXHIBIT I-B

OUTPATIENT SERVICES
BEGIN AT AGE 28
DURATION 6

NAME: RENE MATA

DATE OF VALUATION: JULY 22, 2004

DATE OF REFERENCE: FEBRUARY 7, 2005

| YEAR | ANNUAL COST | ADJUSTED COST | PRESENT VALUE | CUMULATIVE TOTAL | PVIF | TIMELINE (YEARS) | AGE | DURATION |
|------|------------|--------------|---------------|------------------|---------|-------------------|-----|----------|
| 2002 | 3,060 | 3,060 | 3,060 | 3,060 | 1.00000 | 0.00000 | 28 | 1 |
| 2003 | 3,060 | 3,060 | 3,060 | 6,120 | 1.00000 | 0.00000 | 29 | 2 |
| 2004 | 3,060 | 3,060 | 3,060 | 9,180 | 1.00000 | 0.00000 | 30 | 3 |
| 2005 | 306 | 306 | 306 | 9,486 | 1.00000 | 0.10000 | 31 | 4 |
| PAST | 9,486 | 9,486 | 9,486 | | | | | |
| 2005 | 2,754 | 2,873 | 2,743 | 12,229 | 0.95467 | 0.90000 | 31 | 4 |
| 2006 | 3,060 | 3,207 | 2,908 | 15,136 | 0.90670 | 1.90000 | 32 | 5 |
| 2007 | 3,060 | 3,361 | 2,894 | 18,031 | 0.86115 | 2.90000 | 33 | 6 |
| FUTURE | 8,874 | 9,441 | 8,545 | | | | | |
| TOTALS | $ 18,360 | $ 18,927 | $ 18,031 | | | | | |