*Exhibit B*

storm sewer systems; performing bridge design and analysis; preparing and reviewing construction plans, and PS&E packages; and supervising technicians in the preparation and development of project estimates, general notes, specifications and special provisions.

Engineering Assistant III / TxDOT Bridge Division /Austin, Texas (3/88 - 8/89)

Managed, supervised and performed bridge design and analysis for various types of bridge projects throughout the State. Responsibilities included, but were not limited to: analyzing and designing concrete, prestressed concrete and steel bridge superstructures, substructures, foundations and appurtenances; serving as project manager for large bridge design projects; assisting Austin District with construction inspection, material sampling/testing and contract administration on Mopac/US 183 interchange for four months; supervising graphics technicians in the preparation of structural details; preparing and reviewing bridge construction plans and estimates; reviewing structural design and details; and providing technical assistance to District personnel.

Engineering Assistant II / TxDOT Bridge Division / Austin, Texas (5/86 - 2/88)

Supervised and performed bridge design and analysis for various types of bridge projects throughout the State. Responsibilities included, but were not limited to: analyzing and designing concrete, prestressed concrete and steel bridge superstructures, substructures, foundations and appurtenances; supervising graphics technicians in the preparation of structural details; preparing and reviewing bridge construction plans and estimates; and reviewing structural design and details.

## PROFESSIONAL LICENSES

11/90 - Texas Profession Engineer #68708 / Texas Board of Professional Engineers / Austin, Texas

## EDUCATION

5/86 – BS, Civil Engineering /Texas A&M University / College Station, Texas



**Texas Department of Transportation**

# MEMORANDUM
# << CONFIDENTIAL >>

**TO:**      Michael Ratliff                         **DATE:** September 29, 2004
                Office of Attorney General

**FROM:**     Toribio Garza, Jr., P.E.
                Director of Maintenance, Pharr District

**SUBJECT:**   Queen Isabella Causeway Bridge Allision & Reconstruction
                General Summary Information

---

As the Pharr District Director of Maintenance and Emergency Management Coordinator, I am always on call to respond to emergencies. In the early morning hours of 9/15/01, I responded to such a call from our San Benito Assistant Maintenance Supervisor regarding the bridge allision at the Queen Isabella Causeway. For this incident, I was responsible for overseeing the construction and operation of an emergency temporary transportation system to and from South Padre Island. I have knowledge of the purchase of services, emergency contracts, as well as TxDOT's personnel costs involved in the establishing and operating of both pedestrian and vehicular ferry systems during the reconstruction on the Queen Isabella Causeway. The attached summary provides general information regarding the various charges that make up the Temporary Transportation and Other District Expenses of the damage claim that are detailed in Exhibit A. I have also attached a general personal resume labeled Exhibit B.

### ALLISION & RESCUE/RECOVERY OPERATIONS (9/15/01-9/24/01)

♦ TxDOT provided two emergency purchase of services contracts (no bid) to assist with recovery operations. One with Oden Contracting 9/15-9/25 for standby barges, etc. at a cost of $33,752.50, and another one with Marine Salvage and Services from 9/15-10/7 at a cost of $174,979.49 (this also covered assistance with ferry landing construction operations). Note that these costs are included under the Temporary Transportation – Purchase Orders section of the attached damage claim estimate.

### TEMPORARY TRANSPORTATION (9/15/01-11/25/01)

♦ Late on 9/15/01, after possibilities of installing a temporary structure across the bridge gap were no longer feasible with the collapse of span #30, attention was turned to private boats and vehicular ferries to provide for temporary transportation.

♦ Pedestrian transportation was established the same day of the collapse. Initially several private boats were hired from Fish Tale Charters by TxDOT via emergency purchase of services at a cost of $117,600 covering 9/15-9/28. TxDOT also secured docking facilities with Sea Ranch Marina on the Island ($35,200 & $24,000) and Southpoint Marina at Port Isabel ($40,700 & $30,127.43) via emergency purchase of services (negotiated bid) covering 9/15-10/22 at a total cost of $130,027.43. In addition, Marine Salvage and Services was brought on board via emergency purchase of services (negotiated bid) for barges & pile driving to help set up/maintain docking facilities from 9/16-11/30 at a cost of $40,291.37. With the first two weeks covered, another emergency purchase of services was put out for bids to address the longer term transportation needs. The lowest 3 bidders were selected to provide a minimum of 2 boats each (6 boats 24/7) at a cost of $2,400 (American Diving), $3,520 (Captain Murphy's) & $3,520 (Fish Tale Charters) per day. Service was provided from 9/29-11/25 at a total cost of $779,328 ($196,800 for American Diving, $291,264 for Captain Murphy's, and $291,264 for Fish Tale Charters). Desiring to set up a turn key operation (ferries, shuttles, docking services, etc.) to supplement this, an emergency

---

maintenance contract was put out for bids to listed vendors and interested locals, but later rejected because the low bidder had not addressed the shuttle and docking services. Realizing these services were difficult to combine, the contract was revised to only include ferry operations and let out for bids again. The best value bid (number and quality of boats) was awarded to Marine Salvage & Services on 10/23/01, with a requirement to provide for transport of 200 to 400 passengers per hour (24/7) depending upon the time of day. The contract was bid at $18,788.00/day (60 day & $1,127,280 max) with 5 vessels and 2 standby proposed. Operations began on 10/23/01 and continued through 11/25/01, with a total of $920,612 paid out. There was also a concern with transporting of kids from the Island to Port Isabel to attend school, so TxDOT authorized the school district (we would reimburse) to hire a separate 4th boat just for transporting them back and forth. To continue handling docking facilities, two separate emergency maintenance contracts (negotiated bids) were executed with entities that already had adequate dock facilities in place. The first on 10/18/01 with Sea Ranch Marina (South Padre Island side) for $1,600/day and $96,000 maximum payable. Operations began 10/23/01 and continued through 11/25/01, with a total of $78,400 paid out. The second contract was with Southpoint Marina (Port Isabel side) on 10/23/01 for $1,850/day with a maximum payable of $111,000. Operations also began 10/23/01 and continued through 11/25/01, with a total of $90,650 paid out. TxDOT also awarded an emergency maintenance contract (bids received) to Ballenger Construction to construct a parking lot in Port Isabel on the old Port Isabel stadium parking lot. The contract was executed on 10/19/01 with a low bid of $76,267.62. TxDOT provided the RAP material and the total paid out for this work was $71,214. Note that shuttle service and other parking/staging areas were provided by South Padre Island, Port Isabel and Cameron County. Approved expenses borne by these entities are being reimbursed. Note that these pedestrian ferries transported approximately 25,000 people per week.

♦ For vehicular transportation, the Corpus Christi District was contacted with a request for help and agreed to send one of the ferry boats in their fleet. The next day (9/16/01), personnel from the Corpus District arrived to help locate landing areas, and construction of the first temporary landing on the Island side began with TxDOT District maintenance/special jobs crews. Operations also began on the Port Isabel side with TxDOT District maintenance/special jobs crews retrofitting the existing Port Isabel Navigation Dock to serve as a landing on the mainland side. An emergency purchase of services (negotiated bid) was also executed with Ballenger Construction to provide for access road construction to Island landing 9/16-9/18 at a cost of $23,722.76. On 9/17/01, the TxDOT ferry "Mark Goode" (20 veh capacity) arrived from Corpus. It began operation on 9/19/01 as soon as these first landings were completed. By this time, it was evident that additional ferries would be needed, so a second TxDOT ferry was requested, and an emergency maintenance contract prepared for bringing in a commercial ferry. On 9/22/01 the second TxDOT ferry the "William Burnett" (20 veh capacity) arrived from Corpus and began operations. The contract for the commercial ferry (negotiated bid) was awarded to Mobile Bay Ferry of Pensacola, Ltd on 10/4/01 at a price of $400 to $500 per hour (depending upon the time of day) with a 3 month minimum and $1,032,000 maximum payable limit. They provided the "Fort Morgan" (40 veh capacity) which arrived from Alabama on 9/30/01, but due to its configuration could not utilize the temporary landings built for the TxDOT ferries. As such, a 2nd set of temporary landings had to be constructed. The "Fort Morgan" contract was amended twice to provide for installation and removal of flexifloat docking materials and piling for these second landings, increasing the total amount payable to $1,320,944.29. Operations for the "Fort Morgan" began 10/8/01 when these second landings were complete and continued until 11/25/01. A total of $1,311,161.77 was paid out. During this same time, through an existing emergency assistance agreement between states, North Carolina DOT offered to assist by providing one of their ferries for our use. TxDOT accepted and an emergency assistance agreement was signed between the states to cover the lease of the vessel as well as NCDOT crews to operate it. The "Chicamacomico" (28 veh capacity) arrived from North Carolina on 10/20/01 and began operations with NCDOT personnel utilizing the second landing facilities. This ferry operated until 11/23/01, at a cost of $143,377.19, with transportation of the ferry to and from North Carolina provided by Bayfront Marine, Inc. at an additional cost of $39,135.87. Note that due to unpredictable currents (landing just near the opening to the gulf), additional tug boats were hired from SIGNET Marine Time Corporation via emergency purchase of services (low bid) at a cost of $688,785 (2-450hp tugs @ $2,160/day and 2-800 hp tugs at $2,727/day). In addition, barges which were sunk and used as portions of the temporary landings were hired from SIGNET Marine Time

Corporation via purchase of services (low bid) at a cost of $63,450 (3 barges @ $300/day/ea). Both contracts were for service 10/4-12/12 which included clean up and removal operations. Note also that TxDOT District maintenance/special jobs crews constructed temporary access roads, staging areas and approaches for these landings. These four ferries ran around the clock and at their peak transported approximately 7,000 vehicles per week.

- ◆ Other emergency purchase of services were also provided for the ferry operations as follows:
  - (a) Ferry Landing Construction – SIGNET Maritime Corporation for assistance with barge landing setup ($2,076.00), Texas Tool Co. for cutting/welding of some of the landing ramp material ($332.50), ZIMCO Marine Inc. for pre-fabrication of landing ramp hinges ($6,363.21), ), WW Grainger for supply of winches used to raise/lower landing ramps ($646.18), Plitt Crane and Equipment for crane rental to assist with 2nd South Padre ferry landing flexifloat installation ($735.00), Techline Inc. for steel cable used to construct guard fence on South Padre landing ($1,575.00), and Marine Electric Service for wiring to light South Padre ferry landing ($693.20).
  - (b) Staging/Parking Area Construction – L Fernandez trucking for hauling TxDOT supplied reclaimed asphalt material ($4,275.00).
  - (c) TxDOT Ferry Maintenance/Repair – Holt Company of Texas for repair ($1,581.89), John Bludworth Shipyard LLC for repair ($23,451.00), SIGNET Maritime Corporation for towing ($2,168.86), Marine Electric Service for electrical service check ($60.00), Stewart and Stevenson Services for repair ($1,848.06), and NES Companies LP for generator rental needed to run North Carolina Ferry lights and pumps when engine shut down for maintenance ($3,510.00).
  - (d) Ferry Landing (Barge) Maintenance – Movac Environmental for bilge pumping ($1,341.58, $504.30 and $775.60).
  - (e) Fuel for TxDOT Ferries – Oil Patch Fuel & Supply ($36,292.21), and Southwest Services ($1,817.35 and $6,923.85).
  - (f) Ferry Landing Operation – Vela Enterprises for flagmen to control loading/unloading operations ($43,740), Enterprise Rent-A-Car for North Carolina crew transportation ($3,494.70), and A Clean Portoco for portable toilet rental ($3,657.27).
  - (g) Ferry Landing Removal – Marine Salvage and Services for dolphin piling removal, including barge rental for transport/disposal ($6,388.00, $1,500.00, and $1,400.00)
  There was also one additional maintenance contract involving Garrett Construction for supplying guard fence for the 2nd Port Isabel ferry landing ($10,208.00)
- ◆ Both pedestrian and vehicular ferry operations were ceased after the bridge was re-opened to traffic, and the temporary ferry landings removed.
- ◆ Local Entities were also reimbursed for their assistance with temporary transportation as noted below:
  - (a) Cameron County for parking, shuttle service, staging areas, etc. ($713,491.47).
  - (b) South Padre Island for parking, shuttle service, staging areas, transportation of essential supplies, etc. ($442,936.61).
  - (c) Port Isabel ISD for rental of separate ferries for transportation of school children ($76,400.00).
  - (d) Long Island Owners Association for additional operating costs of the swing bridge to accommodate the passenger ferries ($11,090.60).
  - (e) Texas Parks and Wildlife for providing boat assistance during the rescue/recovery operations and transportation thereafter for South Padre Island to help maintain essential services ($24,614.53).
  - (f) State Aircraft Board for rental of aircraft used to fly Bridge Division experts down from Austin on the morning of the incident ($1,500.01).
- ◆ Division and District Indirect costs were charge at $51,311.67 and $46,843.89 respectively.

## OTHER DISTRICT EXPENSES

- ◆ Other District Expenses in the amount of $1,063,265.16 includes in-house labor, equipment, materials and supplies, etc. which was mostly for temporary transportation.

Under the circumstances, the Temporary Transportation and other District expenses noted above were reasonable and necessary.

Within the last 4 years I have not testified in trail but have in deposition in matters involving the maintenance of our roadways and can provide information regarding these cases if requested.

*Exhibit A*

## << CONFIDENTIAL >>
## QUEEN ISABELLA CAUSEWAY - DAMAGE CLAIM ESTIMATE

### BRIDGE DEMOLITION
A.) Contract Charges
| | |
|---|---:|
| (1) Invoice dated 11/16/01-1/31/02 | $355,765.98 |
| (2) Invoice dated 10/15/01-11/15/01 | $555,656.27 |
| (3) Invoice dated 11/1/2001 | $934,548.63 |
| | $1,845,970.88 |

B.) Other Charges
| | |
|---|---:|
| (1) Jardin & Howard Tech, Inc - endang species survey | $4,568.04 |
| (2) RODS - 1st Hydrographic Survey for ACOE | $31,000.00 |
| (3) Bay-Tech Industries - underwater video for inspection | $1,013.85 |
| (4) RODS - 2nd Hydrographic Survey for ACOE | $30,000.00 |
| (5) Marine Salvage & Services - buoys for | $1,990.00 |
| saftey zone (Purchase Order) | ---- |
| | $68,571.89 |

C.) Fender System to Protect Remaining Debris (Orion Construction)
> Project let in 6/3/02, with low bid as follows:
| | |
|---|---:|
| (1) Concrete Piling - 5768 lf @ $45/lf | $259,560.00 |
| (2) Steel Connections - 2696 lb @ $5/lb | $13,480.00 |
| (3) Plastic Timber Walers - 2881 lf @ $45/lf | $129,645.00 |
| (4) Aluminum Signs - 90 sf @ $70/sf | $6,300.00 |
| (5) Mobilization @7% | $28,628.95 |
| | $437,613.95 |

| | |
|---|---:|
| **Total Bridge Demolition =** | **$2,352,156.72** |

### BRIDGE RECONSTRUCTION
A.) Contract Charges
| | |
|---|---:|
| (1) Invoice dated 2/7/2002 | $2,661.00 |
| (2) Invoice dated 2/7/02 | $44,942.00 |
| (3) Invoice dated 12/12/2001 | $2,962,050.00 |
| (4) Invoice dated 11/1/2001 | $1,065,050.00 |
| | $4,074,703.00 |

B.) Construction Engineering
| | |
|---|---:|
| (1) Division & District Indirect Costs | $429,055.93 |
| (2) Project Supervision | $37,460.33 |
| (3) Job Control | $69,131.41 |
| (4) Design Verification/Changes | $3,096.78 |
| | $538,744.45 |

C.) Purchase Orders
| | |
|---|---:|
| (1) Automatic Power Inc. - Nav lights | $24,380.00 |
| | $24,380.00 |

| | |
|---|---:|
| **Total Bridge Reconstr =** | **$4,637,827.45** |

### TEMPORARY TRANSPORTATION
A.) Purchase Orders
| | |
|---|---:|
| (1) Oden Contracting Inc. - rescue operations/standby | $33,752.50 |
| (2) Marine Salvage & Services - rescue standby, barges & ferry land | $174,979.49 |
| (3) Fish Tale Charters - Passenger Ferries | $117,600.00 |
| (4) Sea Ranch Marina - Dock | $35,200.00 |
| (5) Sea Ranch Marina - Dock | $24,000.00 |
| (6) South Point Marina - Dock | $40,700.00 |
| (7) South Point Marina - Dock | $30,127.43 |
| (8) Marine Salvage & Services - barges & pile driving | $40,291.27 |
| (9) American Diving - Passenger Ferries | $196,800.00 |
| (10) Captain Murphy Charter Serv - Passenger Ferries | $291,264.00 |
| (11) Fish Tale Charters - Passenger Ferries | $291,264.00 |
| (12) Ballenger Construction - Ferry access road | $23,722.76 |
| (13) SIGNET Maritime Corporation - tug boats for ferry landing | $688,785.00 |
| (14) SIGNET Maritime Corp - barges for ferry landing | $63,450.00 |

*Exhibit A*

## << CONFIDENTIAL >>
## QUEEN ISABELLA CAUSEWAY - DAMAGE CLAIM ESTIMATE

| | |
|---|---:|
| (15) SIGNET Maritime Corp - ferry landing constr. | $2,076.00 |
| (16) Texas Tool Co. - machine shop services for ferry landing | $332.50 |
| (17) ZIMCO Marine Inc. - framp hinges for ferry landing | $6,363.21 |
| (18) WW Grainger - winches for ferry landing | $646.18 |
| (19) Plitt Crane & Equipment Inc - crane rental for ferry landing | $735.00 |
| (20) Techline Inc - steel cable for ferry landing guard fence | $1,575.00 |
| (21) Marine Electric Service - wire for lighting ferry landing | $693.20 |
| (22) L Fernandez Trucking - RAP hauling for parking areas | $4,275.00 |
| (23) Holt Company of Texas - ferry repair | $1,581.89 |
| (24) John Bludworth Shipyard LLC - ferry repair | $23,451.00 |
| (25) SIGNET Maritime Corporation - ferry repair | $2,168.86 |
| (26) Marine Electric Service - ferry electrical service check | $60.00 |
| (27) Stewart & Stevenson Services - ferry repair | $1,848.06 |
| (28) NES Companies LP - generator rental for NCDOT ferry | $3,510.00 |
| (29) Movac Environmental Inc - barge bilge pumping | $1,341.58 |
| (30) Movac Environmental Inc - barge bilge pumping | $504.30 |
| (31) Movac Environmental Inc - barge bilge pumping | $775.60 |
| (32) Oil Patch Fuel & Supply Inc. - diesel for ferry operations | $36,292.21 |
| (33) Southwest Services - diesel for ferry operations | $1,817.35 |
| (34) Southwest Services - diesel for ferry operations | $6,923.25 |
| (35) Vela Enterprises - flagmen for ferry operations | $43,740.00 |
| (36) Enterprise Rent-A-Car - car rental for NCDOT crew | $3,494.70 |
| (37) A Clean Portoco - portable toilet rental for ferry operations | $3,657.27 |
| (38) Marine Salvage & Services - ferry landing pile removal | $6,388.00 |
| (39) Marine Salvage & Services - ferry landing pile removal | $1,500.00 |
| (40) Marine Salvage & Services - ferry landing pile removal | $1,400.00 |
| | $2,209,086.61 |

**B.) Contracts**

| | |
|---|---:|
| (1) Marine Salvage & Services - passenger Ferries | $920,612.00 |
| (2) Sea Ranch Marina - dock | $78,400.00 |
| (3) Southpoint Marina - dock | $90,650.00 |
| (4) Ballenger Construction - parking Facility | $71,214.00 |
| (5) Mobile Bay Ferry - Fort Morgan Ferry & landing | $1,311,161.77 |
| (6) Chicamacomico - NCDOT Ferry | $143,377.19 |
| (7) Bayfront Marine, Inc - mob/demob of NCDOT Ferry | $39,135.87 |
| (8) Garret Construction - guard fence for landings | $10,208.00 |
| | $2,664,758.83 |

**C.) Reimbursements & Indirect Costs**

| | |
|---|---:|
| (1) Reimb to Cameron County | $713,491.47 |
| (2) Reimb to South Padre Island | $442,936.61 |
| (3) Reimb to Port Isabel ISD | $76,400.00 |
| (4) Reimb to Long Island Owners Association | $11,090.60 |
| (5) Reimb to Texas Parks and Wildlife | $24,614.53 |
| (6) Reimb to State Aircraft Board | $1,500.01 |
| (7) Division Indirect Costs | $51,311.67 |
| (8) District Indirect Costs | $46,843.89 |
| | $1,368,188.78 |

| | |
|---|---:|
| **Total Temporary Transp. =** | **$6,242,034.22** |

**OTHER DISTRICT EXPENSES (Mostly Temp Transp)**

| | |
|---|---:|
| (1) TxDOT in-house labor, materials, equipment, supplies, etc. | $1,063,265.16 |
| | $1,063,265.16 |

| | |
|---|---:|
| **Total Other =** | **$1,063,265.16** |

| | |
|---|---:|
| **GRAND TOTAL =** | **$14,295,283.55** |

*Exhibit B*

**TORIBIO GARZA, JR., P.E.**
**P.O. Box 1717**
**Pharr, Texas 78577-1717**

## WORK EXPERIENCE

### Director of Maintenance / TxDOT Pharr District / Pharr, Texas (10/99 – Present)

I oversee the Pharr District's maintenance operations. I ensure that our maintenance operations are conducted in accordance with Department standards and guidelines. I am responsible for the development, preparation and letting of the district's maintenance contracts. Additional responsibilities include but are not limited to; coordinating with local, city, state, and federal agencies regarding district maintenance matters; prioritizing the work of special jobs crew; developing and monitoring the district's maintenance budget; serve as a consultant to other staff engineers regarding maintenance operations as they relate to administration, programming, planning, design, construction and right-of-way; responsible for the requisition of maintenance materials; represent the district at various meetings; responsible for the execution of various maintenance agreements; serve as Aviation Coordinator and coordinate the RAMP program; recommend maintenance training needs for the district; responsible for the district's equipment shop operations; responsible for the district's utility permit office; responsible for emergency operations; responsible for the Adopt a Highway Program; responsible for Homeland Security issues; coordinate roadway and parking lot maintenance for the state parks and state hospital with in the district.

### San Benito Associate Area Engineer / TxDOT Pharr District (7/96 - 9/99)

Managed and supervised all project development and design for the San Benito Area Office. In this capacity I was responsible for coordinating with and ensuring that all the design projects out of this Area Office are completed in accordance with our design guidelines and our scheduled master letting list. I sign and seal plans, reports; such as scour analysis, FPS design, Bridge Layouts, etc. for seven (7) design engineers. I review and approve all their design work along with required general notes, specification lists, and special provisions necessary for each project. I also oversaw all the consultants hired by the area office to prepare P.S. & E. I ensure that they follow our design guidelines. I also monitored and approved consultant work invoices.

### Raymondville Associate Area Engineer / TxDOT Pharr District (3/95 – 6/96)

In the absence of the area engineer, I was directly responsible for the complete supervision and operation of the Raymondville Area Office as well as two (2) maintenance sections. Responsibilities included, but not limited to; supervising, evaluating personnel, planning and scheduling, maintaining effective working relationships with state, local, and federal officials, as well as the general public. I was also directly responsible for all the construction operations of the area office. Along with these duties, I also designed highway projects. I monitored the consultant design of a major interchange project in Harlingen. I also assisted our maintenance sections with all aspects of their operations such as: drainage and flooding issues, traffic control signing, and pavement restoration.

### Design Engineer / TxDOT Pharr District / (11/93 - 2/95)

I supervised an engineering technician and an engineer in training in the development of several highway project schematics in different locations of the Pharr District. I assisted in the monitoring of the districts' three (3) MPO operations. I coordinated the second call for district wide nominations of all ISTEA enhancement projects.

*Exhibit B*

Sinton Interim Area Engineer / TxDOT Corpus Christi District  (6/86 - 10/93)

I began working with TxDOT on 6-1-68 as an engineering assistant in the Nueces County Area Office. As an engineering assistant, I was designed several projects. On these projects, I was involved with all aspects of project design such as: schematics, traffic control, flexible pavement, hydraulics, roadway alignment, and signing. These projects ranged from farm to market roads to a $26 million interchange at US 77 & IH 37. I have also been exposed to highway construction and maintenance. My last position in the Corpus District was Sinton Interim Area Engineer. In this capacity, I was directly responsible for all the area office construction and design projects as well as the operations of three (3) maintenance sections.

## PROFESSIONAL LICENSES

7/91 - Texas Profession Engineer #70147 / Texas Board of Professional Engineers / Austin, Texas

## EDUCATION

5/86 – BS, Civil Engineering /University of Texas in Austin / Austin, Texas

0001

1    UNITED STATES DEPARTMENT OF TRANSPORTATION

     UNITED STATES COAST GUARD MARINE SAFETY OFFICE

2                    HEARING

3

     RE:  ALLISION OF BROWN WATER V WITH QUEEN ISABELLA

4        CAUSEWAY, D/L SEPTEMBER 15, 2001

5

                    VOLUME II

6                OCTOBER 10, 2001

7

8

9

10

11

12

13

14

15            Community Room

              Tower II

16            555 North Carancahua

              Corpus Christi, Texas 784

17

18

19

20

21

                    (ORIGINAL)

22

23

24

25

0002

```
 1          A P P E A R A N C E S
 2
 3   HEARING OFFICER:
       MR. JIM WILSON
 4      U.S. Coast Guard Marine Safety Officer
        555 Carancahua Street, Suite 500
 5      Corpus Christi, Texas 78478
 6
     FOR Brown Water Marine:
 7      MR. WILL PIERSON
        Royston, Rayzor, Vickery & Williams
 8      606 North Carancahua, Suite 1700
        Corpus Christi, Texas 78476
 9
        MR. JAMES H. HUNTER, JR.
10      Royston, Rayzor, Vickery & Williams
        55 Cove Circle
11      Brownsville, Texas 78521-2613
12
     FOR THE STATE OF TEXAS:
13      MR. JACK F. GILBERT
        Assistant Attorneys General
14      Post Office Box 12548
        Austin, Texas 78711-2548
15
        MR. MARK SPANSEL
16      Adams & Reese
        Suite 4400, 1221 McKinney St.
17      Houston, Texas
        77010-2010
18
19   FOR PORT ISABEL:
        MS. ELIZABETH G. NEALLY
20      Roerig, Oliveira & Fisher, L.L.P.
        855 West Price Road, Suite 9
21      Brownsville, Texas 78520
22
     FOR SOUTH PADRE ISLAND:
23      MR. RICARDO J. NAVARRO
        Denton, Navarro & Bernal
24      Bank of America Building
        222 East Van Buren, Suite 405
25      Harlingen, Texas 78550-6804
```

0003

1   APPEARANCES CONTINUED

2

FOR CAMERON COUNTY:

3      MR. GEORGE C. KRAEHE

    Willette & Guerra, L.L.P.

4      International Plaza

    3505 Boca Chica Boulevard, Suite 460

5      Brownsville, Texas 78521

6

UNITED STATES COAST GUARD:

7      MR. ALAN R. GRODECKI

    MR. ROBERT L. HELTON

8      MR. HARRY MARCH

    MS. CHRISTINE WOOD

9      MS. NICOLE STARR

    MR. FRANK GARCIA

10

11   ALSO PRESENT: MR. ALTON CHADWICK

        MR. DAVID STUART JENKINS

12         MR. RICHARD F. SILLOWAY

        MR. MIKE WIKE

13         MR. RONALD W. YATES

14

15

16

17

18

19

20

21

22

23

24

25

0004

```
 1              I N D E X
 2                        PAGE
 3   Appearances                2
 4   CAPTAIN NICK PERUGINI
         Examination By Hearing Officer      8
 5       Examination By Mr. Pierson         36
         Examination By Mr. Spansel         92
 6       Examination By Mr. Pierson        100
         Examination By Mr. Kraehe         104
 7       Examination By Mr. Pierson        106
         Examination By Mr. Spansel        115
 8       Examination By Mr. Navarro        116
         Examination By Mr. Pierson        117
 9
     ELIJIO GARZA
10       Examination By Hearing Officer     118
         Examination By Mr. Pierson        122
11       Examination By Mr. Gilbert        137
         Examination By Mr. Pierson        146
12
     DOUGLAS W. SWAIN
13       Examination By Mr. Pierson        150
         Examination By Mr. Pierson        198
14       Examination By Mr. Gilbert        239
         Examination By Mr. Navarro        260
15       Examination By Mr. Pierson        269
16   JEFFREY INGRAM
         Examination by Mr. Pierson        196
17
18
19
20
21
22
23
24
25
```

0008

1  to the stand.  Sir, please raise your right hand.

2           CAPTAIN NICK PERUGINI,

3  the witness, being first duly cautioned and sworn to

4  tell the truth, the whole truth and nothing but the

5  truth, testified as follows:

6           E X A M I N A T I O N

7  BY HEARING OFFICER:

8     Q.  Could you state your full name and title and

9  spell your last name for the court reporter, please.

10    A.  Nicholas Edward Perugini.  Captain, NOAA,

11  and I am the Chief of the Marine Chart Division.

12    Q.  Captain, as part of your presentation, do

13  you present your personal history, or should I get

14  into that right now?  I don't mind doing that.

15    A.  I can give a brief --

16    Q.  I would like to start possibly with high

17  school and just work up your various -- we want as

18  much information on you on here as possible so that

19  my chain of command knows who I am dealing with.

20    A.  Sure, understood.  Well, I am originally

21  from Wellsboro, Pennsylvania, went to high school

22  there, graduated from Penn State University, Bachelor

23  Degree in Meteorology.  I joined NOAA, the NOAA

24  Corps, that is, in 1977.  In 1983 I received a

25  Master's in Oceanography from the Naval Postgraduate

0009

1   School.  I have served aboard three NOAA hydrographic

2   survey vessels, the Commanding Officer of the NOAA

3   Ship Rudy, was in charge of NOAA's shore-based

4   mapping of TWA Flight 800, also involved in the JFK,

5   Junior airplane search.  Currently, I am Chief of the

6   Marine Chart Division in NOAA's office of the coast

7   survey stationed in Silver Spring, Maryland.

8       Q.  Captain, can you explain what NOAA stands

9   for?

10      A.  Yes, I can.  In fact, that's --

11      Q.  Sir, if you would like to move your chair or

12  anything anywhere, you're in charge.  You let us

13  know.

14      A.  Okay.

15      Q.  Whatever your comfort level is at.

16      A.  Do you mind if I sit down as I give this

17  presentation?

18      Q.  No, sir, please do.

19      A.  Okay.  Lots of people mistake someone in a

20  white uniform like this, especially in a Navy town,

21  for someone from the Navy.  I am actually part of the

22  Department of Commerce National Oceanic and

23  Atmospheric Administration.  Most people know NOAA

24  for the National Weather Service or the National

25  Marine Fishery Service.  But one of NOAA's primary

0010

1   missions is to promote safe navigation in our

2   nation's coastal waters.

3       In accomplishing this, we have what's called the

4   Office of Coast Survey in NOAA's National Ocean

5   Service.  The Office of Coast Survey is the National

6   Hydrographic Office.  We are in charge compiling of,

7   No. 1, compiling and maintaining the 1,000 nautical

8   charts that cover the coastal waters of the United

9   States, and also we have hydrographic survey units

10   that we conduct hydrographic surveys throughout the

11   country in support of your nautical charts.  So many

12   and most of the depths and the information that you

13   see on a nautical chart has come from a NOAA

14   hydrographic survey.  There are exceptions to that

15   that I will talk about a little later.  So charting

16   is one of our missions in NOAA, and the other one is

17   to observe water levels throughout the country in the

18   coastal areas, as well as the Great Lakes.  And in

19   accomplishing this, we maintain a network of tide and

20   water level stations throughout the country.

21       Now, how did we get involved in this particular

22   incident?  On September 18th, 2001, we received a

23   request from the Marine Safety Office at the Coast

24   Guard here in Corpus Christi, and they basically

25   presented us with the fact that there may have been

0011

1    some conflicting information between a Corps of

2    Engineer survey and a private survey firm, and I

3    understand that the channel for a period was closed

4    and that the request entailed was for NOAA to come in

5    and conduct a hydrographic survey so that it could

6    verify that it was safe for navigation.

7        Now, I would like --

8    Q.  Captain, can I interrupt?  I am sorry.  We

9    have these over there?

10   A.  Yes.

11   Q.  The displays?

12   A.  Yes, everything that you see here, you have

13   got a copy of.

14       HEARING OFFICER:  Okay.  Could you do

15   me a favor, Mr. Grodecki?  And, again, I hate

16   interrupting you.  Would you mark them as they come

17   up, NOAA 1, NOAA 2, each page.  Or if they are in the

18   exact order, we will put them all in as one exhibit,

19   you think?

20       THE WITNESS:  Yeah, I would -- I will

21   tell you, I put one new one in last night that

22   probably doesn't --

23       HEARING OFFICER:  Okay.  So if you

24   wouldn't mind, just the first one he showed, NOAA 1,

25   the second one NOAA 2.

0012

1          MR. GRODECKI:  Did you want to pick the

2    one that you wanted in case there is some stuff that

3    --

4          HEARING OFFICER:  Pardon me?

5          MR. GRODECKI:  Did you want to direct

6    which ones you wanted entered into evidence?

7          HEARING OFFICER:  No, I want every one

8    that shows up up there.  And I will explain that in

9    my report, that here's -- so anything that shows up

10   up there, if you have got a copy, just mark it next

11   in line for NOAA.

12   Q.  (BY HEARING OFFICER)  I am sorry, Captain.

13   I am so sweating this record going up.

14   A.  Not a problem.

15   Okay.  NOAA produces what we call chart number

16   11302.  This is a NOAA chart that covers Stover Point

17   to Brownsville, including Brazos Santiago Pass.  It's

18   produced in a small graph-like format, two-sided

19   paper chart.  We also produce this particular chart

20   -- it was called a raster chart.  It's basically an

21   electronic image that mariners will use combining GPS

22   positions with this raster chart.  You can see the

23   vessel track along its position on the chart.  So

24   this chart, 113029, is the largest scale chart that

25   covers the area of interest.

0013

1     Just to get the geography down here, we have got

2   the Gulf of Mexico. We have got Brazos Santiago

3   Pass. We have got Laguna Madre Channel and the Gulf

4   Intracoastal Waterway and, of course, the bridge that

5   San Isabella Causeway -- Queen Isabella Causeway.

6     Now, I would like to talk a little bit about the

7   responsibilities of each federal agency that is

8   involved in nautical charting. Let's start with the

9   Corps of Engineers. The Corps of Engineers does a

10   lot of things, and one of the things that they do is

11   they dredge and survey federal channels. The white

12   area that you see on the chart here with the dashed

13   limits indicate this is a federal project. This is

14   an area where the Federal Government maintains, and

15   the Corps of Engineers occasionally dredges and then

16   surveys this particular white area to a particular

17   project depth. In this particular case, the project

18   depth for the Gulf Intracoastal Waterway is about 240

19   feet. Now, the Corps by, by law --

20         HEARING OFFICER: Captain, I am sorry.

21   You confused me. You said the project depth is 240

22   feet.

23         THE WITNESS: Oh, I am sorry. The

24   project depth is 12 feet. The width is 240 feet. I

25   am sorry.

0014

1          HEARING OFFICER:  Thank you, sir.

2          THE WITNESS:  Yeah, the project depth

3   is 12 feet.

4      Now, the Corps of Engineers basically provides

5   our NOAA charting program, which is located in Silver

6   Spring, Maryland with reports on blueprints

7   essentially that show where the channel is located;

8   and when surveys are conducted, they provide us with

9   results of the surveys.  NOAA is responsible for

10   charting this information, but the Corps passes this

11   information along to NOAA quite regularly.  In fact,

12   from the Galveston Corps of Engineers District, we

13   receive monthly reports as to the condition of the

14   Gulf Intracoastal Waterway.

15      The second agency, of course, involved in

16   nautical charting is the Coast Guard.  The Coast

17   Guard's responsibility is, No. 1, they maintain aids

18   to navigation.  They also establish the positions of

19   the aids to navigation.  So basically the Coast Guard

20   through a publication call the Local Notice To

21   Mariners will provide positions and updates of aids

22   to navigation.  Basically, NOAA is just involved in

23   taking this information and presenting it as the

24   Coast Guard provides it to us.

25      Also, the Coast Guard maintains a bridge

0015

1  clearance database, essentially a bridge database

2  that gives items like the vertical clearance and the

3  horizontal clearance.  The Coast Guard is responsible

4  for providing NOAA with that information.  We just

5  chart what the Coast Guard tells us to do as far as

6  bridges goes.  And I did mention that there is a

7  publication called the Local Notice To Mariners the

8  Coast Guard publishes.  Essentially, that publication

9  amends things that are on the chart.  The last time

10  that this lithographic version of this chart was

11  printed was in 1999.  There are many changes going on

12  to the shoreline, to depths, people discovering

13  shoaling, obstructions.

14      Since we and NOAA are a very small agency, we

15  rely on the Coast Guard who are set up regionally in

16  districts that basically they collect information

17  that pertains to our charts.  They publish that

18  information.  And ultimately the next time that we

19  print a paper chart, that information will correct or

20  improve the paper chart, based on what's reported in

21  the Local Notice To Mariners.

22      And, finally, NOAA -- our responsibility in

23  charting, again, has to do with collecting all of

24  this information that comes in from various sources.

25  Certainly, the Coast Guard and the Corps of Engineers

0016

1   are the major sources, but we also get reports from

2   organizations like the U.S. Power Squadrons, Coast

3   Guard Auxiliary, other people who report

4   discrepancies with the nautical chart.  We also

5   conduct photogrammetric surveys that essentially

6   defines the shoreline, so we will do aerial

7   photography.  And when we think that the shoreline in

8   an area needs to be recompiled, we will recompile it

9   and display it on the chart.

10      NOAA is responsible for conducting hydrographic

11   surveys in areas outside of the federal project.

12   And, again, I had mentioned that this white area is

13   the federal project.  That is the Corps of Engineers'

14   responsibility.  NOAA's responsibility is everywhere

15   else outside of the federal project, so if, if a case

16   was necessary that there had to be a survey done in

17   this area of blue water, NOAA would be responsible

18   for conducting that survey.

19      Okay.  What I would like to do is go through some

20   of the specific charting features that are of

21   interest, just so everybody can understand some of

22   the symbology that's on the nautical chart in this

23   particular area.

24      First, published on the chart in association with

25   the Gulf Intracoastal Waterway is there is an

0017

1   intracoastal waterway project depth 12 feet,

2   Carrabelle, Florida to Brownsville, Texas.  The

3   controlling depths are published periodically in the

4   U.S. Coast Guard Notice to Mariners.  Essentially,

5   what our chart shows in this particular area is,

6   again, just as white water with this note that says,

7   This is the project depth in the Intracoastal

8   Waterway.  Unless we hear from the Corps of Engineers

9   or through the Notice to Mariners, we won't change

10  that note, and that note has been on this particular

11  chart since it was first introduced.

12      The second area of interest -- again, the blue

13  water on this particular chart essentially shows

14  depths that are less than six feet, so in this

15  particular case, again, the channel shows the white

16  area, project depth of 12 feet, and what the chart is

17  showing is anything outside of the dash limit are

18  water depths of six feet or less.  Again, horizontal

19  and vertical bridge clearances, we see that on the

20  chart.  Horizontal clearance, 275 feet, vertical

21  clearance, 73 feet.  That note was first published in

22  1975, provided that information -- that information,

23  again, provided by the Coast Guard.  Buoys 145, 146,

24  147, and 149, these are -- it's a red nun and three

25  green cans.  These have no lights on them.  Again,

0018

1  this information is provided to us by the Coast

2  Guard.  And all of these buoys, the latest positions

3  that we had were published in the -- in a Local

4  Notice To Mariners between 1990 and the present

5  time.

6      Q.  Captain, those are floating, or you don't

7  know?

8      A.  Those are floating.  That's a good point.

9  These buoys are floating aids, and, yeah, and, you

10  know, they have -- the Coast Guard can certainly

11  explain better than I, but they have a buoy anchor

12  with some scope, and, you know, their positions,

13  depending on the tide and the current, I imagine, can

14  change slightly.

15     The last light, I guess, between the Long Island

16  Bridge and the Queen Isabella parkway bridge heading

17  north essentially was light 151.  This is charted as

18  a continuous flashing green light.  This is on a

19  fixed structure.  The chart also shows three red day

20  marks.  These are essentially, I believe, on piles,

21  triangular red marks on piles, no lights.

22     This note in the vicinity of 147 is seven foot

23  shoal position approximate reported.  This particular

24  note originated from a 1990 local notice, Coast Guard

25  Local Notice to Mariners.  We have no further

0019

1    information on this; but as I said, when the Coast

2    Guard publishes something like this in the Notice to

3    Mariners, we will add a note to the chart that warns

4    of shoaling in this particular area.

5        So as I indicated earlier, we were called in to

6    conduct a hydrographic survey to help determine if

7    the channel was clear. Just a couple ways on how we

8    conduct a survey, in this particular case, what we

9    did was our vessel using a deferential GPS

10   positioning, essentially high accuracy positioning,

11   probably on the order of three meter positioning,

12   horizontal accuracy, will run a set of systematic

13   lines back and forth, essentially perpendicular to

14   the channel at 25 meter spacing.

15       What we used in this particular case was a single

16   beam echo sounder that essentially can tell the depth

17   very precisely right below the survey vessel. So

18   essentially in a survey like this what you're doing

19   is sampling the bottom. And in looking at the

20   records from here, it's very unlikely that anything

21   major would -- could be found between these 25 meter

22   line spacing. So this particular entire area we

23   covered pretty thoroughly with echo sounders, then we

24   also --

25       Q.  I am sorry about interrupting. But the red

0020

1  line on the left side of the screen, whatever exhibit

2  this is --

3  A.  Oh, I am sorry.

4  Q.  That's the swing bridge you covered from --

5  A.  Yeah, this is the swing bridge here.

6  Q.  Okay, thank you.

7  A.  From here north to the causeway.

8  Q.  Thank you, sir.

9      MR. GRODECKI:  That's Exhibit NOAA 04.

10     HEARING OFFICER:  Okay.

11  A.  Okay.  And just to give you an idea of

12  perspective, this, this distance is from the swing

13  bridge to the causeway bridge is, is less than a

14  mile, one nautical mile, and the information that was

15  given to me that the tug and barges together were

16  about 850 feet.  One of the, one of the rules of

17  thumb that I have sort of been using in sort of

18  judging scale here is that between buoys 147 and 149,

19  at least their charted positions, roughly that's

20  about 850 feet.  So when you're looking at some of

21  these exhibits, you can sort of keep that in mind.

22  Q.  That was 149 and 145?

23  A.  149 and 147.

24  Q.  Okay.

25  A.  Approximately that distance is 850 feet

0021

1    approximately.

2        Q.  Thank you, sir.

3        A.  Just gives you a general idea of scale.

4        So this area we covered pretty thoroughly with

5    echo soundings that will show the depths very

6    accurately.  This area in the blue is the area that

7    we covered with side scan sonar.  Now, side scan

8    sonar, you tow from the stern of a vessel, and it

9    creates an image of the bottom.  It doesn't measure

10    the depths, but what it can show are features that

11    stick up off the bottom or irregularities in the

12    bottom.

13        So, for example, if there were an old abandoned

14    buoy block on the bottom, we would be able to see it

15    with the side scan sonar, if there were an old

16    anchor, a wreck.  If there was any sort of

17    irregularity in the bottom itself, like a dredge

18    scour, we can very often detect that in the side scan

19    sonar, so it creates a shadowy image of the bottom.

20        Now, I think a little later on we are going to

21    get into the -- sort of the details of some of the

22    results of this, this survey.  But in general what

23    we're looking at here are depths in feet in the area

24    from 149 to 145, and essentially the depths in feet

25    are corrected to the chart vertical datum, which is

0022

1    mean lower low water. So, of course, as the tide

2    goes up and down, if you have a high tide, the depths

3    that you can expect are going to be higher or deeper

4    than what you see as far as the depths at the

5    particular vertical datum.

6        Again, this is -- these depths that you're

7    looking at right here are reduced to mean lower low

8    water. Essentially, what we're seeing is that in the

9    Corps' project, that is in the white water there --

10    all of the depths that we found are 12 feet or

11    deeper. We will be able to go into some detail on

12    depths in the blue water. Essentially, again, the

13    blue water on the chart indicates six feet or less.

14    In the particular case, we are going to see that

15    there are depths deeper than six feet and in some

16    cases between six feet and 12 feet.

17    Q.  Captain?

18    A.  Yes.

19    Q.  This is, this is -- we're looking at the

20    chart depths right now, or we are looking at the

21    depths that you project for 2:00 o'clock?

22    A.  No, no. These are actually reduced to the

23    chart depths to the mean lower low water.

24    Q.  Okay. So that's what you would see on a

25    chart, if you put all that on a chart?

0023

1    A.  Yeah.  If you put all of it on there, that's

2  exactly what you would see on a chart reduced to the

3  vertical datum.

4      Just a note, also, you will see -- and we will be

5  able to take a look at this a little bit later on

6  more closely as we can zoom in.  But what you'll see,

7  that we also obtained positions of the buoys, and

8  essentially the positions of the buoys were pretty

9  much right on where the Coast Guard had told us to

10  chart them, so the positions of the buoys agree with

11  their charted positions.

12      Okay.  Now, and I know this is going to be very

13  difficult to see right here.  But, like I said, later

14  on we will be able to zoom in and get more detail out

15  of this.  What I have here is a plot of depths at the

16  time of the incident approximately 02:00 on September

17  15th.  We have a tide gauge in Port Isabel that we

18  maintain, so we're able to compute quite accurately

19  the stage of tide at the time of the incident, and we

20  computed that.  Out here in this particular area, the

21  tide corrector would be about 2.1 feet, so what we

22  did was we took our survey, and we added 2.1 feet to

23  all of the survey depths, and essentially that

24  increased most of the depths within the channel

25  certainly well over 12 feet.  And, again, I have got

0024

1   some views that will show this a little bit more

2   zoomed in. This is more of a zoomed in view of the

3   hydrographic survey. I know buoys 149 and 147 are of

4   particular interest. What we've done here is we've

5   just dashed in a line between just connecting the two

6   positions of the buoys approximately. And, again,

7   this particular shot is at mean lower low water. You

8   will see the convention that I use is blue depths are

9   at the time of the incident. This is, this is at

10  mean lower low water on the chart. You will see

11  between these two lines basically eight feet at mean

12  lower low water somewhere between eight feet, seven

13  to eight feet, nine feet along this particular line.

14  That's at mean lower low water.

15      Now, at the time of the incident, again, this is

16  zoomed in; and what we're looking at, as I said, the

17  tide corrector was about 2.1 feet, so the depths at

18  the time of the incident between buoys, our survey

19  shows about 10 feet, nine feet, somewhere between

20  nine and 10 feet, between the buoys, okay? And as I

21  said, later on if you want to examine that more

22  closely, we will be able to do that.

23      Q. Yes, sir, I am sure we will.

24      A. Now, one of the things that -- this is one

25  that does not appear in the package that I gave you,

0025

1    the paper copy.

2        Q.  Can we get a print of that later, Captain?

3        A.  Yeah, we can figure out how to do that, I am

4    sure.

5            HEARING OFFICER:  Do you want to make

6    that IO exhibit next in line -- I am sorry, NOAA

7    exhibit next.

8            MR. GRODECKI:  This one?

9            HEARING OFFICER:  Yes, and he'll

10   provide the print later.

11       A.  Now, you had provided me with some

12   information about potential, I guess, wheel marks or

13   scour marks, latitude and longitudes that was

14   discovered by another survey firm, and I -- we took

15   those positions of -- I think what were referred to

16   as holes.  We plotted those, the adjusting the chart

17   datum correctly.  And essentially looking at our side

18   scan sonar records, what we see is there is some sort

19   of man-made mark that extends along this red line,

20   which appears to be something either dragging across

21   the bottom or very close to the bottom that may have

22   stirred up some of the bottom.  But essentially there

23   is something from this buoy 149 approximately to

24   about this position where, where there the shoaling

25   reported arrow is, and along there there is a

0026

1  man-made -- well, it's a man-made feature

2  essentially. Now, what that is, we can't say.

3     Q.  How long is that feature, sir?

4     A.  That feature -- well, it's -- I am going to

5  have to sort of get into my other program.

6     Q.  Okay.  Well, we will just wait.

7     A.  Again, just to give you an idea, the

8  distance between buoys 149 and 147 are roughly 850

9  feet.

10     Q.  Okay.

11     A.  So this looks roughly around 600 feet.

12     Q.  Okay.  Thank you, sir.

13     A.  Okay.  But, again, I would like to impress

14  the fact that interpreting sonar records is -- well,

15  it's a very interpretive activity looking at a sonar

16  record is our experience in saying definitively what

17  is there and what is not there.  But I think that the

18  thing that we can say definitively is that there is

19  some sort of man-made type feature along the bottom.

20  It could have been a dredge scour.  It could have

21  been somebody dragging an anchor.  It could have been

22  anything.  We really can't speculate on when that got

23  there and how it got there.

24     We just have some different views of the data.

25  This is really just more supporting the notion that

0027

1   the channel itself was cleared to a project depth of

2   200 and -- or 12 feet -- 12 feet, and, again, at the

3   time of the survey the Corps of Engineers channel

4   cleared to 12 feet. This is just a perspective of

5   the data. Looking at it a different way, we say plot

6   all of the depths that are 12 feet or less. Again,

7   this just shows that there are no depths less than 12

8   feet plotted inside the channel.

9       Just a little note about the fact that NOAA does

10  maintain a tide gauge in Port Isabel, and at 02:00 on

11  September 15th, we were able to retrieve this

12  information. It's actually posted on the Internet

13  for anyone to look at, but basically the tide height

14  above mean lower low water at the Port Isabel tide

15  gauge was 2.19 feet. The wind speed at the tide

16  gauge was about 6.8 knots, wind direction 068 degrees

17  true; and the wind gusts that were recorded at 02:00

18  were about 9.5 knots. And information is essentially

19  at the tide gauge recorded every six minutes.

20      Let's see. And this is the kind of information

21  that you can pull off the Internet, if you really

22  want to get into it. This shows the trend of the

23  wind speed in meters per second. Again, the time

24  that comes up is in standard time, so that's 01:00.

25  Again, the wind speed about 6.8 knots. This dash

0028

1  line down here shows the wind direction of about 068

2  here, and likewise the blue curve shows the predicted

3  tide for the particular area Laguna Madre. The red

4  shows the actual observe tide that was running a

5  little bit, oh, about six-tenths of a foot above

6  predicted, so there was a little higher tide on that

7  evening on September 15th than was expected.

8    Q.  Captain, you say that's above predicted, but

9  that might be way more than above average, right?

10    A.  That's correct, that's correct. In this

11  particular case, at the time of the incident, the

12  tide was nearly high in its cycle, so. . .

13    Q.  Do we have the data to know whether or not

14  that was an unusually high tide or whether this was a

15  normal high tide?

16    A.  Well, yeah. In fact, this is the data that

17  will show, that indicates that it is slightly above

18  what would be --

19    Q.  Predicted?

20      MR. PIERSON: Officer Wilson, may I

21  interrupt and just ask that to be identified on the

22  record, that particular chart?

23      HEARING OFFICER: Sure. What is that?

24      MR. GRODECKI: NOAA 15.

25      HEARING OFFICER: NOAA 15.

0029

1        MR. PIERSON: Thank you.

2        THE WITNESS: Yeah, it's -- again, this

3    information, these curves, the data itself can all be

4    accessed at this web site.

5    Q.  (BY HEARING OFFICER) I guess what I was

6    curious about, if you look at, like, say, a six-month

7    average tide through there, was this an unusual tide

8    that night?

9    A.  Let me say this, that it's, it's somewhat

10    complicated in Texas because in general there is a

11    lot of -- the land is sinking, and so the predicted

12    and the actual observed tides I believe are running

13    approximately about three-tenths of a foot

14    difference, so the observed -- you're always having

15    about three-tenths of a foot on average more of the

16    observed tide than the predicted.

17        Now, in this particular case, the predicted tide

18    shows approximately, I would say, 1.2 feet is the, is

19    the prediction, okay?  The observed tide is about 2.2

20    feet.  Now, about point three of that feet is sort of

21    the systematic discrepancy that I had talked about,

22    about essentially subsidence in the area.  So in this

23    particular case, it was about seven-tenths of a foot

24    more than what you would expect.

25    Q.  What you would predict, but does that get us

0030

1   into the averages for six months or anything like

2   that?

3      A.  Well, no, it doesn't; and I would have to

4   defer.  I mean, we can find that information out for

5   you.

6      Q.  Okay, sir.  I would like to get it sometime,

7   and it doesn't have to be during the hearing.

8      Here is what I was getting at, Captain.  We had a

9   pilot on the stand yesterday that had run that

10  channel apparently almost exclusively for the last

11  two years.  And he was, he was the pilot that was

12  asleep during the allision.  He apparently came right

13  up on deck.  He looked out, and he said he had never

14  seen the current run like that ever.  It was, you

15  know -- it was the hardest current he had ever seen,

16  so that's why I was --

17     A.  Well, we did -- I will say we did ask our

18  people who are involved in current predictions and

19  observations if they could come up with any figure

20  for the currents on that evening; and we are really

21  unable to do that.  We really don't have the

22  information to do that.

23     Q.  Okay.  That's fine, Captain.  We will just

24  go with running hard.

25          HEARING OFFICER:  Sir?

0031

1          MR. SPANSEL:  Just a point of

2   clarification.  Mark Spansel, from TxDOT.  The

3   Captain was in the process of characterizing the tide

4   compared to predicted when Mr. Pierson interrupted to

5   ask for identification.  I just wanted to make sure

6   he completed what he was saying.  He was saying it

7   was slightly above -- the tide was slightly above --

8   I thought you were going to say predicted, but I

9   don't think you were able to get that out.

10          THE WITNESS:  Well, again, what I would

11   say is generally the tides are running about

12   three-tenths of a foot higher than predicted.

13   That's, that's based on the last few years.  That's

14   what you would expect.  In this particular case, the

15   observed tides were approximately between -- let's

16   see.  We said 1.3 to 2.2, point nine feet

17   difference.  So, again, if you take that point three

18   out, they are approximately six-tenths of a foot

19   higher than what you would expect.  I understand it's

20   a little complicated, but. . .

21     Q.  You're doing a good job of putting it.  I am

22   understanding it.  If I can, anybody else in here

23   can.

24          MR. SPANSEL:  At the time of the

25   incident -- if this is appropriate.  I can wait.

0032

1        HEARING OFFICER:  Yeah, let's -- he's

2   got us up here.  If we have got questions on this

3   chart, let's ask him while he's got it up there.

4        MR. SPANSEL:  At the time of the

5   incident, do you know where the tide was in the tide

6   stage?

7        THE WITNESS:  Yes, it's -- well, you

8   can see it right here.  This is high tide.  This is

9   high tide that happens just about at the -- let's see

10  here.  Approximately 03:00 which would be 04:00

11  daylight savings time, so right here where you see

12  the cursor is high tide, so you can see this dashed

13  line indicates the time of the incident, so the tide

14  was rising in that particular time.

15       MR. SPANSEL:  Okay.  And it's almost a

16  high tide?

17       THE WITNESS:  It's almost a high tide.

18    Now, there is one other thing I should explain

19  here is that the tide height at the tide gauge itself

20  is not precisely the height in the area of the

21  bridge.  It's about a tenth of a foot difference.

22  And that's just sort of the hydrodynamics as water

23  comes in and goes out at the --

24    Q.  (BY HEARING OFFICER)  It's a difference in

25  which direction, sir?

0033

1    A.  Well, the tide height in the vicinity of the

2    bridge is 2.1 feet, so it's a tenth of a foot --

3    essentially a tenth of a foot lower.

4    Q.  Okay.  Thank you.

5    A.  2.19 feet is at the tide gauge.  Again,

6    there is a slight difference -- there is a slope to

7    the water between the tide gauge and the area of the

8    incident, just a tenth of a foot.

9        So this is the summary of the results that we had

10   found in our survey.  Our survey confirmed a 12 foot

11   project depth within the limits of the federal

12   channel.  Our -- the aids to navigation, as displayed

13   on the nautical chart, were correct.  The survey

14   showed that they were very closely approximately in

15   their charting -- charted positions.  We did not find

16   any apparent charting discrepancies; that is, what

17   the chart showed was essentially correct.

18       Now, that means that there are some shoaling

19   reported features that are shown on the chart

20   presently, and those features came from reports from

21   different places, one, as I had mentioned, the 1991

22   was from the Coast Guard Notice To Mariners.  Several

23   of those shoaling reported notes were sent to us in

24   the 1970s by United States Power Squadron individuals

25   who help us inspect and update our charts.  Some of

0034

1   those notes may eventually be removed from the chart,

2   the shoaling reported, because essentially our chart

3   shows the area outside of the federal channel to be

4   blue water, which is six feet or less, and inside the

5   federal project to be a project depth of 12 feet.

6   And that's what the survey showed, so there is really

7   saying seven foot shoaling reported in an area around

8   the channel that is really redundant information, so

9   those types of notes we may end up removing.

10    Q.  Remove them because of this present survey?

11    A.  Because of this present survey.

12    Q.  Okay.

13    A.  See, very often features get put on the

14  chart, and they stay there for 20, 30, 50 years

15  sometimes.  And until either a NOAA field unit, Coast

16  Guard or a Corps of Engineers comes in and

17  specifically addresses those features, they will stay

18  on the chart.  For example, there are objects on that

19  chart, submerged piles in that area.

20    Q.  I was going to ask you about that, sir.

21    A.  Those piles first originated on the chart in

22  1953.  They were reported to us by the Galveston

23  Corps of Engineers, and at that time, as I understand

24  it, those piles were used as a type of range markers

25  or positioning aids to help dredging, so there were