0035

1  those sometimes temporary piles that were put up 50

2  years ago.  And as time passes, some of them may be

3  removed; some of them might be knocked down.

4  Essentially, if we don't get that information

5  reported to us directly, they stay on the chart.

6  Somebody in the 1970s passed them and said, We don't

7  see any of these visible piles that you have

8  charted.  Chart them as submerged, so we end up

9  charting them as submerged, and that's how they are

10  today.

11     Q.  Are those piles going to disappear because

12  of your new survey?  Will they disappear from the

13  chart?

14     A.  We still need to examine the sonar records

15  very closely on that.

16     Q.  Is it possible they could?

17     A.  It's very possible.  It's very difficult.

18  Piles are very difficult to detect on sonar records

19  because essentially they could be so small.  And,

20  again, like I said, sonar records are very

21  interpretive.  We will have to make that decision.

22  Part of the decision-making process would be we would

23  ask the Corps of Engineers if they know anything more

24  about these piles that were reported to us in the

25  1950s.  We would ask local people if anyone ever saw

0036

1   or heard of anybody hitting submerged piles. We

2   would look at this survey. We would put all of that

3   information together and essentially use our

4   discretion to make that judgment. And sometimes they

5   are very difficult calls because we want to try to

6   err on the side of safety in presenting nautical

7   charting information.

8      So, again, the final result, I think we talked

9   about the depth, the tide height at that time. And

10  essentially that's it.

11        HEARING OFFICER: Okay, sir. Does

12  anybody have any questions about the survey?

13        E X A M I N A T I O N

14  BY MR. PIERSON:

15    Q. I do. Captain, I am Will Pierson. I

16  represent Brown Water Marine. Did NOAA personnel

17  actually perform this survey?

18    A. Yes, they did.

19    Q. And I take it you, since you're in Maryland,

20  you did not?

21    A. I did not.

22    Q. Can you identify who did?

23    A. Yes. The lead hydrographer, his name was

24  David Elliott, two Ls and two Ts. He is certified by

25  the American Congress on Surveying and Mapping,

0037

1   hydrographer.  He has been a hydrographer for over 20

2   years.  He essentially conducts -- it's his job to

3   conduct hydrographic surveys full-time.  He has been

4   doing that for about 20 years.  The person who

5   assisted him, his name was Robert Ramsey, and he has

6   exactly the same credentials, over 20 years of

7   conducting hydrographic surveys and also an ACSM

8   Certified Hydrographer.

9      Q.  Do you know of the company DWS?

10     A.  I am not familiar with that company.

11     Q.  Do you know that NOAA hires DWS to perform

12  similar surveys as what has been done by NOAA?

13     A.  I am not that familiar with our contracting

14  now.  NOAA contracts out about 50 percent of our

15  hydrographic surveying to private companies, and

16  that's in another division.

17     Q.  Do you know that DWS supplies equipment to

18  NOAA such as was used at this particular survey?

19     A.  No, I wasn't aware of that.

20     Q.  What type of calibration method was used on

21  the equipment that NOAA used?

22     A.  Well, our standard calibration techniques,

23  again, we have echo sounding, calibrations.  I don't

24  know specifically if they did what's called a bar

25  check.  A bar check is typically lowering a metal bar

0038

1   underneath a vessel to determine what the echo

2   sounder is reading. We did take a -- what's called a

3   sound velocity cast. That's essentially a profile of

4   the water that adds a corrector to the depth because

5   of its particular density, salinity and temperature.

6   So our standards are what we do in hydrographic

7   surveying essentially are to the, you know, the

8   International Hydrographic Organization standards,

9   including calibrations.

10     Q. How accurate can you tell us plotting of the

11   bottom of the ocean or the bay in this particular

12   case? Is it accurate to one-tenth of an inch?

13     A. No.

14     Q. How accurate would you say that it is?

15     A. A tenth of a meter is the resolution which

16   we collect the data.

17     Q. For those of us that never learned that in

18   school, what would a tenth of a meter translate into?

19     A. Well, 2.54 centimeters and one inch. That's

20   about the best I can -- I think it's about

21   three-tenths of a foot maybe.

22     Q. Do you agree that there are other standards

23   that are used by contractors that are perhaps more

24   accurate in mapping the bottom of the bay than

25   NOAA's?

0039

1    A.  There certainly may be other standards,

2  correct.

3    Q.  You're in charge of the charting division,

4  as I understand it?

5    A.  That's correct.

6    Q.  It would make sense to you that there are

7  other contractors out there that NOAA uses that can

8  give us a more accurate picture of the ocean bottom

9  than perhaps NOAA?

10    A.  If, if we wanted to do a more accurate

11  survey, a more accurate survey, you know, you can

12  spend a lot more time and money doing more accurate

13  surveys.  The surveys that we conducted were to the

14  same standards that we use to chart the major ports

15  and harbors in the United States, so I would say

16  this, that a tanker going in or out of Houston,

17  Galveston that is basically using one of our port

18  system navigated high tide, they are relying on NOAA

19  depths and NOAA tide gauges conducted by NOAA

20  personnel to navigate safely within very small

21  clearances from the bottom, so what we've done here

22  is no different than what we do in all of the other

23  surveys that we survey throughout the U.S. where

24  there are a lot of high stakes as far as being

25  correct.

0040

1    Q.  If we wanted to be more accurate, what would

2  we do?

3    A.  If you wanted to be more accurate, there may

4  be specific shallow water echo sounders that you

5  might be able to use.  There may be specific --

6  what's called multi-beam systems that can give you

7  higher accuracy, but we stand by our data being

8  accurate to a tenth of a meter.

9    Q.  You-all used the single beam?

10    A.  Correct.

11    Q.  What does that mean?

12    A.  That means that the transducer that in this

13  particular case is mounted to the hull sends out a

14  beam of sound in about a seven degree beam width, so

15  it's looking essentially directly below the vessel.

16  It's not looking lateral to the vessel path.  There

17  are systems -- the wider, the wider beam systems

18  essentially can detect measure depths off to the side

19  of the vessel, but actually the most accurate type of

20  echo sounding systems are the ones that are high

21  frequency and single beam.  That's what we used.

22    Q.  How many passes would you say the NOAA

23  vessel made between markers 149 and 147 to the right

24  of the dredged channel?

25    A.  We were running perpendicular to the dredge

0041

1   channel in general for our echo sounder

2   cross-sections, so every, every one of our passes

3   essentially went to the right or to the east of the

4   channel limits.

5     Q.  Can I interrupt just a second?  Captain,

6   could you explain on 147 how far from the edge of the

7   channel was marker 147 on your survey?

8     A.  Okay.  See, the distance from -- now, can

9   you repeat?

10    Q.  From the edge of the channel to marker 147

11  --

12    A.  Right.

13    Q.  -- what is the distance that --

14    A.  Distance is 210 feet.

15    Q.  210?

16    A.  Approximately 210 feet.

17    Q.  Okay.  I thought you told me it was 240, but

18  210.  Now, again --

19        MR. PIERSON:  May I clarify that with a

20  question?  Is that from the center of the channel or

21  from the edge of the channel?

22        THE WITNESS:  Edge of the channel.  The

23  charted edge of the channel.  And you have to

24  remember that we are magnifying a very small part of

25  the paper chart --

0042

1        HEARING OFFICER:  Okay.

2        THE WITNESS:  -- that was essentially

3    compiled by hand, so there is, there is, you know,

4    there is not complete accuracy in this process.

5      But, again, what I told you was 240 feet from the

6    charted location.  Now, right here what we're looking

7    at is the distance between the east edge of the

8    channel and the center of the charted position of

9    147.  That, as you can see, where it says ruler -- I

10   know this is sort of tough, tough to see

11   -- is about 240 feet approximately.

12       HEARING OFFICER:  Okay.  Now, that's

13   from the charted position.  We're talking about the

14   NOAA published chart.  How about, did you have an

15   actual position that you got with the --

16       THE WITNESS:  The actual position --

17   and, again, I think you need to remember that the

18   buoy is floating.  It has scope, you know.  You

19   expect it to move in the current.  About 210 position

20   -- 210 feet from our survey position.

21       HEARING OFFICER:  Okay.  I am lost.

22   The actual position, the charted position, it's 210

23   feet from the edge of the channel?

24       THE WITNESS:  Again, if you see our --

25   if you see how our buoy here is charted, you see, you

0043

1    see a circle.

2         HEARING OFFICER:  Okay.

3         THE WITNESS:  That circle indicates

4    that a buoy is floating.  It is not a precise

5    position.  It can move.  So the survey position at

6    the time that we got the position on the buoy, it was

7    located right where you see that diamond.

8         HEARING OFFICER:  Okay.  Thank you,

9    sir.  That's where I was confused.

10         THE WITNESS:  All right.  So

11    essentially you'll see 210 feet from the survey

12    position to the channel.  And if you went to the

13    middle of the buoy, you would see 240, 250 feet.

14         HEARING OFFICER:  Okay.  The charted is

15    240 -- I mean, the center of the charted -- the whole

16    circle is charted.  I got you, sir.  Thank you.  I am

17    sorry.

18         THE WITNESS:  And just as a note,

19    again, I think this kind of exercise you really have

20    to, you really have to have an understanding.  For

21    the size of this area on the paper chart is, is very,

22    very small, so we have magnified something that, you

23    know, we're approaching, you know, saying something

24    is 10 feet or 20 feet difference is, is really

25    pushing the limits of the accuracy of all the censors

0044

1  involved here.

2          HEARING OFFICER: Okay. Thank you,

3  sir.

4      Q.  (BY MR. PIERSON) So what you're telling us

5  is that there is a margin for error?

6      A.  There is.

7      Q.  And the buoy is designed to move, so it

8  could actually be, as you've indicated, on the chart

9  approximately 240 or 250 feet from the channel?  I am

10  talking about buoy 147.

11      A.  Essentially, what we have charted is the

12  position of buoy 147 as provided to us. Now, how far

13  it can move depends on its scope, and I would really

14  defer to the Coast Guard on that, how far it can

15  move. Where it's charted is where essentially the

16  Coast Guard has told us it's charted.

17          HEARING OFFICER:  Captain, how far is

18  it from the edge of the channel to the outer edge of

19  the ring that's there?

20          THE WITNESS: Okay. From the edge of

21  the channel to the outer edge is about 320 feet.

22          HEARING OFFICER: Okay. Thank you,

23  sir.

24      Q.  (BY MR. PIERSON) And how far would it be

25  from the center line of the channel to the outer

0045

1  edge, please?

2  A.  Approximately 440 feet.

3  Q.  Would you -- well, let me ask you this

4  before I ask you to change screens.  What was the

5  date of you-all's survey?

6  A.  What was the --

7  Q.  The date when you-all actually went out

8  there and did it?

9  A.  It was September 25th.

10  Q.  So it was approximately 10 days after the

11  incident?

12  A.  Correct.

13  Q.  Is it recognized within NOAA that the ocean

14  bottom around channels that are exposed to high tides

15  or currents can change within a short period of time?

16  A.  We really don't have any specific knowledge

17  of the local characteristics of the ocean bottom in

18  this particular area.

19  Q.  Is that because you-all don't have a current

20  meter?

21  A.  We don't -- it's because, one, we don't have

22  a current meter in this particular area, but really

23  we don't, you know -- we really don't work in this

24  area all that often, so every, every area, you know,

25  this area might have a silty bottom, a sandy bottom.

0046

1    We don't know.  We don't know what the

2    characteristics of the ocean bottom is, and we don't

3    have any NOAA personnel in this particular area to

4    determine that information.

5       Q.  Can you estimate for us when was the last

6    time a NOAA personnel was in this particular area and

7    performed the very function that you-all did?

8       A.  I don't know when that was.

9       Q.  It's been a long time?

10      A.  It -- actually, the, the depths outside of

11   the channel in Laguna Madre in general appear to come

12   from surveys that were conducted in 1867.

13      Q.  That's a long time?

14      A.  Yeah, but that's -- and I will have to say

15   that over the years there are, you know -- we do all

16   different types of surveys.  We will go into an area

17   and do what's called a coast pilot survey, just sort

18   of a cursory inspection of the chart.  So those types

19   of surveys may have existed, but it's very shallow

20   water.  Unless we get a specific request from a port

21   authority or some port of commercial mariner

22   organization, we would not, you know, we would not

23   come in and do a survey.

24      Q.  I am being critical of you-all's

25   organization.  You-all have limited funds, I know.

0047

1  That's why you use outside contractors?

2        MR. SPANSEL: Objection. That's a

3  gratuitous, self-serving statement for the record.

4        HEARING OFFICER: Yeah, I have got an

5  objection to that. I haven't seen any evidence about

6  anybody didn't have any money to do anything.

7        MR. PIERSON: I am not saying that. I

8  am just asking why it is --

9    Q.  (BY MR. PIERSON) Let me ask this. Does

10  NOAA concentrate its resources in other areas of the

11  country more so than this particular area?

12    A.  We concentrate our resources on -- we have

13  what's called a -- we have identified what's called

14  critical areas. These areas are essentially

15  prioritized by commercial ports that have a specific

16  number of, you know -- do a specific number of

17  commercial total volume or basically the high

18  commerce ports is where we survey.

19        HEARING OFFICER: Sir, I am trying to

20  figure out where we're going. I don't want to get

21  into the history. I have learned more about NOAA

22  than I -- it was very interesting, but it's more than

23  I need to know for this.

24        MR. PIERSON: I would like to ask one

25  more question about the priority given to this

0048

1  particular channel.

2        HEARING OFFICER:  I don't understand, I

3  don't understand the basis of your questions.  He

4  gets his information from the Coast Guard --

5        MR. PIERSON:  I am trying to establish

6  the accuracy of the information that's given to

7  mariners, and I think the Captain would agree that

8  more information is given to the higher traffic

9  areas.  This is not as high a traffic area as

10  others.

11        HEARING OFFICER:  Okay.  That doesn't

12  -- stop, Captain.  That doesn't sound like a

13  question.  What I have got from him so far is, one,

14  NOAA takes information from the Coast Guard; two, it

15  takes it from the Army Corps; three, it will take it

16  from any other source, the patrol squadron or

17  whatever it is, and it puts it in there.  I get the

18  -- that you're implying that NOAA should be down

19  there doing a side scan, and that's not their

20  purpose, and that's not the way he explained it.

21        MR. PIERSON:  That's not what I am

22  implying.  I am just asking what the priority is from

23  NOAA's standpoint for this particular --

24        HEARING OFFICER:  What is the

25  relevance?

0049

1          MR. PIERSON:  I think if he can be

2   allowed to answer the question, we will know that

3   it's not a high priority area.

4          HEARING OFFICER:  Why do I care?

5          MR. PIERSON:  Because --

6          HEARING OFFICER:  Me, the fact finder

7   here, why do I care whether it's a high priority area

8   or not?

9          MR. PIERSON:  Because if this is a

10  dangerous channel that caused or contributed to this

11  particular collision or allision, and there is a way

12  to prevent it perhaps by knowing that the sides of

13  the channel are not as deep as advertised, then

14  perhaps attention could be given to it.

15          HEARING OFFICER:  I don't understand.

16  They don't build the channel.  They don't mark the

17  channel.  They accept information from other

18  agencies, state agencies, federal agencies.  Why do I

19  care what their priority is?

20          MR. PIERSON:  I would just like to get

21  an answer.

22          HEARING OFFICER:  Their priority on

23  putting stuff on a chart would be important, if they

24  were building a new chart.

25          MR. PIERSON:  Okay.  We will ask that

0050

1    one, then.

2    Q.   (BY MR. PIERSON)  What's the priority of

3    putting information on charts in this particular

4    case?

5    A.   Again, I would say that we have -- our

6    priorities for hydrographic survey are based on the

7    commercial value of ports along the Coastal U.S.

8    That's one criteria.  So places like Houston,

9    Galveston, New York Harbor, New Orleans, Puget Sound,

10   we will basically focus our resources on those kind

11   of places.

12       Similarly, there are places in Alaska that have

13   not been surveyed since the 1800s where cruise ships

14   are now going, visiting glaciers and all those kind

15   of things where there is a real requirement for

16   updated hydrographic surveys.  So I would say, again,

17   on the one hand, commercial ports in the U.S., on the

18   other hand, are these areas in Alaska which haven't

19   been surveyed but now are experiencing vessel

20   traffic.

21       I will say one of the things that we are doing in

22   this area of the Gulf Intracoastal Waterway, we are

23   in the process of building what's called electronic

24   navigational charts.  These are very highly accurate

25   electronic charts that are different from the

0051

1   electronic charts that are available right now, and

2   we do have a project that has begun in building these

3   electronic navigational charts for the Gulf

4   Intracoastal Waterway from New Orleans west to

5   Brownsville.

6        HEARING OFFICER:  Thank you, sir.

7   Q.  (BY MR. PIERSON)  Would you be kind enough

8   to flip your screen to I think it was NOAA No. 4?

9   A.  Okay.

10   Q.  And if you'll continue along because I guess

11   it's the wrong one.  I think it's the one where you

12   showed in color the results of the hydrographic.

13   A.  Oh, you mean the -- sort of the fill contour

14   area.

15   Q.  I think so.  I think I saw it there.  It

16   looks like number six or seven.

17   A.  Oh, okay, yeah, this is the -- just showing

18   generally the areas of where we survey.

19   Q.  Okay.  If we could go, then, back to your

20   screen that shows us the depth.  I think it showed

21   pink.

22   A.  Okay.  You want to see --

23   Q.  The chart that we were just looking at that

24   illustrates your various screens that you can show

25   us.

0052

1    A.  Oh, again, would you say that one more

2  time?

3    Q.  I am just interested in the pink portions

4  where you actually have the water depths.

5    A.  The pink portions?

6    Q.  If you go back to your exhibit screen.  I am

7  sorry I am not a computer person, and I have just

8  been shown this for the first time today.  But if you

9  would be kind enough to go back to your screen that

10  shows all of the different screens, I will show you

11  exactly where it's at.

12    A.  (Witness complies.)

13    Q.  There we go.

14        MR. PIERSON:  May I approach?

15        HEARING OFFICER:  Sure.

16        MR. PIERSON:  Thank you.

17    Q.  (BY MR. PIERSON)  Would you first show us

18  this particular screen?

19    A.  Sure.

20    Q.  Thank you.

21        HEARING OFFICER:  I don't know how

22  we're going to be able to follow this on the record.

23  Can you identify that based on your pictures?

24        MR. GRODECKI:  Can I have that back?

25        MS. WOOD:  It's 10.

0053

1        MR. GRODECKI: Number 10?

2        MS. WOOD: I believe so.

3        MR. GRODECKI: NOAA Exhibit No. 10.

4        HEARING OFFICER: Okay. Thank you.

5        MR. PIERSON: Thank you.

6    Q.  (BY MR. PIERSON) On NOAA Exhibit 10, then,

7  at 2:00 o'clock in the morning on September the 15th,

8  we would have a depth of water there by your study

9  where I am pointing to the seven of approximately

10  nine feet, correct?

11    A.  Yeah, that's correct. Would you want to --

12  I have got that color shown at time of incident.

13    Q.  Sure, okay.

14    A.  That's the next one. Okay. There it is.

15    Q.  Okay. Thank you. That was the difference

16  between the mean and low tide and the actual tide?

17    A.  That's the difference between mean lower low

18  water and the observed tide.

19    Q.  Which one is this, then, for the record?

20        MR. GRODECKI: That would be NOAA 11.

21        MR. PIERSON: Thank you.

22    Q.  (BY MR. PIERSON) On NOAA No. 11, then,

23  these show within the boundaries of buoys 147 and 149

24  a depth of water of nine feet at the time of the

25  incident, do we not? I am referring to right here.

0054

1    A.  Between buoys 149 and 147, you will have to

2  let me do a little bit of --

3    Q.  You can go to the one where you drew the

4  line, if you would like.

5    A.  Okay.  Let me do it this way.

6    Q.  You show basically nine feet right here?

7    A.  Correct.

8    Q.  If the draft of a vessel was nine feet on

9  the evening of September the 15th at 2:00 in the

10  morning, you would expect that vessel to touch bottom

11  where I am pointing, would you not?

12        THE REPORTER:  Mr. Pierson, I am having

13  trouble hearing you.

14        HEARING OFFICER:  I couldn't hear you,

15  either.

16        THE REPORTER:  Could you repeat it?

17        MR. PIERSON:  Sure, I can do that.

18    Q.  (BY MR. PIERSON)  On the night of September

19  the 15th, at 2:00 o'clock in the morning, if a vessel

20  has a nine foot draft, you would expect, just based

21  on your knowledge and your study that you did, that

22  it would touch bottom where I am indicating?

23    A.  Let me -- that, that may not be correct.

24  The convention that we use at the National

25  Hydrographic Office for plotting depths in whole feet

0055

1    is that if we had a depth of -- if that particular

2    depth was 9.7 feet we would show it as a nine rounded

3    to whole feet.

4      Q.  If it was 8.7, you would round it up to

5    nine?

6      A.  No.  If it was 8.8 we would round it to

7    nine.

8      Q.  I see.  So there is the potential, then,

9    that what we're looking at here is actually 8.8 feet

10   on this particular exhibit; is that true?

11     A.  That's correct.

12     Q.  Okay.  Now, my question to you, then, is:

13   If it's 8.8 feet on the evening of September the 15th

14   at 2:00 in the morning and a vessel has a draft of

15   nine feet or nine feet, four inches, you would expect

16   it to touch bottom in this particular area, would you

17   not?

18     A.  If the actual depth is 8.8 feet and the

19   draft is 9.4 feet, you would expect it to touch

20   bottom.  That being said, that dashed line that we

21   have drawn here -- and, again, I would caution

22   against really reading in accuracies in this

23   particular, in this particular way, but that line is

24   actually west of that nine foot survey depth which

25   indicates that it's somewhere between nine and 10

0056

1  feet. That contour that we see just to the left of

2  the dashed line is a 10-foot contour, so that, that,

3  that line here -- this line right here corresponds to

4  the 10-foot contour, so this means that there is a 10

5  right where that line is.

6     Q.  If we moved your line that you have drawn

7  out to where the buoy could also be stationed from

8  here, 147, I am referring to --

9          HEARING OFFICER:  Could I jump in a

10  second?  I had the same kind of question.

11      That 147 is a floating thing with a chain which

12  the Coast Guard is going to explain.  Your survey was

13  done 10 days after?

14          THE WITNESS:  Correct.

15          HEARING OFFICER:  That's where the can

16  was in that circle the day of your survey.  We have

17  no idea where it was the night of the incident,

18  right?

19          THE WITNESS:  That's correct.

20          HEARING OFFICER:  It could have been on

21  any side in that circle, if it was properly

22  stationed.  If it was improperly stationed, it could

23  have been out; but we're assuming it was properly.

24  Okay.  I just wanted to --

25          MR. GARZA:  Sir, excuse me.  I am

0057

1  Elijio Garza with the Corps of Engineer.  Now, those

2  depths have the tide correction, am I correct?

3          THE WITNESS:  That's correct.

4          MR. GARZA:  So, then, therefore, there

5  is 2.1 foot of water more, am I correct?

6          THE WITNESS:  It's already in there.

7          MR. GARZA:  It's already in there.

8          THE WITNESS:  It's in there.

9          MR. GARZA:  But that nine feet, does

10  that -- do we have --

11          THE WITNESS:  That's nine feet at the

12  time of the incident.

13          MR. GARZA:  At the time of the

14  incident.  But do we have two additional feet of

15  water with the tide?

16          THE WITNESS:  Right.  We have 11, one,

17  am I right?

18          THE WITNESS:  No, no, no.  We would

19  have seven feet at mean lower low water.

20          MR. GARZA:  Okay.  That's the

21  question.

22          THE REPORTER:  Could you say your name,

23  again?

24          MR. GARZA:  That's Elijio, E-L-I-J-I-O,

25  Garza.

0058

1          MR. PIERSON: May I ask the gentleman

2     that just spoke a question?

3          HEARING OFFICER: Yeah. Listen, let's

4     -- I tell you what we need to do, we need to get him

5     on the stand under oath. That's the Army Corps'

6     representative.

7     .      MR. PIERSON: I just recall him saying

8     earlier he agreed with the NOAA study, so. . .

9          HEARING OFFICER: Okay, right. But

10    we're going to put him on the stand under oath and

11    have him discuss whatever he wants. And if he would

12    like to bring up some of NOAA's slide to point out

13    anything that differs or anything that's the same or

14    whatever, we are going to allow him to do that after

15    the Captain is done.

16    Q.  (BY MR. PIERSON) Would you be kind enough,

17    Captain, to draw us a line from what the projected

18    outer edge station for buoy 149 would be to the outer

19    projected edge of 147, please?

20    A.   Okay. I could do that if you could just

21    give me one second here to -- I am sort of switching

22    between applications here. Let's see. The contour

23    fill incident.

24    Q.   Would you draw the line for us on this type

25    of chart of the colors and the depths?

0059

1    A.  Yes, I can.  All right.  Is that -- let's

2  see.  And you would like to see this line like this?

3    Q.  From where the buoy could be positioned.

4    A.  Okay.

5         HEARING OFFICER:  Is there not a one

6  with a circle on it like we've got at 147 there is a

7  circle?  Does 149 not have a circle?

8         THE WITNESS:  Yeah, yeah, it does.

9         HEARING OFFICER:  Do we have a chart

10  with that?

11         THE WITNESS:  Unfortunately, in this

12  particular I can't show the -- I can't show the fill

13  -- well, what I can do is I have to take away the

14  color fill, but I could show the contour.  I can show

15  the numbers and do that.

16    Q.  (BY MR. PIERSON)  I would just like for you

17  to give us the best estimate if the two buoys were

18  out on their outer edges.

19    A.  All right.  Just give me --

20         HEARING OFFICER:  I would like to see

21  it with the circles, if we can do that.

22         THE WITNESS:  Can I do this just --

23         HEARING OFFICER:  And if we switch

24  screens, somebody please holler to make sure the

25  Coast Guard numbers are properly identifying what

0060

1  we're identifying for the record.  Okay.  There we

2  go.

3        THE WITNESS:  Just contour lines.  I

4  think this is what you are looking for here.  This

5  would give, I think, the most --

6        HEARING OFFICER:  Okay.  Captain, is

7  that, is that the, the foot levels at, at 02:00 on

8  the 15th, or is that chart foot level?

9        THE WITNESS:  No, this is at the time

10  of the incident.

11        HEARING OFFICER:  Okay.  That's from

12  the outer -- and I am sorry, sir.  You have got me

13  thinking about stuff.  From the outer circle, which I

14  understand is the watch circle to the outer circle of

15  147.

16        THE WITNESS:  Okay.  You want me to go

17  to the eastern edge?

18        HEARING OFFICER:  Yes, sir.

19        THE WITNESS:  Like where the cursor is

20  right here?

21        HEARING OFFICER:  Yes, sir.

22        THE WITNESS:  Okay.  Go there to there.

23        HEARING OFFICER:  Okay.

24        MR. PIERSON:  May I continue, then?

25        HEARING OFFICER:  Yes, sir.

1    Q.  (BY MR. PIERSON) So you would agree, and I

2    am sure the Coast Guard would agree, that the buoy

3    could be at the time of the incident on the line that

4    you have just drawn for us between 147 and 149.  That

5    would be a straight line?

6    A.  That would -- if it were in that watch

7    circle, we would consider it accurately.

8    Q.  So over here, then, you would still be

9    within the accurately charted area if you were

10   navigating a barge and you could contact water

11   perhaps as shallow as seven feet, true?

12   A.  In between that seven and the 10, you can

13   see water depths, yes, as shallow as seven feet.

14   Q.  And you could contact and touch bottom if

15   you had a nine-foot draft here at this nine on this

16   particular chart, true?

17   A.  That's correct.

18         THE REPORTER:  I am having trouble

19   hearing.

20         HEARING OFFICER:  Sir, we are going to

21   need you to talk louder out towards --

22         THE REPORTER:  There is some talking,

23   and I can't hear.

24         HEARING OFFICER:  Okay.  Then we're

25   going to need to hold that down back there, too.

0062

1          (Off the record discussion.)

2     Q.  (BY MR. PIERSON)  We know that if a vessel

3   has a nine foot draft that it could touch bottom in a

4   number of areas shown on this particular chart on the

5   evening in question, do we not?

6     A.  That's correct.

7     Q.  And if a vessel is turning to make the Queen

8   Isabella Causeway, it could touch bottom at any of

9   these particular points that you've indicated on this

10   chart, true?

11     A.  In the area, in the area of the seven,

12   you're saying?

13     Q.  The seven, the nines?

14     A.  Along that line that we have drawn that's

15   correct; that's possible.

16     Q.  Okay.  If we reposition the line to exactly

17   where -- let's say the center of those two circles.

18     A.  Okay, the center of the charted buoy

19   positions or the actual position of the buoys?

20     Q.  Yes, sir -- well, you did it 10 days later.

21   I am just asking you to theorize with me here.  Let's

22   just look at it to the center.

23     A.  Okay.  Here you go.

24     Q.  We would have the same nine-foot possibility

25   of touching bottom right here, correct?

0063

1    A.  It would be somewhere between nine and 12,

2  yeah, probably close to nine.

3    Q.  Or even 8.8?

4    A.  That's a possibility.

5    Q.  Well, you're not saying that it's not

6  possible.  You're saying it could be eight feet; it

7  could be up to, what, 12 feet?

8    A.  Between the nine and the 12 that you see

9  charted there, it could be anywhere from 8.8 feet to

10  12 feet.

11    Q.  Do you agree with me that this particular

12  area where I am showing this nine between 147 and 149

13  on your chart could change dramatically within 10

14  days, as far as a buildup of silt?

15        HEARING OFFICER:  Do you know or do you

16  not know, Captain?

17        THE WITNESS:  I don't know.

18        HEARING OFFICER:  If you don't know,

19  just. . .

20    A.  I do not know.

21    Q.  (BY MR. PIERSON)  Would you be kind enough

22  to go to your chart where you show us the scour?

23        HEARING OFFICER:  Okay.  I would like

24  to stop on this one.

25        MR. SPANSEL:  The only thing I wanted

0064

1   to say, is that I think the Captain has customized

2   this particular slide; and I am going to have a

3   couple of questions about it, so if there is a way to

4   save it or leave it up or whatever.

5          HEARING OFFICER:  Let me ask my

6   questions, and you can ask yours; and then we will

7   move on to another slide.

8      Captain, if assuming that at 02:00 on September

9   15th the tide was running hard and the current was

10  running from this corner this way, okay, those cans,

11  I am assuming, that you don't need to be an expert to

12  figure out the cans would be on this edge of these;

13  is that right?  That side of the circle?  I am doing

14  this for the Coast Guard.

15         THE WITNESS:  That's what I would

16  think.  I am no expert on buoys.

17         HEARING OFFICER:  Could you put the

18  line now to the inner edge of the two circles?

19         THE WITNESS:  Here you go.

20         HEARING OFFICER:  Okay.  Does that

21  change anything on your questions?  I would like to

22  have outer edge, center, inner edge.

23         MR. PIERSON:  Sure, I would like to ask

24  a question.

25         HEARING OFFICER:  Okay, please.

0065

1    Q.  (BY MR. PIERSON) If we use the inner line

2  on this particular chart as you've done it now,

3  you're not telling us it's not possible to touch

4  bottom within that inner line if you have a nine-foot

5  draft, are you?

6    A.  I am saying our survey depths along that

7  line are on the order of -- I would say from that 12,

8  from that 12 down to here you would see depths no

9  shoaler than 11.8 feet.

10        MR. PIERSON: I would like to go to the

11  scour deal, unless Mr. Spansel would like to ask

12  questions.

13        HEARING OFFICER:  While we've got this

14  one up, let's --

15        MR. SPANSEL:  Mike, I was thinking like

16  you were, sir, that --

17        HEARING OFFICER:  This is the State of

18  Texas.  Do you have his name?

19        MR. SPANSEL:  So that the record is

20  clear, the Captain has now placed a line on the

21  western side of the scope of each buoy; is that

22  correct, sir?

23        THE WITNESS:  It's on the western side

24  of the watch circle, charted watch circle for the

25  buoy.

0066

1          MR. SPANSEL:  And just so that the

2   record is clear, would you read the various depths

3   between 147 and 149 along that line so it's clear for

4   the record and the court reporter?

5          THE WITNESS:  Okay.  Starting at buoy

6   149 depths of 16, 14, 14, 12, 12, the -- 12, 13, and

7   14 at buoy 147.

8          MR. SPANSEL:  And that would be

9   consistent -- that line would be consistent with a

10  strong current from the southeast to the northwest

11  based on your experience?

12          THE WITNESS:  That's correct.

13          MR. SPANSEL:  Thank you, sir.

14          MR. PIERSON:  Can I go to the scour

15  chart now?

16          HEARING OFFICER:  Please.

17   Q.  (BY MR. PIERSON)  If you would accommodate

18  us.

19   A.  Okay.

20   Q.  12, I think.

21   A.  12?  Oh, that's correct, that's it.

22          HEARING OFFICER:  Okay.  Is this the

23  one you wanted?

24          MR. PIERSON:  12.

25          HEARING OFFICER:  Is this the chart you

0067

1  wanted up?

2          MR. PIERSON: (Counsel nods head.)

3          HEARING OFFICER: What is that NOAA

4  exhibit number?

5          THE WITNESS: Now, this one is one that

6  you don't have.

7          MR. GRODECKI: But we've labeled it

8  NOAA Exhibit 9, even though it's not in here.

9          HEARING OFFICER: Okay. It will be

10  NOAA Exhibit 9 when it's in there.

11     Q.  (BY MR. PIERSON) NOAA Exhibit 9, you're

12  showing an area in you-all's experience with this red

13  line where something man-made has come in contact

14  with the bottom of the Laguna Madre; true?

15     A.  That's correct. And I would like to say,

16  also, that that red line is approximate at this time

17  because this was something that I scaled off very

18  roughly very recently, so that has not been checked,

19  but I think that roughly shows the extent and general

20  location of what we're seeing is a man-made feature

21  on the bottom.

22     Q.  It could be a little bit further to the

23  left, or it could be a little bit further to the

24  right?

25     A.  That's correct, and we could, you know --

0068

1   subsequently we can provide that information very

2   accurately.  It wasn't until that I received the

3   information from Mr. Wilson about these so-called

4   hole ones and hole twos that I really looked at our

5   sonar records very precisely.

6       Q.  There is actually four holes on the survey

7   that you-all did?

8       A.  That's correct, and I assume that the

9   information that we were given, there must have been

10  some err with that because hole number three plotted

11  over here in the middle of the channel in 19 feet of

12  water, and hole number four plotted up here in number

13  four I think for this discussion, these particular

14  positions really don't have any relevance.

15          HEARING OFFICER:  Okay, sir.  I have

16  got a -- I would like to get something on the record

17  because I am a little lost.  These holes that you

18  have got on there, the information latitude and

19  longitude that I provided you that I got from Brown

20  Water survey?

21          THE WITNESS:  That's correct.

22          HEARING OFFICER:  Okay.

23          THE WITNESS:  Now, can I also clarify?

24          HEARING OFFICER:  Sure.

25          THE WITNESS:  The positions that you

0069

1  provided me were in what's called a Horizontal Datum

2  of North American Datum 27.  The, the position of the

3  chart or the chart itself, as well as our survey, was

4  conducted on what's called North American Datum 83.

5  That's sort of the standard datum that's in use now.

6  There is a difference, there is a difference of about

7  30 meters in latitude and longitude roughly between

8  these two datums.  I converted those positions from

9  latitude and longitude in 1827 to 83 so I can display

10  here.  And, as I said, what, what was indicated on

11  the E-mail that you sent me hole one and hole two

12  correspond closely to what we're saying is some sort

13  of man-made feature on the bottom.

14        HEARING OFFICER:  Okay, sir.  Why are

15  you saying it's man-made?

16        THE WITNESS:  Well, again, this is -- I

17  would say this is based on our interpretive

18  judgment.  What we see on the bottom on our sonar

19  record is a long, straight line.  Now -- and it has

20  an indentation on the bottom.  Those kind of features

21  don't usually exist naturally along the ocean

22  bottom.  Straight lines are, are --

23        HEARING OFFICER:  God doesn't make many

24  straight lines.

25        THE WITNESS:  No, not along the ocean

0070

1    bottom.  Now, again, that feature, we have no idea

2    where that had come from.  We see those kind of

3    features sometimes from fishing vessels that are

4    trawling the bottom, from dredges that scour, create

5    dredge scours, from vessels that have dragged

6    anchors, and from, from vessels that have been near

7    the bottom.  Depending on the bottom type, in my

8    experience in interpreting side scan sonars, you can

9    be very close to the bottom, not be on the bottom,

10   and still disrupt the bottom to make a -- sort of a

11   trench-like feature.

12          HEARING OFFICER:  Okay.  How long do

13   you think we're going to be?  He has been on the

14   stand for an hour and a half.  I am thinking a break

15   now.  We will put you back up or you can continue, if

16   it's not going to be much longer.

17          MR. PIERSON:  A break is fine.

18          HEARING OFFICER:  Okay.  We're in

19   recess.  Does anybody need more than 10 minutes?

20   We're in recess.  It's 9:30.

21          (A recess was taken.)

22          HEARING OFFICER:  It's 09:47.  We're

23   back in session.  A television -- you're a television

24   station, sir?  I believe I have your card here.  News

25   10, KZTV.  I put in a special request for him.  He

0071

1    says that his camera can get copies of all this as

2    we're up here presenting it.  I may -- and he has

3    agreed to supply us with a copy, so I may use that as

4    a backup to preserve the record.  Do you have a clear

5    view from back there?

6            THE VIDEOGRAPHER:  (Nods head.)

7            HEARING OFFICER:  Okay.  And I thank

8    you for your public service.

9            HEARING OFFICER:  Okay.  The hearing is

10    in order.  Captain Perugini is on the witness stand

11    under oath.  Mr. Pierson?

12            MR. PIERSON:  Yes, sir.

13            HEARING OFFICER:  I believe you had the

14    floor.

15            MR. PIERSON:  Thank you.

16    Q.  (BY MR. PIERSON)  Could we go back, Captain,

17    to the scour screen?

18    A.  Yes.

19    Q.  This is for the record, again, Exhibit 9?

20            MR. GRODECKI:  Just one minute.  Okay.

21    Is this the one that we do not have in the record?

22            HEARING OFFICER:  That's No. 9.

23            MR. GRODECKI:  Exhibit No. 9, that's

24    correct.

25    Q.  (BY MR. PIERSON)  You testified that in your

1   experience this is a man-made mark that's shown the

2   red line between the two red dots, correct?

3       A.   That's correct.

4       Q.   You testified that it could be consistent

5   with a shrimp boat, a trawler on a shrimp boat?

6       A.   What I said was fishing vessels, for

7   example, a trawler that might drag the bottom when

8   they are fishing -- and I have no idea what the local

9   fishing habits are down here -- they can make marks

10  on the bottom that appear similar to this mark.

11      Q.   We're talking about like the doors of the

12  shrimp boat?

13      A.   That's correct.

14      Q.   Correct?  And, of course, we know, are

15  familiar with that area, that there are many

16  shrimpers down there, just for your information.

17      But the market you've described for us would also

18  be consistent with the corner of the barge touching

19  bottom, would it not?

20      A.   It is consistent with some type of touching

21  of the bottom by a vessel.  I can't say the corner.

22  It's really very interpretive on what it is.

23      Q.   Well, you mentioned a number of

24  possibilities?

25      A.   Correct.  A vessel -- certainly a vessel

0073

1   touching the bottom is one of the possibilities.

2      Q.  And that would include a barge?

3      A.  Correct.

4      Q.  You just can't be that sophisticated at this

5   time to tell us?

6      A.  That's correct.

7      Q.  But we know that that's a man-made mark?

8      A.  That's our interpretation, that it is a

9   man-made mark.

10     Q.  It is not a dredge cutter cutting into the

11  channel?

12     A.  I have no idea.

13     Q.  Well, you know what those look like.  The

14  dredge that cuts into this particular channel run

15  like this, do they not?

16     A.  I have no idea.

17     Q.  Did you see anything like that on your data?

18     A.  Not that I can recall, no.

19     Q.  Really?  Do you know that this area was

20  dredged allegedly three months prior to this

21  incident?

22     A.  I was not aware of that.  I can say that in

23  September we did receive from the Corps of Engineers

24  a report that said survey depths were 12 feet or

25  greater.  That is a condition of the, the project

0074

1   channel was 12 feet or greater.

2      Q.   The white water?

3      A.   Correct.

4      Q.   Okay.  But this mark that you have for us on

5   Exhibit No. 9, that's not a dredge mark, is it?

6      A.   I have no idea.  It may be.  There is really

7   no way for me to tell what made that mark.

8      Q.   Your particular single scan, am I right?

9      A.   Side scan sonar.

10     Q.   Okay.  But you use one, one beam, right?

11     A.   Not in the side scan sonar, no.  What I

12   explained to you was the echo sounder, single beam

13   echo sounder that measures depths very precisely

14   under the vessel as it surveys back and forth.  The

15   side scan sonar sends out sound waves to each side of

16   this towed fish that's towed behind the vessel.  And

17   if something is sticking up above the bottom or

18   something is very hard on the bottom, basically there

19   will be a return to the fish, and it will create this

20   shadowy image, so you can see in this particular case

21   with side scan sonar features that rise up above the

22   bottom that's off the, the track of the vessel on the

23   fish.

24     Q.   Well, the bottom is not level.  I mean, we

25   agree with that?