0075

1    A.  Correct.

2    Q.  I am talking about in this area.  It's not

3  level?

4    A.  That's correct, there is a slope there.

5        HEARING OFFICER:  Can I interrupt a

6  minute?  Do we have the ability to show the side scan

7  computer 3-D animation that I saw down at South Padre

8  Island?

9        THE WITNESS:  The 3-D animation?

10       HEARING OFFICER:  They showed myself --

11       THE WITNESS:  I can show -- I have the

12  side scan records with me.  I don't have them in

13  electronic format.  I have got them on paper, but you

14  can see them.

15       HEARING OFFICER:  Okay.  That wouldn't

16  answer my question.  This was an electronic format

17  3-D thing, so if we don't, that's fine, sir.

18       MR. PIERSON:  We will be able to show

19  you side scan similar to what he's talking about in

20  our presentation.

21       HEARING OFFICER:  Okay.  In the 3-D

22  mode and all of that?

23       MR. PIERSON:  We will eventually be

24  able to do that, but we can show it much more

25  sophisticated than it.

0076

1        HEARING OFFICER:  Okay.  Then why are

2    we staying with this?

3        MR. PIERSON:  Because I wanted to

4    establish, since I believe he's an expert and

5    probably the most knowledgeable person in the country

6    about this particular issue, that this particular

7    mark in his interpretive data could be consistent

8    with the vessel touching bottom.

9        THE WITNESS:  That's correct.

10    Q.  (BY MR. PIERSON)  Okay.  The holes that we

11    have talked about here, one and two, they are

12    actually quite large, are they not?

13    A.  We did not see large holes on our side scan

14    records.

15    Q.  Well, how big would you say that they are?

16    A.  I really did not make an estimate.

17        HEARING OFFICER:  I have got a

18    question.  Aren't those holes there because of

19    information provided through me by Brown Water?  How

20    would he know how big the holes are?

21        MR. PIERSON:  Well, because you're

22    capable, if you make that particular study, to

23    determine that that's evidence of prior groundings of

24    other vessels or perhaps this vessel.

25        HEARING OFFICER:  Okay.  But those are

1  Brown Water's holes.

2        MR. PIERSON:  I am just asking him if

3  he found those in his side scan.

4        HEARING OFFICER:  Okay.  That's a good

5  question.  Did you find those in your side scan?

6        THE WITNESS:  We did not find anything

7  that we would characterize as holes.  What we found

8  was this one, long line that appears to be a man-made

9  feature.

10      Now, I have to say that when we did the survey,

11  too, we really were not doing this survey to

12  necessarily look for, you know, features on the

13  bottom.  This is not really a routine part of what we

14  do in our surveys.  The kind of things that we use

15  side scan for typically is to see if there are

16  obstructions or features rising up above the bottom,

17  so I have to say that we did not focus in on this

18  area and really concentrate.  We at the time of the

19  survey did not know that this particular area was

20  really of interest.

21        HEARING OFFICER:  Okay.  Thank you.

22      Q.  (BY MR. PIERSON)  We do.

23      Are you familiar or have you heard that Captain

24  Fowler told the Coast Guard within minutes after the

25  incident that he believed that he had touched bottom

0078

1    between markers 149 and 147?

2        A.  I had heard that -- I guess I had read in

3    the newspaper reports that there was something about

4    touching the bottom.

5        Q.  Okay.  These holes in the data that came

6    from us, they would be consistent with perhaps a

7    wheel wash of the vessel?

8        A.  I haven't seen your records, so I don't

9    know.

10       Q.  Okay.  But what causes a hole?  That's,

11   that's not an actual feature either, is it?

12           HEARING OFFICER:  I don't think he has

13   the background on your holes to describe what your

14   holes look like.

15           MR. PIERSON:  I was just asking in

16   general.  He used the term holes, what he means by

17   that.

18           HEARING OFFICER:  Your expert will

19   explain this when he takes -- I mean, it looks like

20   we're beating a dead horse to death here.  If you're

21   trying to lay a background for your expert that he

22   can agree with whatever, that's, you know --

23           MR. PIERSON:  Okay.  That's fine.  I

24   understand.

25       Q.  (BY MR. PIERSON)  What I am interested in,

1  when you did you-all's particular survey, is it

2  measured 25 meters apart as we go up this chart,

3  true?

4      A.  Correct.  That's the echo sounding single

5  beam survey, correct.  Now, the side scan lines were

6  run.  One line was run along the, the eastern edge,

7  the black dash line --

8      Q.  That would be this --

9      A.  -- along the channel, correct.  The other

10  line was run in the middle of the channel which

11  corresponds to the magenta line, and the other line

12  was run on the outer edge of the channel, the, the

13  western side.

14      Q.  So to answer my question, you-all did not do

15  side scan sonar in this area that's blue at all, did

16  you?

17      A.  Oh, yes.  Well, again, the side scan sonar

18  looks out 50 meters to each side of the vessel track,

19  so in this particular case -- well, I have to be in

20  the other -- in this particular case, what we have is

21  looking out --

22          HEARING OFFICER:  We are on the same

23  exhibit?

24          THE WITNESS:  No, we're not.

25          HEARING OFFICER:  What exhibit are we

1  on?

2          MR. GRODECKI:  I didn't see which one

3  he switched to.

4          THE WITNESS:  Well, this is not -- this

5  is sort of a real time tool that is not a power point

6  exhibit.

7          HEARING OFFICER:  Okay.  He doesn't

8  have a picture of this in there?

9          MR. GRODECKI:  The one that most

10  closely --

11          THE WITNESS:  When I measure, I have to

12  be in this real time tool that I am using.

13          HEARING OFFICER:  Okay, sir.

14          MR. PIERSON:  So I have asked him to go

15  out and tell us how far they did side scan sonar.

16          HEARING OFFICER:  And can I make --

17  somebody this morning said it was 150 meters or 150

18  meters or which one?

19          THE WITNESS:  50 meters.

20          HEARING OFFICER:  Which is

21  approximately 150 feet?

22          THE WITNESS:  Which is approximately a

23  little more than 150 feet, right.

24          HEARING OFFICER:  Okay.

25  A.  Okay.  So this side scan line that was run

0081

1  here along this channel edge -- I think it was

2  actually this particular line was run south.  The

3  side scan sonar looks out 50 meters, approximately

4  out to where this crosses, so we image a part of the

5  bottom on that particular line that includes what I

6  think you had indicated were hole one and hole two.

7          HEARING OFFICER:  Captain, how did you

8  get the location of marker 147, then, if that's more

9  than 150 feet from the edge of the channel?

10          THE WITNESS:  Oh, well, the side scan

11  lines, they are run independently.  What we -- I

12  mean, typically the way we would conduct a survey,

13  first we basically do the echo sounding survey, which

14  essentially is taking the vessel back and forth 25

15  meter spacing crossing the line.

16          HEARING OFFICER:  That's for depth?

17          THE WITNESS:  That's the depths.  Then

18  what they might have done was gone to each aid to

19  navigation, brought the boat up alongside it, take --

20  recorded a position.  That's where you see this.

21          HEARING OFFICER:  Okay.

22          THE WITNESS:  Then what they did was

23  they threw their side scan sonar fish in the water,

24  ability to look out 50 meters on each side and

25  basically ran a line along the channel, in the middle

1  of the channel and to the west of the channel.

2       HEARING OFFICER:  Okay.  Thank you,

3  sir.

4    Q.  (BY MR. PIERSON)  On you-all's side scan

5  sonar, what are the intervals that you-all recorded

6  your data?

7    A.  That -- you want time or distance?

8    Q.  Distance.

9    A.  Well, if you can give me a second.  It's --

10  I can figure that out pretty quickly.

11       HEARING OFFICER:  Is this something

12  that we have as an exhibit?

13       THE WITNESS:  Something that I would

14  say you have.  It is not an exhibit you have

15  available to you, though.

16       HEARING OFFICER:  Could you do

17  something to make that available as an exhibit?

18       THE WITNESS:  Anything that -- any

19  particular view that you see in this real time tool,

20  you just tell me what you -- if you want me to

21  capture a screen.  I will do that and have somebody

22  --

23       HEARING OFFICER:  Okay, sir.  Once you

24  get it set up the way you want, I would like this one

25  captured, and then we will make that --

0083

1        MS. WOOD: It would be NOAA Exhibit 17.

2        HEARING OFFICER: NOAA Exhibit 17. It

3   won't be here until later.

4        THE WITNESS: All right. Let's try

5   this. Okay. So the distance -- you will see this

6   line 116, 117, 118. These are the, the sequence of

7   side scan sonar positions. Approximately every 90

8   feet we -- actually, we recorded a mark every, every

9   90 feet, but, in fact, the data are being recorded

10   once a second, so the information is being really

11   recorded constantly.

12    Q.  (BY MR. PIERSON) But what I am interested

13   in is the numbers that you came up with on your

14   charts to show the depth, then, are recorded

15   essentially every 90 feet, true?

16    A.  We have -- the digital information is

17   recorded every second. It is just portrayed in this

18   particular case every 90 feet. What you decide to

19   portray is different from what you record.

20    Q.  Sure. And all I would like for you to

21   answer is the numbers that you have shown us for the

22   depths of the water in your various charts in the

23   blue water to the right of the channel records

24   information every 90 feet from your side scan sonar?

25    A.  It doesn't -- no, it records information

0084

1   once a second from my side scan sonar.  It displays

2   it once every 90 feet.

3      Q.  So can you tell us with certainty, then,

4   what's on the bottom between the 90 feet or 90-foot

5   intervals?

6      A.  I can tell you the depths between the

7   90-foot intervals, yes.

8      Q.  With certainty?

9      A.  With as much certainty as each individual

10   depth that you see plotted there.

11      Q.  Well, that's what I was asking you.

12      A.  Yeah.

13      Q.  But you can't tell us around one of those

14   numbers whether or not it's, in fact, eight feet or

15   seven feet or nine feet because the bottom changes,

16   does it not?

17      A.  Oh, I think you're talking about two

18   different things there.  The bottom changing is a

19   whole different issue than if I can tell from the day

20   of my survey what is between any two depths that

21   you're seeing.  I can go back into our data records

22   at any point along the lines and tell you precisely

23   what the depth is with the same accuracy that all of

24   the other depths are that you see displayed.  That's

25   not a problem.  The water, the bottom changing over a

0085

1   period of time, that's a, that's a whole separate

2   issue.  And how often it changed, whether it does

3   change, that's really not our --

4          HEARING OFFICER:  You don't have that

5   data, sir?

6          THE WITNESS:  -- expertise.

7          HEARING OFFICER:  See, you wouldn't

8   know that, right --

9          THE WITNESS:  No.

10         HEARING OFFICER:  -- unless somebody

11  told you?

12         THE WITNESS:  I have no idea what the

13  dynamics of that, that area are.

14         HEARING OFFICER:  Okay.

15     Q.  (BY MR. PIERSON)  Do you know the dynamics

16  of a barge as it moves through the water that the

17  shallower it gets the more that it compresses toward

18  the bottom, the shallower the water?

19     A.  I am familiar with the general principle of

20  settlement and squat of a vessel.

21     Q.  And what I said was accurate?  The shallower

22  the water --

23     A.  Well --

24         HEARING OFFICER:  I have got to stop

25  here a second.  I am trying to decide if this is the

1   right witness to get into that.  Do you have this

2   knowledge, Captain?

3          THE WITNESS:  I don't, I don't have

4   that specific knowledge because I think it's based on

5   individual vessels and their characteristics.

6          HEARING OFFICER:  There is no way you

7   could be qualified as an expert in --

8          THE WITNESS:  No.

9          HEARING OFFICER:  -- in squatting of

10  barges?

11      I would like to -- if we have got another

12  witness, I would love to hear this information, but I

13  don't think this is the right witness.

14          MR. PIERSON:  Okay.  I am just

15  inquiring about whether or not it's possible that if

16  you have a nine-foot draft of a barge and you have

17  water depths that are nine feet, six inches, nine

18  feet, eight inches that as a barge traverses that

19  area that it would actually squat down a little bit

20  lower.  That's all I was asking.

21      A.  I just don't -- I do not know the

22  hydrodynamics.

23          HEARING OFFICER:  Yeah, wrong, wrong

24  witness.

25      Q.  (BY MR. PIERSON)  Let me ask you this,

0087

1    though:  What you do know is from the sophisticated

2    study that you-all did that you have determined

3    evidence of some type of man-made contact in the area

4    between 147 and 149?

5        A.  There is a feature in our estimation that

6    was made -- that was man-made, and I have to say that

7    it doesn't necessarily mean something was dragging on

8    the bottom.  In my mind it's possible that if you

9    have a, a vessel traveling very close to the bottom,

10    depending on the bottom type -- and I am not at all

11    an expert or familiar with the bottom type -- you can

12    stir up silt or whatever the bottom type is without

13    actually being in contact with the bottom.

14        Q.  And you could also touch it?

15        A.  You can also touch it and make the same type

16    of mark that we saw.

17        Q.  You just can't tell us?

18        A.  I cannot tell you.

19        Q.  Let me ask you this:  The information that

20    you have with your side scan sonar, how many passes

21    did the vessel make?  Did it just go down the eastern

22    edge of the channel one time?

23        A.  It went down the eastern edge of the channel

24    one time, correct.

25        Q.  And you have calibrated your equipment

0088

1  satisfactorily so that you're satisfied with that

2  side scan sonar?

3     A.  The calibration techniques that we used are

4  the same calibration techniques that we use in TWA

5  Flight 800 and the JFK, Junior flight.

6        HEARING OFFICER:  Haven't we gone over

7  this area?

8        MR. PIERSON:  I was going to ask a

9  different question.

10        HEARING OFFICER:  Okay.

11     Q.  (BY MR. PIERSON)  The aids to navigation and

12  the charts that you-all published, the charts are

13  considered to be aids to navigation as well?

14     A.  The charts are -- nautical charts are

15  basically the mariner's road map.  They are for

16  certain categories of vessel required by law to be

17  carried, and they show the latest information that

18  NOAA has from all these different sources.

19     Q.  And relied upon?

20     A.  And relied upon, correct.

21     Q.  And so we know that if a captain is

22  traversing this particular channel on the night of

23  September the 15th at 2:00 in the morning and if his

24  barge, the stern of the barge contacts the ground in

25  the area where you indicated the scour mark, that

0089

1   that's possible under your data?

2   A.   Again --

3       MR. SPANSEL:  Objection.  That's

4   ambiguous.  I don't understand the question.

5       HEARING OFFICER:  I was thinking the --

6   I was trying to figure out --

7       MR. PIERSON:  I will make it more clear

8   for you.

9       THE WITNESS:  Can I answer that?

10      HEARING OFFICER:  Sure.

11   A.   Just our chart in the area of the scour

12   shows that there are depths six feet or less in that

13   particular area where we've found the scour mark.

14      HEARING OFFICER:  Okay.

15   A.   That's what our chart shows.  And if a

16   mariner is using our chart to navigate, what the

17   chart is telling them is they have a nine-foot draft,

18   there is six feet of water outside the federal

19   project.

20      HEARING OFFICER:  And the two don't

21   match.

22   Q.   (BY MR. PIERSON)  And if you did come into

23   contact with it, though, the bottom, you have seen

24   physical evidence to confirm that from your side scan

25   sonar, true?

1        HEARING OFFICER: I, I --

2    A.  I don't have physical -- I cannot say that

3  we have physical evidence that that barge dragged

4  across the bottom in that area.

5    Q.  (BY MR. PIERSON)  But you can't rule it out,

6  either, can you?

7    A.  I cannot rule it out.

8        MR. GRODECKI:  Before we move on,

9  Mr. Wilson, you have designated this as Exhibit 17?

10        HEARING OFFICER:  NOAA 17.  You have

11  captured it, Captain?

12        THE WITNESS:  No, I haven't.  Now, this

13  is the view you want?

14        HEARING OFFICER:  Yes, sir, that's the

15  one we were discussing, so that's the one we want.

16        THE WITNESS:  Okay.

17        MR. PIERSON:  One or two more

18  questions, Mr. Wilson.

19        HEARING OFFICER:  Sure.  Do you want

20  this screen up there?

21        MR. PIERSON:  No, that's fine.

22    Q.  (BY MR. PIERSON)  The evidence that you

23  have, Captain, would be consistent with the barge

24  touching the area that you have shown for us in your

25  various diagrams?

0091

1          HEARING OFFICER:  Captain, do you have

2    the experience or knowledge or training to -- I think

3    you've explained there is a straight line there, and

4    you have no idea; but it appears to be man-made by

5    something.

6          THE WITNESS:  That's correct.

7          MR. PIERSON:  And all I am asking is if

8    in his experience it would be consistent with the

9    vessel touching the bottom in that area.

10         MR. SPANSEL:  A turning vessel?

11         MR. PIERSON:  That's fine, too, however

12   you would like to qualify it.

13         HEARING OFFICER:  Do you have the

14   expertise to answer these questions?

15         THE WITNESS:  Again, I think I have

16   answered that question.

17    A.  The answer is that line across the bottom

18   could have been made by a number of different

19   occurrences, one of which is a vessel dragging across

20   the bottom, another is a fishing activity, another is

21   a vessel being close to the bottom, and another is an

22   anchor dragging across the bottom.

23         HEARING OFFICER:  Okay.

24         THE WITNESS:  So that's really, I

25   think, the best we can determine.  It is not a, you

0092

1    know, a completely -- it's highly interpretive.

2           HEARING OFFICER: Okay. That's the end

3    of that subject. Everybody I know has got the

4    information.

5           MR. PIERSON: Thank you for being here,

6    Captain.

7           THE WITNESS: Sure.

8           HEARING OFFICER: Any other questions

9    for the Captain? Sir?

10              E X A M I N A T I O N

11   BY MR. SPANSEL:

12     Q.  Mark Spansel on behalf of TxDOT.

13         Would you mind going back to the slide on scour

14   on sonar record?

15     A.  Okay.

16     Q.  The red line that's displayed there, which

17   has been described as a straight line, a man-made --

18   apparently man-made disturbance?

19           HEARING OFFICER: What exhibit is

20   this? I am sorry. Number?

21           MS. WOOD: No. 17, sir, NOAA 17.

22           MR. GRODECKI: No, that's not 17. He

23   switched. That's No. 9, the one that's not in here.

24           HEARING OFFICER: Okay. That's NOAA

25   exhibit not available No. 9. I am sorry. Go ahead.

0093

1    Q.  (BY MR. SPANSEL)  The southern most point of

2    that line, can you tell us how far it is outside the

3    edge of the channel?

4    A.  I can give you a very rough estimate.

5    Q.  Would you do that?

6    A.  I think I can give you a rough estimate.

7    Let's see.

8         HEARING OFFICER:  Whichever chart

9    you're going to stop on, Captain, just give us a

10   second to figure out.

11   A.  Well, yeah, you know, this is, this is very

12   rough because right now I am eye-balling it here, but

13   on the order of 60 feet.

14   Q.  (BY MR. SPANSEL)  And I was going to ask you

15   --

16   A.  And, again, I want to qualify that as being

17   very approximate.

18        HEARING OFFICER:  Given time, could you

19   come up with a better?

20        THE WITNESS:  Given time, again, I

21   think since this issue of scours and holes really

22   came up, brought to our attention in the last day or

23   two, we really haven't done all of this location, you

24   know, as accurate as we can.  And, again, I would

25   like to reiterate that for any particular area of

0094

1  interest, like, between this 14 and this 10, for

2  example, we have data between there essentially

3  collected once every second, that if you wanted to

4  have more dense information in any particular place,

5  we can provide that.

6      Again, we were requested to do this survey

7  essentially to say if the channel was passable or

8  not, and that's how the survey was done.  But we have

9  information that we can extract far more

10  sophisticated.

11          HEARING OFFICER:  Okay.  That's nice to

12  know.  Do we have this exhibit?

13          MR. GRODECKI:  This particular view

14  he's showing here?

15          HEARING OFFICER:  Yes, is that the one

16  that he captured earlier.

17          MR. GRODECKI:  No, sir.

18          HEARING OFFICER:  Could you capture

19  that for us, sir?

20          THE WITNESS:  Okay.

21          HEARING OFFICER:  Because you were

22  discussing various depths.  That would be NOAA

23  exhibit --

24          MS. WOOD:  18, sir.

25          HEARING OFFICER:  18.

0095

1          THE WITNESS:  Okay.

2          HEARING OFFICER:  Thank you, sir.

3          THE WITNESS:  It will take a second

4   here.

5          MR. SPANSEL:  While the captain is

6   working on the display, I would be satisfied if he

7   can do the calculations and provide them to you,

8   Mr. Wilson, after the hearing.  And what I am

9   interested in is the distance of that entire scour

10  line --

11         THE WITNESS:  Yeah.

12         MR. SPANSEL:  -- from the southern to

13  the northern most point outside the edge of the

14  channel.

15         THE WITNESS:  We can, we can provide

16  that information.

17         HEARING OFFICER:  You can provide that

18  whenever it's convenient for you, sir.

19         THE WITNESS:  We can give you a lot

20  more information on that scour line, including --

21         HEARING OFFICER:  As I explained

22  opening day, this hearing is a part of the Coast

23  Guard investigation.  It is not the investigation, so

24  if it's not convenient for you to get it to us before

25  the close of the hearing, if you will provide it to

0096

1   me, I will provide it to the --

2        THE WITNESS:  We can provide all this

3   in electronic images to you and give you the

4   calculations of length, width and all of the

5   parameters.

6        HEARING OFFICER:  Latitude and

7   longitude, down to the whatevers?

8        THE WITNESS:  Not a problem.

9        HEARING OFFICER:  Okay.  Thank you,

10  sir.  Any more questions?

11       MR. SPANSEL:  Yes.

12   Q.  (BY MR. SPANSEL)  The next question would go

13  -- if you're finished, Captain, if we can go back to

14  that scour slide.

15   A.  Okay.

16       HEARING OFFICER:  That's NOAA exhibit

17  number -- that's the one that's not in.  I think it's

18  nine, NOAA Exhibit 9.

19   Q.  (BY MR. SPANSEL)  Subject to the

20  supplementation of the record with exact

21  calculations, Captain, you've testified that the

22  length of that line is approximately 600 feet; is

23  that correct?

24   A.  I could probably give you a little better

25  estimation.  Let's see.  I would say closer to

0097

1  approximately 500 feet.

2      Q.  Now, it's essentially a straight line; is

3  that correct?

4      A.  That's correct.

5      Q.  If the object that made that straight line

6  were moving from south to north, is it fair to say

7  that it was moving in a straight line with the scour

8  mark?

9      A.  Could you repeat that?

10     Q.  Whatever object made the scour line of some

11  500 feet, is it fair to say that it also was moving

12  in a straight line for some at least 500 feet?

13     A.  That's correct.

14     Q.  Let me ask you, Captain:  Going back to the

15  testimony about the tide data that you had, you told

16  us that at the time of this incident we were almost

17  at high tide.

18     A.  Correct.

19     Q.  Are you able to tell us what the difference

20  in time is at that area between maximum current and

21  high tide?

22     A.  We have no information at all on current.

23         MR. SPANSEL:  Okay.  Mr. Wilson, I was

24  going to ask finally, may we as parties and interest

25  have copies of the slides that have been presented

0098

1   here in evidence today?

2           HEARING OFFICER: One hundred percent,

3   sir. I think some of them --

4           MR. GRODECKI: We have extra copies.

5           HEARING OFFICER: We have extra. I

6   think NOAA provided us extra copies. Anybody that

7   doesn't have them will get them to you.

8           THE WITNESS: And just -- the scour

9   slide is not in those packages. That was one that we

10  put together last night.

11          MR. GRODECKI: There is a total of

12  three exhibits that are not in that.

13          HEARING OFFICER: Okay.

14          MR. SPANSEL: And my last question,

15  Mr. Wilson, is the Captain going to stay and observe

16  the testimony of the Brown Water?

17          HEARING OFFICER: Yes, sir, he has

18  agreed to stay throughout the day because this is

19  channel day, in case anybody forgot.

20          HEARING OFFICER: Captain, I have got a

21  question for you. Could you put the scour slide back

22  up, the NOAA Exhibit No. --

23          MR. GRODECKI: Nine.

24          HEARING OFFICER: Nine.

25          HEARING OFFICER: Okay. What I am

0099

1   curious is, Captain, we have got a 500-foot scour

2   there.  And looking at the depths, it appears to me

3   not that have a longer scour or a turn scour or if it

4   was a vessel.  It would have had to back right

5   straight out that straight line.  I guess I am

6   looking -- if a vessel went up through there in a

7   straight line and was, and was making this scour, why

8   does the scour stop?  The only thing I could come up

9   with, it must have backed out down the same straight

10  line, or is there some depth there that would say,

11  well, we are not scouring any more?

12          THE WITNESS:  I will say this, that,

13  again, the side scan line that we ran essentially was

14  along the dashed line which delineates the east edge

15  of the channel.  This particular, the start of, of

16  this scour we found was about 40 meters from the edge

17  of the channel.  Essentially, as you travel farther

18  north along the channel, you know, this would tend to

19  depart, and essentially we're looking out 50 meters

20  on the side scan, so this may continue out here.

21          HEARING OFFICER:  Okay.  And it's

22  getting into a deep water up there, so that's a

23  possibility.  Okay.  That answers my question.

24          MR. PIERSON:  May I ask a question to

25  follow up?

0100

1        HEARING OFFICER:  Certainly.

2            E X A M I N A T I O N

3   BY MR. PIERSON:

4      Q.  So your scour mark that's in a straight

5   line, it could also be evidence if a more

6   sophisticated reading was done of a turn or an elbow

7   beyond the northern part or point?

8      A.  That's really not my, not my area of

9   expertise.

10     Q.  I understand, but you just don't know what's

11  beyond the northern part or point of that scour mark?

12     A.  That's correct.

13     Q.  And if a vessel was turning, you would

14  expect to see perhaps some evidence of an elbow

15  bending toward the left?

16     A.  If that scour mark were made by a vessel and

17  it was turning back toward the channel and it were

18  dragging the bottom, we would expect to see it.  We

19  would expect to see some evidence of it within the 50

20  meter range scale of the sonar.

21     Q.  But you-all just haven't made that

22  particular determination yet?

23     A.  Well, again, basically our data, again, is

24  50 meters out, so, you know, what happened, what

25  happened out here outside the 50 meters, there is no

0101

1    way for us to tell.

2      Q.  Well, the 50 meters actually would get

3    closer, more toward the left as the channel bends to

4    the left?

5            HEARING OFFICER:  Is there any way,

6    Captain, to put a 50 meter line on there and move it

7    along that channel?

8            THE WITNESS:  You're really pushing me

9    here.  Let's see.

10           HEARING OFFICER:  Well, you've got the

11   only piece of equipment that's worked since we've

12   started this, so I want to see it working.

13           THE WITNESS:  The problem is --

14           HEARING OFFICER:  Now, if it's going to

15   be a long project where you can do it later --

16           THE WITNESS:  Let me just try this.

17           HEARING OFFICER:  -- that would be

18   fine.  I would be interested in that, also.

19           THE WITNESS:  Let's see.  All right.

20   So --

21           HEARING OFFICER:  I guess what we want

22   is from the north end, the north end of your scour

23   mark is a line drawn from the channel where you feel

24   that the NOAA vessel was making its side scan 50

25   meters towards the north end of the scour mark.

0102

1          THE WITNESS: Let me do my best here.

2     Okay. Roughly, I think roughly -- I know this

3     line is pretty difficult to see. This is roughly the

4     area of coverage of our side scan line.

5          HEARING OFFICER: Okay.

6          THE WITNESS: And --

7          MR. PIERSON: May we have that marked,

8     Mr. Wilson?

9          HEARING OFFICER: Yes. Do we have

10    this? Let's just capture this one and make it NOAA

11    exhibit next in line which would be?

12         MR. GRODECKI: 19.

13         HEARING OFFICER: NOAA Exhibit 19, sir,

14    if you could capture that.

15         THE WITNESS: Okay. You know, I am not

16    sure -- I am sorry. I have to do this in here. I am

17    not sure I can do what you need to have done here,

18    but let me try one more thing here.

19    Okay. What are we calling this now?

20         HEARING OFFICER: NOAA Exhibit No. 18.

21         THE WITNESS: Again, I would like to

22    qualify all of this, that, you know, the accuracy of

23    all of this is really not as good as we can provide

24    at a later time.

25         HEARING OFFICER: Okay. Well, this is

0103

1   good enough for right now.  It gives us the idea.

2   Now, I believe, sir, that you were going to try and

3   figure out where that scour line is based on your 50

4   meter scan, and what we're looking for is the

5   northern end of the scour line and whether or not it

6   should have been in your 50 foot -- I am sorry, 50

7   meter scan.

8           THE WITNESS:  Yeah, that's going to be

9   very difficult for me to --

10          HEARING OFFICER:  Okay.  If it's not

11   going to be somewhere close to accurate, we don't

12   want it.

13          THE WITNESS:  Yeah, there is really --

14   I don't think I am going to be able to do that.

15          HEARING OFFICER:  Okay.  Sir, does

16   Brown Water -- did Brown Water find that scour loss,

17   though, on their survey?

18          MR. PIERSON:  Yes, sir.

19          HEARING OFFICER:  Are they going to be

20   able to do that?

21          MR. PIERSON:  Yes, sir.

22          HEARING OFFICER:  Okay.  Thank you.

23   Anything else for the Captain?

24

25           E X A M I N A T I O N

0104

1  BY MR. KRAEHE:

2      Q.  I have a few questions.  I am George

3  Kraehe.  I represent Cameron County.  Sir, as I

4  understand it, your mission is to generate charts

5  that mariners can use?

6      A.  Correct.

7      Q.  And the purpose of these charts is to

8  provide all of the information a mariner needs in

9  order to safely navigate his vessel?

10     A.  A nautical chart is not all of the

11  information.  There are other publications, for

12  example, like NOAA also publishes a textual

13  publication called The Coast Pilot that is sort of a

14  descriptive supplement to the chart.  Publications

15  like Light List, so the nautical chart is certainly

16  an important tool that the mariners -- a mariner

17  should definitely have a nautical chart on board when

18  they are navigating.

19     Q.  And the mariner, I thought you said is

20  required to have a nautical chart?

21     A.  There are some categories of vessels based

22  on size that are by law required to have a nautical

23  chart aboard.

24          HEARING OFFICER:  Sir, those are Coast

25  Guard laws, right?

0105

1    THE WITNESS: Correct.

2    HEARING OFFICER: So we have got Coast

3  Guard witnesses coming, if you need to get deeper

4  into that.

5    Q. (BY MR. KRAEHE) The charts that you

6  indicate are based on information that you obtain

7  from various agencies?

8    A. Various agencies and individuals at times,

9  yes.

10    Q. And these agencies include the Coast Guard

11  and the Corps of Engineer?

12    A. That's correct.

13    Q. Do any of the charts that you examined here

14  today indicate the presence or absence of street

15  lighting on the Queen Isabella Causeway?

16    A. That is something that we typically do not

17  chart is street lighting on a nautical chart. That's

18  -- our charts are constructed to conform with

19  international cartographic standards, and there are

20  some features that are on, on land that really are

21  not charted.

22    MR. KRAEHE: Thank you.

23    HEARING OFFICER: Any further

24  questions?

25    MR. PIERSON: I just have a couple

0106

1  more.

2            E X A M I N A T I O N

3  BY MR. PIERSON:

4     Q.  Captain, if you did go back and six months

5  as far as the tide, would it show us that this

6  particular night was the highest tide, or do you

7  know?

8     A.  I don't know.  I can determine that

9  information pretty easily, but. . .

10            HEARING OFFICER:  It's available?

11            THE WITNESS:  Oh, yes, yes.

12            HEARING OFFICER:  Okay.  I would like

13  to have that, also, if you wouldn't mind at some

14  time.

15            THE WITNESS:  Okay.  So you would like

16  to know if this particular tide was the highest in

17  the last six months?

18            HEARING OFFICER:  Sir, what I would

19  really like to know is what the tides looked like, if

20  it's possible to get that data in English for the

21  last six months.  Will that satisfy you, too?

22            MR. PIERSON:  Yes, sir.

23            HEARING OFFICER:  And then we can look

24  at it and say, yeah, this is highest, or, no, it's

25  not; but it's very high or whatever.  But we're

0107

1    looking for actual tides, not projected tides.

2         THE WITNESS:  Not a problem.

3         HEARING OFFICER:  Thank you, sir.  I

4    would like to get that.

5         THE WITNESS:  By the way, that

6    information is available to everybody on the

7    Internet; but we will provide you that in hard copy.

8         HEARING OFFICER:  Okay.  Let's make

9    that NOAA exhibit next in line.

10        MS. WOOD:  20.

11        MR. GRODECKI:  I would just like to

12   point something out, Mr. Wilson.  For anybody who

13   does want to look this up on the Internet, the meter

14   that they use to measure it, the NOAA site, is

15   8779770.

16        HEARING OFFICER:  Did everybody hear

17   him?  Okay.

18        THE WITNESS:  And there is a tenth of a

19   foot difference between the actual tide gauge and the

20   area around it.

21        HEARING OFFICER:  Okay.  And that's a

22   tenth of a foot plus or minus.

23        THE WITNESS:  It would be minus from

24   the tide gauge reading.  So if it says 10 feet at the

25   tide gauge, it's 9.9 feet at the bridge.

0108

1        THE WITNESS:  Correct.

2        HEARING OFFICER:  Thank you.

3    Q.  (BY MR. PIERSON)  Are there such things as

4  current meters?

5    A.  Yes, there are.

6    Q.  What do they do?

7    A.  Well, current meters -- it depends on how

8  sophisticated a meter you use, but the most

9  sophisticated meters can measure currents all the way

10  through a water column and measure the speed and the

11  direction.  So, basically, you know, a foot off the

12  bottom to, let's say, the water surface which might

13  be 12 feet, it could measure the current direction

14  and speed.

15    Q.  Are you aware that there is a strong current

16  moving from right to left just north of the scour

17  mark?

18    A.  No.

19    Q.  The reason that we don't have current

20  information in the Port Isabel/South Padre Island

21  area is what?

22    A.  I would say that NOAA's program to observe

23  currents has been severely cut back over the last 10

24  years, and there are many, many significant areas,

25  major commercial areas where we have absolutely no

1 current readings. The closest current meter I think

2 that we have is -- that NOAA operates is in Aransas

3 Pass, I believe.

4          HEARING OFFICER: Okay. Can I cut in

5 for a second? I am sure I can.

6      I have got a question for you, Captain. I am

7 interested in current meters, also, because we're

8 looking for a solution to this to make it safer. Who

9 would be responsible for putting a current meter in

10 there? Would that be NOAA?

11          THE WITNESS: NOAA can do it, if, if it

12 were requested and we have the capability to do

13 that.

14          HEARING OFFICER: Okay. Now --

15          THE WITNESS: Can I --

16          HEARING OFFICER: Sure.

17          THE WITNESS: Just to qualify this,

18 too. The currents in this area I was told by our

19 current experts are in -- a large part of the current

20 is predominated by meteorological conditions, so it's

21 really -- it will be -- it would be somewhat

22 difficult to take a current meter measurements at a

23 time and work backwards to a particular, you know,

24 the September 15th that you're interested in.

25          HEARING OFFICER: No, sir, I would be

0110

1   looking -- I am looking for future remedial action,

2   what options, what's available that somebody could do

3   to keep this from happening, again. And that's why I

4   am interested in them. That would be --

5           THE WITNESS: Well, in fact -- I mean,

6   NOAA operates in some major harbors, like Houston and

7   Galveston, a system called PORTS, for example,

8   Physical Oceanographic Real Time System. Parts of

9   PORTS are basically current meters, tide gauges,

10  meteorological information where the mariner can

11  access real time information about currents, tides,

12  and meteorological conditions at a particular time.

13  And so those kind of systems exist; however, there

14  are not that many of them throughout the country.

15      Q.  (BY MR. PIERSON) And there is no such

16  system like you've just talked about in the area

17  where this allision occurred?

18      A.  There is no NOAA system that has any current

19  measurements.

20          HEARING OFFICER: Could other agencies

21  besides NOAA, for instance, a state agency or a

22  different, I mean, you know, forbid other people from

23  putting current meters there.

24          THE WITNESS: Not at all. But what is

25  really the common model now that's arising throughout

0111

1   the country is places like San Francisco, New York,

2   Houston, Galveston, Tampa, in other areas where

3   currents are very important, many of the state -- you

4   know, the state, local entities, commercial shipping

5   port authorities get together and furnish the money

6   that basically has NOAA administer and, you know,

7   purchase equipment and, and sort of keep the system

8   running, so there are --

9        HEARING OFFICER: There is other

10   options?

11        THE WITNESS: There are options there.

12   And basically if you're interested in making the

13   data, you know, official, that would be one, one way

14   that other people are doing it.

15        HEARING OFFICER: Okay. Thank you.

16   Q.  (BY MR. PIERSON) Do you agree with me,

17   Captain, in your experience that the issue of current

18   is something that would be helpful to a captain or a

19   mariner, a question of the current?

20   A.  Well, you know, the more information that is

21   available to the mariner, the better they are, and I

22   would say the current situation is one that, you

23   know, we have problems, in many of our major ports

24   where people just don't know what the actual currents

25   are because of, you know, dredging, new channel

0112

1   configurations.  The observations that were made in

2   some cases 50 years ago are no valid -- are no longer

3   valid as a basis for predictions, so, yeah, having an

4   accurate understanding of the currency can be very

5   important.

6        HEARING OFFICER:  Okay.  That could be

7   kind of taken, but we have also got mariners that we

8   are going to put on that we can get more specific

9   with this on that particular channel, do you agree?

10        MR. PIERSON:  I think we do.  We had

11   one yesterday.

12        HEARING OFFICER:  Okay.

13   Q.  (BY MR. PIERSON)  Captain, do you know that

14   the subject of a need for a current meter was

15   intensely discussed by the Waterway Users Group down

16   in Brownsville, Port Isabel, in the fall of 2001 and

17   the spring of 2002, and the reason I am asking that

18   is because a NOAA representative --

19        MR. SPANSEL:  2002?

20        MR. PIERSON:  I am sorry.

21   Q.  (BY MR. PIERSON)  The fall of 2001, and that

22   a representative -- it was the fall of 2000.

23   A.  I am not personally aware of that, but we do

24   have a NOAA -- what we call a regional navigational

25   manager that I imagine would have been at that

0113

1  particular meeting, and so it doesn't surprise me.

2    Q.  And do you know that the people that

3  actually use that waterway are discussing the need

4  and they want the current meter for that particular

5  area.  Are you aware of that?

6    A.  I was not aware of.

7    Q.  Are you aware of other evidence in this

8  particular case, maybe through documents that you

9  have seen from the Coast Guard that the channel and

10  the currents in that particular channel are

11  considered to be dangerous?

12    A.  I was not aware of that.

13        HEARING OFFICER:  I think the wrong, I

14  think the wrong witness here.  This study you were

15  talking about, is there, is there a study available

16  or documentation or anything?

17        MR. PIERSON:  The Waterway Users

18  meeting members discussed it intensely in the fall of

19  2000.

20        HEARING OFFICER:  Is there any

21  documentation that came out of it?

22        MR. PIERSON:  My lawyer says yes.

23        HEARING OFFICER:  I wonder if your

24  lawyer would provide that to us.

25        MR. HUNTER:  We'll do.

0114

1          HEARING OFFICER: Thank you. Anything

2    else?

3          MR. PIERSON: One more question.

4          HEARING OFFICER: Oh, I am sorry.

5    Q. (BY MR. PIERSON) Is it expected within your

6    agency that vessels will operate in the areas between

7    the buoys 147 and 149?

8      A. I don't quite -- can you rephrase that?

9      Q. Why are the buoys to the right of the

10   channel, and is it expected that vessels will at

11   times actually operate within the blue water that you

12   have shown up there on that particular exhibit?

13     A. I don't know why the buoys are to the right

14   of the channel. The buoys are where the Coast Guard

15   has reported them to us by the Local Notice To

16   Mariners, and what I would expect -- if I were

17   confronted with this chart and someone who has never

18   navigated through that area, I personally, not

19   knowing anything about the area, would try to keep in

20   the federal project, the 12-foot part of the channel.

21     Q. Do you agree with me that at night without

22   it being lighted within the areas between 147 and 149

23   it would be very difficult to do that if the currents

24   were strong?

25          HEARING OFFICER: I think we have got