# FORENSIC ENGINEERING REPORT ON THE ALLISION OF BROWN WATER V WITH QUEEN ISABELLA CAUSEWAY OVER THE INTRACOASTAL WATERWAY

## PORT ISABEL TO SOUTH PADRE ISLAND, TEXAS

Concerning:
State of Texas
V
Brown Water Towing Incorporated, et al.
Civil Action No. B-01-157

United States District Court, Southern District of Texas,
Brownsville Division

Prepared by:



M.G. McLaren, P.C.
Consulting Engineers
100 Snake Hill Road
West Nyack, New York 10994

November 2004

# EXECUTIVE SUMMARY

On September 15, 2001, the Brown Water V and its four barges collided with Pier 32 of the Queen Isabella Causeway and caused the collapse of approximately 240 ft of the Bridge. There was no pier protection on either sides of the collapsed pier.

The determination of the size and adequacy of bridge piers to withstand vessel impacts is a responsibility which ultimately lies with the States. Similarly, the design and maintenance of pier protection systems are the responsibility of the States. A permit issued by the United States Coast Guard (USCG) does not endorse or approve the pier sizes or strengths, or the adequacy of the pier protection. When this agency originally approved the Queen Isabella Causeway permit, the approval only pertained to the structure's layout and its overall position within the navigable waterway.

The publication of the *1991 American Association of State Highway and Transportation Officials (AASHTO) Guidelines* and the issuance of five significant Federal Highway Administration (FHWA) memoranda throughout the 1980's and 1990's provided the State of Texas Department of Transportation (TxDOT) with the means, methodology, and resources to thoroughly evaluate and assess the vulnerability of its existing bridges, and develop retrofit schemes or pier protection systems to ensure the vitality of its bridges over navigable waters. The *1991 AASHTO Guidelines* also provide examples in its appendices, which illustrate how the *Guidelines* are to be used, and describe via comprehensive commentary the procedures contained therein.

Even though the installation of pier protection is relatively inexpensive, an alternative solution to protect the Bridge could have been easily provided by strengthening the existing concrete piers. This could be achieved by placing tremie concrete beneath the existing pile caps to increase the embedment length of the piles and reduce the moment imposed on the prestressed piles.

The structural analysis of Pier 32 revealed that its lateral load capacity was only $718^K$. Other bridges constructed in the mid-twentieth century comprise robust bridge piers of either a solid concrete mass or a wide solid web-wall extending to the foundation. Clearly, Pier 32 of the Queen Isabella Causeway was not designed to the standards of the day, nor was it evaluated and re-designed in the 1990's to comply with the *1991 AASHTO Guidelines*. During this era, other states, such as Florida and Louisiana, proactively engaged in the AASHTO and FHWA directives by performing evaluations of their bridge piers.

# TABLE OF CONTENTS

| Description | Page |
|---|---|

Executive Summary ... ii
Table of Contents ... iii
List of Figures ... v
List of Drawings ... vi

1.0  Scope of Work ... 1

2.0  Description of the Queen Isabella Causeway ... 2
    2.1  Structural Components and Details ... 2
    2.2  Permit for Construction of the Queen Isabella Causeway ... 3

3.0  History of Inland Bridge Allisions ... 4

4.0  Pier protection Requirements ... 9
    4.1  State of the Art – Pre 1960's ... 9
    4.2  FHWA Memoranda ... 12
    4.3  Development of Vessel Condition Standards 1981 to 1991 ... 15
    4.4  State of the Art – Current Bridge Protection Systems and Devices ... 17
    4.5  Alternative Design Considerations ... 18

5.0  Condition of The Queen Isabella Causeway Prior to Allision Incident ... 30
    5.1 Texas DOT Bridge Inspection Record of September 5, 2001 ... 30
    5.2 Texas DOT Underwater Substructure Evaluation of January 26, 2001 ... 30
    5.3 Federal Highway Administration Construction Inspection Report of August 14, 1973 ... 31
    5.4 Texas DOT Interoffice Memo of October 18, 1972 ... 31
    5.5 Summary ... 31

6.0  Bridge Allision of September 15, 2001 ... 32
    6.1  Barge Tow Characteristics ... 32
    6.2  Energy and Velocity Estimates ... 32
    6.3  Collapse Mechanism of the Queen Isabella Causeway ... 33

7.0  Failure Analysis ... 41
    7.1  Mathematical modeling ... 41
    7.2  Analysis of Pier 32 ... 41
    7.3  Improvements to Pier 32 ... 41

8.0  Commentary on Structural Adequacy of Queen Isabella Causeway ... 46
    8.1  Pre-Allision Event ... 46
    8.2  AASHTO Vessel Collision Design Standards ... 46

9.0  Commentary on Reconstructed Section of Queen Isabella Causeway (November 2001) ... 49

# TABLE OF CONTENTS (Cont'd)

**Description**                                                      **Page**

10.0    Conclusions                                                  49

11.0    Summary                                                      50

Appendices
        A    Qualifications
        B    List of Testimonies as Expert Witness
        C    Hourly Rates
        D    References
        E    Drawings
        F    Photographs
        G    Attachments

# LIST OF FIGURES

Figure 3-1      Eads Bridge, St. Louis, Missouri

Figure 4-1      Steel sheet pile cellular cofferdam

Figure 4-2      Timber Pile Cluster Dolphin

Figure 4-3      Steel sheet pile protective island

Figure 4-4      Independent buffer structure

Figure 4-5      Pile barrier system with cable array

Figure 4-6      Tappan Zee Bridge, Hudson River, New York

Figure 4-7      Sunshine Skyway Bridge, Tampa Bay, Florida

Figure 4-8      An array of fender components

Figure 4-9      Pile barrier system with donut fenders

Figure 4-10     Floating device – pneumatic or foam-filled fender

Figure 4-11     Alternative design consideration

Figure 6-1      View of the collapsed portion of the Causeway facing northwest

Figure 6-2      View of the collapsed spans facing west

Figure 6-3      Pier 32 and 33 viewed from Pier 31

Figure 6-4      Pier 32 and 31 viewed from Pier 33

Figure 6-5      Headlog of NM 315 indentation approx. 4 1/8 in. at maximum set in

Figure 6-6      Pier 26 remains in place. Spalled off concrete corner indicative of secondary barge contact

Figure 6-7      At 0200, the Brown Water V tug and barge configuration impacted the Queen Isabella Causeway at Pier 32

Figure 6-8      Immediately following the barge impact at Pier 32, Spans 31 and 32 collapsed into the waterway

Figure 6-9      Pier 32 was sheared off of its piles and shifted to the northeast, albeit it remained upright

Figure 6-10     At 1500, Span 31 and Pier 31 collapsed

Figure 6-11     Pier 31 fell over onto adjacent Pier 32, crushing the standing substructure

Figure 7-1      Finite Element Modeling of Pier 32

Figure 7-2      Layout of Model of Pier 32

Figure 7-3      Deflected Structure of Pier 32

Figure 8-1      Force Comparison Chart

# LIST OF DRAWINGS
### (In Appendix E)

E-1    Partial Plan and Elevation Sheet 1

E-2    Partial Plan and Elevation Sheet 2

E-3    Pier 32 Plan and Elevation

# 1    SCOPE OF WORK

M.G. McLaren, P.C., Consulting Engineers (MGM) was retained by the Law Offices of Royston, Rayzor, Vickery & Williams, L.L.P. on behalf of Brown Water Marine Service, Inc. to investigate the allision of the BROWN WATER V with the Queen Isabella Causeway over the Intracoastal Waterway between Port Isabel and South Padre Island, Texas.   With information obtained from interested parties and government agencies, MGM developed an understanding of the facts and produced opinions therefrom pertinent to this case.

MGM's List of Qualifications and List of Testimonies as Expert Witness are provided in Appendices A and B, respectively.   The firm's fee is billed on an hourly basis for services rendered per documentation in Appendix C.

The scope of this report includes the evaluation of all documents produced by Plaintiff concerning the bridge allision of September 15th, 2001.   The following list summarizes these components:

Documents Produced by Plaintiff:
- Correspondence;
- Drawings;
- Inspection Reports;
- Contracts;
- Photographs;

The defendant's counsel provided additional information reviewed by MGM. The following list summarizes these components:

Vessel Information:
- Characteristics of Brown Water V; and
- Characteristics of Barge NM 315, ACLL 9933B, VLB 9182, and VLB 9173

Depositions
- Robert Helton, October 9, 2001;
- Alan Grodecki, October 9, 2001;
- Levy Paul Old, October 9, 2001;
- Rocky Lee Wilson, October 9, 2001;
- Nick Perugini, October 10, 2001;
- Elijio Garza, October 10, 2001;
- Douglas W. Swain, October 10, 2001;
- Jeffrey Ingram, October 10, 2001;
- Paul Inskeep, October 10, 2001;
- Ross Baligure, October 11, 2001;
- J.W. Blocker, October 11, 2001;
- Philip Langley, October 11, 2001;
- Wally Olmsted, October 11, 2001;
- Alton Chadwick, October 11 & 12, 2001;
- Frank Garcia, October 12, 2001;
- David Stuart Jenkins, October 12, 2001;
- Stephen Mosher, November 5, 2001; and
- Robert L. Helton, November 5, 2001.

Additional information pertinent to this case was researched independently and reviewed by MGM. Specific documents are listed in Appendix D, References. General documents and publications include the following:

Federal Documents:
- American Association of State Highway Officials (AASHO) and American Associations of State Highway and Transportation Officials (AASHTO) Standards;
- Federal Highway Association (FHWA) Notices to States Concerning Pier Protection and Bridge Allisions;
- United States Codes and Federal Regulations;
- National Transportation Safety Board (NTSB) Reports Concerning Bridge Allisions; and
- United States Army Corps of Engineers (ACOE) Permits and Correspondence Concerning the Queen Isabella Causeway.

Other Documents:
- News Articles;
- Historical Vessel Data Concerning Inland Waterways; and
- Various resources concerning bridges, waterways, and general engineering.

The following pertinent information was requested by MGM but had not been provided prior to the completion of this report. The opinions expressed in this report are subject to change based upon new discoveries or receipt of the following documents.

Materials Requested But Not Received:
- Original Bridge Substructure Drawings
- Historical Vessel Data Concerning the Port Isabel Vicinity of the Gulf Intracostal Waterway
- Video of Secondary Causeway Collapse
- Annual Mean Current Velocity
- Texas Department of Transportation (TxDOT) Analysis of Causeway Pier Impact Resistance and Analysis of Barge Tow Impact Energy

## 2    DESCRIPTION OF THE QUEEN ISABELLA CAUSEWAY

### 2.1    STRUCTURAL COMPONENTS AND DETAILS

The Queen Isabella Causeway Bridge over Intracoastal Waterway is Park Road 100 between Port Isabel and Padre Island in Cameron County, Texas. The bridge is 12,510 ft long and 67.75 ft wide (see Drawings E-1 and E-2, in Appendix E), and is designated as part of the National Highway System.

The bridge consists of 150 spans that are numbered from west to east. Span lengths are shown in Table 2-1.

TABLE 2-1
SPAN LENGTHS

| Span | 1 through 33 | 34 | 35 | 36 | 36 Through 150 |
|---|---|---|---|---|---|
| Length (ft) | 80 | 220 | 310 | 220 | 80 |

Plans for the existing piers were not available but it appears that the reconstructed piers (piers 30, 31, 32, and 33) are similar to the existing piers that collapsed or were demolished afterward. These piers consist of three concrete columns resting on individual concrete pile caps, each of which are supported by five prestressed concrete piles embedded two feet into the pile caps. The original design, however, consisted of 4 piles per pile cap embedded only 2 inches into the pile caps. The columns vary in diameter from 4 feet at the base to 3 feet at the top (see Drawing E-3, in Appendix E). The three columns are connected by concrete tie beams (3 ft high by 3.5 to 4.5 ft wide) at several levels along the height of the pier.

The superstructure consists of a reinforced concrete slab supported by eight prestressed concrete beams, 80 ft long, for the majority of the spans (spans 1 – 33 and 37 –150). Spans 34, 35 and 36 (main spans) are constructed of three continuous steel plate girders. Only the fascia prestressed concrete beams are anchored to the pier cap with one 1.25″ diameter anchor bolt.

The navigation channel is 275 feet wide and is located between Piers 35 and 36. Pier protection is provided for Pier 35 and 36 and consists of five treated timber wales (12 inches high by 6 inches wide, and 300 ft long) anchored to steel beams that are welded to steel piles. Pier protection cells constructed of concrete (8 ft to 10 ft in diameter) were also placed along the timber fendering system at both piers.

## 2.2    PERMIT FOR CONSTRUCTION OF THE QUEEN ISABELLA CAUSEWAY

The United States Coast Guard (USCG) issued Bridge Permit No. 9-71 on February 22, 1971 for the construction of the Queen Isabella Causeway (Reference No. 45, see Attachment in Appendix G-2). In its approval of the original bridge plans, the USCG did not extend its approval to the adequacy of the design or the sufficient strength of the bridge piers, since it is not within its jurisdiction to approve of such matters. In fact, the USCG permit explicitly states its purpose within its approval letter:

> *"All work shall be conducted so that the free navigation of the waterway is not unreasonably interfered with and the present navigable depths are not impaired."*

> *"Issuance of this permit does not relieve the permittee of the obligation or responsibility for compliance with the provisions of any other law or regulation as may be under the jurisdiction of any federal, state or local authority having cognizance of any aspect of the location, construction or maintenance of said bridge project."*

# 3    HISTORY OF INLAND BRIDGE ALLISIONS

Over the past thirty to forty years, awareness and concern regarding bridge/vessel allisions and the various means to prevent them has become a significant issue in both the inland navigation and bridge design communities. While minor allisions happen frequently, catastrophic events are much less frequent. When they do occur however, the loss of life and destruction of property can be so dramatic as to capture public attention. The latter half of the Twentieth Century has a seen a significant increase in commerce, waterborne shipping, size of vessels, and motor vehicle traffic.  It is not surprising that there has been a corresponding increase in bridge allisions and a subsequent rise in concern and legislation.

Awareness of the potential for bridge allisions appears to date to the late 1800's when the first significant water crossings were created in order to accommodate the railroads and early vehicular traffic. A look at pre-war bridges, from the Brooklyn Bridge (1883) to the Golden Gate Bridge (1937), and others within that period shows a marked trend towards massive piers. Following World War II however, the relative massiveness of bridge piers decreased as a result of more streamlined strength calculations and a greater focus on economical construction.

As early as the 1960's, studies were conducted and papers were published by organizations such as the International Association for Bridge and Structural Engineers (IABSE). In 1965, the IABSE published a paper on the subject of bridge allisions titled, "Ship Collision Problems" by Dr. C. Ostenfeld. This paper was likely inspired by the Maracaibo Bridge collapse in 1964. The Tanker, "Esso Maracaibo," lost control after a failure of the ship's electrical system approximately 2 km from the bridge.  The ship dropped anchor in an attempt to stop, but only succeeded in turning the vessel, so that it struck two piers broadside.  The piers were destroyed, three spans fell into the water, and several motorists were killed.  In the report, Ostenfeld cited 16 case studies of bridge allisions, most taking place in the early 1960's, and ten of these in the United States. Ostenfeld observed that with the increase in vessel sizes, the frequency of such incidents will also increase, and that future bridges should be designed with such concerns in mind. Ostenfeld's case studies noted one fairly consistent trend; that piers with some form of sacrificial protection do not collapse when hit for the obvious reason that the vessel never reaches the actual bridge structure, whereas piers without protection, unless extremely massive, tend to collapse.

One of the significant U.S. barge allision incidents that Ostenfeld stated in his paper was the striking of the Outerbridge Crossing in Staten Island in 1963. This incident was not particularly catastrophic, largely due to the sacrificial timber pier protection, but it did have one interesting result. The Port of New York Authority initiated a comprehensive investigation, possibly one of the earliest in the U.S., on Ship Collisions against Bridge Piers, which concluded with recommendations of pier protection on a variety of bridges in New York Harbor.  This is an early example of a local bridge authority taking a proactive approach to this problem.

Throughout the 1960's and 1970's, incidents of bridge allisions continued to rise in frequency. A study in the mid-1970's estimated 811 incidents occurred between 1970 and 1974 with 14 fatalities and $23 million in damages, while a report in 1983 enumerates 22 catastrophic events worldwide between 1960 and 1982, with an estimated 100 fatalities. These figures were presented at the IABSE Colloquium on Ship Collision with Bridges and Offshore Structures in Copenhagen, Denmark. The presenter, A.G. Frandsen, had assisted Ostenfeld on his paper 18 years earlier. Mr. Frandsen's paper is cited in AASHTO's specification on Vessel Collision Design of Highway Bridges.

This paper and the Colloquium itself were probably motivated and inspired by the Sunshine Skyway bridge allision in 1980. Thirty-five people died in this event, as a result of a vessel collision with a bridge pier outside of the navigation channel. The event challenged the widely held conviction, that if a bridge pier could be hit, it would be one of the bridge piers near the navigation channel. Furthermore, the NTSB report stated that:

> "Contributing to the loss of life and to the extensive damage was the lack of a structural pier protection system which could have absorbed some of the impact force or redirected the vessel" (Reference No. 13).

The NTSB report for the Sunshine Skyway Bridge allision made several observations, two of which are as follows: First, bridge allisions can occur and cannot always be prevented. Second, Bridge owners should consider protecting existing vulnerable bridges and their components. The report concludes with a series of recommendations to various entities, amongst them the Federal Highway Administration (FHWA).  One of these read as follows:

> "In cooperation with the U.S. Coast Guard, develop standards for the design, performance, and location of structural pier protection systems which consider that the impact from an off course vessel can occur significantly above as well as below the water surface" (Reference No. 13).

This recommendation lead directly to FWHA technical advisory T5140.19, issued in 1983 (Reference No. 14). This document offered recommendations for motorist warning systems and pier protection (Section 4.3). It was distributed to FHWA field offices and hence, to State DOT's. This advisory was cited in the Code of Federal Regulations (23CFR650.807) in 1987 (Reference No. 15, see Appendix G-6).

FHWA also created a National Highway Institute training course (NHI Course 13060) associated with the new specification, to better acquaint design engineers with its contents and its application to future bridge design.

In 1993, the U.S. Towboat Chris struck the Judge William Seeber Bridge (Claiborne Avenue Bridge) in New Orleans, Louisiana. The NTSB report indicated that the subject bridge pier was inadequately protected, which resulted in the collapse of the superstructure. The NTSB Highway Marine Accident Report (Reference No. 13) made the following observations:

- The barge tow comprised a towboat, U.S. Towboat Chris, and one empty barge. Together, the barge tow weighed 285 long tons (approximately 628,425 lbs);

- Calculations show that a lateral impact load of the tow traveling less than 1/2 knot (0.56 mph) would have collapsed the bent [pier] (page 19);

- The Claiborne Avenue Bridge is a non-redundant structure (page 19);

- The Claiborne Avenue Bridge was vulnerable to vessel collisions because the approach piers were inadequately protected (page 19);

- The design of the structure, including the simply supported spans and the lack of redundancy in the substructure, made the bridge vulnerable to collapse (page 19); and

- The States are responsible for inspecting and maintaining bridges in accordance with FHWA requirements and AASHTO guidelines (page 30).

The important result of the Claiborne Avenue Bridge allision was the post-event response by the Louisiana DOT and Development (LADOTD). The LADOTD proactively responded by performing the following:

- The LADOTD subsequently constructed eight 10-pile dolphins to protect the struck bridge piers (page 23);

- The State bridge maintenance engineer sent a questionnaire to each of the nine district maintenance engineers, asking them to verify the number of bridges over navigable water in their districts and to answer nine questions regarding commercial vessel activity near the bridge and the status of protection for the bridges (page 23); and

- The [State] agency sent its bridge design engineers to an FHWA school to familiarize them with the specifications contained in the AASHTO 1991 Guide Specification and Commentary for Vessel Collision Design of Highway Bridges. The LADOTD subsequently evaluated the survey information [from the questionnaires] to determine which bridges should undergo a vulnerability assessment based on the guidelines (page 23).

In 1998, the M/V Anne Holly, composed of 12 loaded and 2 empty barges and traveling upstream on the Mississippi River, struck the center pier of the Eads Bridge in St. Louis, Missouri. The Eads Bridge (Figure 3-1), constructed in 1874, was built of robust granite piers to withstand the strong currents of the Mississippi River and the already-present vessel traffic. The NTSB Marine Accident Report (Reference No. 66) made no mention of any damage to the Eads Bridge, for the simple reason that there was no damage. The only pertinent observation with regard to the Queen Isabella Causeway allision was the following:

- No deaths resulted from the accident; 50 people were examined for minor injuries (Executive Summary, page vii).

The FWHA, in a memo dated November 15, 1995, planned an Intermodal Task Force to develop a standard for determining the vulnerability of the Nation's highway and railroad bridges against collisions from marine vessels (Reference No. 16). In 1999, the FHWA Department of Bridge Technology issued a second memorandum to all State DOTs requesting them to evaluate pier protection on all bridges as part of the regular inspection process (Section 4.3). It directs the states to:

"evaluate…piers where the systems were not designed for the type and size of vessel currently using the waterway and may not be adequate to protect the bridge and take corrective action as necessary" (Reference No. 17, see Appendix G-7).

In 2001 and 2002, two more fatal high-profile allisions occurred. The tug M/T Brown Water V pushing a tow formation of four (4) barges struck the Queen Isabella Causeway Bridge between Port Isabel and Padre Island, Texas, and the tug M/V Robert Y Love struck the Interstate 40 Bridge over the Arkansas River at Webbers Falls, Oklahoma. The first incident is the subject of this report. Shortly after these events, the U.S. Coast Guard and the American Waterways Operators convened a joint working group to study bridge allisions in general. This group did not study those specific allisions, since both were under investigation by government agencies, but instead assembled a database of allisions going from 1992 to 2001. The total data set contained 2,692 allisions where a U.S. flag-towing vessel, with or without tow, collided with a bridge. To provide statistical context, this equates to six allisions for every 10,000 trips. The working group's scope was mostly concerned with *preventing* allisions, rather than *protecting against* allisions. The group's

report, which was issued in May 2003, yielded some useful historical and statistical information on allisions in general (Reference No. 18).

One of the basic facts derived from the report was that 94 percent of all allisions resulted in no injury, fatality, or damage to property of more than $100,000. In short, allisions, given the right circumstances and the right bridge, can occur without an ensuing catastrophe. The most dramatic demonstration of this point is the EJE Railway Bridge in Morris, Illinois, which was struck 170 times in the ten-year period with no appreciable damage. Although the study was performed primarily from a pilot's perspective, Item 1A on its list of recommendations was:

> *"Identify vulnerable bridges where measures to prevent and/or mitigate allisions should be applied."*

Furthermore, Item #3 of the report reads:

> *"The costs and benefits of requiring additional protection for bridge piers should be given further consideration in the process of identifying vulnerable bridges as proposed in Recommendation #1 above. Targeting improved bridge protection measures on those bridges identified as most vulnerable to allision or to severe consequences should an allision occur may be a meaningful and cost-effective addition to the prevention recommendations offered here and should be given further study."*



General view of the main spans of the Eads Bridge over the Mississippi River in St. Louis, Missouri. Completed in 1874, the original plans specified that robust piers be made of granite and stone and founded 100 ft below ground on bedrock. The main span is 520 ft long while the adjacent spans are 502 ft long. At the time of construction, the Mississippi River was already in use to transport goods.

Figure 3-1   Eads Bridge, St. Louis, Missouri

## 4    PIER PROTECTION REQUIREMENTS

### 4.1    STATE OF THE ART – PRE-1960'S

Prior to the 1960's, the state of the art for bridge pier design was to use sound engineering judgment, taking into consideration the forces that the bridge would be required to withstand during its lifetime, and the direction from which these forces would be applied.  In most cases, the vertical loads would consist of the structure's self weight, and vehicular and pedestrian traffic.  Lateral loads would typically consist of forces generated by wind, vehicle braking, current, ice, earthquake, and vessel impact.

The force due to a vessel impact could be determined by an energy analysis, which would account for the size, weight, and speed of the vessel.  Since the resultant force is dependent upon these variables, and the types of vessels using the waterway could vary greatly, the state of the art for bridge pier design was to over-compensate for the forces by providing massive piers, which could resist the vertical and lateral loads imposed upon them.  In 1965, Dr. C. Ostenfeld published a paper entitled, "Ship Collisions Against Bridge Piers" (Reference No. 19).  Dr. Ostenfeld speaks of the history of bridge pier design and analysis for vessel impacts, wherein he summarized an historical basic rule-of-thumb.  Ostenfeld makes a simplistic observation; that if the mass of a vessel could potentially make contact with a given pier approach, and if the vessel's mass equals or exceeds the *order of magnitude* of the pier's mass, then serious damage could result to the pier and the entire structure could be destroyed:

> "A ship colliding with a bridge pier, and possessing a mass of the same order of magnitude as the mass of the pier, may in many cases cause serious damage to the pier and force it out of position, to such an extent that the entire structure must be considered as destroyed.  Only very optimistic assumptions in respect of the capacity of the ship to absorb impact energy will lead to a relatively moderate effect on the pier" (Reference No. 19, page 272).

In other words, if a vessel is likely to collide with a given pier, the pier must weigh more than 10-times the vessel, otherwise the pier is at risk in the event of a collision, and should be protected.  These types of observations and preliminary guidelines emphasized the inherent importance of substantially constructed bridge piers once taken for granted.  Bridges constructed throughout the twentieth century in many states appear to have been designed with the "rule-of-thumb" in mind, as evidenced by the photographs of more than 20 bridges in many states such as Arkansas, Missouri, Tennessee, Kentucky, and Indiana (see photographs in Appendix F).    Notice in the photographs that all of the bridge substructures were built as one of the following:

- Solid piers;
- Tapered piers; or
- Columns with web-walls
    - Wide web-wall (larger than the pier columns)
    - Narrow web-walls (smaller than the pier columns)

By close inspection of the photographs, the majority of bridge piers are built with solid piers, tapered piers, or columns with *wide* web-walls.  Further research on those piers with web-walls indicated that the state-of-the-art was to construct the web-walls as full-height solid elements that extended to the pier's foundation, regardless of their proximity to the

navigation channel. By contrast, all piers of the Queen Isabella Bridge in Texas were constructed of slender columns connected with slender struts, not walls. That type of construction, consisting of multiple slender elements, provides significantly less capacity to resist a vessel impact than is provided by a pier consisting essentially of a single "wall."

As the amount of river transport increased throughout the country, the Federal Highway Administration (FHWA) raised general awareness to the methods by which bridge piers susceptible to barge collisions could be protected. Some of the simplest of pier protection methods are still in use today and are considered either independent protective systems or integral protective systems. Independent protective systems are designed to prevent vessels from reaching the pier, and therefore may be considered sacrificial. They include dolphins, structural barriers, protective islands, moored ships/pontoons and cable arrays. Integral protective systems are designed to absorb part of the impact energy through deformation and reduce the maximum force exerted on the pier to acceptable values. They include timber or steel framework, and rubber elements.

A protective system can be either designed to absorb the collision energy of a barge tow during a vessel impact (thereby reducing the transmitted force into the structure), or to deflect the barge tow away from the structure without necessarily stopping its forward progress. Most systems have been developed based on the principle of stopping the vessel, since this assures that a higher level of reliability is achieved.

The choice of appropriate system depends upon factors such as cost, navigable channel widths, soil conditions, waterway characteristics, vessel traffic, weather conditions and environmental protection requirements. Six differing types of protective systems are summarized below.

*Dolphins (Cells)*

A dolphin or cell is an independent structure, generally circular in shape, and may consist of one large element, such as a cellular cofferdam of steel sheet piles (Figure 4-1), or as a cluster of smaller elements, such as with timber piles (Figure 4-2). Located directly in front of the bridge pier, a dolphin can intercept an errant vessel, reduce the speed of the vessel, absorb significant energy, and deflect the vessel away from the pier. There are four common types of dolphins in use. These are:

- Steel Sheet Pile Dolphins – collision energy is absorbed by the dolphin's resistance to overturning and bursting;

- Concrete Caisson Dolphins – multi-directional reinforcement is provided to prevent local punching shears without full failure while the energy of impact is dissipated through the sliding and tilting of the dolphin;

- Pile Cluster Dolphins – consist of a cluster of plumb or battered piles, bound together at top to promote integral action. The pile cluster absorbs collision energy through deflection; and

- Gravity Pendulum Dolphins – consist of a heavy cylindrical mass of steel or concrete, which are suspended from a cantilevered supporting structure. Supporting structure may be part of the pier or completely independent. Impact energy is dissipated through movement of the pendulum.

*Protective Islands*

Protective islands are artificial islands of sand, gravel or boulders built up around bridge piers. The islands should extend up above the water level for visibility and also to

provide protection against the shallow draft of a vessel's bow in ballast. In many cases, the island is enclosed in a steel sheet pile cellular cofferdam (Figure 4-3). The intention of the island is to prevent the aberrant vessel from coming into any contact with the bridge pier. The impact energy from the collision is absorbed through the plastic deformation of the island material, the lifting of the vessel's weight as it rides up on the island and from the friction between the vessel's hull and the island material.

*Buffer Structures*

This configuration of steel can be considered either an integral or independent protective system; the framework can either be self-standing (Figure 4-4) or attached directly to the pier. The buffer structure is designed to crush during collision and absorb part of the collision energy. Once the bow of the vessel reaches the pier, the remaining energy will be absorbed through the crushing of the vessel.

*Pile Barrier Systems*

Pile barrier systems (Figure 4-5) refer to any number of pile arrangements that are interconnected structurally. Such systems include pile-supported platforms similar to concrete-wharf structures, pile-supported horizontal truss frames of timber, steel, or concrete, and piles connected by strong beams. With all arrangements, the collision energy is absorbed through the deformation of the piles and structure.

*Floating Systems*

Floating systems include moored cable arrays and moored pontoons.

- Moored Cable Arrays are systems of cables supported by buoys at the water surface and attached to anchors in the channel bed. The cables are intended to engage the bulbous bow of a ship and slowly bring it to a stop through the stretching of the cable and the dragging of the anchors;

- Moored pontoons are floating barriers anchored to the channel bottom. They may be arranged in order to deflect a vessel or in a manner that stops the vessel through successive failure of the pontoons.

*Conventional Fenders*

Fenders are the most common protective devices. Fenders can either be attached to the surface of the pier or to an independent protective structure. Materials originally used for fenders were timber or solid rubber. Although not very effective in absorbing large collision energies, conventional fenders can:

- Reduce localized pier damages;
- Limit damage to vessels in cases of smaller collisions;
- Prevent sparking upon vessel impact; and
- Help deviate the ship from head-on collisions if suitably shaped.

One case in point, which utilized pier protection from its original conception in the 1940's and 1950's, was the Tappan Zee Bridge in New York (Figure 4-6). The original plans called for timber pile cluster dolphins on both sides of the 155 piers within the waterway. In 2000, improvements were made to the pier protection system, which increased the fender capacity on both sides of both adjacent piers and piers several times removed from the navigational channel.

Fendering was only provided for the Queen Isabella Bridge at the navigation piers (Pier 34 and Pier 35).

## 4.2   FHWA Memoranda

**Memorandum: December 8, 1980**

On December 8, 1980, Stanley Gordon, the Chief of the Bridge Division of the Federal Highway Administration (FHWA) within the Department of Transportation, expressed increasing concern within a memorandum that was issued to Regional Federal Highway Administrators (Reference No. 20, see Appendix G-9).  The memorandum was in response to the allision of the Summit Venture with the Sunshine Skyway Bridge, on May 9, 1980. The main subject matter of the memorandum was, "Motorist Warning System on Bridges Subject to Ship Collisions".  The memorandum discussed the warranted need for the implementation of warning systems on those bridges deemed susceptible to bridge allisions due to impacting ships as there is:

*"the potential for (vehicular) drivers to be unaware of the danger and to drive off the damaged bridge."*

The document also stated that this hazard is compounded by the fact that such vessel accidents are more likely to occur at night or in periods of poor visibility.  This is supported by Modjeski and Masters (Reference No. 21) who, state that:

*"the continuation of [vehicular] traffic following the destruction of bridge spans has caused the largest loss of life in ship-barge collisions."*

Design concepts within a technical advisory were noted to be in development for installing warning systems on bridges at the time of issue and were subsequently published at the end of December 1980.

**Technical Advisory: February 11, 1983**

In February 1983, the FHWA published the Technical Advisory, T5140.19, Pier Protection and Warning Systems for Bridges Subject to Ship Collisions (Reference No. 14, see Appendix G-10).  Although the document was considered, "not regulatory" at the time, it does acknowledge its purpose as:

*"...To provide guidance on these subjects [protection for bridge piers and the installation of warning systems] to the Federal Highway Administration's (FHWA) field offices and to State and local agencies involved with Federal-aid highway projects which cross navigable waters."*

The advisory also noted that such systems should be based on an assessment of ship-bridge collisions, taking into consideration:

- The type and frequency of shipping on the waterway;
- The location and arrangement of the bridge piers in relation to the navigable channel and the resulting vulnerability of the piers to ship collisions;
- Other factors (fog, channel geometrics, wind, river currents; and
- Volume of highway traffic using the bridge.

A portion of the Technical Advisory implicitly discusses the importance of pier protection, and acknowledges that retrofitting existing bridge piers with protective systems may be difficult to accomplish.  However, it clearly states that the Coast Guard had

developed a computer program which could analyze impact loadings and that this program was available through the FHWA Bridge Division. It explains that:

> "The FHWA is exploring with the American Association of State Highway and Transportation Officials the feasibility of developing standards for the location and protection of bridge piers in navigable waterways. As a result of a research study commissioned by the Coast Guard, a computer program to analyze impact loadings on piers and protection systems has been developed and is fully operational. This program provides a structural evaluation of the effectiveness of bridge pier protective systems for any selected vessel size, speed, and angle of attack."

**Memorandum: October 30, 1984**

On October 30, 1984, another Memorandum was issued from the FHWA addressed to all Regional Federal Highway Administrators, (Reference No. 70, see Appendix G-11). The subject of the memorandum was, "Bridge Inspection Program – Inspection of Bridge Piers and Fendering Systems". The document explicitly directs the states to conduct evaluations and assessments of bridge piers and fendering systems for structural integrity. Three key statements are put forth in this memorandum:

- A ship impact with an unshielded or inadequately protected supporting pier could cause the bridge to collapse with possible tragic consequences;

- The ongoing bridge inspection programs by the States should include the inspection of bridge piers and fendering systems; and

- The structural integrity of these protection systems must be maintained. Therefore, each FHWA field office is requested to evaluate and emphasize the State inspection procedures for bridges over navigable waters. The evaluation should ensure that the State inspection continues to include an assessment and evaluation of bridge piers and fendering systems for structural integrity.

The memorandum also makes specific reference to previous documents, which discuss pier protection systems, namely the FHWA Technical Advisory T5140.19 dated February 11, 1983 and the publication, "Ship Collisions with Bridges –The Nature of the Accidents, Their Prevention and Mitigation". Copies of the latter publication were available upon request.

**Memorandum: November 15, 1995**

On November 15, 1995, another Memorandum was issued from the FHWA addressed to all Regional Federal Highway Administrators and the Federal Lands Highway Program Administrators (Reference No. 16, see Appendix G-12). The subject dealt with recommendations issued by the National Transportation Safety Board (NTSB) following the investigation of an accident caused on September 22, 1993, when the Barges being pushed by the towboat MAUVILLA struck and displaced the Big Bayou Canot railroad bridge near Mobile, Alabama. The tragedy occurred shortly after the collapse when a train en route from Los Angeles to Miami, with 220 passengers aboard struck the displaced bridge and derailed. Forty-seven people lost their lives in the incident. The recommendations published within the memorandum are summarized below.

- To develop a standard methodology for determining the vulnerability of the Nation's highway and railroad bridges to collisions from marine vessels, formulate a ranking system for identifying bridges at greatest risk and

provide guidance on the effectiveness and appropriateness of protective measures.

- These tasks would be undertaken by an inter-modal task force derived from an amalgamation of Governmental agencies such as the Coast Guard, Federal Railroad Administration (FRA), the Federal Highway Administration (FHWA) and the U.S. Army Corps of Engineers

- FRA and FHWA to augment national risk assessment program that utilizes the methodologies developed by the task force for Nation's railroad and highway bridges;

- Employee accountability to report use of medication whilst on duty; and

- Consider use of RACONS, radar detectors, and other devices to make bridges more identifiable on radar.

Although the FHWA shared the NTSB's concerns regarding the seriousness and consequences of marine vessel collision with highway bridges, they believed risk assessment guidance could be provided within the American Association of State Highway and Transportation Officials' (AASHTO) publication "Guide Specification and Commentary for Vessel Collision Design of Highway Bridges, February 1991". The FHWA developed a National Highway Institute (NHI) training course (No. 13060) in order to acquaint bridge engineers with the principles laid out within the AASHTO publication.

In addition to this, the FHWA also cited the availability of guidance within the National Research Council's publication entitled "Ship Collisions With Bridges: The Nature of Accidents, Their Prevention, and Mitigation, 1983". The need for motorist warning systems was re-iterated within this FHWA notice, and the December 8, 1980 memorandum was referenced.

**Memorandum: January 11, 1999**

Following the NTSB investigation of the collision of the Liberian tanker ship the Julie N, with a bascule pier of the Portland-South Bridge in Portland Maine on September 27, 1996, the NTSB requested that the FHWA in co-operation with AASHTO, inform State Departments of the circumstances of the incident (Reference No. 22. This surmounted an effort to highlight the importance in evaluating the adequacy of fendering systems at bridge piers on those bridges that have USCG permits for navigation clearances:

> "The Federal Highway Administration has been requested by the NTSB recommendation (M-98-83) to inform, in cooperation with the American Association of State Highway and Transportation Officials (AASHTO), State highway departments of the circumstances of this accident and recommend that the States evaluate the adequacy of fendering systems at bridge piers where the systems were not designed for the type and size of vessel currently using the waterway and may not be adequate to protect the bridge and take corrective action as necessary."

> "Therefore, we request that State DOTs evaluate the adequacy of fendering systems at bridges which have a USCG permit for navigational clearances. This evaluation should be conducted as a part of the next scheduled national bridge inspection. The evaluation should determine if the bridge's fender system provides adequate protection for the bridge or for vessels navigating through its draw. If the fendering is found to be inadequate, an improved fendering system should be considered."

### 4.3   DEVELOPMENT OF VESSEL COLLISION STANDARDS 1981 TO 1991

After the 1980 collapse of the Sunshine Skyway Bridge there was a great concern over the safety of the nation's bridges which cross navigable waters. In response to this event, the Marine Board of the National Research Council tasked the "Committee of Ship/Bridge Collisions" in 1983 to examine the risks and consequences of ship and barge collisions with bridges in the United States. The formation of this committee was the first step toward the publication of a vessel collision standard for the United States.

The committee published several recommendations in their final report titled, "Ship Collisions with Bridges – the Nature of the Accidents, Their Prevention and Mitigation" (Reference No. 23). Therein, they stated three important general recommendations regarding bridge pier design:

*"Where conditions permit, the main piers should be placed on land, on artificial islands, or in very shallow water that allows vessels to ground before reaching them. If exposed to vessel collision, and unprotected, the piers should be designed as solid structures capable of resisting collision impacts in all directions. The more massive the bridge pier the less damage it will suffer in a collision."*

*"Pier shafts have relatively little resistance to collision. Therefore special attention should be given to their design, especially if they can be reached by a colliding vessel. Providing shear walls between shafts will increase their resistance, and use of redundancy will improve their overall safety. Adequate reinforcement to ensure ductility should be provided," and*

*"Adequate bearing support and restrainers for superstructure connection at the pier top will provide additional resistance and may prevent a span from falling off the pier during a collision."*

In 1985, the engineering firm of Modjeski and Masters, under the direction of Dr. Zolan Prucz, published, "Criteria for: Design of Bridge Piers with Respect to Vessel Collision in Louisiana Waterways for the Louisiana Department of Transportation and Development" (Reference No. 21). Therein, Dr. Prucz makes several observations with regard to bridge piers, which illustrate the movement of the industry toward a more systematic methodology of evaluating bridge piers. The analyses and equations presented in the document reflect the work of several key researchers: Dayton, Paramore, Frandsen, Knott, Larsen, Ostenfeld, Reese, Matlock, and Woisin. In his report, Prucz makes the following statements:

*"If an unprotected bridge pier can be reached by a vessel it should be designed for collision."*

*"Piers which can be reached by a vessel, even if located far away from the navigational channel, should be designed for collision. Piers as far as 2,000 feet away from the navigational channel have been hit."*

*"Bridge piers should be solid structures capable of resisting collision impacts in all directions including torsion."*

*"The more massive the bridge pier the less damage it will suffer in a collision. The mass of a pier therefore should not be minimized in design."*

*"Employ redundant structural systems. In some cases, shaft piers can be designed so that even with the rupture of one shaft, the cap is so connected to the*

*remaining shafts that it can carry the dead load of the span as a cantilever without collapse."*

*"The second take of warning motorists of an impending or actual collision is also of great importance. The greatest loss of life in bridge accidents has resulted from the continuation of bridge traffic after a bridge span has been knocked out."*

In 1987, the new Sunshine Skyway Bridge in Tampa Bay, Florida was completed. The Florida Department of Transportation (FDOT) demonstrated its awareness to the seriousness of vessel impacts and their consequences by installing a pier protection system of substantial proportions (Figure 4-7). This pier protection system also includes protection cells for those piers outside of the navigation channel. Subsequently, FDOT played a significant role in the development of bridge designs for vessel collision with the development of computer programs, which aid engineers in their assessment and evaluation of bridge piers and their required capacities.

In 1988, together the FHWA and AASHTO began to address the concerns regarding ship and barge collisions with highway bridges over navigable waterway. Their work culminated in the *1991 AASHTO Guide Specification for Vessel Collision Design of Highway Bridges"* (*Guide*). This was the first standard specification on the subject in the U.S. and it was widely adopted. It was a comprehensive document with specifications on various fender systems, dolphins, and design guidelines for bridge piers. Its basic premise was that bridge piers within navigable waterways must either be themselves strong enough to withstand the impact of a vessel, or must have a protection system strong enough and appropriately located to protect bridge piers. The *Guide* clearly states in Section 3 of the General Provisions four specific directives, which provide guidance and explain the applicability of its contents:

*"In navigable waterway areas where vessel collision by merchant ships and barges may be anticipated, bridge structures shall be designed to prevent collapse of the superstructure by considering the size and type of the vessel, available water depth, vessel speed, and structure response in accordance with the Guide Specification criteria."*

*"These specifications are for the design of new bridges and for the evaluation of existing bridges to resist the effect of collision impacts from merchant vessels."*

*"The specifications apply to all bridge types which cross a navigable shallow draft inland waterway with barge traffic, and deep draft waterways with large merchant ships. The provisions are applicable to normal merchant vessels, either steel hulled ship or barge vessels."*

*"The specifications apply to bridges crossing waterways which have defined navigation channels as established by federal or state agencies. Judgment must be used when applying the Guide Specification criterion to waterways in which no defined navigation channel exists."*

*"The provisions specified in the Specification are minimum requirements."*

The *Guide* is quite specific in its applicability, and its commentary provides additional explanation to the specification. In Section 7 – Bridge Protection Design Provisions, it is stated:

*"The Guide Specification requires that exposed bridge elements either be designed to withstand the required impact forces without bridge collapse, or that physical protection be provided."*

In 1994, the *Guide* was first incorporated into the AASHTO LRFD Bridge Design Specifications (Reference No. 2).  The objective of including the Vessel Collision Guidelines into the AASHTO LRFD Specifications was to mandate that State Departments of Transportation evaluate their current bridges and construct new bridges for vessel impacts. As stated in Section 3.14.1, Vessel Collision: CV, General:

> *"All bridge components in a navigable waterway crossing, located in design water depths not less than 2.0 ft, shall be designed for vessel impact."*

The owner's responsibility is clearly stated as well, in Section 3.14.2, Owner's Responsibility:

> *"The Owner shall establish and/or approve the bridge importance classification, the vessel traffic density in the waterway, and the design velocity of vessels for the bridge.  The Owner shall specify or approve the degree of damage that the bridge components, including protective systems, are allowed to sustain."*

## 4.4   STATE OF THE ART – CURRENT BRIDGE PROTECTION SYSTEMS AND DEVICES

Today, and at the time of the Queen Isabella allision, there are and were bridge protection systems and devices available that augment the traditional methods described in Section 4.1.  These systems not only include the use of advanced materials and energy-absorbing devices, but also include warning devices similar to those discussed in the 1983 FHWA Technical Advisory, T5140.19 (Reference No. 14, see Appendix G-10).  The preventive systems are used in conjunction with a protective system in order to maximize their success rate and the subsequent survival of motorists affected by a damaged bridge pier structure.

**Collision Prevention Systems**

Preventive systems involve the use of various navigational aids and warning systems and are considered a means of preventing collisions thereby lessening the chances of the loss of human life should a collision occur.  These include the following:

- Aids to Navigation – Provide proper levels of orientation, guidance and accuracy at time of both low and high visibility.  Such aids include ranges, racons, fog detectors and additional low-illumination lighting for delineation purposes at night.

- Warning Systems – Two basic functions are performed by warning systems.  The first is to warn pilots/captains who are off course.  The second is to warn motorists of an impending or actual vessel collision with the bridge.  The motorist warning system is especially important when considering the continuation of vehicular traffic following the destruction of a bridge span.  The greatest cause of death during a vessel/bridge collision incident is the continuation of traffic which is unaware of the damaged bridge.

**New Pier Protection Devices**

The new types of pier protection devices in the current marine marketplace have actually been available since the 1970's.  The most common devices consist of rubber fender elements, designed so that the rubber material deforms upon impact, hence absorbing energy and reducing the force on the bridge pier.  The size and shape of the fender element can be specified to accommodate the anticipated energy of an aberrant vessel impact.  These elements can either be affixed directly to the bridge pier or affixed to

a buffer structure (as described in Section 4.1).  The rubber elements are connected together with a rigid steel plate covered with an Ultra High Molecular Weight Polyethylene (UHMW PE) panel.  The UHMW PE panel maintains low friction properties, which means that oblique strikes to the panel will transmit less force to the structure since the amount of friction between the two objects is reduced.  UHMW PE sheets also provide high resistance to impact and abrasion from vessels.  Figure 4-8 illustrates some common rubber fender elements fronted with steel plates and UHMW PE panels.

A second type of pier protection device is a pneumatic or foam-filled donut fender (Figure 4-9).  Donut fenders enhance pile barrier protection systems, whereby the donut fender absorbs energy and provides a buffer material between the steel pipe and the steel vessels.  This prevents steel-on-steel contact, which could result in sparks.  The donut rides up and down the pipe pile and therefore can easily accommodate variations in water elevation.

A third type of fender commonly used to protect structures from vessel impact is a pneumatic or foam-filled fender (Figure 4-10).  These devices float in the water and are secured to the structure by galvanic chains.  The fenders are easy to install; can be easily moved; and accommodate various water elevations typical of lock and dam waterways.

## 4.5  ALTERNATIVE DESIGN CONSIDERATION

Even though the installation of pier protection is relatively inexpensive, an alternative solution to protect the Queen Isabella Causeway could have been easily provided by strengthening the existing concrete piers.  This could be achieved by placing tremie concrete beneath the existing pile caps to increase the embedment length of the piles and reduce the moment imposed on the prestressed piles (Figure 4-11).



Figure 4-1   Steel sheet pile cellular cofferdam



Figure 4-2    Timber Pile Cluster Dolphin



Figure 4-3   Steel sheet pile protective island



Figure 4-4   Independent buffer structure



Figure 4-5   Pile barrier system with cable array



General view of the main span and approach structure of the Tappan Zee Bridge over the Hudson River in New York.  Constructed between 1952 and 1955, the original plans specified that pier protection be implemented on both the north and south sides of each of the 155 piers, regardless of its proximity to the navigation channel.  On the north side of each pier, a 14-pile timber cluster dolphin was installed with an ice breaker cap.  A similar timber pile cluster dolphin was installed on the south side of each pier without the ice breaker.

In 2000, the existing pier protection was augmented by installing new fender components to the two main piers as well as the flanking piers adjacent to the navigation channel.  At the two main piers, a new pre-cast concrete ring structure was installed on steel pipe piles, similar to a protective buffer structure with conventional fenders.  The flanking piers received a new reinforced timber system.

Figure 4-6   Tappan Zee Bridge, Hudson River, New York



General view of the main span and approach structure of the Sunshine Skyway Bridge in Tampa Bay, Florida.  Note the significant size and quantity of the protective pier system, which consists of cofferdam cells (dolphins) and rock island barriers.  The bridge protection system was designed by Parsons Brinkerhoff to withstand an impact from an 87,000-ton tanker traveling at 10 knots.  Construction began in 1982 and was completed in 1987.

Figure 4-7   Sunshine Skyway Bridge, Tampa Bay, Florida



**Buckling Fenders** – Generally used in pairs, the buckling fender can be installed directly between the structure and a fender panel. The fenders compress, "buckle," when a colliding vessel impacts the fender panel. As the fender deforms, energy is absorbed, thereby reducing the force transmitted to the structure.



**Cone Fenders** – Conical shape fender can be installed directly between the structure and a fender panel. As a colliding vessel contacts the fender panel, the cone fender compresses and absorbs energy, thereby reducing the force transmitted to the structure. The cone shape permits compression in any direction.



**Arch Fenders** – Similar to the buckling fenders described above, arch fenders can be installed directly on structures as well as on sacrificial buffer systems. Their smaller size (compared to the larger buckling fender) affords the opportunity to provide a continuous fender surface on an entire protective buffer system.



**UHMW PE & Steel Box Fender Panel** – Fender panel system provides uniform contact between the colliding vessel and the structure or buffer system to which it is affixed. UHMW PE sheets provide low friction properties; high impact resistance; and high abrasion resistance.

Figure 4-8  An array of fender components.



Figure 4-9   Pile barrier system with donut fenders.



Figure 4-10  Floating device – pneumatic or foam-filled fender.



Figure 4-11  Alternative design consideration.

## 5    CONDITION OF THE QUEEN ISABELLA CAUSEWAY PRIOR TO ALLISION INCIDENT

### 5.1    Texas DOT Bridge Inspection Record of September 5, 2001

Queen Isabella Causeway was visually inspected by a private consultant on September 5, 2001; findings were reported on Texas DOT "Bridge Inspection Record" forms (Reference No. 68, see Appendix G-3). The report provides a numerical rating between 0 ("failed condition") and 9 ("excellent condition") of various "elements" of the structure.

Element ratings are grouped into "components" and overall component ratings are reported. According to the letter of transmittal dated September 18, 2001, from Kenneth Kolodzie (Lone Star Engineering) to Eddy Gonzalez (TxDOT), various attachments such as photographs and maintenance records, and other miscellaneous items are associated with the inspection record, but were not available for this review. Component names and ratings are as follow:

> Deck – 6
> Superstructure – 6
> Substructure – 5
> Channel Item – 6
> Culvert Item – not applicable
> Approaches – 6
> Miscellaneous – all elements 7 or greater

The substructure rating of "5" is defined as "fair condition – minor deterioration of structural elements (extensive)."

### 5.2    Texas DOT Underwater Substructure Evaluation of January 26, 2001

Queen Isabella Causeway substructure was visually inspected by Texas DOT forces during August 2000; findings were reported in a document titled "Texas Department of Transportation Underwater Substructure Evaluation" dated January 26, 2001 (Reference No. 12, see Appendix G-5).

The report provides text descriptions and photographs for individual bents, groups of bents, fender system, and dolphins. Vertical cracks extending from the bottom of pile caps, and spalls and consolidation voids in the pile caps were described. Impact damage at Bent 112 was described as "major." Exposed aggregate was reported for all piles within one foot of the pile caps at bent 97. "Typical pile cap cracking with numerous spalls (mentioned in previous report)" was reported for Bents 23 through 34. The report authors concluded that *"Overall the condition of the substructure is fair."*

### 5.3    Federal Highway Administration Construction Inspection Report of August 14, 1973

Structural welding at splices of structural girders was inspected by Federal Highway Administration (FHWA) forces on August 14, 1973 and documented the same day on a FHWA form titled "Construction Inspection Report" (Reference No. 69, see Appendix G-4). The report included the comment:

> *"It was noted during this inspection that construction operations have resulted in spalling concrete from the footings in several areas, presumably from work barges impacting the footings. This had been a problem earlier in construction but had been remedied. It was agreed that continuing vigilance would be required to keep this type of damage to a minimum."*

## 5.4    Texas DOT Interoffice Memo of October 18, 1972

In an interoffice memo, cracking of foundation piles during installation is described (Reference No. 71, see Appendix G-8). In the memo, pile stress during driving is discussed. Pile stress can be "predicted" using dynamic mathematical models of the pile and soil or "measured" dynamically during pile installation. The memo is not clear regarding which is being referred to, but we believe that both "predicted" and "measured" stress data were acquired. The following is our interpretation of the conditions that are described in the memo.

During installation of the foundation piles, bearing capacity was both predicted and measured. The memo author expressed "concern" regarding the high predicted pile stresses. Expert advice was requested and received from Dr. Hirsch, on staff at the company providing the pile stress data. Measured stresses less than predicted were reported. Several piles were inspected in-situ after installation and found to be cracked and filled with water.

Modifications to the pile driving apparatus were made in an attempt to reduce driving stresses. The memo concludes:

> *"We further discussed the piling that showed cracking and that had filled with water and it had been recommended that the Contractor be advised that he should establish to our satisfaction if the piling was an acceptable piling or would need to be replaced. Several methods of observing the piling was discussed including the pumping out of the water with a submersible sump pump or bailing out the water with a well bailer. There was some discussion as to the responsibility for the cracked piling due to the timing of our alerting district personnel as to the requirements for changing cushion block material."*

> *"Since there are many things that might have caused cracking or breakage of the pile, it is my belief that these piling are the Contractor's responsibility to prove structurally adequate prior to our acceptance."*

## 5.5    SUMMARY

At the time of the allision, certain documented conditions of the Queen Isabella Causeway may be considered as degraded. We note the following:

- Cracked piles at unspecified locations,

- Vertical cracks extending from the bottom of pile caps, spalls and consolidation voids in the pile caps at various piers including Pier 32.

# 6    BRIDGE ALLISION OF SEPTEMBER 15, 2001

## 6.1    BARGE TOW CHARACTERISTICS

The barge tow comprised four filled hopper barges, NM 315 (lead barge), followed in line by ACL 9933B, VLB 9182, VLB 9173. These barges were pushed by the Brown Water V tug boat. The overall tow length (LOA) was approximately 844 ft and the total weight was approximately 6,982 short tons. A summary of relevant barge tow properties are listed in Table 6-1. A summary of gross mass and total displaced mass is listed in Table 6-2. Additional information regarding the barge tow is provided in Appendix G-1.

### Table 6-1 Barge Tow Properties

|  | Length | Width | Depth | Fwd. Dft. | Aft Dft. |
|---|---|---|---|---|---|
| NM 315 | 195′ | 35′ | 12′ | 9′-1″ | 9′-0″ |
| ACL 9933B | 200′ | 35′ | 13′ | 9′-1″ | 9′-1″ |
| VLB 9182 | 200′ | 35′ | 12′ | 9′-1″ | 9′-0″ |
| VLB 9173 | 200′ | 35′ | 12′ | 6′-10″ | 7′-0″ |
| Brown Water V | 49.1′ | 20′ | 8.3′ |  |  |

### Table 6-2 Barge Tow Weights

|  | Gross Weight (tons) | Displaced Weight (tons) |
|---|---|---|
| NM 315 | 687 | 1696.31 |
| ACL 9933B | 704 | 1928.92 |
| VLB 9182 | 705 | 1401.96 |
| VLB 9173 | 705 | 1829.16 |
| Brown Water V | 84 | 125.97 |

As a result of the allision, damage occurred to the bow of the NM 315 rake barge. This damage, as well as the displaced weights listed above, was observed and reported by the office of Allan R. Schultz. The report notes damages to the bow of NM 315, separating primary damage from secondary damage. Primary damage was caused by the impact of the barge with the causeway pier, while secondary damage was caused by failing debris from the damaged bridge. Schultz reported that the primary indentation was circular indicating that the barge struck a circular column of the Queen Isabella pier. The depth of the indentation was reported to be 4-1/8″.

## 6.2    ENERGY AND VELOCITY ESTIMATES

The velocity of the barge tow directly influences the amount of force imparted on the pier. Several methods can be used to determine the velocity of a barge including, but not limited to: drawing on a Global Positioning System (GPS) to track and record the position of the vessel versus real-time via satellite; and observing the actual vessel speed using a tachometer. Unfortunately, the barge tow was not equipped with a GPS tracking device and to date, no statements regarding tachometer observations have been made.

Velocity can also be calculated if the kinetic energy absorbed by the damaged barge and pier is known. Kinetic energy is the energy of an object in motion. Since energy cannot be created or destroyed, to reduce the motion of an object, such as a barge tow, the

energy must be transferred or absorbed by other objects or mechanisms. In this case, most of the kinetic energy of the barge allision would be absorbed by damage to the barge headlog and damage to the pier.

Several methods are available for determining the energy absorbed by damage to the bow of a ship. One method is presented in the AASHTO Bridge Design Specifications. This AASHTO procedure takes the deformation of the damaged vessel and yields a force required to create such a deformation. The damage to the bow of the lead barge was measured and recorded in the Allan R. Schultz (ARS) Report. Further analyses then yield the energy absorbed by the barge structure. The ARS report utilized a more recent study than the AASHTO specification, titled "Collision Energy Absorption of Ship's Bow Structures" published in the *International Journal of Impact Engineering*, (Reference No. 67) to compute the energy imparted during the impact. After deriving the energy, the velocity necessary to cause the observed damage to the bow of the barge can be determined. Using the AASHTO procedure, a velocity of 0.77 knots (0.89 mph) was calculated, whereas ARS calculated a velocity of 0.37 knots (0.43 mph).

It is important to note that these values assume that the pier was infinitely rigid. The energy and velocities calculated above represents the total energy absorbed if no pier damage had been observed. Since significant pier damage was observed, it can be concluded that a large portion of the barge's kinetic energy was absorbed by the pier structure. Therefore, the energy absorbed by pier must be known to accurately determine the velocity of the barge at the time of impact. Although it is known that the pier was significantly damaged, the exact measurements of this damage are unavailable. Without considering the energy absorbed by the pier the preceding velocity can be established as a lower bound.

### 6.3    COLLAPSE MECHANISM OF THE QUEEN ISABELLA CAUSEWAY

The allision of Brown Water V with the Queen Isabella Causeway resulted in the collapse of approximately 240 ft of the bridge between Pier 30 and Pier 33 (Figure 6-1). From the photographs and references provided to MGM by Royston, Rayzor, Vickery & Williams, L.L.P., we have developed the following hypothesis which conforms to the data and information provided, and explains the resulting damage, and the sequence of events related in testimony. We reserve the right to amend this hypothesis as we receive the information requested.

As the barge collided with the southern pile cap of Pier 32, the piles supporting the pier sheared. The entire substructure of the pier was pushed northwest of the existing pier location and then dropped into the mudline (Figures 6-3 and 6-4). The substantial displacement of the pier substructure resulted in spans 31 and 32, supported by the pier, to collapse into the waterway. Pier 32 remained standing following the collapse of Spans 31 and 32.

The ARS Report indicates that a rounded indentation was made at the top of the barge headlog during impact with Pier 32 (Figure 6-5). Relative to the height of the barge (12 ft), the known draft (9 ft), and the tide elevation of approximately 2 ft above MLLW, we can infer that the barge impacted the southeast corner of the southern pile cap of Pier 32, crushing it, resulting in the rounded indentation.

Following the impact at Pier 32, the barge and tow configuration swung around in the current such that the port side contacted the southern side of the Queen Isabella Causeway. The barge then came to rest against the southern most pile cap of Pier 26, thereby incurring

secondary damage.    Piles sheared, tie beams cracked, the footing was displaced approximately 3 in., and torsional cracking was visible in the column at Pier 26 (Figure 6-6).

Approximately 13 hours following the initial impact, Span 30 and Pier 31 collapsed into the waterway.  It is apparent that Pier 31 was pulled sufficiently to the east by the collapsed span to become unstable.  Pier 31 rotated about its pile supports, with the result that the pier cap beam struck the upright remains of Pier 32.  The rotated pile cats of Pier 31 are evident in photographs.

Figures 6-7 to 6-11 are visual representatives of our understanding of the Queen Isabella Causeway collapse.



Figure 6-1   View of the collapsed portion of the Causeway facing northwest.



Figure 6-2   View of the collapsed spans facing west.



Figure 6-3   Pier 32 and 33 viewed from Pier 31.



Figure 6-4   Pier 32 and 31 viewed from Pier 33.



Figure 6-5   Headlog of NM 315 indentation approx. 4 1/8 in. at maximum set in.



Figure 6-6   Pier 26 remains in place.  Spalled off concrete corner indicative of secondary barge contact.



Figure 6-7   At 0200, the Brown Water V tug and barge configuration impacted the Queen Isabella Causeway at Pier 32.



Figure 6-8   Immediately following the barge impact at Pier 32, Spans 31 and 32 collapsed into the waterway.



Figure 6-9   Pier 32 was sheared off of its piles and shifted to the northeast, albeit it remained upright.



Figure 6-10   At 1500, Span 30 and Pier 31 collapsed.



Figure 6-11   Pier 31 fell over onto adjacent Pier 32, crushing the standing substructure.

# 7    FAILURE ANALYSIS

A failure analysis was performed for Pier 32 to determine the capacity of the existing pier. The barge struck the southern pile cap of Pier 32. The impact apparently sheared the piles supporting the pier, causing the collapse of spans 31 and 32 into the waterway. The analysis revealed that the pier was able to sustain an impact load of approximately 685 kips prior to failure.

## 7.1    MATHEMATICAL MODELING

A finite element computer program, ETABS, was used to model the pier. This is a state-of-the-art, general purpose, and three-dimensional structural analysis program, with pushover capabilities. Pushover analysis is a static, nonlinear procedure in which the magnitude of the structural loading is incrementally increased. With the increase in the magnitude of the loading, areas of structural weakness and failure modes are identified and incorporated into the successive iterations of analysis.

The pier is modeled using beam elements for the columns, and pier cap (Figure 7-1). The pile caps are modeled with beam and shell elements. The piles were modeled as beam elements with springs simulating the lateral resistance of the soil.

## 7.2    ANALYSIS OF PIER 32

The failure analysis was performed for Pier 32 at 0-degree angle (force parallel to centerline of pier) and at 90-degree angle (force perpendicular to centerline of pier). The analysis revealed that the failure load is $718^K$ (Figures 7-2 and 7-3). This load is independent of the angle of impact since the piles are located symmetrically at 0-degree and 90-degree angles.

Since the piles are only embedded two inches into the pile caps, their capacity to resist lateral loads is greatly reduced. It is believed that the pile caps simply slid off the piles and the only resistance the piles offered was the friction between the two concrete surfaces. Had these piles been embedded two feet into the pile caps, as provided in the reconstructed piers, their capacity to resist the barge impact load would have been greatly increased. Furthermore, the calculated failure load did not account for any deterioration atop the piles that may have been present prior to the allision, as discussed in Section 5.4.

The superstructure is anchored to the pier bents with only one anchor bolt, 1.25 inches in diameter, at the two fascia beams. These bolts would fail at a barge impact load of approximately $381^K$. The pier would not collapse at this load but its stability would be impacted and major rehabilitation or replacement of the pier would be required.

## 7.3    IMPROVEMENTS TO PIER 32

### A.    Providing additional anchor bolts.

If anchor bolts were provided at all girders, then the impact load that is required to fail these bolts would be extremely high that the piles would fail prior to the anchor bolts. This relatively inexpensive improvement would have provided additional stiffness to the pier.

**B.  Increasing the embedment length of piles.**

The increase of the embedment length of piles from two inches to two feet would provide an increase in the pier capacity beyond the calculated value of $718^K$.



Figure 7-1  Finite Element Modeling of Pier 32



barge impact

Figure 7-2  Layout Model of Pier 32



Figure 7-3  Deflected structure of Pier 32

# 8    COMMENTARY ON STRUCTURAL ADEQUACY OF QUEEN ISABELLA CAUSEWAY

## 8.1    PRE-ALLISION EVENT

The condition of the existing piles prior to the allision may have an impact on the structural capacity of Pier 32. Interoffice memo issued by TxDOT on October 18, 1972 indicates concern over the cracked piles during installation. The underwater inspection evaluation report dated January 26, 2001 also revealed that cracks, spalls, and voids are present in the pile caps.

The only entity, which is responsible for determining the appropriate pier protection for a given bridge, is the State itself. The FHWA commenced an initiative in the 1980's and 1990's to define the responsibility of pier protection and bridge pier strengths as one that belonged to the states. In 1980, immediately following the Sunshine Skyway Bridge allision, the FHWA issued the first of five memoranda, the first of which instructed the State DOT's to consider motorist-warning systems. TxDOT did not comply with the FHWA recommendation. Had the Queen Isabella Causeway been equipped with a motorist-warning system, vehicular traffic would have been aware of the collapsed bridge spans and lives would have been saved. In 1983, the FHWA issued Technical Advisory T5140.19, which instructed all States to evaluate their existing bridge pier protection systems and to design new bridge piers with the consideration of ship collisions. TxDOT did not comply with the FHWA recommendation. If the Queen Isabella Causeway piers had been evaluated, TxDOT would have realized that the strength of Pier 32 was incapable of withstanding a vessel impact and was therefore susceptible to serious damage.

## 8.2    AASHTO VESSEL COLLISION GUIDELINE STANDARDS

In 1984, 1995, and 1999, the FHWA issued memoranda instructing all States to assess and evaluate their bridge piers and fender systems for structural integrity for those bridges over navigable waters. In addition, the *1991 AASHTO Guide Specification and Commentary for Vessel Collision Design of Highway Bridges* was published and provided the States with a definitive methodology for determining pier strength requirements. These four documents emphasized the responsibility of the States to ensure that their bridge piers were either properly designed or protected against vessel impacts.

The *1991 AASHTO Guidelines* provide analytical methods for determining the minimum strength of bridge piers based upon several characteristics of the bridge and the waterway it traverses. These characteristics include the typical vessels; the number of barges per tow; the size and displacement of the barges; the mean annual river velocity; the geometry of the waterway; the layout of the navigation channel; the water depths; and the classification of the bridge, whether it is *critical* or *regular*.

The *Guidelines* outline three methodologies by which the bridge piers are to be designed. Each of the methods produce a *design vessel,* which is based upon the type of vessel traffic on the waterway, its displacement, and its speed. Once determined, the design vessel enables the user to perform an analysis of the bridge, and determine whether the probability of collapsing is acceptable by comparison to the prescribed *Guidelines*. A description of each of the Methods taken directly from the *Guidelines* follows:

- Method I – A simple semi-deterministic procedure for selecting the design vessel for collision impact. The procedure is calibrated to normally fulfill the Method II acceptance criteria in Section 4.8.2. However, the procedure is less accurate than Method II and should be used only in simple and un-complicated situations;

- Method II – Method II is a more complicated probability based analysis procedure for selecting the design vessel for collision impact. This method must be used in all situations where proper documentation of fulfillment of the acceptance criteria in Section 4.8.2 is required; and

- Method III – A cost-effectiveness analysis procedure for selecting the design vessel for collision impact. This method may be used in cases where it is not economical or technically feasible to design the bridge structure to comply with the acceptance criteria in Section 4.8.2.

AASHTO recommends the use of Method I for cases of; shallow draft waterways where the marine traffic consists almost exclusively of inland barges, waterways where the distribution of vessel sizes is small, or waterways in which accurate vessel traffic data is unavailable or difficult to obtain. Because of the lack of vessel size data MGM resorted to testimony from local mariners to determine a design vessel (Reference 72). The Method I analysis determined the minimum required vessel collision force that each bridge element must be designed to resist.

The structural analysis of pier 32 suggests that it can resist a collision force of 718 kips. The Method I analysis indicates that pier 32 is required to resist a minimum force of approximately 2970 kips (See Figure 8-1). As designed by TxDOT pier 32 is not structurally sufficient to resist the AASHTO prescribed minimum impact load. In fact, it is significantly deficient.

Lastly, the structural deficiencies throughout the Queen Isabella Causeway accumulated to the point where the bridge did not maintain its original design capacity and was in a weakened condition prior to the allision event. Such examples as scale, cracks, and spalls observed on concrete pile caps in addition to scale, cracks, and scour observed on the concrete piles were all indications that the bridge TxDOT did not proactively attempt to properly maintain the Queen Isabella Causeway. This ambivalent approach to the structural deficiencies of the causeway, coupled with the ambivalence toward federal guidelines concerning pier protection, resulted in its collapse. As owners of the Queen Isabella Causeway, TxDOT had a responsibility to properly maintain and protect all of its structural components, yet failed to do so.



Figure 8-1  Force Comparison Chart

## 9   COMMENTARY ON THE RECONSTRUCTED SECTION OF QUEEN ISABELLA CAUSEWAY (NOVEMBER 2001)

There are two apparent improvements to the original design that were utilized for the reconstruction of Piers 30, 31, 32 and 33. Five prestressed concrete piles at each pile cap were installed instead of four piles. Another improvement is the increase of pile embedment into the pile caps from 2 inches to 2 feet. These improvements greatly increase the capacity of the pier ability to withstand barge impacts.

## 10   CONCLUSIONS

Based upon our review of the available documents and the analyses conducted, the following statements reflect our opinions for this case:

- State Departments of Transportation have an obligation to protect their bridges, which traverse navigable waterways. States were provided five notices from the FHWA between 1980 and 1999, which stated the potential of vessel impacts and the importance of evaluating all piers within the navigable waterway. It was also stated that pier protection could prevent bridge damage, and that warning devices could save lives;

- The State of Texas knew at the onset that the Gulf Intracoastal Waterway was a navigable waterway and would be utilized by barge traffic;

- The State of Texas failed to consider the state-of-the-art in bridge pier design in navigable waterways;

- The State of Texas did not employ adequate pier protection.

- ACOE memos prior to construction of the bridge indicate the clear need for vessel impact considerations: barge impact energies and forces were all clearly identified. TxDOT did not evaluate its bridge piers to withstand the vessel impact forces suggested by the ACOE;

- The State of Texas ignored the 1980 FHWA memorandum instructing DOTs to consider motorist-warning systems;

- The State of Texas ignored the 1983 FHWA Technical Advisory T5140.19, instructing States to evaluate their existing bridge pier protection systems and to design new bridge piers susceptible to ship collisions;

- The State of Texas performed no evaluation of the existing bridge as required by the issuance of the *1991 AASHTO Guide Specification and Commentary for Vessel Collision Design of Highway Bridges*;

- The State of Texas ignored the 1995 FHWA notice to evaluate bridges for vessel collision;

- The State of Texas ignored the 1999 FHWA notice to evaluate bridge fender systems on all bridges with United States Coast Guard permit for navigation;

- Riverbed scour diminished the embedment of the piles;

- The State of Texas ignored several cases of bridge allisions (most of which were the catalyst that produced the FHWA memos), which illustrated the fatal consequences of vessel impacts;

- The MGM analyses revealed that the failure load for Pier 32 is approximately $718^K$; and that AASHTO requires a capacity of $2970^K$ for Pier 32.

- The State of Texas failed to comply with Federal Guidelines published by AASHTO (and AASHO) as early as 1970, when the bridge was first designed, and again in 2001 when the reconstructed bridge was built. The original bridge piers outside of the navigational channel were not designed to withstand a vessel impact.

## 11  SUMMARY

The responsibility of ensuring that bridges are capable of withstanding vessel impacts ultimately lies with the States; not the Army Corps of Engineers, not the United States Coast Guard, and not the Federal Government. When these federal agencies originally approved the Queen Isabella Causeway permit, the approval only pertained to the structure's layout and its overall position within the navigable waterway. The permits do not declare approval of the pier sizes or strengths, or the adequacy of the pier protection. Although these agencies often times will provide guidance to the States in the form of letters and memoranda, it is the ultimate responsibility of the States to protect its bridges and the traveling public.

With *AASHTO Guidelines* in place since 1991, and the issuance of five significant FHWA memoranda throughout the 1980's and 1990's, the State of Texas had the means, methodology, and resources to thoroughly evaluate and assess the vulnerability of its existing bridges, and develop retrofit schemes or pier protection systems to ensure the longevity of its bridges over navigable waters. The *1991 AASHTO Guide* also provides examples in its appendices, which illustrate how the *Guidelines* are to be used and describe, via comprehensive commentary, the procedures contained therein. It is apparent that these assessments were not performed by TxDOT officials

The Pier 32 analyses indicate that its lateral load capacity was only $718^K$. Other bridges constructed in the mid-twentieth century comprise robust bridge piers and piles sufficiently embedded into the pile caps. Clearly, Pier 32 of the Queen Isabella Causeway was not properly designed to the state-of-the-art standards of the day, nor was it evaluated and re-designed in the 1990's to comply with the *1991 AASHTO Guidelines*. During this era, other states, such as Florida and Louisiana, proactively engaged in the AASHTO and FHWA directives by performing evaluations of their bridge piers.

We have provided the above opinions to a reasonable degree of engineering certainty. Based upon any further evidence and the evidence at trial, we reserve the right to amend and supplement this report.

Sincerely,

The Office of
**M.G. McLAREN, P.C.**

Malcolm G. McLaren, P.E.
President
November 2004

# APPENDIX A

# LIST OF QUALIFICATIONS

**Malcolm G. McLaren, P.E.**
**President & Chief Executive Officer**

**Education:**
Master of Science, Structural Engineering, Rutgers University, 1975
Bachelor of Science, Civil Engineering, Cornell University, 1973

**Professional Registration:**
*Licensed Professional Engineer:*

- Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Hampshire, New Jersey, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, Wisconsin
- ADC and NASDS Certified Diver

**Honors & Societies:**
- American Society of Testing and Materials
- Task Group Chairman - Committee 20.95.03 - Manufactured Recycled Plastic Lumber - Development of Material and Performance Specifications
- The Association for Bridge Construction and Design
- American Society of Civil Engineers
- American Association of Port Authorities
- American Concrete Institute
- Precast/Prestressed Concrete Institute
- National Society of Professional Engineers
- Association of Diving Contractors
- Society of American Military Engineers
- Society of Plastics Engineers
- International Code Council
- Chi Epsilon - Civil Engineering Honorary Society
- Who's Who Among Students in American Universities
- Who's Who in the East

**Awards:**
- Rockland County September 11th Memorial at Haverstraw Bay, presented by Rockland County Office of the County Executive. May 2003.
- Lecturer "21st Century Engineered Structures – Materials Will Lead the Way," presented by Rutgers Ceramic Association of New Jersey, Rutgers School of Engineering. April 2003.
- 21st Annual Art Commission Design Award 2002. Presented by Mayor Bloomberg, City of New York. July 2003.
- Rockland County Engineer of the Year 2002-2003, Rockland County Chapter – N.Y.S. Society of Professional Engineers. February 2003.
- Citation for Outstanding Citizen and Esteem for both the Community and State of New York. Presented by New York State Assemblyman Alexander J. Gromack. February 2003.
- Senate Certification of Recognition of 25 Years of Service Dedicated to the Engineering Community, presented by Senator Thomas P. Morahan. May 2002.
- Outstanding Service and Active Participation Work on the Ceramics Committee D20, presented by American Standards Testing Materials. November 1999.
- Excellence on the Waterfront for Yonkers Recreation Pier, Waterfront Center Annual Award. October 1997.
- Merit Award for Easton Avenue Student Housing, presented by NJ Chapter of the American Concrete Institute and NJ Concrete/Aggregate Association. May 1994.
- Excellence in Long Island Architect for Roslyn Highlands, E&H Co. ARCHI Design Award sponsored by the Long Island Chapter of Architects. May 1986.



**Malcolm G. McLaren, P.E.**
**President & Chief Executive Officer**

**Papers:**
- McLaren, M.G., Pensiero, J.P., Assis, G.F., Melewski, P. M., Krishnaswamy, P., and Lashway, K.F., " Introducing the First Recycled Plastic Bridge In the World," April 2001; Presented at 2001 IBTTA Maintenance Committee Fall Conference, New Orleans, LA, October 2001.
- McLaren, Malcolm G., Pensiero, John P., Assis, George F., Melewski, Peter M., Krishnaswamy, Prabhat, Lashway, Keith F., " Introducing the First Recycled Plastic Bridge In the World," April 2001.
- McLaren, Malcolm G., Lampo, Richard G., and Nosker, Thomas J., "Demonstration Installations of Recycled-Plastic Lumber for Bridges, Marine Pilings, and Railroad Ties," June 2000.
- McLaren, Malcolm G., and Pensiero, John P., "Simplified Design of Recycled Plastic as a Structural Material," *Plastics in Building Construction*, April 2000.
- McLaren, Malcolm G., "Recycled Plastic Lumber and Shapes-Design and Specifications," 1994.
- McLaren, Malcolm G., "Underwater Inspections and Repairs," 1992.
- McLaren, Malcolm G., and O'Connor, Daniel W., "Polymeric Bonding of Ceramic Tiles on Flexible Framing Systems," October 11, 1994.

**Experience:**

Mr. McLaren has more than 27 years of civil, structural, marine, site and geotechnical design, engineering and inspection experience. Mr. McLaren has participated as engineer or manager on more than 5,000 projects nationally, varying in scope and difficulty from bridge design to rehabilitation of berthing facilities to multi-story, multi-bay design of difficult post-tensioned structures.

Mr. McLaren is a registered professional engineer in the state of New York and 34 other states. His experience in the fields of structural, marine, site/civil design and engineering, construction management, and value engineering have been developed on the following projects:

- **Maxwell House Site Development, Hoboken, New Jersey.** Productive Principal for conversion of the former Maxwell House coffee industrial site to a residential mixed-use facility. Plans include conversion and modifications of existing buildings, design of roadways that will connect to local streets, site and utility development, and the addition of a connecting two-level underground parking area to Elysian Park on Sinatra Drive.

- **Riverwalk Buildings 4 and 5, West New York, New Jersey.** (2002) Productive Principal responsible for the structural engineering design for the residential Riverwalk Buildings 4 and 5 as well as the adjacent clubhouse as part of the Port Imperial waterfront site development.

- **Areawide Waterfront Rehabilitation Design Services Contract at Brooklyn Navy Yard for the Brooklyn Navy Yard Development Corporation** - Productive Principal for the design of repairs, reinforcing, and protection of various waterfront structures at the site, including Berths 3A, 14A, 17 and 18, and Pier K.

- **Rehabilitation of the Fulton Fish Market and Pier 17, New York City for the NYC Economic Development Corporation/Turner Construction Company** - Productive Principal for project involving condition assessment of previously repaired timber elements at the Fulton Fish Market, and existing concrete elements (piles, pile caps and deck) at Pier 17. Work included a detailed technical assessment and load rating analysis of the existing facilities, and repair recommendations.

- **Battery Park City Ferry Terminal, Battery Park City, New York -** Principal-in-Charge and Chief Engineer providing structural, marine, geotechnical and civil engineering design for a 32,000 s.f. floating terminal for the Port Authority of New York & New Jersey.

- **East and Harlem River Ferry Landings Project, New York City for the New York City Economic Development Corporation** - Principal-in-Charge for a $10 million civil-structural-



**Malcolm G. McLaren, P.E.**
**President & Chief Executive Officer**

marine engineering project to develop seven waterfront landing sites to accommodate vessels, passengers, and connecting transportation.

▪ **Weehawken Intermodal Ferry Terminal, Weehawken, New Jersey for NJ Transit -** Productive Principal for structural, foundation, and accessibility design components for the design of a new $30 million, three-level, 38,000 square foot terminal that will include four ferry slips on floating platforms, and intermodal connection to the Hudson-Bergen Light Rail Transit System.

▪ **Pier A Ferry Landing, New York, New York -** Principal-in-Charge for preparation of design documents for the construction of a new ferry landing capable of accommodating four bow-loading and three side-loading ferries.

▪ **Hunters Point Ferry Landing, Hunters Point, Queens, New York for the Port Authority of New York & New Jersey -** Project involved the design of a ferry landing and terminal and ancillary upland facilities. Included preparation and submittal of U.S. Army Corps of Engineers permit application.

▪ **Structural Inspection, Assessment and Design of Repairs, at Various Port Authority of New York & New Jersey Facilities.** Productive Principal for the following projects:

- *Pier 40, Hudson River*
- *Passenger Ship Terminals, Piers 88, 90, 92 & 94, Hudson River*
- *Piers 1, 2, 3 & 5, Red Hook Terminal, Brooklyn*
- *Piers 9A, 9B, 11 & 12, Clinton Wharf, Brooklyn*
- *Piers A, C, and Headhouses, Hoboken*

▪ **Indefinite Quantity Contract for Underwater Inspection Services at U.S. Navy Facilities Worldwide (1997; 2001-Present)** - Productive Principal for an Indefinite Quantity Contract to provide underwater inspection, assessment and rehabilitation design services for Navy facilities worldwide:

- *U.S. Navy Fuel Support Pier, Melville, RI*
- *U.S. Naval Station, Everett, WA*
- *U.S. Navy Weapons Station, Concord, CA*
- *U.S. Naval Station, Bremerton, WA*
- *Vandenberg AFB, California*
- *U.S. Naval Base, Pearl Harbor, HI*

▪ **2004-2005 Bridge Diving Inspection and Fathometer Survey for the East (Regions 1, 2, 7, 8, 9) of New York State -** Principal In Charge for this two-year bridge inspection contract for the New York State Department of Transportation. McLaren will provide underwater inspection and fathometer survey services for 93 bridges consisting of 186 SSU's.

▪ **2003-2005 Below Water Inspection of Canal Structures located within the Albany, Syracuse and Buffalo Divisions for the New York State Thruway Authority -** Productive Principal for underwater inspection of 122 canal structures along the New York Waterway Canal System. Structures encompass locks, guard gates, fixed crest dams, moveable dams, taintor gates, spillways, terminals, docks, guide structures and culverts. The assignment includes preparation of a comprehensive report, drawings, and photo documentation.

▪ **Investigation of the I-40 Bridge Collapse, Webbers Falls, Oklahoma for Magnolia Marine Transport Company (2002-Present) -** Project Principal for forensic investigation of the I-40 bridge collapse. Involved evaluation of the structural condition of the bridge and assessment of damage caused by the collision of the barge. Responsibilities included investigation of the bridge failure, preparation of documents summarizing the events, and assessment of the causes of the collapse.



**Malcolm G. McLaren, P.E.**
**President & Chief Executive Officer**

- **Investigation of the Beckett Street Terminal Collapse, Camden, New Jersey (2002-Present) –** Project Principal for the forensic investigation of the partial collapse of a deteriorated waterfront wharf structure.   The firm performed analyses, developed theories, and conducted historic research to aid the defense in its case.

- **2001-2002 Biennial Underwater Bridge Inspection and Fathometer Survey Program for Regions 10 and 11, New York City and Long Island for the New York State Department of Transportation -** Principal-in-Charge for the underwater inspection and assessment of 64 bridges located in the New York City and Long Island areas. A total of 426 SSUs were inspected, and fathometer surveys performed for 61 bridges.

- **Metro-North Railroad 2003 Underwater Inspection Contract No. 9438A02056 Task 056 -** Productive Principal for the underwater inspection of 30 bridge structures as part of this Undergrade Bridge Rehabilitation Project.

- **1995-1998 Biennial Underwater Bridge Inspection and Fathometer Survey Program for the State of Connecticut for the Connecticut Department of Transportation -** Principal-in-Charge for underwater inspection and assessment of 360 bridges throughout the state of Connecticut.   Inspections included probings, soundings, pile diameter measurements, videotape recordings, photo documentation, and preparation of detailed reports.

- **1999-2000 Underwater Inspection and Assessment of Bridges throughout the State of New Hampshire for the New Hampshire Department of Transportation -** Principal-in-Charge for statewide inspection of bridges throughout the State of New Hampshire. Includes underwater inspection and assessment of 150 bridges.  Bridge inspection reports included forms, photo documentation, sketches, and recommendations for repairs were provided.

- **1998-1999 Biennial Underwater Bridge Inspection and Fathometer Survey Program for Upstate West (Regions 3, 4, 5 & 6) for the New York State Department of Transportation –** Principal-in-Charge for the underwater inspection and fathometric survey of 128 bridges in the Upstate West Regions of New York State. Work included videotape and photo documentation, and comprehensive reports were prepared using NYSDOT's database management system per the NYSDOT Bridge Inspection Manual.

- **1998-1999 Biennial Underwater Inspection and Fathometer Survey of Bridges for the New York State Thruway Authority/Hardesty & Hanover -** Principal-in-Charge for the underwater inspection and fathometer survey of bridges located in the Syracuse and Buffalo Divisions of the state. A total of eight bridges encompassing 59 substructure units (SSUs) were inspected in a five-county area.  Work included above and underwater photographs and preparation of comprehensive reports detailing findings. All inspection work was performed in accordance with NYSDOT and NYSTA Bridge Inspection Manuals.

- **U.S. Gypsum Facility, Stony Point, New York -** Productive Principal for rehabilitation of breasting and mooring dolphins used to accommodate a 20,000-ton cargo vessel.  Included structural analysis to determine the combined stresses due to axial compression and bending in unbraced battered steel H-piles; as well as analyses of berthing energy and criteria of the vessel for fender selection; determination of environmental forces such as wind, wave, current and ice; and geometric studies of the vessel to determine optimum positioning during operation.

- **Pier 98 Fuel Oil Unloading Dock Inspection, New York, NY, Con Edison.**  Project Executive for the structural condition assessment of the Pier 98 facility at Con Edison's 59th Street Station.  A thorough tactile inspection of the facility was performed to enable the development of detailed and prioritized repair recommendations. All structural and fendering components were examined with emphasis on marine borer activity, deterioration, and damage.

- **Puerta Cancun-Xcaret, S.A. de C.V. Cruise Ship Docking Facility, Quintana Roo, Mexico -** Productive Principal for a contract for Carnival Cruise Lines to develop RFP



**Malcolm G. McLaren, P.E.**
**President & Chief Executive Officer**

Design-Build documents for a 280,000 s.f. cruise ship docking facility along the East coast of Mexico. Providing oversight and senior level input to the production and assembly of technical and performance specifications, design criteria, and proposal documents. The contract also includes bidding services, design review, quality control implementation, and construction inspection.

- **Ravenswood Generating Station, New York City for Consolidated Edison Company** - Productive Principal for new berthing facility design including fendering, bulkhead and utility design.

- **Rutgers University Housing, New Brunswick, New Jersey.** Productive Principal providing structural and foundation engineering for a new 12-story, post-tensioned concrete tower structure (dormitory) and five-story precast concrete parking garage.

- **Mahan Hall, U.S. Military Academy at West Point, New York.** Productive Principal for the investigation of water infiltration problem along the building's exterior masonry wall. Development of repair options.

- **Signature Place, Stamford, Connecticut.** Productive Principal providing structural and foundation engineering for a 38-story reinforced concrete complex consisting of three residential, high-rise towers and retail space. The entire facility will comprise 1.6 million s.f. of floor area.

- **City Center Mall, White Plains, New York.** Productive Principal providing structural and foundation engineering for a new mixed-use retail and residential use complex (conversion of the former Macy's Department Store in downtown White Plains).



**APPENDIX B**

**LIST OF TESTIMONIES AS EXPERT WITNESS**

**M.G. McLaren, P.C. Consulting Engineers**
**List of Testimonies as Expert Witness**
**2001 - 2004**

1.     Allision of the M/V Robert Y Love with the Interstate 40 Bridge over the Arkansas River, Webbers Falls, OK

2.     Independence Harbor I Condominium Association, Edgewater, NJ

3.     Supergrid Collapse, Boardwalk Hall, Atlantic City, NJ

4.     Kim & Song v. Norlam, Congers, NY

5.     Weiner Residence Dock, Old Saybrook, CT

**APPENDIX C**

**HOURLY RATES**

Hourly Rates

| | |
|---|---|
| Principal: | $225/hr. |
| Senior Associate: | $200/hr. |
| Associate: | $180/hr. |
| Senior Engineer: | $150/hr. |
| Staff Engineer: | $125/hr. |
| Junior Engineer: | $100/hr. |
| Sr. CAD Operator: | $115/hr. |
| Jr. CAD Operator: | $ 95/hr |
| Diver | $135.50/hr. |
| Tender | $101.25/hr |
| Intern Engineer: | $ 50/hr. |
| Clerical: | $ 65/hr. |

**APPENDIX D**

**REFERENCES**

# REFERENCES

1.  Federal Highway Administration Strategic Highway Network Mapping Application. Bureau of Transportation Statistics. 22 Mar. 2003 <http://websas.bts.gov>.

2.  AASHTO LRFD Bridge Design Specifications, Customary U.S. Units. American Association of State Highway and Transportation Officials , 1994.

3.  AASHTO LRFD Bridge Design Specifications, Customary U.S. Units. Washington, D.C.: American Association of State Highway and Transportation Officials, 1998.

4.  Barbour, R. W., and J. I. Gray. Federal Highway Administration. Port Isabel-Padre Island Causeway Construction Inspection Report. August 14, 1973.

5.  Building Code Requirements for Structural Concrete (ACI 318-02). Farmington Hill, MI: American Concrete Institute, 2002.

6.  Caldwell, J.B., and P.D.C. Yang. "Collision Energy Absorption of Ships' Bow Structures." International Journal of Impact Engineering 7 (1988): 181-196.

7.  Cox, PE, William R. Letter to Kami L. Eisemann, Associated Steel Fabricators, Inc.. 26 Oct. 2001. Reviewed Shop Drawings (36 drawings).

8.  Ellington, P.E. (Texas Department of Transportation), Jody. "Inspection Report." Rev. of TXDOT Structure 21-031-0331-04-005. 24 Sept. 2001.

9.  Helton, LT Robert. "Consolidated Sitrep One - Barge Collision with Queen Isabella Causeway." 16 Sept. 2001.

10. Kowalik, P.E., Alan. Texas Department of Transportation. Inspection Report. Rev. of TXDOT Structure 21-031-0331-04-005. 20 Dec. 2001.

11. Ramsey, P.E., Keith. Texas Department of Transportation. Inspection Report. Rev. of TXDOT Structure 21-031-0331-04-005. 12 Oct. 2001.

12. Ramsey, P.E., Keith L. Texas Department of Transportation (Bridge Division). Underwater Substructure Evaluation. 26 Jan. 2001.

13. NTSB Marine Accident Report; Ramming of the Sunshine Skyway Bridge By the Liberian Bulk Carrier Summit Venture; Tampa Bay, Florida; May 9, 1980. Washington, D.C.: National Transportation Safety Board, 1981.

14. FHWA Technical Advisory: T 5140.19; February 11th 1983. Federal Highway Administration, 1983.

15. Code of Federal Regulations; Title 23 - Highways. 22 May 2003 <http://www.archive.gov>

16.  FHWA Memorandum: National Transportation Safety Board Recommendations; November 15 1995. N.p.: Federal Highway Administration, 1995.

17.  FHWA Memorandum: Evaluation of Fendering Systems; January 11th 1999. N.p.: Federal Highway Administration, 1999.

18.  U.S. Coast Guard - American Waterways Operators; Bridge Allision Work Group. N.p.: USCG/AWO, 2003.

19.  Ostenfeld, Dr. C.,1965 Publications. Vol. 25th. Zurich: International Association for Bridge and Structural Engineering, 1966.

20.  FHWA Memorandum: Motorist Warning System on Bridges Subject to Ship Collisions; December 8th 1980. Federal Highway Administration, 1980.

21.  Criteria For: The Design of Bridge Piers with Respect to Vessel Collision in Louisiana Waterways. N.p.: Louisiana Department of Transportation and Development & Federal Highway Administration, 1985.

22.  FHWA Memorandum: National Transportation Safety Board Recommendations; November 4th 1996. N.p.: Federal Highway Administration, 1996.

23.  Marine Board (National Research Council), Ship Collisions with Bridges - The Nature of Accidents, Their Prevention and Mitigation; By the Committee on Ship Bridge Collisions. Washington D.C.: National Academy Press, 1983.

24.  Schultz, Allan R. "Report M/T 'Brownwater V' Allision With Queen Isabella Causeway Bridge, Port Isabel, Texas on September 15, 2001." 30 Oct. 2004.

25.  Witness Statement of Levie Old, September 15, 2001.

26.  Witness Statement of Ross L. Valigura, September 15, 2001.

27.  Witness Statement of J.W. Blocker, September 15, 2001.

28.  Witness Statement of Rocky L. Wilson, September 15, 2001.

29.  Witness Statement of David D. Fowler, September 15, 2001.

30.  Consolazio, Gary R., and Ronald A. Cook. Barge Impact Testing of the St. George Island Causeway Bridge; Phase I: Feasibility Study. Gainesville: University of Florida, 2002.

31.  AASHTO: Guide Specification and Commentary for Vessel Collision Design of Highway Bridges.  Volume 1: Final Report.  American Association of State Highway and Transportation Officials.  February 1991.

32.  Tsinker, Gregory P. Floating Ports. Gulf Publishing Company.

33.   Texas Department of Transportation. Queen Isabella Causeway Allision, Span Collapse & Repair, September 15, 2001 (PowerPoint Presentation, photocopy only). 2001.

34.   Texas Highway Department. Press Release on Opening of Queen Isabella Causeway. 1974.

35.   United States Coast Guard Marine Safety Office. Deposition from Hearings on Allision of Brown Water V With Queen Isabella Causeway, D/L September 15, 2001. Sept. 2001.

36.   Wallace, P.E., Mark A. Texas Department of Transportation (Design Division). Underwater Substructure Evaluation. 2 Oct. 1996.

37.   Quinn, Alonzo D. Design and Construction of Ports and Marine Structures. N.p.: McGraw-Hill, 1972.

38.   Shore Protection Manual, Army Corps of Engineers. N.p.: Coastal Engineering Research Center, 1984.

39.   American Bureau of Shipping, Steel Vessels for Service on Rivers and Intercostal Waterways. 1997.

40.   Chen, Wai-Fai, and Lian Duan. Bridge Engineering Handbook. New York: CRC P, 1999.

41.   Consolazio, Ph.D., Gary R., and Ronald A. Cook, Ph.D., P.E.. Barge Impact Testong of the St. George Island Causeway Bridge, Phase I: Feasibility Study. University of Florida Department of Civil & Coastal Engineering, January 2002.

42.   "Reconstruction Plans, Port Isabel-Padre Island Causeway." Texas Department of Transportation, 21 Sept. 2001.

43.   "Plans of Proposed State Highway Improvement, Port Isabel-Padre Island Causeway Bridge (Incomplete Set)." Texas Highway Department, 3 Sept. 1971.

44.   Texas Highway Department. Port Isabel-Padre Island Causeway Test Pile Data. Dec. 1972-Mar. 1973.

45.   United States Coast Guard. Bridge Permit (9-71). 22 Feb. 1971.

46.   Brown Water V Queen Isabella Bridge Allision. Objections and Answers of the State of Texas to Interrogatories of Petitioners United States District Ct. for the Southern District of Texas, Brownsville Division

47.   Conway, William B., and Zolan Prucz. Ship Collision with Bridge Piers - Dynamic Effects. N.p.: Preprint for the Transportation Research Board 69th Annual Meeting (January 7-11, 1990), 1989

48. Conway, William B., and Zolan Prucz. "Design of Bridge Piers Against Ship Collision." Bridge and Transmission Line Structures  (1987): 209-223.

49. Barge MIV Registration Information (attached). 19 Sept. 2001.

50. United States Coast Guard. Certificate of Documentation: Brown Water V. 15 Sept. 2001.

51. United States Coast Guard. Marine Casualty Investigation Report. 15 Sept. 2001.

52. Ship Collision with Bridges; The Interaction Between Vessel Traffic and Bridge Structures . Zurich: International Association for Bridge and Structural Engineering (IABSE), AIPC, IVBH, 1993.

53. Civil Engineering Reference Manual; for the PE Exam. Belmont: Professional Publications, Inc., 1999.

54. Code of Federal Regulations; Title 33 - Navigation and Navigable Waters. 22 May 2003 <http://www.archives.gov>.

55. Code of Federal Regulations; Title 49 - Transportation. 22 May 2003 <http://www.archives.gov>.

56. "6 Minute Water Level Data, Port Isabel, Laguna Madre, TX (Sept. 11-Sept. 20, 2001)." National Oceanic and Atmospheric Administration. 11 Nov. 2004 <http://co-ops.nos.noaa.gov>.

57. "Nautical Chart Intracoastal Waterway 11302 Stover Point to Port Brownsville, Texas." National Oceanic and Atmospheric Administration, 2002.

58. "Nautical Chart 11301 Southern Part of Laguna Madre, Texas." National Oceanic and Atmospheric Administration, 2002.

59. Perugini, Captain Nicholas E. (National Oceanic and Atmospheric Administration). Presentation of NOAA Hydrographic Survey Results and Nautical Charting Issues Associated with Queen Isabella Causeway Bridge Collapse. 10 Oct. 2001.

60. "Tidal Bench Marks, Port Isabel, Laguna Madre." National Oceanic and Atmospheric Administration. 15 May 2003 <http://co-ops.nos.noaa.gov/benchmarks/8779770.html>.

61. Fentek Marine Fendering Systems. N.p.: Trelleborg Engineered Systems, 2002.

62. Sumitomo; New Selection of Fender; The New Answer for approaching Right Fenders. Sumitomo.

63. Marine Fenders and Related Products. Lafayette, Louisiana: Maritime International, Inc.

64. Trellex Fender Systems. Keokuk, IA: Svedala Industries, Inc.

65. NTSB Highway-Marine Accident Report; U.S. Towboat Chris Collision With the Judge William Seeber Bridge; New Orleans, Louisiana; May 28, 1993. Washington D.C.: National Transportation Safety Board, 1994.

66. NTSB Marine Accident Report; Ramming of the Eads Bridge by Barges In Tow of the M/V Anne Holly with Subsequent Ramming and Near Breakaway of the President Casino on the Admiral; St Louis Harbor, Missouri; April 4th 1998. Washington D.C.: National Transportation Safety Board, 2000.

67. Caldwell, J.B., and P.D.C Yang. Collision Energy Absorption of Ships Bow Structures. N.p.: Pergamon P plc, 1988. 181-196.

68. Bridge Inspection Record, Structure 21-031-0331-04-005.  Texas Department of Transportation, Bridge Inspection Office, September 5, 2001. Includes cover letter dated September 18, 2001 from Kenneth Kolodzie, P.E. of Lone Star Engineering to Eddy Gonzalez of TxDOT.

69. Construction Inspection Report, Port Isabel-Padre Island Causeway, Project No. BRS 1911(4), Project Stage Inspection.  U.S. Department of Transportation, Federal Highway Administration, August 14, 1973.

70. FHWA Memorandum: Bridge Inspection Program; Inspection of Bridge Fendering Systems. 30 Oct. 1984. Federal Highway Administration.

71. Interoffice Memorandum: from Clarence R. Shea, to D-5 Files, re Project BR-S 1911(4).  Texas Department of Transportation, October 18, 1972.

72. Depositions re Allision of Brown Water v With Queen Isabella Causeway, D/L September 15, 2001, Volume 1.  United States Department of Transportation, United States Coast Guard Marine Safety Office Hearing October 9, 2001.

73. Depositions re Allision of Brown Water v With Queen Isabella Causeway, D/L September 15, 2001, Volume 2.  United States Department of Transportation, United States Coast Guard Marine Safety Office Hearing October 10, 2001.

74. Depositions re Allision of Brown Water v With Queen Isabella Causeway, D/L September 15, 2001, Volume 3.  United States Department of Transportation, United States Coast Guard Marine Safety Office Hearing October 10, 2001.

75. Depositions re Allision of Brown Water v With Queen Isabella Causeway, D/L September 15, 2001, Volume 4.  United States Department of Transportation, United States Coast Guard Marine Safety Office Hearing October 11, 2001.

76. Depositions re Allision of Brown Water v With Queen Isabella Causeway, D/L September 15, 2001, Volume 5.  United States Department of Transportation, United States Coast Guard Marine Safety Office Hearing October 12, 2001.

**APPENDIX E**

**DRAWINGS**



**PARTIAL PLAN (SPAN 25 TO 46)**
SCALE: 1"= 50'

**ELEVATION**
SCALE: 1"= 50'

COPYRIGHT © 2004 M.G. McLAREN, P.C.

McLaren

QUEEN ISABELLA
CAUSEWAY COLLAPSE
Park Road 100 Bridge
Cameron County, Texas

PARTIAL PLAN
AND ELEVATION
SHEET 1

PROJECT NO. 104222
SCALE AS NOTED
DATE 11/10/04
DRAWN BY J
CHECKED BY GA
DRAWING NO.

**E-1**



**PARTIAL PLAN (SPAN 25 TO 46)**
SCALE: 1"= 50'

**ELEVATION**
SCALE: 1"= 50'

QUEEN ISABELLA
CAUSEWAY COLLAPSE
Park Road 100 Bridge
Cameron County, Texas

PARTIAL PLAN
AND ELEVATION
SHEET 2

| PROJECT NO. | 104222 |
| SCALE | AS NOTED |
| DATE | 11/10/04 |
| DRAWN BY | JI |
| CHECKED BY | GA |

DRAWING NO.
**E-2**

COPYRIGHT © 2004 M.G. McLAREN, P.C.



**PIER 32 PLAN**
$\frac{1}{4}$" = 1'-0"

**PIER 32 ELEVATION**
$\frac{1}{4}$" = 1'-0"

**SECTION** A
$\frac{1}{4}$" = 1'-0"

**SECTION** B
$\frac{1}{4}$" = 1'-0"

QUEEN ISABELLA
CAUSEWAY COLLAPSE
Park Road 100 Bridge
Cameron County, Texas

PIER 32 PLAN
AND
ELEVATION

| PROJECT NO. | 104222 |
| SCALE | AS NOTED |
| DATE | 11/10/04 |
| DRAWN BY | JI |
| CHECKED BY | GA |

DRAWING NO.
**E-3**

COPYRIGHT © 2004 M.G. McLAREN, P.C.

# APPENDIX G

# ATTACHMENTS

G-1    Vessel Information
  G-1.1    United States Coast Guard. Certificate of Documentation: Brown Water V. 15 Sept. 2001.  (Ref. 50)
  G-1.2    Barge MIV Registration Information. 19 Sept. 2001. (Ref. 49)

G-2    United States Coast Guard. Bridge Permit (9-71). 22 Feb. 1971. (Ref. 45)

G-3    Bridge Inspection Record, Structure 21-031-0331-04-005. Texas Department of Transportation, Bridge Inspection Office, September 5, 2001. Includes cover letter dated September 18, 2001 from Kenneth Kolodzie, P.E. of Lone Star Engineering to Eddy Gonzalez of TxDOT. (Ref. 68)

G-4    Construction Inspection Report, Port Isabel-Padre Island Causeway, Project No. BRS 1911(4), Project Stage Inspection.  U.S. Department of Transportation. Federal Highway Administration. August 14, 1973. (Ref. 69)

G-5    Ramsey, P.E., Keith L. Texas Department of Transportation (Bridge Division). Underwater Substructure Evaluation. 26 Jan. 2001. (Ref. 12)

G-6    Code of Federal Regulations; Title 23 - Highways. 22 May 2003 http://www.archive.gov (Ref. 15)

G-7    FHWA Memorandum: Evaluation of Fendering Systems; January 11th 1999. N.p.: Federal Highway Administration, 1999. (Ref. 17)

G-8    Interoffice Memorandum: from Clarence R. Shea, to D-5 Files, re Project BR-S 1911(4).  Texas Department of Transportation, October 18, 1972. (Ref. 71)

G-9    FHWA Memorandum: Motorist Warning System on Bridges Subject to Ship Collisions; December 8th 1980. Federal Highway Administration, 1980. (Ref. 20)

G-10    FHWA Technical Advisory: T 5140.19; February 11th 1983. Federal Highway Administration, 1983. (Ref. 14)

G-11    FHWA Memorandum: Bridge Inspection Program; Inspection of Bridge Fendering Systems. 30 Oct. 1984. Federal Highway Administration. (Ref. 70)

G-12    FHWA Memorandum: National Transportation Safety Board Recommendations; November 15 1995. N.p.: Federal Highway Administration, 1995. (Ref. 16)



# UNITED STATES OF AMERICA
## DEPARTMENT OF TRANSPORTATION
## UNITED STATES COAST GUARD

# Certificate of Documentation

| VESSEL NAME | OFFICIAL NUMBER | HAILING PORT | |
|---|---|---|---|
| BROWN WATER V | 580422 | ROCKPORT, TEXAS | |

| GROSS | NET | LENGTH | BREADTH | DEPTH | HULL MATERIAL | SELF PROPELLED |
|---|---|---|---|---|---|---|
| 84 | 57 | 49.1 | 20.0 | 8.3 | STEEL | YES |

**PLACE BUILT**
KROTZ SPRINGS LA

**YEAR BUILT**
1977

**OWNER**
BROWN WATER TOWING I, INC.

**OPERATIONAL ENDORSEMENTS**
COASTWISE

**COMPLETE RECORDS ON FILE AT:** NATL VESSEL DOC CTR

**MANAGING OWNER**
BROWN WATER TOWING I, INC.
320 COVE HARBOR
PO BOX 2269
ROCKPORT, TX 78381

**RESTRICTIONS**
NONE

**ENTITLEMENTS**
NONE

**REMARKS**
NONE

THIS CERTIFICATE MAY NOT BE ALTERED EXCEPT BY AFFIXING OFFICIAL RENEWAL AND ADDRESS CHANGE DECALS ON THE REVERSE.

**ISSUED AT** NATL VESSEL DOC CTR

**SIGNATURE AND SEAL**
*N Christian Wolff*

**ISSUE DATE** JANUARY 28, 1997

N. CHRISTIAN WOLFF
DOCUMENTATION OFFICER

THIS CERTIFICATE EXPIRES ON THE LAST DAY OF ___JAN98___
UNLESS RENEWED BY DECAL ON REVERSE. NCW

SN 7530-01-

PREVIOUS EDITION OBSOLETE

Approved OMB No. 2115-00

DEPARTMENT OF
TRANSPORTATION
U.S. COAST GUARD
CG-2692A (Rev. 7-86)

**BARGE ADDENDUM**

REPORTS CONTROL SYMB.
G-MMI-4017

NOTE: This form may be used to report data for barges causing or sustaining damage or meeting other reporting criteria in the accident
described on form CG-2692. This form may only be used in addition to form CG-2692, never alone.

NAME OF VESSEL (Use Same Name as Block 1., of CG-2692).

**BROWN WATER V**

DATE OF ACCIDENT
9/15/01

26a. Certificate of Inspection Issued /
N/A

## BARGE INFORMATION

| 26. Name | 26a. Official Number | 26b. Type | 26c. Length | 26d. Gross Tons |
|---|---|---|---|---|
| NM 315 | 953212 | COVERED HOPPER | 195' | 687 |

| 26f. Year Built | 26g. Single Skin / Double Skin | 26h. Draft FWD | AFT | 26i. Operating Company |
|---|---|---|---|---|
| 1989 | ☑ Double Skin | 9'01" | 9'00" | AMERICAN COMMERCIAL BARGE LINES |

26j. Damage Amount
BARGE $ 150K
CARGO $ NONE
OTHER $ "

26k. Describe Damage to Barge
BOW AND DECK PLATE

## BARGE INFORMATION

| 26. Name | 26a. Official Number | 26b. Type | 26c. Length | 26d. Gross Tons |
|---|---|---|---|---|
| ACL 9933 B | 1084946 | COVERED HOPPER | 200' | 764 |

| 26f. Year Built | 26g. Single Skin / Double Skin | 26h. Draft FWD | AFT | 26i. Operating Company |
|---|---|---|---|---|
| 1999 | ☑ Double Skin | 9'01" | 9'01" | AMERICAN COMMERCIAL BARGE LINE |

26j. Damage Amount
BARGE $ NONE
CARGO $ "
OTHER $ "

26k. Describe Damage to Barge
NONE

26e. USCG Certificate of Inspection Issued /
N/A

## BARGE INFORMATION

| 26. Name | 26a. Official Number | 26b. Type | 26c. Length | 26d. Gross Tons |
|---|---|---|---|---|
| VLB 9173 | 967622 | COVERED HOPPER | 200' | 705 |

| 26f. Year Built | 26g. Single Skin / Double Skin | 26h. Draft FWD | AFT | 26i. Operating Company |
|---|---|---|---|---|
| 1991 | ☑ Double Skin | 6'10" | 7'00" | AMERICAN COMMERCIAL BARGE LINE |

26j. Damage Amount
BARGE $ NONE
CARGO $ "
OTHER $ "

26k. Describe Damage to Barge
NONE

26e. USCG Certificate of Inspection Issued A
N/A

## BARGE INFORMATION

| 26. Name | 26a. Official Number | 26b. Type | 26c. Length | 26d. Gross Tons |
|---|---|---|---|---|
| VLB 9182 | 967631 | COVERED HOPPER | 200' | 705 |

| 26f. Year Built | 26g. Single Skin / Double Skin | 26h. Draft FWD | AFT | 26i. Operating Company |
|---|---|---|---|---|
| 1991 | ☑ Double Skin | 9'01" | 9'00" | AMERICAN COMMERCIAL BARGE LINES |

26j. Damage Amount
BARGE $ NONE
CARGO $ "
OTHER $ "

26k. Describe Damage to Barge
NONE

26e. USCG Certificate of Inspection Issued A
N/A

## BARGE INFORMATION

| 26. Name | 26a. Official Name | 26b. Type | 26c. Length | 26d. Gross Tons |
|---|---|---|---|---|
| | | | | |

| 26f. Year Built | 26g. Single Skin / Double Skin | 26h. Draft FWD | AFT | 26i. Operating Company |
|---|---|---|---|---|
| | ☐ Single Skin ☐ Double Skin | | | |

26j. Damage Amount
BARGE $
CARGO $
OTHER $

26k. Describe Damage to Barge

26e. USCG Certificate of Inspection Issued At

SIGNATURE (of Person making this Report)

PREVIOUS EDITION MAY BE USED

SN 7530-01-GF3-0390

TXDOT002620

| 27. Person Involved | 27a. Name (Last, First, Middle Name) | 27c. Status |
|---|---|---|
| ☐ MALE or ☐ FEMALE<br>☐ DEAD  ☐ INJURED<br>☐ MISSING | N/A<br>27b. Address (City, State, Zip Code) | ☐ CREW<br>☐ PASSENGER<br>☐ OTHER (Specify) |

| Birth Date | 29. Telephone No.<br>( ) | 30. Job Position | 31. (Check here if off duty)<br>☐ |
|---|---|---|---|

**32. Employer** -(If different from Block 18., fill in Name, Address, Telephone No.)

| 33. Person's Time | YEAR(S) | MONTH(S) | 34. Industry of Employer (Towing, Fishing, Shipping, Crew Supply, Drilling, etc.) |
|---|---|---|---|
| A. IN THIS INDUSTRY - | | | |
| B. WITH THIS COMPANY - | | | 35. Was the Injured Person Incapacitated 72 Hours or More?  ☐ YES   ☐ NO |
| C. IN PRESENT JOB OR POSITION - | | | |
| D. ON PRESENT VESSEL/FACILITY - | | | 36. Date of Death |
| E. HOURS ON DUTY WHEN ACCIDENT OCCURRED - | | | |

**37. Activity of Person at Time of Accident**

**38. Specific Location of Accident on Vessel/Facility**

| 39. Type of Accident (Fall, Caught between, etc.) | 40. Resulting Injury (Cut, Bruise, Fracture, Burn, etc.) |
|---|---|
| **41. Part of Body Injured** | **42. Equipment Involved in Accident** |

**43. Specific Object, Part of the Equipment in Block 42., or Substance (Chemical, Solvent, etc.) that directly produced the Injury.**

## SECTION IV. DESCRIPTION OF CASUALTY

**44.** Describe how accident occured, damage, information on alcohol/drug involvement and recommendations for corrective safety measures. (See instructions and attach additional sheets if necessary).

The M/V BROWN WATER V allided with the Queen Isabella Causeway at approximately 2:00 a.m. on 9/15/01.  Automobiles drove off the unlighted causeway.

**45. Witness** (Name, Address, Telephone No.)
David Fowler

**46. Witness** (Name, Address, Telephone No.)
Unknown

| SECTION V. PERSON MAKING THIS REPORT | | 47c. Title President |
|---|---|---|
| 47. Name (PRINT) (Last, First, Middle)<br>Stephen Mosher | 47b. Address (City, State, Zip Code)<br>320 Cove Harbor<br>P.O. Box 2269<br>Rockport, TX  78381 | 47d. Telephone No.<br>( 361 ) 729-3721 |
| 47a. Signature | | 47e. Date  9/18/01 |

| FOR COAST GUARD USE ONLY | REPORTING OFFICE: |
|---|---|

**APPARENT CAUSE**

| CASUALTY CODE A B C | INVESTIGATOR (Name) | DATE | APPROVED BY (Name) | DATE |
|---|---|---|---|---|

TXDOT002621

DEPARTMENT OF
TRANSPORTATION
U.S. COAST GUARD
CG-2692A (Rev. 7-86)

:01-cv-00157    Document 289-7    Filed in TXSD on 11/15/2004    Page 8 of 17

BARGE ADDENDUM

Approved OMB No. 2115-0003

REPORTS CONTROL SYMBOL
G-MMI-4017.1

**NOTE:** This form may be used to report data for barges causing or sustaining damage or meeting other reporting criteria in the accident described on form CG-2692. This form may only be used in addition to form CG-2692, never alone.

| NAME OF VESSEL (Use Same Name as Block 1., of CG-2692) | DATE OF ACCIDENT |
|---|---|
| BROWN WATER I | 9/15/01 |

## BARGE INFORMATION

| 26. Name | 26a. Official Number | 26b. Type | 26c. Length | 26d. Gross Tons | 26e. USCG Certificate of Inspection Issued A |
|---|---|---|---|---|---|
| NM 315 | 953212 | COVERED HOPPER | 195' | 687 | N/A |

| 26f. Year Built | 26g. | 26h. Draft FWD | AFT | 26i. Operating Company |
|---|---|---|---|---|
| 1989 | ☐ SINGLE SKIN ☒ DOUBLE SKIN | 9'01" | 9'00" | AMERICAN COMMERCIAL BARGE LINES |

26j. Damage Amount
BARGE $ 150K
CARGO $ NONE
OTHER $ "

26k. Describe Damage to Barge
BOW AND DECK PLATE

## BARGE INFORMATION

| 26. Name | 26a. Official Number | 26b. Type | 26c. Length | 26d. Gross Tons | 26e. USCG Certificate of Inspection Issued A |
|---|---|---|---|---|---|
| ACL 9933 B | 1084946 | COVERED HOPPER | 200' | 764 | N/A |

| 26f. Year Built | 26g. | 26h. Draft FWD | AFT | 26i. Operating Company |
|---|---|---|---|---|
| 1999 | ☐ SINGLE SKIN ☒ DOUBLE SKIN | 9'01" | 9'01" | AMERICAN COMMERCIAL BARGE LINES |

26j. Damage Amount
BARGE $ NONE
CARGO $ "
OTHER $ "

26k. Describe Damage to Barge
NONE

## BARGE INFORMATION

| 26. Name | 26a. Official Number | 26b. Type | 26c. Length | 26d. Gross Tons | 26e. USCG Certificate of Inspection Issued A |
|---|---|---|---|---|---|
| VLB 9173 | 967477 | COVERED HOPPER | 200' | 705 | N/A |

| 26f. Year Built | 26g. | 26h. Draft FWD | AFT | 26i. Operating Company |
|---|---|---|---|---|
| 1991 | ☐ SINGLE SKIN ☒ DOUBLE SKIN | 6'10" | 7'00" | AMERICAN COMMERCIAL BARGE LINES |

26j. Damage Amount
BARGE $ NONE
CARGO $ "
OTHER $ "

26k. Describe Damage to Barge
NONE

## BARGE INFORMATION

| 26. Name | 26a. Official Number | 26b. Type | 26c. Length | 26d. Gross Tons | 26e. USCG Certificate of Inspection Issued A |
|---|---|---|---|---|---|
| VLB 9182 | 967631 | COVERED HOPPER | 200' | 705 | N/A |

| 26f. Year Built | 26g. | 26h. Draft FWD | AFT | 26i. Operating Company |
|---|---|---|---|---|
| 1991 | ☐ SINGLE SKIN ☒ DOUBLE SKIN | 9'01" | 9'00" | AMERICAN COMMERCIAL BARGE LINES |

26j. Damage Amount
BARGE $ NONE
CARGO $ "
OTHER $ "

26k. Describe Damage to Barge
NONE

## BARGE INFORMATION

| 26. Name | 26a. Official Name | 26b. Type | 26c. Length | 26d. Gross Tons | 26e. USCG Certificate of Inspection Issued At |
|---|---|---|---|---|---|
| | | | | | |

| 26f. Year Built | 26g. | 26h. Draft FWD | AFT | 26i. Operating Company |
|---|---|---|---|---|
| | ☐ SINGLE SKIN ☐ DOUBLE SKIN | | | |

26j. Damage Amount
BARGE $
CARGO $
OTHER $

26k. Describe Damage to Barge

SIGNATURE (of Person making this Report)

# REPORT OF MARINE ACCIDENT INJURY OR DEATH

DEPARTMENT OF
TRANSPORTATION
U. S. COAST GUARD
CG-2692 (Rev. 6-87)

RCS No. G-MMI 2115-0093
UNIT CASE NUMBER

## SECTION I. GENERAL INFORMATION

| 1. Name of Vessel or Facility | 2. Official No. | 3. Nationality | 4. Call Sign | 5. USCG Certificate of Inspection |
|---|---|---|---|---|
| V BROWN WATER V | 580422 | U.S. | WBR 3118 | Nat'l Vessel Doc Ctr |

| 6. Type (Towing, Freight, Fish, Drill, etc.) | 7. Length | 8. Gross Tons | 9. Year Built | 10. Propulsion (Steam, diesel, gas, turbine...) |
|---|---|---|---|---|
| Towing | 49.1 | 84 | 1977 | Diesel |

| 11. Hull Material (Steel, Wood...) | 12. Draft (ft. - in.) FWD. / AFT. | 13. If Vessel Classed, By Whom: (ABS, LLOYDS, DNV, BV, etc.) | 14. Date (of occurrence) | 15. TIME Local |
|---|---|---|---|---|
| Steel | 8.3 / 8.3 | N/A | 9/15/01 | 2:00 a.m. |

6. Location (See Instruction No. 10A)
Queen Isabella Causeway

8. Name, Address & Telephone No. of Operating Co.
Brown Water Towing I, Inc.
320 Cove Harbor, P.O. Box 2269
Rockport, TX 78381

17. Estimated Loss or Damage TO:

VESSEL $ **N/A**

CARGO $ **N/A**

OTHER $ **Unknown**

| 9. Name of Master or Person in Charge | USCG License | 20. Name of Pilot | USCG License | State License |
|---|---|---|---|---|
| David Fowler | ☒ YES ☐ NO | | ☐ YES ☐ NO | ☐ YES ☐ NO |

| 19a. Street Address (City, State, Zip Code) | 19b. Telephone Number | 20a. Street Address (City, State, Zip Code) | 20b. Telephone Number |
|---|---|---|---|
| ███████ | ██████ | | ( ) |

21. Casualty Elements (Check as many as needed and explain in Block 44.)

NO. OF PERSONS ON BOARD  5

☒ DEATH- HOW MANY?  Unknown
☒ MISSING- HOW MANY?  Unknown
☒ INJURED- HOW MANY?  Unknown
☐ HAZARDOUS MATERIAL RELEASED OR INVOLVED
(Identify Substance and amount in Block 44.)
☐ OIL SPILL-ESTIMATE AMOUNT:

☐ CONTAINER LOST/DAMAGED
☒ COLLISON (Identify other vessel or object in Block 44.)
☒ GROUNDING   ☐ WAKE DAMAGE

☐ FLOODING; SWAMPING WITHOUT SINKING
☐ CAPSIZING (with or without sinking)
☐ FOUNDERING OR SINKING
☐ HEAVY WEATHER DAMAGE
☐ FIRE
☐ EXPLOSION
☐ COMMERCIAL DIVING CASUALTY
☐ ICE DAMAGE
☐ DAMAGE TO AIDS TO NAVIGATION

☐ MACHINERY OR EQUIPMENT FAILURE
☐ ELECTRICAL FAILURE
☐ STRUCTURAL FAILURE

☐ FIREFIGHTING OR EMERGENCY EQUIPMENT FAILED OR INADEQUATE (Describe in Block 44.)
☐ LIFESAVING EQUIPMENT FAILED OR INADEQUATE (Describe in Block 44.)
☐ BLOW OUT (Petroleum exploration/production)
☐ ALCOHOL INVOLVEMENT (Describe in Block 44.)
☐ DRUG INVOLVEMENT (Describe in Block 44.)
☐ OTHER (Specify)

22. Conditions

A. Sea or River Conditions (wave height, river stage, etc.)

B. WEATHER
☒ CLEAR
☐ RAIN
☐ SNOW
☐ FOG
☐ OTHER (Specify)

C. TIME
☐ DAYLIGHT
☐ TWILIGHT
☒ NIGHT

D. VISIBILITY
☐ GOOD
☒ FAIR
☐ POOR

E. DISTANCE (miles) **Night** (of visibility)

F. AIR TEMPERATURE **68-74°** (F)

G. WIND SPEED & DIRECTION  **App. 20K.**

H. CURRENT SPEED & DIRECTION  **App. 3-4 1/2  Flood**

23. Navigation Information
☐ MOORED, DOCKED OR FIXED
☐ ANCHORED   ☒ UNDERWAY OR DRIFTING

SPEED **4-4 1/2K.** AND COURSE **N**

24. Last Port **Port Brownsville, TX** Where Bound **Bolivar, TX**

24a. Time and Date of Departure
2110; 9/14/01

| 25. FOR TOWING ONLY | 25a. NUMBER OF VESSELS TOWED | Empty | Loaded | Total | 25b. TOTAL H.P. OF TOWING UNITS | 25c. MAXIMUM SIZE OF TOW WITH TOW-BOAT(S) | Length | Width | 25d. (Describe in Block 44.) |
|---|---|---|---|---|---|---|---|---|---|
| | | 0 | 4 | 4 | 800 | | 850' | 35' | ☐ PUSHING AHEAD ☐ TOWING ASTERN ☐ TOWING ALONGSIDE ☐ MORE THAN ONE TOW-BOAT ON TOW |

## SECTION II. BARGE INFORMATION

25e. USCG Certificate of Inspection Issued at:

| 26. Name | 26a. Official Number | 26b. Type | 26c. Length | 26d. Gross Tons |
|---|---|---|---|---|
| See attachment | | | | |

| 26f. Year Built | 26g. ☐ SINGLE SKIN ☐ DOUBLE SKIN | 26h. Draft FWD / AFT | 26i. Operating Company |
|---|---|---|---|

Damage Amount
BARGE $ _____
CARGO $ _____
OTHER $ _____

26k. Describe Damage to Barge
Damage to bow and deckplate of Barge NM315.

TXDOT002623

VESSEL FILE PARTICULARS SUMMARY

NAME/ VLB 9173                          VIN/ D967622      CALL/         FLAG/ US

1. DESIGN                          Attachment G-1.2

SERVICE.../ FREIGHT BARGE        DESIGN TYPE /
VESSEL USE/                      DECK DRAINAGE CLASS/
INSP SUBCH/

2. MEASURES

TONNAGES......:  GROSS../  705   ITC GROSS../        DUAL GROSS../
BY..../ FORMULA  NET..../  705   ITC NET..../        DUAL NET..../
DIMENSIONS US :  LENGTH / 200.00  BREADTH..../  35.00  DEPTH......./     12.00
          ITC:  LENGTH /         BREADTH..../        DEPTH......./
                LOA..../         DEADWEIGHT /         DISPLACEMENT/

X 3. CONSTRUCTION
CONTRACT DATE /         · KEEL LAYING DATE/         DELIVERY DATE /
INIT CERT DATE/           BUILD YEAR....../ 1991    BUILD DATE..../
PLACE BUILT.../ JEFFERSONVILLE, IN                  COUNTRY......./ US

4. OPERATIONS
ROUTE CODE.../          MINIMUM CREW /         OTHER PERSONS IN CREW....../
MAX PERSONS../          PASSENGERS.../         PERSONS IN ADDITION TO CREW/

5. STABILITY/LOADLINE
STABILITY DOC: LETTER/    BOOK/    STATUS/      APP DATE/       OFFICE/
LOADLINE REG : CFR PART/  VESS TYPE/  ROUTE TYPE/              FREEBD/

6. CARGO AUTHORITY
AUTHORIZATION/
  CFR SUBCHAPTER D AUTHORITY: HIGHEST GRADE/     CAPACITY/       UNITS/
  HAZARDOUS SOLIDS IN BULK?/

7. CARGO LIST
NUMBER OF SPECIFIC CHEMICALS AUTHORIZED/    0

8. CARGO CARRIAGE CONDITIONS

```
                                    LAST REVISED: PORT/          DATE/

NAME/ VLB 9173                    VIN/ D967622    CALL/        FLAG/ U?

                      --- REGISTERED MEASURES ---
TONNAGES......:  GROSS./    705    ITC GROSS../          DUAL GROSS../
BY..../ FORMULA  NET.../    705    ITC NET..../          DUAL NET..../
DIMENSIONS US :  LENGTH/ 200.00  BREADTH..../   35.00  DEPTH......./   12.0(
          ITC:  LENGTH/           BREADTH..../          DEPTH......./

                      --- REGULATORY MEASURES ---
                 LOA.../          DEADWEIGHT /        DISPLACEMENT/

                      --- OPTIONAL MEASURES ---
DECKHOUSE      :  LENGTH/          BREADTH..../          DEPTH......./
CATAMARAN      :  LENGTH/          BREADTH..../          DEPTH......./
TRIMARAN-MAIN :  LENGTH/          BREADTH..../          DEPTH......./
    -OUTBOARD :  LENGTH/          BREADTH..../          DEPTH......./

EFFECTIVE DATE........./ 11MAR91  NUM HIST RECS/    0
```

VESSEL FILE CONSTRUCTION DETAILS          19SEP0:

LAST REVISED:   PORT/ SLMVD DATE/ 11MAR9:

NAME/ VLB 9173                    VIN/ D967622    CALL/              FLAG/ U:

--- INITIAL CONSTRUCTION ---
CONTRACT DATE./              KEEL LAYING DATE/              DELIVERY DATE/
INIT CERT DATE/              BUILD YEAR....../ 1991         BUILD DATE.../
RBS HULL NUM../                                             HULL NUM/ 90-2365
LOCATION OF PRINCIPAL PLAN REVIEW/                          PRIS..../
YARD BUILT..../ JEFFBOAT
PLACE BUILT.../ JEFFERSONVILLE, IN                          COUNTRY./ US

NAME/ VLB 9173                                    VIN/ D967622    CALL/                    FLAG/ U:
MMSI/                          DATE /

### 1. BOILERS

NUMBER OF MAIN PROPULSION BOILERS/ 0              NUMBER OF AUXILIARY BOILERS/ 0

### 2. UNFIRED PRESSURE VESSELS
--- NUMBER OF PRESSURE VESSELS BY TYPE ---

| | | | | | | |
|---|---|---|---|---|---|---|
| AIR RECEIVER / | 0 | DC HEATER.../ | 0 | DRY BULK..../ | 0 |
| EVAPORATOR../ | 0 | HEAT XCHANGE/ | 0 | HUMAN OCCUP./ | 0 |
| INDUST SYSTM/ | 0 | STEAM GEN.../ | 0 | OTHER......./ | 0 |

### 3. CARGO/BALLAST SYSTEM

CARGO HOLDS: NUM OF/    GEAR TYPE/              REF/    HTD/    AC/    INERT/
CARGO TANKS NO...../    TOTAL VOL/      IGS/    REF/    HTD/    CONT    TYPE/

### 4. HULL SYSTEM

MATERIAL....../ STEEL       HULL TYPE..../              SCANT REDUCED?/
CORROSION CONT/             DOUBLE SIDES /              FOREBODY....../
RUDDER TYPE.../             DOUBLE BOTTOM/              TYPE CONSTRUCT/

### 5. PROPULSION SYSTEM

PROPULSION TYPE /           FUEL TYPE.../              NUM SHAFTS /
AUTOMATION LEVEL/           HP AHEAD..../              SHAFT RPM../
AUX PROPULSION../           AUTO BRIDGE?/              FLANK SPEED/
NUM FUEL TANKS../           FUEL CAP..../              F/C UNITS../
                           LUBE OIL CAP/              L/O/C UNITS/

### 6. STEERING SYSTEM

MAIN STEERING SYSTEM TYPE/                          HP/

### 7. NAVIGATION SYSTEM
--- AVAILABLE EQUIPMENT ---

RADAR........../    ANTI-COLL RADAR/    RDF.........../    LORAN RECEIVERS/
FATHOMETER...../    MAG COMPASS..../    GYRO COMPASS.../    GYRO REPEATER../
COURSE RECORDER/                        OTHER/

### 8. ELECTRICAL SYSTEM

TOTAL NUM SVC/EMER GENERATORS/    EMERGENCY SOURCE OF POWER AVAILABLE?/

### 9. PUMPS
--- NUMBER OF PUMPS BY USE ---

CARGO/        STRIPPING/      BALLAST/        FIRE/        BILGE/

### 10. DECK MACHINERY

NUMBER OF ANCHORS/    NUMBER OF BOW THRUSTERS/    NUMBER OF STERN THRUSTERS/

### 11. LIFESAVING SYSTEM
NUMBER    PERSONS                                              REQUIRE

TOTAL EQUIPMENT FOR                  LIFE PRESERVERS(ADULT) ..
  LIFEBOATS (TOTAL) .......          LIFE PRESERVERS(CHILD) ....
    LIFEBOATS (PORT) * .....         RING BUOYS (TOTAL) ........
    LIFEBOATS (STARBD) * ...           WITH LIGHTS*............
    MOTOR LIFEBOATS*.....              WITH LINE ATTACHED*.....
    LIFEBOATS W/RADIO*...              OTHER*..................
  RESCUE BOATS/PLATFORMS.           IMMERSION SUITS...........    0
  INFLATABLE RAFTS.......           PORTABLE LIFEBOAT RADIOS..    0
  LIFE FLOATS/BUOYANT APP           EPIRB....................
  WORKBOATS (NOT REQUIRED)          MMSI /            DATE /
                                    (* INCLUDED IN TOTALS)

### 12. FIXED FIRE FIGHTING SYSTEM

TXDOT002575

**PORTABLE FIRE FIGHTING SYSTEM**

**--- NUMBER OF PORTABLE EXTINGUISHERS BY CLASS ---**

|   |   |   |   |
|---|---|---|---|
| 0 A-II | 0 B-I | 0 B-II | 0 B-III |
| 0 B-IV | 0 B-V | 0 C-I | 0 C-II |

**14.   MISCELLANEOUS SYSTEMS**

TOTAL NUMBER FILED/    0

VFCG Case 1:01-cv-00157   VESSEL FILE COAST GUARD CONTACT LOG   Page 88 of 171
Document 289-7   Filed in TXSD on 11/15/2004
19SEP0

NAME/ NM 315                                VIN/ D953212    CALL/              FLAG/ U

TOTAL CASES/    22

```
   0 INSPECTION(MI)          2 CASUALTY(MC)          0 PORT SAFETY(PS)-BOARDIN(
  20 DOCUMENTATION(VD)       0 POLLUTION(MP)          0 PORT SAFETY(PS)-NO BOAR
   0 MARINE VIOL.(MV)        0 VIOL. REPORTS(VR)      0 FORTY-ONE HUNDREDS
   0 PERS.ACTION(PA)         0 POLL. TICKETS(TK)
```

```
                   ACTION        CASE
                   PORT INIT     DATE STAT --------- STATUS / PARAMETERS ---------
SEL    CASE
  1. DXFO017165   RE3VD        08NOV00    NOTICE-FLEET
  2. DXFE029374   RE3VD        09NOV99    NOTICE-FLEET
  3. DXAY037218   RE3VD        09NOV98    NOTICE-FLEET
  4. DXFJ029361   RE3VD        10NOV97    NOTICE-FLEET
  5. VD96060038   CO3VD        11DEC96  V SURRENDER          VALIDATED
  6. DXAN044157   RE3VD        10SEP96    NOTICE-FLEET
  7. MC96004027   PEOD   MSS   18FEB96  V GROUNDING
  8. VD95061090   CO3VD        18OCT95  V RENEW - VDAR       VALIDATED
  9. DXAY032904   NEWVD        16OCT95    NOTICE-WARNING
 10. DXAK033213   NEWVD        15SEP94    RENEWAL
 11. DXKQ008025   NEWVD        29AUG94    NOTICE-FLEET
 12. DXAR022506   NEWVD        24AUG94    NOTICE-FLEET
 13. DXFJ010903   NEWVD        18AUG93    RENEWAL
 14. DXFC010043   NEWVD        06AUG93    NOTICE-FLEET
 15. VD92065507   NEWVD        14SEP92  V SURRENDER          VALIDATED
 16. DXAV001729   NEWVD        15NOV91    RENEWAL
 17. DXPR000873   NEWVD        06NOV91    NOTICE-FLEET        REPORTABLE
 18. MC91000381   NEWMS        13JAN91    COLNC
 19. DX90386190   NEWVD        13DEC90    RENEWAL
 20. DX90343011   NEWVD        06NOV90    NOTICE-FLEET
 21. VD89118030   NEWVD        29DEC89  V SURRENDER          VALIDATED
 22. VD89096656   NEWVD        08DEC89  V INITIAL ISSUE      VALIDATED
```

TXDOT002577

VFVD    VESSEL DOCUMENTATION LOG    19SEP0:

NAME/ NM 315                          VIN/ D953212    CALL/          FLAG/ US

TOTAL INCIDENTS ON FILE/  20

| SEL | CASE NUMBER | PORT | CASE TYPE | START | FINISH | V/C |
|-----|-------------|------|-----------|-------|--------|-----|
| 1.  | DXFO017165 | RE3VD | NOTICE-FLEET | 08NOV00 | 08NOV00 | |
| 2.  | DXFE029374 | RE3VD | NOTICE-FLEET | 09NOV99 | 09NOV99 | |
| 3.  | DXAY037218 | RE3VD | NOTICE-FLEET | 09NOV98 | 09NOV98 | |
| 4.  | DXFJ029361 | RE3VD | NOTICE-FLEET | 10NOV97 | 10NOV97 | |
| 5.  | VD96060038 | CO3VD | SURRENDER | 25NOV96 | 11DEC96 | V |
| 6.  | DXAN044157 | RE3VD | NOTICE-FLEET | 10SEP96 | 10SEP96 | |
| 7.  | VD95061090 | CO3VD | RENEW - VDAR | 16OCT95 | 18OCT95 | V |
| 8.  | DXAY032904 | NEWVD | NOTICE-WARNIN | 16OCT95 | 16OCT95 | |
| 9.  | DXAK033213 | NEWVD | RENEWAL | 15SEP94 | 15SEP94 | |
| 10. | DXKQ008025 | NEWVD | NOTICE-FLEET | 29AUG94 | 29AUG94 | |
| 11. | DXAR022506 | NEWVD | NOTICE-FLEET | 24AUG94 | 24AUG94 | |
| 12. | DXFJ010903 | NEWVD | RENEWAL | 18AUG93 | 18AUG93 | |
| 13. | DXFC010043 | NEWVD | NOTICE-FLEET | 06AUG93 | 06AUG93 | |
| 14. | VD92065507 | NEWVD | SURRENDER | 09SEP92 | 14SEP92 | V |
| 15. | DXAV001729 | NEWVD | RENEWAL | 15NOV91 | 15NOV91 | |
| 16. | DXFR000873 | NEWVD | NOTICE-FLEET | 06NOV91 | 06NOV91 | |
| 17. | DX90386190 | NEWVD | RENEWAL | 13DEC90 | 13DEC90 | |
| 18. | DX90343011 | NEWVD | NOTICE-FLEET | 06NOV90 | 06NOV90 | |
| 19. | VD89118030 | NEWVD | SURRENDER | 27DEC89 | 29DEC89 | V |
| 20. | VD89096656 | NEWVD | INITIAL ISSUE | 12OCT89 | 08DEC89 | V |

NAME/ NM 315                                      VIN/ D953212    CALL/              FLAG/ US

TOTAL INCIDENTS ON FILE/    2

--- CLOSED CASES ---

| SEL | CASE NUMBER | PORT | INCIDENT DATE | STAT | ----- PARAMETERS ------ | | BODY OF WATER |
|-----|-------------|------|---------------|------|------------|------------|---------------|
| 1. | MC96004027 | PEOD | 18FEB96 | V | GROUNDING | | ILLINOIS RIVER |
| 2. | MC91000381 | NEWMS | 13JAN91 | | COLNC | REPORTABLE | LOWER MISSISSIPPI R |

TXDOT002579

NAME/ NM 315          VIN/ D953212    CALL/        FLAG/ U$

TOTAL INCIDENTS ON FILE/    1

| SEL | CASE NUM | PORT | DATE | CONTACT TYPE | REF CASE | -- NUMBER OF -- DAMAGES DEFECTS |
|-----|----------|------|------|--------------|----------|---------------------------------|
| 1. | MC91000381 | NEWMS | 13JAN91 | COLNC | | |

NAME/ NM 315                          VIN/ D953212    CALL/              FLAG/ U:

1. DESIGN

ERVICE.../ FREIGHT BARGE          DESIGN TYPE /
VESSEL USE/                        DECK DRAINAGE CLASS/
INSP SUBCH/

2. MEASURES
TONNAGES......:  GROSS../  687    ITC GROSS../          DUAL GROSS../
BY..../ FORMULA  NET..../  687    ITC NET..../          DUAL NET..../
DIMENSIONS US :  LENGTH / 195.00  BREADTH..../  35.00   DEPTH......./
        ITC:     LENGTH /          BREADTH..../          DEPTH......./      12.0
                 LOA..../          DEADWEIGHT /          DISPLACEMENT/

X 3. CONSTRUCTION
CONTRACT DATE /           KEEL LAYING DATE/              DELIVERY DATE /
INIT CERT DATE/           BUILD YEAR....../ 1989         BUILD DATE..../
PLACE BUILT.../ MADISONVILLE LA                          COUNTRY......./ US

4. OPERATIONS
                          MINIMUM CREW /         OTHER PERSONS IN CREW....../
ROUTE CODE.../            PASSENGERS.../         PERSONS IN ADDITION TO CREW/
MAX PERSONS../

5. STABILITY/LOADLINE
STABILITY DOC: LETTER/   BOOK/    STATUS/      APP DATE/        OFFICE/
LOADLINE REG : CFR PART/ VESS TYPE/   ROUTE TYPE/              FREEBD/

6. CARGO AUTHORITY
UTHORIZATION/
  CFR SUBCHAPTER D AUTHORITY: HIGHEST GRADE/    CAPACITY/       UNITS/
HAZARDOUS SOLIDS IN BULK?/

7. CARGO LIST
NUMBER OF SPECIFIC CHEMICALS AUTHORIZED/    0

8. CARGO CARRIAGE CONDITIONS

TXDOT002581

LAST REVISED: PORT/                    DATE/

NAME/ NM 315                              VIN/ D953212    CALL/              FLAG/ US

                          --- REGISTERED MEASURES ---
                                                           DUAL GROSS../
TONNAGES......:    GROSS./    687   ITC GROSS../            DUAL NET..../
BY..../ FORMULA   NET.../     687   ITC NET..../            DEPTH......../  12.0
DIMENSIONS US :   LENGTH/ 195.00    BREADTH..../   35.00    DEPTH......../
        ITC:      LENGTH/           BREADTH..../

                          --- REGULATORY MEASURES ---
                  LOA.../            DEADWEIGHT /           DISPLACEMENT/

                          --- OPTIONAL MEASURES ---
                                     BREADTH..../           DEPTH......../
DECKHOUSE     :   LENGTH/            BREADTH..../           DEPTH......../
CATAMARAN     :   LENGTH/            BREADTH..../           DEPTH......../
TRIMARAN-MAIN :   LENGTH/            BREADTH..../           DEPTH......../
     -OUTBOARD :   LENGTH/            BREADTH..../

EFFECTIVE DATE........../ 08DEC89   NUM HIST RECS/     0

TXDOT002582

LAST REVISED:  PORT/ NEWVD DATE/ 08DEC8

NAME/ NM 315                        VIN/ D953212    CALL/                    FLAG/ U:

```
                    --- INITIAL CONSTRUCTION ---
CONTRACT DATE./            KEEL LAYING DATE/        DELIVERY DATE/
INIT CERT DATE/            BUILD YEAR....../ 1989   BUILD DATE.../
RBS HULL NUM../                                     HULL NUM/ 1941-5
LOCATION OF PRINCIPAL PLAN REVIEW/                  PRIS..../
YARD BUILT..../ EQUITABLE SHIPYARD
PLACE BUILT.../ MADISONVILLE LA                     COUNTRY./ US
```

TXDOT002583

NAME/ NM 315                                   VIN/ D953212    CALL/              FLAG/ US
MMSI/                          DATE /

## 1. BOILERS
NUMBER OF MAIN PROPULSION BOILERS/ 0              NUMBER OF AUXILIARY BOILERS/ 0

## 2. UNFIRED PRESSURE VESSELS
--- NUMBER OF PRESSURE VESSELS BY TYPE ---

| | | | | | | |
|---|---|---|---|---|---|---|
| AIR RECEIVER/ | 0 | DC HEATER/ | 0 | DRY BULK/ | 0 |
| EVAPORATOR../ | 0 | HEAT XCHANGE/ | 0 | HUMAN OCCUP./ | 0 |
| INDUST SYSTM/ | 0 | STEAM GEN/ | 0 | OTHER/ | 0 |

## 3. CARGO/BALLAST SYSTEM
CARGO HOLDS: NUM OF/    GEAR TYPE/               REF/    HTD/    AC/    INERT/
CARGO TANKS NO...../    TOTAL VOL/      IGS/     REF/    HTD/    CONT   TYPE/

## 4. HULL SYSTEM
MATERIAL....../ STEEL    HULL TYPE..../              SCANT REDUCED?/
CORROSION CONT/          DOUBLE SIDES /              FOREBODY....../
RUDDER TYPE.../          DOUBLE BOTTOM/              TYPE CONSTRUCT/

## 5. PROPULSION SYSTEM
PROPULSION TYPE /       FUEL TYPE.../            NUM SHAFTS /
AUTOMATION LEVEL/       HP AHEAD..../            SHAFT RPM../
AUX PROPULSION../       AUTO BRIDGE?/            FLANK SPEED/
NUM FUEL TANKS../       FUEL CAP..../            F/C UNITS../
                        LUBE OIL CAP/            L/O/C UNITS/

## 6. STEERING SYSTEM
MAIN STEERING SYSTEM TYPE/                   HP/

## 7. NAVIGATION SYSTEM
--- AVAILABLE EQUIPMENT ---

RADAR........../     ANTI-COLL RADAR/     RDF............/     LORAN RECEIVERS/
FATHOMETER...../     MAG COMPASS..../     GYRO COMPASS.../     GYRO REPEATER../
COURSE RECORDER/                         OTHER/

## 8. ELECTRICAL SYSTEM
TOTAL NUM SVC/EMER GENERATORS/    EMERGENCY SOURCE OF POWER AVAILABLE?/

## 9. PUMPS
--- NUMBER OF PUMPS BY USE ---

CARGO/          STRIPPING/          BALLAST/          FIRE/          BILGE/

## 10. DECK MACHINERY
NUMBER OF ANCHORS/    NUMBER OF BOW THRUSTERS/    NUMBER OF STERN THRUSTERS/

## 11. LIFESAVING SYSTEM
NUMBER    PERSONS                                              REQUIRE

TOTAL EQUIPMENT FOR                   LIFE PRESERVERS(ADULT) ..
  LIFEBOATS (TOTAL) .......           LIFE PRESERVERS(CHILD) ....
    LIFEBOATS(PORT) * .....           RING BUOYS(TOTAL) .........
    LIFEBOATS(STARBD) *...              WITH LIGHTS*............
    MOTOR LIFEBOATS*.....               WITH LINE ATTACHED*.....
    LIFEBOATS W/RADIO*...               OTHER*..................
  RESCUE BOATS/PLATFORMS.            IMMERSION SUITS...........    0
  INFLATABLE RAFTS.......            PORTABLE LIFEBOAT RADIOS..    0
  LIFE FLOATS/BUOYANT APP            EPIRB.....................
  WORKBOATS (NOT REQUIRED)           MMSI /              DATE /
                                     (* INCLUDED IN TOTALS)

## 12. FIXED FIRE FIGHTING SYSTEM

TXDOT002584

PORTABLE FIRE FIGHTING SYSTEM

--- NUMBER OF PORTABLE EXTINGUISHERS BY CLASS ---

| 0 A-II | 0 B-I | 0 B-II | 0 B-III |
|--------|-------|--------|---------|
| 0 B-IV | 0 B-V | 0 C-I | 0 C-II |

14.  MISCELLANEOUS SYSTEMS

TOTAL NUMBER FILED/    0

VESSELS History in order of
Configuration



| 49.1 | 200 | 200 | 200 | 195 |
|------|-----|-----|-----|-----|
| BWS | VLB 9173 | VLB 9182 | ACL 9933B | NM 315 |

↓ D967622   ↓ D967631   ↓ D1084946   ↓ D 953212

VIN/ D560422   CALL/ WYH7805   FLAG/ US
NAME/ BROWN WATER V
ALT VINS/
MMSI NUMBER/                    DATE/

### *** INVOLVED PARTIES ***

|  | NAME | IPN/COFR# |
|---|---|---|
| ROLE |  |  |
| OWNER | BROWN WATER MARINE SVC INC | IP89024672 |
| OPERATOR | BROWN WATER MARINE SVC INC | IP89024672 |

### **** VESSEL SPECIFICS ****

| | | | |
|---|---|---|---|
| SERVICE.../ TOWBOAT/TUGBOAT | GROSS TONS../ | 84 | HOME PORT../ CO2VD |
| PROPULSION/ | NET TONS..../ | 57 | BUILD DATE./ |
| HORSEPOWER/ 600 ROUTE/ | DEADWT TONS / | 0 | REG. LENGTH/ 49.100 |
| FUEL TANKS/ 0 | FUEL CAP..../ | 0 | F/C UNITS../ |
| | LUBE OIL CAP/ | 0 | L/O/C UNITS/ |

--- DANGEROUS CARGOES AUTHORIZED/ N ---

### **** CERTIFICATE STATUS ****

| DOCUMENT KIND | IDENT | AGENCY | PORT | ISSUED | EXPIRES | STATUS |
|---|---|---|---|---|---|---|
| DOCUMENTATION CERTIFICATE | | USCG | CO2VD | 28JAN97 | 31JAN02 | VALID |

### ***** INSPECTION/BOARDING STATUS ****

| INSPECTION/EXAM TYPE | -----LAST------ PORT | DATE | -NEXT-- DATE | ------CURRENT STATUS ----- ACTION | PORT | DATE |
|---|---|---|---|---|---|---|
| INITIAL CERT | | | | | | |
| CERTIFICATION | | | | | | |
| REINSPECTION | | | | | | |
| HULL EXAM | | | | | | |
| DC | | | | | | |
| EXAMINATIONS | | | | | | |
| BOARDING | PLAD | 15AUG00 | | | | |
| POL PREV EXAM | HOUMS | 14AUG95 | | | | |
| CARGO SUPERVIS | | | | | | |
| CARGO MONITOR | HOUMS | 05JUL94 | | | | |
| MARPOL | HOUMS | 14AUG95 | | | | |
| SECURITY | | | | | | |
| AMVER | | | | | | |

PORT CALLS IN LAST YEAR/   0      PORT CALLS SINCE LAST BOARDING/   0

| BOARDING TYPE | CASE | DATE | PORT | DISCR | LEGAL ACTIONS |
|---|---|---|---|---|---|

### **** OUTSTANDING REQUIREMENTS / RECOMMENDATIONS ****

CASE/ PS00073245   DATE/ 15AUG00   PORT/ PLAD   IDENT/ 0005
LEGAL ACTIONS/ N   COMPLIANCE DATE..../ 15SEP00

DESCRIPTION/
Provide up to date charts of area's transited by vessel.

### **** RESOLVED DISCREPANCY SUMMARY ****

| CASE | DATE | PORT | IDENT | SYSTEM | SUBSYSTEM | LEGAL ACTIONS |
|---|---|---|---|---|---|---|

TXDOT002587

PORT SAFETY VESSEL HISTORY

NAME/ BROWN WATER V                           VIN/ D580422  CAT/  NYH  USE/ TAG71 US
ALT VINS/
MMSI NUMBER/                    DATE/

#### **** RESOLVED DISCREPANCY SUMMARY ****

| CASE | DATE | PORT | IDENT | SYSTEM | SUBSYSTEM | LEGAL ACTIONS |
|------|------|------|-------|--------|-----------|---------------|
| PS00073245 | 15AUG00 | PLAD | 0004 | STEERING | HYDRAULIC SYSTE | N |
| PS00073245 | 15AUG00 | PLAD | 0003 | LIFESAVING | APPARATUS | N |
| PS00073245 | 15AUG00 | PLAD | 0002 | FIRE FIGHTING | EXTINGUISHERS | N |
| PS00073245 | 15AUG00 | PLAD | 0001 | ELECTRICAL | PANELS | N |

#### **** CASUALTY SUMMARY ****

SINCE/ 18SEP00

| CASE | PORT | DATE | EVENT | TYPE | BODY OF WATER |
|------|------|------|-------|------|---------------|
| MC01002705 | CORMS | 09FEB01 | GROUN | | INTERCOASTAL WTRWY-G |
| MC01001490 | CORMS | 22JAN01 | GROUN | | CORPUS CHRISTI SHP C |
| MC00015162 | GALMS | 11NOV00 | ALLIS | | INTERCOASTAL WTRWY-G |

TXDOT002588

NAME/ BROWN WATER V    VIN/ D560422 CALL/ WPB6700 FLAG/ US

TOTAL CASES/    40

|  |  |  |
|---|---|---|
| 2 INSPECTION(MI) | 8 CASUALTY(MC) | 4 PORT SAFETY(PS)-BOARDING |
| 23 DOCUMENTATION(VD) | 0 POLLUTION(MP) | 0 PORT SAFETY(PS)-NO BOARD |
| 0 MARINE VIOL.(MV) | 0 VIOL. REPORTS(VR) | 0 FORTY-ONE HUNDREDS |
| 0 PERS.ACTION(PA) | 3 POLL. TICKETS(TK) |  |

|  |  | ACTION | CASE |  |  |
|---|---|---|---|---|---|
| SEL | CASE | PORT INIT | DATE STAT | --------- STATUS / PARAMETERS --------- |  |
| 1. | MC01002705 | CORMS EOJ | 09FEB01 V | GROUNDING |  |
| 2. | MC01001490 | CORMS EOJ | 22JAN01 V | GROUNDING |  |
| 3. | MC00015162 | GALMS HB | 11NOV00 V | ALLISION |  |
| 4. | TK00047227 | CORMS RCW | 15SEP00 V | POL TICKET | FWPCA |
| 5. | PS00073245 | PLAD RCW | 15AUG00 V | BOARDING | NO OPERATIONS |
|  |  |  |  | DOCUMENT CHEC |  |
| 6. | MC00006875 | CORMS TOC | 28MAY00 C | PERSON CAS |  |
| 7. | TK00047190 | CORMS JA | 23MAY00 V | POL TICKET | FWPCA |
| 8. | MC00005094 | CORMS TOC | 30APR00 V | SINKING |  |
| 9. | MI99009369 | CORMS | 29MAR99 V | UNINSP TOWING |  |
| 10. | MI98032658 | CORMS | 29SEP98 V | UNINSP TOWING |  |
| 11. | MC98000948 | PLAD RRG | 21JAN98 V | EQUIP FAIL | VALIDATED |
| 12. | VD97003447 | CO2VD | 03FEB97 V | SURRENDER |  |
| 13. | DXAS041717 | RE3VD | 10JAN97 | NOTICE-FLEET |  |
| 14. | DXAV034040 | CO2VD | 09FEB96 | RENEWAL |  |
| 15. | DXAK051486 | RE3VD | 15JAN96 | NOTICE-FLEET |  |
| 16. | PS95080089 | HOUMS SMD | 14AUG95 V | BOARDING | MOORED |
|  |  |  |  | NAV SAFETY | DOCUMENT CHEC |
|  |  |  |  | CREW LIC. CHK | MARPOL GEN |
|  |  |  |  |  | FWPCA |
| 17. | TK00003186 | CORMS BJP | 30JUN95 V | POL TICKET | VALIDATED |
| 18. | VD95008352 | HOUVD | 14FEB95 V | RENEW - VDAR | MOORED |
| 19. | PS94100461 | PATMS BW | 09OCT94 V | BOARDING | POL PREV COMP |
|  |  |  |  | DOCUMENT CHEC | NAV SAFETY |
|  |  |  |  | FIREFIGHTING | MOORED |
| 20. | PS94065932 | HOUMS RPS | 05JUL94 V | BOARDING |  |
|  |  |  |  | MON NEC OPS | VALIDATED |
| 21. | VD94000844 | HOUVD | 13JUN94 V | SURRENDER | VALIDATED |
| 22. | VD93076924 | HOUVD | 30NOV93 V | ADMIN | VALIDATED |
| 23. | VD93051234 | HOUVD | 04AUG93 V | ADMIN |  |
| 24. | MC93003752 | MORMS IPA | 25FEB93 V | ALLISION |  |
| 25. | DXFQ008594 | HOUVD | 12FEB93 | RENEWAL |  |
| 26. | DXFB006845 | HOUVD | 06JAN93 | NOTICE-RENEWAL | VALIDATED |
| 27. | VD92080863 | HOUVD | 10NOV92 V | ADMIN | VALIDATED |
| 28. | VD92080028 | HOUVD | 06NOV92 V | ADMIN |  |
| 29. | DXKD001532 | HOUVD | 21JAN92 | RENEWAL |  |
| 30. | DXAH002379 | HOUVD | 09JAN92 | NOTICE-RENEWAL |  |
| 31. | DXAI004060 | HOUVD | 08JAN92 | NOTICE-RENEWAL |  |
| 32. | DX91024811 | HOUVD | 17JAN91 | RENEWAL |  |
| 33. | DX91003518 | HOUVD | 07JAN91 | NOTICE-RENEWAL | VALIDATED |
| 34. | VD90062007 | HOUVD | 22JUN90 V | ADMIN |  |
| 35. | DX90023239 | HOUVD | 17JAN90 | RENEWAL |  |
| 36. | DX90004059 | HOUVD | 04JAN90 | NOTICE-RENEWAL |  |
| 37. | DX89020828 | HOUVD | 23JAN89 | RENEWAL |  |
| 38. | DX89012206 | HOUVD | 11JAN89 | NOTICE-RENEWAL | VALIDATED |
| 39. | VD88079480 | HOUVD | 30DEC88 V | ADMIN | REPORTABLE |
| 40. | MC88000722 | GALMS | 25NOV87 | COLNC |  |

PORT SAFETY VESSEL HISTORY

NAME/ VLB 9173                                    VIN/ D967622    CALL/        FLAG/ US
ALT VINS/ CG029256
MMSI NUMBER/                          DATE/

**** VESSEL SPECIFICS ****

| | | |
|---|---|---|
| SERVICE.../ FREIGHT BARGE | GROSS TONS../  705 | HOME PORT../ CO2VD |
| PROPULSION/ | NET TONS..../  705 | BUILD DATE./ |
| HORSEPOWER/  0  ROUTE/ | DEADWT TONS /  0 | REG. LENGTH/ 200.00 |
| FUEL TANKS/  0 | FUEL CAP..../  0 | F/C UNITS../ |
| | LUBE OIL CAP/  0 | L/O/C UNITS/ |

--- DANGEROUS CARGOES AUTHORIZED/ N ---

**** CERTIFICATE STATUS ****

| DOCUMENT KIND | IDENT | AGENCY | PORT | ISSUED | EXPIRES | STATUS |
|---|---|---|---|---|---|---|
| DOCUMENTATION CERTIFICATE | | USCG | CO2VD | 27JUN98 | 30JUN02 | VALID |

***** INSPECTION/BOARDING STATUS ****

| INSPECTION/EXAM TYPE | -----LAST------ PORT    DATE | -NEXT-- DATE | ------CURRENT STATUS ----- ACTION    PORT    DATE |
|---|---|---|---|
| | | | |

PORT CALLS IN LAST YEAR/  0     PORT CALLS SINCE LAST BOARDING/  0

TXDOT002590

NAME/ VLB 9182                              VIN/ D987831 CA2VD
ALT VINS/ CG029266
MMSI NUMBER/                    DATE/

#### **** VESSEL SPECIFICS ****

| | | |
|---|---|---|
| SERVICE.../ FREIGHT BARGE | GROSS TONS../    705 | HOME PORT../ CO2VD |
| PROPULSION/ | NET TONS..../    705 | BUILD DATE./ |
| HORSEPOWER/     0  ROUTE/ | DEADWT TONS /      0 | REG. LENGTH/ 200.00 |
| FUEL TANKS/  0 | FUEL CAP..../      0 | F/C UNITS../ |
| | LUBE OIL CAP/      0 | L/O/C UNITS/ |

--- DANGEROUS CARGOES AUTHORIZED/ N ---

#### **** CERTIFICATE STATUS ****

| DOCUMENT KIND | IDENT | AGENCY | PORT | ISSUED | EXPIRES | STATUS |
|---|---|---|---|---|---|---|
| DOCUMENTATION CERTIFICATE | | USCG | CO2VD | 27JUN98 | 30JUN02 | VALID |

#### ***** INSPECTION/BOARDING STATUS ****

| INSPECTION/EXAM TYPE | -----LAST------ PORT | DATE | -NEXT-- DATE | ------CURRENT STATUS ----- ACTION | PORT | DATE |
|---|---|---|---|---|---|---|

PORT CALLS IN LAST YEAR/   0      PORT CALLS SINCE LAST BOARDING/   0

TXDOT002591

PORT SAFETY VESSEL HISTORY

NAME/ ACL 9933B                              VIN/ D1084946 CALL/              FLAG/ US
ALT VINS/
MMSI NUMBER/                 DATE/

**** VESSEL SPECIFICS ****

SERVICE.../ FREIGHT BARGE          GROSS TONS../    764    HOME PORT../ CO1VD
PROPULSION/                        NET TONS..../    764    BUILD DATE./
HORSEPOWER/       0 ROUTE/         DEADWT TONS /      0    REG. LENGTH/ 200.00
FUEL TANKS/   0                    FUEL CAP..../      0    F/C UNITS../
                                   LUBE OIL CAP/      0    L/O/C UNITS/

--- DANGEROUS CARGOES AUTHORIZED/ N ---

**** CERTIFICATE STATUS ****

          DOCUMENT KIND          IDENT   AGENCY PORT  ISSUED  EXPIRES  STATUS
DOCUMENTATION CERTIFICATE                 USCG   CO1VD 11JUL01 31JUL02 VALID

***** INSPECTION/BOARDING STATUS ****

| INSPECTION/EXAM | -----LAST------ | | -NEXT-- | ------CURRENT STATUS ----- | | |
| TYPE | PORT | DATE | DATE | ACTION | PORT | DATE |

PORT CALLS IN LAST YEAR/   0     PORT CALLS SINCE LAST BOARDING/   0

NAME/ NM 315                              VIN/ D953212  CATD/        FLAG/ US
ALT VINS/ CG024986
MMSI NUMBER/                  DATE/

**** VESSEL SPECIFICS ****

| | | | |
|---|---|---|---|
| SERVICE.../ FREIGHT BARGE | GROSS TONS../ | 687 | HOME PORT../ CO3VD |
| PROPULSION/ | NET TONS..../ | 687 | BUILD DATE./ |
| HORSEPOWER/        0  ROUTE/ | DEADWT TONS / | 0 | REG. LENGTH/ 195.00 |
| FUEL TANKS/  0 | FUEL CAP..../ | 0 | F/C UNITS../ |
| | LUBE OIL CAP/ | 0 | L/O/C UNITS/ |

--- DANGEROUS CARGOES AUTHORIZED/ N ---

**** CERTIFICATE STATUS ****

| DOCUMENT KIND | IDENT | AGENCY | PORT | ISSUED | EXPIRES | STATUS |
|---|---|---|---|---|---|---|
| DOCUMENTATION CERTIFICATE | | USCG | CO3VD | 11DEC96 | 31DEC01 | VALID |

***** INSPECTION/BOARDING STATUS ****

| INSPECTION/EXAM TYPE | -----LAST------ | | -NEXT-- | ------CURRENT STATUS ----- | | |
|---|---|---|---|---|---|---|
| | PORT | DATE | DATE | ACTION | PORT | DATE |

PORT CALLS IN LAST YEAR/    0        PORT CALLS SINCE LAST BOARDING/    0

**Attachment G-2**



DEPARTMENT OF TRANSPORTATION
UNITED STATES COAST GUARD

Address reply to:
COMMANDANT
U.S. COAST GUARD
WASHINGTON, D.C.  20591

BRIDGE PERMIT
(9-71)

22 February 1971

WHEREAS by Title V of an act of Congress approved August 2, 1946, entitled "General Bridge Act of 1946," as amended (33 U.S.C. 525-533), the consent of Congress was granted for the construction, maintenance and operation of bridges and approaches thereto over the navigable waters of the United States;

AND WHEREAS under Section 502(b) of that act, the authority of which was transferred to and vested in the Secretary of Transportation by Section 6(g)(6)(C) of the Department of Transportation Act (80 Stat. 931) and delegated by the Secretary to the Commandant, U. S. Coast Guard by Section 1.46(c) of Title 49 Code of Federal Regulations, it is required that the location and plans for such bridges be approved by the Commandant before construction is commenced and in approving the location and plans of any such bridge, the Commandant may impose any specific conditions relating to the construction, maintenance and operation of the structure which he deems necessary in the interest of public navigation, such conditions to have the force of law;

AND WHEREAS the – STATE OF TEXAS – has submitted plans and a map of location of a bridge project to be constructed across Laguna Madre connecting Port Isabel with Padre Island, Texas;

NOW THEREFORE, This is to certify that the location and plans dated July 1970 are hereby approved by the Commandant, subject to the following conditions:

1. No deviation from the approved plans may be made either before or after completion of the structures unless the modification of said plans has previously been submitted to and received the approval of the Commandant.

2. All work shall be so conducted that the free navigation of the waterway is not unreasonably interfered with and the present navigable depths are not impaired. The construction of falsework, pilings or other obstructions, if required, shall be accomplished in accordance with plans submitted to and approved by the Commander, Eighth Coast Guard District prior to construction of the bridge project. The channel or channels through the structures shall be promptly cleared of all obstructions placed therein or caused by the construction of the bridge project to the satisfaction of the District Commander, when in his judgment the construction work has reached a point where such action should be taken, but in no case later than ninety days after the bridge project has been opened to traffic.

TXDOT004772

BRIDGE PERMIT:   Bridge project across Laguna Madre connecting Port
       (9-71)         Isabel with Padre Island, Texas

3.  Issuance of this permit does not relieve the permittee of the
obligation or responsibility for compliance with the provisions of any
other law or regulation as may be under the jurisdiction of any federal,
state or local authority having cognizance of any aspect of the location,
construction or maintenance of said bridge project.

4.  The existing pontoon bridge across the Gulf Intracoastal
Waterway, mile 668.0 west of Harvey Lock, and all parts of the existing
fixed bridge, commonly known as Queen Isabella Causeway, across Laguna
Madre, mile 1.0, not utilized in the new bridge project shall be re-
moved from the waterway(s) in their entirety and the waterway(s) cleared
to the satisfaction of the Commander, Eighth Coast Guard District.  A
period of 90 days subsequent to the opening of the new bridge project,
Gulf Intracoastal Waterway, mile 667.4, to traffic, will be allowed for
such removal and to clear the waterway(s).  Retention of any portions
of the two existing bridges not utilized in the new bridge project,
having lost their character as bridges, are subject to the approval of
the Corps of Engineers or other authority having cognizance over
structures, other than bridges, in the navigable waters of the United
States.

5.  The design and materials to be used in construction of the pier
protection system as shown on sheet 3 (of 4) dated July 1970 shall be
approved by the Commander, Eighth Coast Guard District prior to com-
mencement of construction of such system.

6.  The approval hereby granted shall cease and be null and void
unless the actual construction of the bridge project is commenced within
2 years and completed within 4 years after the date of this permit.

P. A. YOST
Commander, U. S. Coast Guard
Chief, Bridge Branch

TXDOT004773





TXDOT0004775

TXDOT004776



PLAN

ELEVATION

FENDER

€ GULF INTRACOASTAL WATERWAY

€ BRIDGE

FENDER

FENDER

FENDER

NATURAL GROUND

MEAN HIGH TIDE = +1.0

275'

137.5'

137.5'

137.5'

PROP. NAVIGATION LIGHTING

LEGEND:
R—RED FENDER MARKER (180°)
G—GREEN BRIDGE MARKER (300°)

NAVIGATION LIGHTS AND/OR SIGNALS APPROVED

D. D. DAVISON, Captain, USCG
Chief, Aids to Navigation Branch

Date: 9 MAR 1971

SHEET 4 OF 4 SHEETS

TEXAS HIGHWAY DEPARTMENT
PROPOSED
PORT ISABEL - PADRE ISLAND BRIDGE
CONTROL 331-4-
CAMERON COUNTY
DISTRICT 21
JULY 1970

# Lone Star Engineering

331 Waxwood, San Antonio, Texas 78216;  Phone: (210) 826-2984;  FAX: (210) 826-1797;  E-mail  bubba@texas.net

September 18, 2001

**Eddy Gonzalez**
TxDOT – Bridge Inspection Office
600 W. Exp 83
Pharr, Texas 78577

RE:    Queen Isabella Causeway Inspection Report & Photos

**Dear Eddy,**

Enclosed are the <u>ORIGINAL Inspection Report</u> and <u>Photograph Sheets</u> for the Queen Isabella Causeway, as you requested.

The remainder of the miscellaneous items (Elements coding disk, NBI coding disk, Appraisal worksheet, Maintenance Worksheet, etc.), which are usually attached to the report will be submitted later, when all coding is completed and various copies have been made, etc.

Should you have any questions, please call or e-mail me.

Sincerely,

Kenneth Kolodzie, P.E.
Principal



# Bridge Inspection Record

Modified (12-5-2000)
v Microsoft Word 7.0, WIN95 & NT

| District | **21** | County: | **031** | Cont-Sec: | **0331-04** | Structure | **005** | Route: | **PR 100** (Queen Isabella Causeway) |

Description  **150 spans [ 3 – continuous Steel Plate Girder spans  &  147 – simple Prestressed Concrete Girder spans ]**

Feature Crossed: **Intracoastal Waterway**     Inspector's Name: **Kenneth Kolodzie, P.E.**     Date **Sept. 5, 2001**

Company Name: **Lone Star Engineering**

N- Not applicable
9- Excellent condition
8- Very good condition - no problems noted
7- Good condition - some minor problems
6- Satisfactory condition - minor deterioration of structural elements (limited)
5- Fair condition - minor deterioration of structural elements (extensive)
4- Poor condition - deterioration significantly affects structural capacity
3- Serious condition - deterioration seriously affects structural capacity
2- Critical condition -bridge should be closed until repaired
1- Failing condition - bridge closed but repairable
0- Failed condition - bridge closed and beyond repair

STATE OF TEXAS
KENNETH KOLODZIE
66548
REGISTERED PROFESSIONAL ENGINEER

Enter a rating for each element of each component. The rating should equal or exceed the minimum rating listed to the left of each element. Component ratings should equal the lowest rating of any element of the component. Fully supportive comments are to be made hereon or on attachments for all ratings of 7 or below.

| Min. | Deck (Item 58) | | Rating |
|---|---|---|---|
| 1 | Deck -Rating | 1 | **6** |
| 6 | Wearing Surface | | N |
|  | Joints, Expansion, Open | 2 | 6 |
|  | Joints, Expansion, Sealed | | N |
| 8 | Joints, Other  (Finger Joints) | | 8 |
| 6 | Drainage System | | 8 |
| 6 | Curbs, Sidewalks & Parapets | | N |
| 6 | Median Barrier | 3 | 7 |
| 6 | Railings | 4 | 6 |
| 7 | Railing Protective Coating | | N |
| 7 | Delineation (curve Markers) | | 8 |
|  | Other | | N |

| Min. | Superstructure (Item 59) | | Rating |
|---|---|---|---|
| 0 | Main Members - Steel | 1 | 6 |
| 0 | Main Members - Concrete | 2 | 7 |
| 0 | Main Members - Timber | | N |
| 0 | Main Member Connections | 1 | 6 |
| 1 | Floor System | | N |
| 1 | Floor System Connections | | N |
| 5 | Secondary Members | 1 | 6 |
| 5 | Secondary Member Connections | 1 | 6 |
| 6 | Expansion Bearings | 3 | 7 |
| 6 | Fixed Bearings | 3 | 7 |
| 6 | Steel Protective Coating | 1 | 7 |
|  | Other | | N |
| | Component Rating | | **6** |

**Comments:**
1. Generally, there is widespread minor cracking on the deck surface with some efflorescence on underside. The underside of the deck has minor spalls & delaminations on Span № 1. On top of Span № 3, the deck surface shows widespread shallow spalls & delaminations. (see photo) There is minor spalling of the deck surface on Span № 114. (see photo) Deck surface shows widespread moderate cracking over Main Spans with efflorescence on underside. (see photos)
2. Open joints are pinched closed @ Bent №s 2, 3, 149 & 150. The open joint @ the SW Abutment is nearly closed (~1/4" opening) and has a minor accumulation of debris inside it. Isolated minor spalling of deck surface @ open joint locations.
3. Some areas of minor spalling with exposed, corroded reinforcing steel. (see photo) Center median barrier has widespread minor bruises & scrapes, but generally is still in good condition.
4. Minor impact damage to Aluminum Rail Tube and posts @ several locations on both sides of the bridge. Minor spalling with exposed reinforcing steel on concrete portion of railing (@ base of posts) due to impact damage. Widespread deterioration of rail post anchor bolts and nuts. (Many nuts are missing. Many others are loose. Some nuts have rusted to a point where they are splitting apart. Some anchor bolt threads have completely rusted away, etc.) (see photos)

**Comments:**
1. All structural steel was sandblasted and repainted in 1998, but prior to this painting, widespread minor rusting & pitting of the Steel Plate Girders, as well as moderate rusting of gusset plates, diagonal bracing, diaphragms & connections had occurred. There is minor impact damage @ midspan due to over height ships. Paint system is generally in good condition; however, there are isolated minor paint system failures, with minor rust staining. (see photo)  *Note: A detailed Fracture Critical inspection of the Steel Superstructure members is regularly conducted by the TxDOT Bridge Division.*
2. Minor spalling with exposed reinforcing steel on Prestressed Concrete Beams, and concrete diaphragms. Minor cracking & spalling with rust staining on NW exterior beam @ Span № 1. (see photos)
3. Minor rusting & pitting of Steel bearings under main span unit. Generally the bearings under the Prestressed Concrete Beams appear to be in good condition; however, there is a minor accumulation of debris around bearings (and between the end of the beams and backwall) @ the East Abutment.

Bridge Inspection Record (page 1 of 2)

TXDOT007312

rict:  21  County  031   Cont-Sec:  033T-04   Structure:  005   Route:  PR 100  (Queen Isabella Causeway)

| Min. | Substructure (Item 60) | | Rating |
|---|---|---|---|
| 0 | Abutment Caps | 1 | 7 |
| 0 | Above Ground | 1 | 7 |
| ● | Below Ground or Foundation | | 8 |
| 5 | Backwalls & Wingwalls | 2 | 7 |
| 0 | Intermediate Supports | | |
| | Caps - Concrete | 3 | 6 |
| | Caps - Steel | | N |
| | Caps - Timber | | N |
| | Above Ground - Concrete | 4 | 5 |
| | Above Ground - Steel | | N |
| | Above Ground -Timber | | N |
| | Above Ground - Masonry | | N |
| | Below Ground or Foundation | 5 | 6 |
| 5 | Collision Protection System | 6 | 5 |
| 6 | Steel Protective Coating | | N |
| | **Component Rating** | | **5** |

**Comments:**
1. Minor cracking in Abutment Caps & Breastwall @ SW Abutment.
2. Minor cracking & spalling with exposed reinforcing steel & rust staining on Wingwall @ NW end of SW Abutment. (see photo)  Minor cracking on Wingwall @ North end of East Abutment, and on both Backwalls.
3. Widespread minor cracking is present on the underside of numerous Bent Caps, some with rust staining. (see photos) There is a large spall on the underside of Bent № 47 which has exposed the stirrups as well as the bottom layer of reinforcing steel. This exposed reinforcing steel appears to be heavily corroded. (see photos) Isolated minor cracking on East side face of Bent № 70 under bearing area of Beam № 2 (from North side)
4. Widespread moderate cracking with rust staining, and minor impact spalls on Pile Caps. Widespread minor cracking in Tie-Beams. Several columns have minor cracking, and some shallow spalls & delaminations (generally following spiral reinforcing).  Minor spalling & deterioration of concrete on SE column of Bent № 36 @ waterline. (see photos)
   *|Comments continue under Culvert (Item 62) section of this page|*

| Min. | Channel (Item 61) | | Rating |
|---|---|---|---|
| 0 | Channel Banks | | 8 |
| 0 | Channel Bed | 1 | 6 |
| 0 | Rip Rap. Toe Walls & Aprons | 2 | 7 |
| 5 | Dikes | | N |
| 5 | Jetties | | N |
| 5 | Other | | N |
| | **Component Rating** | | **6** |

**Comments:**
1. *Note:  Although the inspection today included only portions of the structure above the waterline, Underwater Inspections are regularly conducted by the TxDOT Bridge Division to assess portions of the structure below water, and monitor Tidal scour. Underwater Inspections have found widespread minor scour around Bents, with moderate scour around the Bents nearest the Intracoastal Waterway. The most recent Underwater Inspection report (September, 2000) notes that "The local tidal scour that is occurring is of little concern. It can change on a daily basis with any tidal influx." and that "Channel profile measurements showed no change according to the original construction drawings."*
   Minor cracking of riprap.

| Min. | Culvert (Item 62) | Rating |
|---|---|---|
| 0 | Top Slabs | N |
| 0 | Bottom Slabs or Footing | N |
| 0 | Abutments & Intermediate Supports | N |
| 5 | Headwalls & Wingwalls | N |
| | Other | N |
| | **Component Rating** | **N** |

*|Comments from Substructure (Item 60) continued|*
5. Several minor spalls on Concrete Piles. Isolated spalls have exposed reinforcing steel. A number of Piles appear to have fiberglass "jackets" around them (immediately underneath the Pile Caps). (see photo) Some "jackets" extend down from the Pile Cap only a short distance, others appear to continue further underwater. (possibly some previous repair) No problems were noted with these "jackets." *Note: Underwater Inspections are regularly conducted by the TxDOT Bridge Division to assess portions of the structure below water, and monitor channel scour.*
6. The 2nd Dolphin from the SE end of the Fender on the SW side of Intracoastal Waterway has been impacted and is leaning over. (see photos) Steel Piles & Wales have widespread minor rusting above water. Some impact damage to Timber Wales. (see photos)

| Min. | Approaches (Item 65) | | Rating |
|---|---|---|---|
| 0 | Embankments | | 8 |
| 4 | Embankment Retaining Walls | 1 | 6 |
| 5 | Slope Protection | | 8 |
| 5 | Roadway | 2 | 6 |
| 6 | Relief Joints | | N |
| 6 | Drainage | | 8 |
| 6 | Guardfence | 3 | 6 |
| 7 | Delineation | | N |
| 7 | Sight Distance | 4 | 7 |
| | Other | | N |
| | **Component Rating** | | **6** |

**Comments:**
1. Moderate cracking in Embankment retaining wall which wraps around the East Abutment Embankment.
2. Approach roadway pavement on SW end of bridge (Port Isabel) rides rough and has widespread patching & flushing of asphalt. (see photo)
3. Concrete rail-extensions have long. moderate horizontal cracks with rust staining. Concrete rail-extension @ North end of East Abutment also has minor spalling with exposed. corroded reinforcing steel.
4. Vertical & horizontal alignment limits sight distance while driving on the bridge. (see photos)

| Min. | Miscellaneous | | Rating |
|---|---|---|---|
| 7 | Signs | 1 | 7 |
| 7 | Illumination | 2 | 7 |
| 7 | Warning Devices    (Navigation Lights) | | 8 |
| 7 | Utility Lines | 3 | 7 |
| | Other | | N |

**Comments:**
1. Sign supports (attached to bridge rail) severely deteriorated. (see photo)
2. Widespread severe deterioration of anchor bolts and nuts. (Some nuts have rusted to a point where they are splitting apart.) The overhead portions of the Illumination poles are heavily rusted as well. (see photos)
3. Conduit is attached along the South/SE side & a pipeline is attached along the underside. (see photos)  Numerous conduits attached for Cathodic Protection systems. Several access boxes are open. (see photos)

Bridge Inspection Record (page 2 of 2)

TXDOT007313

District: **21**   County **031**   Cont-Sec: **0331-04**   Structure: **005**   Route: **PR 100  (Queen Isabella Causeway)**

| Min. | Substructure (Item 60) | | Rating |
|---|---|---|---|
| 0 | Abutment Caps | 1 | 7 |
| 0 | Above Ground | 1 | 7 |
| 0 | Below Ground or Foundation | | 8 |
| 5 | Backwalls & Wingwalls | 2 | 7 |
| 0 | Intermediate Supports | | |
| | Caps - Concrete | 3 | 6 |
| | Caps - Steel | | N |
| | Caps - Timber | | N |
| | Above Ground - Concrete | 4 | 5 |
| | Above Ground - Steel | | N |
| | Above Ground - Timber | | N |
| | Above Ground - Masonry | | N |
| | Below Ground or Foundation | 5 | 6 |
| 5 | Collision Protection System | 6 | 5 |
| 6 | Steel Protective Coating | | N |
| | Component Rating | | **5** |

**Comments:**
1. Minor cracking in Abutment Caps & Breastwall @ SW Abutment.
2. Minor cracking & spalling with exposed reinforcing steel & rust staining on Wingwall @ NW end of SW Abutment. (see photo)  Minor cracking on Wingwall @ North end of East Abutment, and on both Backwalls.
3. Widespread minor cracking is present on the underside of numerous Bent Caps, some with rust staining. (see photos)  There is a large spall on the underside of Bent № 47 which has exposed the stirrups as well as the bottom layer of reinforcing steel.  This exposed reinforcing steel appears to be heavily corroded. (see photos)  Isolated minor cracking on East side face of Bent № 70 under bearing area of Beam № 2 (from North side)
4. Widespread moderate cracking with rust staining, and minor impact spalls on Pile Caps.  Widespread minor cracking in Tie-Beams.  Several columns have minor cracking, and some shallow spalls & delaminations (generally following spiral reinforcing).  Minor spalling & deterioration of concrete on SE column of Bent № 36 @ waterline. (see photos)
   *[Comments continue under Culvert (Item 62) section of this page]*

| Min. | Channel (Item 61) | | Rating |
|---|---|---|---|
| 0 | Channel Banks | | 8 |
| 0 | Channel Bed | 1 | 6 |
| 0 | Rip Rap, Toe Walls & Aprons | 2 | 7 |
| 5 | Dikes | | N |
| 5 | Jetties | | N |
| 5 | Other | | N |
| | Component Rating | | **6** |

**Comments:**
1. *Note:  Although the inspection today included only portions of the structure above the waterline, Underwater Inspections are regularly conducted by the TxDOT Bridge Division to assess portions of the structure below water, and monitor Tidal scour.  Underwater Inspections have found widespread minor scour around Bents, with moderate scour around the Bents nearest the Intracoastal Waterway.  The most recent Underwater Inspection report (September, 2001) notes that "The local tidal scour that is occurring is of little concern.  It can change on a daily basis with any tidal influx." and that "Channel profile measurements showed no change according to the original construction drawings."*
2. Minor cracking of riprap.

| Min. | Culvert (Item 62) | | Rating |
|---|---|---|---|
| 0 | Top Slabs | | N |
| 0 | Bottom Slabs or Footing | | N |
| 0 | Abutments & Intermediate Supports | | N |
| 5 | Headwalls & Wingwalls | | N |
| | Other | | N |
| | Component Rating | | **N** |

*[Comments from Substructure (Item 60) continued]*
5. Several minor spalls on Concrete Piles.  Isolated spalls have exposed reinforcing steel.  A number of Piles appear to have fiberglass "jackets" around them (immediately underneath the Pile Caps). (see photos)  Some "jackets" extend down from the Pile Cap only a short distance, others appear to continue further underwater. (possibly some previous repair)  No problems were noted with these "jackets."  *Note:  Underwater Inspections are regularly conducted by the TxDOT Bridge Division to assess portions of the structure below water, and monitor channel scour.*
6. The 2nd Dolphin from the SE end of the Fender on the SW side of Intracoastal Waterway has been impacted and is leaning over. (see photos)  Steel Piles & Wales have widespread moderate rusting above water. Some impact damage to Timber Wales. (see photos)

| Min. | Approaches (Item 65) | | Rating |
|---|---|---|---|
| 0 | Embankments | | 8 |
| 4 | Embankment Retaining Walls | 1 | 6 |
| 5 | Slope Protection | | 8 |
| 5 | Roadway | 2 | 6 |
| 6 | Relief Joints | | N |
| 6 | Drainage | | 8 |
| 6 | Guardfence | 3 | 6 |
| 7 | Delineation | | N |
| 7 | Sight Distance | 4 | 7 |
| | Other | | N |
| | Component Rating | | **6** |

**Comments:**
1. Moderate cracking in Embankment retaining wall which wraps around the East Abutment Embankment.
2. Approach roadway pavement on SW end of bridge (Port Isabel) rides rough and has widespread patching & flushing of asphalt. (see photo)
3. Concrete rail-extensions have long, moderate horizontal cracks with rust staining.  Concrete rail-extension @ North end of East Abutment also has minor spalling with exposed, corroded reinforcing steel.
4. Vertical & horizontal alignment limits sight distance while driving on the bridge. (see photos)

| Min. | Miscellaneous | | Rating |
|---|---|---|---|
| 7 | Signs | 1 | 7 |
| 7 | Illumination | 2 | 7 |
| 7 | Warning Devices    (Navigation Lights) | | 8 |
| 7 | Utility Lines | 3 | 7 |
| | Other | | N |

**Comments:**
1. Sign supports (attached to bridge rail) severely deteriorated. (see photo)
2. Widespread severe deterioration of anchor bolts and nuts. (Some nuts have rusted to a point where they are splitting apart.)  The overhead portions of the Illumination poles are heavily rusted as well. (see photos)
3. Conduit is attached along the South/SE side & a pipeline is attached along the underside. (see photos)  Numerous conduits attached for Cathodic Protection systems.  Several access boxes are open. (see photos)

Case 1:01-cv-00157   Document 239   Filed in TXSD on 11/15/2004   Page 114 of 171

## Attachment G-4

( Check appropriate box )  ☐ CONTACT   ☒ PROJECT STAGE INSPECTION   ☐ FINAL INSPECTION

| REGION NO. | REPORT NO. | COUNTY | DIVISION |
|---|---|---|---|
| 6 | 19 | Cameron | Texas |

| DATE OF INSPECTION | INSPECTION MADE BY | PROJECT NO. |
|---|---|---|
| Aug. 14, 1973 | J. L. Gray & R. W. Barbour | BRS 1911(4) |

IN COMPANY WITH  Messrs. W. D. Barnes, Asst. Dist. Engr.; and
Roberto Martinez, Res. Engr., THD

| QUALITY OF WORK* | PROGRESS OF WORK | TIME ELAPSED | WORK COMPLETED |
|---|---|---|---|
| Satisfactory | Satisfactory | 291/550=53 % | 53 % |

REPORT TO INCLUDE: (1) SCOPE OF INSPECTION (2) SUMMARY OF FINDINGS, RECOMMENDATIONS, AND ACTION TAKEN
(* Not applicable for all contacts.)

Contractor: Austin Bridge Co.

### STAGE INSPECTION:  Structural Welding

1. **SCOPE OF INSPECTION:**

   This inspection consisted of an office review of records pertaining to this operation and observation of the welding of field splices on structural steel girders.

2. **SUMMARY OF FINDINGS:**

   This item is being constructed in substantial compliance with the approved plans and specifications.

   a. Approved shop and erection drawings are on file in the project office as well as falsework plans.

   b. Certified welders are being used. The welding is being done inside an environmental shelter made of steel and plywood. Four welders were being used, two on the top and two on the bottom.

   c. Electrodes are being stored in an oven. E-7018 electrodes are being used which are the proper type.

   d. As is customary, the welding inspection is being performed by D-5 personnel. One inspector was present which was adequate for the amount of work being performed.

   e. During the course of this inspection, the contractor's welding procedure for the top flange of girder #1 between flange plates #2 and #3 were observed. The stringer bead was made with a 1/8" E7018 rod, and back gouged with an air-arc. Pass #4, in the overhead position, using a 5/32" E7018 rod was then placed. Proper pre-heat and interpass temperatures were being maintained with a "torch" and checked using temple-sticks. The State inspector was using "sticks" marked for 200°, 225°, and 250°F. The specified minimum pre-heat was 225°F.

   - more -

cc: Division (1)  Region (1)  Wash (1)  HHO-30  State (3)

TXDOT004212

Texas BRS 1911(4)
Cameron County
Aug. 14, 1973
Stage Inspection - Structural Welding

3.  COMMENTS:

It was noted during this inspection that construction operations
have resulted in spalling concrete from the footings in several
areas, presumably from work barges impacting the footings.  This
had been a problem earlier in construction but had been remedied.
It was agreed that continuing vigilance would be required to keep
this type of damage to a minimum.

| Dist Office Copy | |
|---|---|
| Re~ | |
| *Berno* | |
| *Lanno* | |

| EXTRA COPY TO: | |
|---|---|
| *G. B. Ancon* | |
| A. . . . | |
| ACTION | |
| FILE | |

# UNDERWATER
# SUBSTRUCTURE EVALUATION



## BRIDGE DIVISION

| TEXAS DEPARTMENT OF TRANSPORTATION | |
|---|---|
| BRIDGE #: 21-031-0331-04-005 | |
| HIGHWAY: PR 100 | |
| WATERWAY: Intracoastal Canal | |
| DATE OF INSPECTION: 9-1-00 | |
| INSPECTED BY | Sims |
| | Riba |
| | |

SIGNATURE                    DATE

TXDOT007436

# Texas Department of Transportation
## Underwater Substructure Evaluation

**Structure I.D. # -**    21-031-0331-04-005

**Location:**    PR 100 @ Intracoastal Canal

## Objective:

The objective of this underwater inspection was to inspect and evaluate the condition of the Substructure below the waterline and note any defects or deterioration.

## Methods:

This underwater inspection was broken down into two separate inspections. The first inspection was conducted the week of August 7, 2000; the second inspection was the week of August 14, 2000 and was conducted by personnel from the Inspection branch of the Bridge Division. The personnel involved in the inspection consisted of four Diver / Inspectors and one Diver / Team Leader. Standard SCUBA diving procedures were used to perform this inspection. Due to the length of the structure the Bridge Division boat was used to gain access. The channel profile measurements were taken with an Eagle depth finder.

## Bridge History:

PR 100 crosses South Bay connecting Port Isabell with South Padre Island. This structure was built in 1974 and consists of 152 bents of which 149 are considered wet. The Substructure of the Main Spans (Bents 34 and 35) consists of a 3 concrete columns on a Pile Cap founded on 20" Concrete Piles. Bents 1 through 7 and 149 through 151 consists of 20" concrete piles below a concrete bent cap. Bents 8 through 18 and 53 through 148 consist of 3 concrete columns resting on concrete pile caps (one per column) founded on 3 concrete piles per cap. Bents 19 through 33, and 38 through 52 consist of 3 concrete columns per bent resting on concrete pile caps (one per column) with 4 concrete piles per cap. The last underwater inspection was conducted in 1996 by personnel from the BRINSAP section of the Design division.

## Scope of the Inspection:

This inspection consisted of numbering the bents according to the construction drawings and taking a channel profile. This was accomplished with the use of a barge type boat and an eagle depth finder. The below water portions of the substructure were inspected using SCUBA. All concrete surfaces were covered with a thick layer of marine growth which had to be removed to see the concrete. Approximately 10% of each pile was cleaned during this stage of the inspection and any defects were noted.

## Findings:

**Bent 3, Pile 4**
          Vertical crack found extending from the bottom of the Pile Cap to approximately 3' below, on the west face of the Pile.

**Bent 7, Pile 8**
Vertical crack found extending from the bottom of the Pile Cap to approximately 3' below, on the west face of the Pile.

**Bents 23 – 34**
Typical Pile Cap cracking with numerous Spalls (mentioned in the previous report)

**Bent 23**
Fiberglass encasement exhibits no problems. Slight Tidal Scour is present.

**Fender System**
A slight amount of section loss is present on the steel H-Piles, otherwise the fender system is in good condition.

**Dolphins**
The Dolphins are in good condition with the exception of the Dolphin on the southeast portion of the structure. This Dolphin has suffered major impact damage, the steel H-Piles are bent below the waterline. The Dolphin is out of plumb and the concrete is cracked. Large rubber bumpers were attached near the waterline and they extend upward toward the top of the Dolphin. They appear to be successful protecting the dolphin successfully.

**Bents 35 and 36**
Tidal scour extends 5' around the pile cap and 4' in depth.

**Bent 37**
Tidal scour extends 5' around and 4' to 6' below the top of the pile cap.

**Bents 38 through 60**
Typical Tidal scour ranging from 2' to 4' around the piles and 2' to 3' deep which diminishes as you move away from the main channel.

**Bent 50**
The center Pile Cap has a large consolidation void on the bottom in the Northwest corner that measures 4" x 4" x 10"(deep). This void is not below the waterline under normal conditions.

**Bent 97**
The aggregate is exposed on all of the Piles from the bottom of the Pile Cap to 1' below.

**Bent 112**
The North Pile Cap has suffered major impact damage in the form of spalls. This has occurred on the West and North faces of the cap.

**Bent 121**
The South column has a large consolidation void at the high water mark, this void measures approximately 2' long x 6" wide x 6" deep.

## Conclusions:

TXDOT007438

Overall the condition of the substructure is fair. The local tidal scour that is occurring throughout the structure is of little concern. It can change on a daily basis with any tidal influx. The concrete is in fair condition with only a few exceptions which are noted in the report. Channel profile measurements showed no change according to the original construction drawings.

### Recommendations:

The consolidation void at Bent 121, south Column, should be repaired to prevent any further damage.
This structure will remain on a 5-year underwater inspection frequency.

Item 88-A     2
Item 92.2     Y60
Item 93.2     092000
Item 60     5
**Underwater Substructure Rating    5**

TXDOT007439

# TEXAS DEPARTMENT OF TRANSPORTATION
## UNDERWATER PHOTOGRAPH LOG

STRUCTURE I.D. # 21-031-0331-04-005
LOCATION: PR 100 @ Intracoastal Canal
DATE: 9-1-00



Typical Bent configuration of Main Piers

# TEXAS DEPARTMENT OF TRANSPORTATION
## UNDERWATER PHOTOGRAPH LOG

STRUCTURE I.D. # 21-031-0331-04-005
LOCATION: PR 100 @ Intracoastal Canal
DATE: 9-1-00



Spalling and Delaminations of Span #1

TXDOT007441

# TEXAS DEPARTMENT OF TRANSPORTATION
## UNDERWATER PHOTOGRAPH LOG

STRUCTURE I.D. # 21-031-0331-04-005
LOCATION: PR 100 @ Intracoastal Canal
DATE: 9-1-00



Spalling and Delaminations of Span #1



Spalling and Delaminations of Span #1

TXDOT007442

# TEXAS DEPARTMENT OF TRANSPORTATION
## UNDERWATER PHOTOGRAPH LOG

STRUCTURE I.D. # 21-031-0331-04-005
LOCATION: FR 100 @ Intracoastal Canal
DATE: 9-1-00



Spalling and Delimanation of Span 1

Spalling and Delimanation of Span 1

TXDOT007443

# TEXAS DEPARTMENT OF TRANSPORTATION
## UNDERWATER PHOTOGRAPH LOG

STRUCTURE I.D. # 21-031-0331-04-005
LOCATION: PR 100 @ Intracoastal Canal
DATE: 9-1-00



Spalling and Delaminations of Span #1



Spalling and Delaminations of Span #1

TXDOT007444

# TEXAS DEPARTMENT OF TRANSPORTATION
## UNDERWATER PHOTOGRAPH LOG

STRUCTURE I.D. # 21-031-0331-04-005
LOCATION  PR 100 @ Intracoastal Canal
DATE  9 1 00



Spalling and Delaminations of Span #1



Spalling and Delaminations of Span #1

TXDOT007445

[Code of Federal Regulations]
[Title 23, Volume 1]
[Revised as of April 1, 2002]
From the U.S. Government Printing Office via GPO Access
[CITE: 23CFR650.807]

[Page 237-238]

TITLE 23--HIGHWAYS

CHAPTER I--FEDERAL HIGHWAY ADMINISTRATION, DEPARTMENT OF TRANSPORTATION

PART 650--BRIDGES, STRUCTURES, AND HYDRAULICS--Table of Contents

Subpart H--Navigational Clearances for Bridges

Sec. 650.807  Bridges requiring a USCG permit.

    (a) The USCG has the responsibility (1) to determine whether a USCG
permit is required for the improvement or construction of a bridge over
navigable waters except for the exemption exercised by FHWA in
Sec. 650.805 and (2) to approve the bridge location, alignment and
appropriate navigational clearances in all bridge permit applications.
    (b) A USCG permit shall be required when a bridge crosses waters
which are: (1) tidal and used by recreational boating, fishing, and
other small vessels 21 feet or greater in length or (2) used or
susceptible to use in their natural condition or by reasonable
improvement as a means to transport interstate or foreign commerce. If
it is determined that a USCG permit is required, the project shall be
processed in accordance with the following procedures.
    (c) The HA shall initiate coordination with the USCG at an early
stage

[[Page 238]]

of project development and provide opportunity for the USCG to be
involved throughout the environmental review process in accordance with
23 CFR part 771. The FHWA and Coast Guard have developed internal
guidelines which set forth coordination procedures that both agencies
have found useful in streamlining and expediting the permit approval
process. These guidelines include (1) USCG/FHWA Procedures for Handling
Projects which Require a USCG Permit \1\ and (2) the USCG/FHWA
Memorandum of Understanding on Coordinating The Preparation and
Processing of Environmental Projects. \2\ ----------------------------
--------------------------------------------------------------------

    \1\ This document is an internal directive in the USCG Bridge
Administration Manual, Enclosure 1a, COMDT INST M16590.5, change 2 dated
Dec. 1, 1983. It is available for inspection and copying from the U.S.
Coast Guard or the Federal Highway Administration as prescribed in 49
CFR part 7, appendices B and D.
    \2\ FHWA Notice 6640.22 dated July 17, 1981, is available for
inspection and copying as prescribed in 49 CFR part 7, appendix D.
--------------------------------------------------------------------

    (d) The HA shall accomplish sufficient preliminary design and
consultation during the environmental phase of project development to
investigate bridge concepts, including the feasibility of any proposed
movable bridges, the horizontal and vertical clearances that may be
required, and other location considerations which may affect navigation.
At least one fixed bridge alternative shall be included with any
proposal for a movable bridge to provide a comparative analysis of

engineering, social, economic and environmental benefit and impacts.

(e) The HA shall consider hydraulic, safety, environmental and navigational needs along with highway costs when designing a proposed navigable waterway crossing.

(f) For bridges where the risk of ship collision is significant, HA's shall consider, in addition to USCG requirements, the need for pier protection and warning systems as outlined in FHWA Technical Advisory 5140.19, Pier Protection and Warning Systems for Bridges Subject to Ship Collisions, dated February 11, 1983.

(g) Special navigational clearances shall normally not be provided for accommodation of floating construction equipment of any type that is not required for navigation channel maintenance. If the navigational clearances are influenced by the needs of such equipment, the USCG should be consulted to determine the appropriate clearances to be provided.

(h) For projects which require FHWA approval of plans, specifications and estimates, preliminary bridge plans shall be approved at the appropriate level by FHWA for structural concepts, hydraulics, and navigational clearances prior to submission of the permit application.

(i) If the HA bid plans contain alternative designs for the same configuration (fixed or movable), the permit application shall be prepared in sufficient detail so that all alternatives can be evaluated by the USCG. If appropriate, the USCG will issue a permit for all alternatives. Within 30 days after award of the construction contract, the USCG shall be notified by the HA of the alternate which was selected. The USCG procedure for evaluating permit applications which contain alternates is presented in its Bridge Administration Manual (COMDT INST M16590.5). \3\ The FHWA policy on alternates, Alternate Design for Bridges; Policy Statement, was published at 48 FR 21409 on May 12, 1983.

-----------------------------------------------------------------------

\3\ United States Coast Guard internal directives are available for inspection and copying as prescribed in 49 CFR part 7, appendix B.

-----------------------------------------------------------------------



U.S. Department of Transportation
Federal Highway Administration

Attachment G-7

Search FHWA: [        ] Go!

FHWA > Infrastructure > Bridge

## Bridge Technology

# MEMORANDUM

U.S. Department of Transportation
Federal Highway Administration

Subject: **ACTION**: Evaluation of Fendering Systems

Date: January 11, 1999

From: Acting Associate Administrator
for Program Development

Reply to
Attn of: HNG-30

To: Resource Center Directors
Division Administrators

The 560-foot-long Liberian tankship *Julie N*, carrying a cargo of heating oil, collided with the south bascule pier of the Portland-South Portland (Million Dollar) Bridge in Portland, Maine, on September 27, 1996. The collision resulted in a 33-foot-long hole in the vessel's hull beneath the waterline. About 4,000 barrels of oil spilled into the harbor. The vessel sustained about $660,000 in damage, and the cost for cleanup of the oil was approximately $43 million. Repairs to the Million Dollar Bridge were about $232,000. After investigating the accident, the National Transportation Safety Board (NTSB) issued Special Investigation Report (SIR) 98/02 which was adopted on May 5, 1998. A summary of SIR/98/02 is attached.

The Federal Highway Administration has been requested by the NTSB recommendation (M-98-83) to inform, in cooperation with the American Association of State Highway and Transportation Officials (AASHTO), State highway departments of the circumstances of this accident and recommend that the States evaluate the adequacy of fendering systems at bridge piers where the systems were not designed for the type and size of vessel currently using the waterway and may not be adequate to protect the bridge and take corrective action as necessary.

Therefore, we request that State DOTs evaluate the adequacy of fendering systems at bridges which have a USCG permit for navigational clearances. This evaluation should be conducted as a part of the next scheduled national bridge inspection. The evaluation should determine if the bridge's fender system provides adequate protection for the bridge or for vessels navigating through its draw. If the fendering is found to be inadequate, an improved fendering system should be considered. The attached summary of SIR/98/02 contains an example of an adequate fendering system in the section titled: "Fender System for the New Bridge."

/s/ Original Signed by
Henry H. Rentz

Henry H. Rentz

1 Attachment

This page last updated November 2, 2001

**FHWA**

United States Department of Transportation - Federal Highway Administration - Office of Bridge Technology

INTEROFFICE MEMORANDUM   Attachment G-8

1972

D-5 Files

Date   October 18, 197.

FROM   Clarence R. Rea,

Responsible

SUBJECT:   Cameron County
Project BR-S 1911(4)
Control 331-4-15
Park Road 100
Port Isabel Causeway
Summary of Pile Driving

Desk _____ D-5 _____

When a decision was made to use the wave equation analysis for
obtaining bearing capacity on the piling for the Port Isabel
Causeway, a computer problem was run on each of the ten test
piling. It was noted at that time, and brought to my attention,
that the tensile stresses were very high (above 2000 psi). Dis-
cussions at that time with TTI personnel, particularly Mr. Bob
Foy, indicated that the driving stresses tabulated by the com-
puter program were high and that the true value of the tensile
stresses was in the neighborhood of 50 percent of those computed.
TTI personnel stated that the measured stresses in the piling had
also been found to be less than the computed stresses.

Approximately three weeks ago, since we could not justify this 50
percent of the computed stresses by any method available to us,
we requested Dr. Hirsch to come to Austin to discuss this in
particular and the wave equation analysis method in general.
Dr. Hirsch came to Austin on September 20 for this discussion.
It was determined at that time that the information given by
Mr. Foy was incorrect in the 50 percent reduction but that it
was true that measured stresses had always been some less than
the computed stresses. After a several hour discussion with Dr.
Hirsch, I called Mr. Barnes in the Pharr District office and
indicated to him our concern over the high driving stresses
being encountered and asked that a spot check be made of the
piling driven so far to determine if we had any evidence of
any cracked piling. A day or so later Mr. Barnes advised that
a spot check had been taken and that, at that time, there was no
evidence of cracked piling. On Tuesday, September 26, I again
called Mr. Barnes and stated that the driving stresses were
still high and that we would perhaps have to change cushion
block materials or something in order to reduce these driving

| Dist Office Copy | EXTRA COPY TO: | |
|---|---|---|
| Routing | | |
| BARNES | ANSWER | |
| Gonne | ACTION | |
| | FILE | |

TXDOT004280

Texas Highway Department
Form 433-B

47607—1159—50m

# INTEROFFICE MEMORANDUM

TO:        D-5 Files                                      Date    October 18, 197

FROM:      Clarence R. Rea                               Responsible

SUBJECT:                                                 Desk _____D-5_____
                                -2-

stresses to an acceptable level.  He advised me at that time,
that there were three piling on the job which contained water
up to the level of the bay water which indicated that these
piling were in fact cracked.

During this several week period discussed above we were running
computer programs to see what change could be made in either
the cap block cushion material or the lower cushion material,
or both, to lower the stresses to an acceptable range.

On Thursday, September 28, I called Mr. Barnes to discuss the
methods which might be acceptable to reduce the stresses and
at this time Mr. Barnes stated that there were four piling
which had filled with water.  At that time I suggested to Mr.
Barnes that we cease driving piling on the project until some
changes could be made to reduce the possibility of further
cracking and to analyze the piling which indicated cracking.
It was also requested that these four piling which had filled
with water be pumped down as far as possible and observe how
fast the piling would again fill with water.  Mr. Barnes
stated that he would advise the Resident Engineer to stop
the pile driving operation and would investigate the piling.
A teletype was sent to the District confirming our request
as discussed with Mr. Barnes.

On Friday morning September 29, Mr. Barnes called and stated
that the Contractor had changed the cap block cushion material
from micarta to asbestos and that he only had about nine more
piling to drive before he was out of piling and questioned if
it would be satisfactory to drive these nine piling since the
Contractor had changed cushion block material.  A change from
micarta to asbestos cap block material appreciably reduces the
stresses and Mr. Barnes was advised that it would be satisfactory
to drive the additional nine piling.  He stated at that time
that the four piling in question had been pumped down 17 feet
and that they were observing the piling and would report back
later in the day.

TXDOT004281

Texas Highway Department
Form 433-D

# INTEROFFICE MEMORANDUM

TO:        D-5 Files                                     Date   October 18, 197

FROM:    Clarence R. Rea                            Responsible

SUBJECT:                    **-3-**                   Desk _____D-5_____

About 4:30 PM on Friday, September 29, Mr. Barnes called and
stated that they had observed the water in the four piling and
that one pile had not made any water, one pile had made about
5/10 foot of water, one about 6/10 foot of water and the fourth
one had regained about one foot of water.  This is an approxi-
mate 7-hour period.  I discussed with Mr. Barnes my coming to
the project so that firsthand observations of the driving
characteristics of the piling could be observed and that an
analysis of the change in cushion block material might be made.
Mr. Barnes stated that this seemed to be a very good idea and
it was arranged that I would be in the District office on
Monday morning, October 2.

Upon arrival at the District Office, Mr. Barnes and I dis-
cussed, at length, the various analyses that had been made
by this office with respect to driving stresses, various
changes in cushion block materials (both upper and lower
cushion blocks) and what should be done about the problem.
We then went to San Benito and met Mr. G. G. Garcia, Super-
vising Resident Engineer for this project and again held
detailed discussions of this matter.

The three of us went to the project, arriving shortly after
1:00 and observed the driving of several piling.  We also
requested the Contractor to break down the cap blocks and
see what condition the asbestos was in.  This was done and
the upper cap block material ~~(asbestos)~~ which had been changed
to asbestos, was in very good condition.  The Contractor stated
that he had driven approximately 17 piling without changing
the material.  The top 1/4 inch layer of asbestos appeared to
be deteriorating, however, all the other 1/4 inch thicknesses
seemed to be in good condition.  This one thickness was changed
and the cap block reassembled.  The Contractor was then asked
to put a 10 inch green oak cushion block in the lower level
and drive a piling so that we could observe.  This was done.

TXDOT004282

Texas Highway Department
Form 433-B

## INTEROFFICE MEMORANDUM

47407—1253—50m

**TO:**      D-5 Files                                    Date    October 18, 1972

**FROM:**    Clarence R. Rea                             Responsible

**SUBJECT:**                      **-4-**               Desk _____ D-5 _____

One of the first things that I noted, when I started watching
the pile driving operation, was that there did not appear to
be any driving at less than 7 to 10 blows per foot. This was,
of course, after the micarta was changed to asbestos in the
cap block. There did not appear, to any of the observers, to
be any appreciable difference in the blow count per foot be-
tween the 6 inch green oak cushion block and the 10 inch
green oak cushion block, leading me to come to the conclusion
that with the change in the upper cushion block material, and
by driving the first pile in each bent with a 10 inch cushion
block and reading this pile as a test pile, there might be a
minimum blow count below which, if the driving did not reach
on the test pile it would perhaps be satisfactory to drive the
other piling with the 6 inch cushion block, depending of course
on the use of asbestos in the upper block at all times. A
further experiment was made with the cooperation of the Con-
tractor to see if throttling down the pile driving hammer was
feasible. It was found that by cutting back from the usual
60 strokes a minute to about 40 to 45 strokes per minute an
approximate two foot drop of the hammer could be made.

It was discussed at that time that:

1. First pile in each bent would be driven as a test pile
   with a 10 inch cushion block.

2. If no blow count of less than 8 blows per foot (final
   number to be established later) than the rest of the
   piling in that bent could be driven with a six inch
   cushion block (bents 53 thru 74 only).

3. If, when driving the additional piling with the six
   inch cushion block, a low blow count was determined
   then the hammer would be throttled down to the two
   foot block until the blow count built up again.

TXDOT004283

## INTEROFFICE MEMORANDUM

TO:      D-5 Files

**FROM:**    Clarence R. Rea

**SUBJECT:**                 **-5-**

Date   October 18, 1972

Responsible

Desk ........... D-5 ...........

We further discussed the piling that showed cracking and that had filled with water and it had been recommended that the Contractor be advised that he should establish to our satisfaction if the piling was an acceptable piling or would need to be replaced. Several methods of observing the piling was discussed including the pumping out of the water with a submersible sump pump or bailing out the water with a water well bailer. There was some discussion as to the responsibility for the cracked piling due to the timing of our alerting District personnel as to the requirements for changing cushion block material.

Since there are many things that might have caused cracking or breakage of the pile, it is my belief that these piling are the Contractor's responsibility to prove structurally adequate prior to our acceptance.

CRR:nh

cc: District 21
      D-6

TXDOT004284

Form FHWA 121 (6/79)

**DEPARTMENT OF TRANSPORTATION**
**FEDERAL HIGHWAY ADMINISTRATION**

UNITED STATES GOVERNMENT

# memorandum

Subject: Motorist Warning System on Bridges
Subject to Ship Collisions

Date: DEC 8 1980

From: Chief, Bridge Division
Office of Engineering
Washington, D.C. 20590

Reply to
Attn. of: HNG-31

To: Regional Federal Highway Administrators
Regions 1 - 10

Several bridge failures involving the collapse of a bridge span have
occurred in the recent past as a result of the collision of a ship with
the bridge. In the immediate aftermath of such an accident, the potential
exists for drivers to be unaware of the danger and to drive off the
damaged bridge before warning devices and barricades can be installed.
This hazard is compounded by the fact that such accidents are likely to
occur at night or in periods of poor visibility.

The Department of Transportation has been evaluating the various factors
involved in ship-bridge collisions in an effort to find ways to reduce
the severity and occurrence of such accidents. While this type of
catastrophic failure is not too common, enough accidents do occur to
warrant consideration of the need for motorist warning systems on bridges
subject to ship collisions.

At this time, the most practical warning device is considered to be some
type of electrical conductor attached to or a part of the bridge which
will activate warning systems and/or gates when the continuity is
disrupted (span collapse).

While the use of such a system is simple in concept, there are a number
of design considerations (sources of power, need for gates, signals,
lights, signs, etc.) to be taken into account. The design and location
of warning mechanisms becomes more complex for bridges susceptible to
collision over a considerable number of spans. Thus, the warning system
must be designed to fit the type of structure, the approaches, and other
specific conditions existing at each bridge site.

A Technical Advisory is under development to provide some general guidance
on design concepts for installing warning systems on bridges. We
anticipate that it will be ready for distribution by the spring of 1981.

Federal funds may be used to construct warning systems on existing bridges and on new construction when approved by the Division Administrator. The type of funds used (including Interstate funds) should be consistent with the Federal-aid system on which the bridge is located. The warrants for such systems should be based on an assessment of the risks and consequences of a ship-bridge collision, taking into consideration (1) the type and frequency of shipping on the waterway; (2) the location and arrangement of the bridge piers in relation to the navigable channel and the resulting vulnerability of the piers to ship collisions; (3) other factors (fog, channel geometrics, wind, river currents, etc.) which may create navigational problems in the vicinity of the bridge; and (4) volume of highway traffic using the bridge.

Stanley Gordon

Federal Highway Administration
HNG-31:SDavis:war:12-8-80
cc: Files (1)     3111
      Reader file  3208, 3113, 3111

Pier Protection and Warning Systems for
Bridges Subject to Ship Collisions

## Background

The increase in the occurrence of ship-bridge collisions during
the past 10 years warrants additional emphasis on the need to
consider protection for bridge piers as well as the installation
of warning systems to alert motorists in the event of a span
collapse. The purpose of this directive is to provide guidance on
these subjects to the Federal Highway Administration's (FHWA) field
offices and to State and local agencies involved with Federal-aid
highway projects which cross navigable waters. This material is
not regulatory, but has been developed to provide additional
support and emphasis for developing appropriate protective and
warning systems.

## Project Development Procedures

The consideration of the potential for ship-bridge collisions
should be addressed in the early stages of project development
so that cost-effective means can be developed for addressing
such hazards. Information from the Coast Guard and the waterway
users regarding (1) the type and frequency of shipping on the
waterway, and (2) special navigational needs or problems con-
cerning the channel in the vicinity of the bridge, can be most
helpful in assessing possible hazards during the location and
design of the bridge piers, and the evaluation of the need for
motorist warning systems.

The warrants for such systems should be based on an assessment of
the risks and consequences of a ship-bridge collision, taking
into consideration: (1) the type and frequency of shipping on the
waterway; (2) the location and arrangement of the bridge piers in
relation to the navigable channel and the resulting vulnerability
of the piers to ship collisions; (3) other factors (fog, channel
geometrics, wind, river currents, etc.) which may create
navigational problems in the vicinity of the bridge; and (4)
volume of highway traffic using the bridge.

## Motorist Warning Systems

Several bridge failures involving the collapse of a bridge span
have occurred in the recent past as a result of the collision of
a ship with the bridge. In the immediate aftermath of such an

accident, the potential exists for drivers to be unaware of the
danger and to drive off the damaged bridge before warning devices
and barricades can be erected. This hazard is compounded by the
fact that such accidents are likely to occur at night or in
periods of poor visibility.

The Department of Transportation has been evaluating the various
factors involved in ship-bridge collisions in an effort to find
ways to reduce the severity and occurrence of such accidents.
While this type of catastrophic failure is not common, enough
accidents do occur to warrant consideration of the need for
motorist warning systems on bridges subject to ship collisions.

At this time, the most practical warning device is an electrical
conductor attached to or a part of the bridge which will activate
warning systems and/or gates when the continuity is disrupted
(span collapse).

While the use of such a system is simple in concept, there are a
number of design considerations (sources of power, need for
gates, signals, lights, signs, etc.) to be taken into account.
The design and location of warning mechanisms becomes more
complex for bridges susceptible to collision over a considerable
number of spans. Thus, the warning system must be designed to
fit the type of structure, the approaches, and other specific
conditions existing at each bridge site.

Appendix A, Alternate Surveillance and Warning Systems for the
Sunshine Skyway Bridge Across Tampa Bay, was prepared for the
Florida Department of Transportation and contains an excellent
comprehensive overview of various factors which should be
considered while assessing the need for a motorist warning
system. Design Category II, Detection, lists a number of laser,
radar, radio and television early warning systems to alert
motorists of an impending collision. In general, these systems
are still experimental and have not as yet been proven to be
reliable for the purpose of providing an early warning to
motorists. Accordingly, it is recommended that requests for such
systems be submitted to Washington Headquarters for review.

Figure 8 of Appendix A has been modified by the addition of a
schematic electrical circuit (Appendix B) in order to illustrate
how an electrical conductor can be installed for purposes of
detecting a span collapse. The continuity circuit (a pair of
conductor wires) and the switch circuits are normally energized.

2

In the event of a span collapse, the switch circuits are de-energized, causing the activation of warning signs, alarms or gates by the local power source.

A source of local power must be available at each end of the bridge in order to activate the respective warning systems, and of course, the switches and warning devices should be located beyond the point where damage to the bridge is expected.

Under some circumstances, it is possible that a ship-bridge collision could cause severe displacement of a portion of the bridge without a span collapse so that the conductor would stretch but not break. For this reason, consideration should be given to designing the conductor with a circuit interrupter (mercury switch, bayonet-type plug, etc.) located at periodic intervals along the bridge so that a severe impact would interrupt the circuit and activate the warning devices (Appendix B).

## Pier Protection

Because of the tremendous momentum achieved by modern ocean-going vessels even while traveling at low speeds in inland channels, it may be extremely difficult to retrofit some existing bridge piers with protective systems which can successfully withstand the anticipated impact loadings. For this reason, it becomes particularly important to recognize the potential hazards from ship collisions and to locate and design piers on new bridges in such a way that the risks of collision are reduced to an acceptable level.

At this time, FHWA is exploring with the American Association of State Highway and Transportation Officials the feasibility of developing standards for the location and protection of bridge piers in navigable waterways. As a result of a research study commissioned by the Coast Guard, a computer program to analyze impact loadings on piers and protection systems has been developed and is fully operational. This program provides a structural evaluation of the effectiveness of bridge pier protective systems for any selected vessel size, speed and angle of attack. Details of this computer program and further guidance of pier protective systems can be obtained from the Bridge Division.

3

FHWA TECHNICAL ADVISORY T 5140.15
February 11, 1983
ATTACHMENT

## References

1.  **Pier Protection System for Sunshine Skyway Bridge (Interstate 275 and U.S. Highway 19) Hillsborough, Manatee and Pinellas Counties Florida**, U.S. Department of Transportation (Federal Highway Administration and U.S. Coast Guard) and the Florida Department of Transportation, December 10, 1982.

2.  **Motorist Warning System on Bridges Subject to Ship Collisions** - Federal Highway Administration Washington Headquarters memorandum from Mr. Stanley Gordon, Chief, Bridge Division to Regional Federal Highway Administrators dated December 8, 1980.

3.  **USCG/FHWA Procedures for Handling Projects which Require a USCG Bridge Permit** - FHWA Washington Headquarters memorandum from Mr. David K. Phillips, Director, Office of Engineering and Mr. Leon N. Larson, Director, Office of Environmental Policy to Regional Federal Highway Administrator dated October 25, 1982.

4

ALTERNATIVE SURVEILLANCE
AND WARNING SYSTEMS
FOR THE

SUNSHINE SKYWAY BRIDGE

ACROSS
TAMPA BAY

STATE TRAFFIC OPERATIONS OFFICE
FLORIDA DEPARTMENT OF TRANSPORTATION
DECEMBER, 1980

REVISED 1/27/81

## INTRODUCTION

The occurrence of a catastrophy such as the one that took place when the ship Summit Venture collided with the Sunshine Skyway Bridge on May 9, 1980, is very difficult, if not impossible, to predict. In most cases the possibility of such an occurrence is so remote that it is not considered in the design of structures such as the Sunshine Skyway Bridge. However, when such an accident does occur, attention is sharply focused on the prevention of accidents of this nature.

The purpose of this report is to document the results of a study conducted to identify alternative systems which could be installed on the Sunshine Skyway Bridge to provide detection of catastrophic failures of the bridge and warning motorists of such events. Systems which warn motorists of inclement weather conditions on the bridge such as fog or high winds were also included in this study.

## SURVEILLANCE AND WARNING SYSTEMS - SYSTEM ELEMENTS

Three basic categories for design were selected prior to the development of alternative surveillance and warning systems. System elements were identified for each category. Listed below are the three design categories and the system elements contained in each. Short descriptive paragraphs and advantages and disadvantages follow each system element.

## I. DESIGN CATEGORY - PREVENTION

### A. System Element - Pier Markings

Amber lights are installed on each pier which supports the structural steel elements of the bridge. The amber lights outline the path of the channel beneath the bridge and identify the most critical piers closest to the channel. See Figure 1.

| Advantages | Disadvantages |
|---|---|
| • Provide positive guidance | • Energy consumption |
| | • Maintenance |
| | • Limited visibility conditions hamper effectiveness |

### B. System Element - Subsurface Attenuation Devices

Subsurface attenuation devices such as dredge material, junked vehicles, etc., are placed parallel to the edge of the channel at a depth so as not to interfere with non-channel restricted waterway traffic. Off course ships are slowed or stopped when they impact the subsurface attenuation device. See Figure 2.

| Advantages | Disadvantages |
|---|---|
| • Low probability of impact | • Cost |
| • Reduces damage when impacted | • Environmental constraints |
| • Not affected by environmental conditions | • Maintenance |

1



AMBER LIGHT

PIER



FIGURE 1. PIER MARKINGS FOR SUNSHINE SKYWAY BRIDGE

2



FIGURE 2.  SUBSURFACE ATTENUATION DEVICES FOR SUNSHINE SKYWAY BRIDGE

FHWA TECHNICAL ADVISORY T 5140.19
February 11, 1983
ATTACHMENT - APPENDIX A

C.  System Element - Fender System

An extensive fender system is constructed along each side of the
channel.  The fender system outlines the path of the channel
beneath the bridge and slows or stops off course ships.  See
Figure 3.

| Advantages | Disadvantages |
|---|---|
| • Positive guidance | • Maintenance |
| • Reduces damage when impacted | • Environmental constraints |
| • Not affected by environmental conditions | • Cost |

II.  DESIGN CATEGORY - DETECTION

Probabilistic Determination

A.  System Element - Ship Channel Surveillance (Laser)

A laser beam is projected along the edge of the ship channel at a
height so as to be affected by larger vessels only.  When the laser
beam is disrupted, an off course ship and possible collision with
the bridge is indicated.  See Figure 4.

| Advantages | Disadvantages |
|---|---|
| • Early warning of erratic ship manuevers | • Cost |
| • Operator not required | • Maintenance |
|  | • Environmental constraints |
|  | • Verification |
|  | • False detections |

B.  System Element - Radar System

A ground level radar system similar to those used in airports is
installed near the bridge.  An operator is able to track ships
and verify their position relative to the channel and bridge.  See
Figure 5.

| Advantages | Disadvantages |
|---|---|
| • Complete tracking of ships | • Cost |
| • Self-verification | • Maintenance |
| • Reliability | • Operator required |
| • Not affected by environmental conditions |  |
| • Early warning of erratic ship manuevers |  |

C.  System Element - Closed Circuit Television

Closed circuit television cameras are located on the bridge and
provide visual surveillance of the ship channel.  The operator and

4



FIGURE 3. FENDER SYSTEM FOR SUNSHINE SKYWAY BRIDGE

FIGURE 4.  LASER SHIP CHANNEL SURVEILLANCE FOR SUNSHINE SKYWAY BRIDGE

FIGURE 5.   RADAR SYSTEM FOR SUNSHINE SKYWAY BRIDGE

7

television monitors are located at one of the toll facilities for the bridge. See Figure 6.

| Advantages | Disadvantages |
|---|---|
| • Early implementation | • Part-time operator required |
| • Self-verification | • Limited visibility conditions hamper effectiveness |
| • Early warning of erratic ship manuevers | |
| • Roadway incident detection | |

D.  System Element - Radio Beam Guidance System

Directional radio beam transmitters are installed on the bridge and aimed toward the center of the channel. A portable radio beam receiver is carried on board by the pilot and the system provides the pilot with information on the ship's position relative to the center of the channel and distance from the bridge. See Figure 7.

| Advantages | Disadvantages |
|---|---|
| • Early warning of erratic ship manuevers | • Cost |
| | • Maintenance |
| | • Environmental constraints |
| | • False detections |

Impact Occurrence

E.  System Element - Bridge Continuity

A conduit containing a pair of conductors is attached to the bridge structure. The pair of conductors are connected to a sensor which monitors electrical continuity of the conductors. A catastrophic failure of the bridge structure would break the continuity of the conductors and the sensor would detect this occurrence. See Figure 8.

| Advantages | Disadvantages |
|---|---|
| • Low cost | • Does not provide time to warn 100% of motorists |
| • Reliability | • Malfunction of system creates severe impact on motorist behavior |
| • Not affected by environmental constraints | |
| • Low maintenance | |
| • No operator required | |
| • Early implementation | |

F.  System Element - Pier Vibration

A vibration sensor is placed on each pier which supports the structural steel elements of the bridge. Pier vibration above a threshold value which would be created by the impact of a ship is detected by the sensor. See Figure 9.

8

FHWA TECHNICAL ADVISORY T 5140.19
February 11, 1983
ATTACHMENT - APPENDIX A



FIGURE 6.   CLOSED CIRCUIT TELEVISION SYSTEM FOR SUNSHINE SKYWAY BRIDGE

9

FHWA TECHNICAL ADVISORY T 5140.19
February 11, 1983
ATTACHMENT - APPENDIX A



RADIO BEAM
TRANSMISSION UNIT

MAXIMUM RADIO BEAM
STRENGTH

NOTE:

RADIO BEAM RECEIVER
CARRIED ON-BOARD SHIP
BY PILOT.

FIGURE 7.  RADIO BEAM GUIDANCE SYSTEM FOR SUNSHINE SKYWAY BRIDGE
10

FIGURE 8.  BRIDGE CONTINUITY SYSTEM FOR SUNSHINE SKYWAY BRIDGE

CONDUIT ATTACHED TO BRIDGE STRUCTURE

CONDUCTOR PAIR (NORMALLY ENERGIZED)

CONDUIT

BRIDGE BEAM

TERMINATION OF CONTINUITY CIRCUIT

11

FHWA TECHNICAL ADVISORY T 5140.19
February 11, 1983
ATTACHMENT - APPENDIX A



FIGURE 9. PIER VIBRATION SYSTEM FOR SUNSHINE SKYWAY BRIDGE

12

| Advantages | Disadvantages |
|---|---|
| • Low cost | • Does not provide time to warn |
| • Early implementation | 100% of motorists |
| • No operator required | • Maintenance |
| • Not affected by environmental | • False detections |
| conditions | |
| • Detection of non-catastrophic | |
| damage | |

G. System Element - Roadway Delineation (Reflectors)

Reflective button markers are attached to the hand rails at a close, uniform spacing. The presence of these markers at night would indicate a continuous structure, their absence would indicate a section of the bridge is missing.

| Advantages | Disadvantages |
|---|---|
| • Low cost | • Low effectiveness |
| • Early implementation | • Limited visibility conditions |
| • No operator required | hamper effectiveness |
| • Low maintenance | • Verification |
| | • Notification |
| | • Does not provide time to warn |
| | 100% of motorists |

H. System Element - Roadway Delineation (Rail Lighting)

Rail lights, which are continuous longitudinal sections of lights for roadway illumination, are attached to the bridge hand rails. The presence of these lights at night would indicate a continuous structure, their absence would indicate a section of the bridge is missing.

| Advantages | Disadvantages |
|---|---|
| • Early implementation | • Does not provide time to warn |
| • No operator required | 100% of motorists |
| • Improves nighttime traffic | • Limited visibility conditions |
| operations | hamper effectiveness |
| | • Limited effectiveness |
| | • Maintenance |
| | • Driver education |

III. DESIGN CATEGORY - WARNING

A. System Element - Passive Signing with Flashers

Passive signs with static messages are installed on the bridge at regular intervals. Both environmental and operational messages are displayed on the signs. These messages are in effect when the flasher is activated. See Figure 10.

| Advantages | Disadvantages |
|---|---|
| • No operator required | • Malfunction of system creates severe |
| | impact on motorist behavior |

13

FHWA TECHNICAL ADVISORY T 5140.19
February 11, 1983
ATTACHMENT - APPENDIX A



FIGURE 10.   PASSIVE SIGNING WITH FLASHER FOR SUNSHINE SKYWAY BRIDGE

FHWA TECHNICAL ADVISORY T 5140.19
February 11, 1983
ATTACHMENT - APPENDIX A

- Low cost
- Low maintenance
- Early implementation

- Not positive control
- Limited visibility conditions hamper effectiveness
- Psychological effects on motorists
- Does not provide time to warn 100% of motorists
- Message not observed by all motorists

B.  System Element - Dynamic Signing

Variable message signs are located over the roadway at regular intervals across the bridge.  Both environmental and operational messages are displayed on the signs in response to operator commands or detection systems.  See Figure 11.

Advantages

- Can be used for other applications
- Good target value
- Early implementation

Disadvantages

- Cost
- Message not observed by all motorists
- Not positive control
- Does not provide time to warn 100% of motorists

C.  System Element - Signals and Gates

Drawbridge type signals and gates are located on the bridge at several locations prior to the main span structure.  Signals and gates are activated by detection systems.  See Figure 12.

Advantages

- Positive control
- No operator required
- Early implementation

Disadvantages

- Psychological effects on motorists
- Maintenance

D.  System Element - Lane Control Signs

Lane control signs are located over each roadway lane at one quarter mile spacings across the high rise section of the bridge. Roadway lanes are closed by changing the lane control sign message from a green arrow to a red "X" on command from a system operator.  See Figure 13.

Advantages

- Can be used for other applications

Disadvantages

- Not positive control
- Maintenance
- Message not observed by all motorists
- Does not provide time to warn 100% of motorists

15

FHWA TECHNICAL ADVISORY T 5140.19
February 11, 1983
ATTACHMENT - APPENDIX A



FIGURE 11. DYNAMIC SIGNING FOR SUNSHINE SKYWAY BRIDGE

16

Case 1:01-cv-00157    Document 289-7    Filed in TXSD on 11/15/2004    Page 157 of 171



FHWA TECHNICAL ADVISORY T 5140.19
February 11, 1983
ATTACHMENT - APPENDIX A

FIGURE 12.   SIGNALS AND GATES FOR SUNSHINE SKYWAY BRIDGE

FHWA TECHNICAL ADVISORY T 5140.19
February 11, 1983
ATTACHMENT - APPENDIX A



FIGURE 13.  LANE CONTROL SIGNS ON SUNSHINE SKYWAY BRIDGE

FHWA TECHNICAL ADVISORY T 5140.19
February 11, 1983
ATTACHMENT - APPENDIX A

E.  System Element - Audible Alarm and Signs

Audible alarms are installed integral to the operation of the passive signs with flashers (Figure 10) or dynamic signs (Figure 11).  See Figure 14.

Advantages

- Low cost
- Early implementation
- No operator required

Disadvantages

- Malfunction of system creates severe impace on motorist behavior
- Message not observed by all motorists

F.  System Element - Citizen Band Radio

A citizen band radio base station is located in the toll facility. An operator reports condition on the bridge over CB channel 9.  See Figure 15.

Advantages

- Low cost
- Greater coverage area

Disadvantages

- False calls
- Message not observed by all motorists
- Not reliable
- Does not provide time to warn 100% of motorists

G.  System Element - Traffic Signals

Pedestal mounted traffic signals (red and amber sections only) are located on both sides of the roadway at one quarter mile spacings across the high rise section of the bridge.  Warnings (flashing amber) or bridge closure (steady red) are indicated on the traffic signal by operator command or input from detection systems.  See Figure 16.

Advantages

- Recognized roadway control
- Early implementation

Disadvantages

- Energy
- Not positive control
- Maintenance

ALTERNATIVE SURVEILLANCE AND WARNING SYSTEMS - DEVELOPMENT AND SELECTION

By combining various prevention, detection and warning devices presented in preceding sections of this report, ten alternative surveillance systems were developed.  Each system element in the alternatives is listed in Table 1. The overall system cost and complexity increases as the alternative number increases.  To achieve adequate system effectiveness; however, the surveillance system must be moderately complex, and the system cost is therefore relatively high.

Listed in Table 2 are eight surveillance system goals and numerical goal weights developed to quantitatively evaluate the alternative surveillance

FHWA TECHNICAL ADVISORY T 5140.19
February 11, 1983
ATTACHMENT - APPENDIX A

systems.  The technique used involved the appraisal of intangible system
benefits by numerically weighting goal achievements.  For example, alternative
system nine employs the use of a fender system which is considered to be an
excellent positive guidance system for ships; therefore, a value of twenty-
four out of a possible twenty-five was assigned to the first system goal for
system nine.  Performance values assigned to each goal were then totalled.
Alternative systems six, seven, eight and nine had total goal achievement
values of 64 or higher.  The prevention, detection and warning techniques used
in these four surveillance systems are considered to be the best choice for
implementation on the Sunshine Skyway Bridge.



FIGURE 24. AUDIBLE ALARM AND PASSIVE SIGNS WITH FLASHERS FOR SUNSHINE SKYWAY BRIDGE

21

FHWA TECHNICAL ADVISORY T 5140.19
February 11, 1983
ATTACHMENT - APPENDIX A



FIGURE 15.  CITIZEN BAND RADIO FOR SUNSHINE SKYWAY BRIDGE

22

FHWA TECHNICAL ADVISORY T 5140.19
February 11, 1983
ATTACHMENT - APPENDIX A



FIGURE 16. TRAFFIC SIGNALS ON SUNSHINE SKYWAY BRIDGE

FHWA TECHNICAL ADVISORY T 5140.19
February 11, 1983
ATTACHMENT : APPENDIX A

| | ALTERNATIVE 1 | ALTERNATIVE 2 | ALTERNATIVE 3 | ALTERNATIVE 4 | ALTERNATIVE 5 | ALTERNATIVE 6 | ALTERNATIVE 7 | ALTERNATIVE 8 | ALTERNATIVE 9 | ALTERNATIVE 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| **PREVENTION** | | | | | | | | | | |
| Pier Markings | X | X | X | X | X | X | X | X | | X |
| Attenuators | | | | | | | | | X | |
| Fender System | | | | | | | | | | |
| | | | | | | | | | | |
| **DETECTION (PROBABILISTIC)** | | | | | | | | | | |
| Laser System | | | | | X | X | X | X | X | |
| Radar System | | | | | | | | | | |
| CCTV | | | | | | | | X | X | |
| Radio Beam | | | | | | X | X | X | | |
| Weather Instruments | X | X | X | X | X | X | X | X | X | X |
| | | | | | | | | | | |
| **DETECTION (IMPACT OCCURRENCE)** | | | | | | | | | | |
| Bridge Continuity | X | | X | | | | | | | |
| Pier Vibration | | X | X | X | X | X | X | X | | |
| Delineation (Reflectors) | X | X | X | | X | | | | | |
| Delineation (Offset-Spot Rail Lighting) | | | | | X | | X | X | X | |
| | | | | | | | | | | |
| **WARNING** | | | | | | | | | | |
| Passive Signing & Flashers | X | X | | | | | | | | |
| Dynamic Signing | | | X | X | X | X | X | X | X | X |
| Gates | | | | | | X | X | X | X | |
| Lane Control Signs | | | | | | X | | | | |
| Audible Alarm & Signs | | | | | | | | | | |
| C.B. Radio | | | | | | | | | | |
| Traffic Signals | | | | | X | | X | X | X | |

TABLE 1
ALTERNATIVE SYSTEMS DEVELOPMENT
SURVEILLANCE AND WARNING SYSTEM
FOR SUNSHINE SKYWAY BRIDGE

TECHNICAL ADVISORY
February 11, 1983
ATTACHMENT - APPENDIX A

| SYSTEM GOALS | GOAL WEIGHT | ALTERNATIVE SYSTEM 1 | ALTERNATIVE SYSTEM 2 | ALTERNATIVE SYSTEM 3 | ALTERNATIVE SYSTEM 4 | ALTERNATIVE SYSTEM 5 | ALTERNATIVE SYSTEM 6 | ALTERNATIVE SYSTEM 7 | ALTERNATIVE SYSTEM 8 | ALTERNATIVE SYSTEM 9 | ALTERNATIVE SYSTEM 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. POSITIVE GUIDANCE TO SHIPS | 25 | 5 | 5 | 5 | 5 | 10 | 22 | 22 | 22 | 24 | 0 |
| 2. POSITIVE BRIDGE PROTECTION | 20 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10 | 18 |
| 3. SYSTEM RELIABILITY | 15 | 1 | 2 | 5 | 5 | 6 | 10 | 10 | 14 | 14 | 14 |
| 4. WARNING CONVEYED TO 100% OF MOTORISTS | 15 | 0 | 0 | 0 | 0 | 12 | 14 | 14 | 14 | 14 | 14 |
| 5. POSITIVE VEHICLE TRAFFIC CONTROL | 10 | 2 | 2 | 4 | 4 | 6 | 9 | 9 | 9 | 9 | 4 |
| 6. POSITIVE GUIDANCE TO MOTORISTS | 5 | 2 | 2 | 2 | 4 | 2 | 4 | 4 | 4 | 0 | 0 |
| 7. MINIMAL MAINTENANCE & OPERATION COSTS | 5 | 4 | 4 | 4 | 3 | 2 | 1 | 1 | 0 | 0 | 4 |
| 8. IMPROVEMENTS IN ROADWAY OPERATIONS | 5 | 1 | 1 | 3 | 4 | 3 | 5 | 4 | 4 | 3 | 3 |
| TOTAL | 100 | 15 | 16 | 23 | 25 | 41 | 65 | 64 | 67 | 74 | 57 |

TABLE 2
ALTERNATIVE SYSTEMS
GOAL ACHIEVEMENT CHART

25

FHWA TECHNICAL ADVISORY T 5140.19
February 11, 1983
ATTACHMENT - APPENDIX A

## CONCLUSIONS AND RECOMMENDATIONS

Based on the results of this study, it is recommended that Alternative Systems 6, 7, 8 and 9 be evaluated in detail to determine which system would be the most cost effective for installation on the Sunshine Skyway Bridge. System 6 is estimated to be the least costly system and System 8 is the most expensive.

Functionally, Systems 6, 7, and 8 are basically the same, with the differences being in the maintenance, operation and initial costs of these systems.

Installation of a surveillance and warning system could take place during reconstruction of the Skyway Bridge. However, with the present two-way traffic conditions on the remaining bridge, consideration should be given to early implementation of the system on this existing section.

FIGURE 8.  BRIDGE CONTINUITY SYSTEM FOR SUNSHINE SKYWAY BRIDGE

# Memorandum

**Attachment G-11**

U.S. Department
of Transportation

Federal Highway
Administration

| | |
|---|---|
| Subject: | Bridge Inspection Program - Inspection of Bridge Piers and Fendering Systems |
| From: | Chief, Bridge Division Office of Engineering Washington, D.C. 20590 |
| To: | Regional Federal Highway Administrators Regions 1-10 |

Date: OCT 30 1984

Reply to
Attn. of:    HNG-33

Many bridges spanning navigable waters are susceptable to damage from water traffic. A ship impact with an unshielded or inadequately protected supporting pier could cause the bridge to collapse with possible tragic consequences.

Pier protection systems are used at most bridges where collision may occur. The ongoing bridge inspection programs by the States should include the inspection of bridge piers and fendering systems. The inspection of pier protection systems is described in Section 25, Dolphins and Fenders, of the Bridge Inspector's Training Manual 70.

Two other specific references for pier protection systems are:

1. FHWA Technical Advisory T5140.19 dated 2/11/83
   "Pier Protection and Warning Systems for Bridges
   Subject to Ship Collision."

2. "Ship Collisions with Bridges - The Nature of the
   Accidents, Their Prevention and Mitigation," by the
   Committee on Ship Bridge Collisions National Research
   Council.

A limited number of copies of the National Research Council publication is available from the Hydraulics Branch.

The structural integrity of these protection systems must be maintained. Therefore, each FHWA field office is requested to evaluate and emphasize the State inspection procedures for bridges over navigable waters. The evaluation should assure that the State inspection continues to include an assessment and evaluation of bridge piers and fendering systems for structural integrity. If there are any questions, please contact the Design and Inspection Branch.

Stanley Gordon

# Memorandum

Attachment G-12

**U.S. Department of Transportation**

**Federal Highway Administration**

| | |
|---|---|
| Date | NOV 15 1995 |

Subject: **ACTION:** National Transportation Safety Board Recommendations

Reply to Attn of: HNG-33

From: Director, Office of Engineering

To: Regional Federal Highway Administrators
Federal Lands Highway Program Administrator

The National Transportation Safety Board (NTSB) conducted an investigation of an accident on September 22, 1993, when barges that were being pushed by the towboat MAUVILLA struck and displaced the Big Bayou Canot railroad bridge near Mobile, Alabama. Shortly thereafter, National Railroad Passenger Corporation (Amtrak) train 2, the Sunset Limited, enroute from Los Angeles, California, to Miami, Florida, with 220 persons on board, struck the displaced bridge and derailed. Forty-two passengers and five crew members were killed, and 103 passengers were injured.

As a result of this catastrophic incident, the NTSB made the following recommendations to Secretary Federico Peña:

1. Convene an intermodal task force that includes the Coast Guard, the Federal Railroad Administration, the Federal Highway Administration, and the U.S. Army Corps of Engineers to develop a standard methodology for determining the vulnerability of the Nation's highway and railroad bridges to collisions from marine vessels, to formulate a ranking system for identifying bridges at greatest risk, and to provide guidance on the effectiveness and appropriateness of protective measures.

2. Require that the Federal Railroad Administration and the Federal Highway Administration, for their respective modes, use the methodology developed by the intermodal task force to carry out a national risk assessment program for the Nation's railroad and highway bridges.

3. Require the modal operating administrations to develop and disseminate bulletins, notices, circulars, and other documents that call attention to the need for an employee reporting procedure concerning use of medication (over-the-counter and prescription) while on duty and that urge the transportation industry to develop and implement informational and educational programs related to this subject.

2

4.  Consider the use of RACONS, radar detectors, and other devices to make bridges more identifiable on radar.

The Office of the Secretary has provided an initial response to each of the NTSB's recommendations. Recommendation 4 has been satisfactorily closed, whereas Recommendations 1, 2, and 3 remain open. The open recommendations concerning the development and use of a risk assessment methodology and the employee use of medication while on duty require action by FHWA at this time.

We share the NTSB's concern regarding the serious consequences resulting from marine vessel collisions with highway bridges. However, the FHWA believes the States currently have available for use the needed guidance for the performance of the recommended risk assessment. This guidance is contained in the American Association of State Highway and Transportation Officials' (AASHTO) publication entitled "Guide Specification and Commentary for Vessel Collision Design of Highway Bridges, February 1991."

The AASHTO guide specification provides the basic framework and guidance for the States to appropriately determine the vulnerability of the Nation's highway bridges to collisions from marine vessels, to formulate a ranking system for identifying bridges at greatest risk, and to evaluate the appropriateness of protective measures. It enables bridge engineers to assess the risk of vessel collisions with a bridge, calculate the costs of probable collisions, develop plans to minimize the risk of collision, and develop designs to protect the bridge and its motorists in the event of a collision.

The FHWA has developed a National Highway Institute (NHI) training course, NHI Course Number 13060 "Vessel Collision Design of Highway Bridges," to acquaint bridge engineers with the background and overall approach of the AASHTO guide specification, and to train them in the detailed application of the specification through the use of a typical design example. Upon the satisfactory completion of this NHI course, participants are able to appropriately use the AASHTO guide specification to design new bridges and evaluate existing bridges crossing navigable waterways which are subject to collision by marine vessel.

In addition to the AASHTO guide specification, the States also have available guidance provided in the National Research Council's publication entitled "Ship Collisions With Bridges: The Nature of the Accidents, Their Prevention, and Mitigation, 1983." This publication presents the results of a study of 133 bridge crossings of navigable waterways. The study examined the risks and consequences of ship collisions with bridges spanning navigable coastal waters, and considerations important to the understanding of these accidents, the interaction of ships and waterways, and measures that can be taken to prevent ship-bridge collisions and to reduce their consequences.

The NTSB's Recommendation 1 also addresses evaluating the effectiveness and appropriateness of marine vessel-bridge collision protective measures. This particular issue relates to our December 8, 1980, memorandum (copy attached) that provided information concerning motorist warning systems on bridges subject to ship collisions. As indicated in the memorandum, Federal funds can

be used to install motorist warning systems on existing bridges or on new construction. Please note that the warrants for the installation of such a system should be based on an assessment of the risks and consequences of a ship-bridge collision.

In response to the NTSB's Recommendations 1 and 2, please request the divisions to alert the States of the potential hazard of marine vessel collisions with highway bridges and urge them to assess the hazard of such accidents using the available AASHTO and other appropriate guidance. The priority of mitigative actions may then be determined by each State through its bridge management process. In addition, the States should be made aware of the availability of NHI Course Number 13060 and be encouraged to schedule presentations as appropriate.

The Office of the Secretary in response to NTSB Recommendation 3 has developed the following statement to be used by all of the modal administrations:

> The U.S. Department of Transportation (DOT) reminds all transportation industries of the potential threat to public safety caused by the on-duty use of some over-the-counter and prescription medications by persons performing safety-sensitive duties. As a result, we strongly urge all transportation industry employers to include in their employee training materials appropriate information to address this issue. We also encourage employers to reiterate with their employees the need to report use of such medications when required by applicable DOT rules or by company policies.

Please ensure that the States within your region are also aware of this DOT statement regarding the on-duty use of medications by persons performing safety-sensitive duties.

If there are any questions concerning the above, please contact the Bridge Management Branch at (202)366-4617.

William A. Weseman

Attachment

FEDERAL HIGHWAY ADMINISTRATION
HNG-33:CCHAMBERS:ldw:64618:11-6-95
REVISED:ldw:11-9-95
REVISED:ldw:11-14-95
cc:  Mr. Weseman   HNG-1
     Mr. Wood      HNG-33
     Mr. Mihalek   HNG-33
     Mr. Ernst     HNG-33
     L. Lawrence   P-13
     Readers   3203/3212
     Chron  HNG-33/BMB
OFFICIAL FILE  HNG-33