**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | |
|---|---|
| **IN RE THE COMPLAINT AND PETITION OF BROWN WATER TOWING I, INC., AS OWNER, AND BROWN WATER MARINE SERVICE, INC., AS BAREBOAT CHARTERER OF THE BROWN WATER V, ITS ENGINES, TACKLE, ETC., IN A CAUSE OF EXONERATION FROM OR LIMITATION OF LIABILITY** | **C. A. NO. B-01-157** Admiralty <br><br><br><br><br> **Consolidated with** |
| **IN RE THE COMPLAINT AND PETITION OF AMERICAN COMMERCIAL LINES, LLC AS OWNER, AND AMERICAN COMMERCIAL BARGE LINES, LLC AS CHARTERER OF THE BARGES NM-315, VLB-9182, ACL-9933B, VLB-9173, IN A CAUSE OF EXONERATION FROM OR LIMITATION OF LIABILITY** | **C. A. NO. B-02-004** Admiralty <br><br><br> **Consolidated with** |
| **IN RE THE COMPLAINT AND PETITION OF DEERE CREDIT, INC., (FORMERLY SENSTAR FINANCE COMPANY), AS OWNER OF THE BARGE NM-315, AND STATE STREET BANK AND TRUST COMPANY OF CONNECTICUT, NATIONAL ASSOCIATION, AS OWNER TRUSTEE OF THE BARGE ACL-9933B AND NOT IN ITS INDIVIDUAL CAPACITY, AND GENERAL ELECTRIC CAPITAL CORPORATION, AS BENEFICIAL OWNER OF THE BARGE ACL-9933B, PRAYING FOR EXONERATION FROM AND/OR LIMITATION OF LIABILITY** | **C. A. NO. B-02-125** Admiralty |

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
OF AMERICAN COMMERCIAL BARGE LINE LLC**

## MAY IT PLEASE THE COURT:

# TABLE OF CONTENTS

**Page**

TABLE OF CITATIONS ..................................................................................... ii

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING ...................... v

STATEMENT OF ISSUES TO BE RULED UPON BY THE COURT AND SUMMARY
OF ARGUMENT ................................................................................................ 1

    I.    BACKGROUND FACTS ................................................................. 6

    II.   THE TOWAGE IN QUESTION. .................................................. 14

    III.  LAW AND ARGUMENT FOR EXONERATION OF ACBL ......................... 18

        A.    Dominant Mind Doctrine Exonerates Innocent Tow .......................... 18

        B.    Legal Duties Owned by Tug and Tow ................................................... 19

        C.    Independent Contractor Defense ......................................................... 20

        D.    ACBL Was Not Negligent in Contracting with Brown Water ........... 21

CONCLUSION ................................................................................................. 25

## TABLE OF CITATIONS

<u>**Page**</u>

### *Cases*

<u>Agrico Chemical Co. v. M/V BEN W. MARTIN,</u>
  664 F. 2d 85 (5th Cir. 1981), <u>reh. denied</u>, 669 F. 2d 733 (5th Cir. 1982)...................................... 4

<u>Alter Co. v. M/V MISS SUE,</u>
  536 F. Supp. 313 (E.D. La. 1982) ......................................................................................... 18, 19

<u>Anderson v. Liberty Lobby, Inc,</u>
  477 U.S. 242, 106 S. Ct. 2505 (1986) ......................................................................................... 4

<u>Bartholomew v. CNG Producing Co.,</u>
  832 F. 2d 326 (5th Cir. 1987) ............................................................................................... 5, 20

<u>Celotex Corp. v. Catrett,</u>
  477 U.S. 317, 106 S. Ct. 2548 (1986)...................................................................................... 3, 4

<u>Ellison v. Conoco, Inc.,</u>
  950 F. 2d 1196 (5th Cir. 1992), <u>cert. denied</u>, 509 U.S. 907 (1993)........................................... 21

<u>Hart v. Blakemore,</u>
  410 F.2d 218 (5th Cir. 1969) ................................................................................................... 20

<u>In Re Caribbean Sea Transport, Ltd.,</u>
  748 F. 2d 622 (11th Cir.), <u>amended on other grounds</u>, 753 F. 2d 948 (11th Cir. 1985)............. 3

<u>In Re: Central Gulf Lines, Inc.,</u>
  176 F. Supp. 2d 599 (E.D. La. 2001), <u>aff'd</u>, 62 Fed. Appx. 557 (Table),
  2003 WL 1202793 (5th Cir. No. 01-31028, 03/03/03).................................................. 5, 23, 24

<u>In re: Kristie Leigh Enterprises, Inc.,</u>
  76 F. 3d 497 (5th Cir. 1996)...................................................................................................23

<u>Kenny Marine Towing, Inc. v. M/V JOHN R. RICE,</u>
  583 F. Supp. 1196 (E.D. La. 1984) ........................................................................................... 20

<u>Lewis v. Lewis & Clark Marine, Inc.,</u>
  531 U.S. 438, 121 S. Ct. 993 (2001)....................................................................................... 2, 3

<u>Naptha Barge Co. v. Continental Navigation Co.,</u>
  1978 AMC 501 (E.D. La. 1977) ............................................................................................... 19

{N1220257.1}

Naviera Tabago S.A. v. Sprigg Carroll,
    394 F. Supp. 1354 (S.D. Fla. 1975) ............................................................................ 20

Ryan Walsh Stevedoring Co. v. James Marine Service, Inc.,
    557 F. Supp. 457 (E.D. La. 1983), aff'd, 729 F.2d 1457 (5th Cir.),
    cert. denied, 469 U.S. 981 (1984) ............................................................................ 19

Singer v. Dorr,
    272 F. Supp. 931 (E.D. La. 1967) ............................................................................ 20

Stevens v. THE WHITE CITY,
    285 U.S. 195, 52 S. Ct. 347 (1932) ............................................................................ 4

Sturgis v. Boyer,
    65 U.S. (24 How.) 110, 16 L. Ed. 591 (1860) ............................................................ 18

THE EUGENE F. MORAN,
    212 U.S. 466, 29 S. Ct. 339, 53 L. Ed. 600 (1909) .................................................... 18

The Quickstep,
    9 Wall. 665, 76 U.S. 665, 19 L. Ed. 767 .................................................................. 19

The Vulcan,
    60 F. Supp. 158 (E.D. La. 1945) .............................................................................. 19

Tittle v. Aldacosta,
    544 F. 2d 752 (5th Cir.), reh. denied, 546 F. 2d 907 (5th Cir. 1977) ......................... 3

W. Horace Williams Co. v. The WAKULLA,
    109 F. Supp 698 (E.D. La. 1953), aff'd, 213 F.2d 27 (5th Cir. 1954) ....................... 19

Wallace v. Oceaneering International, Inc.,
    727 F. 2d 427 (5th Cir. 1984) ...................................................................... 5, 20, 21

**Statutes**

28 U.S.C. § 1333 ....................................................................................................... v, 2

46 U.S.C. app. § 183 ..................................................................................................... v

**Other Authorities**

C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2725 ..................... 4

Parks and Cattell, The Law of Tug, Tow, and Pilotage (3d ed. 1994) ............. 18, 19, 20

T. Schoenbaum, Admiralty and Maritime Law § 10-1 (West 4th ed. 2003) ................. 5

T. Schoenbaum, <u>Admiralty and Maritime Law</u> § 10-6 (West 4th ed. 2003) ............................ 5, 18

***Rules***

33 C.F.R. ................................................................................................................................. 12

46 C.F.R. ................................................................................................................................. 17

Rule 38(e) of the Federal Rules of Civil Procedure ................................................................. 2

Rule 56(c) of the Federal Rules of Civil Procedure ................................................................. 3

Rule 9(h) of the Federal Rules of Civil Procedure ................................................................... 2

Rule F of the Supplemental Rules for Certain Admiralty and Maritime Claims of the
   Federal Rules of Civil Procedure ......................................................................................... v, 2

{N1220257.1}

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

These consolidated actions are admiralty and maritime cases pursuant to 28 U.S.C. § 1333,   The Limitation of Liability Act, 46 U.S.C. app. § 183, et seq., and Rule F of the Supplemental Rules for Certain Admiralty and Maritime Claims.   A non-jury trial was set to commence in February, 2005 but was recently continued.   The Court in its Amended Scheduling Order dated December 6, 2004 ordered that dispositive motions be filed by all parties, other than Cameron County, pursuant to deadlines referenced in the Scheduling Order of April 12, 2004. The date for filing dispositive motions, such as this motion for summary judgment, is December 15, 2004.

{N1220257.1}

## STATEMENT OF ISSUES TO BE RULED UPON BY THE COURT AND
## SUMMARY OF ARGUMENT

This case arises out of the September 15, 2001 collision (or allision) that occurred between the lead barge of a four barge tow, consisting of the VLB-9182, VLB-9173, NM-315 and ACL-9933B, being pushed by the M/V BROWN WATER V and the Queen Isabella Causeway.[1] American Commercial Lines LLC ("ACL") is the registered owner of the VLB-9182 and VLB-9173. Certain financial institutions were the registered or beneficial owners and owner trustee of the NM-315 and ACL-9933B. American Commercial Barge Line LLC ("ACBL") was the owner *pro hac vice* and bareboat charterer of the four barges. These four barges were all dumb, unmanned barges, having no motive power of their own, which were being towed by the BROWN WATER V, a tug owned by Brown Water Towing I, Inc. and operated and crewed by Brown Water Marine Service, Inc. (hereafter collectively "Brown Water"), pursuant to a verbal contract of towage between Brown Water and ACBL. Brown Water is an independent towage contractor headquartered in Rockport, Texas which had been in the towing business for over 10 years at the time of the accident and owned and operated 12 tugs. At all material times, ACBL's four barges were under the sole care, custody and control of Brown Water and were seaworthy in all respects. There was no relationship between ACBL and Brown Water other than that of principal and independent contractor. ACBL never exercised operational control over Brown Water.

Brown Water controlled and decided all aspects of the towage of ACBL's barges, including selecting the particular tug to be used to tow the barges, the crewing of the tug, the number of barges to be taken by the tug and their configuration, the building of the tow, when,

---

[1] In the inland towing industry although barges are "pushed" ahead by a tug also called a towboat, they are referred to as being "towed" and the operation is known as "towage." The barges being towed are referred to as the "tow."

where and how the barges were to be towed, and the navigation of the tug and tow. Brown Water was the most experienced tower in the Gulf Intracoastal Waterway ("ICW") between Brownsville and Houston and had the reputation of being a competent tower having safely and reliably performed towage for its many customers in addition to ACBL. Brown Water had safely and reliably towed hundreds of barges for ACBL in the ICW, including the area where the collision occurred.

On September 15, 2001 Brown Water filed a complaint for exoneration from or limitation of liability, C.A. No. B-01-157.  On January 11, 2001 ACBL and ACL filed a complaint for exoneration from or limitation of liability, C.A. No. B-02-004.  On June 10, 2002 the financial institutions filed a complaint for exoneration from or limitation of liability, C.A. No. B-02-125.[2]  These three actions have been consolidated and this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1333 and The Limitation of Liability Act, 46 U.S.C. app. § 183 since these matters arise out of a maritime casualty that occurred on the navigable waters of the United States.  These actions have been designated as admiralty and maritime claims pursuant to Rule 9(h) of the Federal Rules of Civil Procedure.  Pursuant to Rule 38(e) of the Federal Rules of Civil Procedure all issues in these consolidated cases are non-jury matters to be decided by the Court and the Claimants have no right to trial by jury.  See Lewis v. Lewis & Clark Marine, Inc., 531 U.S. 438, 448, 121 S. Ct. 993, 1001 (2001).

In this motion ACBL seeks to be exonerated from all liability arising out of the accident and a dismissal of all claims.  ACBL files herewith as Exhibit 1 a proposed exoneration decree. Rule F(2) of the Supplemental Rules for Certain Admiralty and Maritime Claims permits ACBL

---

[2] ACL and the financial institutions have each filed separate Motions for Summary Judgment and adopt ACBL's Motion and this memorandum as additional support.

{N1220257.1}

to demand exoneration from liability in this case.[3]  A vessel owner is entitled to exoneration where it is free from fault.  Tittle v. Aldacosta, 544 F. 2d 752, 756 (5th Cir.), reh. denied, 546 F. 2d 907 (5th Cir. 1977); In Re Caribbean Sea Transport, Ltd., 748 F. 2d 622, 626 (11th Cir.), amended on other grounds, 753 F. 2d 948 (11th Cir. 1985).  All of the essential facts have been discovered through numerous depositions and document productions.  There is no genuine issue as to any material fact and the law is clear that ACBL is entitled to summary judgment as a matter of law pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.

As the U.S. Supreme Court noted in Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548 (1986): "In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be no 'genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of a non-moving party's case necessarily renders all other facts immaterial."  Celotex, 477 U.S. at 322-23, 106 S. Ct. at 2552.

Rule 56(c) requires the non-moving party to set forth specific facts which demonstrates that there exists a genuine issue for trial.  The mere allegation of a factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.  The material facts are those which might affect the outcome of the case under the governing substantive law:

> As to materiality, the substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude

---

[3]  A party "need not confess liability" to file a limitation action.  Lewis v. Lewis & Clark Marine, Inc., 531 U.S. 438, 453, 121 S. Ct. 993, 1003 (2001).

{N1220257.1}

3

the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. See generally 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2725, pp. 93-95 (1983).

Anderson v. Liberty Lobby, Inc, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).

"That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." Anderson, 477 U.S. at 248, 106 S. Ct. at 2510. It is further recognized that a party opposing a summary judgment may not merely rest on the allegations of his pleadings. Id. See also Celetox, 477 U.S. at 324-326, 106 S. Ct. at 2553-2555.

ACBL is entitled to exoneration because its barges were seaworthy, it was not negligent and breached no duty imposed by law, and there is no legal basis upon which it can be held liable for the collision. It is well settled under the General Maritime Law that:

(1)   The owner *pro hac vice* of dumb, unmanned barges, having no motive power of their own, in the tow of an independent contractor's tug has no liability for a collision that occurs during the navigation of the barges by the tug. "Barges are vessels, but of a peculiar kind.... Lacking power and usually crew, barges depend upon another vessel, a tug, for movement. A contract for a tug to move a barge is one of towage." Agrico Chemical Co. v. M/V BEN W. MARTIN, 664 F. 2d 85, 90 (5th Cir. 1981), reh. denied, 669 F. 2d 733 (5th Cir. 1982).

Towage is defined as a service rendered by one vessel to aid the propulsion and expedite the movement of another vessel. The vessel that supplies the power in such an arrangement is typically called the tug. Stevens v. THE WHITE CITY, 285 U.S. 195, 200, 52 S. Ct. 347, 349 (1932);

T. Schoenbaum, <u>Admiralty and Maritime Law</u> at § 10-1, p. 717 (West 4th ed. 2003), (Ex. 2.)  Under the "dominant mind" doctrine, the tug is the "dominant mind" and supplies "power" to tow the unmanned, powerless barges, and is in all respects responsible for the safe navigation of the tow. The tug, and <u>not</u> the tow, is legally responsible for damages done by the flotilla.   T. Schoenbaum, <u>Admiralty and Maritime Law</u> at § 10-6, p. 730-731, (Ex. 2.)

(2)   A principal who hires an independent contractor over whom it exercises no operational control is not liable for any negligence of the independent contractor. <u>See</u> <u>Wallace v. Oceaneering International, Inc.</u>, 727 F. 2d 427, 437 (5th Cir. 1984), and <u>Bartholomew v. CNG Producing Co.</u>, 832 F. 2d 326, 329 (5th Cir. 1987).

(3)   The owner *pro hac* vice of a dumb, unmanned barge is entitled to be exonerated where reasonable case is exercised by the barge owner in selecting a towage contractor and the barge owner had no knowledge or reason to believe that the towage contractor was incompetent to perform the job.  ACBL had no knowledge or reason to believe that Brown Water was incompetent or that Brown Water did not have the requisite knowledge and skill to tow its barges. <u>See</u> <u>In Re: Central Gulf Lines, Inc.</u>, 176 F. Supp. 2d 599 (E.D. La. 2001), <u>aff'd</u>, 62 Fed. Appx. 557 (Table), 2003 WL 1202793 (5th Cir. No. 01-31028, 03/03/03) (exoneration by summary judgment of barge owner *pro hac vice*/bareboat charterer for a collision that occurred when its barge was being towed by an independent

towage contractor.)  A copy of the Fifth Circuit's unpublished decision affirming the exoneration is attached as Ex. 3.

## I.    BACKGROUND FACTS.

On September 15, 2001, the Queen Isabella Causeway was damaged when the BROWN WATER V pushed the lead barge of its four barge tow into the bridge.  The barges were all unmanned river barges[4] having no motive power of their own, and ACBL had no employees or representatives on either the barges or the towing vessel at the time of the accident.  (Ex. 4, Old Deposition, page (hereinafter "p.") p. 100, line (hereinafter "l.") l. 6 to 10; Ex. 5, Mosher Deposition, p. 230, l. 7 to 20; Ex. 6, Affidavit of Foltz, p. 1-2, para. 4.)  A portion of the bridge collapsed resulting in 8 deaths, several personal injuries and property damage.  The bridge's required navigational lights were not working and had been reported out the day before.  (Ex. 7, Langley Deposition, p. 17, l. 4 to 19; Ex. 8, Fowler Statement, p. 17, l. 3 to 14.)

ACBL's Senior Vice President of Logistics Services, Whitlock, testified that at the time of the accident ACBL owned and operated approximately 5000 barges and 150 towboats. (Ex. 9, Whitlock Deposition, p. 16, l. 15 to 22; p. 141, l. 22 to p. 142, l. 6.)  These barges and towboats moved on all the major inland waterways of the United States and their tributaries.[5] Farley, ACBL's Vice President of Marketing Services, explained that ACBL does not have enough equipment to reach all areas of the inland waterways with a frequency to service its customers.  (Ex. 10, Farley Deposition, p. 33, l. 1 to p. 34, l. 19; p. 41, l. 5 to 24; p. 129, l. 2 to 11.)  Therefore, ACBL, like all other barge lines, contracts with independent towing contractors to move its barges when none of its own towboats are available.  (Ex. 11, T. Chapman

---

[4]   River barges are much like railroad box and tank cars.  Their cargo compartments are filled with the barge owner's customer's cargoes for transport from point of origin to point of destination.

[5]   These would include the Mississippi River, Ohio River, Missouri River, Tennessee River, Arkansas River Tombigbee, Illinois River, Cumberland River, the Intracoastal Waterways, and tributaries.

{N1220257.1}

6

Deposition, p. 45, l. 6 to 25; Ex. 9, Whitlock Deposition, p. 52, l. 5 to p. 56, l. 9; p. 142, l. 24 to

p. 144, l. 12.)  The far western reach of the ICW, west of Houston, is an area where ACBL often

relies upon independent towing contractors.  (Ex. 9, Whitlock Deposition, p. 142, l. 24 to p. 144,

l. 12.)

Brown Water is an established third-party tower based in Rockport, Texas, which ACBL

regularly relied upon to tow its barges in the ICW between Brownsville and Houston.

ACBL has never had an ownership interest in or a corporate relationship with Brown Water or

its vessels.  (Ex. 11, T. Chapman Deposition, p. 95, l. 19 to 24.)  Brown Water owns and

operates 12 towboats (as well as various offshore vessels) and was (and still is) the most

experienced towing company in the ICW between Brownsville and Houston.  (Ex. 5, Mosher

Deposition, p. 127, l. 10 to 15; p. 228, l. 2 to 23; Ex. 12, Hoessle Deposition, p. 129, l. 3 to

p. 130, l. 25.)

ACBL's relationship with Brown Water began approximately 10 years before the

accident.  (Ex. 17, Khouri Deposition, p. 70, l. 12 to p. 72, l. 2; Ex. 9, Whitlock Deposition,

p. 95, l. 21 to p. 96, l. 7; p. 155, l. 11 to 19, p. 172, l. 17 to 24; Ex. 5, Mosher Deposition, p. 16,

l. 19 to p. 18, l. 18.)  Brown Water was founded in the late 1980's by Tim Chapman who has

been in the marine transportation business since 1974.  (Ex. 11, T. Chapman Deposition, p. 9,

l. 10 to p. 10, l. 7.)  During this 10-year period Brown Water towed for numerous other

customers, including Kirby Marine, Dow Chemical, Exxon, BP Amoco, BASF, duPont and

others.  (Ex. 5, Mosher Deposition, p. 67, l. 20 to 23, p. 229, l. 9 to 18; Ex. 11, T. Chapman

Deposition, p. 96, l. 13 to p. 97, l. 2.)  ACBL was not Brown Water's largest customer.  (Ex. 11,

T. Chapman Deposition, p. 96, l. 13 to p. 97, l. 2.)

Brown Water, like all other independent towing contractors, operates by combining the barges of more than one customer into a single tow (Ex. 5, Mosher Deposition, p. 237, l. 7 to p. 238, l. 5; Ex. 14, Affidavit of Brock at Ex. A, p. 9, para. 4) much like a railroad company combines boxcars owned by its various customers into a single train. This type of towage is most always pursuant to a verbal towage agreement, as it was in this case.[6] (Ex. 12, Hoessle Deposition, p. 310, l. 8 to 19; Ex. 13, Kazunas Deposition, p. 93, l. 2 to 10.) The barge owner offers its barges for towage from point A to point B to the third-party tower; if the tower accepts the towage it will tow the barges for a price based upon a tariff or rate. (Ex. 12, Hoessle Deposition, p. 74, l. 1 to 25; p. 132, l. 21 to p. 133, l. 7; Ex. 9, Whitlock Deposition, p. 62, l. 10 to 24; p. 169, l. 5 to 21; Ex. 5, Mosher Deposition, p. 139, l. 19 to p. 142, l. 13; Ex. 14, Affidavit of Brock at Ex. A, p. 10, para. 4.) The barge owner's dispatcher contacts the third-party tower's dispatcher to offer the barges for towage. There is never any communication between the barge owner and the crew of the tug. (Ex. 5, Mosher Deposition, p. 137, l. 2 to 6; Ex. 12, Hoessle Deposition, p. 73, l. 10 to p. 74, l. 25; Ex. 14, Affidavit of Brock at Ex. A, p. 11, para. 4; Ex. 15, Valigura Deposition, p. 100, l. 16 to p. 102; l. 4.) The barge owner is given an update of the status of its barges once each morning. (Ex. 12, Hoessle Deposition, p. 362, l. 24 to p. 363, l. 21; Ex. 11, T. Chapman Deposition, p. 98, l. 3 to p. 99, l. 18.)

The customs and practices of the towage industry are explained by various witnesses including: Brock, ACBL's expert with over 40 years experience in the inland towing industry (Ex. 14, Brock Affidavit, p. 1, para. 2 to p. 2, para. 5; and Ex. B thereto at pp. 1 to 4); Mosher, Brown Water's Vice President of Operations; and Brinkop, ACBL's Vice President of Gulf

---

[6] Most towage agreements are verbal because the duties and obligations of the tower and barge owner are well defined by over 100 years of towage law. There is no need to put those obligations in writing. This is discussed infra at pp. 17-19.

Coast Operations. (Ex. 16, Brinkop Deposition, p. 9, l. 12 to p. 15, l. 7.) By custom and by law, the tower is obligated to provide a tug of adequate horsepower, properly manned and crewed with qualified and properly licensed captains, and capable of safely navigating the barges to their destination. The barge owner has no operational control over the towage. The barge owner cannot impose a time limit on the towage and plays no role in the selection of the particular tug or crew, and does not tell the tower when, where, or how to perform the towage. The barge owner has no input into the make-up of the tow by the tower or the number of barges that will be towed by any given tug. The tower can combine barges from several customers to build its tow without telling its customers. The barge owners are often not given information as to the total number of barges in the tow and many times do not even know which tug will be towing its barges. The tower can also sub-contract the towage to another company without advising the barge owners. (Ex. 5, Mosher Deposition, p. 230, l. 7 to p. 238, l. 23; Ex. 12, Hoessle Deposition, p. 310, l. 8 to p. 319, l. 2; p. 324, l. 24 to p. 325, l. 13; p. 333, l. 5 to p. 335, l. 7; Ex. 16, Brinkop Deposition, p. 140, l. 3 to p. 142, l. 20; Ex. 10, Farley Deposition, p. 167, l. 10 to p. 168, l. 18, p. 172, l. 6 to 13; p. 175, l. 4 to 25; Ex. 14, Affidavit of Brock at Ex. A, at pp. 8 to 11, para. 4.) Once the tower takes its customer's barges into tow it assumes the sole care, custody, and control over the barges and makes all decisions for their safe towage. (Ex. 16, Brinkop Deposition, p. 140, l. 3 to p. 142, l. 20; Ex. 13, Kazunas Deposition, p. 82, l. 25 to p. 83, l. 7; Ex. 9, Whitlock Deposition, p. 166, l. 22 to p. 168, l. 18; Ex. 10, Farley Deposition, p. 167, l. 10 to p. 168, l. 18; Ex. 5, Mosher Deposition, p. 230, l. 7 to p. 233, l. 8; Ex. 14, Affidavit of Brock at Ex. A, p. 7, para. 3 and pp. 10 to 11 at para. 4.)

During the 10 year relationship that existed between ACBL and Brown Water prior to the accident, Brown Water towed hundreds of ACBL barges in the ICW and under the

Queen Isabella Causeway. (Ex. 9, Whitlock Deposition, p. 172, l. 17 to p. 173, l. 17.) ACBL never exercised any operational control over Brown Water. (Ex. 5, Mosher Deposition, p. 232, l. 19 to 22.) Brown Water's safety record was excellent, with only two minor incidents before the towage in question, one of which turned out not to be Brown Water's fault and resulted in no damage to ACBL's barge. (Ex. 17, Khouri Deposition, p. 70, l. 12 to p. 72, l. 2; p. 82, l. 25 to p. 83, l. 21; Ex. 13, Kazunas Deposition, p. 103, l. 11 to p. 104, l. 18; Ex. 9, Whitlock Deposition, p. 96, l. 8 to p. 97, l. 4; p. 154, l. 20 to p. 155, l. 19; p. 171, l. 24 to p. 172, l. 5; Ex. 12, Hoessle Deposition, p. 320, l. 23 to p. 323, l. 7.) ACBL never received any information that Brown Water was not a safe and competent operator. (Ex. 9, Whitlock Deposition, p. 96, l. 8 to p. 97, l. 4; Ex. 12, Hoessle Deposition, p. 324, l. 4 to 23; p. 326, l. 11 to p. 327, l. 22; p. 329, l. 8 to p. 330, l. 8; Ex. 10, Farley Deposition, p. 170, l. 2 to p. 171, l. 21; Ex. 16, Brinkop Deposition, p. 142, l. 5 to 20.)

In early 2000, ACBL was advised by the Coast Guard of the grounding of one of its barges which ACBL had contracted with Brown Water to tow. Brown Water had not advised ACBL of this grounding. ACBL later learned the grounding was done by a tug of a towing company which Brown Water had subcontracted with to tow the ACBL barge because Brown Water did not have a tug available to move the barge, as was Brown Water's right. (Ex. 13, Kazunas Deposition, p. 36, l. 18 to p. 37, l. 17; Ex. 9, Whitlock Deposition, p. 93, l. 12 to p. 94, l. 15; p. 171, l. 24 to p. 172, l. 9; Ex. 12, Hoessle Deposition, p. 320, l. 23 to p. 322, l. 19.) There was no damage to the ACBL barge as a result of the grounding but ACBL was concerned because it had not been notified by Brown Water of the grounding.

As a result of the grounding incident, ACBL arranged for a vendor audit of Brown Water. Kazunas, ACBL's Assistant Vice President of Logistics Services, and Whitlock

{N1220257.1}

sent an experienced, independent auditor, Timberlake, to Brown Water in March of 2000 to determine if Brown Water had notification processes in place and was the type of tower ACBL should continue to utilize. (Ex. 13, Kazunas Deposition, p. 19, l. 7 to p. 20, l. 8; p. 37, l. 1 to 17; p. 103, l. 2 to p. 104, l. 18; Ex. 17, Khouri Deposition, p. 82, l. 25 to p. 83, l. 11; Ex. 9, Whitlock Deposition, p. 93, l. 12 to p. 95, l. 13; Ex. 18, Timberlake Deposition, p. 63, l. 9 to p. 64, l. 17.) Timberlake had 17 years experience in the towing industry working in dispatching, distribution, as a harbor master and as operations manager until he retired from ACBL in 1997. (Ex. 18, Timberlake Deposition, p. 21, l. 7 to p. 26, l. 18.) Upon leaving ACBL, Timberlake started a marine consulting company performing audits of towing and barge companies. He was certified as an auditor by the American Waterway Operators ("AWO"). (Ex. 18, Timberlake Deposition, p. 29, l. 3 to 8; p. 31, l. 25 to p. 32, l. 11; p. 53, l. 21 to p. 54, l. 6; p. 240, l. 2 to 15.) ACBL hired Timberlake to do the vendor audit because they had great faith in him and his ability. (Ex. 9, Whitlock Deposition, p. 122, l. 1 to 24.)

The AWO is an industry trade organization. It is purely a voluntary organization. (Ex. 5, Mosher Deposition, p. 206, l. 14 to p. 207, l. 1; Ex. 9, Whitlock Deposition, p. 111, l. 14 to 25; Ex. 14, Affidavit of Brock, pp. 7 to 8, para. I; and Ex. A to Brock Affidavit, pp. 19 to 20, para. 8.) There is no requirement to join the AWO and, in fact, a large percentage of towing companies in the United States are not AWO members. (Ex. 5, Mosher Deposition, p. 206, l. 14 to p. 207, l. 1; Ex. 17, Khouri Deposition, p. 79, l. 2 to p. 80, l. 3; Ex. 18, Timberlake Deposition, p. 278, l. 6 to 15; Ex. 14, Affidavit of Brock, pp. 7 to 8, para. I, and Ex. A to Brock Affidavit, pp. 19 to 20, para. 8.) As attested to by ACBL's expert, Russell, a retired U.S Coast Guard Officer with 20 years experience in Coast Guard matters and marine safety, the towing industry is regulated by the Coast Guard which provides the various rules and regulations to the owners

and operators of barges and tugs that operate on the inland waterways and provides the requirements for and the licensing of the towboat captains. (See generally 33 C.F.R.; Ex. 19, Russell Affidavit, pp. 3 to 4, para. D and E; Ex. A to Russell Affidavit, pp. 3 to 4, para. 4; pp. 5 to 6, para. 5.)

During his vendor audit of Brown Water, Timberlake used as a guide a form provided by the AWO, which is used in the AWO's Responsible Carrier Program ("RCP"). (Ex. 18, Timberlake Deposition, p. 64, l. 10 to p. 66, l. 14.) The RCP is a process whereby AWO members hire independent auditors to audit their company and their vessels to certify that certain safety processes are in place, that the company has proper documentation concerning the processes, and is in compliance with certain regulations. As explained by Khouri, ACBL's former General Counsel and Head of Operations, RCP is not a set of "government regulations." (Ex. 17, Khouri Deposition, p. 10, l. 21 to p. 11, l. 8; p. 79, l. 2 to p. 80, l. 2.) Timberlake did not perform an "RCP" audit of Brown Water. (Ex. 18, Timberlake Deposition, p. 59, l. 2 to p. 60, l. 10.) At the time of the audit, Brown Water was not a member of the AWO and was not RCP certified which, of course, it did not have to be. (Ex. 18, Timberlake Deposition, p. 277, l. 8 to 14; p. 288, l. 2 to 6.)

After auditing two Brown Water vessels, speaking to the crews, speaking to management and reviewing pertinent documents, Timberlake discussed his findings and areas for improvement with Brown Water's management. (Ex. 18, Timberlake Deposition, p. 129, l. 4 to p. 131, l. 5.) Brown Water agreed to look into possible membership in the AWO and pledged that they would achieve the standards of the AWO whether they became a member or not. (Ex. 18, Timberlake Deposition, p. 170, l. 6 to p. 171, l. 25; Ex. 20, Report of Timberlake, p. 5, para. 7.) Timberlake later sent a report to ACBL (Ex. 20) and discussed his findings with

{N1220257.1}

ACBL. He noted a few, minor areas for improvement but nothing that would interfere with the safe operation of towboats by Brown Water. (Ex. 18, Timberlake Deposition, p. 172, l. 16 to p. 173, l. 17; p. 279, l. 22 to p. 283, l. 10.) At the end of his report, Timberlake stated the following: "Brown Water Marine works hard, smart and effectively with a small staff. There seems to be a climate of continuous improvement. I also noticed that the leadership of the organization focused on the important, that are those things which will produce the best results in such things as safety and service." (Ex. 20, Report of Timberlake, p. 5, para. 6.)

Timberlake advised ACBL that ACBL should continue using Brown Water as a third-party tower and that he saw no problems and that the observations that he made about areas for improvement were not a cause for concern. (Ex. 18, Timberlake Deposition, p. 172, l. 16 to p. 173, l. 9; p. 279, l. 22 to p. 280, l. 20.) After auditing two other third-party towing contractors, Timberlake recommended that ACBL discontinue using them. ACBL followed his advice. One of them was RCP certified. (Ex. 18, Timberlake Deposition, p. 35, l. 24 to p. 37, l. 24; p. 286, l. 9 to p. 287, l. 1.) Timberlake testified that joining the AWO and becoming RCP certified does not ensure that a towing company is a safe operating company. (Ex. 18, Timberlake Deposition, p. 273, l. 4 to 8; see also Ex. 14, Affidavit of Brock, pp. 7 to 8, para. I.)

Brown Water joined the AWO in early 2001 and began working towards RCP certification, which the AWO requires to be accomplished within two years of joining. Brown Water became RCP certified in July 2002, well within the time frame of the AWO. (Ex. 5, Mosher Deposition, p. 147, l. 4 to p. 148, l. 11; Ex. 18, Timberlake Deposition, p. 270, l. 22 to p. 271, l. 3; Ex. 14, Affidavit of Brock, p. 8, para. I.)

Mosher, Brown Water's Vice President of Operations, testified that, prior to the time of Timberlake's audit, Brown Water had also been audited by its customers Dow, duPont,

BP Amoco, Exxon, BASF, and others, passing all audits. (Ex. 5, Mosher Deposition, p. 196, l. 21 to p. 197, l. 19.) All of these customers continued to use Brown Water. Additionally, Brown Water was a member of the Coast Guard's Cooperative Towing Vessel Examination Program. (Ex. 21, Testimony of Helton, Coast Guard Hearing, Vol. 1, p. 76, l. 16 to p. 77, l. 6; Ex. 22, C. Chapman Deposition, p. 86, l. 14 to p. 87, l. 1.) Brown Water's vessels are considered uninspected vessels by the Coast Guard and are not required to undergo periodic, mandatory inspections by the Coast Guard. As a proactive tower, Brown Water voluntarily participated in the Cooperative Towing Vessel Examination Program and invited the Coast Guard to board, inspect and certify its vessels despite the fact that such boardings and inspections are not required by law. (Ex. 14, Affidavit of Brock, p. 5, para. F; Ex. 19, Affidavit of Russell, p. 3, para. A; Ex. 22, C. Chapman Deposition, p. 86, l. 14 to p. 87, l. 1.) Brown Water has never been stopped from operating by the Coast Guard and continues to operate. (Ex. 11, T. Chapman Deposition, p. 126, l. 21 to 23.)

## II.    THE TOWAGE IN QUESTION.

Several days prior to September 15, 2001, Hoessle, ACBL's dispatcher located at ACBL's headquarters in Indiana, arranged with Brown Water's dispatcher, Chad Chapman, located in Brown Water's Rockport office, to tow three ACBL barges, by verbal towage contract, west from Houston toward Brownsville. Brown Water decided to use the BROWN WATER V to tow those three barges. One of those barges, the VLB-9173, was loaded with phosphate and was to be towed to Harlingen, which is east of Brownsville and east of the Queen Isabella Causeway. (Ex. 12, Hoessle Deposition, p. 156, l. 8 to p. 165, l. 8; Ex. 22, C. Chapman Deposition, p. 87, l. 25 to p. 89, l. 10.)

Hoessle later offered the NM-315, VLB-9182 and ACL-9993B to Brown Water for towage. These three barges were located in Brownsville and were to be loaded with steel coils

{N1220257.1}

in Brownsville by ACBL's customer. The exact time the barges would complete loading and be ready for towage to Houston was unknown at that time. Brown Water agreed to tow these three barges from Brownsville to Houston once loading was complete. Brown Water assigned the BROWN WATER V to tow the NM-315, VLB-9182 and ACL-9993B to Houston once it dropped the westbound VLB-9173 in Harlingen and delivered the two other west bound barges to Brownsville. (Ex. 12, Hoessle Deposition, p. 155, l. 25 to p. 165, l. 8; Ex. 22, C. Chapman Deposition, p. 31, l. 9 to 24; p. 40, l. 11 to p. 41, l. 21.)[7]

The BROWN WATER V developed mechanical problems as it approached Harlingen on the morning of September 14, 2001. The BROWN WATER V's master, Captain Wilson, decided to bypass Harlingen and go to Brownsville for repairs taking the VLB-9173 with it instead of dropping the barge at Harlingen as ACBL expected Brown Water to do. Brown Water alone decided not to drop the VLB-9173 in Harlingen, as was its prerogative. ACBL was not notified of this decision or of the mechanical problem with the tug. As far as ACBL knew, the BROWN WATER V would only have three of its barges in tow at any given time. (Ex. 5, Mosher Deposition, p. 130, l. 12 to p. 133, l. 10; p. 207, l. 14 to p. 210, l. 19; Ex. 12, Hoessle Deposition, p. 155, l. 25 to p. 158, l. 8; p. 172, l. 21 to p. 176, l. 21.)

Mosher testified that he told Captain Wilson that once the BROWN WATER V was repaired to take the VLB-9173 as a single barge to Harlingen, a relatively short distance, and then return to Brownsville to pick up the NM-315, VLB-9182 and ACL-9993B. (Ex. 5, Mosher Deposition, p. 8, l. 18 to p. 9, l. 14; p. 111, l. 5 to 18; p. 130, l. 12 to p. 133, l. 10; p. 207, l. 13 to p. 208, l. 20.) Brown Water's general rule of thumb, which was the same rule of thumb of

---

[7]    Brown Water also had the BROWN WATER VIII, a 1000 horsepower tug, available to tow the NM-315, VLB-9182 and ACL-9993B east to Houston but chose to use the 800 horsepower BROWN WATER V. (Ex. 22, C. Chapman Deposition, p. 32, l. 9 to 21.)

ACBL and other carriers on the ICW, was that a tug should have 200 horsepower per loaded barge in tow. (Ex. 5, Mosher Deposition, p. 210, l. 20 to p. 211 l. 17; Ex. 9, Whitlock Deposition, p. 71, l. 15 to p. 72, l. 14.) The BROWN WATER V is advertised by Brown Water as having 800 horsepower. (Ex. 5, Mosher Deposition, p. 26, l. 6 to 23; p. 229, l. 5 to 8.) Using the 200 horsepower per barge rule of thumb, the BROWN WATER V should have been capable of towing four loaded barges. However, Mosher testified, that it was Brown Water's policy, that the BROWN WATER V never take four loaded barges. Its maximum assigned tow was three loads and one empty or two loads and two empties. (Ex. 5, Mosher Deposition, p. 207, l. 13 to p. 211; l. 17; Ex. 11, T. Chapman Deposition, p. 103, l. 9 to 25; Ex. 22, C. Chapman Deposition, p. 90, l. 5 to p. 91, l. 11.)

Captain Wilson on his own decided to tow the VLB-9173, NM-315, VLB-9182 and ACL-9993B from Brownsville to Harlingen. The four barges were placed in a single string with the towboat pushing from behind. The barges were wired together by the tug's crew. (Ex. 5, Mosher Deposition, p. 130, l. 12 to p. 132, l. 15; Ex. 15, Valigura Deposition, p. 86, l. 22 to p. 89, l. 10.) No one from ACBL was present in Brownsville. ACBL was unaware that the VLB-9173 had not been dropped at Harlingen, did not know when its 3 barges would be picked up by Brown Water in Brownsville and was not aware that the BROWN WATER V was preceding east with the four barge tow at the time of the accident. (Ex. 12, Hoessle Deposition, p. 173, l. 19 to p. 175, l. 21; p. 230, l. 18 to p. 233, l. 1; p. 263, l. 22 to p. 265, l. 1.)

At the time of the accident, the BROWN WATER V was being operated by Captain Fowler, who held the proper Coast Guard license.[8] Prior to obtaining his license, Fowler had to undergo training, demonstrate to the Coast Guard years of experience on towboats and was then

---

[8] Inland towing vessels usually carry two Coast Guard licensed operators. Each stands two 6-hour watches per day.

{N1220257.1}

tested by the Coast Guard. (Ex. 18, Timberlake Deposition, p. 284, l. 7 to p. 285, l. 8; 46 C.F.R. 10.464; Ex. 14, Affidavit of Brock, p. 3, para. C; Ex. 19, Affidavit of Russell, p. 3, para. D.) Fowler had twelve years of experience as a licensed captain and had previously navigated the waters in question. (Ex. 8, Fowler Statement, p. 12, l. 7 to p. 14, l. 9; Ex. 23, Submission of Brown Water to USCG regarding Fowler prepared by Mosher; Ex. 5, Mosher Deposition, p. 45, l. 18 to p. 46, l. 11; p. 172, l. 1 to p. 173, l. 23.)

During the early morning hours of September 15, 2001, there was a strong current between the Long Island Swing Bridge and the Queen Isabella Causeway. The distance between these two bridges is less than a mile. (Ex. 24, Testimony of Perugine, Coast Guard Hearing, Vol. 2, p. 20, l. 4 to 21.)

As Fowler steered out of the Long Island Swing Bridge and toward the Queen Isabella Causeway, the BROWN WATER V touched bottom. This caused Fowler to lose control of the tug and the tug and its tow began to swing to the west, out of the navigation channel. By the time Fowler was able to gain control, it was too late and the collision occurred. Fowler blamed the accident on his failure to properly judge the current and the grounding of the tug. (Ex. 8, Fowler Statement, p. 4, l. 20 to p. 7, l. 1; p. 9, l. 14 to p. 10, l. 7; p. 18, l. 5 to p. 20, l. 19; Ex. 25, Fowler Handwritten Statement, p. 1.) Mosher testified that Fowler also gave him this same explanation shortly after the accident. (Ex. 5, Mosher Deposition, p. 53, l. 5 to 23.)

After the accident, the Coast Guard inspected the BROWN WATER V and noted a few minor deficiencies which were not in any way related to the accident. Lieutenant Helton, the Coast Guard Investigator, testified at the Coast Guard hearing that the deficiencies noted, including the lack of a current copy of the Local Notice to Mariners aboard the tug, were minor in nature and were not causally related to the accident. (Ex. 21, Testimony of Helton, Coast

Guard Hearing, Vol. 4, p. 207, l. 6 to 22; see also Ex. 14, Affidavit of Brock, p. 5, para. G to p. 7.)

There is no testimony or evidence that the four ACBL barges were in any respect unseaworthy.  There is no evidence that the barges in any way caused the accident.

## III.    LAW AND ARGUMENT FOR EXONERATION OF ACBL.

### A.    Dominant Mind Doctrine Exonerates Innocent Tow.

Under the "dominant mind" doctrine, the tug is the "dominant mind" and supplies "power" to tow the unmanned, powerless barges, and is in all respects responsible for the safe navigation of the tow.  The tug, and not the tow, is thus legally responsible for damages done by the flotilla.  Professor Schoenbaum, a leading authority in the field of maritime law, notes:

> **When damage is caused by a casualty involving the tow or by the whole flotilla, the courts employ the concept of "dominant mind" to place liability on the tug and to absolve the tow from liability.  This doctrine holds that only that vessel is liable whose people are actually in control of the operation, even though the whole flotilla causes the damage.**

T. Schoenbaum, Admiralty and Maritime Law at § 10-6, p. 730 (West 4th ed. 2003) (citations omitted) (emphasis added), (Ex. 2.)

Professor Schoenbaum further notes:  "If the tug and the tow are separately owned, the negligence of the tug cannot be imputed to the tow, and there is neither in personam nor in rem liability on the part of the tow."  Ex. 2, T. Schoenbaum, Admiralty and Maritime Law at § 10-6, p. 731 (citing the principle of Sturgis v. Boyer, 65 U.S. (24 How.) 110, 16 L. Ed. 591 (1860), and THE EUGENE F. MORAN, 212 U.S. 466, 29 S. Ct. 339, 53 L. Ed. 600 (1909)).  See also Parks and Cattell, The Law of Tug, Tow, and Pilotage, p. 24 (3d ed. 1994) ("It is settled law in the United States that the vessel in control of the flotilla, the 'dominant mind,' is responsible for the actions of the flotilla and thus responsible in damages if negligent."), Ex. 26; Alter Co. v.

{N1220257.1}

18

M/V MISS SUE, 536 F. Supp. 313, 316 (E.D. La. 1982); Naptha Barge Co. v. Continental Navigation Co., 1978 AMC 501, 510 (E.D. La. 1977), (Ex. 27.)  The Vulcan, 60 F. Supp. 158 (E.D. La. 1945), citing Sturgis and THE EUGENE F. MORAN, states:  "Where as here the tugboat supplying the power is in control and the tow inert and helpless, the towing vessel alone is liable for fault and errors in navigation."  60 F. Supp. at 162.

### B.    Legal Duties Owned by Tug and Tow.

"It is the duty of the towing vessel to see that the tow is properly made up and that her lines are sufficient and securely fastened.  The Quickstep, 9 Wall. 665, 76 U.S. 665, 19 L. Ed. 767."  W. Horace Williams Co. v. The WAKULLA, 109 F. Supp 698, 700 (E.D. La. 1953), aff'd, 213 F.2d 27 (5th Cir. 1954); Parks and Cattell, The Law of Tug, Tow, and Pilotage, pp. 133 to 136 (3d ed. 1994), (Ex. 26.)

Under the law, Brown Water and its tug master were responsible for all aspects of the towage of ACBL's barges:

> The master of a tug towing an unmanned barge must know all conditions essential to the safe accomplishment of the undertaking or voyage.  This knowledge includes the depth of the water, the ordinary obstructions, the state of the tides and water levels in the channel, and the clearance of bridges to be negotiated. [citations omitted.]  …  The tug master, moreover, must obtain knowledge from personal cognizance, or avail himself of the means of knowledge, of conditions likely to produce or contribute to a loss, unless appropriate means are adapted to prevent it. [citations omitted.]  "[C]aptains [are] held to a standard of prudent navigation, including the knowledge they should have had." *Houma Well Service v. Capt. O'Brien*, 312 F.Supp 257, 262 (E.D. La. 1970).

Ryan Walsh Stevedoring Co. v. James Marine Service, Inc., 557 F. Supp. 457, 461 (E.D. La. 1983), aff'd, 729 F.2d 1457 (5th Cir.), cert. denied, 469 U.S. 981 (1984); see also Parks and Cattell, The Law of Tug, Tow, and Pilotage, pp. 144-157; 160-166 (3d ed. 1994), (Ex. 26.)

{N1220257.1}

19

"When a tower undertakes a contract of towage the law implies that he possess sufficient skill to perform the task safely." <u>Naviera Tabago S.A. v. Sprigg Carroll</u>, 394 F. Supp. 1354, 1357 (S.D. Fla. 1975). "The tower has an obligation to exercise reasonable care and skill." <u>Id.</u> (citing <u>Hart v. Blakemore</u>, 410 F.2d 218, 221 (5th Cir. 1969)). The tug owes the tow an implied warranty of workmanlike service, "[t]hat is, an implied obligation to tow properly and safely ... -- the very nature of the towing agreement necessarily implies an obligation to tow properly and safely, and competency and safety are essential elements of the towing service undertaken." <u>Singer v. Dorr</u>, 272 F. Supp. 931, 934 (E.D. La. 1967) (citations omitted).

By law, Brown Water warranted that it possessed knowledge and skill to safely tow ACBL's barges, that it would furnish a seaworthy towboat, properly equipped and manned, and of sufficient capacity and power to perform the service undertaken under the conditions which were to be reasonably anticipated, and that its tug and crew would navigate itself and the tow properly and prudently, and to exercise its best endeavors, skill and diligence for the safe completion of the towage contract. <u>See</u>, <u>e.g.</u>, Parks and Cattell, <u>The Law of Tug, Tow, and Pilotage</u>, 127-128 (3d ed. 1994), (Ex. 26.)

ACBL, as the tow, owed a duty to provide Brown Water with seaworthy barges for towage. <u>Kenny Marine Towing, Inc. v. M/V JOHN R. RICE</u>, 583 F. Supp. 1196, 1198 (E.D. La. 1984). There is no evidence that ACBL breached its obligation to provide seaworthy barges. All evidence points to Brown Water's failure to properly navigate the tow of ACBL's barges. ACBL is not liable for any negligence attributable to Brown Water.

## C.    Independent Contractor Defense.

Under maritime law, a principal, such as ACBL, is not liable for negligent acts committed by an independent contractor, such as Brown Water, while the independent contractor is performing its assigned duties. <u>Wallace</u>, 727 F.2d at 437, and <u>Bartholomew</u>, 832 F. 2d at 329.

{N1220257.1}

A principal who hires an independent contractor over whom he exercises no operational control has no legal duty to discover or to remedy any hazards created by the independent contractor. Wallace, 727 F. 2d at 437. Therefore, ACBL is not liable for any negligence of Brown Water. As previously shown, ACBL exercised no control over the activities of Brown Water. ACBL merely offered barges for towage from Brownsville to Houston. Brown Water and its employees made all decisions as to towage, including which tug to use, timing of the towage, how many barges to tow, what route to take, how to build the tow, the suitability of the weather, tide and current to be encountered, and assignment of a crew to the tug.

A very high threshold must be met to show that a principal exercised operational control over an independent contractor: "It is not enough that [the principal] has merely a general right to order the work [of the independent contractor] stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations.... There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way." Wallace, 727 F. 2d at 437 n. 7. See also Ellison v. Conoco, Inc., 950 F. 2d 1196, 1207-08 (5th Cir. 1992), cert. denied, 509 U.S. 907 (1993). Here, Brown Water was entirely free to "do the work its own way."

### D.    ACBL Was Not Negligent in Contracting with Brown Water.

ACBL was not negligent in contracting with Brown Water to tow its· barges. ACBL exercised reasonable care in selecting Brown Water and was entitled to rely upon Brown Water's expertise as a towage contractor. Brown Water was well established towing company that had been in business for over ten years towing barges for numerous customers including major oil and chemical companies. When ACBL contracted with Brown Water it was not contracting with an unknown, "fly by night" start-up company with unproven

{N1220257.1}

capabilities. In ACBL's ten-year history with Brown Water, Brown Water had proven itself to be a safe and reliable tower. Moreover, Brown Water also had the most experience of any tower in the ICW between Brownsville and Houston and ACBL acted responsibly in selecting the most experienced tower to tow its barges. Brown Water had safely towed hundreds of ACBL's barges under the Queen Isabella Causeway prior to this accident.

Despite the fact that Brown Water had consistently shown the ability to competently and safely move ACBL's barges, ACBL went one step farther, sending Timberlake, an independent auditor, to further evaluate Brown Water after a minor incident where ACBL was not notified of the grounding of one of its barges. As it turned out, Brown Water was not responsible for the grounding of the barge as Brown Water had subcontracted out the towage of this barge to another towing company and was unaware of the grounding itself. Timberlake's audit of Brown Water revealed no reason to discontinue utilizing Brown Water. ACBL was advised by Timberlake that Brown Water focused on "the important, that are those things which will produce the best results in such things as safety and service." (Ex. 20, Report of Timberlake, p. 5, para. 8.) ACBL's vendor audit of Brown Water was not required by any governmental agency, custom, law or regulation. There was also no information within the towing industry that Brown Water was not a competent tower. The fact that Brown Water had numerous repeat customers, was a member of the Coast Guard Cooperative Towing Vessel Examination Program and grew in size further evidences its reputation as a competent and established tower. (Ex. 14, Affidavit of Brock, p. 5, para. F; pp. 8 to 9, para. J.)

Claimants' allegations against ACBL appear to be that it was negligent in contracting with or "entrusting" its barges to Brown Water. No court has ever applied the theory of "negligent entrustment" to impose liability on the owner of an unmanned barge who contracts

{N1220257.1}

22

with an established independent tower. There is no evidence that ACBL contracted with someone whose capabilities were unknown or who was known to be incompetent.

In In Re:  Central Gulf Lines, Inc., 176 F.Supp. 2d 599 (E.D. La. 2001), aff'd, 62 Fed. Appx. 557 (Table), 2003 WL 1202793 (5th Cir. No. 01-31028, 03/03/03, Ex. 3, the court granted exoneration by summary judgment to Waterman, the bareboat charterer of a dumb, unmanned barges, for a collision that occurred when its barge was being towed by a third-party independent towing contractor.

The theory of liability expressed by the Claimants here was espoused by the claimants in Central Gulf, 176 F. Supp. 2d 599. As in this case, the tug master decided how many barges the tug would take on any given trip based upon his experience, considering weather, wind, tide and draft of the barges. 176 F. Supp. 2d at 606. As is this case, the tower was an experienced contractor, and the tug master was properly licensed and had been employed on inland tugs for 12 years. As in this case, the Claimants argued that the Petitioners "negligently hired" the tower. In exonerating Waterman, the court noted:

> The party moving for limitation here is the tow, not the tug....
>
> Quite succinctly, there is simply an absence of evidence in the record establishing that either Waterman, its local agent, Oceanic, or its general agent in Singapore, Marco were aware, or should have been aware, of the likelihood of this accident after the tug was underway. *Kristie Leigh*, 72 F.3d at 481-482. No personnel of Waterman or Oceanic boarded the tug after it took control of the LASH barge once it was placed in the water by the GREEN ISLAND's crane. No personnel of Waterman or Oceanic instructed Eastern's supervisors or tugmaster on the proper method of constructing the tow, or the maximum load the KAMRUP could push under the weather, wind, and tide conditions existent at the time. There is no evidence that Waterman or Oceanic even observed Eastern personnel constructing the tow,....
>
> The record is similarly devoid of evidence that Waterman and Oceanic had any knowledge or reason to know that Captain

> Dutta in particular or Eastern in general were incompetent or inadequate to perform the job. Nothing in Oceanic's experience, 8 years, and Waterman's experience, 27 years, with Eastern would have put it on notice of any problems concerning the specific practice which Baron vilifies, the KAMRUP's towage of five loaded barges from Haldia to Calcutta....

176 F. Supp. 2d at 614-615. The court concluded:

> The liability of the tow ... and Waterman's right to exoneration and/or limitation of liability, must be decided independently of the liability of the tug. Baron seeks a determination that Waterman, as the barge owner, is not entitled to limitation because of navigational errors of the tugboat operator in configuring the tow and using a tugboat which was underpowered. There is simply no legal authority for doing so. The maritime law governing the allocation of liability between the tug and tow and exoneration and limitation of liability applicable to these facts weigh against the claim that Baron/U.K. Club asserts here.

> Assuming for the purposes of these motions only that the tug boat master was negligent in arranging the five barge tow and using the KAMRUP, because it had insufficient power, and further assuming that it was in the navigational channel at the time of the collision, none of these acts can be imputed to Waterman. Waterman discharges LASH barges in ports across the world. It cannot be, nor should it be, expected to follow each tug and tow to its destination to ensure that the tug does its job safely and properly.

176 F. Supp. 2d at 615-616. The Fifth Circuit affirmed the District Court's analysis and the exoneration of Waterman at 62 Fed. Appx. 557 (Table). The Fifth Circuit noted that the claimants had the burden to show that the owner *pro hac vice*/bareboat charterer of the barges was negligent, "independent of possible negligence" by the towage contractor or its tug. (See Ex. 3, p. 23.) A copy of the unpublished opinion is attached as Exhibit 3 and at pp. 22-25 the Panel discussed the exoneration of Waterman.

**CONCLUSION**

This Court should grant ACBL's motion and exonerate it under the uncontested material facts and the applicable law. ACBL breached no legal duty which would impose liability on it for the collision and the claims asserted herein. The law imposes no duty or obligation upon ACBL to oversee the operational activities of an independent tower, to dictate how the tower is to perform the towage, including the selection of the tug to be used, how may barges to be towed by the tug, and when, where and how to perform the towage, or to otherwise impose upon the tower any other requirements. Brown Water was an established towing company that had proven time and again that it was competent and qualified to tow ACBL's barges and the barges of Brown Water's many other customers. ACBL's barges were seaworthy and did not cause or contribute to the collision.

{N1220257.1}

25

Respectfully Submitted,

GLENN G. GOODIER, Attorney-in-Charge
Admitted *Pro Hac Vice*
By Order Entered 4/23/02
Jones, Walker, Waechter, Poitevent,
    Carrère & Denègre, L.L.P.
201 St. Charles Avenue - 48th Floor
New Orleans, Louisiana 70170-5100
Telephone:     (504) 582-8174
Facsimile:      (504) 582-8010

LES CASSIDY
State Bar Number 03979270
Federal Identification Number 5931
814 Leopard Street
Christi, Texas  78401
Telephone:     (361) 887-2969
Facsimile:      (361) 887-6251

OF COUNSEL:

WOOLSEY & CASSIDY, P.C.
814 Leopard Street
Corpus Christi, Texas  78401
Telephone:     (361) 887-2969
Facsimile:      (361) 887-6251

Counsel for Petitioners,
American Commercial Lines LLP and
American Commercial Barge Line LLC
Deere Credit, Inc. (formerly Senstar Finance
Company), as Owner of the Barge NM-315,
State Street Bank and Trust Company of
Connecticut, N.A., as Owner/Trustee of the Barge
ACL-9933B and Not in Its Individual Capacity, and
General Electric Capital Corporation, as Beneficial
Owner of the Barge ACL-9933B

## CERTIFICATE OF SERVICE

I do hereby certify that I have on this 10th day of December, 2004, served a copy of the foregoing pleading on counsel for all parties to this proceeding by mailing the same by United States Priority Mail, properly addressed and first class postage prepaid.

GLENN G. GOODIER