UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

U.S. COURT OF APPEALS
**FILED**

MAR 0 3 2003

CHARLES R. FULBRUGE III
— CLERK

No. 01-31028

In Re: In the Matter of the Complaint of:
CENTRAL GULF LINES, INC., Owner; WATERMAN STEAMSHIP CORPORATION,
Owner Pro Hac Vice, Operator, and Bareboat Charterer of the Lash
Barge CG-F70, Praying for Exoneration from and/or Limitation of
Liability,

CENTRAL GULF LINES, INC., Etc.; ET AL.,

Petitioners,

CENTRAL GULF LINES, INC., Owner; WATERMAN STEAMSHIP CORPORATION,
Owner Pro Hac Vice, Operator,

Petitioners-Third Party Defendants-Appellees-Cross-Appellants,

versus

R. L. BARON SHIPPING S.A.; ET AL.,

Third Party Defendants,

R. L. BARON SHIPPING S.A.,

Third Party Defendant-Claimant-Appellant-Cross-Appellee,

and

MASAHIRO TOYODA; HAJIME ONO; TOSHIAKI TAKEUCHI; DOOYANG LINE
COMPANY LIMITED; DOOYANG SHIP MANAGEMENT COMPANY LIMITED; UNITED
KINGDOM MUTUAL PROTECTION AND INDEMNITY ASSURANCE ASSOCIATION
(BERMUDA) LTD.,

Third Party Defendants-Cross-Appellees,

and

SUN ALLIANCE AND LONDON INSURANCE PLC,

Movant-Cross-Appellee-Appellant,

**EXHIBIT 3**

and

BOTO COMPANY LIMITED,

Claimant-Cross-Appellee-Appellant,

and

ROYAL & SUN ALLIANCE INSURANCE (HONG KONG) LIMITED,

Claimant-Cross-Appellees,

versus

MINGTAI FIRE & MARINE INSURANCE COMPANY; CHIN LING STEEL COMPANY,

Claimants-Appellants.

---

R. L. BARON SHIPPING S.A.,

Plaintiff-Appellant-Cross-Appellee,

versus

WATERMAN STEAMSHIP CORPORATION,
as the time charterer of the Tug KAMRUP,

Defendant-Third Party Plaintiff-Appellee-Cross-Appellant,

versus

DOOYANG LINE COMPANY LIMITED; DOOYANG SHIP MANAGEMENT COMPANY
LIMITED; UNITED KINGDOM MUTUAL STEAMSHIP ASSURANCE
ASSOCIATION (BERMUDA) LIMITED,

Third Party Defendants-Cross-Appellees.

---

Appeals from the United States District Court
for the Eastern District of Louisiana
(97-CV-3829-E and 99-CV-1888-E)

---

2

Before SMITH, BARKSDALE, and EMILIO M. GARZA, Circuit Judges.

PER CURIAM:*

These matters arise out of a collision in India between a barge and an ocean-going vessel. For the underlying Rule 54(b) judgment, primarily at issue is whether the district court erred in granting summary judgment to Central Gulf Lines, Inc. (CGL; barge owner), and Waterman Steamship Corporation (Waterman; barge bareboat charterer). Also at issue, concerning R. L. Baron Shipping (Baron; vessel owner), are: (1) choice of law; and (2) standing to appeal. We hold: Baron has standing; United States law applies, with reference to Indian law for issues of navigational error; and summary judgment was proper. **AFFIRMED and REMANDED.**

I.

The collision occurred in June 1997, near Calcutta, India, on the Hooghly River (tributary of the Ganges River). It involved the M/V GREEN OPAL, an ocean-going vessel, and a dumb, unmanned LASH Barge, CG-F70 ("LASH" is an acronym for "Lighter Aboard Ship"), towed by the tug KAMRUP. As noted, Baron owned the GREEN OPAL; CGL owned the barge; and Waterman bareboat chartered it.

Waterman operates a LASH shipping system, which involves loading LASH barges, containing cargo, directly onto a mother

---

*Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

vessel. That vessel transports the barges to a deep water port, where the barges are unloaded and towed to inland ports not accessible to the mother vessel. The mother vessel takes on new barges, again loaded with cargo, and proceeds to a new port. *See Wirth, Ltd. v. S/S Acadia Forest*, 537 F.2d 1272, 1274 (5th Cir. 1976) (providing more detailed description).

Like most international shipping companies, Waterman hires local agents at various ports to conduct its business. Waterman's general regional agent for Southeast Asia is Marco Shipping Company (Marco); its local agent in India is Oceanic Shipping Agency Pvt. Ltd. (Oceanic). Through its agents, Waterman negotiated, at arms-length, with Eastern Navigation Private Limited (Eastern) in March 1974 to provide towage of its LASH barges (1974 Contract). The 1974 Contract was effective in June 1997, when the collision occurred. The pertinent provisions follow:

> WHEREAS the said Principal [Waterman] carries on business in Calcutta through its Agents [Oceanic, in 1997] ... AND WHEREAS ... Waterman ... intends to operate their Lash vessels (hereinafter called the "Mother Ship") to Calcutta Port which vessels due to their size and draught will normally anchor in the vicinity of Haldia,
>
> AND WHEREAS [Waterman] has approached the said *Contractor* [Eastern] for undertaking the towage work of the Lash barges ...,
>
> AND WHEREAS [Eastern] has agreed to undertake the said work on the following terms and conditions:

4

## NOW IT IS HEREBY AGREED AND DECLARED as follows:

1. For the purpose of carrying out the aforementioned towing operation [Eastern] shall purchase and/or procure suitable tugs as may be approved by the Agents in writing for the various stages of the operation. The entire operation is required to be performed with the help of three tugs - of which one tug should be a very powerful one of a capacity of minimum 1500 h.p., another of a capacity of 500 to 700 h.p. or more and a third one may be a small launch mainly for moving the said Lash barges from one place to another inside the docks. It is understood that all those tugs will be under the sole approval of the Agents as aforesaid.

* * *

3. [Eastern] will not be entitled to use the said tugs and equipments *for Lash vessels of any company other than those belonging to or chartered by [Waterman]*. Those tugs are meant to be operated within the area of Calcutta Port i.e. between sandheads and Calcutta. *However, when free from Lash operations [Eastern] may with the prior permission in writing of the Agents, do some other work in Calcutta Port.*

4. Ordinarily, but not exclusively, barge operation will mean and include the following under direction of the Agents:

> a) Receiving the Lash barges at the water level from Mother Ship as and when they are lowered.

> b) Safe handling and controlling of Lash Barges as soon as they are floated on the water.

> c) To tow the Lash barges to a floating area or areas in or around Haldia or to any other place as may be found suitable.

d) To tow from the said floating area in Haldia, loaded or empty lash barges, to floating areas inside the Calcutta Docks as may be directed by the said Agents.

e) To move the Lash barges from one place to another inside the Calcutta Docks, as may be required, for the loading and/or unloading purposes to and from the floating area as mentioned in Clause (d) above.

f) Likewise to tow the Lash barges from the floating area in Calcutta Docks to the floating area in Haldia and from there to tow the Lash barges to the side of the Mother Ship for loading them on to the Mother Ship as and when required, strictly under the schedule chalked out by the Agents.

* * *

10. *The Contractor [Eastern] shall ensure safe towing and handling of the barges in tow.*

(Emphasis added.)

As renewed in February 1985, the contract (Renewal Contract) provides specific provisions relating to the HOLLAND, the 1500 horsepower tug required by the 1974 Contract and referenced in its paragraph 1:

It was clearly understood that Holland will be kept in perfect working condition all the time for the use of Waterman work only and, if at all, it is held up for repairs and/or for any other reasons (which must be discussed with us) *Eastern will make alternate suitable arrangements for towage operation in place of Holland at their own cost.*

Over and above Holland or tug/tugs replacing Holland as stated above, in the event a second tug is required, Eastern will ensure that such

6

> service is so provided for which they will be
> paid for extra.   For this purpose, it is
> clarified that a suitable good tug capable of
> operation and towage will be made available
> whenever required.

(Emphasis added.)

At the time of the June 1997 collision, and because the HOLLAND was being repaired, Eastern bareboat chartered the KAMRUP to perform Waterman's LASH towage.   Oceanic knew of these circumstances.  Waterman and Marco had no knowledge of any serious collisions occurring before that June and were satisfied with Eastern's work.

In June 1997, the mother vessel, GREEN ISLAND, carried LASH barge CG-F70 and others to Haldia, India. Before arriving in Haldia, the GREEN ISLAND contacted Marco and Oceanic.   Oceanic alerted Eastern of the new arrival.

In the morning of 16 June 1997, the LASH barges, including CG-F70, were placed in the water and taken into Eastern's possession. The LASH barge discharge was completed in the early afternoon on 17 June, and the GREEN ISLAND departed.  The KAMRUP's tugmaster waited one and one-half days for appropriate tidal conditions and decided how many barges to tow.  (Haldia is approximately 80 miles from Calcutta.)

The KAMRUP towed five loaded barges, as it had often done. For this tow, the KAMRUP pushed the barges upriver with the tug

7

attached to the port side of the last barge ("on-the-hip").  CG-F70 was the lead barge.

Although there is some dispute as to the exact events, in the morning of 19 June, the KAMRUP rounded a river bend outside the navigable channel of the Hooghly River.  The GREEN OPAL had been proceeding down river, full ahead, for an hour before the collision.  Visibility was clear.  The GREEN OPAL cut to half; and, 30 seconds later, the lead barge, CG-F70, and the GREEN OPAL collided.  The GREEN OPAL sank in the navigable channel.  The Indian Government ordered wreck removal.  Baron's sole capital was the GREEN OPAL; because of its loss, Baron was dissolved approximately one year later.

Baron, its directors, and the United Kingdom Mutual Steamship Assurance Association (Bermuda) Ltd. (GREEN OPAL's insurer and subrogated underwriter of its cargo) seek damages for the lost ship, its cargo, and the wreck removal.  Chin Ling Steel Company; its insurer, Mingtai Fire & Marine Insurance Company; Boto Company Limited; and its insurer, Sun Alliance and London Insurance Plc (collectively, Cargo Claimants) seek damages for cargo that sank with the GREEN OPAL.  Waterman and CGL seek exoneration or limitation of liability.  And, Baron filed an action against Waterman as the time charterer of the barge, contending that, as a time charterer, limitation does not apply.

8

On 25 June 2001, through an extremely detailed and comprehensive opinion, the district court granted summary judgment to Waterman and CGL for both the limitation and time charterer actions.   It held Indian law applied to issues of navigational error and United States law applied to all other issues; reiterated CGL was awarded summary judgment because its motion was unopposed; held that, even if Eastern or the KAMRUP were negligent, this could not be imputed to Waterman; held Waterman was not independently negligent; and, finally, held the 1974 and Renewal Contracts were towage contracts, not time charters, and limitation law applied.

That July, the district court issued an order dismissing as moot various motions, including Waterman's motion to dismiss for Baron's failure to comply with discovery orders and vexatious litigation tactics.   The district court, pursuant to Rule 54(b), directed entry of a final judgment of the 25 June order (with two amendments).

## II.

Baron appeals from that judgment.   (Waterman and CGL contend we lack jurisdiction because Baron, as a dissolved corporation, lacks legal capacity to sue.)   Waterman cross-appeals the denial, as moot, of its motion to dismiss concerning claimed vexatious litigation and discovery.

As hereinafter discussed:   (1) Baron has legal capacity to appeal because it filed this action within the time limit, provided

by Panamanian corporate law, for dissolved corporations to conclude their affairs; (2) United States law, with reference to Indian law regarding navigational error, is applicable; (3) summary judgment for CGL and Waterman was proper; (4) Baron abandoned, through inadequate briefing, its challenge to cost allocation; and (5) we lack jurisdiction to review the denial, as moot, of Waterman's motion to dismiss concerning claimed vexatious litigation and discovery.

### A.

Waterman and CGL contend this controversy is moot because Baron lacks legal capacity to sue. Needless to say, Article III of the Constitution permits federal courts to adjudicate only actual cases or controversies. *E.g.*, *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 476 (1990). "A controversy becomes moot where, as a result of intervening circumstances, there are no longer adverse parties with sufficient legal interests to maintain the litigation. Mootness can arise in one of two ways: First, a controversy can become moot when the issues presented are no longer live. A controversy can also become moot when the parties lack a legally cognizable interest in the outcome." *Chevron U.S.A. Inc. v. Traillour Oil Co.*, 987 F.2d 1138, 1153 (5th Cir. 1993) (internal quotations and citations omitted).

A corporation's dissolution abates all pending litigation, absent a contrary provision under the law where that corporation

was formed. *Oklahoma Natural Gas Co. v. State of Oklahoma*, 273 U.S. 257, 260 (1927). Federal Rule of Civil Procedure 17(b) incorporates this concept: "The capacity of a corporation to sue or be sued shall be determined by the law under which it was organized". Because Baron was incorporated in Panama, we look to Panamanian corporate law to determine Baron's legal capacity to sue.

Panamanian law provides a three-year period post-dissolution for a corporation to conclude its affairs. PANAMANIAN LAW OF CORPORATIONS, Art. 85 (Law No. 32, 26 February 1927). Baron dissolved on 22 June 1998. Therefore, that three-year period ended on 22 June 2001. Waterman and CGL contend Baron lacks capacity to appeal because that three-year period has run. Baron counters: Panamanian law only requires an action to be *initiated* within the three-year period; thereafter, a dissolved corporation maintains legal capacity to complete the action.

Articles 85 and 86 of the Panamanian Law of Corporation are relevant. Article 85 provides:

> A corporation the existence of which terminates by the expiration of the period fixed in the Articles of Incorporation or by dissolution is, nevertheless, continued body corporate for a term of three years thereafter, *for the express purpose of maintaining special proceedings which may be deemed convenient; of defending its interest as defendants*, settling and closing its affairs, disposing and conveying its properties and dividing its capital stock; but under no circumstances shall the corporation

11

continue the business for which its was
established.

(Emphasis added.)   In Spanish, Article 85 reads:

Toda sociedad anónima cuya existencia termina
por vencimiento del período fijado en el pacto
social o por disolución, continuará no
obstante por el término de tres años desde esa
fecha *para los fines específicos de iniciar
los procedimientos especiales que consideren
convenientes defender sus intereses como
demandada*, arreglar sus asuntos, traspasar y
enajenar sus bienes, y dividir su capital
social, pero en ningún caso podrá continuar
los negocios para los cuales fue constituida.

(Emphasis added.)

The parties submitted differing translations of this article.
CGL and Waterman's translation, quoted above, reads:   "for the
express purpose of maintaining special proceedings which may be
deemed convenient; of defending its interest as defendants ...."
Baron's translation reads:    "for the specific purpose of
*prosecuting or defending* suits by or against it ...."   (Emphasis
added.) We have adopted the CGL/Waterman translation because it
better tracks the original Spanish.   *See also Tryforos v. Icarian
Dev. Co. S.A.*, 47 F.R.D. 191, 193 (N.D. Ill. 1969) (translating
Article 85 as CGL/Waterman does), *modified on other grounds in
Tryforos v. Icarian Dev. Co. S.A.*, 518 F.2d 1258 (7th Cir. 1975),
*overruled on other grounds in Felsen v. Andreas*, 134 F.3d 873 (7th
Cir. 1998).

12

Article 86 states:

> Whenever the existence of a corporation shall
> terminate by the expiration of its duration
> period, or by dissolution, the Directors shall
> serve as Trustee of the corporation with power
> to settle its affairs, collect all sums or
> owing [sic], sell and transfer all class of
> its properties, divide its properties among
> shareholders, when the debts of the
> corporation have been satisfied and *they shall*
> *also have the authority to sue for, in the*
> *name of the corporation, and recover debts and*
> *assets* and to represent the corporation in
> proceedings against it which may be
> maintained.

(Emphasis added.)  In Spanish, Article 86 reads:

> Cuando la existencia de una sociedad anónima
> termine por vencimiento del período de su
> duración, o por disolución, los directores
> actuarán como fiduciarios de la sociedad con
> facultades para arreglar sus asuntos, cobrar
> sus créditos, vender y traspasar sus bienes de
> todas clases, dividir sus bienes entre sus
> accionistas, una vez pagadas las deudas de la
> sociedad; *y además tendrán facultad para*
> *iniciar procedimientos judiciales en nombre de*
> *la sociedad con respecto a sus créditos y*
> *bienes,* y para representarla en los
> procedimientos que se inicien contra ella.

(Emphasis added.)

As earlier discussed, Article 85 only authorizes "*defending* [a

corporation's] interest as *defendants*".    (Emphasis added.)

Nonetheless, Article 86 provides that the directors, as trustees

post-dissolution, may sue in the corporation's name.  *See also*

*Tryforos*, 47 F.R.D. at 194 (recognizing Article 86 authorizes

action in the name of corporation, but also allows trustees to sue

in own name).  Baron's legal expert confirms this reading: "Among

13

the acts of liquidation, the company is entitled to *commence* legal actions to collect moneys owed to the company arising out of ... tortious acts commited [sic] against the company or it's [sic] property". (Emphasis added.) *See also* **A. Halcoussis & Co. v. Coastal States Gas Corp.**, No. 82 Civ. 4963-CSH, 1985 U.S. Dist. Lexis 14417 at *6 (S.D.N.Y. 29 October 1985) (considering Articles 85 and 86 and citing expert testimony that Panamanian corporation "can sue and be sued" during the three-year period). We hold, therefore, that, post-dissolution, Baron can bring, as well as defend, an action.

Nevertheless, Article 85 authorizes continued legal action for only *three years* after dissolution. Although more than three years have passed, we hold that Baron has legal capacity to appeal because it initiated this action within the three-year period.

First, the uncontroverted testimony of Baron's Panamanian legal expert supports our conclusion:

> Whatever actions the company takes, as part of the liquidation process, should be *commenced* within a period of three years from the date of it's [sic] dissolution. ... Eventhough [sic] a litigation process, to which the dissolved company is a party, may last more than three years, *the statute only requires that the judicial proceeding in question be initiated within said period* ....

(Emphasis added.)

Second, the Panamanian Corporation Code is based on Delaware law. Features of Panama Corporations, at

14

http://www.geocities.com/WallStreet/4245/sa.htm; Panama
International Business Corporations, at
http://www.offshorexplorer.com/panama.htm; Panama Offshore Company
Incorporations, *at* http://www.milonline.com/mil-panama1.html.
Under Delaware law, litigation pending during the three-year period
can be continued after that period ends, but no new actions can be
initiated. *In re Citidel Indus., Inc.*, 423 A.2d 500, 503 (Del. Ch.
1980) ("*[E]xcept with regard to pending proceedings or litigation*,
three years from the date of dissolution established the outside
limit after which the corporation could no longer act or be sued in
a corporate capacity". (emphasis added)). Finally, this reading
comports with interpretations of similar statutes. *E.g.*, *Chicago
Title & Trust Co. v. Forty-One Thirty-Six Wilcox Bldg. Corp.*, 302
U.S. 120, 128 (1937) (under Illinois statute, no new proceedings
may be initiated, but pending proceedings initiated within
statutory dissolution period may be litigated to completion).

B.

Baron and the Cargo Claimants maintain Indian law applies to
substantive issues; Waterman and CGL, United States law. The
district court held the latter applies, with reference to the
Indian Rules of Inland Navigation to determine navigational errors.
A choice of law determination is reviewed *de novo*. *Fogleman v.
ARAMCO*, 920 F.2d 278, 282 (5th Cir. 1991).

15

Waterman and CGL contend that, as a matter of law, limitation proceedings apply both procedural *and* *substantive* United States law.  We disagree.

> While United States law governs the procedural issues of the limitation proceeding, this Court must decide what substantive law applies to the underlying cause of action.  The fact that United States law determines limitation does not automatically mean that United States law should supply the substantive law for the underlying claim.

*Karim v. Finch Shipping Co. Ltd.*, 94 F. Supp. 2d 727, 735 (E.D. La. 2000) [*Karim I*], *aff'd*, 265 F.3d 258 (5th Cir. 2001) [*Karim II*]. *See Oceanic Steam Navigation Co. Ltd. v. Mellor*, 233 U.S. 718, 732 (1914) [*The Titantic*] (applying British substantive law to United States limitation of liability action).

We determine what substantive law applies by evaluating the eight factors set forth in *Lauritzen v. Larsen*, 345 U.S. 571 (1953), and *Hellenic Lines Ltd. v. Rhoditis*, 398 U.S. 306 (1970): (1) place of the wrongful act; (2) law of the flag; (3) allegiance or domicile of the injured; (4) allegiance of the defendant shipowner; (5) place of contract; (6) inaccessibility of the foreign forum; (7) law of the forum; and (8) base of operations. Although these factors were first enunciated in a Jones Act context, they are applicable to maritime law generally. *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 382 (1959).

"These principles do not depend upon a mechanical application .... The controlling considerations are the interacting interests of the United States and of foreign countries ...." *Id.* at 383. Courts have weighed the factors differently in different contexts. *E.g.*, *Fogleman*, 920 F.2d at 282 ("[T]he significance of each factor in a nontraditional maritime context like offshore oil production may vary from that in the traditional shipping context in which the *Lauritzen-Rhoditis* test arose".); *Carbotrade S.p.A. v. Bureau Veritas*, 99 F.3d 86, 91 (2nd Cir. 1996) (noting several factors did not apply because of the unique circumstances of that case).

Here, the eight factors, by themselves, point to numerous possible choices of law. The place of the wrongful act is India. The law of the flag yields three options: CG-F70 is United States; GREEN OPAL, Panama; and KAMRUP, India. The allegiance of the injured includes: Baron, a Panamanian corporation, with directors from Japan, Korea, and China; the primary underwriter, a United Kingdom corporation; and Cargo Claimants of Bermuda, Japan, Hong Kong, and Norway. The allegiance of the defendants, CGL and Waterman, is the United States.

Baron and Cargo Claimants assert Waterman was negligent because of a contract executed in India. Further, Baron and Cargo Claimants assert Indian law should be applied and Indian courts are accessible. The law of the forum in which Baron and Cargo

17

Claimants instigated this action, as hereinafter discussed, is United States.

Finally, the base of operations determination requires consideration of both the ship's and the shipowner's contacts. *Rhoditis*, 398 U.S. at 311. Courts have considered: the location of corporate headquarters; the ownership interest in the corporation; where the ship is regularly loaded; where the management of operations occurs; where maintenance of the vessel is performed; and where shipping agents are located. *See, e.g., Sosa v. M/V LAGO IZABAL*, 736 F.2d 1028, 1032 (5th Cir. 1984).

Waterman's home offices are in New Orleans, Louisiana, although it has agents in Singapore and India. The CG-F70 was registered by the American Bureau of Shipping from 24 August 1995 until 1 August 2000. It was loaded (grain for CARE) in Memphis, Tennessee, and inspected by USDA representatives before its trip to India. After the collision, the CG-F70 was repaired in the United States. These facts indicate a United States base of operations.

We must now weigh these factors. The most significant factors are: the place of the wrongful act; the allegiance of defendants; the allegiance of the injured; the accessibility of the Indian courts; and the law of the forum. We assign little weight to the place of contract, because Baron and Cargo Claimants are not in privity with Waterman or Eastern. *E.g., Lauritzen*, 345 U.S. at 588; *Carbotrade*, 99 F.3d at 90.

18

The place of the wrongful act is usually given little weight for *shipboard* torts; a ship, by nature, passes through many jurisdictions, and a territorial determination of law creates little regularity. **Lauritzen**, 345 U.S. at 585. Therefore, "[t]he law of the flag has traditionally been of cardinal importance in determining the law applicable to maritime cases". ***Fogleman v. ARAMCO***, 920 F.2d 278, 282 (5th Cir. 1991).

Here, however, we are concerned with a collision between two ships, not a personal injury accident aboard ship. Obviously, India has a strong interest in ensuring the safety of its waterways; application of Indian navigation regulations, where relevant, is enough to protect India's interests in this dispute. Other factors weigh in favor of applying United States law to the other substantive issues.

In most cases, the law of the forum and accessibility of other forums are not significant because it is the *defendant*, who is involuntarily before United States courts, asserting application of *foreign* law. **Lauritzen**, 345 U.S. at 591-92 ("Because a law of the forum is applied to plaintiffs who voluntarily submit themselves to it is no argument for imposing the law of the forum upon those who do not."). *See, e.g., **Rhoditis***, 398 U.S. 306; **Romero**, 358 U.S. 354; **Lauritzen**, 345 U.S. 571; **Karim II**, 265 F.3d 258. Here, however, the usual situation is reversed: Baron, and other

19

*plaintiffs*, seek to apply *foreign* law; *defendants*, United States domicilaries, are asserting application of *United States* law.

Baron initiated an action against CGL on 26 June 1997, one week after the collision. On 4 December, Baron attempted to voluntarily dismiss the action and refile in Louisiana courts. CGL opposed the dismissal and, with Waterman, filed, on 10 December, a limitation action. The district court granted the voluntary dismissal of Baron's action. In June 1999, Baron filed a separate action claiming the 1974 and Renewal Contracts were time charters and, therefore, limitation law did not apply.

In short, this is not a case where the law of the forum is being "imposed on defendants who are involuntarily made party to a suit in the forum". **Merren v. A/S BORGESTAD,** 519 F.2d 82, 83 (1975). *See also Karim I,* 94 F. Supp. 2d at 736 (rejecting application of United States law where the United States is fortuitously host forum - injured plaintiff merely treated in United States). Here, the *defendants*, Waterman and CGL, are arguing for the application of United States law, and the *plaintiffs*, Baron and Cargo Claimants, voluntarily submitted themselves to United States courts. The Indian courts were accessible to them, and they chose not to institute an action there, even though Eastern operates in India. Moreover, although not all are United States domicilaries, none of the Baron interests

are Indian domicilaries.  *E.g.*, **Karim I**, 94 F. Supp. 2d at 735-36 (applying Bangladeshi law where plaintiff is Bangladeshi).

Baron and Cargo Claimants, who chose to sue a United States corporation in the United States and accept United States limitation law, cannot now receive Indian substantive law.  The United States has a strong interest in preventing such manipulation of our choice-of-law jurisprudence.  Therefore, United States law applies to all issues but navigational error. *See, e.g.*, **Rhoditis**, 398 U.S. at 309-10 (finding base of operations another factor and preventing avoidance of application of United States law where foreign corporation only a facade for United States operations).

C.

Summary judgment was awarded CGL and Waterman for the limitation action and for Waterman for the time charterer action. CGL was granted summary judgment because its motion was unopposed. And, as discussed *supra*, the district court held:  even if Eastern were negligent in using the KAMRUP to tow Waterman's LASH barges, Waterman was not liable because it was not independently negligent; and the agreement between Waterman and Eastern was a towage contract, *not* a time charter, and therefore limitation law applies.

A summary judgment, reviewed *de novo*, is proper if there is no genuine issue of material fact and the movant is entitled to a judgment as a matter of law.  *E.g.*, **GATX Aircraft Corp. v. M/V COURTNEY LEIGH**, 768 F.2d 711, 714 (5th Cir. 1985); FED. R. CIV. P.

21

56(c).  The record, as well as inferences based on it, are viewed

in the light most favorable to the non-movant.  *E.g.*, *GATX Aircraft*

*Corp.*, 768 F.2d at 714.

1.

For the limitation action, Baron and Cargo Claimants contend

the district court erred in exonerating Waterman.  First, they

assert Waterman can be held liable for negligently employing

Eastern's tug, the KAMRUP.  Second, they maintain Waterman allowed

the claimed dangerous operation of the KAMRUP by failing to ensure

the 1974 and Renewal Contracts' terms were followed.

The Limitation of Liability Act provides shipowners a means to

limit liability to the value of their vessel:

> The liability of the owner of any vessel ...
> for any loss, damage, or injury by collision,
> or for any act, matter, or thing, loss, damage
> or forfeiture, done, occasioned, or incurred,
> without the privity or knowledge of such owner
> or owners, shall not ... exceed the amount or
> value of the interest of such owner in such
> vessel, and her freight then pending.

46 U.S.C. app. § 183(a).

The shipowner is entitled to exoneration from, or limitation

of, liability when he shows his lack of knowledge or privity with

the negligent acts or conditions of unseaworthiness that caused the

collision.  *See Brister v. A.W.I. Inc.*, 946 F.2d 350, 355 (5th Cir.

1991).  A shipowner free from fault will be exonerated.  *Tittle v.*

*Aldacosta*, 544 F.2d 752, 755 (5th Cir. 1977).

22

Waterman, as bareboat charterer of the LASH barge CG-F70, is the owner of the *tow*; however, Waterman is *not* the owner of the *tug*, KAMRUP.  It is well-settled that a tow is not liable for the acts of the tug:

> When damage is caused by a casualty involving the tow or by the whole flotilla, the courts employ the concept of "dominant mind" to place liability on the tug and to absolve the tow from liability.  This doctrine holds that only that vessel is liable whose people are actually in control of the operation, even though the whole flotilla causes the damage.

T. Schoenbaum, ADMIRALITY AND MARITIME LAW § 12-7, at 258 (West 3d ed. 2001) (internal citations omitted).  Therefore, Baron and Cargo Claimants must show Waterman is negligent, independent of possible negligence by Eastern or KAMRUP.  They fail to do so.

The record is devoid of evidence suggesting Waterman was negligent for employing Eastern to tow its barges.  In its eight-years' experience, Oceanic (Waterman's Agent) knew of no problems with Eastern's towing practices.  Likewise, in its 26-years' experience, Waterman had no notice of any problems.  To the contrary, the KAMRUP towed barges as it did on the day of the collision many times in the past without incident.  There is no evidence Waterman or Oceanic (its Agent) instructed Eastern on the makeup or movement of the tug and tow.  Likewise, Oceanic or Waterman employees were not present on the tug during the tow giving rise to this action.  *See, e.g., Dow Chemical Co. v. Tug THOMAS ALLEN,* 349 F. Supp. 1354 (E.D. La. 1972) (holding owners of

23

tow liable for accident where employee of tow owner was on board tug and required tug to navigate dangerous waters).

Further, Baron and the Cargo Claimants fail to show that, under the 1974 or Renewal Contracts, Waterman had a duty to monitor Eastern's operations.  Primarily, Baron and the Cargo Claimants rely on two passages.  First, they rely on the following from the 1974 Contract:

> For the purpose of carrying out the aforementioned towing operations the Contractor [Eastern] *shall purchase and/or procure suitable tugs* as may be approved by the Agents [of Waterman] in writing for the various stages of the operation.  The entire operation is required to be performed with the help of three tugs - of which one tug should be a very powerful one of a capacity of minimum 1500 h.p., another of a capacity of 500 to 700 h.p. or more and a third one may be a small launch mainly for moving the said Lash barges from one place to another inside the docks.  It is understood that all those tugs will be under the sole approval of the Agents as aforesaid.

(Emphasis added).  Second, the Renewal Contract specifically addresses the HOLLAND (1500 h.p.; being repaired at time of collision):

> It was clearly understood that Holland will be kept in perfect working condition all the time for use of Waterman work only and, if at all, it is held up for repairs and/or for any other reasons (which must be discussed with us) *Eastern* will make alternative suitable arrangements for towage operation in place of Holland at their own cost.
>
> Over and above Holland or tug/tugs replacing Holland as stated above, in the event a second

24

> tug is required, *Eastern* will ensure that such
> service is so provided for which they will be
> paid for extra.

(Emphasis added.)

These clauses establish no right on the part of Waterman or its Agents to generally control Eastern's operations.  The 1974 Contract clause only provides Oceanic (Waterman's local Agent) with a right to approve the *purchase or other procurement* of suitable tugs.  It says nothing about approval of the *use* of the tugs.  The Renewal Contract clause does not require Eastern to use an alternative 1500 horsepower tug in the event the HOLLAND is being repaired.  It only requires Eastern to make "alternative suitable arrangements" and establishes who bears the costs when "tug/tugs" are used to replace the HOLLAND.

The Waterman corporate representative stated by deposition: "The actual employment of those tugs is left to the contractor [Eastern].  Waterman is concerned about the delivery of its cargo, not the details of what equipment is used by the towage contractor [Eastern]."  Along this line, Baron and the Cargo Claimants ignore paragraph 10 of the 1974 Contract:  "*The Contractor* [*Eastern*] shall ensure safe towing and handling of the barges in tow".  (Emphasis added.)

### 2.

As noted, the district court granted Waterman summary judgment against Baron's time charter action.  Baron contends:  the contract

between Oceanic and Eastern is a time charter; the Limitation on Liability Act does not apply to such charters; and, therefore, Waterman can be held liable. Waterman responds: the contract is instead one for simple towage; and, in any event, Waterman is not independently negligent.

A time charter entitles the charterer to full possession and control of the owner's vessel for a specified period of time. *Agrico Chem. Co. v. M/V BEN W. MARTIN*, 664 F.2d 85, 91 (5th Cir. 1981); *Walker v. Braus*, 995 F.2d 77, 80-81 (5th Cir. 1993). On the other hand, a towage contract provides for one vessel, such as a tug, to move another, such as a barge. *Agrico Chem. Co.*, 664 F.2d at 90. As Baron notes, these categories are not mutually exclusive; for example, the purpose of a time charter could be towage. Nevertheless, here, the character of the entire agreement indicates it is solely a towage contract.

The 1974 Contract preamble states: "[T]he said *principal* [Waterman] has approached the said *Contractor* [Eastern] for undertaking the *towage* work of [Waterman's] Lash barges". (Emphasis added.) The contract is an agreement between the "principal" and the "contractor", not between the "charterer" and the "owner". In the preamble and throughout, the 1974 Contract repeatedly refers to "towage", never once mentioning "chartering". Finally, paragraph 4 of that contract enunciates Eastern's duties, which all specifically relate to towage.

26

Further, although the 1974 Contract, and its renewals, specify a period of time after which the contract terminates, this period relates to Eastern's towage services, rather than a time over which Waterman has possession and control of particular tugs.  For instance, unlike the typical time charter, the disputed contract does not designate any specific chartered vessel.  *See generally* POOR ON CHARTER PARTIES AND OCEAN BILLS OF LADING, § 1, at 4-5 (5th ed. 1968); MICHAEL WILFORD ET AL., TIME CHARTERS 81-139 (4th ed. 1978). Paragraph 1 of the 1974 Contract merely provides for the procurement of three tugs.  The evidence demonstrates this paragraph was included only to *describe* the existing equipment available at the time of contracting.

Also, Waterman did not control tug operations.  It merely gave a time frame for Eastern to deliver its barges to a certain destination.  It did not direct how Eastern should use its vessels, which ones should be used, or what route they should take. Although the 1974 Contract, paragraph 3 (as emphasized earlier), contains a non-competition clause, it was not meant to limit Eastern's general operations; Eastern did tow for others.

Moreover, even were the 1974 Contract characterized as a time charter, Waterman must still have been negligent in its direction of the tugs.  *See Moore v. Phillips Petroleum Co.*, 912 F.2d 789, 792 (5th Cir. 1990).  As discussed above, Waterman was not negligent.

27

### D.

Baron and Cargo Claimants consented, in district court, to the exoneration of CGL. Nevertheless, Baron appealed from the allocation of costs awarded CGL. Baron did not provide any briefing, however, on this issue in its original brief. "An appellant abandons all issues not raised and argued in its *initial* brief on appeal". *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) (emphasis in original).

### E.

Waterman and CGL cross-appeal the district court's denial, as moot, of their motion to dismiss for Baron's failure to comply with discovery orders and vexatious litigation tactics. The denial of that motion is not included within the Rule 54(b) judgment. Accordingly, we lack jurisdiction over this cross-appeal. *See* 28 U.S.C. §§ 1291 & 1292.

### III.

For the foregoing reasons, Waterman's motion to dismiss Baron for lack of jurisdiction is **DENIED**; Baron's motion to dismiss the cross-appeal by Waterman and CGL is **GRANTED**; the summary judgment awarded Waterman and CGL is **AFFIRMED**; and this matter is **REMANDED** to the district court for further proceedings consistent with this opinion.