# AFFIDAVIT

**STATE OF KENTUCKY**

**COUNTY OF McCRACKEN**

BEFORE ME, the undersigned Notary Public, duly commissioned in the State and County aforesaid, personally came and appeared:

**DANIEL E. BROCK**

who, after being duly sworn, did depose and testify that:

1. I am a citizen of the United States of the full age of majority and a resident of the State of Kentucky, have personal knowledge of the facts attested to herein, and also make this affidavit based upon my investigation and work as an expert witness having specialized knowledge, training and experience regarding the maritime industry generally and, in particular, the inland towing industry and the towage of unmanned barges.

2. I am 62 years of age and have over 40 years of experience in the inland towing industry. Since 1993, I have worked as a marine consultant. Attached as Exhibit A is a true and correct copy of my expert report dated November 9, 2004 regarding the September 15, 2001 allision with the Queen Isabella Causeway Bridge involving the tug M/V BROWN WATER V and the towage of certain barges of American Commercial Barge Lines LLC. Attached as Exhibit B is a true and correct copy of my curriculum vitae which outlines my work experience, training, and educational and professional background.

3. As set forth more fully in my curriculum vitae, Exhibit B, I have worked in the inland towing industry in several capacities from deckhand to captain. I have also worked as a port captain, an assistant vice president, and a marine superintendent for major barge lines. During my career, I had responsibility for the overall operation of numerous

**EXHIBIT 14**

towboats and barges, the design and implementation of safety and training programs for vessels and shore-based personnel, and various administrative and managerial responsibilities. I have also operated towing vessels on various rivers and inland waters of the United States, including the Gulf Intracoastal Waterway and the waters where the allision in question occurred, and am familiar with the towage of unmanned barges.

4. I currently hold a valid U.S. Coast Guard license (7th issue) as a First Class Pilot of Steam and Motor Vessels of Any Gross Tons Upon the Lower Mississippi River from Mile 900 to Mile 950; Master of Towing Vessels Upon the Great Lakes, Inland Waters and Western Rivers, excepting waters subject to International Regulations Preventing Collisions at Sea; Master of Towing Vessels upon the Western Rivers. My license is also endorsed with a Radar Observers Endorsement (Unlimited). A true and correct copy of my U.S. Coast Guard license is included with my curriculum vitae, Exhibit B.

5. I have testified as an expert witness in a variety of cases including engagements in matters before state courts, federal courts and administrative and regulatory bodies. I have provided expert testimony concerning the marine and inland towing industry. A list of engagements appears at pages 5 to 12 of my curriculum vitae, Exhibit B.

6. In preparation of my report dated November 9, 2004, Exhibit A, I reviewed the various documents and depositions listed on pages 1 and 2 of my report. The substance of my observations, opinions and discussion are set forth more fully in my report, attached as Exhibit A, and is incorporated by reference. To summarize, it is my opinion that:

   (A) Barges NM-315, VLB-9182, ACL-9933B and VLB-9173 were duly documented with the U.S. Coast Guard and were in all respects seaworthy for their intended services. These barges were by design and construction unmanned dry cargo

barges having no means of self propulsion or steerage for navigation purposes. Unmanned barges of this type must rely on an external source of propulsion and steerage for movement, such as a tug boat or a towboat.

(B)   On September 15, 2001, Barges NM-315, VLB-9182, ACL-9933B and VLB-9173 were under the care, custody and control of Brown Water Marine Service, Inc. ("Brown Water"), a third party tower who by towing industry custom and practice is to provide a seaworthy towing vessel to move the barges from one point to another in a reasonable time frame and with the utmost care and safety of navigation. It is expected that the barges to be towed will remain under the custody of the tower and that the tower will make all necessary decisions regarding the towage of the barges, including which towing vessel to be used, how to crew the vessel, and by whom.

(C)   Brown Water utilized the M/V BROWN WATER V, a diesel powered towboat manned by Brown Water personnel, to tow the barges. The Pilot and operator of the M/V BROWN WATER V was appropriately licensed by the U.S. Coast Guard and was acting under the authority of his license to Pilot and operate the towboat at the time of the allision.

(D)   When the M/V BROWN WATER V and its tow of barges allided with the Queen Isabella Causeway Bridge on September 15, 2001 causing damage to Barge NM-315, Brown Water did not fulfill its responsibility as a third party tower to American Commercial Barge Line. Barges NM-315, VLB-9182, ACL-9933B and VLB-9173 did not in any way cause or contribute to the allision of September 15, 2001 with the Queen Isabella Causeway Bridge.

(E)  At the request of American Commercial Barge Line, Mr. Timberlake performed an independent vendor audit of Brown Water. Mr. Timberlake was an experienced auditor and the purpose of his audit was to identify within the Brown Water organization which processes were in place and working, which areas required the implementation of a process, and to identify areas for improvement that would assist Brown Water in improving their overall service to American Commercial Barge Line. Mr. Timberlake was also asked by American Commercial Barge Line to determine if Brown Water should continue to be used as an approved vendor based on his overall findings. Mr. Timberlake reviewed Brown Water's management processes that were in place, noted areas that could be improved and identified various deficiencies on two of Brown Water's vessels that were audited. The deficiencies noted on the vessels were of a process oriented nature or replacement of requirement equipment. None of the deficiencies identified by Mr. Timberlake on Brown Water's vessels were of a nature that would affect the operational capability of the vessels. I have reviewed Mr. Timberlake's audits of Brown Water's vessels, the notes attached to his deposition and have also performed an additional review of Brown Water management processes that were in place and submitted as exhibits to Mr. Mosher's deposition. I am in agreement with Mr. Timberlake's findings and his report to American Commercial Barge Line that while there were areas for improvement noted within the Brown Water organization, there were not serious issues identified and/or noted that would disqualify Brown Water as a viable vendor.

(F) Brown Water and American Commercial Barge Line were participants in the U.S. Coast Guard's Cooperative Towing Vessel Examination Program. This is an indication that both companies are responsible operators. The Cooperative Towing Vessel Examination Program involves a rigorous inspection criteria and voluntary participation on the part of those companies in the industry that chose to participate. The program was designed to assist the participating companies in identifying areas for improvement and regulatory compliance on their towing vessels. Phase One (1) participants invited the Coast Guard to board and thoroughly inspect every aspect of each of their company's vessels utilizing the in-depth Eighth Coast Guard District Boarding and Inspection format. Following successful completion of the inspection, the vessel was awarded a placard to be displayed in the Pilothouse window. The M/V BROWN WATER V displayed a Phase One (1) placard indicating participation in and compliance with the program and inspection protocol.

(G) Following the allision of September 15, 2001, the U.S. Coast Guard conducted an in-depth post-casualty inspection of the M/V BROWN WATER V. As a result of the inspection, seven (7) minor discrepancies were identified. The Coast Guard Officer in Charge of the inspection of the M/V BROWN WATER V testified during the accident investigation hearings that none of the deficiencies identified during the inspection as discrepancies were related to the causality either as a causal or as a contributing factor. Following a review of the inspection report completed by the Coast Guard Inspecting Officer and his testimony during the Coast Guard hearing, I am in agreement with his conclusion and am of the

opinion that each of the noted deficiencies were minor in nature and that none of the discrepancies were of a serious nature that would warrant the removing the M/V BROWN WATER V from service.

(H)   The failure of the M/V BROWN WATER V to not have on board a copy of the published document "Local Notice to Mariners," although a violation of 33 C.F.R. 164.72, is not considered a serious violation nor does it indicate that the vessel operator is irresponsible. It is in fact a minor violation and a minor discrepancy if noted at all by the Coast Guard Inspector or the Primary Carrier Auditor due to the ever increasing difficulty mariners encounter in obtaining a current copy because of a limited distribution network. The "Local Notice to Mariners" is published by the Coast Guard and is an informational document identifying specific issues that aids the mariner and is required to be carried on board a vessel. In my years of experience, I have never known of the Coast Guard removing a vessel from service because a current "Notice to Mariners" was not on board. Further, the Coast Guard "Local Notice to Mariners" broadcasts via VHF radio supplement the hard copy document. These radio broadcasts were available in 2001 and continue today, and the vessel Master and Pilot each have the opportunity twice per 24 hour period to receive current up to date local information that it is the Coast Guard's responsibility to provide. Towboat Operators rely on these VHF broadcasts to stay current with changes within their area of operation. Brown Water was responsible for providing "Local Notice to Mariners" to its vessels and ensuring crew familiarity with the content as it relates to the route to be navigated. If the M/V BROWN WATER V did not have on

6                                                                                                   *(Continued)*

board the required documents, Brown Water is accountable to whatever degree appropriate, not American Commercial Barge Line. Further, I have reviewed the four issues of the "Local Notice to Mariners" printed document for September, 2001 and note that there is no weather, current velocity, tidal action or any other type of information for the Port Isabel, Texas area that would have aided the M/V BROWN WATER V Pilot in navigating through this area or any other cautionary information that would have prevented this accident. Unless the Coast Guard is specifically requested to publish that type of information, it will not be found in the "Notice to Mariners" as weather, tidal and current information is a National Oceanic and Atmospheric Administration Agency function. If unusual tidal height and current velocity information had been available, it was Brown Water's responsibility as the Operator of the vessel to make that information known to the M/V BROWN WATER V crew, not American Commercial Barge Line management.

(I) The American Waterway Operators ("AWO") is a National Trade Organization providing a liaison between the Industry and the Regulatory Authorities. Membership in the AWO was in 2001 and is today voluntary. According to its published literature, the AWO states that as of December 31, 2001 it represented approximately 63 percent of the Towboats and Tugboats in the towing industry with a major portion of the companies represented clustered in the medium to large fleet category. A review of the published membership roster of the AWO for 2004 identifies an approximate even division between Blue Water and Inland Companies. The absence of membership in the AWO organization or non-

participation in the AWO Responsible Carrier Program did not in 2001 and does not today reflect negatively on a company's operational expertise and commitment to safety. Numerous Barge and Towing Companies did not then and do not now maintain an active membership in the AWO for a variety of reasons. Membership in the AWO or certification as a Responsible Carrier does not insulate a company from accidents. Before the Responsible Carrier Program existed and even after the program was made a mandatory condition of AWO membership, major accidents occurred involving AWO member's vessels. I note that Brown Water applied for AWO membership and was accepted as a Carrier member in February of 2001. Brown Water also applied for participation in the Responsible Carrier Program and received certification as a Responsible Carrier Program participant on July 22, 2002, well within the AWO's allotted time frame for certification.

(J)   American Commercial Barge Line contracted for towage service with a responsible third party tower, namely Brown Water, and exercised sound business rationale in their decision to use Brown Water. Brown Water had a proven record for competence and dependable service spanning over the ten year period that Brown Water had satisfactorily performed their contractual responsibility of towing American Commercial Barge Line's barges to various points along the Gulf Intracoastal Waterway in a manner consistent with industry standards. Brown Water performed the same type of towing services for numerous other

liquid and dry cargo barge owners/operators along the same route and had a reputation as a competent tower throughout the industry.

*Daniel E. Brock*
DANIEL E. BROCK

SWORN TO AND SUBSCRIBED BEFORE
ME, NOTARY PUBLIC, THIS __8__ DAY
OF DECEMBER, 2004.

*Tambra G. Sullenger*
NOTARY PUBLIC
exp: 8-22-05