Glenn G. Goodier, Esq.  November 9, 2004
New Orleans, Louisiana

## INTRODUCTION

1. At your request, I have reviewed documents concerning the allision of the BROWN WATER V and tow with the Queen Isabella Causeway Bridge, South Padre Island, Texas, on September 15, 2001. My initial report of findings and all opinions to date follows. As additional work may be done in this matter, any findings and opinions expressed herein will be amended or supplemented as required.

## DOCUMENTS REVIEWED

2. The following were reviewed:

   1) Transcript of the U.S. Coast Guard Hearing of October 9-12 and November 5, 2001
   2) Exhibits from the U.S. Coast Guard Hearing
   3) Deposition transcript of Stephen Mosher
   4) Deposition transcript of Philip Timberlake
   5) Deposition transcript of William Whitlock
   6) Deposition transcript of Norman Ivey
   7) Deposition transcript of Michael Khouri
   8) Deposition transcript of Douglas Ruschman
   9) Deposition transcript of Patrick Hoessle
   10) Deposition transcript of Peter Kazunas
   11) Deposition transcript of J. Adams
   12) Deposition transcript of Christian Brinkop
   13) Deposition transcript of Paul Book
   14) Deposition transcript of James Farley
   15) Deposition transcript of Gary Langley
   16) Report of Dr. Jerome Modell
   17) Report of Richard Cortez, CPA
   18) American Waterways Operators Responsible Carriers Program Administrative Procedures
   19) U.S. Coast Guard 8th District Local Notice to Mariners of September 4, 11, 18 & 25, 2001
   20) *Inland River Record 2004*
   21) U.S. Coast Guard Port State Information Exchange (PSIX) website
   22) Expert Panel Report of Captain J. Disler and John Deck III of September 29, 2004
   23) Expert Report of Richard Silloway, P.E. of September 29, 2004
   24) Expert Report Captain William Beacom of September 29, 2004
   25) Title 33 Code of Federal Regulations

**Exhibit A**

26) Title 46 Code of Federal Regulations
27) NOAA Chart 11302, September 13, 2003
28) "Gulf Intracoastal Waterway" The Handbook of Texas Online
29) U.S. Coast Guard Marine Safety Manual
30) U.S. Coast Guard, Eighth District Instruction 16710.1, January 21, 1997

## FINDINGS AND OPINIONS

1. The U.S. Coast Guard Eighth District has a Cooperative Towing Vessel Examination Program (CTVEP). "Commercial towing vessel safety is enhanced through this cooperative effort between industry and the Coast Guard. This program allows the Coast Guard to maximize the use of its resources by concentrating its enforcement activities on higher risk vessels." The program "...is designed to reward companies that have shown a commitment to quality, and it allows for a more efficient use of Coast Guard and industry resources." Brown Water Marine Services was an active participant in the program and voluntarily offered itself up to examinations by the Coast Guard. (U.S. Coast Guard, Eighth District Instruction 16710.1, January 21, 1997; LT Helton, U.S. Coast Guard at U.S. Coast Guard Hearing, Volume One, Page 77.)

OPINION: Brown Water Marine Service qualified for the Coast Guard's CTVEP by meeting federal regulations and demonstrated to the Coast Guard to be a low risk regarding vessel safety.

2. The BROWN WATER V was inspected by Coast Guard following the incident. LT Helton signed the United States Coast Guard Vessel Boarding Report (CG-5437). There are 7 deficiencies noted on the 2 page report. The report is marked "Repairs to be effected by 1 Oct 2001". LT Helton testified that the deficiencies noted on the report were not collaterally related to the incident. (Helton at U.S. Coast Guard Hearing, Volume Four, Page 207; United States Coast Guard Vessel Boarding Report, CG-5437, for the BROWN WATER V, September 15, 2001.)

OPINION: The deficiencies noted on the CG-5437 report were not major safety violations. Had they been major safety violations, they would have been required to be corrected immediately. The deficiencies had nothing to do with the allision of the BROWN WATER V with the Queen Isabella Causeway Bridge.

3. The green navigation lights on the underside of the center span of the Queen Isabella Causeway Bridge which marked the center of the Gulf Intracoastal Waterway were not lighted. Captain Phillip Langley was at the wheel of the BRUCE BORDELON when she passed under the Queen Isabella Causeway bridge southbound. He testified that the green navigation lights were not working on both the north side and south side of the bridge. He notified the harbormaster on VHF-FM Channel 16 of the outage at 2045 hours on September 14, 2001, 5.25 hours before the incident. The owner or operator of the Queen Isabella Causeway Bridge failed to maintain the range of 2 green lights over the center of the navigable channel of the Gulf Intracoastal Waterway. (Exhibit 115; Exhibit 116; Langley at 17; Audio Tape Transcription of Interview with David Wayne Fowler, September 12, 2001 at Page 17 and Audio Tape Transcription (undated) at Page 13, Title 33 Code of Federal Regulations, Part 118)

OPINION: The U.S. Coast Guard should have been notified directly and a Broadcast Notice to Mariners (BNM) should have been broadcast on VHF-FM radio for alerting vessels in the area of the outage. The owner or operator of the Queen Isabella Causeway Bridge was in violation of Title 33 Code of Federal Regulations, Part 118.

4. The U.S. Coast Guard enforces federal regulations including those regulations concerning the surrender, suspension and revocation of U.S. Coast Guard issued licenses for the operation of uninspected towboats. Administrative actions against a license are remedial in nature and are not penal. Administrative actions intend "to help maintain standards for competence and conduct essential to the promotion if safety at sea." Captain Fowler was diagnosed with post-traumatic

stress disorder on September 17, 2001, as a result of the incident. His towboat master's license was deposited with the Coast Guard the same day. (Title 46 Code of Federal Regulations, Part 5.5; U.S. Coast Guard Hearing, Volume One, Page 52)

"Violations by personnel of statutes and regulations enforced by the Coast Guard can result in criminal or civil penalties taken against the person and/or administrative proceedings (or alternative action) against merchant mariners' credentials (MMCs) issued to the person by the Coast Guard.... The basic authority to initiate suspension and revocation (S&R) proceedings is derived from 46 U. S. C. Chapter 77. This authorizes action against a mariner who while acting under the authority of his or her MMCs commit acts of incompetence, misconduct, negligence, or violations of laws or regulations which are intended to promote marine safety or to protect navigable waters....Personnel investigations are conducted to promote safety on the high seas and the navigable waters of the United States, and to prevent or mitigate personnel related hazards to life, property, and the marine environment. Alternative actions concerning MMCs include voluntary surrender agreements, voluntary deposit agreements, goodfaith deposits, settlement agreements, and letters of warning." (U.S. Coast Guard Marine Safety Manual, Volume V, Chapter 2; United States Coast Guard License Serial Number 887687)

OPINION: The criminal or civil penalties taken against a person holding a Coast Guard issued license or the administrative proceedings taken against a mariner's license is how the Coast Guard polices licensed personnel. Captain Fowler's Operator of Uninspected Towing Vessel license, which was deposited with the Coast Guard, was the correct license required to operate the BROWN WATER V.

5. Captain David D. Fowler was on the third issue of his Coast Guard license as an Operator of Uninspected Towboats, at the time of this incident. This represents approximately 12 years. Prior to this incident, he had 2 marine casualty incidents

in his Coast Guard record. Those incidents were groundings on August 30, 2000, when he was at the wheel of the JANICE CAROL and on March 7, 2001, when he was at the wheel of the GOLDA PICKETT. The incidents resulted in no damage or pollution. (Audio Tape Transcription of Interview with David Wayne Fowler, September 12, 2001; United States Coast Guard License Serial Number 887687; U.S. Coast Guard Marine Casualty Investigation Report MC00011686 of October 19, 2000; U.S. Coast Guard Marine Casualty Investigation Report MC01003217 of April 15, 2001)

OPINION: Two groundings in 12 years is a very low number of incidents if Fowler had been operating towboats during those 12 years.

6. The Gulf Intracoastal Waterway (GIWW) is more than 1,300 miles long from Florida through Texas and has a project width of 125 feet and a project depth of 12 feet. Controlling depths are published periodically in the U.S. Coast Guard Local Notices to Mariners. The GIWW is directly linked to 10 deep-draft ports and 26 shallow-draft channels. Competition for tows for the use of the waterway comes from sport and commercial fishing fleets, work boats supporting hundreds of offshore rigs and platforms, recreational boaters and birders. (NOAA Nautical Chart 11302, Side A; "Gulf Intracoastal Waterway" The Handbook of Texas Online.)

OPINION: The Gulf Intracoastal Waterway with a narrow project width of 125 feet and a shallow project depth of 12 feet is restrictive when 35 foot wide barges are doubled up abreast and meet a similar tow. The sharp bends in the GIWW and intersections with major shipping channels combined with environmental conditions, barge drafts and a great deal of other commercial and recreational traffic, present challenges to operators of towboats. Touching bottom or grounding are not unusual occurrences and are in some circumstances the prudent course of action to take to avoid a greater marine casualty.

7. Television receivers are not prohibited by federal law or regulation from being in the wheelhouse of an uninspected towboat. (Eighth Coast Guard District Towing Vessel Boarding Form of September 15, 2001)

OPINION: Television receivers, video games, and other electronic displays other than radar or electronic charts can be distracting and should not be operating when underway. Television receivers are a good source of weather information.

8. The U.S. Coast Guard has a website called the Port State Information Exchange (PSIX) System. It has a Vessel Search feature where it shows some vessel particulars and a Coast Guard contact history of vessels taken from the Coast Guard internal database. A review of the PSIX for vessels operated by Brown Water Marine was conducted. (<http://cgmix.uscg.mil/psix/psix2/>)

OPINION. The PSIX is not an accurate measure of a vessel's marine casualty history. "Involved in a marine casualty" on the PSIX includes but is not limited to groundings, allisions, personnel casualties, sinkings and equipment failures. There is no indication on the PSIX whether the groundings were intentional or unintentional, whether the allision was the striking of a stationery vessel or if the vessel was stationery and was struck by another vessel, whether the personnel casualty was a cut finger, heart attack, bee sting, fall overboard, etc., whether the sinking involved another vessel, whether the equipment failure was a burned out light, a steering failure, or whether due to part failure or maintenance. A review of the PSIX for vessels operated by Brown Water Marine Service does not reflect incompetent or unsafe operation.

This preliminary report is issued solely for the incident referenced above, issued without prejudice to the rights of whom it may concern and is based on federal regulations, the documents provided to this reviewer and documents researched by

this reviewer. The undersigned reserves the privilege to revise, supplement or amend this report should further information be made available.

Michael D. Russell

Encl  (1) Curriculum Vitae
      (2) Prior Testimony and Compensation