CHAD CHAPMAN
November 4, 2004

```
         THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF TEXAS
                 BROWNSVILLE DIVISION


IN RE: THE COMPLAINT AND      )
PETITION OF BROWN WATER       )
TOWING I, INC., AS OWNER,     )
AND BROWN WATER MARINE        )   CIVIL ACTION
SERVICE, INC., AS BAREBOAT    )
CHARTERER OF THE BROWN        )   NO.  B-01-157
WATER V, ITS ENGINES,         )
TACKLE, ETC., IN A CAUSE      )
OF EXONERATION FROM OR        )
LIMITATION OF LIABILITY       )
```

**********************************************************

ORAL AND VIDEOTAPED DEPOSITION OF

CHAD CHAPMAN

NOVEMBER 4, 2004

**********************************************************

ORAL AND VIDEOTAPED DEPOSITION OF CHAD CHAPMAN, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the 4th day of November, 2004, from 9:08 a.m. to 11:49 a.m., before Jan E. Harrison, CSR, RPR, CRR, in and for the State of Texas, reported by machine shorthand, at ROYSTON, RAYZOR, VICKERY & WILLIAMS, LLP, 1700 Wilson Plaza West, 606 N. Carancahua, Corpus Christi, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

**EXHIBIT 22**

```
 1                    A P P E A R A N C E S
 2   FOR THE PLAINTIFF J. ANTONIO MIRELES, AS PERSONAL
     REPRESENTATIVE OF THE ESTATE OF JULIO CESAR MIRELES, JUAN
 3   ANTONIO MIRELES AND SOLEDAD GONZALEZ MIRELES:
 4        Mr. S. Mark Strawn
          AJAMIE, L.L.P.
 5        711 Louisiana, Suite 2150
          Houston, TX  77002
 6
 7   FOR THE PLAINTIFF ANITA HARRIS, INDIVIDUALLY AND AS NEXT
     FRIEND OF VICTOR JUSTIN HARRIS, AND AS REPRESENTATIVE OF THE
 8   ESTATE OF ROBERT V. HARRIS:
 9        Mr. Heriberto "Eddie" Medrano
          Attorney at Law
10        2009 E. Harrison, Suite B
          Harlingen, TX  78550
11
12   FOR THE PLAINTIFFS RENE MATA AND FRANK MATA:
13        Ms. Rebecca Vela
          KITTLEMAN, THOMAS, RAMIREZ & GONZALES, PLLC
14        4900-B North 10th Street
          McAllen, TX  78505
15
     ,
16   FOR THE DEFENDANT(S) AMERICAN COMMERCIAL LINES, LLC, AS
     OWNER, AND AMERICAN COMMERCIAL BARGE LINES, LLC, AS
17   CHARTERER OF THE BARGES NM-315, VLB-9182, ACL-9933B,
     VLB-9178:
18
          Mr. Glenn Goodier
19        JONES, WALKER, WAECHTER, POITEVENT, CARRERE & DENEGRE, LLP
          201 St. Charles Ave.
20        New Orleans, LA  70170-5100
21        and
22        Mr. Sy S. Shamsie
          WESTMORELAND HALL, P.C.
23        2800 Post Oak Blvd., 64th Floor
          Houston, TX  77056-6125
24
25
```

```
 1   (Appearances Continued)
 2   FOR THE DEFENDANT STATE OF TEXAS:
 3       Mr. Michael Ratliff
         OFFICE OF THE ATTORNEY GENERAL
 4       Post Office Box 12548
         Austin, TX  78711-2548
 5
 6   FOR THE DEFENDANT BROWN WATER TOWING I, INC. AS OWNER AND
     BROWN WATER MARINE SERVICE, INC., AS BAREBOAT CHARTERER OF
 7   THE BROWN WATER V, ITS ENGINES, TACKLE, ETC., IN A CAUSE FOR
     EXONERATION FROM OR LIMITATION OF LIABILITY:
 8
 9       Mr. Will W. Pierson
         ROYSTON, RAYZOR, VICKERY & WILLIAMS, L.L.P.
10       606 N. Carancahua, Suite 1700
         Corpus Christi, TX  78476
11
12   THE VIDEOGRAPHER:
13       Mr. John Garza
14
     ALSO PRESENT:
15
         Mr. Tim Chapman
16
                    * * * * *
17
18
19
20
21
22
23
24
25
```

1   Q   What was the reason for your call?
2   A   I really don't remember that either. It was three
3   years ago. Probably order related, but I don't recall the
4   exact -- exact nature.
5   Q   What do you mean by "order related"?
6   A   Barge orders, whatnot, what they were doing or
7   where they're at or giving them orders, as far as which
8   barges were coming out or going where or whatnot.
9   Q   Okay. But specifically do you remember that
10  conversation, what you talked about and who you talked with?
11  A   I don't remember who I talked with. I remember
12  calling them sometime in the afternoon. If I remember
13  correctly, one of their barges had canceled, I think.
14  Q   Okay. So are you saying that they had originally
15  been scheduled to have five barges?
16          MR. PIERSON: I'll object to the form of the
17  question.
18  A   They had originally -- did have five barges, but
19  they were going to take one, I believe, to Rio Hondo and go
20  back and get the other four.
21  Q   (By Mr. Strawn) Okay. And Rio Hondo, for those
22  of us who are not familiar with that area, is over near --
23  in the Harlingen area?
24  A   Correct.
25  Q   Okay. How many barges did y'all have assigned to

1  the Brown Water VIII?
2      A    I don't recall.
3      Q    All right. Do you remember what the voyage of the
4  Brown Water VIII was going to be, where it was -- from where
5  to where?
6      A    Well, usually we're doing round trips, basically
7  Houston all the way to Brownsville, but I don't remember
8  that specific one.
9      Q    Okay. So if the Brown Water VIII was in the Port
10 of Brownsville, it would have been coming north?
11     A    It can't go any further south.
12     Q    That -- that was my point.
13         Y'all don't push barges south from -- from
14 Brownsville because there is no ICW south of Brownsville.
15     A    Correct.
16     Q    All right. So the Brown Water VIII would be coming
17 the same way back that the Brown Water V was coming.
18     A    Correct.
19     Q    All right. Do you know of any reason why you
20 couldn't have assigned barges to the Brown Water VIII?
21     A    No reason.
22     Q    Okay. Do you have a schedule where you regularly
23 check in with the -- with the boats?
24     A    Yes.
25     Q    And what is that schedule?

1   when they change watches?
2       A   Well, they do.  I mean, they just -- I don't know.
3   When a captain coming off meets with the captain coming on,
4   usually it's very briefly.  It doesn't take much, just let's
5   him know what's going on and if there's any pertinent
6   information he needs.
7       Q   All right.  And the pertinent information would be,
8   for example, any unexpected weather that he might encounter
9   in that trip.
10      A   Correct.
11      Q   All right.  Let me go back and -- and talk to you
12  about the -- the 14th of September 2001.  I know the -- the
13  normal course of business is for you to call in to all
14  your -- to all your boats sometime early in the morning, 7
15  o'clock, when you get into work.  Do you recall on that day
16  talking with any of the dispatchers at ACBL?
17      A   I would have had to have.  I talked to them every
18  day.
19      Q   Okay.
20      A   But I don't recall any specifics.
21      Q   All right.  In other words, just as Brown Water has
22  a dispatching function, ACBL has its own dispatchers who are
23  assigned to get their barges from place to place and to find
24  people that can do that if it's not going to be done by
25  their own tugboats.

```
 1    A    True.
 2    Q    All right.  Who at ACBL do you remember that you
 3  had contact with around that time period?
 4    A    At that time, the guy working our area was Denny
 5  Hosley.
 6    Q    Okay.  And you would have had a conversation with
 7  Mr. Hosley on the 14th.  You just can't remember the
 8  specifics of that.
 9    A    Yeah, we talked every day, usually multiple times.
10    Q    Okay.  And you would communicate with him and he
11  would communicate with you, and he would tell you, for
12  example, "We've got these four barges that we need to move
13  out of Brownsville."  True?
14    A    True.
15    Q    All right.  And he would ask you, "Have you got
16  horsepower to push these barges."  True?
17    A    True.
18    Q    All right.  And you'd say, "Yeah, I've got the
19  Brown Water V that I can have these barges pushed by."
20  True?
21    A    True.
22    Q    All right.  Now, when did you become aware that
23  there had been a collision with the Queen Isabella Causeway?
24    A    Probably about 2 o'clock in the morning on the
25  15th.
```

1    MR. PIERSON: Okay.

2    MR. GOODIER: Do you want to ask some

3 questions?

4    MS. VELA: Go ahead. I have a question.

5    MR. PIERSON: Do you have a license to ask

6 questions?

7    MS. VELA: Absolutely.

8    MR. STRAWN: Issued by the U.S. Coast Guard?

9    MR. PIERSON: A license to ask questions.

10 Rebecca is a nice person. We won't -- we won't give her a

11 hard time.

12                    EXAMINATION

13 Questions By Mr. Goodier:

14    Q    Mr. Chapman, I was reading in the Coast Guard

15 investigation when they -- when they did the hearing after

16 this incident that Brown Water Marine was a participant --

17 participant in the United States Coast Guard Cooperative

18 Boarding Program. Were you aware of that?

19    A    Yes.

20    Q    And -- and by that, a towing company such as Brown

21 Water agrees with the Coast Guard that they can come on

22 board your vessels and do inspections at just about anytime,

23 even though the vessels are uninspected towing vessels?

24    A    Correct.

25    Q    And that -- that is something that is voluntary?

```
 1      A    Right.
 2           MR. GOODIER:  Do you have those exhibits with
 3   the --
 4           MR. PIERSON:  The handwriting?
 5           MR. GOODIER:  No, this one.
 6           MR. PIERSON:  Okay.
 7           MR. GOODIER:  I'll look at this one, too.
 8           MR. PIERSON:  We didn't mark any of those.
 9           MR. GOODIER:  I think we just used your Bates
10   -- these are your Bates numbers, I'm sure.
11           MR. STRAWN:  122 is the next number, if you
12   want to ...
13           MR. GOODIER:  Y'all can mark them, if you
14   want.  I mean, I don't mind going off of these.  We all know
15   what they are.
16           MR. PIERSON:  Okay.
17           MR. GOODIER:  Okay.
18      Q    (By Mr. Goodier)  And with respect to Booking
19   Sheet D00825 --
20           MR. GOODIER:  If you want to make that a
21   number, if you want to, 127?
22           MR. STRAWN:  122 would be the next one.
23           MR. GOODIER:  122?  Okay.  We'll mark it as
24   122, then.
25      Q    (By Mr. Goodier)  I believe you indicated that
```

```
 1   this sheet shows only one ACBL barge on the Brown Water V?
 2           You can look at it again.
 3      A    You mean on their way down to Brownsville?
 4      Q    Or at least a barge with an ACBL designator in the
 5   barge name or was it a VLB?
 6           I'm sorry.  It's a VLB designator.  VLB 9713.
 7      A    Right.
 8      Q    And it indicates that barge was booked from Bolivar
 9   to Harlingen.  Is that correct?
10      A    Right.
11      Q    Is Bolivar east of Harlingen?
12      A    Yes.
13      Q    And is Harlingen east of Brownsville?
14      A    Right.
15      Q    Were you aware that the VLB 9173, while on the
16   Brown Water V, actually passed up Harlingen and came into
17   Brownsville?
18      A    Right.
19      Q    Didn't stop there?
20           Do you know why that was?
21      A    It had some kind of -- something, I believe, with
22   the throttle.  They felt it would be better to go into
23   Brownsville first and make that repair and then drop the
24   barge at Harlingen.
25      Q    Mr. Mosher testified that the barge VLB 9173 was to
```

1  be brought back as a single barge from Brownsville to
2  Harlingen, once the vessel was repaired. Were you aware of
3  that? Were you involved in that decision-making?
4     A    I was aware of that.
5     Q    Were you aware of the fact that the Brown Water V
6  actually did not take the barge VLB 9173 as a single barge?
7     A    Right.
8     Q    And that it actually added three other barges to
9  its tow at that time?
10    A    Right.
11    Q    Were you aware of the fact that -- that ACBL had
12 offered three barges for towage to Brown Water coming out of
13 Brownsville heading towards the east for around the time
14 period of this incident?
15    A    Sounds right.
16    Q    Were you involved in -- in the makeup of the tow of
17 the Brown Water V on the -- on the 14th of September, the
18 evening before it left to take the voyage, which eventually
19 wound up in this accident?
20    A    Are you talking about how they configured their
21 tow?
22    Q    Right.
23    A    No.
24    Q    Who -- who decides how the tows are configured at
25 Brown Water?

1   A    The captain of the vessel.
2   Q    Did -- did you know how many barges the Brown Water
3   V had in tow when it left Brownsville on the 14th?  Do you
4   know?
5   A    No.
6   Q    Did you have an idea of how many barges it was --
7   booked on that particular boat at that time?
8   A    I knew how many was booked.
9   Q    How many were booked at that time?
10  A    They had the one for Harlingen and then -- I can't
11  recall exactly.  I know we had three more that continued on
12  east.  Actually, I believe, there was a fifth barge in
13  there; and, I think, maybe it had been an empty or a load
14  that had canceled, which is why he was going to make two
15  trips out.
16  Q    Okay.  So, in other words, if you had five barges,
17  you would have made two trips with the Brown Water V?
18  A    Correct.
19  Q    And why is that?
20  A    He wouldn't have had enough horsepower to push
21  five.
22  Q    Okay.  We've also heard from Mr. Mosher and, I
23  think, Mr. Chapman, also, that the company's sort of rules
24  were that the Brown Water V was not to push four loaded
25  barges?

```
 1             MR. STRAWN:  Objection, form.
 2             MR. PIERSON:  You can answer, if you
 3   understand it.
 4       A     Ask it again.
 5       Q     (By Mr. Goodier)  Mr. Mosher had testified that
 6   the Brown Water V would not push four loaded barges, that it
 7   would either push three loaded and one empty or, I think, it
 8   was two loads and two empties as a usual tow.  Is that
 9   correct?
10             MR. STRAWN:  Objection, leading.
11       A     Right.
12       Q     (By Mr. Goodier)  Okay.  With respect to the
13   mechanical problems that we talked about on the Brown Water
14   V, which led it to bring the VLB 9173 past Harlingen into
15   Brownsville, did you have any responsibility for seeing to
16   it that those repairs were made or was that someone else in
17   the company?
18       A     Someone else.
19             MR. GOODIER:  I think that's all the questions
20   I have.
21             MS. VELA:  I have a few questions.
22             MR. GOODIER:  You've got a microphone?
23             MS. VELA:  Yes.
24                           EXAMINATION
25   Questions By Ms. Vela:
```