# THE LAW OF

# TUG, TOW, AND PILOTAGE

## BY ALEX L. PARKS

Late Member of the Oregon State Bar and the Bars of the United States District Court,
District of Oregon; Court of Appeals, Ninth Circuit; Court of Appeals,
District of Columbia; United States Supreme Court; Late Member of the Maritime
Law Association of the United States; Late Associate Member of the Association of
Average Adjusters of the United States; Late Adjunct Professor (Admiralty),
Willamette University College of Law

*and*

## EDWARD V. CATTELL, JR.

Member of the Bars of New Jersey and Pennsylvania; United States District Courts,
District of New Jersey and Eastern District of Pennsylvania;
United States Courts of Appeals, Third and Fourth Circuits; and
the United States Supreme Court; Member of the Maritime Law Association of
the United States; Adjunct Professor (Admiralty), Widener University School of Law



**EXHIBIT 26**

## CORNELL MARITIME PRESS

*Centreville, Maryland*

JONES, WALKER, WAECHTER,
POITEVENT, CARRÈRE & DENEGRE

NOV - 2 2004

NEW ORLEANS LIBRARY

24                                          LAW OF TUG, TOW, AND PILOTAGE

## Dominant Mind Doctrine

*United States*

In collision law, the tug and tow are considered as one and collision rules are applied to the flotilla as if it were a single vessel. The *Civilta and the Restless*, 103 U.S. 699 (1880). But this does not mean that both the tug and tow are responsible to third persons for negligence in the navigation of the flotilla. See *Liverpool etc. Navigation Co. v. Brooklyn Terminal*, 251 U.S. 48 (1919), holding that where the tug was at fault, only the tug and its freight need be surrendered in limitation proceedings.

It is settled law in the United States that the vessel in control of the flotilla, the "dominant mind," is responsible for the actions of the flotilla and thus responsible in damages if negligent. *Sturgis v. Boyer*, 65 U.S. 110 (1861). That case involved a collision between the lighter *Republic*, on the one hand, and the steamship *Wisconsin*, lashed alongside the steam tug *Hector*, on the other. Both the tug and tow were under the command of the master of the tug, who gave all the orders. None of the ship's crew was on board it except the mate, who did not interfere with the management of the ship. Prior to the collision, the master of the tug left his vessel and went aboard the ship, and all subsequent orders were given by him while standing on the quarterdeck of the latter vessel. The court stated, in part, in holding the tug responsible:

> Looking at all the facts and circumstances in the case, we think the libellants are clearly entitled to a decree in their favor; and the only remaining question of any importance is, whether the ship and the steam-tug are both liable for the consequences of the collision; or if not, which of the two ought to be held responsible for the damage sustained by the libellants. Cases arise, undoubtedly, when both the tow and the tug are jointly liable for the consequences of a collision; as when those in charge of the respective vessels jointly participate in their control and management, and the master or crew of both vessels are either deficient in skill, omit to take due care, or are guilty of negligence in their navigation. Other cases may well be imagined when the tow alone would be responsible; as when the tug is employed by the master or owners of the tow as the mere motive power to propel their vessels from one point to another, and both vessels are exclusively under the control, direction and management of the master and crew of the tow. Fault in that state of the case cannot be imputed to the tug, provided she was properly equipped and seaworthy for the business in which she was engaged; and if she was the property of third persons, her owners cannot be held responsible for the want of skill, negligence or mismanagement of the master and crew of the other vessel, for the reason that they are not the agents of the owners of the tug, and her

owners in the case supposed do not sustain towards those intrusted with
the navigation of the vessel the relation of principal. But whenever the
tug, under the charge of her own master and crew, and in the usual
and ordinary course of such an employment, undertakes to transport
another vessel, which, for the time being, has neither her master nor
crew on board, from one point to another, over waters where such
accessory motive power is necessary or usually employed, she must be
held responsible for the proper navigation of both vessels; and third
persons suffering damage through the fault of those in charge of the
vessels must, under such circumstances, look to the tug, her master or
owners, for the recompense which they are entitled to claim for any
injuries that vessels or cargo may receive by such means. Assuming the
tug is a suitable vessel, properly manned and equipped for the under-
taking, so that no degree of negligence can attach to the owners of the
tow, on the ground that the motive power employed by them was in an
unseaworthy condition, and the tow, under the circumstances sup-
posed, is no more responsible for the consequences of a collision than
so much freight; and it is not perceived that it can make any difference
in that behalf, that a part, or even the whole of the officers and crew
of the tow are on board, provided it clearly appears that the tug was a
seaworthy vessel, properly manned and equipped for the enterprise,
and from the nature of the undertaking, and the usual course of
conducting it, the master and crew of the tow were not expected to
participate in the navigation of the vessel and were not guilty of any
negligence or omission of duty by refraining from such participation .
. . . By employing a tug to transport their vessel from one point to
another, the owners of the tow do not necessarily constitute the master
and crew of the tug their agents in performing the service. They neither
appoint the master of the tug, or ship the crew; nor can they displace
either the one or the other. Their contract for the service, even though
it was negotiated with the master, is, in legal contemplation, made with
the owners of the vessel, and the master of the tug, notwithstanding
the contract was negotiated with him, continues to be the agent of the
owners of his own vessel, and they are responsible for his acts in her
navigation...

The term "dominant mind" appears to have originated in the *Margaret*,
94 U.S. 494 (1876). There, a tug was towing a brig into harbor. In doing
so, the tug made a sharp turn, and the brig lost steerageway and went
aground. Subsequently, the brig hit the end of a pier and sank. The court
said, holding the tug solely at fault:

No serious attempt was made here to inculpate the brig. The tug was
the dominant mind and will in the adventure. It was the duty of the
brig to follow her guidance, to keep as far as possible in her wake, and

to conform to her directions. The exercise of reasonable skill and care within this sphere was incumbent on the tow. It does not appear that there was a failure in any of these particulars . . . . The tug was not a common carrier, and the law of that relation has no application here. She was not an insurer. The highest possible degree of skill and care were not required of her. She was bound to bring to the performance of the duty she assumed reasonable skill and care, and to exercise them in everything relating to the work until it was accomplished. The want of either in such cases is a gross fault, and the offender is liable to the extent of the full measure of the consequences (Citing cases).

It surfaced again in the *Fort George*, 183 F. 731 (2d Cir. 1910), where a tug towing a barque down the Delaware River permitted the barque to come into collision with an anchored dredge. In holding the tug liable, Judge Coxe stated in part:

It is obvious that the expedition down the river could not have been taken under the joint command of the masters of the tug and the pilot of the barque. There can be no divided responsibility in such cases. Conference, discussion and agreement as to what course to pursue when danger threatens, between two vessels separated by a 70 fathom hawser, is out of the question. Someone must be in command. We understand the rule to be, in the absence of an agreement to the contrary, that when the tug supplies the motive power, it becomes the dominant mind, and the tow is required to follow directions from the tug.

And see, generally, the *Clarita*, 90 U.S. 1 (1874); *C. W. Mills*, 241 F. 204 (5th Cir. 1917); *Hand Line v. Canada S.S. Lines*, 281 F. 779 (6th Cir. 1922); *Central Wharf Co. v. Furness*, 269 F. 901 (1st Cir. 1921); *Naptha Barge v. Continental Navigation*, 1978 AMC 501 (E.D. La.).

If, in the circumstances of the case, the tug is the dominant mind, then, logically, fault on its part should not be imputed to the innocent tow. And this is the result reached by the courts in the United States and England. The *Alabama and the Game-Cock*, 92 U.S. 695 (1876); the *Devonshire*, [1912] P. 21, C.A.

It logically follows, too, that the fault of the tug should not be imputed to cargo on board the innocent tow. This was discussed in passing in the *Alabama and the Game-Cock*, *supra*, in which the court cited the *Milan*, (1861) 167 E.R. 167. The former, however, goes farther than the latter in respect of the appropriate division of damages. In the *Milan*, the suit was by innocent cargo on board one of two wrongdoing vessels. The damage to the cargo was divided equally between the two wrongdoing vessels. In the *Alabama*, the decree was entered for the innocent tow and against each of the wrongdoing vessels for a moiety thereof, but with the stipulation that if there was any balance of such moiety, over and above the stipulated value of each vessel, or which the successful libelant should be unable to collect

or enforce, then such balance would be paid by the other vessel to the extent of its value beyond the moiety due from her.

In the *Atlas*, 93 U.S. 302 (1877), the Supreme Court squarely considered the question of imputing fault to the cargo. In that case, there was a collision between the steamboat *Atlas* and a canal boat in tow of the steam tug *Kate*. Cargo on board the canal boat was damaged. Cargo underwriters brought suit only against the steamboat *Atlas*. The district court found both the steamboat *Atlas* and the steam tug *Kate* at fault and decreed that the cargo underwriters recover against the *Atlas* one half of their damages. On appeal, Justice Clifford reviewed the English and American decisions at considerable length. Noting that the owners of a vessel injured in collision could proceed to recover compensation against either of the owners of the offending vessel, or the master personally, or the vessel itself at their election (citing the *Volant*, (1842) 166 Eng. Rep. 616), and that cargo on board a colliding vessel at the time the collision occurs is not liable for damage done by the ship in which it is carried (citing the *Victor*, (1860) 167 Eng. Rep. 38), the court held that the cargo was innocent of all wrong; that the owners of the cargo could sue the owners of one of the ships, or both, at law or in admiralty, at their election; and that cargo underwriters could recover in full their loss from the one vessel. In relying in part on the *Woodrip—Sims*, (1815) 165 Eng. Rep. 1422, Justice Clifford paid tribute to Lord Stowell in these words: "Judicial experience has given no better guide than that furnished by Lord Stowell, than whom no abler judge ever presided over the Admiralty Court of the parent country."

It should be kept in mind that the rule in both the United States and Great Britain at this time was that of mutual fault, i.e., equal division of damages where both parties were at fault, irrespective of the degrees of fault. This was changed by statute in Great Britain (Maritime Conventions Act, 1911, following the Brussels Convention of 1910) and by the decision in 1975 of the U. S. Supreme Court in *U.S. v. Reliable Transfer Co., Inc.*, 1975 AMC 541, 421 U.S. 397 (1975). See discussion, *infra*, "Proportional Fault," Both to Blame Clause, Chapter VI.

### British and Commonwealth Rule

Prior to the *Devonshire*, [1912] P. 21, C.A., the British and Commonwealth decisions considered the tow the "dominant mind" in directing the movements of the flotilla, and, consequently, the general control of the tug's navigation was considered to be vested in the tow. See the *Julia*, (1861) 15 Eng. Rep. 284, P.C.; *Spaight v. Tedcastle* (1881) 6 A.C. 217; the *Minnehaha* (1861) 167 Eng. Rep. 149; *sub nom. Ward v. M'Corkill, the Minnehaha*, 15 Moo. P.C.C. 133; *sub nom. the Storm King & the United Kingdom (Owners) v. the Minnehaha (Owners)*, 30 L.J.M.A. 211, P.C.; *Smith v. St. Lawrence Tow Boat Company*, (1873) L.R. 5 P.C. 308, 2 Asp. M.L.C. 41, P.C. A close analysis of

CHAPTER IV

# DUTY OF THE TUG GENERALLY

### Seaworthiness and the Exercise of Due Care

Generally speaking, in every American contract of towage (unless the parties agree to the contrary and such agreement is not valid as being against public policy), the towing company undertakes that it possesses sufficient knowledge and skill to perform the contract safely; that it will use its best endeavors, skill, and diligence for that purpose; that it will provide a seaworthy vessel, properly equipped and manned, and of sufficient capacity and power to perform the service undertaken, under conditions which are to be reasonably anticipated.[1]

A careful reading of the British and Commonwealth cases reveals that the same general principles have been established in those jurisdictions. For example, in the leading case of the *Marechal Suchet*, [1911] P. 1, Sir Samuel Evans stated the obligations of the tower as follows:

> . . . This being so, the owners of the tug must be taken to have contracted that the tug should be efficient, and that her crew, tackle and equipment should be equal to the work to be accomplished in weather and circumstances reasonably to be expected; and that reasonable skill, care, energy and diligence should be exercised in the accomplishment of the work. On the other hand, they did not warrant that the work should be done under all circumstances and at all hazards, and the failure to accomplish it would be excused if it were due to vis major or to accidents not contemplated, and which rendered the doing of the work impossible.

A distinction is drawn, however, between contracts for the hire of a tug and contracts to perform towage. If the former, and the tug is specifically named, or a tug is specifically contracted for, there is no implied obligation or warranty as to the fitness of the tug. *Robertson v. Amazon Tug & Lighterage Co., Ltd.*, (1881) 7 Q.B.D. 598; *Point Anne Quarries Ltd. v. the M.F. Whalen*, (1921) 21 Ex. C.R. 99 (varied 63 S.C.R. 109, *aff'd*, [1923] 1 D.L.R. 45, 39 T.L.R. 37, by the Judicial Committee). See also the *West Cock*, [1911] P. 208, and the *Undaunted* (1886) 11 P.D. 46. The same rule obtains in the United

---

1. Quoted with approval in *U.S. v. LeBeouf Brothers Towing Co., et al.*, 1978 AMC 2195 (E.D. La.).

128                                                                LAW OF TUG, TOW, AND PILOTAGE

States: See *Dodd,* 1927 AMC 427 (9th Cir.), where it was held that whether a tug is of sufficient capacity depends upon its adequacy for the particular trip in the judgment of prudent and skillful navigators, and, where the tow employs a tug with full knowledge of its capacity, such employment is evidence of the sufficiency of the tug. However, in the United Kingdom, towage contracts are subject to the Supply of Goods and Services Act 1982 which implies various terms into the contract. In particular, sections 13 and 14 stipulate that:

> 13. In a contract for the supply of a service where the supplier is acting in the course of a business, there is an implied term that the supplier will carry out the service with reasonable care and skill.

> 14. (1) Where, under a contract for the supply of a service by a supplier acting in the course of a business, the time for services to be carried out is not fixed by the contract, left to be fixed in a manner agreed by the contract or determined by the course of dealing between the parties, there is an implied term that the supplier will carry out the service within a reasonable time.
>
>    (2) What is a reasonable time is a question of fact.

It should be noted however that section 16(3) of the act expressly provides that:

> (3) Nothing in this Part of this Act prejudices-
>
>    (a) Any rule of law which imposes on the supplier a duty stricter than that imposed by section 13 or 14 above; or
>    (b) Subject to paragraph (a) above, any rule of law whereby any term not inconsistent with this Part of the Act is to be implied in a contract for the supply of a service.

If, however, the contract is one of performing towage with a named tug, there is no warranty to tow to destination, but merely an engagement to use the best endeavors and competent skill for that purpose with a vessel properly equipped. The *Minnehaha,* (1861) 167 E.R. 149, *sub nom. Ward v. M'Corkill,* 4 L.T. 810, *sub nom. the Storm King & the United Kingdom (Owners) v. the Minnehaha (Owners),* 30 L.J.P.M. & A. 211, P.C.; *Bland v. Ross, the Julia,* (1860) 15 E.R. 284, P.C. In the *Julia,* the court stated that when such a contract is made, it in law implies an engagement that each party to the contract will perform his duty in completing it; that proper skill and diligence will be used on board both the vessel and the tug; that neither party will, by neglect or mismanagement, create unnecessary risk to the other, or increase any risk which might be incidental to the service undertaken. See also *Read v. the Lillie,* (1907) 11 Exch. C.R. 274 (Can.); *McCormick v. Sincennes-McNaughton Line, Ltd.,* (1918) 18 Ex. C.R. 357, 45 D.L.R. 392 (Can.); *Port Anne Quarries, Ltd. v. the M.F. Whalen,* (1921) 21 Ex. C.R. 99,

also called to Chapter VII, "Governmental Regulations," for specific requirements relating to radio transmitting and receiving equipment in specific instances.

### Competent Master and Crew

The courts have not always been consistent in their treatment of this factor. Clearly, in every instance in which negligence is found on the part of tug personnel, the question is raised, at least inferentially, that the tug personnel were incompetent. It is equally obvious that perfectly competent personnel may also be negligent in the stress of the circumstances then existing.

In the following cases, one or more members of the crew of the tug were found to be incompetent: *Tug Companion*, 1961 AMC 2333, 290 F.2d 641 (9th Cir.) (crew of tug consisting of master and seventeen-year-old deckhand with no experience); *NL-5—Chesapeake Bay Bridge-Tunnel*, 1968 AMC 1427 (E.D. Va.) (unlicensed master, and mate and deckhand with limited experience); *Dick Towing Co. v. Leo*, 1953 AMC 498, 202 F.2d 850 (5th Cir.) (master and crew clearly incompetent); *A.T. & T. v. Steuart*, 1978 AMC 1680 (D. Md.) (mate at the con did not know, and had never been told, how to take a bearing or plot a vessel's position on a chart, and did not know how to use the vessel's radar to determine his position); *Tug Ocean Prince, Inc. v. U.S.*, 1978 AMC 1786, 584 F.2d 1151 (2d Cir.) (inexperienced pilot).

The relatively few decisions in which crew members have been held to be outright incompetent undoubtedly reflect the tendency of the judges, as human and compassionate beings, to limit their findings to those necessary to achieve the desired result; the heaping of additional opprobrium on vessel owners by expressly declaring their personnel incompetent seems to occur only in aggravated cases.

In keeping with the general principle that a tug is not an insurer of the safety of its tow, there appears to be a general presumption that a tug master exercises such care in the management of the tow as men of ordinary prudence and caution would exercise under similar circumstances. *Wilbanks & Pierce v. Lapwing*, 1944 AMC 1289, 52 F. Supp. 859 (E.D. La.).

## Duty of Tug to Make Up the Tow

It is clear that it is the duty of the tug to take over and properly perform the duty of making up the tow. This includes the proper positioning of barges in a multiple tow, the use of towing hawsers of proper length, the placement of required and proper lights on the tow, and the proper handling of other barges in a multiple tow while in the process of making up the overall tow. *Margaret Irving—A.S. Sherman*, 1931 AMC 147, 47 F.2d 230 (2d Cir.); *Winona*, 1935 AMC 867 (S.D.N.Y.); *Raleigh—Cynthia*, 1943

134                                                    LAW OF TUG, TOW, AND PILOTAGE

AMC 1016, 50 F. Supp. 916 (D. Md.); *Ayres Marine Service v. Williams Co.,*
1954 AMC 1354, 213 F.2d 27 (5th Cir.); *Williams Co. v. Wakulla,* 1953 AMC
380, 109 F. Supp. 698 (E.D. La.); *T-2 Tanker Midsection—Chitula,* 1963 AMC
643, 215 F. Supp. 144 (E.D.N.C.); *Tidewater Marine v. American Towing,* 1971
AMC 307, 437 F.2d 124 (5th Cir.) (making up tow in such a fashion that
the second barge could not be seen from the pilothouse); *NL-5—
Chesapeake Bay Bridge-Tunnel, supra,* (towing of barge with 1,800 tons
of cargo alongside the tug in Chesapeake Bay held improper); *RTC
v. Bronx,* 1981 AMC 2465 (S.D.N.Y.) (towing company found liable for
negligently towing a barge alongside the tug rather than on a hawser,
whereby the barge was damaged by contacts between the two vessels
during expectable heavy weather); *Stevens v. East-West,* 649 F.2d 1104,
1982 AMC 2820 (5th Cir. 1981) (towing company found liable for
injury to its own deckhand-employee when, contrary to orders, he
attached towing line to an insecure "stop plate" aboard the barge tow
rather than to an available towing bitt); *Ryan Walsh Stevedoring v. James
Marine,* 557 F. Supp. 457, 1983 AMC 2516 (E.D. La.) (tug master's
failure to ascertain height of a boom on a towed derrick barge or the
vertical clearance of a bridge at which a collision occurred deemed
negligent).

### *Proper Position in Tow and Makeup*

The following cases are illustrative of those situations in which tugs have
been held liable for a failure to properly position tows in a multiple tow or
to properly make up the tow at the inception of the movement: *Woco 44,*
1925 AMC 1497 (E.D.N.Y.) (placing a high raking barge behind a barge
with low freeboard); *Redmar-Bern,* 1931 AMC 961, 51 F.2d 501 (E.D.N.Y.)
(barge with raked bow and high freeboard permitted to ride up on and
pound the stern of the barge ahead); *U.P. No. 1,* 1931 AMC 1782 (E.D.N.Y.)
(negligent makeup); *Tucker v. Mathiesen Bros.,* 1932 AMC 1619 (E.D.N.Y.)
(barge towed alongside in rough weather instead of astern, causing bump-
ing between tug and barge); *Maurice R.,* 1933 AMC 273, 3 F. Supp. 86
(E.D.N.Y.) (barge without ample freeboard should not be placed in head
tier); *Arundel Co. v. Connors Marine Co.,* 1934 AMC 1080 (S.D.N.Y.) (scows
and pontoons not towed separately); *Lotta Cowles,* 1933 AMC 549, 3 F. Supp.
171 (W.D.N.Y.) (light barges towed abreast in narrow channel with a strong
following wind); *Sargent Barge Lines v. Overbrook,* 1950 AMC 998, 92 F. Supp.
575 (E.D.N.Y.) (wooden barge with 985 tons and freeboard of twelve to
eighteen inches towed by two tugs, one on either side; barge damaged and
later sank); *Ayres Marine Service v. Williams Co.,* 1954 AMC 1354, 213 F.2d 27
(5th Cir.) (forward anchor winch on towed barge improperly used by tug
while making up in protected anchorage, causing damage to barge); *Hendry
v. Aircraft Rescue Vessels,* 1953 AMC 2115, 113 F. Supp. 198 (E.D. La.) (barge
towed astern of two lightly constructed aircraft rescue vessels); *B. No. 90 Co.*

DUTY OF THE TUG                                                                 135

*v. Helen Tracy,* 1964 AMC 145 (S.D.N.Y.) (damage to barge caused by bumping together during push type tow; insufficient rubber bumpers); *NL-5—Chesapeake Bay Bridge-Tunnel,* 1968 AMC 1427 (E.D. Va.) (barge with 1,800 tons of cargo towed alongside on Chesapeake Bay in winter); *DeWitt Clinton—Mary E. Cornell,* 1930 AMC 227 (E.D.N.Y.) (tow improperly made up with excessive strains on starboard hawser; waves from passing steamer caused towing line and hawser to part); *Caddo,* 1925 AMC 1168 (S.D.N.Y.) (tow which steers badly should be taken alongside in a narrow channel); *Tidewater Marine v. American Towing,* 1971 AMC 307, 437 F.2d 24 (5th Cir.) (making up tow in such fashion that the second barge could not be seen from the pilothouse); *Dow Chemical v. Denis Brown,* 1971 AMC 536 (W.D. Tenn.) (placing barge at head of flotilla without a man to control the speed of the flotilla); *Patterson, Chandler & Stephen, Ltd. v. the Senator Janson,* (1919) 19 Exch. C.R. 105, 49 D.L.R. 166 (Can.) (failure to lash tow alongside); *Pillsbury Co. v. Midland,* 1989 AMC 2113, 715 F. Supp. 738 (E.D. La. 1989) (towed barges not properly lashed together); *RTC v. Bronx,* 1981 AMC 2465 (S.D.N.Y.) (negligent in the circumstances to tow alongside rather than on a towing hawser).

In the following cases, the makeup and method of towing was held to be proper: *John C. Rose,* 1925 AMC 1169 (S.D.N.Y.) (proper to "spike" barge on side of the tow at night on the Hudson River); *Norne,* 1932 AMC 1598, 59 F.2d 145 (5th Cir.) (not necessary to tow alongside where driftwood could catch between tug and barge); *Pres. Roosevelt—Westfield,* 1931 AMC 1076 (E.D.N.Y.) (tow properly made up; damage caused by excessive swells of passing vessel); *Fire Island,* 1932 AMC 748 (E.D.N.Y.) (tug departed with barges in tandem, fifty feet apart, on short hawsers in face of small craft warnings, and subsequently encountered squall in which barges bumped together; tug not liable); *Perseverance—Whittelsey,* 1932 AMC 1156, 60 F. Supp. 645 (E.D.N.Y.) (light barges spiked alongside tug caused lopsided and awkward tow; condition of tow did not contribute to the accident, where passing vessel collided with "spiked" barge on a windless day); *Henrik Hudson—Susie Scully,* 1931 AMC 257 (S.D.N.Y.) (six to eight feet proper distance between barges on a river tow); *Green Valley—Perseverance,* 1931 AMC 351, 49 F.2d 785 (S.D.N.Y.) (sudden sinking of brick barge in hawser tier held not "caused by" improper makeup); *Dutton No. 6—Dauntless No. 7,* 1934 AMC 1403, 9 F. Supp. 233 (E.D.N.Y.) (barge turned over in choppy sea while being towed alongside the tug; tug not negligent in towing alongside); *Latin America—Edwin H. Meade,* 1933 AMC 475 (S.D.N.Y.) ("spiking" a barge alongside a large river tow not improper); *Waldie v. Gallagher,* 1942 AMC 199, 125 F.2d 568 (2d Cir.) (not negligent makeup even though sand scows broke away in winds); *Quincy Adams—Wyomissing,* 1939 AMC 534 (E.D.N.Y.) (no presumption of negligence arose by reason of putting slightly higher barge behind a lower one); *Mavis—American Legion,* 1945 AMC 138, 147 F.2d 393 (2d Cir.) (towing alongside in New York Harbor found to be customary and proper); *Lena,* 1943 AMC 444, 49 F.

Supp. 191 (E.D.N.Y. 1943) (makeup of ten barge tow with three abreast in three tiers and tenth barge behind the center barges held proper); *Swenson v. Great Eastern Fuel Co.*, 1943 AMC 1364, 52 F. Supp. 845 (E.D.N.Y.) (not improper to add a beamier barge to one of the rear tiers of a large tow so that it sticks out beyond the leaders); *Gulf Oil v. Card*, 1954 AMC 1124, 121 F. Supp. 461 (E.D.N.Y.) (side-by-side towing of steel tank barge between two tugs not improper even though a "little crack" was later found in one of barge's tanks); *So. Car. Hwy. Dept. v. Jacksonville Shipyards*, 1976 AMC 456 (S.D. Ga.) (use of a single tug in a flotilla in the Intracoastal Waterway found an acceptable practice on the facts and prevailing custom in the industry).

### Proper Handling During Makeup

The duty of the tug to make up the tow properly includes performing the task in a manner which is not negligent and which does not expose the tow to unnecessary danger.

In *Ramsey*, 1925 AMC 1162 (S.D.N.Y.), the tug was held liable for making up the tow in midstream on the East River. In *Brinton and Drifting Barges*, 1931 AMC 852, 48 F.2d 559 (2d Cir.), a tug tried to drill a barge out of a flotilla of empty barges that were moored while awaiting coal cargoes, at the height of a westerly gale. More than twenty barges were set adrift and stranded. The tug was held negligent in the manner in which the maneuver was performed. In *Wilson—Wyomissing*, 1931 AMC 1011 (E.D.N.Y.), the tug negligently drilled out a barge from a flotilla, disturbing the moorings of other barges which went adrift. In *Upper Hudson—Alexander Hamilton*, 1928 AMC 1113 (S.D.N.Y.), a tow was being broken up; the tug was under a duty of either seeing that the barges in close proximity did not collide or in warning passing steamers to slow down and avoid swells. In *Lake Tankers v. J.A.G. Tr. Co.*, 1946 AMC 669, 65 F. Supp. 252 (E.D. Pa.), the tug was held at fault for striking a moored barge which it was about to take in tow. In *O'Brien Bros. v. Capt. Jake*, 1948 AMC 572 (E.D.N.Y.), the tug was held liable for damaging the barge while making up the tow.

On the other hand, in *Valentine v. Wyomissing*, 1942 AMC 1165, 46 F. Supp. 770 (E.D.N.Y.), a tug engaged in assembling several barges at a rack in preparation for a tow was held not at fault when the whole group went adrift in an unexplained manner with no lines parting. See also *Monsanto Co. v. Edwards Towing*, 1970 AMC 105, where the owner of the barge fleeting facility was held liable, and the tug bringing in two barges to the facility was exonerated.

### Duty of Tug as to Towlines

The burden upon the tug to supervise properly its towlines, to furnish lines of sufficient size, strength and length, to inspect and test the lines which it

*Bound Brook—R-14,* 1932 AMC 694 (E.D.N.Y.) (catamarans lying in the water are not submerged objects but are like rafts of logs floating on the surface and must be lighted accordingly); *Hempstead,* 1929 AMC 820 (S.D.N.Y.) (tug with three barges at fault for not having a light at port forward corner of outside barge at point where barge was struck by a passing tow); *Cleary Bros. v. Dauntless,* 1950 AMC 44, 178 F.2d 72 (2d Cir.) (tug broke down and anchored and second tug came to assist it; both displayed running lights although at anchor; a collision ensued with a heavy passing tow; the assisting tug was held liable for displaying deceptive running lights while at anchor); the *Hester—the Giraffe,* (1853) 10 L.T. 242 (failure to carry light); *Lions Gate Lumber Co., Ltd. v. the Ship Frances Salman and Richmond Tug Boat Co., Ltd.,* (1958) Ex. C.R. 259 (Can.) (no lights on tug or on boom of logs in tow; colliding vessel held free from fault); *Kearney v. Dansereau,* (1915) Q.R. 24 K.B. 401 (Can.) (contributory negligence to leave stern of tow unlighted). Compare *Savoie v. Apache Towing Company,* 1968 AMC 951 (E.D. La.), where a towed barge grounded at night. The tug stood by with its engines running in an attempt to refloat it. It was held the tug had the status of a vessel "under way with no way on" and was properly showing navigation lights instead of anchor lights.

Steam vessels proceeding in tow lashed alongside the tug are under way and must display lights accordingly. *Novak v. Fishermen's Packing Co.,* 1936 AMC 34 (St. Wash.); *Joaquin Mumbru,* 1926 AMC 271, 11 F.2d 542 (S.D.N.Y.).

In *Nyland, supra,* the court divided damages three ways where the tow (having a riding crew), the tug, and a vessel colliding with the tow were all held at fault. So, too, in *Elmhurst—Socony No. 123,* 1935 AMC 972, 78 F.2d 536 (2d Cir. 1935).

In *Lehigh—Ballenas,* 1935 AMC 1546 (W.D.N.Y.), a tug with four barges in tow anchored during a rainy night across the entrance from Lake Erie to the Detroit River, all the vessels in the flotilla having their running lights burning and with no anchor lights being displayed. A steamer collided with one of the barges in the flotilla. Tug held at fault.

See also *Interstate, Lim. Procs.,* previous note, where the tug was found negligent, *inter alia,* for failure to show a white bow light on the barge it was towing.

For the specific lights to be displayed under varying circumstances, see discussion in Chapter VII, "Governmental Regulation."

## Duties as to Proper Navigation

It is the duty of the tug to navigate itself and its tow properly and prudently. This duty includes so navigating the flotilla as to avoid damage to its tow from swells of passing vessels; having knowledge of charted obstructions and the nature of the navigable channel; not leaving the navigable channel

where shoals and obstructions are unknown; and so conducting its maneuvers that if it can avoid a casualty, even after negligence of its tow or other parties, it must do so ("last clear chance" doctrine).

The tug must also maintain proper lookouts, not only on the tug but, in appropriate circumstances, upon the tow. It must also maintain a proper speed and this, of course, includes not only not going at too fast a rate of speed but also not slowing down when good seamanship requires a minimum speed. And, above all else, it must keep its tow in line and prevent it from sheering across the channel or into other objects and vessels. *Central Marine v. Gulf Fleet*, 1984 AMC 1019 (E.D. La. 1983) (negligent navigation to avoid predicted severe weather and sea conditions caused tow to be exposed to continued pounding by heavy seas); *Transload & Transport v. Superior Oil*, 1985 AMC 1519 [DRO] (E.D. La. 1984) (tug negligent in failing to keep tow under observation); but compare *Marport Inc. v. Stabbert & Asso., Inc.*, 771 F.2d 1216 (9th Cir. 1985), where the opposite conclusion was reached by the court. See also *Prudential Lines v. McAllister*, 801 F.2d 616, 1987 AMC 231 (2d Cir. 1986) (negligent navigation in attempting to recapture barge which broke loose from the end of a seven-barge tow); *SCNO Barge Lines v. Sun Transportation*, 775 F.2d 221, 1987 AMC 143 (8th Cir. 1985) (tug negligent and held partially at fault for failing to use available procedures to check the channel for shoaling).

### Meeting Swells

In the *Sterling*, 1925 AMC 1515 (E.D.N.Y.), the tug was held liable while towing a barge alongside for not turning so as to take swells head-on, rather than broadside. See also *McLain Line v. Ann Marie Tracy*, 1949 AMC 1499, 176 F.2d 709 (2d Cir.). In *Hougland v. Muscovalley*, 1950 AMC 2026, 184 F.2d 530 (6th Cir.), the tug was held liable for permitting a small vessel in tow to be swamped by swells from a passing vessel. However, in the *Firestone*, 1932 AMC 623, the tug was absolved from fault when passing at a distance of 800 feet, since damage from swells could not be reasonably anticipated at such a distance. In *American Pres. Line and Cabras Marine*, 1992 AMC 684 (Arb. N.Y.), towing company held liable for failing to reasonably anticipate swell conditions.

### Leaving the Channel

The stranding of a tow on shoals, rocks, or obstructions outside a well-marked channel makes out a *prima facie* case of negligence against the tug, and, in fact, a tug which voluntarily leaves the channel does so at its own peril. *Saratoga*, 1927 AMC 900, 19 F.2d 285 (2d Cir.); *Maunch Chunk—Vim*, 1930 AMC 1296, 40 F.2d 638 (D. R.I.) (tug took tow into a berth about which it knew nothing, at low tide instead of high tide and off the recommended

course, without making soundings); *A. S. Sherman and Barges*, 1930 AMC 893 (E.D.N.Y.); *Lennig—Sunset*, 1930 AMC 924, 41 F.2d 166 (E.D.N.Y.); *Lehigh Valley R. R. v. Russell No. 1*, 1959 AMC 962, 163 F. Supp. 459 (E.D.N.Y.); *Badger*, 1927 AMC 566 (5th Cir.); *Hyer—N. Y. Marine No. 2*, 1928 AMC 1580 (E.D.N.Y.); *Viking II—Viking III*, 1932 AMC 845 (E.D.N.Y.); *Miles Standish*, 1928 AMC 215 (S.D.N.Y.) (tug stranded tow upon known rock outside the channel because a buoy had been displaced; tug held liable because the channel was known not only by buoys but by courses and ranges); *Jess B. Shaw*, 1927 AMC 1303 (3rd Cir.); *Overbrook*, 1932 AMC 719 (S.D.N.Y.); *McLain No. 3*, 1936 AMC 618, 13 F. Supp. 402 (E.D.N.Y.); *Coast Transit No. 5*, 1937 AMC 1642 (E.D.N.Y.); *Dynamic—M-15*, 1942 AMC 1044, 138 F.2d 741 (2d Cir.); *Smith Douglass Co. v. Syosset*, 1947 AMC 1658, 164 F.2d 224 (3rd Cir.); *USS Neches—Tug Relief*, 1953 AMC 516 (N.D. Cal.); *Newtown Creek Towing Co. v. Venus*, 1959 AMC 1124, 259 F.2d 97 (3rd Cir.); *Brown & Root v. American Home*, 1965 AMC 2689, 353 F.2d 113 (5th Cir.); *Mid-America v. National Marine*, 1974 AMC 1943, 497 F.2d 776 (8th Cir.); *A.T. & T. v. Steuart*, 1978 AMC 1680 (D. Md.); *Humble Oil v. Crochet*, 1972 AMC 1843, 422 F.2d 602 (5th Cir. 1970); *Tug Ocean Prince, Inc. v. U.S.*, 1978 AMC 1786, 584 F.2d 1151 (2d Cir.); *Giff v. Sincennes-McNaughton Line, Ltd.*, (1918) 18 Ex. C.R. 366, 45 D.L.R. 402 (Can.). *First Mississippi v. Fielder*, 456 F. Supp. 576, 1980 AMC 1017 (N.D. Miss. 1978) (barge received in good order but delivered with holes in its wing tanks and bow rake; evidence of water-covered rock dikes along the route and of the tug's operation outside the channel justified a finding of navigational negligence).

   *Miles Standish, supra*, and *USS Neches—Tug Relief, supra*, illustrate that although channel markers and buoys may be off station, liability is still imposed upon the tug if the proper channel is known and the tug master simply fails to conform to it. In the former, the tug master should have also checked the ranges; in the latter, the tug did not have the proper charts but had been warned by a sister tug of the location of the wreck upon which it stranded its tow.

   Compare, however, *Russell Poling No. 29—Corporal*, 1958 AMC 1093, 252 F.2d 167 (2d Cir.), and *Loveland No. 3*, 1969 AMC 1417 (E.D. Va.). In *Russell*, the buoy moved off station from 75 to 350 yards in two days; in *Loveland No. 3*, the Coast Guard negligently rebuilt a channel marker light so that a vessel navigating on the range line would be twenty-two feet north of the correct centerline of the channel. The tugs were exonerated.

   And, obviously, tug is not liable for striking an unknown and uncharted obstruction, rocks, or shoals in the channel. *Manhattan No. 50*, 1938 AMC 879, 97 F.2d 577 (2d Cir.) (line of piers moved by the authorities without notification to anyone); *Hempstead*, 1942 AMC 174 (E.D.N.Y.); *D.P.B. W. No. 7—Primrose*, 1930 AMC 1350, 42 F.2d 827 (2d Cir.); *W. A. Elsen*, 1925 AMC 1645, 8 F.2d 281 (E.D. La.); *Frank—Marjorie D*, 1929 AMC 819 (E.D.N.Y.); *Nat Sutton*, 1932 AMC 848 (E.D.N.Y.); *Exner v. Gallagher*, 1946 AMC 1449,

157 F.2d 291 (2d Cir.); *Lizzie D. Shaw—Rita Dempsey*, 1931 AMC 707, 47 F.2d 820 (3rd Cir.); *Tug Champlain v. Canada S.S. Lines, Ltd.*, [1939] Ex. C.R. 89, [1939] 1 D.L.R. 384 (Can.); *Mid-America v. National Marine, supra*; *Alter Co. v. Federal Barge*, 1976 AMC 2357, aff'd, 544 F.2d 522 (7th Cir.).

Nor is the tug liable for striking a vessel which is wrongfully obstructing the channel. *No. 7*, 1926 AMC 1143, 12 F. Supp. 137 (E.D.N.Y.); *Frank*, 1930 AMC 858, 40 F.2d 430 (2d Cir.); *Tugs Jackson and Metropolitan No. 3*, 1949 AMC 449, 82 F. Supp. 595 (E.D.N.Y.).

### *Unfamiliarity with Channel or Negligent Navigation within the Channel Boundaries*

It goes without saying that stranding upon a well-charted obstruction is *prima facie* negligence, and the tug is required to be familiar with channel obstructions, channel courses, and proper maneuvers in crowded or narrow channels. *Perth Amboy*, 1931 AMC 971, 48 F. Supp. 640 (D. Mass.); *Detroiter*, 1936 AMC 382 (2d Cir.); *Severance*, 1946 AMC 128, 82 F.2d 234 (4th Cir.); *Navigator*, 1924 AMC 401 (E.D.N.Y.); *Sally Wren*, 1925 AMC 964 (E.D.N.Y.); *Evelyn v. Gregory*, 1949 AMC 22, 170 F.2d 899 (4th Cir.); *O'Boyle, Lim. Procs.*, 1947 AMC 1127, 161 F.2d 966 (2d Cir.) (tug ran its tow upon a recent but unmarked wreck, the existence of which the tug captain had knowledge of, as well as of the approximate location of the wreck); *Tug Ocean Prince, Inc. v. U.S., supra*; *Humble Oil v. Crochet, supra*; *Mid-America v. National Marine, supra*; *Weeks v. Turecamo*, 482 F. Supp. 1053, 1981 AMC 260 (E.D.N.Y. 1980) (tug found negligent by taking scow drawing seventeen feet through a narrow channel in the East River and failing to reduce speed while passing another flotilla in narrowest part of the channel, causing scow to ground); *RTC v. Bronx*, 1981 AMC 2465 (S.D.N.Y.) (grounding damage to tow because of tug's negligence in attempting to enter harbor with nonfunctioning compass and with knowledge that icy conditions precluded reliance on buoys and other navigational aids).

### *Failure to Make Seasonable Movements*

Tugs have been held liable for failure to perform the towage movements seasonably as well as being too precipitous about doing so. In the *Mariner*, 1927 AMC 363 (5th Cir.), the flotilla was delayed in departing for several hours because the tug negligently grounded. As a consequence, the flotilla was exposed to a storm. The court held that the fact that the storm may have been an intervening cause did not prevent the delay from being a proximate cause. And in the *Wall Light*, 1958 AMC 2541, 170 F. Supp. 675 (E.D.N.Y.), the tow grounded in a shallow channel at low water because the tug failed to await a higher tide. In the *Shanklin*, (1932) 43 Ll.L.Rep. 153, there was a collision between a tug and a paddle steamer leaving a landing

stage. The collision was held due to the tug anticipating a maneuver by the steamer which in the circumstances it was unable to carry out.

## Lookout

See discussion *infra*, Chapter VI, "Collision and Limitation of Liability," under Rule 5.

The importance of a proper lookout cannot be overemphasized. Case law contains emphatic statements concerning the vital importance of a proper lookout. For example, in the *Ariadne*, 80 U.S. 475 (1872), the Court stated:

> The duty of the lookout is of the highest importance. Upon nothing else does the safety of those concerned so much depend. A moment's negligence on his part may involve the loss of his vessel with all the property and lives of all on board.

All navigating vessels are subject to this requirement, tugs and barges no less than the largest vessel afloat.[2] Manned barges under tow, being steered, must have a proper lookout. The *Viking*, 201 F. 424 (E.D. Va. 1912). In the *Wilkesbarre*, 151 F. 501, *aff'd*, 157 F. 1006 (2d Cir. 1907), it was even held that the tug was at fault for not having a lookout where the master fainted and, as a consequence, the tug ran into a vessel lying at a pier. A proper lookout is even more important in periods of poor visibility such as fog, rain, or snow. See the *Sagamore*, 247 F.2d 743 (1st Cir. 1917); the *Oregon*, 158 U.S. 186 (1895); the *Germania*, (1869) 21 L.T. 44, 3 Mar. L.C. 269, P.C.

The 72 COLREGS contain an express requirement of a lookout. Rule 5 reads:

> Every vessel shall at all times maintain a proper lookout by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and the risk of collision.[3]

The importance of a proper lookout is doubly underscored in the United States because of the Pennsylvania Rule, the harshness of which does not seem to have been ameliorated by *Reliable Transfer*. (See discussion *infra*, Chapter VI, *"Collision and Limitation of Liability."*)

---

2. Among the earlier tug and barge cases are *Libby v. Kagu Maru*, 1927 AMC 663, 18 F.2d 295 (W.D. Wash.); the *Wm. A. Jamison*, 241 F. 950 (2d Cir. 1917); the *Umbria*, 153 F. 851 (2d Cir. 1907); the *Transfer No. 17*, 254 F. 673 (2d Cir. 1918); the *Mary Tracy*, 1925 AMC 815, 8 F.2d 591 (2d Cir.)

3. It will be noted that the phrase "by all available means appropriate" establishes a strong mandate not only for the traditional lookout but also any other appropriate means of gathering information, such as radar. Rule 5 of the U.S. Inland Rules is identical.

There are literally innumerable cases holding that the failure of a tug (or tow in appropriate circumstances) to have a proper lookout imposes liability; e.g., *Santa Maria—Oliver J. Olson III*, 1961 AMC 1958, 304 F. Supp. 519 (D. Ore.) (insufficient lookout on tug either visually or by radar); *Atlantic Trader—Steel Designer*, 1970 AMC 1371 (C.D. Cal.) (failure to post a lookout immediately upon approaching dense fog bank; requirement not satisfied by presence of mate on watch or helmsman in wheelhouse); *Zeller Marine v. Chemical Transporter*, 1970 AMC 1582, 307 F. Supp. 138 (S.D.N.Y.) (inattentive lookout on tug); *Butcher No. 1—Peggy and Tow*, 1968 AMC 1386 (E.D. La.) (both tugs in a collision held at fault for failure to have proper lookouts); *Wasson Barge Rental v. Carrie D*, 1969 AMC 131, 296 F. Supp. 933 (E.D. La.) (failure to maintain a proper lookout; Pennsylvania Rule applied); *Laurentia—Charles L. Hogan*, 1969 AMC 479 (E.D. La.) (Sy.) (insufficient lookout on towing vessel); *Erie Lackawanna Ry. v. Timpany*, 1974 AMC 418, 495 F.2d 830 (2d Cir.); *Diesel Tanker W.A. Weber v. Margaret McAllister*, 1974 AMC 1407, 366 F. Supp. 974 (S.D.N.Y.) (tug failed to maintain a proper lookout); *Clary Towing v. Port Arthur Towing*, 1974 AMC 2159 367 F. Supp. 6 (E.D. Tex. 1973) (Sy.) (tugs guilty of statutory fault for failure to have lookout); *Taylor v. Tiburon*, 1975 AMC 1229 (E.D. La.) (pilot of barge flotilla had a blind spot as a result of cargo loaded on the barges; held: should have maintained a forward lookout when approaching a narrow channel under a drawbridge); *Diana L. Moran, Lim. Procs.*, 1976 AMC 2423, 420 F. Supp. 1282 (S.D.N.Y.) (failure to maintain proper lookout when passing beneath a bascule bridge); *Valley Towing v. American Wheat*, 1978 AMC 2175 (E.D. La.) (upbound tug failed, *inter alia*, to keep a proper lookout); *Tug Ocean Prince, Inc. v. U.S.*, 1978 AMC 1786, 584 F.2d 1151 (2d Cir.) (tug failed to post a lookout; Pennsylvania Rule applied); *A.T. & T. v. Steuart*, 1978 AMC 1680 (D. Md.) (tug pushing an empty barge did not have a lookout at the bow of the flotilla); *Sause Bros. Ocean Towing Line Procs.*, 1991 AMC 1242 (D. Ore.) ( noncompliance with watch statute precluded limitation of liability for pollution damage).

The British and Commonwealth cases, although not so numerous, are to the same effect. See the *Harvest Home* [1905] P. 177, C.A.; the *Niobe*, (1888) 13 P.D. 55; the *Jane Bacon* (1878) 27 W.R. 35, C.A.; *Pacific Coyle Navigation Co., Ltd. v. Canadian Pacific Ry. Co.*, [1957] Ex. C.R. 137 (Can.); *Keystone Transports, Ltd. v. Ottawa Transportation Co., Ltd.*, [1927] Exch. C.R. 123 (Can.); *Hall Coal & Shipping Corp. v. Canadian Pacific Ry. Co.*, [1925] Exch. C.R. 70 (Can.); the *Brig Byron*, (1879) 2 L.R. (N.S.W.) Adm. 1 (Aus.); *Prince Arthur v. Tug Florence*, (1896) 5 Exch. C.R. 218 (Can.). In *Canadian Dredging Co. v. Northern Navigation Co.*, [1923] Ex. C.R. 189, a tug and its tow collided with a third ship. For purposes of determining liability, it was held that the tug and tow should be treated as being one ship. In Canada's collision regulations, a vessel, if engaged in a towing operation which severely restricts both tug and tow in their ability to deviate from their course, is treated as a vessel restricted in its ability to maneuver. In *Algoma*

*Central Railway v. the Ship "Cielo Bianco," et al.*, [1987] 2 F.C. 592, (1987) 73 N.R. 321 (F.C.A.), a third ship collided with the starboard side of a tug, crushing the tug against the starboard side of its tow. As a result, the towlines parted and the tug sank. Two of its crew members were lost. The tow was held to be 75 percent at fault for not keeping a proper lookout and turning without signal or agreement, with the third ship sustaining 25 percent of the fault for not immediately stopping given the risk of collision and for not having a deck watch that fulfilled the ship's deck watch regulations.

The cases are not, however, entirely consistent with respect to the proper location to place the lookout. Although, generally speaking, the lookout should be in the bow, i.e., "in the eyes of the ship" where visibility is usually the best, the rule is not inflexible. For example, in *Oriental Trading & Transp. Co. v. Gulf Oil Corp.*, 1949 AMC 644, 172 F.2d 108 (2d Cir.), the court stated:

> Although a lookout is one of the most essential safeguards on a ship, nothing could less insure his value than rigidly to circumscribe his functions. Normally, he should indeed be stationed in the bow; because there his view is not obstructed; and apparently he can see better when close to the water than aloft. However, all such considerations yield when the weather makes another position more suitable. It would be fatuous to the last degree to insist upon his being on the forecastle, where rain or sleet or even high winds in his face interfere with his vision.

Compare, however, the *Welsh*, 276 F. 912 (2d Cir. 1921), and the *Capt. Weber*, 89 F. 957 (9th Cir. 1898).

The obligation to keep a good lookout may extend to putting the lookout astern. *Shanks v. Tug N.Y.C. No. 3*, 1930 AMC 1154, 42 F.2d 207 (2d Cir.); *Harbor Star*, 1977 AMC 1168, 433 F. Supp. 854 (E.D. Pa.).

Notwithstanding the almost insuperable burden of the Pennsylvania Rule, tugowners occasionally have met that burden. See, for example, the *Farragut*, 77 U.S. 334 (1870); the *Alice M. Moran*, 1931 AMC 1591 (S.D.N.Y.); *James & Co. v. Chotin Transportation*, 1968 AMC 120 (St. La.); *Steel Designer—Virginia*, 1970 AMC 761, 310 F. Supp. 775 (D. Md.); *Koch-Ellis v. Banija*, 1970 AMC 1698 (E.D. La.) (Sy.); *Schmidt Barge, Lim. Procs.*, 1973 AMC 1053, 475 F.2d 428 (7th Cir.); *Tiger Shipping v. Carville*, 1974 AMC 1957, 381 F. Supp. 1340 (E.D. Va.) (where the court held that while the failure to have an adequate lookout was not a statutory fault, the failure to sound an alarm signal was a statutory breach and brought into play the Pennsylvania Rule); *National Steel v. Kinsman Transit*, 1974 AMC 1070, 369 F. Supp. 498 (E.D. Mich.) (absence of stern lookout held to have no reasonable bearing on fault where both vessels were constantly in sight of each other); *Harbor Star, supra* (shipowner carried burden of the Pennsylvania Rule by showing that the presence of a bow

lookout would not have enabled avoidance of the collision); *Gulfcoast Transit v. Anco Princess*, 1978 AMC 2471 (E.D. La.).

## Duty Not Necessarily Lessened because Tow Unseaworthy

The duty of a tug toward its tow is to exercise reasonable care and maritime skill, and that duty is not necessarily lessened by the fact that the tow was unseaworthy at the inception of the voyage. *Gulf Wave Towing v. Mitchell*, 1959 AMC 2445 (E.D. La.); *Marie—Perth Amboy No. 4*, 1943 AMC 679, 135 F.2d 404 (2d Cir. 1943) (bargee noticed a leak in the barge and called the tug's attention to it; the tug did nothing and continued to tow, passing several places where it might have beached the tow); *Scow Covered Wagon*, 1952 AMC 2034, 200 F.2d 33 (4th Cir.); *Dredge Hull B-1*, 1953 AMC 181, 200 F.2d 603 (2d Cir.); *Chemical Transporter v. Turecamo*, 1961 AMC 1520, 290 F.2d 496 (2d Cir.); *Juno—Drill Barge 58*, 1966 AMC 2172, 262 F. Supp. 282 (S.D. Tex. 1966), 1967 AMC 1597, 287 F. Supp. 724 (S.D. Tex. 1967), *aff'd*, 1969 AMC 1441, 403 F.2d 715 (5th Cir. 1968) (tug failed to alter course and head for a port of refuge when the tow was noticed to be down by the head). Compare, however, *Layne International v. U.S.*, 1969 AMC 1116 (9th Cir.), and *South v. Moran Towing & Transportation Co.*, 1966 AMC 1987 (2d Cir.). In *Layne*, the barge developed a perceptible list and in *South* the tow's running lights went out. In neither case was the tug held liable.

Also, in numerous cases tugs have been exonerated from fault where the evidence disclosed that the tow was unseaworthy or guilty of some affirmative fault. *Mary—J.B. Lewis*, 1927 AMC 1310 (5th Cir.); *Perseverance—Violette*, 1929 AMC 159 (E.D.N.Y.) (bitt on the tow pulled out); *Western Light*, 1930 AMC 379 (E.D.N.Y.) (scow capsized due to bad stowage of cargo); *Seaboard No. 124*, 1932 AMC 494 (E.D.N.Y.) (bargee at fault for slackening lines without orders); *Anthony*, 1938 AMC 732, 96 F.2d 133 (2d Cir.) (barge owner, upon being informed his barge was damaged and leaking, supplied an extra pump; some hours later one of the pumps stopped and the barge sank); *E. J. Wigton—Perseverance*, 1930 AMC 881, 41 F.2d 270 (S.D.N.Y.) (bargees failed to steer barges to follow tug); *Onward*, 1944 AMC 703, 52 F. Supp. 739 (D. Mass.) (inadequate caulking of tow); *Mohawk Harford*, 1953 AMC 1541, 207 F.2d 626 (3rd Cir.) (failure of tow to steer properly); *Horton & Horton v. J. E. Dyer*, 1969 AMC 2262 (S.D. Tex.) (tug and barge held mutually at fault; tug negligent and barge leaked excessively and had a defective pump); *Morning Star*, 1926 AMC 132 (S.D.N.Y.) (unexplained sinking of a barge on a quiet night); *Louise Perry*, 1933 AMC 1539 (S.D.N.Y.); *Roseina*, 1937 AMC 359 (S.D.N.Y.); *Mariner Scow No. 28*, 1940 AMC 1667, 35 F. Supp. 802 (D. Mass.); *Lotz v. Elsie M.*, 1951 AMC 1131 (S.D. Tex.) (overloaded barge); *Ideal Cement Co. v. Home Ins. Co.*, 1954 AMC 663, 210 F.2d 937 (5th Cir.); *Wikstrom v. Julia C. Moran*, 1961 AMC 536, 190 F. Supp. 250 (S.D.N.Y.) (unexplained sinking in calm weather); *Snare Co. v. Moran T. & T. Co.*, 1961 AMC 2605, 195 F. Supp. 639 (S.D.N.Y.) (unexplained

152                                                        LAW OF TUG, TOW, AND PILOTAGE

sinking in calm weather); *Janet—Marie J. Turecamo*, 1965 AMC 2570, 238 F. Supp. 145 (E.D.N.Y.) (forty-year-old barge leaked excessively).

And, where the owner of the tow misrepresents its draft and while under tow it goes aground, the tug is not liable. *Jacob M. Heath—Seneca*, 1925 AMC 1168 (S.D.N.Y.); *Mexpet—Gargoyle*, 1923 AMC 1002 (2d Cir.).

### Negligent Errors in Operating

The cases are legion where tugs have been held liable for improper navigational maneuvers. *Clark—Wayne*, 1925 AMC 1356 (E.D.N.Y.) (tug agreed to a passing when high winds rendered it impracticable); *Cohannet—Wyandotte*, 1927 AMC 1542 (E.D.N.Y.) (tug grounded in shallow water; barge collided with its stern); *Lenning & Tow*, 1931 AMC 546, 45 F.2d 691 (2d Cir.) (tug attempted to shorten hawsers at a lock entrance in waters subject to an eddy; barges struck canal wall); *Overbrook—Corlear*, 1931 AMC 630, 47 F.2d 593 (2d Cir.) (tug, knowing of drill barge ahead, laid its course too near the bank); *Nanuet*, 1932 AMC 252, 55 F.2d 222 (2d Cir.); *Freedom—P.R.R. No. 35*, 1932 AMC 779, 58 F.2d 170 (2d Cir.) (flotilla proceeding at good speed with the tide failed to slow up and swing its tow when it saw lights of another tow ahead); *Lutcher Brown, etc.*, 1930 AMC 1217, 41 F.2d 176 (5th Cir. 1930); *Marjorie Roe—Hattie*, 1929 AMC 791 (E.D.N.Y.) (tug in dense fog failed to use lead, steered wrong course); *Barryton*, 1928 AMC 476 (E.D.N.Y.); *Gillen—Van Dyck*, 1929 AMC 1358 (E.D.N.Y.); *Howe No. 6—Rugge*, 1931 AMC 712 (E.D.N.Y.) (tug carelessly collided with own tow); *Wonder*, 1931 AMC 1796 (E.D.N.Y.) (tug caused tow to hit bridge abutment while attempting to prevent another tug from getting ahead of it); *D. L. & W. 31, etc.*, 1931 AMC 930 (S.D.N.Y.); the *Umbria*, 153 F. 851 (2d Cir.); the *Express*, 212 F. 672 (2d Cir.) (tug caused the tow to block the channel unreasonably); *F. W. Wheeler*, 78 F. 824 (6th Cir.) (failure to cast off tow to avert collision); *J. B. Austin, Jr.*, 1929 AMC 771, 33 F. Supp. 215 (S.D.N.Y.) (failure to properly detect increased current due to opening of spillway gates); *Winnetou—Perseverance*, 1932 AMC 1324 (S.D.N.Y.) (tug and barge approached improperly anchored steamer; tug charged with knowledge it must navigate with greater care; damages divided); *Harry F. Keeler—G. W. Patterson*, 1934 AMC 812, 70 F.2d 712 (2d Cir.) (improper use of heaving lead in fog); *Veribest*, 1933 AMC 474 (E.D.N.Y.) (tug attempted to pass dredge at low tide, thereby picking up cable from dredge); *Pelham—Seaboard No. 91*, 1933 AMC 1096 (E.D.N.Y.) (master failed to take into account that high northwest wind would accelerate the tide about one hour); *Perth Amboy No. 1 and 18 Barges*, 1934 AMC 152 (S.D.N.Y.) (tug rounded reef too closely and was unable to control tow); the *Alpha*, 27 F. 795 (1886), and *Riverside Trawling Co. v. Vulcan*, 1945 AMC 484, 60 F. Supp. 156 (E.D. La.) (improper maneuver caused excessive strain on hawser, which broke); *Canada*, 1924 AMC 886 (S.D.N.Y.) (failure to allow for strong current);

*Cockatoo*, 1932 AMC 111, 54 F.2d 1070 (2d Cir.) (two tows approaching the narrow channel; upbound tow, merely stemming the tide should hold back; its failure to do so considered negligence); *Freeport—Margaret*, 1938 AMC 1484, 99 F.2d 842 (4th Cir.) (tow grounded because tug unnecessarily stopped its engines and lost steerageway in an ebb tide); *Hendry v. Continental*, 1946 AMC 681, 154 F.2d 711 (5th Cir.) (after line broke, tug backed and fouled line, whereupon the barge drifted aground).

Tugs have also been held liable for improper navigational maneuvers in the following cases. *Go-Getter*, 1969 AMC 842 (D.C. Ore.) (tugowner attempted to tow a barge sixty-eight feet wide through a bridge opening seventy-seven feet wide with a single tug under adverse wind conditions when prudence dictated two tugs; limitation denied on grounds of privity); *Andros Marine v. Steve W.*, 1970 AMC 1234 (S.D. Fla.) (Sy.) (*there was* lack of lookout and negligent navigation, although not discovered until four months later, after several other voyages); *Houma Well Service v. Capt. O'Brien*, 1970 AMC 2041, 312 F. Supp. 257 (E.D. La.) (tug crew at fault where they knew or should have known that the tow had become unstable); *M.P. Howlett v. Dalzellido*, 1971 AMC 1389, 324 F. Supp. 912 (S.D.N.Y.) (tug exposed its floating crane tow to predicted unfavorable winds and failed to stop and inspect inordinate swaying of crane boom before it fell);

*Dow Chemical v. Denis Brown*, 1971 AMC 536 (W.D. Tenn.) (Sy.) (tug negligent in towing barge with a hole in its bow and in placing barge at the head of flotilla); *Tidewater Marine v. American Towing*, 1971 AMC 307, 437 F.2d 124 (5th Cir.) (tug negligent in making up tow in such a fashion that second barge could not be seen from the pilothouse; failing to post a lookout; and proceeding at excessive rate of speed); *Humble Oil v. Crochet*, 1972 AMC 1843, 422 F.2d 602 (5th Cir. 1970) (negligent navigation of tug); *Allied Chem. Co. v. Carville*, 1972 AMC 2691, (E.D. Pa.) (Sy.) (tug pulled barge from its berth while it was still aground); *Bilkay Holding v. Consolidated Iron & Metal*, 1972 AMC 440, 300 F. Supp. 1313 (S.D.N.Y.) (tug pulled scow away from bulkhead before high tide); *Gulfcoast Transit v. Kyung Ju*, 1972 AMC 2561, 343 F. Supp. 867 (E.D. La.) (tug failed to stop and reverse when its one-blast passing signal went unanswered, and failed to hear other vessel's whistle signals due to noise from its own engines and fact that wheelhouse doors were closed); *Canal Barge, Lim. Procs.*, 1973 AMC 843, 480 F.2d 11 (5th Cir.) (tug master negligent for, *inter alia*, failing to inform his pilot of known hazardous conditions, failing to allow the pilot a chance to obtain the "feel" of the tow, and abandoning wheelhouse in the face of danger); *Dow Chemical v. Thomas Allen*, 1974 AMC 781, 349 F. Supp. 1354 (E.D. La.) (tug captain failed to refuse to navigate the flotilla through a dangerous, unfamiliar area without a guide boat or charts); *Kinsman Marine v. Great Lakes Towing*, 1975 AMC 837 (N.D. Ohio) (tug imparted too much sternway to ship being assisted; damages divided as ship failed to respond to tug's orders promptly); *Bouchard Transp. v. Gillen Bros.*, 1975 AMC 2030, 389 F. Supp. 77 (S.D.N.Y.) (tug pilot

154

negligent in attempting to dock a loaded lighter without inquiring as to water depth, and tugowner negligent in putting such a pilot in charge); *Ocean Queen*, 1976 AMC 1404, 398 F. Supp. 1062 (S.D.N.Y.) (overtaken tug held at fault for its inability to control its tow, resulting in a collision with the overtaking vessel); *Naptha Barge v. Continental Navigation*, 1978 AMC 501 (E.D. La.) (tug failed to control its tow); *Tug Ocean Prince, Inc. v. U.S.*, 1978 AMC 1786, 584 F.2d 1151 (2d Cir.) (owner failed to designate a tug captain and failed to eliminate known practice of sending deckhand lookouts below to fetch coffee); *Tweed Towing, Lim. Procs.*, 1992 AMC 37 (N.D. Cal. 1991) (negligent master put tug at risk and crew failed to close watertight doors and release towing line); *Weeks v. Turecamo*, 482 F. Supp. 1053, 1981 AMC 260 (E.D.N.Y. 1980) (tug found negligent for taking tow with deep draft through narrow, shallow channel at excessive speed); *Aiple Towing v. Lynne E. Quinn*, 534 F. Supp. 409, 1982 AMC 1869 (E.D. La.) (tugowner found liable for failing to (1) make sure barge's manhole covers were tightly secured, (2) keep barge under close observation during the tow (3) monitor radio weather forecasts, and (4) supply tug with hoses which could have been used to pump out the barge).

*McDonough Marine v. Royal Street*, 465 F. Supp. 928, [DRO] 1982 AMC 2701 (E.D. La. 1979) (tug negligent for failing to keep close watch on tow, to sound and pump its tanks, and to beach the barge when it listed); *Pampa Marine, Lim. Procs.*, 1981 AMC 1939 (E.D. La. 1979) (discussion of damages to which owner of tow entitled by reason of tug's negligence); *First Mississippi v. Fielder*, 456 F. Supp. 576, 1980 AMC 1017 (N.D. Miss. 1978) (evidence of water-covered rock dikes along the route and of tug's operation outside the channel justified a finding of navigational negligence when barge delivered in good condition was found holed); *Cargill v. Taylor Tow.*, 483 F. Supp. 1094, 1980 AMC 2796 (E.D. Mo. 1979) (tugowner denied limitation where he knew that only one of the tug's two engines was in working order); *Mosbacher v. Louisiana Materials*, 1981 AMC 1458 (E.D. La. 1980) (barge captain found negligent for operating without license and totally abdicating responsibility to towing tugs); *RTC v. Bronx*, 1981 AMC 2465 (S.D.N.Y.) (tug negligent in circumstances to tow alongside rather than on a towing hawser); *Citadel Shipping v. Consolidated Grain*, 1983 AMC 1721 (E.D. La. 1982) (damages apportioned equally between tug and barge when contradictory testimony prevented trial judge from apportioning more precisely); *Azcon v. N. Dakota*, 1982 AMC 1448 (D. Minn. 1981) (tug found 25 percent at fault for undermining fill under dock with its wheel wash). See also discussion *infra* with respect to "Liabilities of Owners and Operators of Stake Boats, Moorages, Slips, and Wharves."

By contrast, in the following cases, tugowners were found to be free from fault: *Shebby Dr. v. Smith Bros.*, 469 F. Supp. 1279, [DRO] 1982 AMC 1516 (D. Md. 1979); *Massman v. S.C. & N.O.*, 462 F. Supp. 1362, 1980 AMC 1164 (W.D. Mo. 1979) (rule of *res ipsa loquitur* found inapplicable); *Salter*

*Marine, Lim. Procs.*, 1981 AMC 2944 (E.D. La.); *Chevron v. Progress Marine,* 1980 AMC 1637 (E.D. La. 1979); *U.S. v. Leland James,* 1980 AMC 2514 (D. Ore. 1979); *Stillufsen v. American Dredging,* 431 N.Y.S. 2d 619, 1981 AMC 970 (St. N.Y. 1980); *Daigle v. Point Landing,* 616 F.2d 825, 1981 AMC 458 (5th Cir. 1980).

As to negligent errors in operating, see cases cited with respect to "Duties as to Proper Navigation," *supra,* i.e., *Central Marine v. Gulf Fleet, Transload & Transport v. Superior Oil,* and *Prudential Lines v. McAllister.*

Comparable British and Commonwealth cases are *Waldie Bros., Ltd. v. Fullum,* (1909) 12 Ex. C.R. 325 (Can.) (careless navigation and absence of proper lookout on the tug); *Paterson, Chandler & Stephen, Ltd. v. the Senator Janson,* (1919) 19 Ex. C.R. 105, 49 D.L.R. 166 (Can.) (failure to lash tow properly alongside); *Sewell v. B.C. Towing, etc.,* (1883) 9 S.C.R. 527 (Can.) (failure to use reasonable care); *Hubbard v. Dickie,* (1906) 39 N.S.R. 506 (Can., C.A.) (tug came unnecessarily close to fishnets and damaged them); *R. v. the Island Challenger,* [1959] Ex. C.R. 413 (Can.) (barge under tow sheered and struck bridge due to faulty navigation on part of tug and failure to anticipate sheer and take proper precautions); the *Shanklin,* (1932) 43 Ll.L.Rep. 153 (collision due to tug anticipating a maneuver by a steamer which, under the circumstances, the steamer was unable to carry out); the *Robert Dixon,* (1879) 5 P.D. 54, C.A. (tug imprudently towed a ship too near a lee shore); *Staite v. Webb,* (1838) 100 L .T. 790 (negligent towage in taking additional vessels under tow); *Kincaid v. Willis,* (1850) 14 L.T.O.S. 505 (tow rope improperly dropped); *Preston Corp. v. Biornstad, the Ratata,* [1898] A.C. 513 (tug so slow and inefficient that last vessel in line stranded); *S.S. Rio Verde (Owners) v. S.S. Abaris (Owners) et al.,* (1920) 2 Ll.L.Rep. 411 (undue length of towing hawser in crowded harbor); the *Devonshire,* [1912] P. 21, C.A. (negligent towage by the tug).

Where, however, the tug is *in extremis,* its failure to navigate properly may be excused. *George H. Jones—Sunoco,* 1928 AMC 1504, 27 F.2d 665 (2d Cir.) (two steamers passing changed signals, one of them going into the tug's water; tug hauled its tow to the side of the channel); *Michael Gallagher,* 1964 AMC 1393 (N.D. Ill.) (tug caught between large vessel and closed drawbridge); *Southern Cross,* 1927 AMC 457 (vessel being assisted took unexpected sheer; tugs held to have acted properly *in extremis*); *Agnes A. Moran—Cullen No. 44,* 1928 AMC 438 (E.D.N.Y.) (tug encountered severe storm and grounded tow in seeking port of refuge); *M. P. Howlett v. Michael Moran,* 1970 AMC 783, 425 F.2d 619 (2d Cir.) (where imminent capsizing of his tow confronted captain with an immediately perilous situation, his actions should be judged by a standard different from ordinary maritime negligence).

Nor is the tug liable when the damage is occasioned by an act of God. *J. C. Hartt—Pocahontas,* 1928 AMC 560 (E.D.N.Y.) (gale on the Hudson River attained velocity of eighty-four miles an hour); *G. W. Patterson,* 1933 AMC 1690 (E.D.N.Y.) (dense fog causing stranding); *Patience—Panther,*

1937 AMC 1289, 20 F. Supp. 529 (E.D.N.Y.) (unexpected sudden storm in New York Bay); *Ruth Shaw*, 1943 AMC 1223, 52 F. Supp. 202 (E.D.N.Y.) (sudden storm; failure to correctly forecast probable development of weather conditions and probable depth of water in inlet not tug's fault). See also *John F. Lewis*, 1926 AMC 1330 (2d Cir.). But see *Mid-America v. Rose Barge*, 1973 AMC 449, 344 F. Supp. 1278 (E.D. Mo. 1972), where the court held that damage to a barge that hit the riverbank when a submerged log struck and stopped the propeller of the towing tug was not caused by inevitable accident where submerged and sunken logs are a foreseeable hazard on the Mississippi River.

And, in several instances, the courts have merely characterized the casualty as an "accident" with no fault being imposed. *Brinton*, 1929 AMC 788, 33 F.2d 332 (E.D.N.Y.); *Gildersleeve* 344, 1931 AMC 2011 (E.D.N.Y.).

Where the facts that caused the casualty are peculiarly within the knowledge of the tug, the tug must satisfactorily explain the occurrence or be held liable. *Scipio*, 1938 AMC 1207 (E.D.N.Y. 1938). The language of the court has, at times, bordered on recognition of the doctrine of *res ipsa loquitur*. See *N. Y. Marine No. 2—Wessels*, 1929 AMC 978, 33 F.2d 272 (2d Cir.), where the tug's machinery failed. See, however, *Staley Mfg. v. Puerto Rico Lighterage*, 1970 AMC 2152, 323 F. Supp. 27 (E.D. La.), where the court held that the rule that negligence may be inferred from the towing tug's failure to come forward with all facts in its possession is not applicable where the other party utilized all discovery procedures and there was nothing to suggest that the tug had additional knowledge or evidence within its control. And, in *Mid-America v. National Marine*, 1974 AMC 1943, 497 F.2d 776 (8th Cir.), in the first appeal the appeals court remanded for further proceedings, holding that the tug had at least the burden of coming forward with some reasonable explanation of damage to the tow. In the second appeal, 1976 AMC 389, 526 F.2d 629 (8th Cir.), the appeals court held that, on remand, the tug had satisfied its burden.

In at least three cases, the courts have held tugs liable for a casualty when they had a "last clear chance" to avoid the casualty. *Arundel Co. v. City of Calcutta*, 1959 AMC 168, 172 F. Supp. 593 (E.D.N.Y.) (tug spotted anchored vessel one mile away, misjudged the speed and effect of a strong ebb tide, and elected not to enter Ambrose Channel where a passing could have been safely effected); *N. Y. State Thruway v. Merritt-Chapman & Scott*, 1969 AMC 375 (S.D.N.Y.) (tug held solely at fault when the crane of the barge it was towing struck span of Tappan Zee Bridge 135 feet above the surface of the Hudson River. The bargee said he did not know the height of the crane. Although the barge may have been negligent in having a bargee who did not know the height of his crane, the tug had the last clear chance to avoid the collision by either finding out the exact height of the crane from other sources, or by refusing to proceed until safety measures were taken). In *Montauk Oil Transportation v. Laurie Ann Reinauer*, 1974 AMC

2382, the failure of the barge's crew to lower cargo booms as ordered by the tug captain resulted in a holding that the barge was 50 percent at fault when the booms contacted the underside of a closed railroad bridge. The court rejected the barge's contention that the tug was solely at fault under the last clear chance doctrine. And in *In the matter of J. E. Brenneman Co.*, 782 F. Supp. 1021 (E.D. Pa. 1992), the court held the tug solely at fault for failing to determine the height of the crane boom of the unmanned tow, which hit the span of a bridge.

Attention is specifically directed to the fairly recent line of cases holding a tugowner to a warranty of workmanlike service. See discussion, *supra*, Chapter III, *"General Principles Specifically Applicable to Towing,"* under "Warranty of Workmanlike Service," and *infra*, Chapter XI, "Pilotage," under "Effect of Pilotage Clause."

### Tug's Duty to Mark Wreck of Its Tow

What is the duty of a tug relative to marking the wreck of its tow? Interestingly, it had been held that the duty to mark a wreck is put on the owner of the sunken vessel, and a tug whose negligence caused the barge to be wrecked has no further duty as to marking than to inform the owner as quickly and accurately as possible where the wreck lies. *Joe*, 1927 AMC 597, 18 F.2d 77 (2d Cir.). Moreover, in that case another tug belonging to the same owner ran on the unmarked wreck after the owner received notice and should have marked it. The court held that the tugowner stood in no worse shoes than any other tugowner who has notice that a wreck is in the vicinity. In *Lambert Point*, 1969 AMC 740 (E.D. Va. 1967) (Sy.), the tug was employed to pick up and tow to safety an unmanned pontoon barge adrift on the Chesapeake Bay, laden with a mobile crawler type crane and clam bucket. After considerable difficulty in getting a line on the barge, the flotilla started toward Norfolk. En route, during the severe storm then in progress, the mobile crane went overboard. The tug captain attempted to fix the position of the lost crane, using the gyro repeater, radar range and bearings on buoys, and gyro bearings on physical objects. The court held that the duty to mark or buoy a wreck is not ordinarily an incident of a towage contract, whatever the tug's fault may have been for causing the loss, citing *Anna M. Fahy*, 153 F. 866; *R. J. Moran*, 1924 AMC 796, 299 F. 500; *Red Star Towing and Transportation Co. v. Woodburn*, 1927 AMC 597, 18 F.2d 77; and *Eureka No. 110*, 1951 AMC 638, 187 F.2d 665 (2 Cir. 1951). See also *Transmarine No. 113*, 1927 AMC 1075, 20 F. Supp. 163 (S.D.N.Y.).

Only the *owner* of a vessel at the time of sinking is liable under the Wreck Act, 33 U.S.C.A. 409, for a subsequent failure to mark the wreck. *U.S. v. Tucker*, 1975 AMC 834, 511 F.2d 650 (5th Cir.). But, the duty to remove and/or pay for removal expenses is another story. See discussion, *infra*, this chapter, "Duty of Tug after Disaster" and "Marking Wrecks."

160                                                        LAW OF TUG, TOW, AND PILOTAGE

*No. 10*, 1931 AMC 173 (E.D.N.Y.); *Atlas—Gladys*, 1931 AMC 505 (E.D.N.Y.); *Authentic*, 1929 AMC 1734, 37 F. Supp. 352 (E.D.N.Y.); *Robert J. Kennelly—Holbrook*, 1930 AMC 383 (S.D.N.Y.); *Calumet, etc.*, 1932 AMC 340 (S.D.N.Y.); *Perseverance—Winnetou*, 1933 AMC 508, 63 F.2d 788 (2d Cir.); *P.R.R. No. 26—Dauntless No. 5*, 1933 AMC 186 (S.D.N.Y.); *Chilbar—McCaulley*, 1945 AMC 1422, 152 F.2d 258 (4th Cir.); *U.S. v. Dunmore*, 1945 AMC 803, 61 F. Supp. 258 (E.D.N.Y.); *Segrave v. Amboy*, 1946 AMC 499, 66 F. Supp. 218 (E.D.N.Y.); *Olympic Towing v. Nebel Towing*, 1969 AMC 1571 419 F.2d 230(5th Cir.) *cert. denied*, 397 U.S. 989, [1970] 1 Ll.L.Rep. 430; *Naptha Barge v. Continental Navigation*, 1978 AMC 501 (E.D. La.); *Preston Corp. v. Biornstad, the Ratata, supra*; *Kearney v. Dansereau* (1915) Q.R. 24 K.B. 401 (Can.); *Crown Forest Industries v. Valley Towing, Ltd.* (1988), 19 F.T.R. 48 (F.C.T.D.).

Notwithstanding the tug's duty to keep its tow in line, there are circumstances that call for just the reverse action. In *Scow Henry C. Lang*, 1950 AMC 1117, 92 F. Supp. 615 (E.D.N.Y.), the tug was commended for turning to the right in an imminent collision so as to swing its tow left and away from the colliding vessel. There are circumstances in which the tug has been absolved from liability even though it failed to keep its tow in line. In *George H. Jones—Sunoco*, 1928 AMC 1504, 27 F.2d 665 (2d Cir.), the tug was *in extremis* due to close proximity to two passing steamers and it was absolved of its failure to keep its tow in line. In *Frank*, 1930 AMC 858, 40 F.2d 430 (2d Cir.), the negligent mooring of a vessel so as to obstruct the channel was held to overcome the presumption of negligence against a tug which, by reason of such obstruction, failed to keep its tow in line. In *F. W. Gwinn, Jr.*, 1940 AMC 101 (S.D.N.Y.), the court held that the "forces of nature" made it impracticable for the tug to keep its tow in line.

A tug using helper tugs at the tail end of the tow should provide some means of signaling the helper tugs to avoid the tow swinging out of line. *John F. Curry*, 1932 AMC 447, 56 F.2d 740 (2d Cir.).

## Weather, Weather Reports, and Signals

Unquestionably, the duty is cast upon the tug of ascertaining weather conditions in advance of making the towing movement, if at all possible, and the tug is liable if it ignores or disregards available weather information. Likewise, the tug is liable for leaving harbor or commencing the towing movement in the face of a storm or known adverse weather conditions. Actual knowledge of adverse weather conditions is not required; the tug is liable if the means of obtaining such information were at hand and the tug captain failed to avail him- or herself of such information. *Burns Bros. v. Cleveland*, 1944 AMC 139, 52 F. Supp. 937 (E.D.N.Y.). As the court pointed out in *D.S.C. 113—M. Moran*, 1935 AMC 1061, 12 F. Supp. 493 (S.D.N.Y.), there is little difference in failing to use reasonable diligence to observe storm warnings and in disregarding them. The failure in either respect is

evidence of a failure in that ordinary care and skill which is a tug master's duty when about to proceed with a tow.

Among the cases holding tugs liable for ignoring or failing to obtain or observe weather reports are: *Aiple Towing v. Lynne E. Quinn*, 534 F. Supp. 409, 1982 AMC 1869 (E.D. La.) (tug owner found liable for, *inter alia*, failing to monitor radio weather forecasts); *McDonough Marine v. Royal Street*, 465 F. Supp. 928, [DRO] 1982 AMC 2701 (E.D. La. 1979) (tug acted reasonably in continuing to tow barge in one- to three-foot seas with winds of up to ten to fifteen knots rather than proceed into port); *RTC v. Bronx*, 1981 AMC 2465 (S.D.N.Y.) (tug negligent in attempting to enter harbor with knowledge that icy conditions precluded reliance on buoys and other navigational aids); *Central Marine v. Gulf Fleet*, 1984 AMC 1019 (E.D. La. 1983) (negligent navigation of tug in failing to avoid severe weather and sea conditions).

Compare, however, *Employers' Insurance v. Avondale Shipyards*, 1986 AMC 2770 (E.D. La.), where the court refused to second-guess a tug master's decision to take an already damaged vessel out to sea in the face of a predicted tropical storm. *Mercury*, 1924 AMC 1550, 2 F.2d 325 (1st Cir.); *Mulligan No. 1*, 1923 AMC 325, 297 F. Supp. 633 (S.D.N.Y.); *Barryton—McCue—Mulqueen*, 1930 AMC 562 (S.D.N.Y.); *D.S.C. 113—M. Moran, supra*; *Blumenthal v. Atlantic Coast Line*, 1943 AMC 1341, 139 F.2d 288 (2d Cir.); *Pfizer & Co. v. Conners Marine Co.*, 1949 AMC 1512, 175 F.2d 213 (2d Cir.); *Penna. R.R. Co. v. Beatrice*, 1958 AMC 1612, 161 F. Supp. 36 (S.D.N.Y.); *Ohio Valley Eng. v. Ove 102*, 1963 AMC 728, 214 F. Supp. 784 (E.D. La.); *M.P. Howlett v. Dalzellido*, 1971 AMC 1389, 324 F. Supp. 912 (S.D.N.Y.) (tug exposed its floating crane tow to predicted unfavorable weather); *Seaboard Shipping Co., Lim Procs.*, 1971 AMC 2145, 449 F.2d 132 (2d Cir.) (tug negligent in attempting to cross Lake Michigan without a properly calibrated barometer in the face of increasingly bad weather reports, and without radio communications); *Tweed Towing, Lim. Procs.*, 1992 AMC 37 (N.D. Cal. 1991).

The weather conditions may be known and yet the tug master may elect to depart in the face of worsening weather. If his act in doing so is considered in the light of hindsight to be bad seamanship, the tug will be held liable. See *Whorford, etc.*, 1923 AMC 843, 3 F. Supp. 997 (E.D.N.Y.); *S-33*, 1924 AMC 1192 (E.D.N.Y.); *Walter Mattich—Severn—Bronx No. 1*, 1929 AMC 1665, 35 F.2d 294 (4th Cir.); *Katie E*, 1931 AMC 321, 46 F. Supp. 534 (E.D.N.Y.); *Hughes—Severn*, 1930 AMC 893 (E.D. Pa.); *Transmarine No. 126*, 1937 AMC 875, 90 F.2d 626 (2d Cir.); *Jerry E*, 1940 AMC 137, 30 F. Supp. 208 (E.D.N.Y.); *McLain Line v. U.S.*, 1946 AMC 1659, 69 F. Supp. 938 (S.D.N.Y.); *Pfizer & Co. v. Conners Marine Co.*, 1949 AMC 1512, 175 F.2d 213 (2d Cir.). However, in *Ocean Burning v. Moran T. & T.*, 1974 AMC 2307 (S.D.N.Y.), the court, noting that a tug is liable to its tow only for proven failure to exercise a reasonable navigator's care and skill, held the tug free

from fault in taking a 314-foot barge out to sea when the weather forecast predicted fifteen- to twenty-five-knot winds with higher gusts. See also *Employers Ins. v. Suwannee River*, 1990 AMC 447 (5th Cir. 1989).

However, the courts have been rather lenient with respect to how diligent the tug master must be in attempting to obtain all available weather information. In the *Headlight*, 1924 AMC 829, 300 F.2d 84 (2d Cir.), the court held that a harbor tug was not required to carry a barometer, nor was the master held bound to inquire at the weather bureau for unpublished advance information on the possible trend of storms; and in *Alice Moran—Imoan*, 1933 AMC 1626, 67 F.2d 603 (2d Cir.), the court of appeals reversed the district court (1932 AMC 1380) and exonerated the tug for setting out at 8 P.M., knowing of preliminary warnings issued at 2 P.M., yet being ignorant of the precise warning issued at 4 P.M., a warning he could have obtained by telephone.

In several instances, tugowners have been held for failure to send scout tugs out ahead to ascertain the weather conditions. *Katie E*, 1931 AMC 321, 46 F. Supp. 534 (E.D.N.Y.); *Reichert Line*, 1932 AMC 1325 (S.D.N.Y.). In *Katie, supra*, the tug and barges left harbor, encountered a heavy northwest wind and flood tide, and turned back; in doing so, one barge filled and sank. The court held that a helper tug should have been dispatched first to ascertain weather conditions. In *Reichert, supra*, the tug, upon seeing rough weather outside, grounded its tow in an attempt to get back into harbor; the court held the tug should have gone out first to ascertain the outside weather. *Cf. J. C. Hartt—Pocahontas*, 1928 AMC 560 (E.D.N.Y.).

In *Bern—Dredge No. 6*, 1929 AMC 1148 (E.D.N.Y.), the tug found that it and its two helper tugs could not control its tow of fifty-three light barges. The court held it should have obtained more helper tugs, or tied up the tow, or proceeded with such part of the tow as could have been handled.

In one instance, the tug was held liable for failure to utilize its radar in ascertaining the approach of bad weather. *Daniels v. Wienertor*, 1966 AMC 817 (M.D. Fla.). Severe squalls can often be detected on radar and appear as distinct blips; it should be observed, however, that the blips which appear can often be deceiving. The correctness of the decision in *Daniels* should be seriously questioned.

It may be one thing to leave a barge tied up in a supposedly safe place in the face of worsening weather; it is another to fail to send rescue assistance to the moored vessel when the weather conditions materially deteriorate. The *Grandpa*, 1925 AMC 486, 6 F.2d 362 (2d Cir.); *Bronx*, 1926 AMC 1080, 14 F. Supp. 482 (S.D.N.Y.); *McCaffrey v. Penna. R.R. Co.*, 1925 AMC 927 (S.D.N.Y.); *Pansy*, 1925 AMC 937 (S.D.N.Y.); *Victoria—Burns Bros. No. 21*, 1932 AMC 21, 54 F.2d 532 (2d Cir.). And merely leaving the tow in an unreasonably exposed place may impose liability. See *Army—Buffalo*, 1938 AMC 338 (E.D.N.Y.); *Vale Royal*, 1943 AMC 1099, 51 F. Supp. 412 (D. Md.); *S.C. Loveland v. East West*, 1978 AMC 2293, 415 F. Supp. 596 (S.D. Fla.)

(tug left unmanned barge at anchor near bridge in area exposed to adverse weather).

Even to prolong the tow by unreasonable delay, thereby exposing the tow to additional weather risks, may be considered negligence. *Mariner*, 1927 AMC 363, 17 F.2d 253 (5th Cir.).

The courts are not too consistent with respect to the obligation of the tug to provide radio receiving equipment to obtain weather reports. See discussion, *supra*, on adequacy of tug's equipment. In *T. J. Hooper and Tow*, 1932 AMC 1169, 60 F.2d 737 (2d Cir.), and *Chehaw—Barrenfork*, 1931 AMC 1906, 54 F. Supp. 645 (S.D.N.Y.), the courts held the tugs negligent for failure to have radio equipment; in *Carroll*, 1932 AMC 1478, 60 F. Supp. 985 (D. Md.), *Russell No. 5*, 1939 AMC 339, 26 F. Supp. 575 (E.D.N.Y.), and *Lizzy D. Shaw*, 1937 AMC 140 (E.D. Pa.), radios were held not necessary. As most of the cases were decided some time ago, and the state of the art in the electronics industry has advanced so far, it would appear that the better rule is to ensure adequate and properly functioning radio equipment aboard the tug.

It is not surprising, in assessing the probability of liability by reason of failing to observe threatened weather conditions, that the courts have found tugs blameless where the weather, as it actually developed, was so severe as to be considered either as an act of God or "inevitable accident." *La Touraine*, 1925 AMC 300 (S.D.N.Y.) (inevitable accident); *Robert C.*, 1925 AMC 493 (S.D.N.Y.) (act of God); *Media—No. 32*, 1931 AMC 172 (S.D.N.Y.) (inevitable accident); *Patience—Panther*, 1937 AMC 1289, 20 F. Supp. 529 (E.D.N.Y.) (act of God); *Delmar and Tow*, 1944 AMC 366, 141 F.2d 1020 (2d Cir.) (act of God); *Marine Leasing, Lim. Procs.*, 1971 AMC 1329, 328 F. Supp. 589 (E.D. La.) (act of God, Hurricane Betsy, Sept. 1965).

Nor have the tugs been held liable where the decision to commence the movement was essentially made by the owner of the tow. *Alcoa S.S. Co. v. John T. Walsh*, 1959 AMC 2300 (S.D. Ala.); *Sea Lion*, 1926 AMC 265, 12 F.2d 124 (N.D. Cal.). Nor, of course, is the tug liable where the tow's bargee becomes panicky and proximately causes the loss. *Goodwin—Wang*, 1929 AMC 158 (E.D.N.Y.); *Floral E. Roe*, 1932 AMC 1621, 1 F. Supp. 785 (E.D.N.Y.); *Lykes Bros. v. Great Lake Towing*, 1990 AMC 1210 (E.D. Wis. 1989).

Storm signals or small craft warnings in the vicinity are not necessarily indicative of the weather in the immediate locality, and tugs have been exonerated from fault even though they failed to procure weather reports from nearby areas. *J. C. Hartt—Pocahontas*, 1928 AMC 560 (E.D.N.Y.); *James G. Shaw*, 1928 AMC 1253, 27 F. Supp. 988 (E.D.N.Y.); *Meta E.*, 1932 AMC 852 (E.D.N.Y.).

Attention is directed to *Steuart Transportation, S. T. C. 101*, 1978 AMC 1906, 435 F. Supp. 789 (E.D. Va.), and *Donily v. U.S.*, 1975 AMC 814, 381 F. Supp. 901 (D. Ore.). In the former, even though earlier weather bureau forecasts did not alert the towing tug to seek shelter, this was held not to be

the proximate cause of the barge's sinking during gale force winds and seas, both of which were stronger than predicted. Both the tug and barge were designed to withstand such conditions, and a mere error in making a forecast did not constitute negligence on the part of the United States. In the latter, the United States was held partially liable for the negligence of a shore-based Coast Guard radio operator in failing to furnish correct weather information when requested to do so by a Coast Guard vessel engaged in towing a disabled fishing vessel, as a result of which the fishing vessel capsized and two of its crewmen were drowned. As the fishing vessel was rotted and unseaworthy, the plaintiff's recovery was reduced by 65 percent on account of contributory negligence.

### Discretion of Master

Generally speaking, the courts are inclined to give great weight to the discretion of the tug master in deciding whether to depart from port in the light of known weather reports, or, having departed, in deciding what action should be taken to safeguard the tow. His or her decision should be judged in the light of conditions which existed at the time the decision was made to proceed and not by what later developed. This principle is well demonstrated in *Alice Moran—Imoan*, 1933 AMC 1626, 67 F.2d 603 (2d Cir.). In that case, the tug took in tow five sand and gravel barges. On leaving Port Jefferson, there was a light southeast wind; four hours later the wind was gale force from the east-northeast. The tug left port at 8 P.M.; the New York Weather Bureau had received storm warnings at 4 P.M. but did not post them until 10 P.M. The tug master could have learned of the storm warnings had he called the weather bureau, but he did not. Later, after the storm developed, the master passed two harbors of refuge because he was fearful of taking the wind upon his quarter. Several of his barges were lost in making the turn into the third harbor of refuge. The court of appeals stated, in part:

> We should therefore be obliged to say that every master must call up the Weather Bureau for unpublished news, every time he leaves port, though the weather be good and such advices as he has are promising. We know of no authority for such a doctrine; it seems to us to demand an excessive caution. Even were it required, New York was not the nearest station; New Haven was closer, and surely would have been enough. But at New Haven he would not have got the report . . . Just where the line should be drawn, it is impossible to say beyond our general sense of what is reasonable; we think that the suggested standard required more than prudence demanded.

On the subject of passing the two harbors of refuge, the court said:

Judging as we now can, it would probably have been better to take the chances of the turn into Huntington or Cold Spring, even though that is not certain. But we cannot charge a master because it seems to us, who were not there, that another choice would have been better. Only in case his conduct is outside the range of possible discretion may we hold him for lack of Seamanship; error to become fault must be gross and flagrant. [Citing cases.] It seems to us that, if error there was, it was one which lay within the discretion of capable seamen.

In the *Rob Roy and Howard E.*, 1936 AMC 1217, 15 F. Supp. 727, the court said, with respect to the sinking of one barge and the leaking of the second: "If every time a wind out of the north-northeast of the force shown, not accompanied by storm warnings, were to be deemed to present a hazard to southbound coastwise navigation, those who follow the sea in these parts would spend much of their time ashore."

Additional cases demonstrating this principle are: *Osceola—Hercules*, 1924 AMC 1030, 18 F. Supp. 415 (S.D.N.Y.); *Chehaw—Barrenfork*, 1931 AMC 1906, 54 F. Supp. 645 (S.D.N.Y.); *Admiral*, 1936 AMC 1303, 84 F.2d 616 (5th Cir.); *Perth Amboy No. 1 and 18 Barges*, 1934 AMC 152 (S.D.N.Y.); *Fred Smartley, Jr.*, 1939 AMC 20, 100 F.2d 971 (4th Cir.); *Frances*, 1939 AMC 58, 101 F.2d 30 (4th Cir.); *Quincy Adams—Wyomissing*, 1939 AMC 534 (E.D.N.Y.); *McWilliams Transit v. Henjes*, 1942 AMC 418, 43 F. Supp. 270 (E.D.N.Y.); *Eastern Trans. Co. v. Nancy Moran*, 1948 AMC 1301, 78 F. Supp. 642 (E.D.N.Y.); *McKenzie Barge & Derrick Co. v. Rivtow Marine Ltd.*, 1969 AMC 190 (Can.); *Dixon Chemical v. Turecamo*, 1969 AMC 1977 (2d Cir.); *Herkimer*, 1931 AMC 1449, 52 F.2d 41 (2d Cir.); *Orge v. New Steam Tug Co.* (1858) 31 L.T.O.S. 85 (master, exercising an honest judgment, did what eventually led to the loss of the tow by perils of the seas). However, in *Courtney v. Canadian Development Co.*, (1901) 8 B.C.R. 53 (Can.), the master had been warned by the owners not to undertake any towage. Nonetheless, the master did so and the tow and its cargo were lost in heavy weather. Plaintiffs, owners of the tow and its cargo, on appeal were awarded a new trial; *Employers' Insurance v. Avondale Shipyard*, 1986 AMC 2770 (E.D. La.).

### Favorable Weather Conditions

Where the reported weather conditions have been favorable, or at least not alarming, the courts have demonstrated considerable sympathy for tug masters who later find their flotillas in trouble. *Herkimer, supra; Agnes A. Moran—Cullen No. 44*, 1928 AMC 438 (E.D.N.Y.); *Bump*, 1932 AMC 205, 56 F. Supp. 203 (E.D.N.Y.); *Fire Island*, 1932 AMC 748 (E.D.N.Y.); *Evelyn*, 1932 AMC 1126, 60 F. Supp. 644 (E.D.N.Y.); *Green Valley—Perseverance*, 1931 AMC 351, 49 F. Supp. 785 (S.D.N.Y.); *Theodora Palmer*, 1931 AMC 108, 45 F.2d 621 (D. Md.); *Carroll*, 1932 AMC 1478, 60 F. Supp. 985 (D. Md.); *McCollum—*

*Overbrook*, 1933 AMC 839, 3 F. Supp. 894 (E.D.N.Y.); *George A. Keating*, 1933 AMC 913 (E.D.N.Y.); *Dutton No. 6—Dauntless No. 7*, 1934 AMC 1403, 9 F. Supp. 233 (E.D.N.Y.); *Rob Roy and Howard E, supra.*

The courts will, where hurricanes and storms are catastrophic in nature and attract great notoriety, take judicial notice of the same. See *Mamiye v. Barber S.S. Lines, et al.*, 1966 AMC 1165, 360 F.2d 774 (2d Cir.), where the court took judicial notice of official weather forecasts relating to Hurricane Donna, noting that hurricane predictions cannot be guaranteed beyond a short period as they are by nature unpredictable.

### Fog Signals

The Rules of the Road specifically require certain fog signals on the part of tugs having tows.[4] When the tug fails to sound the prescribed signal, it is at fault. *John M. Worth*, 1929 AMC 146, 30 F.2d 238 (2d Cir.); the *Barendrecht*, 1925 AMC 1121, 9 F.2d 614 (2d Cir. 1925); *Montrose*, 1931 AMC 489 (E.D.N.Y.) (Sy.); *Brooklyn—Leary—N.Y. Marine No. 2*, 1932 AMC 605, 56 F.2d 756 (2d Cir.); *N.Y.O. & W. Ry. Co. v. Cornell*, 193 F. 380 (2d Cir.); *Eymard v. Bonnie Ruth*, 1954 AMC 1186, 120 F. Supp. 67 (E.D. La.); *Ludwig Holberg*, 157 U.S. 60 (1895); *Valley Towing v. American Wheat*, 1978 AMC 2175 (E.D. La.).

Under the 1972 COLREGS,[5] Rule 35(e), a vessel being towed, or if more than one vessel is towed, the last vessel of the tow, if manned, must at intervals of not more than two minutes sound four blasts in succession, namely one prolonged followed by three short blasts. When practicable, the signal shall be made immediately following the signal made by the towing vessel. See, in this connection, *Koninklijke Nederlandsche v. Great Lakes D. & D. Co.*, 1974 AMC 451 (S.D.N.Y. 1973), where the last scow in a tow was held at fault for failing to have on board the foghorn required by the International Rules.

It is not enough that the tug gives a signal in fog; the signal must be the proper signal. *Ashbourne—Grace A. Dalzell*, 1932 AMC 619, 58 F. 2d. 678 (S.D.N.Y. 1931) (tug lying beside its tow moored at the side of the channel in dense fog simply sounded short blasts when other vessels approached); *Artisan—Helmsman*, 1927 AMC 974, 21 F.2d. 439 (S.D.N.Y. 1927) (tug anchored near the channel with its tow, sounding a shrill whistle similar to

---

4. Rules 35(c) and (e); 72 COLREGS; Rules 35(c) and (d), Inland Rules.

5. Public Law 591, codified at 33 6. S. C. signed into law by President Carter on December 24, 1980, entitled "Inland Navigational Rules Act of 1980." The new public law unified §§ 2001 *et seq.*, (for the most part) the U.S. Inland Rules with the 1972 COLREGS and went into effect on the inland waters of the United States on December 24, 1981, except as to the Great Lakes, on which the law became effective on March 1, 1983; see 47 F.R. 15138, April 8, 1982.

498.

that the motion be and it is granted and the case is hereby transferred to the United States District Court for the Eastern District of Louisiana pursuant to 28 U. S. Code, sec. 1506 (1970). The clerk will transmit to that court a certified copy of the record herein. Further proceedings in the United States Court of Claims are hereby terminated.

━━━━━━●━━━━━━

NAPTHA BARGE CO., CHARTERER OF THE M/V *LETHA C. EDWARDS*, AND KEITH S. EDWARDS, d/b/a DELTA BARGE LINE, OWNER OF THE BARGE *BUTANE*,

*v.*

CONTINENTAL NAVIGATION CO., OWNER AND OPERATOR OF THE M/V *NANCY JEAN*; ZITO TOWING, INC., TRI CAPT., INC., OWNER AND CHARTERER RESPECTIVELY OF THE M/V *BIG SAM*; ET AL.

United States District Court, Eastern District of Louisiana, May 25, 1977.

No. 75-1281.

COLLISION—24. Damages—NAVIGABLE WATERS—16. Pollution—REGULATION—1163. U.S. Coast Guard.

Barge owner, subjected to $5,000 Coast Guard fine for oil pollution when oil spilled from its barge after a collision caused by the negligence of another vessel, obtained mitigation of the proposed fine to $4,500, but did not appeal. Since the barge owner reasonably believed there were no grounds for appeal, it would have been improper to impose on it the obligation of incurring additional expense in presenting an appeal. *Held*, the $4,500 fine was a proper item of damages in its suit against owners of the negligent vessel.

COLLISION—272. Duty to Minimize Damages—NAVIGABLE WATERS—16. Pollution.

Barge owner voluntarily expended over $40,000 cleaning up oil spilled from its barge after a collision caused by the negligence of another vessel. *Held*, undertaking to prevent further damage from a large oil spill was a reasonable action for the barge owner to take. There was no duty on it to expose itself to costly, time-consuming litigation by failing to act in order to protect a tortfeasor. In fact, a failure on its part to act might well have been a failure to mitigate damages.

EXHIBIT 27

502          1978 AMERICAN MARITIME CASES.

COLLISION—161. Personnel Required by Statute.

Vessel was unseaworthy when its pilot did not have the requisite experience or instruction to undertake the voyage on which he was sent and did not have a license to navigate the vessel at the place where the collision occurred.

COLLISION—153. Tug and Tow—TOWING—1394. Collision.

A tug is at fault if she fails to control her tow.

TOWING—161. Tug Directing Navigation—1612. Helper Tug.

A "dominant" tug is charged with full responsibility in compliance with the Rules of the Road, for its flotilla's maneuvers. *Held*, helping tug, which followed all instructions received from the dominant tug, was exonerated from blame for collision.

COLLISION—232. Presumptions—242. Allocation of Damages.

Where a vessel clearly shown to have been guilty of faults adequate of themselves to account for a collision seeks to impugn the management of other vessels, there is a presumption in favor of the latter which can only be rebutted by clear proof of contributory fault.

GEOGRAPHICAL INDEX—333. Mississippi River Entrances—
Below Huey P. Long Bridge.

Francis Emmett, *for Plaintiffs*.

Leonard N. Bouzon and Gerald T. Gelpi (Phelps, Dunbar, Marks, Claverie & Sims), *for Defendants Tri-Capt., Inc. and the M/V* Big Sam.

Cornelius G. Van Dalen and James M. Tompkins (Deutsch, Kerrigan & Stiles), *for Defendants Continental Navigation Co. and the M/V* Nancy Jean.

R. BLAKE WEST, D. J.:

This is an action to recover damages sustained by the MV *Letha C. Edwards* flotilla arising out of a collision with the MV *Big Sam* flotilla on the Mississippi River in the Port of New Orleans.

## Findings of Fact.

1. Plaintiff, Naptha Barge Co., was at all times pertinent hereto, a corporation organized and existing under and by virtue of the laws of the State of Texas and was the bareboat charterer of the MV *Letha C. Edwards* and bailee of the crude oil cargo laden aboard the Steel Tank Barge *Butane*.

2. Plaintiff, Keith S. Edwards, d/b/a Delta Barge Line, was at all times pertinent hereto an individual domiciled in the State of Texas and was the owner and operator of the Barge *Butane*.

3. Defendant, Continental Navigation Co., was at all times pertinent hereto the owner, operator and claimant of the MV *Nancy Jean*.

4. Defendant, Tri-Capt., Inc., was at all times pertinent hereto, the owner, *pro hac vice*, operator and claimant of the MV *Big Sam*.

501.

5. On April 25, 1975, shortly before 1410 hours, the MV *Letha C. Edwards* was pushing the loaded Steel Tank Barges *Grand Bay, Naptha* and *Butane* in tandem, made up in the order as stated, up the Mississippi River in the vicinity of Continental Grain Company's facilities at Mile 103 (AHP). The flotilla was running parallel to the right descending bank at least 450 feet off a ship and a fleet of barges which were moored at the Continental Grain Company's facilities. The *Letha C. Edwards* had made the point at Greenville Bend, crossed the river, and then lined her tow up to make the point at Carrollton Bend, in keeping with the custom and practice on the Mississippi River.[1]

6. The weather was good, visibility excellent, there was little or no wind, and there was a strong current running at approximately 5 m.p.h. The *Letha C. Edwards* and her tow were making about 5 m.p.h. at normal full ahead speed as they stemmed the strong current.

7. The MV *Big Sam* had pushed three loaded grain barges made up in tandem down the river and was close alongside the Continental Grain Company Barge Fleet, where she intended to moor the three barges. The *Big Sam* had navigated her tow downriver making the point at Carrollton Bend, in violation of custom and practice, and consequently the *Big Sam* flotilla was headed down stream with the current underfoot. She should have made Carrollton Bend, crossed the river, and stemmed the current before attempting to moor her tow.[2]

8. The *Letha C. Edwards* was a twin screw pushboat with square bow, 95' in length and 30' in beam. She had two diesel engines with a total of 1,800 h.p., which were pilothouse-controlled, and she was equipped with the usual navigation equipment, including two radios. She was guarding the navigation channel, Channel 13, on one of her radios. Her pilot, Captain Bourgeois, who was handling her controls, was properly

---

[1] See, Navigation Map, Corps of Engineers, Map 52. "In the Mississippi River, the courts recognize as valid a custom under which, * * * where there are bends, the descending vessel 'runs the bends,' following the main current around them, while the ascending vessel 'runs the points,' avoiding the current as far as possible." *Griffin on Collision*, sec. 253, p. 574 (1949). *The Esparta*, 160 Fed. 67 (5 Cir., 1908); *John D. Rockefeller*, 272 Fed. 67 (4 Cir., 1921); *Bisso v. U.S.*, 1925 AMC 951, 6 F.2d 132 (5 Cir., 1925).

[2] "When a current is running parallel to a wharf, the ship should be headed into the current and then brought alongside." * * * "Making a pier with a fair current is dangerous and should be avoided when possible." *Knight's Modern Seamanship*, 10th Ed., p. 516 (1941). "The vessel should always stem the tide when coming alongside." *Standard Seamanship for Merchant Service*, Reisenberg, 2nd Ed., p. 663 (1936).

504          : 1978 AMERICAN MARITIME CASES.

1978 A. M. C.

licensed, had long experience in handling this tow and other vessels in the Mississippi River and had never been involved in previous accidents. The Barges *Grand Bay*, *Naptha* and *Butane* had a total length of 819', and a beam of 50', and they were laden with approximately 69,000 barrels of crude oil. The overall length of the flotilla was 916'.

9. The MV *Big Sam* was a twin screw pushboat with square bow, 46.9' in length and 18.7' in beam. She was pilothouse-controlled and had twin screws. The regular master of the *Big Sam*, Captain Bennett, had left her upriver at approximately 11:30 a.m. and had made plans to rejoin her at the Continental Grain Company Barge Fleet. The *Big Sam* was left in charge of a young and inexperienced pilot, Mr. Martyn. He had minimal experience in mooring tows on the Mississippi River; he did not have a license required by the U. S. Coast Guard to operate on the river below the Huey P. Long Bridge; he rearranged the tow contrary to the master's instructions; and he had once been fired because of a prior accident in which he had been involved. The master of the *Big Sam* did not instruct the pilot as to the proper way to navigate down the river before he left the *Big Sam*.

10. The MV *Nancy Jean* was a small twin screw pushboat which worked in and around the Continental Grain Company Barge Fleet. Before the MV *Big Sam* arrived at the fleet to moor her tow, the master of the *Big Sam* had boarded the *Nancy Jean* in order that he might be transferred from that vessel to the MV *Big Sam* upon her arrival at the fleet. The *Nancy Jean* was there to assist the *Big Sam* in the mooring of the tow. When the master of the *Big Sam* first saw the *Big Sam* flotilla, it was near the fleet. He thought the tow was improperly made up and it was headed downstream instead of upstream. He would not go aboard her and take command under the circumstances.

11. The *Big Sam* flotilla was in difficulty and there was fear that the tow would collide with a ship moored at the Continental elevator. The *Big Sam*'s captain ordered the pilot on the *Big Sam* to back down and the *Nancy Jean* pushed on the bow of the tow to try to stop it. The radio transmissions were made on Channel 12 and not on the navigation channel, 13, that the *Letha C. Edwards* was guarding. Momentarily the tow was brought under control and the pilot of the *Big Sam* told the captain that he was going to hold the flotilla right there until "* * * after these tows get by." (These were the *Letha C. Edwards* and another tow behind her.) However, he lost control of the tow and the stern began to "top around" or swing outriver. The *Nancy Jean* then got clear of the *Big Sam* flotilla.

501.

12. The head of the *Edwards* tow was already past the *Big Sam* when the *Big Sam* started topping around. The stern of the *Big Sam* swung "fast" outriver and struck the barge that was faced up to the *Letha C. Edwards* (the *Butane*), and holed her in the area of her No. 1 port tank, thereby allowing almost 6,000 barrels of oil to escape into the river. The point of collision on the *Letha C. Edwards* flotilla was about 6000' aft of the head of that tow.

13. Before the collision, when the navigator of the *Letha C. Edwards* realized that the *Big Sam* was out of control, he sounded the danger signal and attempted to maneuver the flotilla, but there was nothing he could do to avoid collision. Even if Captain Bourgeous had started full astern when the *Big Sam* tow first started topping around the collision could not have been avoided. The master of the *Big Sam* agreed that the *Letha C. Edwards* was "in a bind" and that no matter which way she tried to turn, the collision might have happened.

### Damages.

1. The parties agreed to the following items of damages suffered by Naptha Barge Co.:

|     |                            |          |
| --- | -------------------------- | -------- |
| (a) | Treatment of injured seaman | $ 106.00 |
| (b) | Survey expense             | 406.00   |

2. The parties agreed to the following items of damages suffered by Delta Barge Lines:

|     |                          |          |
| --- | ------------------------ | -------- |
| (a) | Survey expense           | 240.50   |
| (b) | Repair to *Butane*       | 8,053.50 |
| (c) | Protection of water intakes | 7,035.40 |

3. The evidence established that Delta Barge Line expended the cost of gas-freeing the Barge *Butane* of $5,531.50.

4. The evidence established that the cost of towing the Barge *Butane* for repairs was $440.50.

5. The evidence established $2,300.00 to be the value of the loss of use of the Barge *Butane* suffered by Delta Barge Line as a result of the collision.

6. The evidence established the amount of the fine imposed on Delta Barge Line by the Coast Guard for oil spillage as a result of the collision to be $4,500. Defendant Tri-Capt., Inc. contended that there was a failure to minimize damages because Delta did not appeal the amount of the fine. In fact, the original fine was $5,000

and Delta's efforts resulted in a $500 reduction. The fine was imposed without reference to fault, and the spill in question was very large. Under the circumstances, plaintiff Delta felt there were no grounds for an appeal, and it would be improper to impose upon them the obligation of incurring additional expense in presenting an appeal. The efforts to minimize were reasonable and sufficient. Accordingly, the item is a proper item of damages.

7. Delta Barge Line has established through competent evidence that the amount expended in efforts to clean up the oil spill resulting from the collision is $44,375.36. Tri-Capt, Inc. urged that this item should be disallowed because plaintiff was not *required* to clean up the spill, and amounts expended in voluntary efforts to clean up the spill are not credited against the maximum amount recoverable by the United States for its clean-up expenses. Thus, defendant argued that, by voluntarily expending money for clean-up operations, plaintiffs failed to minimize damages. The Water Pollution Control Act, 33 U.S. Code 1321 *et seq.*, does not require that the vessel owner turn over a clean-up operation to the government. It simply provides authority for the government to take over the operation to insure that it is properly done and therefore gives the vessel owner the choice of cleaning up himself or turning it over to the government. To be considered a failure to mitigate damages, the expenses incurred must have been unreasonable. Certainly undertaking to prevent further damage from a large oil spill is reasonable action for a vessel owner to take. Defendant made an analogy to the River & Harbors Act of 1899, 33 U.S. Code, sec. 409, which allows the owner of a wrecked vessel to abandon it and relies on the *Manhattan*, 10 F. Supp. 45 (E.D.Pa., 1953), which defendant urged held that the cost of removal was not chargeable to the tort feasor.

To the contrary, that case dealt with a government vessel removed at government expense from navigable waters after a collision caused by the defendant. The Court there held that the cost of removal fell on the government by reason of its general governmental duty to clear navigable waters regardless of whether the vessel was privately or government owned and regardless of whether it was sunk by a wrongful act or not.

A recent case, *National M & S Corp. v. Mariner*, 1971 AMC 1913, 341 F. Supp. 249 (N.D. Cal., 1971), held that such expenses were recoverable since the vessel owner was under no duty to pro-

501.

tect the tort feasor in a manner that would expose the vessel owner
to a variety of litigation. That is precisely the situation here. There
is no duty on plaintiff to expose itself to costly, time-consuming
litigation by failing to act in order to protect a tort feasor. Had
immediate action not been taken, more serious damage may have
occurred to third parties' property, certainly exposing plaintiff to
further litigation, and perhaps increasing defendant's exposure. In
fact, for this reason, a *failure* to act on plaintiff's part might well
have been a failure to mitigate damages.

Defendant also asserted that Delta Barge Line cannot recover
these expenses because it was reimbursed by insurance, issued a
subrogation receipt and is not the real party in interest. The real
party in interest objection under Rule 17 must be raised with
reasonable promptness to avoid prejudice. Since the rule is for the
protection of the defendant, it is possible to waive it by delay.
*Wright and Miller,* sec. 1554. There would be nothing to prevent
the insurer from intervening for these proceeds, and the equities
between plaintiff Delta and its insurer are of no concern to defen-
dant, having waived its Rule 17 objection.

Accordingly, the expenses incurred were reasonable and are
proper items of damages.

8.  The evidence established the cost to the Barge Company of hiring
    tugs to assist in the handling of the cargo and tow as a result of the
    collision to be $6,926.50.

9.  Naptha Barge Co. established the value of cargo lost as a result of
    the collision to be $26,651.25.

10. The evidence established the value of the loss of use to Naptha
    Barge Co. of the *Letha C. Edwards* tow incurred as a result of the
    collision to be $12,136.26. Defendant urged at trial that operating
    expenses should be deducted from this to arrive at a "net" profit
    lost, apparently viewing the lost income as a gross amount. How-
    ever the fallacy of this argument is that operating expenses were in
    fact incurred without the receipt of income to absorb them. Thus,
    the gross income lost is the proper damage amount.

11. Naptha Barge Co. established the survey expenses for the barge
    *NDT-772B*, required as a result of this collision, to be $156.00.

12. Naptha Barge Co. established the cost of gas-freeing the barge *Ace
    101* to be $1,245.00, and the cost of rental on the *Ace 101* during
    the time it was being gas-freed to be $1,622.25. Although Tri-Capt,

Inc. urged that this item should be disallowed as incurred through a failure to minimize damages because it was not necessary to use a gas-free barge, the Court finds that the circumstances were of such a nature to justify the expense. The testimony established that there was an emergency situation in which several barges were needed to lighten the *Butane's* cargo. It is ridiculous to require "shopping around" for a non-gas free barge in such circumstances when the evidence indicates that it was difficult to find enough cargo space in available barges. Accordingly, these amounts are proper items of damages.

13. In summary, the Court finds that Naptha Barge Co. established damages it suffered in the amount of $49,549.20, and that Delta Barge Line established damages it suffered in the amount of $73,236.66.

14. The Court finds no peculiar circumstances present to warrant departure from the general rule that in collision cases, those injured are entitled to interest from the date of the collision. *Sinclair Refining Co. v. SS Green Island*, 1970 AMC 1117, 426 F.2d 260 (1970).

### Conclusions of Law.

1. The Court has jurisdiction over this Admiralty matter and venue is proper. 28 U.S. Code, sec. 1333.

2. The M/V *Big Sam* was unseaworthy in that her pilot, who was left in charge of her navigation, did not have the requisite experience or instruction to undertake the voyage on which he was sent and he did not have a license to navigate the *Big Sam* at the place where the collision occurred. These facts were known or should have been known by the *Big Sam's* master and defendant Tri-Capt, Inc.'s management. *Chamberlain v. Ward*, 62 U.S. 548, 564, 565 (1859); *Lady Pike*, 88 U.S. 1, 15 (1874); *El Valle*, 1928 AMC 775, 25 F.2d 619; *In re Tug Management Corporation*, 1970 AMC 2511, 330 F. Supp. 486, 495 (E.D. Pa., 1971); *Griffin on Collision* (1949), sec. 254, pp. 576-580.

3. The personnel in charge of the navigation of the M/V *Big Sam* were negligent in allowing the M/V *Big Sam* to undertake a voyage on which she and her tow would be handled by a young pilot, with minimal experience, who did not have the requisite license and who had not been given proper instructions as to how to navigate the river and how to moor the tow. See authorities, *supra*, No. 2.

4. The pilot in charge of the navigation of the M/V *Big Sam* and her