United States District Court
Southern District of Texas
FILED

FEB - 2 2005

Michael N. Milby
Clerk of Court

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| IN RE THE COMPLAINT AND PETITION FOR BROWN WATER TOWING I, INC., AS OWNER, AND BROWN WATER MARINE SERVICE, INC., AS BAREBOAT CHARTERER, OF THE BROWN WATER V, ITS ENGINES, TACKLE, ETC., IN A CAUSE OF EXONERATION FROM OR LIMITATION OF LIABILITY | § § § § § § § § § | CIVIL ACTION NO. B-01-157 (Subject to Rule 9(h) of the Federal Rules of Civil Procedure) Admiralty |
| Consolidated with: | § § § | |
| IN THE MATTER OF AMERICAN COMMERCIAL LINES LLC, AS OWNER and AMERICAN COMMERCIAL BARGE LINE LLC, AS CHARTERER OF THE BARGES NM-315, VLB-9182, ACL-9933B, VLB-9173, PRAYING FOR EXONERATION FROM AND/OR LIMITATION OF LIABILITY | § § § § § § § § § | CIVIL ACTION NO. B-02-004 (Subject to Rule 9(h) of the Federal Rules of Civil Procedure) Admiralty |
| Consolidated with: | § § § | |
| IN THE MATTER OF DEERE CREDIT, INC., (FORMERLY SENSTAR FINANCE COMPANY), AS OWNER OF THE BARGE NM-315, AND STATE STREET BANK AND TRUST COMPANY OF CONNECTICUT, NATIONAL ASSOCIATION, AS OWNER TRUSTEE OF THE BARGE ACL-9933B AND NOT IN ITS INDIVIDUAL CAPACITY, AND GENERAL ELECTRIC CAPITAL CORPORATION, AS BENEFICIAL OWNER OF THE BARGE ACL-9933B PRAYING FOR EXONERATION FROM AND/OR LIMITATION OF LIABILITY | § § § § § § § § § § § § § § § | CIVIL ACTION NO. B-02-125 (Subject to Rule 9(h) of the Federal Rules of Civil Procedure) Admiralty |

**CLAIMANTS' MEMORANDUM IN SUPPORT OF
RESPONSE TO MOTION FOR SUMMARY JUDGMENT OF
AMERICAN COMMERCIAL BARGE LINE LLC**

# TABLE OF CONTENTS

*Page*

TABLE OF CONTENTS .................................................................................. i

TABLE OF CITATIONS ............................................................................... iii

STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT .......... 1

SUMMARY OF THE ARGUMENT .................................................................. 2

I.     SUMMARY RESPONSE ........................................................................ 2

II.    BACKGROUND ................................................................................... 5

III.   THE LAW APPLICABLE TO ACBL'S INDEPENDENT ACTS OF NEGLIGENCE ..... 9

A.     Negligent Hiring of an Independent Contractor ............................... 10

B.     Negligent Entrustment of its Barges ................................................ 13

IV.    THERE ARE ISSUES OF FACT REGARDING ACBL'S
       INDEPENDENT NEGLIGENCE ............................................................ 14

       A.    The Reasonable Standard of Investigation or Inquiry
             of a Contract Tower ................................................................ 15

       B.    Coast Guard Incident Reports ................................................. 17

       C.    Performing Periodic Audits .................................................... 18

       D.    ACBL Never Attempted to Contact Other Barge
             Owners that Used Brown Water ............................................... 21

       E.    ACBL Never Attempted to Contact Local Mariners
             regarding Brown Water's Reputation ....................................... 22

       F.    ACBL Knew or Should Have Known that Brown Water
             was Not Adhering to a Safe Horsepower to Barge Ratio ............ 23

       G.    ACBL's General Lack of Care in Hiring Brown Water ............... 26

H.     There is Evidence ACBL's Breach of the Standard of Care
       was a Proximate Cause of the Occurrence........................................     29

V.     ACBL is Not Entitled to Exoneration from Liability....................................     33

CONCLUSION....................................................................................................     34

# TABLE OF CITATIONS

<u>**CASES**</u>

*American Dredging Co. v. Lambert*, 81 F.3d 127 (11th Cir. 1996).......................................  33

*American Guarantee & Liab. Ins. Co. v. The 1906 Co.*,
    273 F.3d 605 (5th Cir. 2001).....................................................  13

*Avera v. Florida Towing*, 322 F.2d 155 (5th Cir. 1963) .................................  11

*Barbetta v. S/S Bermuda Star*, 848 F.2d 1364 (5th Cir. 1988).............................  10-11

*Becker v. Poling Transp. Corp.*, 356 F.3d 381 (2nd Cir. 2004)............................  11

*Brown v. Wal-Mart Stores, Inc.*,
    976 F.Supp. 729 (W.D. Tenn. 1997) .......................................  14

*Churchill v. F/V FJORD*, 892 F.2d 763 (9th Cir. 1988) .................................  13

*Complaint of Port Arthur Towing Co. on Behalf of M/V Miss Carolyn*,
    42 F.3d 312 (5th Cir. 1995).....................................................  33

*Consolidated Aluminum Corp. v. C.F. Bean Corp.*,
    833 F.2d 65 (5th Cir. 1987).....................................................  30

*EP Medsystems, Inc. v. EchoCath, Inc.*,
    235 F.3d 865 (3rd Cir. 2000)...................................................  29

*Favorito v. Pannell*, 27 F.3d 716 (1st Cir. 1994) ......................................  13

*Florida East Coast Ry Co. v. Revilo Corp.*,
    637 F.2d 1060 (5th Cir. 1981)..................................................  32

*Hess v. Upper Mississippi Towing Corp.*,
    559 F.2d 1030 (5th Cir. 1977)..................................................  11

*Huddleston v. Herman & MacLean*,
    640 F.2d 534 (5th Cir. 1981)...................................................  30

*In re Hellenic, Inc.*, 252 F.3d 391 (5th Cir. 2001) .................................  33

*In re the Matter of Central Gulf Lines, Inc.*,
    176 F.Supp.2d 599 (E.D. La. 2001) .....................................  10-12

*Joyce v. Joyce*, 975 F.2d 379 (7th Cir. 1992) ........................................................ 13

*Kennedy v. Baird*, 682 S.W.2d 377
    (Tex.App.—El Paso 1984, no writ) ........................................................ 14

*Little v. Liquid Air Corp.*, 952 F.2d 841 (5th Cir. 1992) ........................................ 1

*McGuiness v. Brink's Inc.*,
    60 F.Supp.2d 496 (D. Md. 1999) ........................................................ 14

*Olabisiomotosho v. City of Houston*,
    185 F.3d 521 (5th Cir. 1999) ........................................................ 2

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 120 S.Ct. 2097 (2000) ........................................................ 2

*The Pennsylvania*, 86 U.S. (19 Wall.) 125,
    1998 AMC 1506 (1873) ........................................................ 32

## STATUTES, RULES, AND TREATISES

33 C.F.R. §164.72 ........................................................ 32

Gilmore & Black, *The Law of Admiralty* (2nd ed.) ........................................................ 14

Restatement (Second) of Torts §390 ........................................................ 13, 15

Restatement (Second) of Torts §411 ........................................................ 11-12, 15

T. Schoenbaum, *Admiralty and Maritime Law*, Hornbook Series,
    (4th ed. 2003) ........................................................ 9-10

T. Schoenbaum, Admiralty and Maritime Law, (4th ed.) ........................................................ 32

## STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT

American Commercial Barge Line, LLC ("ACBL") has moved for summary judgment and exoneration from all the claims being asserted against it in this action. ACBL hired Brown Water Marine Service, Inc. ("Brown Water") to tow four of its barges on the Intracoastal Waterway ("ICW"). As the ACBL barges were being pushed by the BROWN WATER V, they crashed into the Queen Isabella Causeway. The allision caused a section of the bridge to collapse, and resulted in multiple vehicles plunging from the causeway into the water. Eight people died as a direct result of the ACBL barges crashing into the causeway. The issue before this Court is whether the summary judgment evidence presents a genuine issue of material fact of ACBL's independent negligence, including whether ACBL failed to exercise reasonable care to hire a competent, careful, and safe independent contractor to tow its barges along the ICW, including navigation through the Queen Isabella Causeway.

ACBL is moving for summary judgment based on factual issues. Specifically, it has submitted evidence and arguments that it cannot be held liable for its independent conduct because it acted reasonably in choosing Brown Water as a contract tower and in entrusting its barges to Brown Water. Its burden with its submission of evidence is to negate the existence of a material fact. *Little v. Liquid Air Corp.*, 952 F.2d 841, 847 (5th Cir. 1992). Claimants dispute that ACBL has met its threshold burden of conclusively establishing the issue as a matter of law. Nevertheless, Claimants present evidence to dispute the evidence and arguments of ACBL.

This Court's role is to ascertain the material factual issues and consider the evidence bearing on those issues, viewing the facts and the inferences to be drawn therefrom in the light most favorable to the non-movant Claimants. *Olabisiomotosho v.*

1

*City of Houston,* 185 F.3d 521, 525 (5th Cir. 1999). The Court must not make any credibility determinations or weigh any evidence. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097 (2000). Moreover, the Court must give credence to evidence favoring the non-movant and must disregard evidence favorable to the movant that the jury is not required to believe, including impeached or contradicted evidence favorable to the movant. *Id.* at 151.

## SUMMARY OF THE ARGUMENT

### I.    SUMMARY RESPONSE

The issue before this Court is whether there is some evidence that ACBL failed to act as a reasonably prudent barge owner when it chose to hire Brown Water to tow its barges – i.e., is there evidence ACBL knew or should have known Brown Water lacked competence, care, and safety. Brown Water is asking this Court to find it has met its standard of care, as a matter of law, because it subjectively believed Brown Water had performed competently and safely, so that it had no reason to question Brown Water's level of competence, care, or safety. ACBL's argument, and its motion, must fail for three reasons.

First, ACBL has failed to recognize that there is a standard of care required of barge owners, like itself, to enact and follow policies and procedures to evaluate the ability of a contract tower to provide an acceptable level of safety, and a corresponding common law standard to exercise care to hire a competent and careful contractor. ACBL fails to address the fact that it breached its standard of care from the beginning by failing to have written policies and procedures to evaluate a contract tower, as required by the Responsible Carrier Program. It further fails to provide evidence of what procedures a reasonably prudent barge owner would undertake to conduct an

2

adequate inquiry regarding the contract tower's competence, care, and safety. Consequently, ACBL has failed to meet its initial burden to present evidence that it acted reasonably, as a matter of law.

Second, there is substantial evidence showing that ACBL had no policies and procedures to assure the competence, care, and safety of contract towers because it simply did not believe it had an obligation to make such an assurance. From upper-management down to the dispatcher that hired Brown Water on the occasion in question, the testimony of ACBL employees has consistently demonstrated that whether the contract tower would push the barges with competence, care, and safety was never an issue. Even the audit that was performed of Brown Water was not intended to demonstrate safety in towing, but rather, was intended to determine whether Brown Water had policies and procedures in place to notify ACBL of incidents with its barges. Although ACBL has attempted to paint some of its conduct as being done in the name of safety evaluations, the evidence shows that ACBL had no policies, procedures, or organizational structure to evaluate a contract tower. ACBL had no way of properly evaluating Brown Water because nobody was responsible for obtaining information about the contractor and there was not way to disseminate any information an employee might obtain about a contractor.

Third, ACBL's basis for summary judgment suffers from a fundamental flaw. ACBL contends it acted as a reasonably prudent barge owner because it had found Brown Water's services to be competent and safe. ACBL's subjective belief about the competence and safety of Brown Water is not the standard of a reasonably prudent person. To allow ACBL's subjective standards to substitute for the objective standards of care, is to increase the Claimants' burden from an action in negligence to one in gross

3

negligence. Whether ACBL's subjective standards are consistent with the standards of a reasonably prudent person under similar circumstances is an issue for the trier of fact. And based on the testimony of Norb Whitlock, ACBL's Senior Vice President of Logistic Services (the person who supervises the planning of power and the dispatchers that choose which contract towers to hire), it appears highly unlikely that ACBL's standards are those of a reasonably prudent barge owner. Mr. Whitlock provided the following testimony regarding ACBL's subjective standards for competence, care, and safety of its contract towers:

Page 156, line 14 to line 20:

Q.    Has the competence of Brown Water's crews and their operations on a whole come into doubt as a result of eight people getting killed on the causeway at South Padre, in your mind?

A.    **I have no basis to -- to question their competence.**

Page 160, lines 8 to 17:

Q.    What has ACBL done since September of '01, following this collapse, to ensure that Brown Water is serving ACBL's needs in a safe and responsible carrier compliant manner?

A.    We are continuing to use Brown Water to tow our barges on the west side based on their demonstrated ability over the years to provide good service without – **without any major incidents.**

[Tab 14]

If, after causing the collapse of the Queen Isabella Causeway, causing millions of dollars in property damage, and causing eight deaths, ACBL still believes it has "no basis" to question the competence of Brown Water and still believes Brown Water has pushed ACBL's barges "without any major incidents," Claimants pray that ACBL's standard for competence, care, and safety is not that of an ordinary prudent barge owner.

4

## II.  BACKGROUND

On September 15, 2001, four barges owned by ACBL were being towed by the BROWN WATER V, along the ICW, approaching the Queen Isabella Causeway. The four loaded barges were being towed in a line. The captain of the tug was sleeping and the pilot, David Fowler, did not have much experience steering barges through the Queen Isabella Causeway. [Tab 3]

Mr. Fowler had worked at Brown Water for only a few weeks. [Tab 16 Mosher 172:1-17]  Although he had experience piloting tugs in the ICW, Mr. Fowler had negotiated that causeway only three or four times before. [Tab 3]  On this occasion, there was a depression in the Gulf that caused the water in the ICW to be about two feet deeper than usual. [Tab 16 Mosher 56:20-24, 60:12-16]

For some reason (Mr. Fowler contends his tug hit a sand bar), Mr. Fowler lost control of the barges. [Tab 3]  Once the current grabbed the barges, the tug did not have enough horsepower to regain control of the barges.  [Tab 3; Tab 16 Mosher 56:5-19] Fowler put his engines into reverse and was able to slow the barges to 1.5 to 2 knots. [Tab 3]  The tug, however, did not have enough horsepower to control or stop the barges, which collided with the causeway. [Tab 3]

The force of the barges colliding with the Queen Isabella Causeway caused a section of the bridge to collapse. [Tab 2]  The motorists on the causeway, unable to see that the roadway had collapsed, drove their vehicles off of the causeway, plunging into the water. [Tab 2]  As a result of the ACBL barges colliding with the Queen Isabella Causeway, eight people died and several others were injured.

ACBL is the largest barge line in North America. [Tab 14 Whitlock 141:21-142:18; Tab 15 Farley 157:23-158:12; Tab 25]  It owns approximately 150 tugs and over 5000

5

barges. [Tab 14 Whitlock 141:21-142:18] Over 90% of the time, ACBL pushes its barges with tugs that it owns and operates. [Tab 15 Farley 162:15-63:11] In many circumstances, however, ACBL hires independent contractors to push its barges. [Tab 9 Hoessle 108:17-109:20, 110:5-11, 270:9-17; Tab 15 Farley 86:7-18] ACBL does not hire an independent carrier in order to have a more experience tugboat pilot or to take barges where its tugs cannot go, because ACBL has experienced pilots that can push its barges through all areas of the ICW. [Tab 9 Hoessle 103:11-104:10; Tab 15 Farley 47:13-48:1] Instead, the only reason ACBL will hire an independent contractor is because of economics; it makes more money hiring a carrier in some areas, especially in the Brownsville area of the ICW. [Tab 12 Ivey 32:18-34:25, 41:21-42:15; Tab 14 Whitlock 144:13-145:2]

One of the tugboat operators ACBL hires to push its barges is Brown Water. Brown Water is a family business that owns 12 tugboats, which operate along the Texas gulf coast. [Tab 16 Mosher 122:19-126:24] Despite the comments made by some of ACBL's witnesses, Brown Water has a reputation among the local mariners as being a low-budget operation with questionable seamanship. [Tab 4 Disler ¶6; Tab 19 Benavides ¶3] Brown Water has a reputation for paying low wages and hiring pilots that could not get employment with other operators. [Tab 4 Disler ¶6; Tab 19 Benavides ¶3] Brown Water tugs were involved in a significant number of mishaps or incidents in the years prior to the allision with the Queen Isabella Causeway. [Tab 1, U.S. Coast Guard Port State Information Exchange (PSIX) reports; Tab 4 Disler ¶5; Tab 16 Mosher 179:13-180:3] Some of the incidents involved ACBL barges, including an incident two days before the allision with the Queen Isabella Causeway. [Tab 9 Hoessle 140:2-24, 142:19-24, 144:7-147:8; Tab 11 Kazunas 110:18-111:20; Tab 28; Tab 29] Brown Water does

6

not maintain current Coast Guard notices in its wheelhouses and does not adequately use its charts and maps. [Tab 2; Tab 10 Timberlake 86:8-20, 113:25-114:7, 179:7-181:9; Tab 18] Brown Water misrepresents the power of its tugs. [Tab 83:8-85:6, 112:12-113:17; Tab 16 Mosher 26:6-23; Tab 18] Its criteria for matching barges to tugs is to get the most barges possible to maximize horsepower, without regard to safety. [Tab 6] Brown Water had no training program for its wheelhouse personnel. [Tab 10 Timberwalk 170:6-21; Tab 16 Mosher 169:14-22, 197:20-198:1; Tab 18] It also had no policy in place for investigating the backgrounds of its pilots, so that it would hire a pilot like Fowler who had multiple accidents. [Tab 16 Mosher 84:4-15, 175:1-176:24; Tab 18] As long as the pilot has not had his licensed revoked by the Coast Guard, he is good enough for Brown Water. [Tab 16 Mosher 175:1-176:24] There are contract towers in the area other than Brown Water that ACBL can hire. [Tab 9 Hoessle 108:17-109:20, 110:5-11, 270:9-17; Tab 10 Timberlake 292:14-295:24; Tab 34]

Towing a line of barges through a narrow channel requires great skill and experience, compared to other forms of navigation. Although collisions and allisions can happen with all navigation, allisions caused by towing barges have produced some of the most deadly accidents in American waterways. One such accident occurred in September 1993, when a line of barges being towed along an Alabama river struck a railroad bridge. The Amtrak train *Sunset Limited* derailed as it went over the bridge and into the river, killing 42 passengers and 5 crew members. In the wake of that disaster, the towing industry was faced with the prospect of being subjected to substantial Congressional regulations. In an effort to avoid government regulations, the towing industry, led by the American Waterways Operators ("AWO"), established self-regulations in the form of the Responsible Carrier Program ("RCP"). [Tab 5]

The purpose of the RCP is to provide some minimal standards of safe practices that companies in the tow and barge industry should undertake. [Tab 5; Tab 14 Whitlock 86:2-87:20] Although the RCP standards are voluntary, and companies are not required to abide by them, they establish preferred industry operating principles and practices for all companies to follow. [Tab 5 at I-2; Tab 10 Whitlock 89:3-90:10] Although the RCP provides a template for safety programs, it does not provide an exhaustive list of all safety practices that a company should undertake. [Tab 5] Consequently, the RCP provides the minimum safety requirements that tow and barge companies should follow.

At all times pertinent to this action, ACBL has been a member of the AWO and has been RCP certified. Brown Water, however, was not RCP certified and was not RCP compliant. [Tab 10 Timberlake 165:15-168:11; Tab 11 Kazunas 39:6-45:3, 108:7-9; Tab 18]

One of the minimum safety standards required by the RCP is for the company to have written policies and procedures for evaluating a subcontractor's ability to provide towing services at "an acceptable level of safety." [Tab 5 at II-1 and II-4] ACBL, however, had no written or unwritten policies and procedures for evaluating whether a contract tower, such as Brown Water, could push ACBL's barges with an acceptable level of safety. [Tab 11 Kazunas 79:4-80:25] It is evident from the testimony of ACBL's personnel involved with hiring contract towers, including several members of upper-level management, that ACBL did not employ any safety criteria in determining whether to hire a contract tower. [Tab 9 Hoessle 133:6-20, 296:10-18; Tab 11 Kazunas 47:19-49:13, 66:12-24, 81:1-83:9, 84:13-22, 85:1-9; Tab 14 Whitlock 96:15-97:4, 111:3-113:6, 116:15-117:2, 125:7-128:3] Because of its failure to have policies and procedures in place

8

to adequately investigate contract towers, ACBL hired a contract tower, Brown Water, that was not competent, careful, or safe. Because there is evidence that ACBL was negligent in hiring Brown Water and entrusting its barges to Brown Water, Claimants request this Court deny ACBL's Motion for Summary Judgment.

## III.   THE LAW APPLICABLE TO ACBL'S INDEPENDENT ACTS OF NEGLIGENCE

There are two general legal bases by which the Claimants could attempt to hold ACBL legally responsible for their damages and injuries caused by the ACBL barges colliding with the Queen Isabella Causeway – vicarious liability and independent liability. In this case, the Claimants do not contend that ACBL is vicariously responsible for the conduct of Brown Water. Claimants do not dispute that ACBL hired Brown Water as an independent contractor and ACBL did not have control over the method and manner in which Fowler navigated its barges as they collided with the causeway. ACBL's liability to the Claimants is not based on strict vicarious liability for the conduct of Brown Water, but rather, for its own independent acts of negligence.

ACBL cites this Court to treatises and caselaw regarding the "dominant mind" doctrine and duties that a tug and tow owe each other. None of that authority, however, addresses the issue before this Court. Although ACBL cites to this authority as if it closes the door on all of Claimants' causes of action, closer analysis shows that the authority is limited to vicarious liability of a barge owner. For example, ACBL quotes a paragraph from Professor Schenbaum's *Admiralty and Maritime Law* hornbook explaining that under the "dominant mind" doctrine all liability is on the tug and the tow is absolved of liability when the whole flotilla causes damage. T. Schoenbaum, *Admiralty and Maritime Law*, Hornbook Series, §10-6 (4th ed. 2003). The next paragraph of that treatise provides, however, that the dominant mind doctrine is at best only a

9

presumption, and "[i]f the evidence shows some breach of duty on the part of the tow or an act of negligence that contributed to the casualty, the tow will also be liable." T. Schoenbaum, *Admiralty and Maritime Law*, Hornbook Series, §10-6.

Claimants have alleged that ACBL committed independent acts of negligence that were a proximate cause of the allision. ACBL was negligent in hiring its independent contractor Brown Water, and was negligent in entrusting its barges to Brown Water. It is these independent acts of negligence that make ACBL legally responsible for Claimants' damages.

Other than citing the authority regarding vicarious liability and the legal claims between the tug and tow vaguely to imply they exonerate a barge owner in every circumstance, ACBL does not dispute that a barge owner can be held liable for its own independent acts of negligence.

## A.    Negligent Hiring of an Independent Contractor

Although the Fifth Circuit has never expressly addressed whether a barge owner has a duty to exercise reasonable care in hiring a competent and careful independent contractor to tow its barges, the Fifth Circuit and other circuits have recognized the negligent hiring duty in maritime law and at least one other district court in the Fifth Circuit has recognized that a barge owner does have such a duty.

In the case of *In re the Matter of Central Gulf Lines, Inc.*, 176 F.Supp.2d 599 (E.D. La. 2001), the district court recognized that under maritime law a shipowner can be held liable for negligence in selecting or continuing to use an independent contractor. *Id.* at 622. In *Central Gulf*, the court cited the Fifth Circuit's decision *Barbetta v. S/S Bermuda Star*, 848 F.2d 1364 (5th Cir. 1988), in which the court recognized that although a shipowner could not be held vicariously liable for the conduct of the physician on

10

board, it could be held responsible for hiring an incompetent physician. *Id.*; *Barbetta*, 848 F.2d at 1372; *see also, Avera v. Florida Towing*, 322 F.2d 155 (5th Cir. 1963) (holding that privity and knowledge existed where the owner did not instruct the master to hire competent seamen and the master hired incompetent seamen whose errors resulted in a casualty); *Hess v. Upper Mississippi Towing Corp.*, 559 F.2d 1030, 1033 (5th Cir. 1977) (holding that liability for hiring an independent contractor does not extend to the employee of the contractor hired by the shipowner); *Becker v. Poling Transp. Corp.*, 356 F.3d 381, 389 (2nd Cir. 2004) (holding that the jury submission and the jury finding of negligence in selecting a contractor were proper, but that there was no submission of causation for the independent act of negligent hiring); Restatement (Second) of Torts, §411.

Although ACBL is correct that the claimant in *Central Gulf* was unsuccessful in its cause of action for negligent hiring, it is important to note that the basis for the court's adverse decision was not based on the legal issue, but rather, based on the facts. In *Central Gulf*, the claimant's primary assertion was that the barge owner was liable because it failed to abide by its contractual obligation to approve the tugs being used. *Central Gulf*, 176 F.Supp.2d at 616-17. The court found that contract allowed the owner to approve the tugs, but did not mandate approval. *Id.* at 617. Although the claimant made an argument that the barge owner was negligent in hiring the independent contractor, it did not submit any proof to support this allegation. *Id.* at 622. The court disposed of the negligent hiring claim as follows:

> The Court finds no basis upon which to conclude that Waterman was negligent in either contracting with or retaining Eastern to tow its barges from Haldia to Calcutta. . . . Waterman and its agents, Oceanic and Marco, had no reason to suspect that Eastern was performing its towing services in any other manner than that required in the contract, and had

11

> no cause to believe that the tow was made up in an unsafe manner or that the KAMRUP was not sufficiently powered for the job.

*Central Gulf*, 176 F.Supp.2d at 622. In this case, to the contrary, the Claimants have presented a significant amount of evidence for a trier of fact to conclude that ACBL should have known Brown Water was neither competent nor careful in pushing ACBL's barges.

The general standard for negligent hiring of an independent contractor is set forth in §411 of the Restatement (Second) of Torts. That section provides:

> An employer is subject to liability for physical harm to third persons caused by his failure to exercise reasonable care to employ a competent and careful contractor
>
> (a)    to do work which will involve a risk of physical harm unless it is skillfully and carefully done, or
>
> (b)    to perform any duty which the employer owes to third persons.

Restatement (Second) of Torts §411. In Comment c, the Restatement commentators describe the fact that the standard of care required to be exercised in selecting an independent contractor will vary depending on the circumstances. The comments specifically state, however, that as the consequences of unskillful or careless work result in increased danger, the diligence of the investigation must also increase. *Id.* at cmt. c. (noting that one "may well be required to go to considerable pains to investigate" the independent contractor). Comment c further notes that the extent of the employer's knowledge and experience in the field will have a bearing on the amount of information necessary to meet the standard of a reasonable employer. In this case, ACBL has extensive knowledge and experience in the area of towing its barges. Consequently, it should not be surprising that the standard of care a reasonably prudent barge owner

12

like ACBL will have in hiring a contract tower is not the bare minimum for generally hiring vendors.

## B.    Negligent Entrustment of its Barges

In addition to claims of negligent hiring of an independent contractor, the Claimants are also asserting that ACBL was independently negligent in entrusting its barges to Brown Water. As a practical matter, there is probably little distinction between the standards of negligent hiring and negligent entrustment.

Like negligent hiring, negligent entrustment is an allegation of independent negligent conduct committed by ACBL. Several courts have held that maritime law recognizes the cause of action for negligent entrustment. *Joyce v. Joyce*, 975 F.2d 379, 384 (7th Cir. 1992) (applying the Restatement (Second) of Torts §390, negligent entrustment, to a tort claim and holding that if the shipowner knows enough for a finding of negligent entrustment it knows too much for a limitation of liability); *Churchill v. F/V FJORD*, 892 F.2d 763, 771 (9th Cir. 1988) (applying the doctrine of negligent entrustment from Restatement (Second) of Torts §390, as well as negligent hiring, to a maritime case); *Favorito v. Pannell*, 27 F.3d 716, 720 (1st Cir. 1994) (applying §390 to a maritime action); Restatement (Second) of Torts §390.

ACBL states that no court has ever applied the theory of negligent entrustment to the owner of a barge in a similar situation. Although Claimants have been unable to locate a case applying the theory of negligent entrustment to such a claim, they have also not found a case refusing to apply the doctrine of negligent entrustment. There are, however, other cases applying the doctrine of negligent entrustment to vessels, firearms, and other non-self-propelled chattels. *American Guarantee & Liab. Ins. Co. v. The 1906 Co.*, 273 F.3d 605, 614 (5th Cir. 2001) (recognizing that one can negligently

13

entrust facilities and equipment); *McGuiness v. Brink's Inc.*, 60 F.Supp.2d 496, 499-500 (D. Md. 1999) (recognizing negligent entrustment of a firearm and noting that the standard of care includes not only what the entrustor knew, but also what it should have known); *Brown v. Wal-Mart Stores, Inc.*, 976 F.Supp. 729, 734 (W.D. Tenn. 1997) (holding that negligent entrustment can even arise out of the sale of chattel); *Kennedy v. Baird*, 682 S.W.2d 377 (Tex.App.—El Paso 1984, no writ) (recognizing a claim existed for negligent entrustment of a firearm).  The key to a negligent entrustment claim is that the chattel, whatever it is, poses a risk of harm if not used safely.

It is generally recognized that towing a line of barges requires great skill and training and poses a substantial risk of harm to property and persons.  Gilmore and Black, in their treatise, *The Law of Admiralty* note that "the combined tug and tow constitute a far less maneuverable unit than the single powered vessel, and the presence of the tow makes close maneuvering more problematic for other vessels."  Gilmore & Black, *The Law of Admiralty* (2nd ed.) 7-14, p. 515.  The fact that barges can cause massive destruction has unfortunately been shown time and again, as allisions with bridges in accidents such as the Amtrak *Sunset Limited* discussed above, the allision with the IH-40 bridge over the Arkansas River in Oklahoma that caused 14 deaths, and the subject allision with the Queen Isabella Causeway, have resulted in numerous losses of life. Entrusting barges to an inexperienced or incompetent tower can have devastating consequences.  When such entrustment is performed negligently, the owner of the barges will be held liable for its independent conduct.

## IV.  THERE ARE ISSUES OF FACT REGARDING ACBL's INDEPENDENT NEGLIGENCE

The issue before this Court with regard to negligent hiring of an independent contractor is whether there is any evidence that ACBL failed to exercise reasonable care

14

to employ a *competent and careful* contract tower to do work that will involve a risk of physical harm unless it is skillfully and carefully done *or* to perform any duty the employer owes to third persons. Restatement (Second) of Torts §411. Stated another way, is there any evidence that ACBL knew, or should have known, that Brown Water would not be both competent and careful when towing its barges.

The issue before this Court with regard to negligent entrustment is whether there is any evidence that ACBL supplied its chattel (i.e., its barges) for the use by one it knew, or should have known, because of youth, inexperience, or otherwise, would likely use it in a manner involving unreasonable risk of physical harm to those whom ACBL should expect to share in or be endangered by its use. Restatement (Second) of Torts §390.

There is summary judgment evidence that ACBL knew, or in the exercise of reasonable care, should have known that Brown Water was neither careful nor competent in towing barges along the ICW. There is evidence ACBL failed to act as a reasonably prudent barge owner under similar circumstances would have in investigating Brown Water's care and competence. Consequently, Claimants request this Court deny ACBL's Motion for Summary Judgment.

## A.    The Reasonable Standard of Investigation or Inquiry of a Contract Tower

ACBL is a member of the American Waterways Operators ("AWO") and has agreed to abide by the industry's self-imposed minimum standards of the Responsible Carrier Program ("RCP"). One of the requirements of the RCP is that barge owners like ACBL must have written policies and procedures for evaluating contract towers "on their ability to provide an acceptable level of safety." [Tab 5 RCP, at II-1 and II-4.] Even before the RCP was created, reasonably prudent barge owners would have met this

15

minimum standard of having policies and procedures for selecting contract towers. [Tab 4 Disler ¶4; Tab 5]  ACBL's witnesses, including members of its upper management, have all testified that ACBL does not have any written or unwritten policies and procedures to evaluate the competence, care, or safety of its contract towers.  [Tab 9 Hoessle 133:6-20, 226:8-227:11, 228:6-20; Tab 11 Kazunas 47:19-49:13, 79:4-80:25, 81:1-83:9; Tab 12 Ivey 121:11-122:19; Tab 14 Whitlock 111:3-113:6, 114:21-115:4, 116:19-117:12, 125:7-128:3; Tab 15 Farley 143:24-144:11]  ACBL has failed to act as a reasonably prudent barge owner under similar circumstances because it does not have any policies and procedures for evaluating the competence, care, and safety of contract towers.

A reasonably prudent barge owner like ACBL would have written policies and procedures for hiring contract towers that will allow them to make a reasoned decision whether the tower can provide the services with an acceptable level of safety (i.e., whether the tower is both competent and careful).  [Tab 4 Disler ¶4; Tab 5 RCP at II-1 and II-4]  As discussed above, towing a line of barges through a narrow channel is a specialized skill that requires substantial training and expertise.  The consequences of a collision or an allision caused by barges present a risk of serious physical harm, and often death.  Consequently, the amount of care a barge owner like ACBL (which has extensive knowledge and experience with towing its own barges to know the dangers involved and the skill and competence necessary) must exercise in selecting a contract tower is greater than the care it must exercise in selecting other vendors that do not require as much skill and do not present such a serious risk of physical injury. Restatement (Second) of Torts §411, cmt. c.

16

A reasonably prudent barge owner's policies and procedures for deciding or evaluating the competence, care, and safety of a contract tower will include investigations or inquires in the following regards: (1) investigation of United States Coast Guard incident reports; (2) periodic RCP audits; (3) contacting other barge owners that have hired the contract tower; (4) contacting local mariners regarding the reputation of the contract tower; and (5) independently verifying the tugs have the power the contract tower has represented. [Tab 4 Disler ¶4] None of these methods of inquiry or investigation is burdensome, and, aside from the periodic audits, can be accomplished quickly. ACBL, however, does none of these things to inquire about the contract towers.

**B.    Coast Guard Incident Reports**

One thing a reasonably prudent barge owner would have done, and ACBL should have done, was pull the Coast Guard incident reports on Brown Water. The Coast Guard keeps the Port State Information Exchange ("PSIX") online for the public to obtain free of charge. [Tab 1] The PSIX lists each activity the Coast Guard has reported for Brown Water's tugs, including the date of the activity and, if an incident, a brief description of the incident. [Tab 1]

ACBL never took the opportunity to access the Coast Guard PSIX database, or any other source, to determine the number of reportable marine casualties Brown Water's tugs had been involved in before deciding to hire Brown Water to tow its barges on the ICW. [Tab 10 Timberlake 235:18-237:1; Tab 11 Kazunas 47:19-49:13; Tab 14 Whitlock 96:8-14, 96:15-97:4, 111:3-113:6, 116:19-117:2] Despite the fact that it takes only a few minutes to access this free, public database, ACBL had no person responsible for investigating its contract tower's safety record and, according to upper

17

management, never asked anybody to perform such a search. [Tab 10 Timberlake 235:18-237:1; Tab 11 Kazunas 47:19-49:13; Tab 14 Whitlock 96:8-14, 96:15-97:4, 111:3-113:6, 116:19-117:2] ACBL's Senior Vice President of Logistics, who has authority to say which contract towers will and will not be hired, testified that if he was aware of a tower that had numerous accidents and Coast Guard violations, he would need to take a serious look at that company. [Tab 14 Whitlock 115:20-116:9]

If ACBL had looked at the PSIX database, it would have discovered that Brown Water had been involved in approximately 60 reportable marine casualties in the seven years before the allision with the Queen Isabella Causeway. [Tab 1] Within the three years before the time it hired Brown Water to push its barges that collided with the Queen Isabella Causeway, Brown Water had been involved in 24 reportable marine casualties. [Tab 1] For a small operation, such as Brown Water, this is a significant number of reported incidents. [Tab 4 Disler ¶5] It would have definitely been enough to merit further inquiry by a prudent barge owner. But because ACBL never had anybody take the few minutes necessary to obtain this information about Brown Water's history of marine casualties, it never had this information necessary to make an informed decision whether Brown Water could push its barges with competence, care, and safety. This is evidence that ACBL breached its standard of care with regard to hiring Brown Water and entrusting its barges to it for towing on the ICW.

## C.   Performing Periodic RCP Audits

Although ACBL performed an audit of Brown Water about one and a half years before the allision, it was not an RCP audit. [Tab 10 Timberlake 59:2-60:10, 64:18-66:17, 173:10-175:1, 243:1-18; Tab 14 Whitlock 118:12-21]   In fact, one of the members of ACBL's upper management that requested the audit specified that the purpose of the

audit was merely to ensure that Brown Water had policies and procedures in place to notify it of any incidents involving ACBL barges. [Tab 14 Whitlock 93:12-95:4, 120:5-21] In addition to the fact that the audit of Brown Water did not comply with the standards of the RCP, the person who performed the audit and the person at ACBL that analyzed the audit did not have enough operational experience with towing to provide a proper perspective on the competence, care, and safety Brown Water exercised in navigating barges on the ICW. [Tab 10 Timberlake 175:5-20, 184:24-185:22; Tab 11 Kazunas 47:7-18, 69:5-17; Tab 14 Whitlock 119:5-13] Finally, ACBL failed to properly utilized the audit, because it never shared its findings with many of the key personnel involved in the decision to hire contract towers. [Tab 9 Hoessle 63:7-64:21, 125:12-22, 144:7-145:7, 153:6-154:8, 221:4-25, 300:22-303:13; Tab 11 Kazunas 39:6-45:3; Tab 15 Farley 89:4-91:2]

Even though ACBL's audit of Brown Water was lacking in many respects, the information ACBL gained from the audit was enough to make a prudent barge owner question whether Brown Water would be competent, careful, and safe. [Tab 4 Disler ¶¶7-8] The audit demonstrated that Brown Water was not able to be RCP certified. [Tab 10 Timberlake 165:15-168:11; Tab 11 Kazunas 40:2-20, 108:3-9; Tab 18] Before the audit, ACBL knew that Brown Water was not RCP certified. [Tab 11 Kazunas 40:2-20] There is testimony that ACBL and other members of the AWO believed that all towing entities should become RCP certified and that barge owners were expecting their contract towers to be RCP certified. [Tab 10 Timberlake 131:16-25; Tab 14 Whitlock 89:22-90:1] After the audit, ACBL knew not only that Brown Water was not RCP certified, but also that Brown Water could not meet the RCP requirements. [Tab 10 Timberlake 165:15-168:11; Tab 11 Kazunas 40:2-20, 108:7-9]

19

The audit also demonstrated that Brown Water was violating Coast Guard regulations by failing to carry current copies of the Coast Guard's "Notice to Mariners". [Tab 10 Timberlake 86:8-20, 113:25-114:7; Tab 18; Tab 11 Kazunas 39:6-45:3] According to 33 CFR §164.72, all vessels, such as Brown Water's tugs, must have a current copy of the Notice to Mariners in the wheelhouse. Failure to carry a current copy of the Notice to Mariners is not only a violation of a Coast Guard safety regulation, but is also an indication that the vessel is operated at less than a basic level of seamanship. [Tab 4 Disler ¶7] Immediately after the allision with the Queen Isabella Causeway, the Coast Guard boarded the Brown Water V and found not only that they were still not carrying a current copy of the Notice to Mariners (the latest copy they could find in the vessel's binder was from January 2000), but also that they did not appear to be utilizing the marine charts for the area. [Tab 2] Mr. Timberlake testified that the Coast Guard's description of a tightly folded NOAA Marine Chart that did not appear to have been recently used and had no corrections on it was consistent with what he found when he inspected other Brown Water vessels. [Tab 10 Timberlake 179:7-181:9] Again, these findings that Brown Water was violating Coast Guard regulations and not properly utilizing its charts would cause a prudent barge owner to at least question the competence, care, and safety of Brown Water as a contract tower. This is some evidence that ACBL knew that Brown Water was not competent, careful, and safe. Unfortunately, ACBL failed to provide this information to the dispatchers who make the day-to-day decisions of whether and who to hire as contract towers. [Tab 9 Hoessle 63:7-64:21, 125:12-22, 144:7-145:7, 153:6-154:8, 221:4-25, 300:22-303:13] The dispatcher that hired Brown Water on the occasion in question testified that he would have steered away from a contract tower that did not maintain the documents in its wheelhouse, but

20

that he was never told about the Brown Water audit, the fact that they were violating Coast Guard regulations, or the fact that they failed to properly maintain their wheelhouse, although he thought he should have been given that information. [Tab 9 Hoessle 74:1-25, 105:23-108:16, 225:13-226:7, 226:8-227:11, 228:6-20]

The audit also demonstrated that Brown Water did not have a program in place for training its pilots. [Tab 10 Timberlake 170:6-21; Tab 11 Kazunas 39:6-45:3; Tab 16 Mosher 197:20-198:1; Tab 18] According to Brown Water's representative, Brown Water does not provide training to a pilot who has experience. [Tab 16 Mosher 169:14-22] In this case, Fowler has many year experience as a pilot on the ICW, but had been down to Brownsville only a few times. [Tab 3] This was only the third or fourth time he had navigated those waters, which have a reputation for being difficult to maneuver. [Tab 3; ACBL's Exhibit "19" Russell ¶F] Christian Brinkop, a vice president at ACBL, described what he considers to be a reasonably prudent training program for tug pilots, and stated on multiple occasions that it is not prudent to allow a person to navigate in waters he is not familiar with. [Tab 13 Brinkop 56:13-57:20, 70:22-75:8] ACBL knew Brown Water was not acting in a competent or safe manner by failing to train its pilots and allowing its pilots to navigate in areas where they are not experienced.

**D.    ACBL Never Attempted to Contact Other Barge Owners that Used Brown Water**

In its Motion for Summar Judgment, ACBL refers to the fact that Brown Water has pushed barges for other entities in addition to ACBL, to imply that Brown Water must be safe if others have used their services before. The fact that a contractor has towed barges for an entity in the past is not evidence that the contractor performed its work with competence, care, or safety nor evidence that the other barge owner was satisfied with Brown Water's performance. More relevant to the issue before this Court,

21

however, is the fact that ACBL never attempted to contact these other barge owners to inquire about their satisfaction with the competence, care, and safety of Brown Water. [Tab 14 Whitlock 130:8-14]  ACBL implies that it knew about Brown Water's other employers at the time it decided to hire Brown Water (although the evidence is merely that they knew about these other barge owners after the subject allision), yet it failed to contact any of them to inquire about their satisfaction with Brown Water.  ACBL failed to meet its standard of care as a reasonably prudent barge owner, when it failed to even attempt to contact other barge owners to inquire about their experience with Brown Water's competence, care, and safety. [Tab 4 Disler ¶9]

**E.    ACBL Never Attempted to Contact Local Mariners regarding Brown Water's Reputation**

Another method of inquiry or investigation of a contract tower that a prudent barge owner will employ is to contact local mariners who will know the reputations of the local carriers.  Brown Water is a family-owned towing company that is headquartered on the Texas Gulf Coast. [Tab 16 Mosher 122:19-126:24]  Although it is known among the local mariners, it does not have a national reputation.  It is not unusual for the local mariners to know about the local businesses by reputation and often by direct contact.  ACBL, however, had no policy or procedure in place to contact local mariners to obtain insight into the reputation of Brown Water. [Tab 11 Kazunas 85:1-9]  In fact, it had no system in place, and no personnel assigned to obtain such information on any contract towers. [Tab 11 Kazunas 79:4-80:25]  Although there is some evidence that ACBL's Operations department should have been keeping up with such knowledge about vendors, the Operations department was not doing so. [Tab 15 Farley 145:20-146:20, 147:23-148:21]

22

If ACBL had contacted local mariners, it would have discovered that Brown Water has a reputation for paying low wages, and hiring crew members that have had problems at other employers or are inexperienced. [Tab 4 Disler ¶6; Tab 19 Benavides ¶3] Brown Water generally has a reputation of a basic lack of seamanship in the wheelhouse and a corresponding lack of competence, care, and safety. [Tab 4 Disler ¶6; Tab 19 Benavides ¶3]

Because ACBL failed to contact local mariners to inquire into the reputation of Brown Water, it did not have pertinent information necessary to make an informed decision whether Brown Water had the competence, care, and safety necessary to be a contract tower of ACBL's barges.

## F.    ACBL Knew or Should Have Known that Brown Water was Not Adhering to a Safe Horsepower to Barge Ratio

When towing barges, one of the most important factors in whether the barges can be towed safely is whether the tug has enough horsepower per barge to control the barges. [Tab 9 Hoessle 90:4-92:20, 96:6-24, 283:9-15; Tab 13 Brinkop 92:23-94:24] At ACBL, there is an internal standard or "rule of thumb," that on the ICW, there should be a minimum of 200 horsepower per barge, when navigating under ideal circumstances. [Tab 11 Kanuzas 51:14-53:5; Tab 12 Ivey 42:18-43:23, 95:13-96:24; Tab 13 Brinkop 84:22-85:22, 94:6-24] In fact, there is testimony by ACBL that there must be "over 200" horsepower and that the dispatcher that hired Brown Water on the occasion in question would require 250 horsepower per barge in the ICW. [Tab 9 Hoessle 92:21-93:10; Tab 16 Farley 140:6-8] Regardless, the evidence is that the rule for ACBL towing its own barges in the ICW is that there must be a minimum of 200 horsepower per barge, and that under less than ideal conditions more horsepower is necessary. ACBL set this standard for purposes of safety, because it does not consider a lower

23

horsepower to barge ratio to be a safe method of pushing barges in the ICW. [Tab 9 Hoessle 92:5-20; Tab 27]

ACBL, however, never took any steps necessary to assure that its contract tower, Brown Water, would abide by the same rule of a minimum of 200 horsepower per barge under ideal conditions, when pushing its barges. [Tab 9 Hoessle 122:7-14; Tab 11 Kanuzas 55:18-56:17, 62:21-63:5, 63:15-64:3; Tab 14 Whitlock 73:20-24] This is in spite of the fact that ACBL contractually agreed with its customer to transport its product with "towing power as required." [Tab 11 Kazunas 64:4-7; Tab 30] A reasonably prudent barge owner would have had some procedure in place to assure that its contract tower was abiding by its internal safety standard. [Tab 4 Disler ¶8; Tab 5 RCP II.G.1 at II-4] Despite the fact it had information before it that indicated Brown Water was continually failing to follow a 200 horsepower per barge minimum, ACBL never provided this information to the dispatchers that hire the contract towers and never performed an informed analysis to realize that Brown Water was overstating the horsepower of its tugs.

During the audit, it was noted that the two tugs being evaluated each had two Detroit Diesel 12v71N engines. [Tab 10 Timberlake 198:24-200:16; Tab 18; Tab 32; Tab 33] These are common engines in the inland towing industry. [Tab 4 Disler ¶8] Persons with operational experience in the inland towing industry know that these engines put out 340 horsepower, when they are new from the factory. [Tab 4 Disler ¶8; Tab 16 Mosher 27:18-33:24, 34:14-36:19; Tab 17; Tab 24; Tab 35] In fact, the engines on the Brown Water vessels had the recommended N55 fuel injectors and other specifications that would generate a maximum of 340 horsepower. [Tab 16 Mosher 27:18-33:24, 34:14-36:19; Tab 21; Tab 22; Tab 23; Tab 24; Tab 35] Brown Water, however,

24

was representing that their vessels equipped with these engines were capable of 800 horsepower.  [Tab 4 Disler ¶8; Tab 10 Timberlake 83:8-85:6, 112:12-113:17; Tab 16 Mosher 26:6-23; Tab 21]   Although ACBL had personnel experienced with the capabilities of Detroit Diesel 12v71N engines, the personnel that evaluated the audit of Brown Water had no experience to recognize that Brown Water was overstating its horsepower.  [Tab 4 Disler ¶8; Tab 10 Timberlake 184:24-185:22; Tab 11 Kazunas 69:5-17]  As a result of continuously overstating the horsepower of its vessels, Brown Water was understating the horsepower per barge, so that when it pushed four barges with these vessels, as was its standard, it would have less than 200 horsepower per barge.

The fact that a contract tower would overstate or exaggerate its horsepower capabilities would have raised a concern with a prudent barge owner and should have raised a concern with ACBL about the competence, care, and safety of Brown Water.  [Tab 4 Disler ¶8]  The fact that a contract tower would push barges at lower horsepower to barge ratio than is recommended, gives cause for inherent safety concerns.  The reason the tug needs a certain level of horsepower is generally not for pushing barges under ideal conditions, but rather, for controlling barges under less than ideal conditions.  The allision at issue is a good example of why a vessel must have a minimum level of power.  The Brown Water V had enough horsepower to push the barges on the ICW.  The problem was that it did not have enough horsepower to regain control over the barges once the vessel lost momentum (possible on a sand bar) and the current grabbed them.  [Tab 3]  The fact that Brown Water was exaggerating its vessel's capabilities so that it was pushing more barges than it should have been was a cause of this allision.  The fact that Brown Water would exaggerate its vessel's capabilities raises a question of whether Brown Water was a competent, careful, and safe contract tower.

ACBL breached its standard of care by hiring Brown Water under these circumstances to tow its barges on the ICW.  Claimants, therefore, request this Court deny ACBL's Motion for Summary Judgment.

G.    **ACBL's General Lack of Care in Hiring Brown Water**

As discussed above, ACBL failed to have any policies and procedures in place to evaluate whether a contract tower could provide its services with an acceptable level of safety, with competence, or with care.  ACBL takes the position, in this lawsuit, and apparently as a corporation, that it has no responsibility to assure that its contract towers push its barges safely, competently, or carefully.  [Tab 11 Kazunas 47:19-49:13; Tab 14 Whitlock 125:7-128:3]  Essentially, ACBL takes the position in this lawsuit that it cannot be held responsible as a matter of law, because at the time it hired Brown Water it had a history with the tower that did not include any major incidents so that ACBL had no reason to doubt Brown Water's competence; it audited Brown Water; and Brown Water had an obligation to ACBL to perform its job with competence.  As discussed above, this is not the standard of a reasonably prudent barge owner in a situation similar to ACBL.  To meet its standard of care in choosing a competent, careful, and safe contract tower, ACBL needed to do more than it did to investigate Brown Water.  But even if ACBL could rely solely on its personal experience and its audit, it still must rely on these factors with the care of a reasonable barge owner.  The evidence in this case, however, demonstrates that ACBL was applying no standard to its evaluation of hiring towing contractors and has a corporate mentality that does not consider the safety when hiring a contract tower.

ACBL repeatedly states that it could rely on the fact that Brown Water had "competently and safely" pushed ACBL barges in the past.  The problem with this

26

position is that it is based on circular logic. According to ACBL, its subjective interpretation of "competence" and "safety" are the basis of this Court determining objectively whether it has performed as a reasonably prudent barge owner when hiring an independent contractor. In other words, ACBL could not have breached its standard of care because it acted in a manner that it believes was reasonable. The flaw in this logic is demonstrated by the testimony of ACBL's Senior Vice President of Logistics, Norb Whitlock (one of the highest level executives at ACBL), when discussing ACBL's subjective standards for "competence" and "safety." Mr. Whitlock testified that even after this allision – where a Brown Water tug pushed four ACBL barges into the Queen Isabella Causeway, causing a section of the bridge to collapse and causing eight deaths – ACBL still has "no basis" to question the competence of Brown Water. [Tab 14 Whitlock 156:14-20] When further asked about ACBL's decision to continue using Brown Water after this allision, Mr. Whitlock touted Brown Water's competence, "based on their demonstrated ability over the years to provide good service without – without any major incidents." [Tab 14 Whitlock 160:8-23]

When ACBL states that Brown Water has provided services "competently and safely," that must be adjudged against ACBL's subjective standards of competence and safety. Claimants respectfully submit that ACBL's subjective standards, which allow it to still find "no basis" to question the competence of Brown Water after this allision and allow it to believe Brown Water has provided services "without any major incidents," are not the objective standards of a reasonably prudent barge owner. In fact, Claimants submit that the subjective standards of ACBL demonstrate a complete lack of regard to whether a contract tower is providing a service with competence, care, and safety.

27

There is evidence Brown Water had numerous reported marine casualty incidents before this allision. [Tab 1; Tab 4 Disler ¶5] There is evidence that Brown Water had incidents with ACBL barges before, including one two days before this allision. [Tab 9 Hoessle 140:2-24, 142:19-24, 144:7-147:8; Tab 11 Kazunas 110:18-111:20; Tab 29] ACBL's subjective interpretation of Brown Water as providing competent and safe services cannot be the basis to conclusively establish, as a matter of law, that Brown Water was, in fact, competent, careful, and safe. Consequently, even if ACBL's subjective interpretations of Brown Water are considered as evidence, they are insufficient to prevail on summary judgment.

Similarly, ACBL cannot rely on Brown Water's representations that they would be competent and safe to absolve them of liability for hiring an independent contractor that is not competent, careful, or safe. ACBL has an independent responsibility to take reasonable care to hire a contract tower that is competent, careful, and safe. [Restatement (Second) of Torts §411; Tab 5 RCP II.G. at II-4] Allowing an employer to prove reasonable care by obtaining an assurance from the contractor that it is competent, careful, and safe would render the doctrine of negligent hiring meaningless. The rights and obligations flowing between the employer and the contractor do not fulfill the employer's obligation to third parties to use reasonable care in hiring a competent, careful, and safe contractor. The standard of care to these third parties, such as the Claimants in this case, must be fulfilled to protect these third parties, without regard for the rights and liabilities between the employer and contractor. Restatement (Second) of Torts §411.

Finally, ACBL's reliance on the fact it hired an auditor does not conclusively establish that it used all necessary reasonable care in selecting a contract tower. There

28

are several problems with the audit and what ACBL did with the information that demonstrate a lack of care. As discussed above, there is some evidence the purpose of the audit was not to evaluate Brown Water's competence, care, or safety in towing the barges, but merely to determine whether Brown Water had the policies and procedures in place to report incidents with ACBL barges to ACBL. [Tab 14 Whitlock 93:12-95:4, 120:5-21] Even if ACBL conducted a full-scale RCP audit and obtained significant information about Brown Water, the benefit of such an audit is realized only if ACBL actually provides that information to personnel that make the decisions on which contract towers to hire. ACBL did not have any policies or procedures in place to allow for a flow of information between the dispatchers and the operations department. [Tab 9 Hoessle 133:6-20, 154:13-155:9, 226:8-227:11, 228:6-20, 300:22-303:13; Tab 11 Kazunas 47:7-18; Tab 15 Farley 89:4-91:2, 135:6-136:24, 145:20-146:20, 147:23-148:21] As a result of the corporate structure of ACBL, there is no way for personnel within the company to readily exchange information about contract towers such as ACBL. Consequently, even if Brown Water demonstrated a lack of competence, care, or safety, there is no mechanism in place for that information to be gathered and evaluated by employees responsible for making hiring decisions. Again, this demonstrates a general lack of care at ACBL in attempting to evaluate whether a contract tower is competent, careful, or safe.

## H.    There is Evidence ACBL's Breach of the Standard of Care was a Proximate Cause of the Occurrence

ACBL does not specifically raise the issue of causation in its Motion for Summary Judgment, instead relying on the proposition that it either did not owe a duty or did not breach a duty to the Claimants. The issue of causation is almost always a question of fact in a negligence action. *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 884-85 (3rd

29

Cir. 2000) (citing *Huddleston v. Herman & MacLean*, 640 F.2d 534, 549 (5th Cir. 1981).).
There is evidence sufficient to raise a genuine issue of fact regarding causation in this
case.

At this point, there is really no dispute that Brown Water and Fowler were a
proximate cause of the Queen Isabella Causeway allision and the resulting deaths and
injuries. [Tab 4 Disler Ex. "2"; Tab 20 Deck, Ex. "2"; Tab 2; Tab 3]  For purposes of
causation, the only issue is whether the causes of the actual allision are related to lack of
competence, care, or safety that ACBL knew or should have known about when it hired
Brown Water and entrusted its barges to it.  There is evidence before this Court that the
same problems that ACBL knew, or should have known, about Brown Water were the
same things that caused this occurrence.

One of the factors that indicated Brown Water's lack of competence, care, and
safety was its history of reportable marine casualties. [Tab 4 Disler ¶5; Tab 1]  These
reportable marine casualties were incidents that involved losses of property and/or
personal injury. [Tab 4 Disler ¶5]  Although all of the casualties might not have
involved allisions with bridges, there is evidence that Brown Water was involved in
incidents with towing barges that resulted in loss of property and personal injury. [Tab
4 Disler ¶5; Tab 1]  It is not necessary that Brown Water have been involved in a
reportable marine casualty just like this allision for the foreseeability of personal injury
to arise. *Consolidated Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 68 (5th Cir. 1987)
(foreseeability of injury does not require that the defendant could foresee the exact
injury that occurred, but rather, that it be able to foresee an injury to this class of
persons).

Another factor that indicated Brown Water's lack of competence, care, and safety was its reputation among local mariners for hiring inexperienced crewmembers and crewmembers that had a history of problems. [Tab 4 Disler ¶6]  This allision was caused by a new employee to Brown Water who had little experience navigating in this area of the ICW. [Tab 4 Disler ¶6; Tab 3]  Fowler had navigated through this area of the ICW only three or four times and never with four loaded barges. [Tab 3]  His inexperience in the area is a likely cause of the accident, as he was not accustomed to the strong currents in that area, and once he lost control of the barges, did not have enough experience to know where he could have intentionally grounded his vessel without striking the causeway. [Tab 2; Tab 3; Tab 4 Disler, Ex. "2"; Tab 20 Deck, Ex. "2"]

The fact that Brown Water failed to keep a current copy of the Notice to Mariners and failed to properly utilize its charts is relevant to this allision, because Fowler contends he lost control of the barges because of a sand bar. [Tab 3]  The location of submerged obstacles, such as sand bars, are annotated onto charts through experience, and can be the subject of Notice to Mariners.  Consequently, evidence that the Brown Water V did not have current copies of Notice to Mariners and had not been utilizing the charts, is related to the reason Fowler initially lost control of the barges.

In addition to this evidence of a causal relationship regarding the lack of a current copy of the Notice to Mariners in the wheelhouse, Claimants are entitled to the presumption of causation afforded by the Pennsylvania Rule, based on the violation of a safety regulation.  There is no dispute that Brown Water was in violation of Coast Guard safety regulation 33 C.F.R. §164.72 at the time of the audit and at the time of the allision in question. [ACBL's Exhibit 14 Brock ¶H]  Under the maritime doctrine of the

31

Pennsylvania Rule, Claimants are entitled to a presumption that the violation was a cause of the allision unless there is proof not only that the violation was not one of the contributory causes but that it *could not have been a cause. The Pennsylvania,* 86 U.S. (19 Wall.) 125, 136, 1998 AMC 1506, 1512 (1873); *Florida East Coast Ry Co. v. Revilo Corp.,* 637 F.2d 1060, 1065 (5th Cir. 1981) ("Under the Pennsylvania rule, the violator of a statutory rule intended to prevent allisions has the burden of proving not only that its transgressions were not a contributing cause of the allision, but that they could not have been a cause of the allision."); T. Schoenbaum, *Admiralty & Maritime Law,* (4th ed.), 14-3, vol. II at 102 (noting that the Pennsylvania Rule applies equally to violations of statutes and regulations). The Notice to Mariners requirement is part of the U.S. Coast Guard's Navigation Safety Regulations, which are by definition regulations intended to allow safe navigation in the area, to prevent colliding with objects. 33 C.F.R. §164.72(b). Although ACBL has attempted to downplay the importance of violating the U.S. Coast Guard Safety Navigation Regulations, it has not established that this violation could not have been a cause of the allision.

Another factor that indicated Brown Water's lack of competence, care, or safety involved its underutilitzation and misrepresentation of horsepower. [Tab 4 Disler ¶8; Tab 20 Deck ¶3] At the time of the allision, the Brown Water V had less than 800 horsepower, yet was towing four barges. [Tab 3; Tab 4 Disler ¶8; Tab 20 Disler ¶3] Consequently, even though the Brown Water V was pushing four barges in less than ideal conditions, it was in violation of ACBL's rule of at least 200 horsepower per barge in ideal conditions and was operating unsafely. According to Fowler, he did not have enough horsepower to regain control over the barges once the current grabbed them. [Tab 3] Further, Commander John Deck III, a retired Coast Guard Officer, with

32

expertise in tow power, has opined that if the Brown Water V had been capable of 800 horsepower at the time of the incident, Fowler could have stopped the barges from collapsing the causeway or at least could have slowed the barges enough so that it would have facilitated an intentional grounding, so that the allision would not have occurred. [Tab 20 Deck ¶3, Ex. "2"] There is a causal relationship between the lack of horsepower of the Brown Water V (an issue a reasonably prudent barge owner would have known before hiring Brown Water) and the allision with the causeway.

## V.   ACBL IS NOT ENTITLED TO EXONERATION FROM LIABILITY

In addition to seeking summary judgment, ACBL is also seeking exoneration from liability. ACBL's basis for seeking exoneration is the same as its basis for seeking summary judgment – its contention that it did not have a duty to Claimants or breach its standard of care. ACBL's request for exoneration, therefore, survives or falls with its summary judgment.

A limitation of liability proceeding brought by a ship owner under the Limitation of Liability Act generally involves a two-step process, with the first step being the establishment of the ship owner's liability and as to which the claimant bears the burden of proof. *Complaint of Port Arthur Towing Co. on Behalf of M/V Miss Carolyn*, 42 F.3d 312, 317 (5th Cir. 1995). Once the claimant satisfies the initial burden of proving negligence or unseaworthiness in a limitation of liability proceeding, the burden shifts to the ship owner to prove its lack of privity or knowledge as to the negligence or unseaworthiness. *In re Hellenic, Inc.*, 252 F.3d 391 (5th Cir. 2001); *American Dredging Co. v. Lambert*, 81 F.3d 127 (11th Cir. 1996).

In this case, ACBL has not yet attempted to meet its burden of limiting liability, as its motions are for full dismissal or exoneration of the claims. Consequently,

Claimants are not required, at this point, to present any evidence to rebut a claim that ACBL might make as to lack of privity or knowledge. The evidence demonstrates, however, that ACBL's upper management had full privity and knowledge of ACBL's hiring of Brown Water and of its failure to meet the standards of care for a prudent barge owner to determine whether a contract tower provided its services with competence, care, and safety. [Tab 9 Hoessle 296:10-18; Tab 10 Timberlake 267:11-268:1; Tab 11 Kazunas 39:6-40:1, 46:8-24; Tab 12 Ivey 79:19-80:1, 115:1-119:14, 121:11-122:19; Tab 13 Brinkop 34:23-36:17, 121:11-136:2; Tab 14 Whitlock 43:5-20, 44:20-60:4, 67:12-69:15, 84:2-14; 92:2-19; Tab 15 Farley 41:21-23, 42:5-7; Tab 31] Thus, if ACBL seeks to limit its liability by asserting lack of privity and knowledge, there will be at least a question of fact on that issue. Claimants request this Court deny not only ACBL's Motion for Summary Judgment but also its request for exoneration.

## CONCLUSION

Claimants have presented evidence to raise issues of fact with regard to each of the elements of their causes of action against ACBL for independent acts of negligence. ACBL failed to meet even the threshold standard of having written policies and procedures for evaluating whether a contract tower could provide an acceptable level of safety, as required by the Responsible Carrier Program. There is evidence that ACBL knew or should have known that Brown Water was not a competent, careful, and safe contract tower and presented a foreseeable risk of causing physical harm, which resulted in the allision with the Queen Isabella Causeway and the deaths of eight people. Claimants request this Court deny ACBL's Motion for Summary Judgment and request for exoneration.

34

Respectfully submitted,

_____
Ray R. Marchan
State Bar No.: 12969050
Federal ID No.: 9522
Mikal Watts
State Bar No.: 20981820
Federal ID No.: 12419
1926 E. Elizabeth
Brownsville, TX 78520
Phone: 956.544.0500
Fax: 956.541.0255
*Attorneys for Claimants Lydia Zamora, Individually and as Representative of the Estate of Hector Martinez, Jr., Gustavo Morales, Bigo's International, L.L.C.; Jacqueline Paddock, Individually and as Representative of the Estate of Chelsea Welch and as Next Friend of William B. Welch and Bridgette Goza*

35