IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| IN RE THE COMPLAINT AND PETITION OF BROWN WATER TOWING I, INC., AS OWNER, AND BROWN WATER MARINE SERVICE, INC., AS BAREBOAT CHARTERER, OF THE BROWN WATER V, ITS ENGINES, TACKLE, ETC. IN A CAUSE OF EXONERATION FROM OR LIMITATION OF LIABILITY | § § § § § § § § § § | C.A. NO. B-01-157 (Subject to Rule 9(h) of the Federal Rules of Civil Procedure) Admiralty |
| Consolidated with: | § § | |
| IN THE MATTER OF AMERICAN COMMERCIAL LINES LLC AS OWNER and AMERICAN COMMERCIAL BARGE LINE LLC AS CHARTERER OF THE BARGES NM-315, VLB-9182 ACL-9933B, VLB-9173, PRAYING FOR EXONERATION FROM AND/OR LIMITATION OF LIABILITY | § § § § § § § § § | C.A. NO. B-02-004 (Subject to Rule 9(h) of the Federal Rules of Civil Procedure) Admiralty |
| Consolidated with: | § § | |
| IN THE MATTER OF DEERE CREDIT INC.,(FORMERLY SENSTAR FINANCE COMPANY), AS OWNER OF THE BARGE NM-315, AND STATE STREET BANK AND TRUST COMPANY OF CONNECTICUT, NATIONAL ASSOCIATION, AS OWNER TRUSTEE OF THE BARGE ACL-9933B AND NOT IN ITS INDIVIDUAL CAPACITY, AND GENERAL ELECTRIC CAPITAL CORPORATION, AS BENEFICIAL OWNER OF THE BARGE ACL-9933B PRAYING FOR EXONERATION FROM AND/OR LIABILITY | § § § § § § § § § § § § § § § | C.A. NO. B-02-125 (Subject to Rule 9(h) of the Federal Rules of Civil Procedure) Admiralty |

**AFFIDAVIT OF GERALD E. DISLER**

12470.1

4

THE STATE OF TEXAS §
§
COUNTY OF _Hardin_ §
§

       On this day personally appeared Gerald E. Disler, personally known to me, who after being duly sworn upon his oath did depose and testify as follows:

1.     My name is Gerald E. Disler. I am over the age of eighteen, and am in all respects competent to make this affidavit. The facts stated in this affidavit are true and correct. I am a citizen of the United States of America and a resident of the State of Texas. This Affidavit is made on the basis of my own personal knowledge, and on the basis of my investigation and work as an expert witness and consultant in marine safety. The opinions stated herein are based on my specialized training and experience, acquired during my career in the marine transportation and inland towing industry from the 1950's to the present, and are within a reasonable degree of probability. Further, a true and correct copy of my expert report in this case is attached hereto as Exhibit "2"; the opinions given by me in that report are based on my training and experience and the information I obtained in my profession and by reading the referenced documents, and are within a reasonable degree of probability.

2.     I hold the following licenses issued by the United States Coast Guard, all of which are on their fifth issue:

        Master of Vessels, 3000 Gross IGT (Near Coastal);
        Master of Uninspected Towing Vessels upon Great Lakes, Western Rivers and Inland Waters of the United States;
        Radar Observer (Unlimited) & ARPA;
        Chief Engineer of Motor Vessels (Unlimited Horsepower).

3.    My experience has been both ship-board (as Master and Chief Engineer) and in vessel management. For example, between 1973 and 1979 I worked for Brown and Root, Inc. and Jackson Marine Corp. During this time I not only worked on board tugs, but also as Port Captain and Port Engineer. I also worked as the Port Captain for Conoco Shipping, Inc. in the port of Westlake, Louisiana between 1988 and 1992. In these shore-based positions, my responsibilities included contracting with towing sub-contractors to provide towing services for barges From this and other experience, I am familiar with the standards of care for reasonable barge owners in the selection and retention of towing sub-contractors. A detailed resume of my work and educational experience is attached hereto as Exhibit "1," all of the factual statements made in my resume are within my personal knowledge and are true and correct, and my resume is incorporated herein by reference.

4.    **ACBL had a duty to use reasonable care in selecting a contract tower in South Texas that could tow its barges with an acceptable level of safety.** ACBL breached this duty by selecting Brown Water Marine. ACBL is (and was at the time of the incident giving rise to this litigation) a member of the American Waterways Operators Association ("AWO"), an industry trade and lobbying organization. ACBL was also certified as a "Responsible Carrier" by the AWO Responsible Carrier Program ("RCP"). The RCP was established by the AWO as an exercise in voluntary "industry self-regulation" in order to forestall government imposed regulation. Accordingly, the standards set by the RCP are industry self-imposed, minimum standards. In selecting Brown Water, ACBL breached even these minimum standards. The RCP requires members to "develop and document written policies and procedures... for evaluation of subcontractors and vendors providing towing and vessel assist services on their ability to provide an acceptable level of safety." (See, *"The American Waterways*

*Operators Responsible Carrier Program,* at II-1, II-4). Numerous witnesses have testified that ACBL had no such written policies and procedures for selecting a contract tower. There is also testimony from ACBL's upper management that it has no unwritten requirements for evaluating contract towers, such as Brown Water. In fact, regardless of the RCP requirements, ACBL has never had anyone in charge of tracking vendor safety. (See, Deposition of Kazunas at 49-50.) Although the navigation of all types of vessels requires skill and care, transporting barges with a tug requires a high degree of skill compared to other maritime activities and involves a greater risk of physical harm, especially to the general public, than most other types of navigation. A tug pushing barges is far less maneuverable than a single powered vessel. Failure to properly account for the skill and danger involved in towing barges has accounted for some high-profile and deadly disasters, including the allision with a bridge that resulted in the Amtrak disaster that killed over 40 people and led to the industry's self-examination that culminated in the adoption of the Responsible Carrier Program. Consequently, a reasonably prudent barge owner that is hiring a contract tower will have written policies and procedures for hiring an independent contractor to provide towing services with an acceptable level of safety, which will include the following methods of investigating the contract tower: investigate Coast Guard incident reports; perform periodic RCP audits; contact other barge owners that have hired the contract tower; contact local mariners regarding the reputation of the contract tower; and independently confirm the tugs actually have the power that the contract tower has assigned to them.

5.   **ACBL should have consulted the Port State Information Exchange ("PSIX") System regarding Brown Water Marine's vessels before retaining them.** Before retaining, or continuing to use Brown Water Marine, ACBL should have consulted the PSIX System regarding Brown Water's vessels. This is an internet

accessible database maintained currently and at the time of the incident by The United States Coast Guard. The PSIX System would have told ACBL the number of "reportable marine casualties" onboard each of Brown Water's vessels. This is a free system for the user and gives immediate information via the internet. It is well-known and widely used within the industry. Reasonable policies and procedures for a barge and towboat company in selecting a towing company as their exclusive or main supplier of services in an area, such as ACBL's selection of Brown Water for the South Texas market, should include a review of the PSIX System. Each PSIX report on the system should have a corresponding Form 2692, with more specific details of the incident. "Reportable marine casualties" are defined as incidents involving property damage of more than $25,000.00 or injuries requiring more than onboard first aid. While I agree with ACBL's expert, Michael Russell, that the PSIX System does not provide all of the details of the reportable marine casualties, I disagree that review of the PSIX System regarding Brown Water's fleet would not have shown Brown Water to be an unsafe operator. If ACBL had consulted the PSIX system prior to September 15, 2001, they would have learned: that the M/V BROWN WATER VIII was involved in 19 reportable marine casualties between 1992 and the incident; that the M/V BROWN TIDE was involved in 12 reportable marine casualties between 1994 and the incident; and that the M/V BROWN WATER V, the vessel involved in this case, was involved in 9 reportable marine casualties between 1993 and the incident, including 3 such incidents in the year before the allision of September 15, 2001. While each of the casualties may not have been Brown Water's fault, the sheer volume of casualties is far in excess of the norm, including ACBL's personal history, and should have been a red flag to ACBL. If a reasonably prudent barge owner had accessed this information, it probably would have not

hired Brown Water, unless they first preformed a serious review of the company to investigate its accident history.

6.    **ACBL should have consulted others in the inland towing industry in South Texas regarding Brown Water Marine.**  I am experienced in the inland towing industry in South Texas.  Based on my familiarity with this industry and my communication with other mariners in the area, I am of the opinion that Brown Water Marine has a near universally poor reputation in this area for safety. Brown Water is known to pay crew members on its vessels less than competing companies.  For this reason, Brown Water is known to have difficulty retaining good workers on its vessels, and is know to hire crew members who have had trouble with previous employers.  For many in this industry Brown Water is the employer of last resort.  As a result, the crews on Brown Water vessels tend to be inexperienced, or to have had drug, alcohol, or Coast Guard problems at other employers.  I have reviewed ACBL's Memorandum in Support of Motion For Summary Judgment.  I disagree with the statement on page 7 that Brown Water "was (and still is) the most experienced towing company in the ICW between Brownsville and Houston."  This statement is attributed to Stephen Mosher, the president of Brown Water at the time of the incident, and to Patrick Hoessle, a dispatcher at ACBL.  A few phone calls to local mariners would have revealed this statement to be untrue.  No one in the dispatch department or in management at Brown Water at the time of the incident had any experience as crew members, or had ever held a mariner's license.  (See, Deposition of Chad Chapman, at 44 - 45).  Furthermore the crew members aboard Brown Water's boats tend to either be inexperienced in this area, or to have had other problems. David Fowler, the man at the wheel at the time of the incident in question is good example.  Although he was on the third issue of his license, he told the Coast Guard after the incident that he had only been through this area three or

four times as Captain (i.e. at the wheel), and never with four loaded barges. (See, transcribed statement of David Fowler, at 6-7.) According to James Farley, a member of upper-management at ACBL, the Operations division should have been responsible for keeping up with knowledge of what was going on with its independent contractors. Yet, nobody at ACBL was fulfilling this responsibility of contacting local mariners to determine the reputation of Brown Water.

7.  **ACBL failed to properly audit Brown Water.** Following a grounding incident of one of ACBL's barges, ACBL arranged for an audit of Brown Water. Even before the audit, ACBL knew that Brown Water was not an RCP certified carrier. (See, Deposition of Kazunas at 40.) The audit confirmed that Brown Water was not compliant with the minimum standards of the AWO RCP. In other words, Brown Water was not RCP compliant. In particular, ACBL was warned that Brown Water did not maintain required documentation (Notices to Mariners) in the wheelhouses of the audited vessels, and that Brown Water needed to develop a shoreside and on-board training program. (Id. at 41,43.) It is extremely significant that the same deficiency in required wheelhouse documentation was noted in the M/V BROWN WATER V following the incident in question. I strongly disagree with the opinion of ACBL's expert, Michael Russell, that the lack of Notices to Mariners is not a major safety-related deficiency. This deficiency shows the same lack of basic seamanship that was apparent in the wheelhouse of the M/V BROWN WATER V following the allision. At that time, the crew could not immediately produce the chart for the area being transited, and when the crew finally located the chart it was apparent that it had not been in use (1999 edition of the chart with no annotations of any kind-appeared not to have been used). (See, US Coast Guard's Boarding Report.) Further, the fact that Brown Water did not have a training program in place was also pertinent to this accident, as Fowler was inexperienced in navigating the Queen Isabella

Causeway.  ACBL's management testified that it would never put a pilot in a position of navigating in a geographic area he was unaccustomed to.  The training standards for Brown Water, however, were not as good.  Brown Water had no training program for its wheel house personnel. (See, Deposition of Chad Chapman, at 84 – 85.)  ACBL knew as a result of the Timberlake audit that Brown Water needed to have a training program to meet the RCP standards.  Although ACBL did perform an audit of Brown Water that gave it enough information to question whether it should hire Brown Water, the audit itself did not meet the standards of an audit by a reasonably prudent barge owner.  Although ACBL at one point indicated it was going to perform an RCP audit, the audit it actually requested to be performed was definitely not an RCP audit.  Norb Whitlock, the manager at ACBL that ordered the audit, testified that the purpose of the audit was merely to determine if Brown Water had policies and procedures in place to report incidents to ACBL.  Mr. Timberwalk testified that an RCP audit of Brown Water would have taken at least five days, whereas his audit of Brown Water took him a total of two days, including travel.  Further, part of the auditing process of a reasonably prudent barge owner would be to share the information gained from the audit with the personnel who are responsible for making the decisions of which independent contractor to hire.  The dispatcher for the ICW that hired Brown Water on this occasion testified that he never saw the audit until after this accident , that he would have wanted to know if the contract tower was violating Coast Guard regulations or failing to properly maintain its wheelhouse, and that he should have been given this information.  Finally, ACBL failed to act as a reasonably prudent barge owner when it hired an auditor that was not trained in seamanship.  ACBL's witnesses have testified that barge owners like ACBL are expecting their contract towers to be RCP certified and that they should be encouraging all towers to be RCP certified.  Under the audit

it conducted ACBL knew that Brown Water could not meet the RCP certification requirements.  A reasonably prudent barge owner in ACBL's circumstances would have likely refused to hire Brown Water until they became RCP certified. ACBL failed to act as a reasonably prudent operator in continuing to entrust its barges to a company that ACBL knew could not meet the minimum standards set by the AWO RCP.

8.    **American Commercial Barge Lines (ACBL) failed to act as a reasonably prudent barge owner in contracting with a company (Brown Water Marine) that it knew or should have known was not adhering to the 200 horsepower per barge minimum standard.**  Numerous ACBL employees have testified that ACBL has a "rule of thumb" within its fleet of tow boats that, under ideal conditions, the minimum horsepower to tow ratio is 200 horsepower per standard size barge.  In fact, the ACBL dispatcher in charge of the ICW testified he would personally apply a minimum of 250 horsepower, and there is other testimony to the effect of the rule of thumb being "over 200" horsepower. Regardless, the testimony from ACBL is that a minimum of 200 horsepower per barge is necessary and that under less than ideal conditions more horsepower is needed. (See e.g., Deposition of Sonny Ivey, at 96).  A reasonably prudent barge owner would have required that its contract towers adhere to the same standard. It is not uncommon for a barge owner to require a contract tower provide certain assurances, including an assurance of a minimum horsepower per barge. Furthermore, ACBL knew or should have known that Brown Water Marine was not adhering to this standard based on the RCP audit.  The "vessel particulars" page for the audit of the M/V BROWN WATER VII, one of two vessels that ACBL audited bears this out.  This is the page where the auditor records the specifications ("particulars") of the vessel.  Under the "main engines" section the auditor recorded that the vessel had "1271 GM" engines.  This refers to Detroit

Diesel (General Motors' marine engine department) 12V-71N engines. This is one of the most common engines in the inland towing industry. Anyone with significant operational experience in the inland towing industry should be familiar with the capabilities of this engine. In particular they should know that this engine, with the recommended "N55" fuel injectors produces a maximum of approximately 340 horsepower if the engines are brand new and if the most efficient reduction gear are used. While it is possible to produce more horsepower by using different injectors, the manufacturer and service companies strongly recommend against this because of the severely diminished engine life between overhauls. As a result, these engines are almost never used in the inland towing industry with other than the recommend injectors. (There is testimony from Brown Water's employees that the specifications of the engines on the Brown Water V allowed for no more than 340 horsepower.) Therefore, someone with significant operational experience in the inland towing industry, who knew the vessel had Detroit Diesel 12V-71N engines should know that the absolute maximum horsepower of the engines, if they were brand new, was 340 per engine. The vessel particular sheet from the audit of the M/V BROWN WATER VII also records that the "Rated Horsepower" of the main engines is 400. The Auditor, Phillip Timberlake, should have known that Brown Water was overstating the horsepower of the engines. Unfortunately Timberlake had little operational experience. He was a retired ACBL employee. His work in the marine transportation industry consisted of dispatching tugs in Louisville harbor and negotiating contracts for the purchase of fuel and other supplies for ACBL's fleet. (See, Deposition of Timberlake at 21-25.) Timberlake never served as a crew member aboard vessels, and because of his limited (non-existent) operational experience he had to rely on what he was told as to the horsepower of the engines. (Id. at 84.) Still worse, Timberlake reported the findings of his

audit to Peter Kazunas, ACBL's Assistant Vice President of Logistic Services,
who also lacked any operational experience. (See, Deposition of Kazunas at 69.)
Towing companies sometimes exaggerate the horsepower of their vessels in
order to justify pushing more barges than is safe in order to increase profit at the
expense of safety. This unfortunate practice is well known in the industry, and
has been reported in industry trade publications such as Work Boat magazine.
Based on the Sworn statement of Joe Benavides, a former Captain at Brown
Water, the company considered a full load on this type of vessel to be four or
even five loaded barges. (See statement of Benavides at 16.) If ACBL had
commissioned an audit by a qualified auditor, with operational experience, or if
the audit had been reviewed by an ACBL employee with such experience, ACBL
would have learned that Brown Water was putting too many barges on their
boats to operate safely. A reasonably prudent barge owner would perform at
least a limited independent investigation to determine the horsepower of the
engines is the amount the contract tower is representing. The fact that a contract
tower is one that exaggerates its horsepower is a red flag that would cause a
reasonably prudent barge owner to probably not hire that contract tower.

9.      **ACBL failed to act as a reasonably prudent barge owner by failing to contact
any of the barge owners that had hired Brown Water.** A reasonably prudent
barge owner, as part of its policies and procedures for determining whether to
hire a contract tower will contact other barge owners that have hired the tower.
Checking references and keeping in touch with other similarly situated
employers of independent contractors is standard in most industries, including
the towing industry. According to Norb Whitlock, ACBL has never requested
information from any other barge owner regarding the reputation or conduct of
Brown Water. According to Mr. Benavides, if ACBL had performed such a

simple investigation, it would have known about Brown Water's reputation for lack of seamanship in the wheelhouse.

10.  **ACBL failed to exercise reasonable care to hire a competent and careful contract tower.** As discussed above, a reasonably prudent barge owner in the situation of ACBL would have had policies and procedures in place to assist it in determining whether a contract tower could push its barges with an acceptable level of safety. ACBL had neither a written nor unwritten policy. The only thing ACBL relied on in selecting a contract tower was its own history with that tower. Although a barge owner's personal history with a tower will generally be one of the factors a barge owner uses in choosing a contract tower, a reasonably prudent barge owner, in a situation like ACBL, will not rely only on its personal history. The mere fact that a contract tower has not had any major collisions while towing a specific barge owner's barges does not mean the tower is pushing those barges safely. The fact that a contract tower is acting in an unsafe manner does not mean that it will have a collision on every voyage. Because of the degree of skill and care needed to push barges and because of the danger of injury to other vessels, landowners, and the general public posed by pushing barges, a reasonably prudent barge owner will incorporate several different checks into its procedures for assuring its contract towers are towing its barges with an acceptable level of safety. Because ACBL does not incorporate these checks into its actual policies and procedures, it is not acting as a reasonably prudent barge owner of in a similar circumstance would. In addition to the fact that ACBL had no policies and procedures for choosing a safe contract tower, it had no person who was responsible for performing any background investigations of its contract towers, including checking Coast Guard records, contacting other barge owners that contract with the towers, contacting local mariners, or investigating the power of the tugs or the general seamanship of the

wheelhouse. From reviewing the deposition testimony of the dispatchers at ACBL and the management in charge of the various divisions that play a role in hiring contract towers, it is clear that ACBL did not attempt to take reasonable care in selecting a contract tower who could perform the job with competence and care, but rather, merely looked for a tower that could push its barges. ACBL did not have any mechanism for gathering information about contract towers and did not have any mechanism for sharing any of the information it did obtain. The dispatchers who were hiring the contract towers on a day-to-day basis had no way to communicate about the towers with its operations department that was the one in charge of adding or removing contract towers from the "list" of approved vendors. In my opinion, ACBL (starting with the management level and working its way down) did not believe it had any independent obligation to evaluate whether Brown Water could tow its barges with an acceptable level of safety, so that it did not act as a reasonably prudent barge owner in hiring Brown Water. The corporate mentality of ACBL is put into context by the testimony of Norb Whitlock, a member of upper management, who stated that after the allision of its barges into the Queen Isabella Causeway that caused a section of the bridge to collapse and resulted in the deaths of eight people, he had "no basis" to question the competence of Brown Water. He also testified that Brown Water has towed its barges without "any major incidents."

11. **A reasonably prudent barge owner in a situation similar to ACBL would not have hired Brown Water to push its barges.** Based on the information that ACBL had and the information it should have had with a reasonable investigation, a reasonably prudent barge owner would have known that Brown Water had been involved in an inordinate number of incidents within the past few years before the subject allision, that it had a bad reputation among local mariners for hiring less competent pilots, that it failed to follow Coast Guard

regulations regarding navigation, that it did not have a proper training program in place, and not only that its tugs did not have enough horsepower to push four barges, but that it misrepresented the horsepower so that it regularly pushed barges with inadequate power. ACBL had other options for towing in the area, including the use of its own tugs and the use of tugs owned by more reputable and safer contract towers. In my opinion, a reasonably prudent barge owner in a situation similar to ACBL would not have hired Brown Water to push its barges, because it would be foreseeable that Brown Water would be involved in a collision or allision which could cause injury to person and property.

Further, the Affiant sayeth not.

_Gerald E. Disler_
Gerald E. Disler

SWORN TO BEFORE ME the undersigned authority, on this __2nd__ day of February, 2005

_Kathy J. Parker_
Notary Public, State of Texas
My Commission Expires: __8-31-08__

KATHY J. PARKER
Notary Public, State of Texas
My Commission Expires
AUG. 31, 2008

12477.1                                        14

# CURRICULUM VITAE
## (RESUME)

**Captain Gerald Edwin Disler**

P.O. Box 899
Wildwood, Texas 77663
(409) 834-2433
Fax -- (409) 834-2499
CAPTDISLER@SBCGLOBAL.NET

## U.S. COAST GUARD LICENSES
- Master 1,600 G.T. (Near Coastal)
- Master Of Uninspected Towing Vessels Upon Great Lakes and Inland Waters
- Radar Observer (Unlimited)
- Chief Engineer, Motor Unlimited Horsepower
- All licenses are fifth issues, original towing license

## U.S. COAST GUARD ENDORSEMENTS
- Z Card: any unlicensed rating in the deck department, including Able Seaman (Unlimited)
- Any unlicensed rating in the Engine Department, including Jr. Engineer, Ship's Electrician, Ship's Refrigeration, Pumpman, Fireman, Oiler, Welder, Tankerman, Grade A and all lower grades.

## EDUCATION AS PERTAINS TO MARINE INDUSTRY ONLY

**Safety**
    Vessel Entry, Marine Chemist Seminar
    *-Received shipyard competent person certificate, Beaumont, TX.*
    University of North Florida
    -OSHA Instructor, Qualified
    *HASMAT, 40 hrs., OSHA & 8 hrs., Site Supervisor*
    Conoco, Inc.
    *-Improving safety through incident investigation*
    *-Occupational Safety*
    Marine Spill Response Corp.
    *HASWOPER*

**Deck**
    Texas A & M University (Radar, Collision Avoidance) 4 times
    Houston Marine Training Services
    *-Radar Observer Recertification-unlimited*
    Houston Marine Training Services, Master Prep.
    Protechnical Institute, St. Petersburg, FL.-
    U.S.C.G. Fire Suppression School
    *-51 hours basic and advanced*
    Universal Maritime Training Celestial Navigation

**GED/Page 2**

**STCW**

> Basic Fire-Fighting
> STCW Personal Survival
> STCW Personal Safety and Social Responsibility
> STCW First Aid and CPR
> Bridge Resource Management
> STCW ARPA Radar (No Geographical Restrictions)

**Engineering**

> H.E.W. Welding and Shop Math School
> *-Received certified welding certificate #7266, March 3, 1970*
> *Pittsburgh Testing Lab*
> Automation Systems S.I.U., Piney point, MD
> Alco Diesel School, White Plains, NY
> E.M.D. Division of General Motors School, IL
> Caterpillar Dealer Training School
> *-6.25 Bore, Mustang – Caterpillar, Houston, TX*
> *-71 Series GM Detroit Diesel School, Houston TX*
> Louisiana Marine and Petroleum Institute
> *-Chief Engineer Prep.*
> Manitowoc Crane School, Manitowoc, WI

**OFFICES HELD**

> -  Director, American Admiralty Bureau, Ltd.

**PROFESSIONAL ASSOCIATIONS**

> -  The Society of Naval Architects & Marine Engineers (SNAME)
> -  National Forensic Center
> -  American Boat and Yacht Council
> -  Propeller Clubs of The United States
> -  American Professional Captains Association

**GED/Page 3**

## EMPLOYMENT HISTORY

| | |
|---|---|
| 1984-Present | MARITIME CONSULTANTS AND ASSOCIATES,<br>G.E. "Jay" Disler/Owner<br>P.O. Box 899<br>Wildwood, Texas 77663 |

Consultants, Crewing Agents, Surveyors, Expert Witness, PI Investigations, Contract Negotiations, Vessel Brokers, Operators, Port Engineers & Forensic Examiners.

| | |
|---|---|
| Consultants: | All maritime matters. |
| Crewing Agents: | Delivery, temporary crews engine and deck, top to bottom License and unlicensed, any tonnage, any horse power, Anywhere U.S. or foreign. |
| Surveyors: | Damage, cargo, and value surveyors. |
| Expert Witness: | Maritime accidents, defense and plaintiff. |
| P.I. Investigations: | Defense, plaintiff & vessel owners. |
| Contract Negotiations: | Maritime personnel, supplies, modifications and repairs, Charter, operation contracts, and brokerage agreements. |
| Other: | Served as Chief Engineer of The Tall Ship "Elissa", Texas Seaport Museum, Pier 21, Galveston, Texas<br>Lecturer, Texas A & M University, Galveston Texas<br>Various licensed relief work to include: U.S. Maritime Administration, Military Sea command, Marine Spill Response Corp., Orange Ship Building, Dyn Corp.<br>Core of Army Engineers Marine Spill Response Corp.<br>Neches Gulf Marine, Instructor OSHA, 40 hrs., Hazardous Substance Training & OSHA, 8 hrs., Hazardous Substance Site Supervisors. |
| May, 1989 – Nov., 1993: | CONOCO SHIPPING, INC.<br>Bob Kimmons/Marine Superintendent<br>P.O. Box 2197<br>Houston, Texas |

Hired as Chief Engineer for the M/V Ventura, the only vessel ever designed and built for lightering. Was promoted to Captain, January 15, 1990. Completed 289 successful

**GED/Page 4**

Lighterings without injury to personnel, damage to ships or vessel. Many were double lighterings with 8 fenders

1991 to 1995                  U.S. MARITIME ADMINISTRATION
                                       Military Sea Command

Complete crewing of ships for operation Desert Storm, took tankers, freighters and RoRos from reserve fleet, outfitted, U.S. Coast Guard and A.B.S. inspected, Sea-tried and delivered to Military Sea command. Completed more for Somalia and annual inspections.

Sept., 1994 – May1989         SELF EMPLOYED, MARITIME CONSULTANT AND
                                        SURVEYOR

Cargo, damage and value surveys, consultant to various maritime companies and attorneys in maritime lawsuits. Called by the U.S. Coast Guard as an expert witness in license revocation hearings. Have taught license prep school with Texas and Louisiana teaching certificate in Nautical Science and Maritime Engineering (license prep only). Various relief work. Buy, sell and broker used vessels, negotiate and write all broker contracts. Various license relief work.

Sept., 1983 – 1984:           SABINE TOWING AND TRANSPORTATION CO., INC.
                                    Paul Moore/Personnel Manager
                                      P.O. Drawer 1528
                                      Groves, Texas 77619

Hired as Assistant Engineer on the composite unit, the tug SATOCO, 160'x40', 7400 h.p. at shaft, total h.p. -9,000, V20 E.M.D.S., and the barge CHROMALLOY I, 240,000 bbls. Multigrade cargo, 630'x 85', draft 41 ft., After 7 days, promoted to permanent 2nd Mate, 3 months later promoted to permanent Chief Mate. Then promoted to Relief Captain shortly before the sale of the vessel. Made regular trips from Lake Charles, LA. To Tampa, FL. And up the East Coast of The United States. Supervised up to 12 people. Inland towing division, master of tug marathon in tow with 36 lash barges, I.C.W. and Mississippi River.

Nov., 1982 – Sept., 1983:     TRANSOCEANIC SHIPPING COMPANY, INC.
                                      Dave L. Thomas/Shipping Agent
                                      1505 International Trademark
                                      No.2 Canal Street
                                      New Orleans, Louisiana 70130

Captain of the M/V Proud Brio, a 202 ft. O.S.V. delivering containerized oilfield supplies
       from the Port of New Orleans to Cundua, Del Carmen, Mexico. Also worked as Port

Captain and Port Engineer for this vessel and two other vessels working in Mexico. I negotiated all supplies, personnel and repair contracts. Over the years I have acquired some command of the Spanish language. Supervised up to 35 people.

Feb., 1981 – Nov., 1982:      MARSEA AGENCIES, INC.
                              Bill Summers/Operations Manager
                              P.O. Box 747
                              Station 2
                              Houma, Louisiana 70360

Chief Engineer – building new offshore supply vessels at Quality Shipyard, Houma, LA. And Halter Marine Mosspoint, MS., from keel through outfitting, and U.S. Coast Guard inspections. Going on board as Captain for sea trails, delivery inspection, and first 30 days of contracts to train crews. Took M/V Marsea 7 as Captain from February 10, 1982 to November, 1982, on contract Halliburton, DeMexico, operating in the southern Gulf of Mexico, off the Yucatan Peninsula. Supervised crew of up to 20.

Sept., 1980 – Jan., 1981:      NEWPARK MARINE
                               Bob Thompson/Operations Manager
                               P.O. Box 976
                               Morgan City, Louisiana 70381

Chief Engineer and Relief Captain on 7500 h.p. ocean-going tug, lay barge Creek, and various oil and cargo barges being towed from Central America to The United States. Supervised 9 people.

Oct., 1979 – Sept., 1980:      BLUDCO BARGE AND TOWING, INC.
                               Jack Jackson/Operations Manager
                               P.O. Box 12424
                               Houston, Texas 77017

Chief Engineer and Relief everything on the M/V Gaucho and Barge Poseidon, a composite unit of multi-grade petroleum cargoes from Texas City, TX. to various ports along the Mississippi River and up the East Coast to Wilmington, NC., Marcus Hook, PA., and Trenton, NJ. This unit hydraulically locked into notch with a patented system with no towing wench on deck and could stay in notch in up to twenty foot seas. Supervised up to 9 people.

1973 – 1979:      BROWN AND ROOT, INC.
                  P.O. Box 3
                  Houston, Texas 77001

GED/Page 6

JACKSON MARINE CORP.
P.O. 96118
Houston, Texas  77015

During this time with Jackson Marine, I worked as Chief Engineer, Mate and Captain on ocean going North Sea tugs used in towing operations, also did anchor handling. These vessels included M/V Mister David, Mister Charlie, Mister Pete, The Godfather, The Doctor Jack and The Midnight Moon. These were all large horsepower V18 alcos to 8000 h.p. I also worked as Port Captain and Port Engineer with responsibilities Negotiated and approved all shipyard contracts. I was loaned back and forth between Brown and Root and Jackson Marine. I completed contracts with Brown and Root in Bombay, India, Bahrain and Saudi Arabia as 1st Assistant Engineer and Port Engineer on various lay barges, jet barges, derrick barges, platform launch barges and diving operations. Basically, these units are used in all phases of the offshore construction business. Supervised up to 80 people.

1950's – 1970's:          REVIA MARINE, INC.
                          Captain Frank Revia/Owner (Uncle)
                          Port Bolivar, Texas

I acquired grass roots complete training from repair yard helper to mastering the many various types of vessels he owned, operated, charted and brokered.

| Bay and Gulf Fishing Vessels | 38' to 100' |
| Crew Boats | 40' to 110' |
| Inland Towing Vessels | to 1800 h.p. |
| Harbor Tugs | to 1800 h.p. |
| Offshore Towing Vessels | to 4200 h.p. |
| Offshore Drilling Rigs | |

Training and worked as shorebase fleet manager, hiring and training personnel, negotiated charter agreements, modification and repair contracts and supply contracts.

Same Time Frame          KELSO MAINE, Galveston, TX
                         EDGAR BROWN TOWING, Orange, TX
                         SEAFARERS INTERNATIONAL UNION
                         MORAN TOWING OF TEXAS

**FAMILY HISTORY**

I am the third generation of seafarer in my family. My father, Captain R.P. Disler, was a Master Mariner who retired from The Gulf Oil Corporation (Chevron Oil Corp.) I made various summer trips as a youth with him on board Gulf Oil tankers. My U.S. Coast Guard file is located at Houston, Texas and shows no offenses since it was started.