# The American Waterways Operators





TimBERLAKE
EXHIBIT
29

# Responsible Carrier Program

Discovery Ex. No. 29
Cause No.
#B-01-157
Causeway Collapse

# Table of Contents

I.    Introduction ................................................................................. I-1

II.   Management/Administration ..................................................... II-1

III.  Equipment/Inspection (Inland) ................................................ III-1

IV.   Equipment/Inspection (Coastal)............................................... IV-1

V.    Human Factors .......................................................................... V-1

VI.   Addenda Introduction ................................................................ VI-1

      A. Dispute Resolution Policy..................................................... A-1

      B. Audit Recertification Protocol.............................................. B-1

      C. Audit Issues ........................................................................... C-1

      D. Auditor Issues........................................................................ D-1

      E. Accreditation Board Issues.................................................... E-1

## Disclaimer

The AWO Responsible Carrier Program is intended to improve marine safety and environmental protection in the tugboat, towboat and barge industry. The program aims to accomplish this objective by establishing preferred industry operating principles and practices as voluntary standards of conduct for tugboat and towboat companies. While the standards outlined in the Responsible Carrier Program meet or exceed current governmental standards for the operation of barges and towing vessels, they do not necessarily constitute an exhaustive catalogue of all potential safety practices that any particular company should undertake. Each company must determine for itself its own operational needs and the range of safety measures necessary to protect its employees, the public, and the environment. The program is not intended to supplant any existing safety procedures that a company may have in place in excess of the standards outlined herein. Finally, while the objective of the Responsible Carrier Program is to enhance safety and environmental protection in the tugboat and towboat industry, no program can be considered a panacea that will completely eliminate injuries, accidents, or pollution incidents. The pursuit of better, safer operations through continuous improvement must always be the industry's goal.

## I.    Introduction

On December 7, 1994, the Board of Directors of the American Waterways Operators (AWO) unanimously approved the establishment of the AWO Responsible Carrier Program as a code of practice for association member companies. The Board's historic vote marked the culmination of an intensive, eight-month effort to develop the outlines of a new, industry-driven safety program for the tugboat and towboat industry. In voting to adopt the Responsible Carrier Program, however, the Board did more than signal its approval of the code of practice and its endorsement of the process that produced it. Perhaps more significantly, the Board directed that a new process begin to help the newly developed safety program take root in the industry and to ensure that the program's goals of a better, safer, and more responsible industry are realized. To that end, the Board set January 1, 1998, as the target date to bring all AWO member companies into compliance with the Responsible Carrier Program.

### Background and Purpose

Development of the Responsible Carrier Program began in April 1994, when the Board of Directors authorized the establishment of a specially selected task force of senior industry executives. Comprised of 13 members representing a broad cross section of AWO's diverse membership -- inland, coastal, and harbor operators; dry and liquid carriers; large and small companies drawn from each of the association's five regions -- the working group was tasked with developing a series of "recommended positions, practices, and standards aimed at enhancing the safety of the barge and towing industry." This work stemmed from the directive of the association's newly approved strategic plan, *AWO 2000*, that AWO "improve industry safety and environmental protection by establishing preferred industry operating principles and practices," and from the process of industry self-examination which began in the wake of the September 1993 derailment of the Amtrak *Sunset Limited*.

Throughout the spring and summer of 1994, the working group labored to fulfill the Board's mandate and to develop the outlines of a new, industry-specific safety program for the tugboat and towboat industry. By late September, the framework of the program had emerged, and a draft document was shared with all AWO members, including shipyard and affiliate members, for review and comment. Throughout the month of October, regional briefing sessions were held in Greenville, Mississippi; New York, New York; St. Louis, Missouri; and Seattle, Washington, to subject the draft program to the critical review of AWO members in all regions of the country. Armed with this feedback, the working group reconvened in early November to consider the input received from the membership, to revise the document as necessary, and to develop final recommendations for consideration by the AWO Executive Committee and Board of Directors. On November 3, the Responsible Carrier Program was approved by the AWO Executive Committee. The Committee-approved changes to the content of the draft program, as well as its recommendations for implementation and use of the new safety program, were shared with all AWO members in mid-November. On December 7, following a final briefing and discussion session on the content of the program held December 6, AWO's Board of Directors voted unanimously to adopt the Responsible Carrier Program as a code of practice for AWO member companies.

*Implementation and Use*

In approving the establishment of the Responsible Carrier Program, AWO's Board of Directors recognized that developing a comprehensive plan for implementation and use of the new safety program would be critical to achieving the program's objectives. *AWO 2000* directed the association to "improve industry safety and environmental protection by establishing preferred industry operating principles and practices," but the mere development of such a program would not by itself achieve these crucial goals. To make real gains in marine safety and environmental protection, the Board recognized that the next step for the association must be to put the Responsible Carrier Program in place and to help all AWO members integrate the program into their own companies' operations.

The Board set January 1, 1998, as the target date to bring all AWO member companies into compliance with the Responsible Carrier Program. To assist AWO members in meeting this target, the Board directed that the development of an implementation and assistance program aimed at giving all AWO members the tools they need to adopt the Responsible Carrier Program commence immediately following Board approval of the program. Development of such a program, which included the identification or development of sample policies and procedures, identification of industry training resources, and a series of regional implementation seminars, then began, and a detailed implementation plan was presented to the AWO membership and Board of Directors at the association's April 1995 Annual Meeting. The Board also recognized the importance of monitoring the implementation process closely to ensure continued progress toward universal member adoption of the program and to identify any difficulties requiring modification, either of the document itself or of the implementation program. To that end, the Board received regular reports on the implementation process at each of its meetings between 1995 and 1998.

*Responsible Carrier Program Third-Party Audit*

In December 1995, AWO's Board of Directors established the Responsible Carrier Program Audit Task Force. The mission of this member task force was to consider the need for and value of an external audit program for the Responsible Carrier Program. In October 1996, the Board approved the recommendation of the Audit Task Force that an audit program be established for the Responsible Carrier Program. The Board concluded that not only would an external audit advance the objectives of marine safety and environmental protection, but that it would significantly increase the external credibility of the Responsible Carrier Program and facilitate the attainment of other important benefits, such as charterer acceptance, recognition from federal and state regulators, and lower insurance premiums. It was clear to the task force and to the Board of Directors that, increasingly, some form of audit would be required by regulators, shippers, and insurers as a condition of conferring many of the tangible benefits of the RCP on individual members. Given these conclusions, the Board established a Technical Subcommittee to develop the details of a future Responsible Carrier Program audit.

## II.    Management/Administration

Each towing company should develop and document written policies and procedures covering, at a minimum, those items outlined below.  Companies should abide by these policies in conducting their operations and should ensure that their employees are aware of and trained in those policies and procedures which affect their job responsibilities.  Companies should develop a mission statement expressing their commitment to abide by their established policies and procedures and to ensure employee awareness and knowledge thereof.

All AWO carrier members, as a baseline, should be in compliance with all applicable federal laws and regulations concerning marine safety and environmental protection.  (Effective July 1, 2002)  All company policies and procedures should be consistent with applicable law and regulation and with the guidelines provided in the Equipment/Inspection and Human Factors sections of the AWO Responsible Carrier Program.  Items marked with an asterisk (*) denote recommended practices only.  Parenthetical items preceded by "e.g.," (or "for example") may not be applicable in all situations and are intended to serve only as examples of the types of items which company policies and procedures may address.

A.    Vessel Operating Policies/Procedures

  1.    Company-specific vessel operating procedures (will depend on trade)

  2.    Vessel-specific operating procedures (will depend on vessel size, cargo, trade, etc.)

    a)    procedures for making horsepower/tow size decisions

  3.    Procedures to ensure proper and valid documentation carried aboard vessels; list of documentation to be carried (46 CFR 67.161(a))

  4.    Fuel transfer procedures

  5.    Vessel maintenance procedures, including:

    a)    persons responsible for maintenance
    b)    maintenance schedules
    c)    qualifications and training requirements for persons responsible for maintenance
    d)    procedures to correct deficiencies identified during maintenance
    e)    maintenance record retention program

  6.    Vessel inspection procedures, including:

    a)    persons responsible for conducting in-house inspections
    b)    frequency of inspections

C.     Environmental Policy/Procedures

     1.     Company environmental policy

     2.     Garbage disposal requirements/procedures/documentation

     3.     Handling of waste oil, oily bilge slops, and used filters

     4.     Hazardous waste disposal/handling

     5.     Sanitary systems/handling of sewage

D.     Incident Reporting Procedures

     1.     Personal injury

     2.     Oil or hazardous substance spill

     3.     Vessel accident

     4.     Bridge, lock, or dock allision

     5.     Grounding

E.     Emergency Response Procedures

     1.     Personal injury response

     2.     Spill response plan/contingency plan

     3.     Vessel accident response

     4.     Onboard emergency response training/drill procedures

         a)     subject matter
         b)     frequency
         c)     documentation

F.     Internal Audit/Review Procedures

     1.     Procedures to ensure compliance with applicable federal laws and regulations concerning marine safety and environmental protection (Effective July 1, 2002)

     2.     Personal injury investigation

     3.     Spill investigation

### III.    Equipment/Inspection (Inland)

Note: Items marked with an asterisk (*) denote recommended items or practices only.

A.    Hull

Documentation of each inspection item listed below should be maintained for reporting or examination by appropriate company or third-party personnel. (Note: Annual inspection requirements are not intended to preclude routine walk-through inspections conducted by vessel personnel. Such inspections are an important component of sound vessel maintenance and should be encouraged.)

1.    Drydock period (routine hull inspection)

    *a)*    Recommended as needed; maximum 36 months

2.    Watertight closures (doors, hatches, airports, windows, etc.)

    *a)*    If vessel has watertight closures, they should be inspected annually, with particular attention to main or freeboard deck closures

3.    Other openings (ventilators, air pipes, tank vents, etc.)

    *a)*    Inspection annually for water or weather tightness and structural integrity

4.    Rails, ladders, bulwarks, lighting, walking surfaces, chain guards, and handrails

    *a)*    Inspection annually for wastage, weakness, and personnel safety considerations
    *b)*    Safety chains along outboard sides of main deck

5.    Emergency walkways and hatchways

    *a)*    Inspection annually

6.    Piping systems and tanks

    *a)*    Piping diagrams should be kept aboard the vessel and piping systems identified by color-coding, numbering, lettering, etc.
    *b)*    Inspection annually

In addition:

(7)    Vessel should have general alarm audible in all compartments. (46 CFR 27.205)

(8)    General alarm shall be tested weekly. Other alarms should be tested quarterly.

*(9)    For unmanned or periodically manned engine room, alarms should have display board in both engine room and wheelhouse.

*b)*    Gauges

Vessel should have the following gauges <u>or</u> have individuals assigned responsibility to monitor and document the following in accordance with company policy:

(1)    Main engine water temperature

(2)    Main engine lube oil pressure

(3)    Generator water temperature

(4)    Generator lube oil pressure

(5)    Main engine tachometer

*(6)    Gear oil pressure

*(7)    Hydraulic steering fluid level (sight glass)

C.    Firefighting/Lifesaving Equipment

A check-off report should be turned in or a log entry made at least quarterly verifying that the following required firefighting and lifesaving equipment is present and in proper working order:

1.    Coast Guard-approved life preservers (46 CFR 25.25-5)

2.    Coast Guard-approved ring buoy (46 CFR 25.25-5(d))

3.    Coast Guard-approved work vests (46 CFR 26.30-5) (46 CFR 26.30-10)

4.    Coast Guard-approved hand-portable fire extinguishers and semi-portable fire extinguishing systems (46 CFR 25.30)

Other equipment/items carried (and addressed in check-off report or log entry) should include the following:

5.    Fire hydrants with hose and nozzle

6.    Flare kits (if applicable)

7.    Fire axe

9.    Swing meter or magnetic compass, depending on area of operations
      (33 CFR 164.72(a)(4))

10.   2 radars (if only one radar is carried, need documented procedures to address
      radar failure) (one radar 33 CFR 164.72(a)(1))

11.   Navigation charts/maps (33 CFR 164.72(b)(1))

12.   Tide and Current Tables (where applicable) (33 CFR 164.72(b)(3))

13.   Coast Pilot (where applicable) (33 CFR 164.72(b)(3))

14.   Notice to Mariners (33 CFR 164.72(b)(3))

15.   Search light (33 CFR 164.72(a)(2))

16.   Defroster/de-icer (where applicable)

17.   VTS Manual (where applicable)

18.   Backup marine radio or telephone communications (33 CFR 164.72(a)(3))

19.   Loran or satellite navigation receiver (where applicable) (33 CFR 164.01,
      33 CFR 164.41)

*20.  Handheld VHF radio

*21.  Public address system/internal communication system

*22.  Windshield wiper (when visibility will be improved by its use)

E.   Boat and Barge Rigging

Each company operating inland towing vessels should:

1.    Establish documented procedures for safe use of wires, ropes, chains, shackles,
      ratchets, and winches.

2.    Identify minimum rigging requirements for each vessel according to service.

3.    Formulate an inspection and replacement program for rigging.

4.    Establish minimum (original/time of purchase) specifications for each element of
      rigging.

**IV.    Equipment/Inspection (Coastal)**

Note:  Items marked with an asterisk (*) denote recommended items or practices only.

A.    Hull

Documentation of each inspection item listed below should be maintained for reporting or examination by appropriate company or third-party personnel.  (Note: Annual inspection requirements are not intended to preclude routine walk-through inspections conducted by vessel personnel.  Such inspections are an important component of sound vessel maintenance and should be encouraged.)

1.    Drydock period (routine hull inspection)

   *a)*    Recommended twice every five years; maximum 36 months
   *b)*    Vessels operating exclusively in coastal harbor services (i.e., not beyond the boundary line); recommended as needed; minimum once every 5 years with a mid-term underwater inspection between the 24th and 36th months.

2.    Hull gaugings and ballast tank inspections

   *a)*    Maximum 36 months for ballast tanks and voids. Maximum 5 years for hull gaugings

3.    Watertight closures (doors, hatches, airports, windows, etc.)

   *a)*    If vessel has watertight closures, they should be inspected annually, with particular attention to main or freeboard deck closures

4.    Other openings (ventilators, air pipes, tank vents, etc.)

   *a)*    Inspection annually for water or weather tightness and structural integrity

5.    Rails, ladders, bulwarks, lighting, walking surfaces, chain guards, and handrails

   *a)*    Inspection annually for wastage, weakness, and personnel safety considerations

6.    Emergency walkways and hatchways

   *a)*    Inspection annually

*(4)    Generator water temperature
*(5)    Generator lube oil pressure
*(6)    Hydraulic steering fluid level

In addition:

(7)    Vessel should have general alarm audible in all compartments.
       (46 CFR 27.205)
(8)    General alarm shall be tested weekly.  Other alarms should be
       tested quarterly.
*(9)   For unmanned or periodically manned engine room, alarms should
       have display board in both engine room and wheelhouse.

*b)*    Gauges

Vessel should have the following gauges <u>or</u> have individuals assigned
responsibility to monitor and document the following in accordance with
company policy:

(1)    Main engine water temperature
(2)    Main engine lube oil pressure
(3)    Generator water temperature
(4)    Generator lube oil pressure
(5)    Main engine tachometer
*(6)   Gear oil pressure
*(7)   Hydraulic steering fluid level (sight glass)

C.    Firefighting/Lifesaving Equipment

A check-off report should be turned in or a log entry made at least quarterly verifying that
the following required firefighting and lifesaving equipment is present and in proper
working order:

1.    Coast Guard-approved life preservers (46 CFR 25.25-5)

2.    Coast Guard-approved ring buoy (46 CFR 25.25-5(d))

3.    Coast Guard-approved work vests (46 CFR 26.30-5) (46 CFR 26.30-10)

4.    Coast Guard-approved hand-portable fire extinguishers and semi-portable fire
      extinguishing systems (46 CFR 25.30)

Other equipment/items carried (and addressed in check-off report or log entry) should
include the following:

5.    Inflatable life raft

5.    Navigation lights (33 USC 2023(a))

6.    Whistle and bell (33 CFR 86.05) (COLREGS Rule 33)

7.    Sound signal device (33 USC 2033(b)) (COLREGS Rule 33)

8.    Emergency position indicating radio beacon (EPIRB) (46 CFR 25.26)

Other equipment/items carried (and addressed in check-off report or log entry) should include the following:

9.    Additional VHF radio capable of connection to battery backup

10.    Magnetic compass and backup means of determining course and direction (*gyrocompass for oceangoing tugs) (33 CFR 164.72(a)(4))

11.    2 radars (if only one radar is carried, need documented procedures to address radar failure) (one radar 33 CFR 164.72(a)(1))

12.    Fathometer

13.    Loran or GPS (33 CFR 164.72(a)(6))

14.    Navigation charts (33 CFR 164.72(b)(1))

15.    Tide and Current Tables (33 CFR 164.72(b)(3))

16.    Coast Pilot (33 CFR 164.72(b)(3))

17.    Light List

18.    Notice to Mariners (33 CFR 164.72(b)(3))

19.    Search light (33 CFR 164.72(a)(2))

20.    Rudder angle indicator

21.    Defroster/de-icer (where applicable)

22.    VTS Manual (where applicable)

23.    Backup marine radio or telephone communications (33 CFR 164.72(a)(3))

*24.    Handheld VHF radio

*25.    Autopilot

*b)* Specifications

(1) Tow wires should have independent wire rope cores (IWRC).
(2) Tow wires should be of improved plow steel or extra improved plow steel.
(3) Tow wires should be heavy lubricated or galvanized at the time of manufacture.
(4) Tow wires should be 6 x 19 or larger (more flexible).
(5) Soft lines used in ocean towing should be rated at 2.5 times the certified or calculated bollard pull of the tug.
(6) The breaking strength of the wire rope or towing hawser should be certified by the manufacturer by pull-testing to destruction a portion of wire from the mill run from which it originated.

*c)* Terminations

The towing end of the tow wire should terminate in a spelter or thermo-set resin poured socket, or a spliced eye with thimble, and should be sized to exceed the breaking strength of the tow wire.

2. Bridles and surge gear (if used)

*a)* Bridles for ocean towing

(1) Connections to the barge should be by a two-legged bridle.
(2) The breaking strength of each leg should be at least 1.3 times that of the minimum required breaking strength of the main towing hawser.
(3) Bridles should be Grade 2 or higher welded or forged integral stud link chain or IWRC wire rope.

*b)* Surge gear (if used)

(1) Surge chains should be Grade 2 or higher welded or forged integral stud link chain.
(2) Surge chains should be of the same grade and type and at least as large as that in the towing bridle.
(3) Each end of the chain may have an end link or one studless link.
(4) A synthetic shockline may be used as surge gear if rated at 1.3 times the breaking strength specified for the primary tow wire or towing hawser [see item 1.a)(1) above].

F.    Environmental Controls

The following requirements are prescribed by regulation:

1.    Fuel oil and bulk lubricating oil containment (33 CFR 155.320)

2.    Bilge slop containment (33 CFR 155.330)

3.    Oily water separator equipment (33 CFR 155.380)

4.    Placard prohibiting discharge of oil (33 CFR 155.450)

5.    MARPOL placard (33 CFR 151.59)

6.    Certified marine sanitation device (33 CFR 159.7)

7.    Fuel oil transfer procedures (33 CFR 155.720)

In addition, each towing vessel should have the following:

8.    Oil spill contingency plan outlining procedures to be followed in the event of a fuel spill from the towing vessel

9.    Containment around fueling stations

10.    Spill kit

*11.    Closable scuppers or other containment method

IV-9                                                4/02

V.     **Human Factors**

A.     Manning

1.     All towing companies should man their vessels for safe operation, taking into account the following criteria:

  *a)* applicable law and regulation
  *b)* number, size, and type of barges to be towed
  *c)* towing route
  *d)* safety of personnel, equipment, environment
  *e)* service in which tow is engaged
  *f)* functional duties required of crew in addition to standard navigation
  *g)* configuration of vessel superstructure and deck and engine room
  *h)* extent of automation
  *i)* size and power of equipment used
  *j)* environmental/climatic conditions (e.g., icing)
  *k)* experience of crew

2.     Except in an emergency, at least one qualified wheelhouse person and one additional crewmember should be on duty at all times while the vessel is underway.

B.     Watchstanding/Work Hours

(Note: Current law [46 USC 8104(h)] provides that "an individual licensed to operate a towing vessel may not work for more than 12 hours in a consecutive 24-hour period except in an emergency." Therefore, unless and until this statute is amended, towing vessel operators remain subject to a 12-hour work limit.)

All other crewmembers on a towing vessel should be permitted to work no more than 15 hours in any 24-hour period or more than 42 hours in a 72-hour period, except in an emergency or drill.

C.     Training

Towing vessel crewmembers should receive initial training and periodic refresher training in the following subjects. Refresher training should be conducted in accordance with company policy, but no less frequently than once every five years.

Unless required as a condition of licensure or otherwise prescribed by regulation, training courses need not be Coast Guard-approved.

3.    Tankerman

    *a)*    Tank barge safety training
        (1)    loading and discharging operations
        (2)    safety practices
        (3)    environmental protection and loading procedures
        (4)    federal regulation review and training
        (5)    first responder/spill mitigation/emergency response orientation (may include HAZWOPER training)
        (6)    vapor recovery operations
    *b)*    Company policy and procedure orientation, including review of federal requirements and company policies
    *c)*    Marine firefighting/fire prevention
    *d)*    Personal safety, including:
        (1)    first aid and CPR awareness
        (2)    confined space hazard awareness
        (3)    injury prevention, including back training
        (4)    cargo-specific training
    *e)*    Vessel communications system and procedures

4.    Deck crew

(Note: Experienced deckhands new to a particular company should receive, or have received, the training identified below.)

    *a)*    Deck operations and safety training
    *b)*    Company policy and procedure orientation, including review of federal requirements and company policies
    *c)*    Vessel firefighting/fire prevention
    *d)*    Personal safety, including:
        (1)    first aid and CPR awareness
        (2)    confined space hazard awareness
        (3)    injury prevention, including back training
        (4)    lock-out/tag-out procedures
    *e)*    For tank barge tows:
        (1)    First responder/spill mitigation training

## VI.    Introduction to Addenda

The following addenda section has been created to assist member companies, auditors and others by providing a comprehensive resource that contains relevant information on the significant policies, procedures and clarifications that govern the Responsible Carrier Program (RCP), Responsible Carrier Program Accreditation Board and the Responsible Carrier Program third-party audit.

The addenda are organized into five parts:

    A.  Dispute Resolution Policy
    B.  Audit Recertification Protocol
    C.  Audit Issues
    D.  Auditor Issues
    E.  Accreditation Board Issues

**Addendum A. Dispute Resolution Policy**

A. The AWO member or AWO-certified auditor requesting a dispute resolution shall notify the AWO Vice President – Safety, in writing, of the details of the dispute as soon as it becomes clear that agreement between the parties cannot be reached.

    1. Upon receipt of a dispute resolution request, the AWO Vice President – Safety will contact all parties involved and ensure that each submits a written description of the facts and understands the dispute resolution process, including their right to communicate directly to the Accreditation Board in writing or in person at its next meeting.

    2. Upon receipt of all relevant paperwork, the Safety Coordinator will forward copies to all members of the Accreditation Board.

B. The Accreditation Board will meet by conference call or in person to discuss the issue(s) in dispute, interview the parties involved and make a decision based on its best judgment.

C. The AWO Vice President – Safety will contact the parties involved in the dispute, notifying them of the Accreditation Board's decision and advising them that they may appeal the Board's decision to the AWO Executive Committee.

D. Any party wishing to appeal a decision of the AWO Responsible Carrier Program Accreditation Board must notify the AWO Vice President – Safety of its request to appeal within 15 days of receiving notification of the Accreditation Board's ruling.

    1. The Vice President – Safety will provide the Executive Committee with all background materials relating to the request for dispute resolution and the Accreditation Board's decision in the matter in the Executive Committee packet prior to its next meeting.

    2. At its first meeting following receipt of an appeal, the AWO Executive Committee will discuss the dispute and prepare a recommendation to the AWO Board of Directors for final disposition.

    3. The Vice President – Safety will notify all parties involved of the Executive Committee's recommendation to the Board of Directors.

    4. The party originally submitting the request for a dispute resolution may accept the Executive Committee's recommendation or proceed to the Board of Directors for a final decision.

E. Any party wishing to proceed to the AWO Board of Directors for a final decision will notify the Vice President – Safety within seven (7) days of its notification of the Executive Committee's recommendation of its decision to proceed with the appeal.

**Addendum B. Audit Recertification Protocol**

1. Responsible Carrier Program (RCP) recertification audits are due three years from the date of completion of the last audit. AWO will notify member companies 180 days prior to the due date for their recertification audit.

2. Upon completion of the recertification audit, members must send AWO a letter and a copy of the letter from their AWO-certified RCP auditor notifying AWO of the successful completion of their audit. Companies having nonconformities that prevent completion of the audit may be granted up to three months to complete their audits. Upon receipt of notification of recertification audit completion, AWO will issue a new audit certificate valid for three years.

3. Member companies that fail to complete the recertification audit due to their inability to present sufficient evidence of ongoing compliance with the documentary requirements of the program, may in lieu of having their membership terminated, immediately apply in writing to the Responsible Carrier Program Accreditation Board for probationary status.

   A. Probationary status is a designation that is internal to AWO. If probationary status is granted (see requirements of and procedures for requesting this status below), a valid RCP certificate will be issued to the company by AWO. A company in "probationary status" will receive all rights and privileges accorded to AWO member companies in full RCP-compliant status, such as publishing the company name on a list of valid third-party audited RCP-compliant companies.

   B. Probationary status may be granted to member companies that provide the following:

      i. A letter from their AWO-certified RCP auditor certifying that they have all policies and procedures required by the Responsible Carrier Program in place; and,
      ii. A letter from the President or Chief Executive Officer of the member company stating that his or her company will undergo an annual recertification audit of its Responsible Carrier Program in the area(s) found to be deficient. An AWO-certified third-party auditor would conduct recertification audits annually for a period of two years, due on the anniversary date of the member's last audit, to ensure ongoing compliance with the documentary requirements of the Program.
      iii. Upon completion of each annual audit, the President or Chief Executive Officer will forward a copy of a letter from the company's auditor to the AWO Vice President – Safety stating that the company is in compliance with the Responsible Carrier Program.

   C. Probationary status will be withdrawn and the membership immediately terminated of any member company that fails to successfully complete its annual recertification audit within three months of the due date for such recertification audit.

4/02

**Addendum C. Audit Issues**

1.  The shoreside management audit should be conducted first and vessel audits should be conducted within 30 days of the management audit.

2.  If a company does not operate any towing vessels (but only barges), it must complete all applicable sections of the management section of the Responsible Carrier Program.

3.  If a company's equipment is bareboat chartered to another company, there is no requirement for the owning company to comply with any of the provisions of the Responsible Carrier Program for the bareboat chartered equipment.

4.  If a company does not own or operate any equipment, but recognizes the Responsible Carrier Program in its vetting program, that company itself is not a Responsible Carrier. The Responsible Carrier Program is a set of policies and procedures for companies that own and/or operate marine equipment.

5.  Ten (10) percent of a company's fleet is subject to a vessel audit. For a fleet of 10 boats or less, one boat would be audited; for a fleet of 11-20 boats, two boats would be audited, etc., up to a maximum of 10 boats. This approach is not meant to preclude an auditor from going aboard other available company vessels to spot-check specific equipment items or systems.

6.  In order to ensure that vessel audits capture a representative sample of a company's fleet but are performed in a cost-effective manner with minimal disruption to the company's operations, vessel availability, area of operations and other scheduling considerations should be considered in determining which vessels are to be audited. The auditor should select the boat(s) to be audited, taking into account the above considerations and the need to ensure that the sample selected is representative of the company's fleet and scope of operations.

7.  Auditors must ascertain that all of a company's policies and procedures are supported by records that contain sufficient information to determine the means by which the company meets the requirements of the RCP. Auditors should also look for evidence that reflects a company's ongoing commitment to complying with the letter and the spirit of the RCP. The required documentary evidence that auditors will be looking for may include, but is not necessarily limited to, maintenance records, crew safety meeting records, vessel inspection checklists and personnel training records.

8.  The Responsible Carrier Program requires that all crewmembers be trained. Training programs do not have to be Coast Guard-approved, but must be formal and well documented.

9.  Masters, mates (pilots), engineers and tankerman are required to receive training in marine firefighting and fire prevention. Deck crews are required to be trained in vessel firefighting and fire prevention. Using these broad guidelines, it is up to the company to determine the content of the training. It should be noted that the difference between

15. The audited company "owns" the completed audit and both the company and the auditor should retain copies of the document. Copies of the audit are provided to third parties only by the audited company or by the auditor at the audited company's request. The auditor should be available to discuss the audit results with a company's customer(s) at the audited company's request.

16. A company is permitted to use an AWO-certified auditor to conduct an RCP audit in conjunction with another audit (e.g., ISM), effectively undergoing both audits at the same time and minimizing attendant financial costs and staff time.

4/02

**Addendum D. Auditor Issues**

1. An AWO member company employee who meets the specified qualifications is permitted to apply for certification to conduct RCP audits of other AWO member companies, such as company vendors or outside towers, as a cost-effective way to provide smaller companies with access to the benefits of a third-party audit. To ensure the credibility of the program, "reciprocal" audits are not permitted; that is, a qualified employee of Company A could not conduct an audit of Company B if an employee of Company B had audited Company A. In addition, a company employee is not permitted to audit his own company or a parent or subsidiary thereof.

2. A prospective auditor is permitted to apply for certification to conduct either management audits, towing vessel audits, or both. Prospective management auditors are required to meet the following criteria:

   1) Marine industry experience (not limited to the barge and towing industry);
   2) Shoreside management experience (not necessarily in the marine industry);
   3) Knowledge of risk management, quality processes, and/or auditing procedures; **and**,
   4) Recommendations from two different AWO members in a position to evaluate the prospective auditor's suitability for the job.

3. Prospective vessel auditors are required to obtain recommendations from two different AWO member companies. In addition, vessel auditors must have experience in the inland or coastal tugboat, towboat, and barge industry (as appropriate for the area in which the auditor plans to work), to include **at least one** of the following:

   1) Auditing, inspecting, or surveying experience (e.g., employment as a Coast Guard inspector, classification society surveyor, etc.);
   2) Sailing experience in a licensed capacity; **or**,
   3) Shoreside marine industry experience with direct responsibility for vessel maintenance and repair, operations, etc.

4. Unanimous agreement of the voting members of the Accreditation Board is required for approval of an auditor.

5. Certified auditors will be notified by AWO in writing when a Board-approved change to the Responsible Carrier Program is made, along with guidance as to how the change is to be addressed in future Responsible Carrier Program audits.

**Addendum E. Accreditation Board**

1. The Accreditation Board must include one AWO member representing each of the four industry sectors – Coastal, Inland Liquid, Inland Dry, and Harbor Services – and two shipper members, preferably one liquid and one dry cargo shipper. The AWO Vice President – Safety will serve as an *ex officio*, nonvoting member of the board.

2. Members will serve two-year terms.

3. The role of the Accreditation Board extends beyond the oversight and certification of Responsible Carrier Program auditors to include a role in clarifying or interpreting the audit guidelines and in considering and recommending changes to the audit program as appropriate.