STEPHEN H. MOSHER, MAY 26, 2004

```
 1           UNITED STATES DISTRICT COURT

 2            SOUTHERN DISTRICT OF TEXAS

 3              BROWNSVILLE DIVISION

 4

 5  IN RE THE COMPLAINT AND      ) CIVIL ACTION

 6  PETITION OF BROWN WATER      ) NO. B-01-157

 7  TOWING I, INC., AS OWNER,    )

 8  AND BROWN WATER MARINE       )

 9  SERVICE INC., AS BAREBOAT    ) c/w

10  CHARTERERS, OF THE BROWN     )

11  WATER V, ITS ENGINES, TACKLE,) CIVIL ACTION

12  ETC., IN A CAUSE OF          )NO. B-02-004

13  EXONERATION FROM OR          )

14  LIMITATION OF LIABILITY      ) Admiralty

15                               )

16  IN THE MATTER OF AMERICAN    )

17  COMMERCIAL LINES AS OWNER    )

18  AND AMERICAN COMMERCIAL BARGE)

19  LINE LLC AS CHARTERER OF THE )

20  BARGES NM-315, VLB-9182,     )

21  ACL-9993B, VLB-9173, PRAYING ) DEPOSITION OF

22  FOR EXONERATION FROM AND/OR  )STEPHEN H. MOSHER

23  LIMITATION OF LIABILITY      )    Taken on

24                               )  May 26, 2004
```

16

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087  800.708.8087  FAX: 312.704.4950



1          The videotaped deposition of STEPHEN H.

2   MOSHER, called for examination, taken pursuant to

3   the Federal Rules of Civil Procedure of the United

4   States District Courts pertaining to the taking of

5   depositions, taken before ELLEN DUSZA, CSR No.

6   84-3386, a Notary Public within and for the County

7   of Cook, State of Illinois, and a Certified

8   Shorthand Reporter of said state, at Suite 1000,

9   155 North Wacker Drive, Chicago, Illinois, on the

10  26th day of May, A.D. 2004, at 9:38 a.m.

11

12  PRESENT:

13       WATTS & HEARD,

14       (1926 East Elizabeth Street,

15       Brownsville, Texas  78520-4933,

16       956-544-0500), by:

17       MR. RAY R. MARCHAN,

18           appeared on behalf of Brigete Goza,

19           Gustavo Morales, Jacqueline

20           Paddock and Lydia Zamora;

21

22

23

24

```
 1  PRESENT:  (Continued)
 2       AJAMIE LLP,
 3       Pennzoil Place, South Tower,
 4       711 Louisiana, Suite 2150,
 5       Houston, Texas  77002,
 6       713-860-1600), by:
 7       MR. S. MARK STRAWN,
 8            appeared on behalf of the Estate
 9            of Julio Morales, et al.;
10       GAUNTT & KRUPPSTADT, LLP,
11       (1400 Woodloch Forest Drive, Suite 575,
12       The Woodlands, Texas  77380,
13       281-367-6555), by
14       MR. J. CHAD GAUNTT,
15            appeared on behalf of the Estate
16            of Stvan Rivas, et al.;
17       WILLIAMS BAILEY,
18       (8441 Gulf Freeway, Suite 600,
19       Houston, Texas  77017-5051,
20       713-230-2200), by:
21       MR. BYRON M. BUCHANAN,
22            appeared on behalf of
23            Hector Martinez, Sr.;
24
```

STEPHEN H. MOSHER, MAY 26, 2004

```
 1  PRESENT: (Continued)
 2       ROYSTON, RAYZOR, VICKERY & WILLIAMS,
 3       (1700 Wilson Plaza west,
 4       606 North Carancahua,
 5       Corpus Christi, Texas  78476,
 6       361-884-8808), by:
 7       MR. WILL W. PIERSON,
 8            appeared on behalf of Petitioners,
 9            Brown Water Marine Service, Inc.,
10            et al.;
11
12       JONES, WALKER, WAECHTER, POITEVENT,
13       CARRERE & DENEGRE,
14       (Bank One Center, 52nd Floor,
15       201 St. Charles Avenue,
16       New Orleans, Louisiana  70170,
17       504-582-8174), by:
18       MR. GLENN G. GOODIER,
19            appeared on behalf of American
20            Commercial Lines LLC and
21            American Commercial Barge Line LLC;
22
23
24
```

STEPHEN H. MOSHER, MAY 26, 2004

```
 1   PRESENT:  (Continued)

 2        ADAMS AND REESE LLP,

 3        4500 One Shell Square,

 4        New Orleans, Louisiana  70139,

 5        504-585-0215), by:

 6        MR. MARK J. SPANSEL,

 7             appeared on behalf of the

 8             State of Texas;

 9

10   ALSO PRESENT:

11        MR. TIMOTHY KELLY, Videographer,

12             Esquire Deposition Services.

13

14

15

16

17

18

19

20

21

22   REPORTED BY:  ELLEN DUSZA, CSR No. 84-3386.

23

24
```

STEPHEN H. MOSHER, MAY 26, 2004

1  either one of those.

2      Q.    Okay.  You're not sure of who he spoke

3  with?

4      A.    No, sir.  He may have just spoken to me

10:00:03  5  entirely.

6      Q.    Okay.  Did you have any knowledge of

7  what the horse rating -- horsepower rating of

8  vessels were for Brown Water V or any other vessel

9  that was audited?

10:00:19  10     A.    They were 800 horsepower tugs.

11     Q.    Okay.  How did you determine that?

12     A.    Basically I was told that.  It's pretty

13 much standard in the industry, 12V-71s are 800

14 horsepower tugs.

10:00:36  15     Q.    And when you say "12V-71," you mean 12

16 cylinder engines and -- dual engines?

17     A.    Correct.

18     Q.    Where did you glean that information

19 from while you worked for Brown Water?

10:00:54  20     A.    Just practice in the industry,

21 discussions with other people knowing that 12V-71s

22 always represent 800 horsepower tugs, if you have

23 two of them.

24     Q.    Okay.  Who was in charge of engine

1   maintenance for Brown Water up until the time of

2   the Queen Isabella Causeway allision?

3        A.    Well, that would be Scooter -- we call

4   him Scooter, Harvey Larson.  Harvey Larson and Tim

10:01:26   5   Chapman usually just always worked on -- he

6   actually did the work on the engines.  Tim bought,

7   you know, engine parts, and high dollar maintenance

8   issues Tim was always involved in that.

9        Q.    Okay.  We received some documents from

10:01:43  10   Brown Water, and I want you to assume with me that

11   during the various inspections of the vessel before

12   and after the allision with Queen Isabella

13   Causeway, it was represented that the engines on

14   the Brown Water V were, as you mentioned, 12V-71s

10:02:05  15   and that they used the N55 injectors.  Does that

16   sound right to you?

17        A.    Could be.  I don't know.

18        Q.    All right.  Now, I'm going to show you

19   what's marked as Exhibit 104.

20                    (WHEREUPON, a certain document

21                     was marked Deposition Exhibit No.

22                     104, for identification, as of

23                     5-26-04.)

24   BY MR. MARCHAN:

1      Q.    And it has a little number identifying

2  it down there I believe from the Defendants,

3  No. 1568.   This is a document called the Propeller

4  Selection Guide.

10:02:35   5            Do you recognize this logo up here, the

6  arrows going around in a circle?

7      A.    Detroit Diesel.

8      Q.    Right.   And the 12V-71s are recognized

9  as a Detroit Diesel or General Motors manufactured

10:02:50  10  engine?

11      A.    Correct.

12      Q.    All right.   Now, looking through here on

13  the very next page we see --

14      A.    Can you --

10:03:03  15      Q.    I'll zoom it in for you.

16            We see this category here that says

17  12V-71 and injector N70.   Do you see that?

18      A.    Yes, sir.

19      Q.    All right.   And then just the title of

10:03:17  20  this is DDA Auxiliary Engines Approved by Lloyd's

21  Register of Shipping Continued.

22            Do you see that?

23      A.    Yes, sir.

24      Q.    Okay.   And everybody in the maritime

1    industry knows who Lloyd's is?

2        A.    Right.

3        Q.    Lloyd's is the big maritime insurer out

4    of England?

10:03:37    5        A.    Correct.

6        Q.    All right.  And they have set out

7    certain standards, recognized standards regarding

8    all kinds of aspects of the maritime industry, is

9    that right?

10:03:46    10        A.    Well, they're with AB Shipping, and they

11    have a lot of input into shipping.  The Coast Guard

12    actually governs us.

13        Q.    Let me flip over to the further page.  I

14    think this is documented by the defendants as

10:04:04    15    No. 1574 and, again, the top of the page is DDA

16    Propulsion Engines Approved By American Bureau of

17    Shipping and Lloyd's Register of Shipping.

18            Do you see that?

19        A.    Yes.

10:04:13    20        Q.    But on this one here, it does have the

21    12V-71 with the N55 injector.  Do you see that?

22        A.    Correct.

23        Q.    In fact, we'll go back up and see that's

24    the engine and injector description.

1              Now, if we go along this line here, we

2     see that this listing by Lloyd's that's contained

3     in this Detroit Diesel document indicates under

4     this category BHP -- you know what that means,

10:05:01    5     don't you?

6          A.     Horsepower.

7          Q.     That, in fact, the horsepower is 360

8     horsepower.

9              Do you see that?

10:05:10    10         A.     Yes.

11         Q.     And that is different than what your

12    working knowledge was of the 12V-71s with the N55

13    injectors, is that correct?

14         MR. PIERSON:   I'll object to the question.

15    BY THE WITNESS:

16         A.     Well, there's a combination -- when you

17    look at an 800, and this is where the industry

18    practices -- you've got shafts, you've got the

19    wheel sizes and you've got the gear sizes in

10:05:32    20    conjunction with that.

21         Q.     Sure.

22         A.     The N55 injector is just a -- lets less

23    diesel into the engine.  You still have to be

24    turning I think 1800 rpms to hit 360 horsepower.

1   There's a lot of things that are in place.  So it

2   doesn't -- that's not an absolute definition there

3   unless you have everything ideally in place.

4       Q.    Okay.

10:05:55    5       A.    You could be higher, you could be lower.

6       Q.    But at least if this document came

7   from Brown Water that they had in their possession,

8   the document within Brown Water indicated that at

9   least according to Lloyd's this type of engine with

10:06:06    10  those types of injectors would generate 360

11  horsepower rather than your working knowledge of

12  400?

13      A.    I think that's American Bureau of

14  Shipping at the top, not Lloyd's.

10:06:19    15      Q.    I'm sorry.  Let me see here.  American

16  Bureau -- you're correct.  American Bureau and

17  Lloyd's.

18      A.    Okay.  A combination of both.

19      Q.    Now -- and, in fact, you know, you're

10:06:31    20  correct, it -- it has an American Bureau of

21  Shipping, but down here further -- let's see if I

22  can find -- right here, it's Lloyd's Register of

23  Shipping, also, and right here it has the 12V-71N

24  and again with the N55 injectors and again 360

1    horsepower.

2         A.    Correct.

3         Q.    All right.  So it's both the Lloyd's

4    Register and the American Bureau of Shipping?

10:07:07    5         A.    Correct.

6         Q.    Now, you had made mention of potentially

7    some other factors such as propeller size and

8    gears.  Do you remember that?

9         A.    Right.

10:07:24   10         Q.    All right.  And this is identified as

11    1578 of exhibit -- 1578 of Exhibit No. 104.

12              And we see in this large print 12V-71N

13    work boat with N55 injectors, correct?

14         A.    Yes.

10:07:58   15         Q.    And then it has the twin disk MG-514

16    marine gear, which is the transmission?

17         A.    Correct.

18         Q.    All right.  Now -- and then it discusses

19    the use of a three- or four-blade propeller,

10:08:10   20    depending on the gear ratios, what size should be

21    used, and in this case, it's not terribly

22    important, but we know that the gear ratio on this

23    was a six to one.  Do you remember that about the

24    Brown Water V?

1          A.    Correct.

2          Q.    All right.  But what I really wanted to

3    concentrate on is this little working chart, and in

4    particular, the top half up here, I'll zoom in a

10:08:38   5    little bit more.  And you see this line up here

6    that's titled Rated Shaft Horsepower.

7                Do you see that?

8          A.    Yes.

9          Q.    And do you see right next to it that,

10:09:03  10    again, it's talking about 340 shaft horsepower?

11          A.    Correct.

12          Q.    All right.  Now, at least if this

13    document was contained in Brown Water's, I guess,

14    files, since they turned it over to us, this is

10:09:24  15    another document that provided information that, in

16    fact, a 12V-71 engine with the N55 injectors with

17    the marine gear 514 would produce at -- we have it

18    down here, 1800 rpm, 340 shaft horsepower?

19          A.    Correct.

10:09:59  20          Q.    All right.  And that was, again,

21    different than your working knowledge of the amount

22    of horsepower that was on the Brown Water V,

23    correct?

24          A.    That's what that represents.

1    Q.    All right.  And who better than Detroit

2  Diesel to know about their engines?

3    A.    Yeah, and I don't know if we had 514

4  gears or if it was another gear, but four-bladded

10:10:13  5  wheels, three-bladed wheels, I mean I wasn't in

6  charge of all that.

7    Q.    I understand.  Let me get another

8  exhibit here.  Maybe we can address that.

9                        (WHEREUPON, a certain document

10                         was marked Deposition Exhibit No.

11                         105, for identification, as of

12                         5-26-04.)

13  BY MR. MARCHAN:

14    Q.    We received this series of documents

10:10:40  15  from Brown Water numbered 709 through 721.  I'm

16  going to hand this first to you so you can take a

17  look at it.  We've marked it as Exhibit 105 for

18  your deposition.

19    A.    Okay.

10:10:48  20    Q.    Kind of flip through that.  If you need

21  a little bit of time, we'll be glad to go off the

22  record, but it appears to be some handwritten

23  mechanic's notes about work on the engines.

24            Does that look familiar to you?

1     A.    These may have been notes from Russ --

2  yeah, it looks like Russ' writing.

3     Q.    Russ being who?

4     A.    Russ Sigmund.

10:11:42  5     Yeah, these are just maintenance

6  information that Russ always maintained on the

7  vessels and Scooter did it also with history on

8  maintenance on the vessel.

9     Q.    Now, again, we're talking about Exhibit

10:11:58  10  105, and going up hear you can see that -- although

11  it's cut off a little bit, that it pertains to the

12  Brown Water V.  Do you see that?

13     A.    Yes, sir.

14     Q.    All right.  And it has some basic

10:12:18  15  data on it, but right here in this category of

16  engines 12V-71N, N55 injectors, do you see where

17  that's confirming the information that we have in

18  that Detroit Diesel book that, in fact, your

19  engines were 12V-71 and they did have N55

10:12:46  20  injectors?

21     A.    That sheet does.  I don't know if that

22  sheet represents the vessel when it had the

23  allision with the bridge.  I mean there's a

24  whole lot of history in that and all that

1  information.

2          Q.      Okay.  And that other subject that we

3  talked about before is at least at the time of this

4  document being written by -- who is it Russell --

10:13:10    5          A.      It was Russ Sigmund and Scooter Larson.

6          Q.      Okay.  They had reduction gears, the

7  mains, the 514s, remember we had talked about that

8  transmission number?

9          A.      Yes, sir.

10:13:21   10          Q.      And that it was a twin disk, six to one

11  ratio.

12          A.      Correct.

13          Q.      So at least contained in Brown Water's

14  notes, in Russ' or the other mechanic's

10:13:30   15  handwriting, there was documentation as to what the

16  engines were, the type of injection -- injectors,

17  the reduction gears, the 514 and the six to one

18  ratio?

19          A.      Yes, sir.

10:14:23   20          Q.      All right.  After the allision with the

21  causeway, the Brown Water V was inspected -- we

22  were given an opportunity to inspect the vessel.

23  Do you remember that?

24          A.      Yes, sir.

STEPHEN H. MOSHER, MAY 26, 2004

1     A.    It's more of a -- it's a deflecting

2  device.

3     Q.    So your prop didn't hit something?

4     A.    Right.

10:35:10    5     Q.    Okay.  And it was his impression that

6  the skag or the protection device for the propeller

7  had touched the bay bottom, the Laguna Madre bay

8  bottom?

9     A.    Correct.

10:35:20    10     Q.    And that in essence, I guess, caused it

11  to stick or slow down because of that contact with

12  the bottom?

13     A.    Correct.

14     Q.    And because of that contact, it allowed

10:35:33    15  the current to take control of the tow?

16     A.    Correct.

17     Q.    All right.  But he still had engine

18  power?

19     A.    Yes.

10:35:44    20     Q.    All right.  Now, you've come to learn

21  that on that evening the water was approximately

22  two feet higher or I guess deeper than what's

23  normal for the area.

24     A.    Yes, sir.

1  through the swing bridge if you want to do that.

2       Q.    Okay.   Just being familiar with the

3  area -- I mean he had some familiarity with that --

4  the traverse in that area as a captain, didn't he?

10:51:08  5       A.    Yes, sir, he had been there numerous

6  times.

7       Q.    Okay.   In fact, I think you composed a

8  document for the Coast Guard at their request

9  listing the number of times that he was actually

10:51:14  10  operating a tug through that area?

11       A.    I believe that's true.

12       Q.    Okay.   And you know as well as I do that

13  available to him were the Coast Guard and Weather

14  Bureau reports that, in fact, there was an offshore

10:51:29  15  depression in the Gulf at that time?

16       A.    Yes, sir.

17       Q.    Okay.   I showed you during the break

18  briefly a document that I was going to refer to

19  next.   I've marked it as Exhibit 108.

20                       (WHEREUPON, a certain document

21                        was marked Deposition Exhibit No.

22                        108, for identification, as of

23                        5-26-04.)

24  BY MR. MARCHAN:

1  bottom showing the passage into the bridge.

2      Q.    The red ones?

3      A.    Weren't on either.

4      Q.    None at all or some were?

11:14:51  5      A.    I believe none were.

6      Q.    Okay.  That's your working knowledge?

7      A.    That's what I was told.

8      Q.    Okay.  But Captain Fowler did not

9  complain to you that he did not have available to

11:15:06  10  him radar, did he, that evening?

11      A.    Right.

12      Q.    And you know as well as I do that

13  regardless of those green lights being on or off or

14  the red lights on the fenders through the entrance

11:15:25  15  of the causeway for the intercoastal waterway, that

16  a radar will paint the causeway and the fender

17  system underneath the causeway regardless of the

18  lights?

19      A.    It has the capability to do that.

11:15:33  20      Q.    Sure.  Did he indicate to you that he

21  was using that navigation tool to its capabilities

22  that evening to help guide him through the center

23  of the causeway?

24      A.    David felt comfortable with the approach

1  to the bridge based on radar and his spotlights.

2         Q.    Okay.  And in all fairness, he didn't

3  lose control of the tow and -- the barge and the

4  tow or I guess the push because he couldn't see the

11:16:01  5  lights because he had available to him the radar,

6  what happened was is that he lost control because

7  of him tagging bottom with the skag of the

8  propeller?

9         A.    Correct.

11:16:11  10        Q.    All right.  So even if the lights

11  weren't on, if he had the radar working, he would

12  have been able to see where the entrance to the

13  causeway was, but that wasn't available to him

14  because he didn't have control of the tow?

11:16:23  15        A.    Correct.  Correct.

16        Q.    All right.  Let's talk about -- this may

17  have been covered by some of your testimony to the

18  Coast Guard -- about Captain Fowler's hiring.

19              It came to your knowledge that Captain

11:17:15  20  Fowler had had other groundings in the past before

21  this allision with the causeway, correct?

22        MR. PIERSON:  I'll object to the form.

23  BY THE WITNESS:

24        A.    After the accident?

STEPHEN H. MOSHER, MAY 26, 2004

```
 1   BY MR. MARCHAN:

 2        Q.     Yes.

 3        A.     Yes, sir.

 4        Q.     And it came to your knowledge after the

11:17:27  5   allision with the Queen Isabella Causeway that, in

 6   fact, he had had another one or two allisions,

 7   hadn't he?

 8        A.     I believe so.

 9        Q.     Okay.  But you indicated that for Brown

11:17:42  10  Water, him still having a current active license

11   from the Coast Guard meant that he was sufficiently

12   trained and qualified to run the Brown Water tugs

13   regardless of that information that you didn't have

14   at the time of his hiring?

11:17:55  15       A.     Correct.

16                        (WHEREUPON, a certain document

17                         was marked Deposition Exhibit No.

18                         109, for identification, as of

19                         5-26-04.)

11:18:53  20  BY MR. MARCHAN:

21        Q.     All right.  I'm going to put on the

22   screen here what I'm marking as Exhibit 109, which

23   purports to be a Coast Guard generated document.

24   We have No. 109, I've marked it, and if we look at
```

**STEPHEN H. MOSHER, MAY 26, 2004**

1     Q.     How much time did you have dabbling in

2  operations at Lloyd Thompson -- Richardson before

3  it went out of business?

4     A.     Actually, I was in Lloyd Richardson for

13:24:09   5  five years, and the last two years I was there it

6  was pretty much starting to get involved in the

7  operations.  That was just overseeing the -- a lot

8  of the managers that were doing what they were

9  doing, like the port captain getting involved with

13:24:22   10  them.  And then there was also a lot of regulations

11  started to come out by the Coast Guard, and I was

12  doing a lot of adhering to those regulations.

13     Q.     None of your formal education was in

14  maritime matters, was it?

13:24:38   15     A.     Correct, none of it.

16     Q.     And you've never held any Coast Guard

17  licenses, have you?

18     A.     No, sir.

19     Q.     How many Brown Water companies are there

13:24:56   20  or were there as of the time you left?

21     A.     I don't know.  There's Brown Water I,

22  Brown Water Marine Service, Brown Water

23  properties -- I guess about six or maybe seven.

24     Q.     Which company owned the Brown Water V?

STEPHEN H. MOSHER, MAY 26, 2004

1      A.     Brown Water I Towing.

2      Q.     Did it own --

3      MR. PIERSON:   Brown Water Towing, Inc. or is

4 it Brown Water I Towing?

13:25:34   5      THE WITNESS:   Brown Water I Towing, Inc.   I

6 believe so.

7      MR. PIERSON:   Sorry.

8 BY MR. SPANSEL:

9      Q.     Did Brown Water I Towing own any other

13:25:53  10 vessels beside the V?

11      A.     The vessel called the Brown Water I.

12      Q.     So it owned two vessels?

13      A.     Correct.

14      Q.     Besides owning these two vessels, did

13:26:02  15 Brown Water I Towing have any other functions?

16      A.     Not really, no.   I don't know if they

17 may have had some on paper, but this existed for

18 the two vessels.

19      Q.     What company crewed the Brown Water V?

13:26:23  20      A.     Brown Water Marine Service.

21      Q.     Did it crew any other vessels?

22      A.     It crewed all the vessels that all the

23 Brown Water companies owned.

24      Q.     Were you employed by more than one Brown

1  Water entity?

2      A.    I was appointed as president or vice

3  president or secretary/treasurer of all the little

4  companies.  I was president of a couple of them.

13:27:04  5  Brown Water Towing I was one of the companies I was

6  president of.  Brown Water Marine Service -- I was

7  the one that was employed by Brown Water Marine

8  Service.

9      Q.    So you were vice president of operations

13:27:17  10  for Brown Water Marine Service?

11      A.    Correct.

12      Q.    But you were either president or vice

13  president of all of them?

14      A.    Or secretary/treasurer of all the other

13:27:22  15  ones, with the exception of Brown Water Properties.

16      Q.    And what did Brown Water Properties do?

17      A.    Brown Water Properties was the holding

18  company of all the corporations.  It owned all the

19  stock of all the corporations.

13:27:41  20      Q.    We've talked a little bit about the

21  ownership of Brown Water and we've talked about the

22  Chapmans.  Hugh -- Tim Chapman is his name?

23      A.    Correct.

24      Q.    And was he the owner of all the Brown

STEPHEN H. MOSHER, MAY 26, 2004

1  Water companies?

2      A.    No.  Brown Water Properties was the

3  owner of all the Brown Water companias.

4      Q.    And he was the principal of Brown Water

13:28:10   5  Properties?

6      A.    I believe so.  Maybe through -- a

7  limited partnership actually owns that.

8      Q.    Do you know who the partners were in the

9  limited partnership?

13:28:23  10      A.    The Chapmans.

11      Q.    Okay.  And that would be Hugh/Tim

12  Chapman?

13      A.    Chad Chapman and Manning Chapman.

14      Q.    And who is Manning Chapman?

13:28:33  15      A.    He was the youngest son.

16      MR. GOODIER:  Is that Manny or Manning?

17      THE WITNESS:  Manning, M A N N I N G.

18  BY MR. SPANSEL:

19      Q.    And Chad was the older son?

13:28:47  20      A.    He was the older son.  He had two boys.

21      Q.    Do you know what offices Hugh/Tim

22  Champman held in the companies?

23      A.    The other companies?  Hugh Chapman?

24      Q.    Yes.

STEPHEN H. MOSHER, MAY 26, 2004

1          A.      I don't think he had an office in any of

2   them.

3          Q.      What office did Chad hold?

4          A.      During that period of time, Chad -- I

13:29:16   5   don't know if he had already been on for -- put

6   into those corporations or not, he wasn't there.   I

7   don't know if that time frame was afterwards or

8   before was he ever elected as an officer of those

9   companies.

13:29:31  10          Q.      When he was elected, what was his

11   position?

12          A.      He would have become president, vice

13   president or secretary/treasurer.   Russ Sigmund was

14   going through a cancer, and I think there was the

13:29:44  15   concern of Russ not being around, that Chad would

16   be able to put on those corporations.

17          Q.      What about Manning Chapman, did he hold

18   offices?

19          A.      Not at that time.   He didn't graduate

13:29:54  20   from school until like 2002.

21          Q.      At the time of the incident, September

22   2001, who was the president of Brown Water Marine

23   Service?

24          A.      Russ Sigmund.

STEPHEN H. MOSHER, MAY 26, 2004

```
 1        A.      Correct.

 2        MR. SPANSEL:  Do you want to do that now?

 3        THE VIDEOGRAPHER:  If it's convenient.

 4        MR. SPANSEL:  The videoman needs to take a

 5   break to change his tape.

 6        THE VIDEOGRAPHER:  We're going off the video

 7   record at 2:20 p.m. at the conclusion of videotape

 8   No. 3.

 9                    (WHEREUPON, a recess was had.)

10        THE VIDEOGRAPHER:  We are going back on the

11   video record at 2:30 p.m. at the beginning of

12   videotape No. 4.

13   BY MR. SPANSEL:

14        Q.      Mr. Mosher, at the time of the accident

15   you would have been the individual at Brown Water

16   most familiar with practices for hiring, training

17   and qualification of captains, correct?

18        A.      Correct.

19        Q.      And there was no particular training

20   you've testified that was done for Mr. Fowler,

21   correct?

22        A.      Correct.

23        Q.      And that would be the same situation

24   with any operator of uninspected towing vessels?
```

14:21:05  5
14:30:40  10
14:30:51  15
14:31:17  20

STEPHEN H. MOSHER, MAY 26, 2004

1  Q.  When you testified at the Coast Guard

2 hearing, you stated that Fowler was hired on April

3 27th, '01.  Do you recall that?

4  A.  If I said that, then I said that.  Yes,

14:34:16  5 sir.

6  Q.  And then you also testified that he took

7 a leave of absence on July 20, '01.

8  A.  Okay.

9  Q.  Do you recall the reason he took a leave

14:34:27 10 of absence?

11  A.  I believe just to work at a vessel that

12 was closer to home, because he lived in Mobile,

13 Alabama and had to fly in.

14  Q.  And then he came back to work for you on

14:34:43 15 September 10th, '01, just a few days before this

16 incident, is that right?

17  A.  Yes, sir.

18  Q.  And do you remember the circumstances of

19 him coming back to you?

14:34:51 20  A.  I believe he was working for a towing

21 company called Basin Marine in -- on the Chaffala

22 Bay River, and they sold the boat out from

23 underneath him I think is what he told me.

24  Q.  And when he did come back, was there any

STEPHEN H. MOSHER, MAY 26, 2004

1    Q.    Okay.  His accident history with the

2 Coast Guard, as you later determined it to be,

3 would that -- had you known it at the time you were

4 hiring him, wouldn't that have been a factor in

14:37:40    5 whether or not you decided to hire him?

6    A.    If the Coast Guard didn't pull his

7 license, then I would say that they evidently did

8 an investigation, and for whatever reason warranted

9 the fact that he could maintain his license or

14:37:53   10 there would be a suspension of his license or some

11 opportunity.  I mean they'll suspend your license,

12 they'll force them to go to additional training or

13 school, what have you, they kind of take that out

14 of industry's hands, so to speak, because they take

14:38:05   15 such a role in the navigation and the law

16 enforcement of their merchant mariners

17 documentation.

18    Q.    Knowing that he had hit bridges in the

19 past, would that have been a factor knowing that he

14:38:16   20 had to traverse bridges on the intercoastal?

21    A.    When you say "hit bridges," I mean that

22 was the first one I know he knocked down.  I don't

23 think he knocked any other bridges down.  I mean if

24 I had known that he knocked another bridge down,

STEPHEN H. MOSHER, MAY 26, 2004

```
 1  maybe I wouldn't have hired him, but then I would

 2  think that the Coast Guard would have pulled his

 3  license.

 4       Q.     But you did notice that he had struck

 5  bridges in the past?

 6       MR. PIERSON:  I object to the question.

 7  BY THE WITNESS:

 8       A.     I think there was one incident where he

 9  laid down the fender works of a bridge.  I mean if

10  you look at the bridges on the navigation systems

11  throughout the entire country, several have been

12  hit.  A lot of them don't fall down.

13  BY MR. SPANSEL:

14       Q.     So bottom line is his record would not

15  have been -- had you known it at the time of

16  hiring, it wouldn't have been significant to you in

17  hiring him?

18       A.     You know, in good conscious I would say

19  I'd be maybe conscious about how I placed him and

20  where I placed him at, maybe somebody look over him

21  if I thought he was so bad.  But then I would look

22  at the system itself, and if the system was so bad,

23  then how are these guys able to operate, and that

24  in itself to me is where the problem may lay.
```

Timestamps (left margin): 14:38:35 (line 5), 14:38:43 (line 10), 14:39:02 (line 15), 14:39:11 (line 20)

STEPHEN H. MOSHER, MAY 26, 2004

1    put on the lead tow to assist in steerage.

2         A.    You're talking a bottle thruster.    Yeah,

3    okay.    I'm familiar with those.

4         Q.    Did Brown Water use those at all?

14:42:30    5         A.    No, sir.

6         Q.    Was that something that at a price, an

7    extra cost, Brown Water could have used?

8         A.    Yes, sir.

9         Q.    The Coast Guard has maintained on its

14:43:21    10    Web site an accident history for Brown Water.    Are

11    you familiar with that history?

12         A.    Yes, sir.

13         Q.    You don't have any reason to dispute the

14    accident history for Brown Water with the Coast

14:43:28    15    Guard?

16         MR. PIERSON:    I'll object to the question.

17    BY THE WITNESS:

18         A.    What I recall is that it has the entire

19    history of Brown Water.    If there was a boarding --

14:43:39    20    I mean it's listed as a number 30 or something, so

21    I think the entire history had 60 or 70 some

22    infractions or notifications or what you may have,

23    but they weren't all injuries or accidents.    And

24    when you think about all those vessels operating 24

1   hours a day, 365 days a year, that's pretty good --

2   that's probably less than 1 percent of the total

3   operating time.

4       MR. STRAWN:  Objection, nonresponsive.

14:44:08   5       MR. GOODIER:  I think it was very responsive.

6       MR. PIERSON:  Wasn't the question are you

7   familiar with that history?

8       MR. GOODIER:  Uh-huh.

9       MR. SPANSEL:  That's all the questions I have

14:44:48   10  right now.

11      MR. GOODIER:  Is that it?

12      MR. STRAWN:  I have a couple questions.

13                  EXAMINATION

14  BY MR. STRAWN:

14:45:00   15      Q.    My name is Mark Strawn and I represent

16  the estate of Julio Morales and the Morales family.

17  And you and I have never met before today, is that

18  right?

19      A.    Correct.

14:45:12   20      Q.    Okay.  I want to ask you how many times

21  you have met with or talked with lawyers

22  representing or investigators representing either

23  the Brown Water entities or the ACBL entities after

24  you stopped working for Brown Water about a year

STEPHEN H. MOSHER, MAY 26, 2004

1   who you can think of that's out there in the Gulf

2   coast.  I mean they would send out auditors, they

3   would inspect on site, they would inspect vessel

4   operations facilities.  If there was problems, they

15:00:03   5   would let us know.

6       Q.   Were these audits always done pursuant

7   to the AWO RCP program or were they done pursuant

8   to the responsible -- didn't the chemical operators

9   have a similar --

15:00:16   10       A.   Right.  They do it for whatever

11   reason -- purposes they want to do it for.  BP Oil

12   may do it as if they did a tugboat operation off

13   Nigeria.

14       Q.   Okay.

15:00:29   15       A.   They didn't conform to AWO standards.

16   Everybody had their own curriculum.

17       Q.   Were the standards pretty similar from

18   what you recall?

19       A.   A lot of standards were the same.

15:00:42   20       Q.   Now, I understand that afore this

21   accident in September of 2001, you-all had no

22   program for wheelhouse -- for training of

23   wheelhouse personnel, true?

24       A.   We had no training program for

1  wheelhouse personnel, true.

2      Q.   Okay.  And you did have -- there are

3  some instructions in the safety manual pertained to

4  safety issues that tell, for example, deck hands

15:01:12  5  not to stand in the bite of a line or how to

6  configure -- how to tie up two barges, things like

7  that, but you also didn't have a safety program

8  where deck hands had to go in and take a class,

9  true?

15:01:25  10      A.   Correct.

11      Q.   And back in March of 2000 when

12  Mr. Timberlake came and looked at your operation,

13  one of the things that he wrote to ACBL about your

14  company was that you needed to develop a shore-side

15:01:48  15  and on-board training program to fulfill the AWO

16  Responsible Carrier Program requirements?

17      A.   Correct.

18      Q.   And you-all didn't do that between the

19  time of the audit in March of 2000 and the accident

15:02:02  20  in September 2001?

21      A.   Correct.

22      Q.   Okay.  And have you looked at -- this

23  has been marked a number of times.  Have you seen

24  it here today, again, the audit that was done back

STEPHEN H. MOSHER, MAY 26, 2004

1    testimony today is that the office at Brown Water

2    would be the ones to assign the horsepower for the

3    tows, true?

4         A.    Yes.

15:11:44    5         Q.    Okay.  You-all had decided that for this

6    boat, the Brown Water V, a full load was either two

7    empties and two fulls or three fulls and one empty.

8    That was your policy about what a full load for

9    this vessel would be, true?

15:12:00   10         A.    That was -- you're going to be careful

11   the way you're illustrating it.  The standard rule

12   of thumb for that boat, you want a combination of

13   empty and loads.  You don't want four loads because

14   you're just going to run into a lot of downtime

15:12:15   15   because they're going to sit on the beach, so to

16   speak.  We only elected to send that boat down

17   there -- we elected to put three barges on there.

18   There may have been more barges in Brownsville

19   available to them, because I heard the Brown Water

15:12:26   20   VII was down there also.  So the Brown Water VII is

21   a little bit bigger boat.  Maybe they took the four

22   loads and then we gave them three loads.  But the

23   crew determined to take that fourth barge load with

24   them.  I wouldn't have done that.

STEPHEN H. MOSHER, MAY 26, 2004

```
 1            UNITED STATES DISTRICT COURT

 2             SOUTHERN DISTRICT OF TEXAS

 3               BROWNSVILLE DIVISION

 4

 5  IN RE THE COMPLAINT AND      ) CIVIL ACTION

 6  PETITION OF BROWN WATER      ) NO. B-01-157

 7  TOWING I, INC., et al,       ) NO. B-02-004

 8  et cetera,                   )

 9

10            I hereby certify that I have read the

11  foregoing transcript of my deposition given at the

12  time and place aforesaid, consisting of Pages 1 to

13  245, inclusive, and I do again subscribe and make

14  oath that the same is a true, correct and complete

15  transcript of my deposition so given as aforesaid,

16  and includes changes, if any, so made by me.

17

18                          STEPHEN H. MOSHER

19  SUBSCRIBED AND SWORN TO before me

20  this        day of                 , A.D. 200   .

21

22            Notary Public

23

24
```

```
 1   STATE OF ILLINOIS )
 2                     )  SS:
 3   COUNTY OF C O O K )
 4          I, ELLEN DUSZA, a Notary Public within
 5   and for the County of Cook, State of Illinois, and
 6   a Certified Shorthand Reporter of said state, do
 7   hereby certify:
 8          That previous to the commencement of the
 9   examination of the witness, the witness was duly
10   sworn to testify the whole truth concerning the
11   matters herein;
12          That the foregoing deposition transcript
13   was reported stenographically by me, was thereafter
14   reduced to typewriting under my personal direction
15   and constitutes a true record of the testimony
16   given and the proceedings had;
17          That the said deposition was taken
18   before me at the time and place specified;
19          That I am not a relative or employee or
20   attorney or counsel, nor a relative or employee of
21   such attorney or counsel for any of the parties
22   hereto, nor interested directly or indirectly in
23   the outcome of this action.
24          IN WITNESS WHEREOF, I do hereunto set my
```

1  hand and affix my seal of office at Chicago,

2  Illinois, this 1st day of June, 2004.

3

4              *Ellen Dusza*

5          Notary Public, Cook County, Illinois.

6          My commission expires September 19, 2005

7

8  C.S.R. Certificate No. 84-3386.

9

10

11                    OFFICIAL SEAL
                      ELLEN DUSZA
12            NOTARY PUBLIC, STATE OF ILLINOIS
              MY COMMISSION EXPIRES:09/19/05
13

14

15

16

17

18

19

20

21

22

23

24

```
 1                    I N D E X

 2   WITNESS                          EXAMINATION

 3   STEVEN H. MOSHER

 4        By Mr. Marchan                     7

 5        By Mr. Spansel                   109

 6        By Mr. Strawn              180, 241

 7        By Mr. Goodier                   225

 8

 9

10                  E X H I B I T S

11   NUMBER                         MARKED FOR ID

12                                        PAGE

13   Deposition Exhibit

14        No. 100........................11

15        No. 101........................12

16        No. 102........................15

17        No. 103........................21

18        no. 104........................27

19        No. 105........................34

20        No. 106........................39

21        No. 107........................47

22        No. 108........................60

23        No. 109........................84

24        No. 110........................88
```

```
 1                  I N D E X  (Continued)

 2                    E X H I B I T S

 3   NUMBER                          MARKED FOR ID

 4                                      PAGE

 5   Deposition Exhibit

 6        No. 111.........................92

 7        No. 112.........................94

 8        No. 113.........................95

 9        No. 114.........................96

10        No. 115.........................99

11        No. 116........................100

12        No. 117........................225

13        No. 118........................226

14                                  FIRST REFERRED

15                                      PAGE

16        No. 34.........................211

17

18

19

20

21

22

23

24
```