IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| IN RE THE COMPLAINT AND PETITION OF BROWN WATER TOWING I, INC., AS OWNER, AND BROWN WATER MARINE SERVICE, INC., AS BAREBOAT CHARTERER OF THE BROWN WATER V, ITS ENGINES, TACKLE, ETC., IN A CAUSE OF EXONERATION FROM OR LIMITATION OF LIABILITY | * * * * * * * * * * * | C. A. NO. B-01-157 Admiralty |
| | | Consolidated with |
| IN RE THE COMPLAINT AND PETITION OF AMERICAN COMMERCIAL LINES, LLC AS OWNER, AND AMERICAN COMMERCIAL BARGE LINES, LLC AS CHARTERER OF THE BARGES NM-315, VLB-9182, ACL-9933B, VLB-9173, IN A CAUSE OF EXONERATION FROM OR LIMITATION OF LIABILITY | * * * * * * * * * * * * | C. A. No. B-02-004 Admiralty and |
| IN RE THE COMPLAINT AND PETITION OF DEERE CREDIT, INC., (FORMERLY SENSTAR FINANCE COMPANY), AS OWNER OF THE BARGE NM-315 AND STATE STREET BANK AND TRUST COMPANY OF CONNECTICUT, NATIONAL ASSOCIATION, AS OWNER TRUSTEE OF THE BARGE ACL-9933B AND NOT IN ITS INDIVIDUAL CAPACITY, AND GENERAL ELECTRIC CAPITAL CORPORATION, AS BENEFICIAL OWNER OF THE BARGE ACL-9933B PRAYING FOR EXONERATION FROM AND/OR LIMITATION OF LIABILITY | * * * * * * * * * * * * | C. A. NO. B-02-125 Admiralty |

N1126075.1



EXHIBIT B

## THIRD-PARTY COMPLAINT AGAINST
## A.G. HILL POWER, INC.,
## a/k/a JHB ENTERPRISES, INC.

**TO THE HONORABLE JUDGE OF THIS COURT:**

**COMES NOW,** American Commercial Lines, LLC and American Commercial Barge Line, LLC, Petitioners and Claimants, and Deere Credit, Inc. (formerly Senstar Finance Company), as Owner of the Barge NM-315, State Street Bank and Trust Company of Connecticut, N.A., as Owner/Trustee of the Barge ACL-9933B and Not in Its Individual Capacity, and General Electric Capital Corporation, as Beneficial Owner of the Barge ACL-9933B, Petitioners, hereafter collectively referred to as "the Petitioners," and file this their Third Party Complaint and Tender against A.G. Hill Power, Inc., a/k/a JHB Enterprises, Inc. ("Hill").

### I.

Jurisdiction over this Third Party Complaint exists under the Court's Admiralty and Maritime Jurisdiction, 28 U.S.C. § 1333, and within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure, and alternatively under the Court's Supplemental Jurisdiction, 28 U.S.C. § 1367. The Petitioners further invoke the maritime procedures specified in Rule 14(c) of the Federal Rules of Civil Procedure.

### II.

The Petitioners initiated Civil Action Nos. B-02-004 and B-02-125 proceedings seeking exoneration from and/or alternatively, limitation of liability and also filed claims in the Brown Water exoneration/limitation proceedings, Civil Action No. B-01-157, all of which proceedings are consolidated and arise out of an allision with the Queen Isabella Causeway on September 15, 2001.

N1126075.1                              - 2 -

Numerous claims have been asserted against the Petitioners and Brown Water Marine Service, Inc. and Brown Water Towing I in these pending actions.

### III.

Made third party defendant is Hill, a Texas corporation and may be served with process by serving its agent for service of process, Mr. Jack B. Bennett at 112 Longshore Drive, Corpus Christi, Texas 78413.

### IV.

During discovery it has been learned that Hill, who is not a party, bears some responsibility for this incident. Specifically, upon information and belief, Hill was responsible for maintaining the navigational and/or street lights on the Queen Isabella Causeway. Discovery obtained to date indicates that these lights were not working on the night of the allision. The failure to maintain or properly operate these lights constitutes negligence and/or negligence *per se*. In addition, under the applicable maritime law, and in accordance with the Pennsylvania Rule, Hill's failure to comply with the law creates presumption of fault or negligence on its behalf. Upon information and belief, the acts or omissions of Hill caused and/or contributed to the allision and/or caused or contributed to several subsequent deaths, personal injuries and property damage.

### V.

This matter cause arises from the allision with the Queen Isabelle Causeway on or about September 15, 2001. American Commercial Lines, LLC, American Commercial Barge Lines, LLC, Deere Credit, Inc., State Street Bank and Trust Company of Connecticut, and General Electric Capital Corporation, seek exoneration from and/or limitation of liability in this proceeding. The Court set a deadline for claimants to appear and file claims against American Commercial Lines,

LLC, American Commercial Barge Lines, LLC, Deere Credit, Inc., State Street Bank and Trust Company of Connecticut, and General Electric Capital Corporation in the limitation proceedings. Subsequently, numerous claims against American Commercial Lines, LLC, American Commercial Barge Lines, LLC, Deere Credit, Inc., State Street Bank and Trust Company of Connecticut, and General Electric Capital Corporation have been filed by or on behalf of Anita Harris, individually and as Next Friend of Victor Justin Harris, and as Representative of the Estate of Robert V. Harris; Raquel Teran Hinojosa, Individually and on behalf of the Estate of Gaspar Hinojosa, Deceased, Clarissa Hinojosa, Omar Hinojosa and Gaspar Hinojosa II, each individually; Martin D. Hinojosa and Rita S. Hinojosa, Individually and as heirs of the Estate of Gaspar Hinojosa, Deceased; Richard "Ricky" Leavell and Carol Leavell, Individually and as Representatives of the Estate of Robin Faye Leavell, deceased; Hector Martinez, Sr.; Lydia Zamora, individually and as Representative of the Estate of Hector Martinez Jr., deceased; J. Antonio Mireles, as personal representative of the Estate of Julio Cesar Mireles, Juan Antonio Mireles and Soledad Gonzalez Mireles; Esteban F. Rivas and Miriam Rivas, Individually and as Representatives of the Estate of Stvan F. Rivas; William E. Kimbrell; Jacqueline Paddock, Individually and as Next Friend of William B. Welch and as Representative of the Estate of Chealsa and Barry Welch; William Morris Welch; Rolando Lee Moya, Alberto Leroy Moya, Antonio Salinas, Jr. and Roberto Espericueta; Bridgette Goza; Rene Mata and Frank Mata; Gustavo Morales and Bigo's International, L.L.C.; Bridgette M. Goza; Laguna Madre Water District; Southwestern Bell Telephone, L.P. and the State of Texas, all of which of the foregoing are hereafter referred to as "Claimants in Exoneration/Limitation."

# IV.

In the event that any or all of Claimants in Exoneration /Limitation seeks recovery or judgment against American Commercial Lines, LLC, American Commercial Barge Lines, LLC, Deere Credit, Inc., State Street Bank and Trust Company of Connecticut, and General Electric Capital Corporation, American Commercial Lines, LLC, American Commercial Barge Lines, LLC, Deere Credit, Inc., State Street Bank and Trust Company of Connecticut, and General Electric Capital Corporation, which is denied, then the Petitioners hereby implead and hereby tender Hill to the Claimants in Exoneration/Limitation herein within the meaning of Rule 14(c) of the Federal Rules of Civil Procedure. The Petitioners, as third party plaintiffs, also seek judgment in like amount over and against Hill, representing contribution and/or indemnification and/or recoupment and/or set-off from and against Hill. Specifically, upon information and belief Hill was responsible for maintaining and operating lights on the Queen Isabella Causeway. Further, upon information and belief, the Lights that Hill was responsible for maintaining and operating were not operating on the day of the incident due to Hill's negligence and/or negligence per se. This negligence and/or negligence per se caused or contributed to the allision and/or caused or contributed to several subsequent deaths and personal injuries. Further, the actions and/or inactions of Hill invoke the presumptions afforded by the Pennsylvania Rule as recognized by the general maritime law of the United States.

WHEREFORE, PREMISES CONSIDERED, American Commercial Lines, LLC and American Commercial Barge Line, LLC, Petitioners and Claimants, and Deere Credit, Inc. (formerly Senstar Finance Company), as Owner of the Barge NM-315, State Street Bank and Trust Company of Connecticut, N.A., as Owner/Trustee of the Barge ACL-9933B and Not in Its Individual Capacity,

N1126075.1                             - 5 -

and General Electric Capital Corporation, as Beneficial Owner of the Barge ACL-9933B, Petitioners, pray that citation issue and be served upon said Third-Party Defendant in the form and manner required by law, requiring the Third-Party Defendant to appear and answer this Third Party Complaint and the Claims of the Exoneration/Limitation Claimants listed hereinbefore; upon final hearing that they as Petitioners be exonerated from all liability and, alternatively, that their liability be limited as allowed for under the Limitation of Vessel Owner's Liability Act, 46 U.S.C. § 181 *et seq.*, as amended, and under the Supplemental Rules for Certain Admiralty and Maritime Claims. In the event that any recovery or judgment is made against Petitioners/Third-Party Plaintiffs, the Petitioners/Third-Party Plaintiffs pray that they be awarded a judgment in like amount over and against Hill for contribution and/or indemnification, and/or recoupment and/or set-off and/or damages, interest, costs, disbursements and all other relief to which the Petitioners/Third Party Plaintiffs may be entitled at law, in equity or in admiralty.

Respectfully submitted,

GLENN G. GOODIER, Attorney-in-Charge
Admitted *Pro Hac Vice*
By Order Entered 4/23/02
Jones, Walker, Waechter, Poitevent,
  Carrère & Denègre, L.L.P.
201 St. Charles Avenue - 48th Floor
New Orleans, Louisiana 70170-5100
Telephone:  (504) 582-8174
Facsimile:   (504) 582-8010

LES CASSIDY
State Bar Number 03979270
Federal Identification Number 5931
1020 Bank of America
500 North Water Street
Corpus Christi, Texas  78471
Telephone:  (361) 887-2969
Facsimile:  (361) 886-3299
Counsel for Petitioners,
American Commercial Lines LLP and
American Commercial Barge Line LLC
Deere Credit, Inc. (formerly Senstar Finance Company), as
  Owner of the Barge NM-315
State Street Bank and Trust Company of Connecticut, N.A.,
  as Owner/Trustee of the Barge ACL-9933B and Not in Its
  Individual Capacity and
General Electric Capital Corporation, as Beneficial Owner of
  the Barge ACL-9933B

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been properly mailed to all known potential

parties and/or their counsel on this ___7___ day of ___April___, 2004.

GLENN G. GOODIER

N1126075.1                                        - 7 -

# ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT ("Agreement") dated as of October 14, 1996 among A.G. HILL POWER, INC., a Texas corporation with its principal office and place of business in Corpus Christi, Texas (the "Seller") and JACK BENNETT, a resident of Texas ("Bennett") and FIRST SOUTH UTILITY CONSTRUCTION, INC., a North Carolina corporation, with its principal office and place of business in Greensboro, North Carolina (the "Buyer") and WILLIAM T. STOVER, a resident of Florida ("Stover").

## WITNESSETH:

WHEREAS, the Seller is engaged in the business of installing and maintaining underground and above ground cable systems and other network equipment for various utility companies (the "Business");

WHEREAS, Seller desires to sell and Buyer desires to purchase the assets utilized in the operation of the Business, including but not limited to, certain machinery, equipment, inventory, and other tangible and intangible assets of Seller on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants hereinafter set forth, the parties hereby agree as follows:

## ARTICLE I
## PURCHASE AND SALE OF ASSETS

1.1 <u>Assets</u>.  Subject to the terms and conditions of this Agreement, at Closing (as defined herein) and effective at 11:59 p.m. on the day before Closing ("Effective Date"), Seller hereby agrees to sell, assign, convey and deliver to Buyer, or cause to be sold, assigned, transferred, conveyed and delivered to Buyer, and Buyer agrees to purchase and accept from Seller the following assets owned by Seller on the Effective Date, whether or not carried or reflected on the books and records of Seller (collectively the "Assets"):

   (a)   All of the manufacturing and operating assets associated with or benefiting the Business including, without limitation, all trucks, automobiles, trailers, rolling stock, machinery, equipment, computers, tooling, accessories, dies, patterns, working and design drawings, materials handling and support equipment, supplies, tools, replacement and spare parts together with all related operation or repair manuals and applicable warranties of each manufacturer of such items and all work-in-process;



EXHIBIT
B

(b) All inventory including, without limitation, replacement and spare parts, new and used tool inventory (including, but not limited to, tools on trucks), packaging materials, operating supplies and fuels (collectively the "Inventory");

(c) Prepaid items relating to the Acquired Assets, prorated as appropriate as of the Effective Date;

(d) All records related to Seller's customers, suppliers and products, as well as other information owned by Seller which enable Buyer to continue the operations of the Business as they are currently being conducted;

(e) All permits, licenses and approvals and authorizations by governmental authorities held by Seller at the Closing date which are transferable by Seller;

(f) All supplier, customer and other designated contracts related to the operation of Seller's Business listed on Schedule 1.1(f);

(g) All Seller's rights in, to and under software licenses, know-how licenses, trade names, the name "A. G. Hill Power", trademarks, copyrights, unpatented inventions, service marks, all trade secrets, know-how (including, without limitation, proprietary know-how and use and application know-how), manufacturing, engineering and other drawings, formulae, process and material specifications, product/process test specifications and test methods, technology, technical information, engineering data, design and engineering specifications (the "Intellectual Property");

(h) All promotional literature, customer and supplier lists (including, without limitation, all lists of customers of the Business maintained by Seller) and similar written data;

(i) All general, financial and personnel records, correspondence and other files and records of Seller, manufacturing and quality control and product development records, and any other files and records of Seller pertaining solely to the Business, wherever located on the Effective Date;

(j) Such rights as Seller has to use its present telephone and facsimile transmission numbers and its post office box, from and after the Effective Date;

-2-

(k)   All of Seller's employment tax reserves and ratings
      related thereto to the extent the assignment thereof is
      permitted by applicable law and in the event Buyer
      requests they be assigned; and

(l)   All work-in-process and all cash and checks received by
      Seller from its customers, employees or other parties
      through the  Effective Date in respect of sales or
      other commitments of Seller to be performed by Buyer in
      whole or in part after the Effective Date.

The sale and transfer of the Assets shall be made free and clear
of all liabilities, obligations, security interests, liens and
encumbrances, except those specifically assumed by Buyer
described in Section 1.3 below.

1.2   <u>Excluded Assets</u>.  Buyer shall not acquire any other
assets of Seller including, without limitation:

(a)   Seller's land and building (including fixtures
      associated therewith) located on Leopard Drive, Corpus
      Christi Texas from which Seller currently operates its
      Business (the "Property");

(b)   Accounts receivable of Seller including, but not
      limited to, obligations owed by officers or directors
      of Seller to Seller (collectively "Accounts
      Receivable");

(c)   Cash and cash equivalents (except as provided in
      Section 1.1(l) above);

(d)   Tax refunds and tax benefits;

(e)   Corporate seals, minute books, stock books, tax returns
      and any other records related to the corporate
      organization of the Corporation; and

(f)   All other tangible or intangible assets of the
      Business.

1.3   <u>Assumed Obligations</u>.  At Closing Buyer shall assume
Seller's liability for the following (the "Assumed Obligations"):

(a)   All trade accounts payable of Seller existing and
      identified on the Effective Date as identified in the
      Assumption Agreement, which have arisen in the ordinary
      course of business; and

(b)   The contracts listed on <u>Schedule 1.1-(f)</u>.

-3-

The Assumed Obligations will be transferred to Buyer at Closing
pursuant to an assumption agreement in the form of <u>Exhibit 1.3</u>
attached hereto (the "Assumption Agreement").  Except as provided
above or as otherwise expressly provided in this Agreement or in
any other agreement executed and delivered by Buyer incident to
the consummation of the transactions
contemplated hereby, Buyer does not assume and shall not be bound
by any obligations or liabilities of Seller of any kind or
nature, known or unknown, contingent or otherwise which
liabilities shall remain the obligation of Seller.

**ARTICLE II**
**PURCHASE PRICE AND PAYMENT**

2.1  <u>Purchase Price</u>. The purchase price for the Assets (the
"Purchase Price") shall be _____ Dollars
($ _____ ) increased or decreased (as applicable) by the
Work-in-Process Amount (defined in Section 2.3 below).

2.2  <u>Payment of Purchase Price</u>.  The Purchase Price shall be
paid by Buyer to Seller at Closing as follows:

    (a)  Buyer will pay One Hundred Twenty-five Thousand Dollars
($125,000.00) into an interest bearing trust account to
be held and disbursed by an escrow agent ("Escrow
Agent") pursuant to the escrow agreement in the form of
<u>Exhibit 2.2 (a)</u> (the "Escrow Agreement");

    (b)  Buyer will assume the Assumed Obligations outstanding
as of the Effective Date.  Provided, however, to the
extent the Assumed Obligations are more than
$211,141.00, the cash portion of the Purchase Price
shall be reduced on a dollar for dollar basis and to
the extend the Assumed Obligations are less than
$211,141.00, the cash portion of the Purchase Price
shall be increased on a dollar for dollar basis;

    (c)  Buyer will pay Seller the balance of the Purchase Price
in cash at Closing;

    (d)  Buyer will pay Seller an amount equal to the Work-in-
Process Amount as provided in Section 2.23 within
thirty (30) days of closing; and

    (e)  <u>Ad valorem</u> taxes for the current year will be
appropriately allocated at Closing between Buyer and
Seller.  The portion allocated to Seller will be
deducted from the amount due from Buyer to Seller at
the Closing, and Buyer will pay the full 1996 <u>ad</u>
<u>valorem</u> taxes on the Acquired Assets to the appropriate
taxing authorities when such taxes are due.

-4-

2.3   <u>Work-in-Process Valuation</u>.  Three (3) days prior to Closing, Seller shall provide Buyer with a schedule of all current work-in-process jobs (the "Work-in-Process Schedule"). Work-in-process shown on the Work-in-Process Schedule will be valued using the following principles ("Work-in-Process Amount"):

(a)   Fixed price contracts shall be valued using the percentage of completion method of accounting to determine the amount of costs incurred in excess of related billings;

(b)   Cost plus contracts shall be valued using actual cost incurred but unbilled prior to Closing; and

All contracts shown shall include the projected profit or loss to completion recoverable from that portion of the job yet unbilled by Seller.  After the delivery of the Work-in-Process Schedule, Seller will cease billing all Work-In-Process jobs.  In the application of the above principles, no Work-In-Process shall be valued at more than the cost bid or otherwise recoverable from the customer for such contract.  Contracts which are to be assumed by Buyer for which projected costs to completion exceed the cost bid or amount otherwise recoverable by Buyer shall be adjusted accordingly on the Work-in-Process Schedule.

2.4   <u>Allocation of Purchase Price</u>.  Buyer and Seller agree to cooperate in the allocation of the Purchase Price incident to the applicable provisions of the Internal Revenue Code and to file Form 8594 as required thereby.  Assets will be valued at their fair market value as determined by Buyer.  The unallocated balance of the Purchase Price shall be allocated to intangibles and goodwill.

**ARTICLE III**
**CLOSING**

3.1   <u>Closing</u>.  The Closing of the sale and purchase of the Assets shall take place at 8:00 a.m. local time on October 14, 1996 at the offices of Prichard, Peeler and Cartwright, Suite 1130, American Bank Plaza, 711 North Carancahua, Corpus Christi, Texas.  The transactions described herein shall all be effective as of the Effective Date.

3.2   <u>Items to be Delivered at Closing</u>.  At the Closing and subject to the terms and conditions herein contained:

(a)   Seller shall deliver to Buyer such bills of sale with covenants of warranty, assignments, endorsements or other good and sufficient instruments and documents of conveyance and transfer, in form and substance satisfactory to Buyer, Seller and their counsel, as shall be necessary and effective to transfer and assign

-5-

to invest in Buyer all of Seller's right, title and interest in and to the Assets, including without limitation:

    (i)    good and valid title in and to all the Assets owned by Seller;

    (ii)    all vehicle titles;

    (iii)    good and valid leasehold interest in and to the personal property leased by Seller as lessee and acquired hereunder;

    (iv)    to the extent assumed by Buyer, all of Seller's rights under all agreements, contracts, commitments, leases, plans, bids, quotations, proposals, instruments and other documents to which a Seller is a party or by which it has rights at the Effective Date; and

    (v)    the executed lease for the Property (the "Corpus Christi Lease").

Simultaneously with such delivery, all such steps will be taken as may be required to place Buyer in actual possession and control of the Assets;

(b)    Buyer shall deliver to the Escrow Agent One Hundred Twenty-five Thousand ($125,000.00) in cash or certified funds as required under the Escrow Agreement;

(c)    Buyer shall deliver the cash balance of the Purchase Price as provided in the closing statement to Seller in cash or certified funds;

(d)    At or prior to Closing, the parties shall deliver to each other the agreements, opinions, certificates and other documents and instruments referred to in Articles VII and VIII hereof;

3.3   <u>Failure to Close</u>. If for any reason the parties are unable to consummate the closing, then this contract shall terminate and neither party shall have any liability to the other party.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER AND BENNETT

4.   <u>Representations and Warranties of Seller and Bennett</u>. Seller and Bennett jointly and severally represent and warrant to the Buyer and Stover as follows:

-6-

4.1  <u>Due Incorporation and Authority</u>.  Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Texas which is the only state in which qualification is necessary for Seller to conduct its Business as such is presently being conducted.  Seller has all requisite corporate power and authority to own, lease and operate its properties and assets and to carry on the Business as presently conducted.

4.2  <u>Validity of Agreement</u>.  Seller has full legal right and all requisite power, legal capacity and authority to enter into this Agreement, and any other agreement contemplated hereunder, and to perform its obligations hereunder and thereunder.  This Agreement has been duly executed and delivered by Seller and is a valid and legally binding obligation of Seller, enforceable against Seller in accordance with its terms and conditions.  The execution, delivery and performance of this Agreement by Seller has been duly authorized by all requisite corporate action.

4.3  <u>Subsidiaries and Affiliates</u>.  Seller does not directly or indirectly own any interest in or control any other corporation, partnership, joint venture or other business association.

4.4  <u>No Approvals or Notices Required; No Conflict with Other Instruments</u>.  Except as described in <u>Schedule 4.4</u> hereto, to the best knowledge of Seller the execution, delivery and performance of this Agreement by Seller and the consummation by it of the transactions contemplated hereby will not violate any provision of any federal, state or local law, regulation, rule or ordinance (with or without the giving of notice or the lapse of time or both), or require any consent, approval, filing or notice under any provision of any federal, state or local law, regulation, rule or ordinance applicable to Seller, and will not require any consent, approval or notice under and will not conflict with, or result in the breach or termination of any provision of, or constitute a default under, or result in acceleration of the performance of the obligations of Seller under, or result in the creation of a lien, charge or encumbrance upon any of the properties or assets of Seller pursuant to Seller's charter or bylaws or any mortgage, deed of trust, indenture, lease, contract, instrument or other agreement, or any order, judgment or decree, to which Seller is a party or by which it or any of its assets or properties are bound.  The consents, approvals, filings or notices listed on <u>Schedule 4.4</u> are referred to herein as the "Required Consents."

4.5  <u>Financial Statements</u>.  The financial statements dated June 30, 1996, prepared by  Seller and reviewed by Seller's accountants previously delivered to Buyer and attached hereto as <u>Schedule 4.5</u> (the "June 30, 1996 Financial Statements"), fairly present the financial position of Seller as at such date and the

-7-

results of operations of Seller for such period in accordance with GAAP applied on a basis consistent with that of the prior audited financial statements of the Seller; subject, however, to changes resulting from normal year-end audit adjustments that will not in the aggregate be material.

4.6  <u>No Undisclosed Liabilities</u>.  Except as and to the extent disclosed in the June 30, 1996 Financial Statements, Seller has no liabilities or obligations of any kind, whether accrued, absolute, contingent or otherwise, of a kind required to be disclosed on a balance sheet prepared in accordance with GAAP.

4.7  <u>No Material Adverse Change</u>.  Since the June 30, 1996 Balance Sheet ("Balance Sheet Date"), there has been no material adverse change in the assets, liabilities, properties, business, prospects, results of operations or financial condition of Seller, nor has there been any material damage, destruction or loss since the Balance Sheet Date to any of the properties or assets of Seller, whether or not covered by insurance.

4.8  <u>Tax Matters</u>.  (i) All federal, state and local tax returns, reports and statements required under laws of the United States or any state or municipal or political subdivision thereof to be filed by Seller (collectively the "Tax Returns") have been filed on a timely basis with the appropriate governmental agencies in all jurisdictions in which such Tax Returns are required to be filed, and all such Tax Returns, reports and statements reflect accurately the tax liabilities of Seller for the periods, properties or events covered thereby; (ii) all federal, state and local taxes, assessments, interest, penalties, deficiencies, fees and other governmental charges or impositions, including those enumerated above in respect of the Tax Returns, which are called for by the Tax Returns, or claimed to be due by any taxing authority from Seller, or upon or measured by properties, assets or income of  Seller (collectively the "Taxes"), have been paid; (iii) Seller has not received any notice of assessment or proposed assessment from the Internal Revenue Service or any other taxing authority in connection with any Tax Returns and there are no pending tax examinations of or tax claims being asserted against Seller or any of its assets or properties; (iv) there is no examination by the Internal Revenue Service or any state or other taxing authority affecting Seller or its assets presently pending or, to the knowledge of Seller or Bennett, contemplated; (v) all payroll, sales and any other taxes which Seller is required by law to withhold or collect have been withheld or collected and have been paid over to the proper governmental authorities or if not yet due and payable are properly held by Seller for such payment; and (vi) no waivers of statutes of limitations with respect to any Tax Returns of Seller nor extensions of time for the filing of Tax Returns or assessments of any tax have been requested or given.

-8-

4.9  <u>Ownership and Adequacy of Assets.</u>  Seller has good and marketable title to the Assets, free and clear of all mortgages, deeds of trust, claims, liens, security interests and other encumbrances, except (i) as specifically set forth in <u>Schedule 4.9</u> hereto and (ii) liens for ad valorem property taxes not yet due and payable.

4.10  <u>Assets</u>.  Seller has delivered to the Buyer a list of all Assets owned by Seller as of the Balance Sheet Date (such list of Acquired Assets being set forth in <u>Schedule 4.10(a)</u> hereto), together with such additions thereto and deletions therefrom as shall have occurred in the ordinary course of business prior to the Effective Date, which list is correct and complete in all material respects.  Seller has also delivered to Buyer a list of all leased personal property ("Leased Personal Property") utilized by Seller as of the Balance Sheet Date which leases are listed in <u>Schedule 4.10(b)</u>.  The operation and maintenance of the  Assets and Leased Personal Property in the ordinary course of Seller's business does not violate any restrictive covenant or any federal, state or local law, ordinance, code, rule or regulation including, but not limited to, infringement of any patent or proprietary intellectual property of any other party.  During the past three (3) years, there has not been any significant interruption in the operations of Seller due to a failure of any such property to operate or to operate properly.

4.11  <u>Inventory</u>.  To the best knowledge of Seller, all Inventory is useable in the ordinary course of business and is not defective.  Seller and Bennett are not aware of any adverse conditions affecting the supply of materials available to Seller and consummation of the transactions provided for herein will not adversely affect such supply.

4.12  <u>Patents, Trademarks, Etc.</u>  Except for the common law rights in the A. G. Hill Power name and logo and office use commercial software, Seller has no patents, trademarks, copyrights, service marks or trade names.

4.13  <u>Actions and Proceedings</u>.  There are no outstanding orders, judgments, injunctions, awards or decrees of any court, arbitrator or governmental or regulatory body against Seller. Except as set forth on <u>Schedule 4.13</u>, there are no actions, suits, investigations, claims or proceedings, including arbitration proceedings, whether or not the defense thereof or liabilities in respect thereof are covered by insurance, pending, threatened against or involving Seller or any of its properties or assets, and, to the best knowledge of Seller there is no reasonable basis for any such action or proceeding.  All notices required to have been given to any insurance company which insures against any action, suit, investigation, claim or

-9-

proceeding set forth on <u>Schedule 4.13</u> have been timely and duly given.

    4.14  <u>Contracts and Other Agreements</u>.  <u>Schedule 4.14</u> sets forth a correct and complete list and brief description of the following agreements (including any renewal or escalation terms) concerning the Business of Seller, or the Assets being acquired by the Buyer pursuant to this Agreement and specifically identifies those agreements which are not terminable by Seller without penalty upon thirty (30) days or less notice:

    (i)  All purchase orders (whether between Seller and its suppliers or Seller and its customers) which require future payments, performance of services or delivery of goods and/or materials to or on behalf of the Business;

    (ii)  All bonus, incentive compensation, severance pay, retirement, group insurance, life insurance, annuities, deferred compensation, death benefit, medical or health benefit or other plans or arrangements providing for current or future benefits to Seller's managers, employees, agents, consultants or other independent contractors;

    (iii)  All employment and consulting agreements to which Seller is a party;

    (iv)  All contracts and other agreements with any person to sell, distribute or otherwise market any products manufactured or distributed by Seller;

    (v)  All contracts and other agreements with any person for the manufacture of any products sold or distributed by Seller;

    (vi)  Any contract or other agreement containing covenants or agreements of Seller not to compete in any line of business or with any person in any geographical area or covenants or agreements of any other person not to compete with Seller in any line of business or in any geographical area;

    (vii)  All leases for Leased Personal Property;

    (viii)  All relationships wherein Seller is holding a deposit for a third party or such Seller has deposited funds with a third party; and

    (ix)  Any and all other contracts of Seller not expressly disclosed elsewhere in this Agreement.

-10-

There have been made available to the Buyer true and complete copies of all contracts and other agreements set forth on Schedule 4.14. All of such contracts and other agreements are valid and binding upon Seller, and neither Seller nor any other party, is in default thereunder in any material respect. Schedule 4.14 also lists all contracts and other agreements currently in negotiation or proposed by Seller of a type which if entered into by Seller would be required to be listed on Schedule 4.14. Seller has made available to the Buyer true and correct drafts or summaries of all such contracts and other agreements in negotiation or proposed and true and complete copies of all documents in the custody or control of Seller relating thereto. Except as set forth in Schedule 4.14, none of the rights of Seller under any of the contracts and agreements set forth on Schedule 4.14 will be adversely affected by consummation of the transactions provided for in this Agreement and all such rights of Seller are assignable to the Buyer at Closing without penalty.

4.15 Compliance with Laws. To the best of Seller's and Bennett's knowledge, Seller is, and at all times in the past has been, in compliance with all applicable federal, state, local and foreign laws, ordinances, regulations, orders, judgments and decrees, including, without limitation, all Environmental Laws (as defined below), and all federal, state and local labor and employment laws. Seller has not received notice nor is aware that violation of any such law, ordinance, regulation, order, judgment or decree is being alleged. To the best of Seller's and Bennett's knowledge, there are no proposed laws, ordinances or regulations that, if enacted, would materially and adversely affect the business of Seller.

4.16 Reserved

4.17 Governmental Licenses, Permits and Related Approvals. Seller is not required to maintain any permits or licenses in connection with the operations of the Business. To the best of Seller's and Bennett's knowledge, there are no limitations on the continued and future use, occupation, operations or expansion of the Business at its present facilities.

4.18 Labor Matters. There are no controversies pending or threatened between Seller and any of its employees or former employees, job applicants or any association or group of such persons and such Seller has not taken or failed to take any action which would provide a reasonable basis for such a controversy. Seller has complied with all laws applicable to it relating to the employment of labor, including any provisions thereof relating to wages, hours, collective bargaining and the payment of social security, Medicare, unemployment compensation and similar taxes. During the five (5) year period preceding the date of this Agreement, there have not been any labor unrest or union activity involving persons employed by Seller. To the best

-11-

of Seller's and Bennett's knowledge, there are no present employees of Seller who will not continue to be available for employment by the Buyer after the Closing on substantially the same terms as presently employed.

4.19  Customer and Suppliers.  Schedule 4.19 lists, by dollar volume paid for the prior twelve (12) months ended on the Balance Sheet Date, (i) the ten largest customers of Seller, (ii) the ten largest suppliers of Seller, and (iii) any other supplier which is Seller's sole supplier of a product of which Seller purchased in excess of $5,000 of such product during such twelve (12)-month period and (iv) any contracts with suppliers that cannot be terminated without penalty on thirty (30) days notice. To the best knowledge of Seller, no entity or person listed on Schedule 4.19 (A) intends or within the last twelve (12) months has threatened to cancel or otherwise terminate the relationship of such person with Seller, or (B) intends to modify materially its relationship with Seller or to decrease materially or limit materially services, supplies or materials to Seller or its usage or purchase of the products or services of a Seller, as the case may be.  There are presently no customer disputes or dissatisfaction related to Seller's Business.

4.20   Employee Benefit Plans.

4.20.1  Schedule 4.20 sets forth a correct and complete list of all employee benefit plans within the meaning of Section 3(3) of ERISA, established, maintained or contributed to by the Seller and under which Seller has any present or future obligation or liability or under which any employee of Seller has any present or future rights (each a "Benefit Plan" and collectively the "Benefit Plans").  Except as set forth in Schedule 4.20, none of the Benefit Plans is a "multiemployer plan" within the meanings of ERISA.

4.20.2  With respect to each Benefit Plan, Seller has delivered to Buyer correct and complete copies of (i) the plan and any related trust documents and all amendments thereto, (ii) all summary plan descriptions and other material employee communications, (iii) the most recent determination letter received from the Internal Revenue Service ("IRS") (if required), (iv) to the extent required to be filed, the most recent Annual Report (Form 5500 Series) and accompanying schedules and other information, as filed with the IRS, and (v) the most recent actuarial valuation for each such plan that is an "employee pension benefit plan" within the meaning of ERISA (if required).

4.20.3  Schedule 4.20.3 is a complete and accurate list, as of the Effective Date, of all participants in the group health insurance plan maintained by the Seller for its employees (the "Group Health Plan"), including all covered employees and covered spouses and covered dependents of Company's employees and all

-12-

qualified beneficiaries, as defined in ERISA in § 607(3) who are
currently exercising their rights under COBRA or are within the
statutory period during which they may still exercise such
rights.  Schedule 4.20.3 shall designate the current status of
each named individual as a current participant or as a qualified
beneficiary exercising or entitled to exercise COBRA rights.  If
an individual is designated as a qualified beneficiary in
exercising or entitled to elect COBRA rights then Schedule 4.20.3
shall also state the expiration date of individual's COBRA
rights.  As of the date hereof, the Seller has complied with all
requirements of COBRA with respect to the Group Health Plan or
any other health insurance plan of the Seller, including, but not
limited to, compliance with the notice and election requirements
of COBRA.  Except for those persons disclosed on Schedule 4.20.3,
neither Buyer nor any of its affiliated corporations, directors,
officers or employees shall incur any tax, penalty, liability,
debt or obligation for failing to provide health care
continuation coverage to any of the following persons who are
participating as of the Closing Date in any group health plan(s),
as that term is defined in Code Section 5000(b)(1) of Seller: (i)
any of Seller's employees, or former employees, who are not hired
by the Buyer; (ii) the spouses, former spouses, dependents or
former dependents of such employees; or (iii) any of Seller's
employees, or former employees, who are hired by the Buyer, or
their spouses, former spouses, dependents or former dependents,
who have preexisting conditions which are not covered by the
group health insurance plan(s), if any, offered by Buyer.

     4.21  Insurance.  Schedule 4.21 sets forth a list and brief
description (specifying the insurer and briefly describing each
pending claim thereunder) of all policies or binders of fire,
liability, product liability, group health, vehicular and other
insurance held by or on behalf of Seller as of September 1, 1996.
At Closing, Seller will deliver to Buyer copies of such policies.
Schedule 4.21 also sets forth a list and brief description
(specifying the insurer and describing each pending claim
thereunder) of all workers compensation insurance held by or on
behalf of Seller.  The premiums due under all such policies or
binders have been fully paid, and such policies and binders are
in full force and effect and insure against risks and liabilities
to an extent and in a manner customary in the industries in which
Seller operates.  Except for claims set forth on Schedule 4.21,
there are no outstanding unpaid claims under any such policy or
binder, and Seller has not received any notice of cancellation or
non-renewal of any such policy or binder.  Except as set forth on
Schedule 4.21, Seller has not received any notice from any of
their insurance carriers that any insurance premiums will be
materially increased in the future or that any insurance coverage
listed on Schedule 4.21 will not be available in the future on
substantially the same terms as now in effect.

4.22  <u>Ordinary Course</u>.  During the past twelve (12) months, (i) the Seller has managed the Business in a manner consistent with past customs and practices, (ii) Seller has not entered into any transaction other than in the ordinary course of business and (iii) none of the Assets has been sold or otherwise disposed of other than in the ordinary course of business.

4.23  <u>Potential Conflicts of Interest</u>.  No officer, director, manager or affiliate (for purposes of this Agreement an affiliate is any party related to Seller within the meaning of Sections 267(b) and (c) of the Internal Revenue Code except that ten (10%) percent shall be substituted for fifty (50%) percent) of Seller, no relative or spouse (or relative of such spouse) of any such officer, director, manager or affiliate, and no entity controlled by one or more of the foregoing:

(a)  owns, directly or indirectly, any interest in (excepting less than 1% stock holdings for investment purposes in securities of publicly held and traded companies), or is an officer, director, employee or consultant of, any person, firm, corporation or other entity which is, or is engaged in business as, a competitor, lessor, lessee, supplier, distributor, sales agent or customer of a Seller;

(b)  owns, directly or indirectly, in whole or in part, any tangible or intangible property that Seller uses in the conduct of its business; or

(c)  has any cause of action or other claim whatsoever against, or owes any amount to, Seller, except for claims in the ordinary course of business for items such as accrued vacation pay, accrued benefits under employee benefit plans and similar matters.

4.24  <u>Leased Real Property</u>.  With regard to the real property located on Leopard Drive in Corpus Christi, Texas to be leased by Seller to Buyer and the leased location of the Company in Pharr, Texas (collectively the "Leased Real Property)

(a)  <u>Access</u>.  Seller has obtained all authorizations and rights-of-way, including proof-of-dedication, which are necessary to ensure vehicular and pedestrian ingress and egress to and from the Leased Real Property.  There are no restrictions on entrance to or exit from the Real Property to adjacent public streets and no conditions which will result in the termination of the present access from the Leased Real Property to existing highways and roads.

(b)  Reserved

-14-



(c) <u>Eminent Domain</u>.  Seller has received no notices, oral or written, and has no reason to believe, that any governmental body having the power of eminent domain over the Leased Real Property has commenced or intends to exercise the power of eminent domain or a similar power with respect to all or any part of the Leased Real Property.

(d) <u>No Violations</u>.  The Leased Real Property and the present uses thereof comply in all material respects with all regulations of all governmental bodies having jurisdiction over the Leased Real Property, and Seller has received no notices, oral or written, from any governmental body, and has no reason to believe, that the Leased Real Property or any improvements erected or situate thereon, or the uses conducted thereon or therein, violate any regulations of any governmental body having jurisdiction over the Leased Real Property.

(e) <u>Improvements</u>.  Except for the Frost Bank Mortgage on the Leopard Drive realty, the improvements located on the Leased Real Property are free of all liens and encumbrances.

(f) <u>Public Improvements</u>.  No work for municipal improvements has been commenced on or in connection with the Leased Real Property or any street adjacent thereto.  No assessment for public improvements has been made against the Leased Real Property which remains unpaid.  No notice from any county, township or other governmental body has been served upon the Leased Real Property or received by Seller requiring or calling attention to the need for any work, repair, construction, alteration or installation on or in connection with the Leased Real Property which has not been complied with.

(g) <u>Deed Restrictions</u>.  The improvements constructed on the leased real property located on Leopard Street are not in conflict with the deed restrictions contained at Volume 1355, Page 64 of the Deed Records of Nueces County.

(h) <u>Flood Plain</u>.  No part of the Leased Real Property contains, is located within, or abuts any flood plain, navigable water or other body of water, tideland, wetland, marshland or any other area which is subject to special state, federal or municipal regulation, control or protection.

(i) <u>Executory Contracts</u>.  There are no executory contracts made by or on behalf of Seller or by which Seller is bound, with respect to the Leased Real Property ("Executory Contracts") including, without limitation, operation, management, maintenance, utility, and construction contracts.

(j) <u>Defects</u>.  To the best knowledge of Seller and Bennett, there are no material defects in the Leased Real Property.

(k) <u>No Restrictions on Access</u>.  There are no restrictions on entrance to or exit from (ingress and egress) the Leased Real Property.

(l) <u>Compliance with Subdivision Statutes</u>.  To the best knowledge of Seller and Bennett, Seller and Bennett warrant that the Property complies with all the local, State and Federal laws with regard to the subdivision of real property, and no final subdivision map, parcel map, or division of land is required to transfer the Leased Real Property validly to Buyer.

4.25  <u>Full Disclosure</u>.  All documents and other papers delivered by or on behalf of the Seller or Bennett in connection with this Agreement and the transactions contemplated hereby are true and complete in all material respects.  No representation or warranty of Seller or Bennett contained in this Agreement contains an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements made, in the context in which made, not materially false or misleading.

## ARTICLE IVA
## REPRESENTATIONS AND WARRANTIES OF BENNETT

4A.  Bennett represents and warrants to Buyer and Seller as follows:

4A.1 <u>Validity of Agreement</u>.  Bennett has full legal right and all requisite power, legal capacity and authority to enter into this Agreement, and any other agreement contemplated hereunder, and to perform his obligations hereunder and thereunder.  This Agreement has been duly executed and delivered by Bennett and is a valid and legally binding obligation of Bennett enforceable against Bennett in accordance with its terms.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF THE BUYER AND STOVER

5.  The Buyer and Stover represent and warrant to Seller and Bennett as follows:

-16-

5.1  <u>Due Incorporation and Authority</u>.  Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of North Carolina and duly qualified to conduct business in the State of Texas.  Buyer has all requisite corporate power and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted.

5.2  <u>Validity of Agreement</u>.  Buyer has full legal right and all requisite power, legal capacity and authority to enter into this Agreement, and any other agreement contemplated hereunder, and to perform its obligations hereunder and thereunder.  This Agreement has been duly executed and delivered by Seller and is a valid and legally binding obligation of Seller, enforceable against Seller in accordance with its terms and conditions.  The execution, delivery and performance of this Agreement by Seller has been duly authorized by all requisite corporate action.

5.3  <u>No Approvals or Notices Required: No Conflict with Instruments to which Buyer is a Party</u>.  To the best knowledge of Buyer and Stover, the execution, delivery and performance of this Agreement by Buyer and the consummation by Buyer of the transactions contemplated hereby will not violate (with or without the giving of notice or the lapse of time or both) or require any consent, approval, filing or notice under any provision of law applicable to Buyer and will not require any consent, approval or notice under and will not conflict with, or result in the breach or termination of any provision of, or constitute a default under, or result in the acceleration of the performance of Buyer's obligations under, or result in the creation of a lien, charge or encumbrance upon any of the properties, assets or business of Buyer pursuant to Buyer's charter or bylaws or any indenture, mortgage, deed of trust, lease, contract, instrument or other agreement, or any order, judgment or decree, to which Buyer is a party or by which Buyer or any of its properties or assets is bound.

5.4  <u>Buyer's Knowledge</u>.  As of the date of closing, Buyer does not know of any facts which would cause Buyer to believe that any representation by the Seller herein is not true in all respects.

5.5  <u>Consents and Approval</u>.  To the best knowledge of Buyer, no filing with, and no permit, authorization, consent or approval of, any public body or authority, the absence of which would not, either individually or in the aggregate, have a material adverse effect on the business, operations or financial condition of Buyer is necessary for the consummation by Buyer of the transactions contemplated by this Agreement.

5.6  <u>Buyer's Representations</u>.  The representations and warranties of Buyer made in this Agreement and in any documents

-17-

specifically referred to herein and delivered to Seller pursuant
hereto do not contain any untrue statement of a material fact or
omit to state any material fact necessary to make the statements
herein or therein, in light of the circumstances in which they
were made, not misleading.

5.7  <u>Current Claims</u>.  Buyer and Stover represent that to the
best of their knowledge at Closing, Buyer has no claims under
this Agreement versus Seller (provided, however, this
representation in no way reduces the duties and obligations of
Bennett and Seller under this Agreement).

### ARTICLE VA
### REPRESENTATIONS AND WARRANTIES OF STOVER

5A.  Stover represents and warrants to Seller and Bennett as
follows:

5A.1  <u>Validity of Agreement</u>.  Stover has full legal right
and all requisite power, legal capacity and authority to enter
into this Agreement, and any other agreement contemplated
hereunder, and to perform his obligations hereunder and
thereunder.  This Agreement has been duly executed and delivered
by Stover and is a valid and legally binding obligation of Stover
enforceable against Stover in accordance with its terms.

### ARTICLE VI
### COVENANTS AND AGREEMENTS

6.  The parties covenant and agree as follows:

6.1  <u>Conduct of Business</u>.  From the date hereof through the
Closing Date, Seller shall conduct its Business in the ordinary
course, consistent with past practice, and, without the prior
written consent of the Buyer and Stover, neither Seller nor
Bennett will take any action that would cause the representations
and warranties contained in Section 4.22 hereof not to be true
and correct immediately after the taking of such action.  From
the date hereof through the Closing Date, Seller will conduct its
business in such a manner so that the other representations and
warranties contained in Article IV hereof, in addition to those
contained in Section 4.22, shall continue to be true and correct
on and as of the Closing Date as if made on and as of the Closing
Date.

6.2  <u>Maintenance of Assets: Casualty Loss</u>.  From the date
hereof through the Closing Date, Seller will maintain its assets
in customary repair, order and condition, reasonable wear and
tear accepted, and, in the event of a casualty, loss or damage
prior to the Closing Date to any of such assets for which Seller
is insured, Seller will, at the option of Buyer, and subject to
the requirements of any applicable loss payee or mortgagee

-18-

clauses, either repair or replace such damaged assets or transfer
the proceeds of such insurance to the Buyer on the Closing Date.

6.3 <u>Notice of Certain Events</u>.  Seller hereby agrees to give
Buyer prompt notice of (i) any event, condition or circumstances
occurring from the date hereof through the Closing Date that
would constitute a violation or breach of any representation,
warranty or covenant of Seller contained in this Agreement, or
(ii) any event, occurrence, transaction or other item which would
have been required to have been disclosed in this Agreement or
any Schedule or statement delivered hereunder, had such event,
occurrence, transaction or item existed on the date hereof.

6.4 <u>Corporate Examinations and Investigations</u>.  Prior to the
Closing Date, Buyer shall be entitled, through its employees,
representatives and contractors, including, without limitation,
Tuggle Duggins & Meschan, P.A., and Buyer's accountants to make
such investigation of the assets, Facilities, properties,
employees, business and operations of Seller, and such
examination of the books, records and financial condition of
Seller as it wishes.  Any such investigation and examination
shall be conducted at reasonable times and under reasonable
circumstances and Seller and Bennett shall cooperate fully
therein.  No investigation by or on behalf of Buyer, however,
shall diminish or obviate any of the representations, warranties,
covenants or agreements of Seller under this Agreement.  In order
that Buyer may have full opportunity to make such physical,
business, accounting and legal review, examination or
investigation as it may wish of the business and affairs of
Seller, Seller shall make available to the representatives of
Buyer during such period all such information and copies of such
documents concerning the affairs of Seller as such
representatives may reasonably request, shall permit the
contractors and representatives of Buyer access to the properties
of Seller and all parts thereof and shall cause Seller's
officers, employees, advisors, staff, consultants, agents,
accountants and attorneys to cooperate fully with such
contractors and representatives in connection with such review
and examination.  From the date hereof through the Closing Date,
Seller shall provide office facilities for the use of Buyer's
employees, agents and advisors at Seller's Facilities as may be
reasonably required for preparation for the transfer of ownership
contemplated by this Agreement and for the post-closing
operations and utilization of the assets being acquired by Buyer
pursuant to this Agreement.

6.5 <u>Expenses</u>.  The parties to this Agreement shall bear
their own respective expenses incurred in connection with the
negotiation, preparation, execution, delivery and performance of
this Agreement and the consummation of the transactions
contemplated hereby, including, without limitation, all fees and

-19-

expenses of agents, brokers, representatives, counsel and accountants.

6.6 <u>Indemnification of Brokerage</u>. Seller and Bennett represent and warrant to the Buyer that if a broker, finder, agent or similar intermediary has acted on behalf of Seller in connection with this Agreement or the transactions provided for herein, Seller and Bennett shall be responsible for any brokerage commissions, finder's fees or similar fees or commissions payable with respect to this Agreement or such transactions based on any agreement, arrangement or understanding with Seller, or any action taken by Seller. Seller and Bennett agree to indemnify and save the Buyer harmless from any claim or demand for commission or other compensation by any broker, finder, agent or similar intermediary employed by or on behalf of Seller and Bennett, and to bear the cost of legal expenses incurred in defending against any such claim.

The Buyer represents and warrants to Seller and Bennett that there are no brokerage commissions, finder's fees or similar fees or commissions payable in connection with this Agreement or the transactions provided for herein based on any agreement, arrangement or understanding with the Buyer, or any action taken by the Buyer. The Buyer agrees to indemnify and save Seller and Bennett harmless from any claim or demand for commission or other compensation by any broker, finder, agent or similar intermediary employed by or on behalf of the Buyer and to bear the cost of legal expenses incurred in defending against any such claim.

6.7 <u>Exclusive Dealing</u>. From the date hereof through the Closing Date, Seller and Bennett agree that they will not, directly or indirectly, encourage, initiate or engage in discussions or negotiations with, or provide any information to, any corporation, partnership, person or other entity or group, other than Buyer, concerning any purchase of any equity interest in Seller, or any merger, sale of substantial assets or similar transaction involving Seller.

6.8 <u>Third Party Consents</u>. To the extent that Seller's rights under any agreement, contract, commitment, lease or other Asset to be assigned to Buyer hereunder may not be assigned without the consent of another person which consent has not been obtained, this Agreement shall not constitute an agreement to assign such contract(s) if an attempted assignment would constitute a breach thereof or be unlawful, and Seller, at its expense, shall use its best effort to obtain any such required consents as promptly as possible. If any such consent shall not be obtained or if any attempted assignment would be ineffective or would impair Buyer's rights in an Asset in question so that the Buyer would not acquire the benefit of all such rights, to the maximum extent permitted by law Seller shall act after the Closing as Buyer's agent in order to obtain for Buyer the maximum

benefits thereunder and shall cooperate with Buyer and any other reasonable arrangement designed to provide such benefits to Buyer.

6.9 <u>Change in Name</u>. On or before the Closing Date, Seller shall amend its name to another name bearing no similarity to the name "A G. Hill Power, Inc."

6.10 <u>Employment Agreements</u>. Bennett agrees, concurrently with the Closing, to enter into an Employment, Consulting and Noncompetition Agreement with Buyer referred to in Section 7.7 (the "Employment Agreement"). In addition, at Closing certain key employees shall enter into employment, confidentiality and noncompetition agreements with Buyer in form and substance satisfactory to Buyer (the "Key Employee Agreements").

6.11 <u>Further Assurances</u>. Each of the parties hereto shall execute such agreements, certificates, documents and other instruments and take such further action as may be reasonably necessary or appropriate to carry out the provisions hereof and the transactions provided for herein. Each such party shall use its best commercially reasonable efforts to fulfill or obtain the fulfillment of all conditions to the Closing. After the Closing, at Buyer's request Seller and Bennett will execute, acknowledge and deliver to Buyer such other instruments of conveyance and transfer and will take such other actions and execute and deliver such other documents, certifications and further assurances as Buyer may reasonably require in order to vest more effectively in Buyer, or to put Buyer more fully in possession of any of the Assets, or to better enable Buyer to complete, perform or discharge any of the Assumed Liabilities. Each of the parties hereto will cooperate with the other and execute and deliver to the other parties hereto such other instruments and documents and take such other actions as may be reasonably requested from time to time by any other party hereto as necessary to carry out, evidence and confirm the intended purposes of this Agreement.

6.12 <u>Transfer Taxes</u>. Seller will pay all sales, transfer and documentary taxes, if any, payable in connection with the sales to be made hereunder.

6.13 <u>Accounts Receivable</u>. At closing, Seller shall provide Buyer a list of all Accounts Receivable as of the Closing (the "Accounts Receivable List"). Buyer agrees to provide Seller or its representatives access to its records at reasonable times in order to assist Seller in collection of its Accounts Receivable. Funds received by Buyer after the Closing Date specifically identified as being in payment for invoices on the Accounts Receivable List shall be remitted to Seller within three (3) business days after Buyer's receipt thereof. All funds received by Buyer from a customer for which no designation has been made as to application shall first be applied the oldest receivable

-21-

first. Any amounts received from a customer by Buyer in excess
of said amounts and not otherwise allocatable to customer
prepayments or deposits shall be remitted to Seller. Seller
agrees to remit to Buyer within three (3) business days after
receipt thereof all funds received by Seller for amounts invoiced
by Buyer.

    6.14 <u>Sale Announcement and Notices</u>. Seller and Buyer
mutually agree that no party hereto shall release, publish or
otherwise make available to the public in any manner whatsoever
any information or announcement regarding the transactions herein
contemplated without the prior written consent of Seller and
Buyer. As soon as possible after the execution hereof and no
later than one day after closing, Seller and Buyer shall mutually
prepare letters to each of Seller's current clients, which makes
full disclosure of the fact that the ownership of the Assets of
A. G. Hill Power, Inc. has changed but that the personnel
providing services to Seller's customers (with the exception of
Bennett) shall remain the same. Seller and Buyer shall also
mutually prepare letters which shall be promptly dispatched to
each of the suppliers of either goods or services to Seller
notifying the suppliers that the ownership of Seller has been
changed and further notifying the suppliers of the new tax
identification number of the new owners.

    6.15 <u>Release of Guarantees</u>. Buyer and Stover agree to use
their best efforts to obtain the release of Bennett from all
personal guarantees of obligations of Seller related to the
Assumed Obligations.

    6.16 <u>Employees</u>. Through the Effective Date, the Seller
shall pay or accrue to all employees all due and proper
allowances for wages, commissions, salaries, holiday and vacation
pay, bonuses and past service claims; and shall have made or
admitted or will be holding in trust for the beneficiaries
thereof and at Closing shall make and remit all proper
deductions, remittances and contributions for employees' wages,
commissions and salaries required under all contracts and
statutes (including, without limitation, for Group Health
Insurance, workmans' compensation, unemployment insurance, income
tax, FICA taxes and the like) and, wherever requested by such
contracts and/or statutes, all proper deductions and
contributions from its own funds for such purposes. The Seller
agrees to perform all reporting duties in respect to all such
wages, commissions, salaries and other compensation and respect
of all such deductions and contributions. Buyer assumes no
liability for any amounts which have been paid or should have
been paid to or for the benefit of, or withheld from, any
employee of the Seller except as set forth in the Assumption
Agreement. Seller will terminate all of its employees effective
on the Effective Date and agrees to the following in connection
herewith:

-22-

(a) on or prior to the Effective Date, the Company will have provided those individuals listed on Schedule 4.20.3 who are not employees on the Effective Date notice of their COBRA rights under the Group Health Plan pursuant to ERISA Section 606(a)(c); and

(b) the Seller shall be solely responsible for any and all severance pay obligations, if any, relevant to its employees which arise as a result of the termination of employment contemplated hereunder.

6.17  **Continuation of Certain Benefit Plans of Company.** Buyer will continue the Group Health Plan of the Company in accordance with the Employee Benefits Succession Agreement between Seller and Buyer executed on the Closing Date in the form of Exhibit 6.17. Provided, however, that the foregoing shall in no way limit Buyer's right at any time following the Effective Date to amend or terminate any employee benefit plan continued by Buyer hereunder.

6.18  **Environmental Matters.** Within thirty (30) days after closing, Buyer will engage a qualified environmental firm to perform an environmental study (the "Study") of the surface of the real property owned by the Seller on 6654 Leopard Drive in Corpus Christi, Texas (the "Realty") the cost of which shall be borne by Buyer. The purpose of the Study is to establish the condition of the Realty at the start of the lease.  A similar study will be conducted at the end of the lease for comparison. The scope of work of the Study shall consist of analysis of samples for TPH, lead and PCB's with each sample numbered and indicated on a site plan.  Seller agrees to assume all environmental liabilities disclosed by the Study and to indemnify and hold harmless Buyer from any and all claims and causes of action related to the environmental condition of the Leased Real Property shown by the Study or any subsequent study conducted by Buyer occurring on or prior to the date of the Study.  Buyer agrees to indemnify and hold Seller harmless for any environmental conditions which arise on the Leased Real Property after the date of the Study.  To the extent the Study discloses violation of any applicable Environmental Laws (as hereinafter defined), Seller shall have full responsibility for any remediation or reporting with regard to such violations.  Nothing in this Section 6.18 shall limit the right of Buyer to conduct additional environmental testing of the Leased Real Property. For purposes of this Agreement, "Environmental Laws" shall mean any and all federal, state and local laws, regulations, ordinances, administrative rules, orders, decrees, decisions and the like, and all other requirements under law relating to pollution or protection of health, safety, public welfare or the environment, including, without limitation, laws, regulations and requirements relating to the ownership, possession, storage and/or control of the Facilities (including the Leased Real

-23-

Property) (as defined below) and to emissions, discharges, releases or threatened releases of storm water, pollutants, contaminants, toxic or hazardous chemicals, materials, or substances, or solid or hazardous wastes into the environment (including without limitation ambient air, surface water, groundwater or land), or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of pollutants, contaminants, toxic or hazardous substances, or solid or hazardous wastes. The Environmental Laws include, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, and any comparable Texas state law.

**ARTICLE VII**
**CONDITIONS PRECEDENT TO THE OBLIGATION**
**OF THE BUYER AND STOVER TO CLOSE**

7.    The obligation of Buyer and Stover to enter into and complete the Closing is subject, at the option of Buyer acting in accordance with the provisions of this Agreement with respect to termination hereof, to the fulfillment on or prior to the Closing Date of the following conditions, any one or more of which may be waived by it:

7.1    <u>Accuracy of Representations and Warranties</u>.    The representations and warranties of Seller and Bennett contained in this Agreement shall be true on and as of the Effective Date and the Closing Date, with the same force and effect as though made on and as of the Closing Date.

7.2    <u>Performance of Agreements</u>.    Seller and Bennett shall have performed and complied with all covenants and agreements required by this Agreement to be performed or complied with by Seller and Bennett on or prior to the Closing Date.

7.3    <u>Certificates of Seller</u>.    Buyer shall have received a certificate, dated the Closing Date, of Seller and Bennett, to the effect set forth in Sections 7.1 and 7.2 above.

7.4    <u>Permits and Required Consents</u>.    All Permits and Required Consents necessary to operate the Business shall have been assigned to Buyer or obtained by Buyer and shall be in full force and effect.

7.5    <u>Resolutions</u>.    Seller shall deliver to Buyer copies of resolutions duly adopted by the shareholders and board of directors of the Seller authorizing and approving Seller's performance of the transactions contemplated hereby and the execution and delivery of this Agreement and the documents described herein, together with a certificate to the incumbency of the officers of Buyer executing any instrument or other

-24-

document delivered to Seller, certified as true and of full force as of the closing, by an appropriate officer of Buyer.

7.6   <u>No Casualty</u>.   Since the date of this Agreement, no damage, destruction or loss, whether or not covered by insurance, adversely affecting in any material respect any of the properties or assets of Seller shall have occurred.

7.7   <u>Consulting Agreement</u>.   Concurrently with the Closing, Bennett shall have entered into the Consulting and Noncompetition Agreement with Buyer substantially in the form of <u>Exhibit 7.7</u> attached hereto.

7.8   <u>Review of Contracts Affecting the Property/Assignments</u>.

(a)   Seller shall furnish Buyer with copies of all contracts to which Seller is a party pertaining to the Leased Real Property.

(b)   Seller shall assign to Buyer all of Seller's and Bennett's warranties and rights against any contractors, subcontractors, suppliers, and materialmen involved in any construction or operation of the Leased Real Property.   Seller shall also assign to Buyer its entire right, title, and interest in and to any existing plans and specifications, engineering studies, utility deposits, applications for governmental permits and utilities, or any other plans, documents, and reports that are in the process or necessary to support applications for governmental permits and approvals.

7.9   <u>Other Documents</u>.   Seller shall deliver to Buyer the following agreements or documentation:

(a)   the Assumption Agreement;

(b)   the Escrow Agreement;

(c)   vehicle titles;

(d)   flood plain certification as required in Section 4.24(1);

(e)   proof of Seller's change of names as required in Section 6.9;

(f)   Reserved;

(g)   A Certificate of Good Standing from the State of Texas and every state in which Seller conducts business;

(h)    certification of Seller's certified public accountant that all state, federal and local taxes and tax returns have been timely filed and all related taxes paid; and

(i)    UCC termination statements terminating all liens and encumbrances on the Assets not being assumed hereunder.

7.10 <u>No Proceeding or Litigation</u>. No action, suit, claim, proceeding or investigation before any federal or state court or any federal or state governmental or regulatory authority shall have been commenced, and no action, suit, claim or proceeding by any such governmental or regulatory authority shall have been threatened, against Seller seeking to restrain, prevent or change the transactions contemplated by this Agreement or seeking material damages in connection with any of such transactions.

7.11 <u>Leases</u>. Buyer shall have entered into agreements for the lease of:

(a)    the real property located at Leopard Drive, Corpus Christi, Texas; and

(b)    The consent of any lessor for Buyer's assumption of the obligations of Seller for any Leased Real Property (other than the Corpus Christi Lease) or Leased Personal Property.

**ARTICLE VIII**
**CONDITIONS PRECEDENT TO THE OBLIGATION**
**OF SELLER AND BENNETT TO CLOSE**

8.    The obligation of Seller and Bennett to enter into and complete the Closing is subject, at the option of Seller acting in accordance with the provisions of this Agreement with respect to termination hereof, to the fulfillment on or prior to the Closing Date of the following conditions, any one or more of which may be waived by them:

8.1 <u>Accuracy of Representations and Warranties</u>. The representations and warranties of Buyer and Stover contained in this Agreement shall be true on and as of the Closing Date, with the same force and effect as though made on and as of the Closing Date.

8.2 <u>Performance of Agreements</u>. Buyer and Stover shall have performed and complied with all covenants and agreements required by this Agreement to be performed or complied with by Buyer and Stover on or prior to the Closing Date.

8.3 <u>Certificates of Buyer</u>. Seller shall have received a certificate, dated the Closing Date, of Buyer and Stover, to the effect set forth in Sections 8.1 and 8.2 above.

-26-

8.4  <u>Resolutions</u>.  Buyer shall deliver to Seller copies of resolutions duly adopted by the shareholders and board of directors of the Buyer authorizing and approving Buyer's performance of the transactions contemplated hereby and the execution and delivery of this Agreement and the documents described herein, together with a certificate to the incumbency of the officers of Buyer executing any instrument or other document delivered to Seller, certified as true and of full force as of the closing, by an appropriate officer of Buyer.

8.6  <u>Employment and Consulting Agreement</u>.  Concurrently with the Closing, Buyer shall have entered into the Employment and Consulting Agreement with Bennett and the Key Employee Agreements.

8.5  <u>Other Documents</u>.  Buyer shall deliver to Seller the following Agreements:

(a)  the Assumption Agreement;

(b)  the Escrow Agreement;

(c)  the Employee Benefits Succession Agreement; and

(d)  Release of Bennett Guarantees on Assumed Obligations.

## ARTICLE IX
### INDEMNIFICATION

9.1  <u>Survival of Representations and Agreements</u>.  Notwithstanding any right of Buyer to fully investigate the affairs of Seller and notwithstanding any knowledge of facts determined or determinable by the Buyer pursuant to such investigation or right of investigation, the Buyer has the right to rely fully upon the representations, warranties, covenants and agreements of Seller contained in this Agreement or in any certificate deliverable pursuant to this Agreement. Notwithstanding any right of Seller to fully investigate the affairs of Buyer and not withstanding any knowledge of the facts determined or determinable by the Seller pursuant to such investigation or right of investigation, the Seller has the right to rely fully on the representations, warranties, covenants and agreements of Buyer contained in this Agreement or in any certificate deliverable pursuant to this Agreement. In particular, the delivery by Buyer to Seller of any environmental surveys or audits procured by Buyer in connection with its pre-closing due diligence activities shall in no way lessen or mitigate the effect of the representations and warranties of Seller in Section 4.16 (Environmental Compliance). All such representations, warranties, covenants and agreements shall survive the execution and delivery of this Agreement and the

-27-

Closing hereunder and shall continue in full force and effect thereafter subject however to the following:

    (a)   All representations, warranties, covenants and agreements of Seller and Buyer contained in this Agreement or made pursuant hereto shall terminate and expire five (5) years after the Effective Date, except the representations and warranties of Seller in respect of Section 4.8 (Tax Matters), Section 4.15 (Compliance with Laws), and Section 4.20 (Employee Benefit Plans) shall terminate and expire upon the expiration of all applicable statutes of limitation against Seller with regard to such matters.

    (b)   With respect to any matter as to which a Claims Notice (as defined in Section 9.4.1) is given prior to expiration of the applicable limitation period described in Section 9.1(a) above, any and all rights of a party hereto related to said Claims Notice shall continue in full force and effect and shall not terminate until final resolution of the matter in question.

    9.2   <u>Obligation of Seller and Bennett to Indemnify</u>.  Seller and Bennett jointly and severally agree to indemnify, defend and hold harmless Buyer (and its directors, officers, affiliates, successors and assigns) and Stover from and against all losses, liabilities, damages, deficiencies, costs or expenses (including interest, penalties and reasonable attorneys' fees and disbursements) (a "Loss" or "Losses") based upon, arising out of or otherwise in respect of

    (i)   any inaccuracy in or any breach of any representation, warranty, covenant or agreement of Seller or Bennett contained in this Agreement or in any agreement, certificate, document or other instrument delivered by Seller or Bennett pursuant to this Agreement; or

    (ii)   any obligation, liability, action, claim, suit or proceeding arising out of any action or inaction by Seller or Bennett or the operations or business of Seller or the environmental condition of the Leased Real Property, arising from events prior to the Effective Date whether or not disclosed in this Agreement (except that the cutoff date for environmental matters shall be the date of the Study).

Provided, however, except with regard to any payment which may be due Buyer or Stover from Seller or Bennett under any of the Assumed Obligations, Seller and Bennett shall have no indemnity obligation hereunder to Buyer with respect to any liability or

obligation assumed by the Buyer pursuant to the Assumption
Agreement.

9.3  <u>Obligation of the Buyer and Stover to Indemnify</u>.  Buyer
and Stover jointly and severally agree to indemnify, defend and
hold harmless Seller (and its directors, officers, affiliates,
successors and assigns) and Bennett from and against any Losses
based upon, arising out of or otherwise in respect of

    (i)  any inaccuracy in or any breach of any representation,
warranty, covenant or agreement of Buyer or Stover
contained in this Agreement or in any agreement,
certificate, document or other instrument delivered by
Buyer or Stover pursuant to this Agreement; or

    (ii) any obligation, liability, action, claim, suit or
proceeding arising out of any action or inaction by the
Buyer or Stover or the operation or business of the
Buyer or the Environmental Condition of the Leased Real
Property arising from events subsequent to the
Effective Date whether or not disclosed in this
Agreement (except that the cutoff date for
environmental matters shall be the date of the Study).

9.4  <u>Notice and Opportunity to Defend</u>.

9.4.1  <u>Notice of Asserted Liability</u>.  Promptly after receipt
by any party hereto (the "Indemnitee") of notice of any demand,
claim or circumstances which, with the lapse of time, would or
might give rise to a claim or the commencement (or threatened
commencement) of any action, proceeding or investigation (an
"Asserted Liability") that may result in a Loss, the Indemnitee
shall give notice thereof (the "Claims Notice") to any other
party (or parties) obligated to provide indemnification pursuant
to Section 9.2 or 9.3 (the "Indemnifying Party").  The Claims
Notice shall describe the Asserted Liability in reasonable
detail, and shall indicate the amount (estimated, if necessary
and to the extent feasible) of the Loss that has been or may be
suffered by the Indemnitee.

9.4.2  <u>Opportunity to Defend</u>.  The Indemnifying Party may
elect to compromise or defend, at its own expense and by its own
counsel, any Asserted Liability.  If the Indemnifying Party
elects to compromise or defend such Asserted Liability, it shall
within thirty (30) days (or sooner, if the nature of the Asserted
Liability so requires) notify the Indemnitee of its intent to do
so, and the Indemnitee shall cooperate, at the expense of the
Indemnifying Party, in the compromise of, or defense against,
such Asserted Liability.  If the Indemnifying Party elects not to
compromise or defend the Asserted Liability, fails to notify the
Indemnitee of its election as herein provided or contests its
obligation to indemnify under this Agreement, the Indemnitee may

-29-

pay, compromise or defend such Asserted Liability and seek repayment from the Indemnifying party. Notwithstanding the foregoing, neither the Indemnifying Party nor the Indemnitee may settle or compromise any claim over the objection of the other; provided, however, that consent to settlement or compromise shall not be unreasonably withheld. If the Indemnifying Party chooses to defend any claim, the Indemnitee shall make available to the Indemnifying Party any books, records or other documents within its control that are necessary or appropriate for such defense.

9.4.3 <u>Disputes with Customers, Distributors, Sales Agents or Suppliers</u>. Anything in Section 9.4.2 to the contrary notwithstanding, in the case of any Asserted Liability by any supplier, distributor, sales agent or customer of a Seller with respect to the business conducted by Seller prior to the Closing in connection with which the Buyer may make a claim against Seller for indemnification pursuant to Section 9.2, the Buyer shall give a Claims Notice with respect thereto but, unless Buyer, Seller and Bennett otherwise agree, Buyer shall have the exclusive right at its option to defend any such matter subject to the duty of Buyer to consult with the Indemnifying Party and its attorneys in connection with such defense and provided that no such matter shall be compromised or settled by Buyer without the prior consent of Seller, which consent shall not be unreasonably withheld. Seller shall have the right to recommend in good faith to Buyer proposals to compromise or settle claims brought by a supplier, distributor, sales agent or customer, and the Buyer agrees to present such proposed compromise or settlements to such supplier, distributor or customer. All amounts required to be paid in connection with any such Asserted Liability under this Section 9.4.3 shall be borne and paid by Seller or Bennett. The parties agree to cooperate fully with one another in the defense, compromise or settlement of any Asserted Liability.

9.5 <u>Limitation on Indemnification</u>. Notwithstanding anything contained in this Agreement to the contrary, neither Stover nor Bennett shall have any indemnification liabilities related to any past, present or future environmental matters related to the Leased Real Property.

### ARTICLE X
### TERMINATION OF AGREEMENT

10.1 <u>Termination</u>. This Agreement may be terminated prior to the Closing as follows:

(a) At the election of Seller if any one or more of the conditions to the obligation of Seller to close has not been fulfilled as of the scheduled Closing Date and such noncompliance shall not have been caused by Seller;

(b)    At the election of Buyer, if any one or more of the conditions to its obligation to close has not been fulfilled as of the scheduled Closing Date and such noncompliance shall not have been caused by Buyer;

(c)    At the election of Seller, if Buyer has breached any material representation, warranty, covenant or agreement contained in this Agreement, which breach cannot be or is not cured by the Closing Date;

(d)    At the election of Buyer, if Seller have breached any material representation, warranty, covenant or agreement contained in this Agreement, which breach cannot be or is not cured by the Closing Date;

(e)    At any time on or prior to the Closing Date, by mutual written consent of Seller and Buyer.  If this Agreement so terminates, it shall become null and void and have no further force or effect, except as provided in Section 10.2; or

(f)    If the Buyer and Seller cannot agree to the Purchase Price.

10.2  <u>Survival</u>.  If this Agreement is terminated and the transactions contemplated hereby are not consummated as described above, this Agreement shall become void and of no further force and effect, except for the provisions of Section 6.5 (Expenses) and 6.6 (Indemnification of Brokerage).  Nothing herein shall relieve either party for any willful breach of this Agreement.

**ARTICLE XI**
**MISCELLANEOUS**

11.1  <u>Publicity</u>.  No publicity release or announcement concerning this Agreement or the transactions provided for herein shall be made without written advance approval thereof by Seller and the Buyer.

11.2  <u>Notices</u>.  Any notice or other communication required or permitted hereunder shall be in writing and shall be delivered personally, sent by facsimile transmission, or sent by certified, registered or express mail, or sent by Federal Express (or similar overnight delivery service), postage or other charges prepaid.  Any such notice shall be deemed given when so delivered personally, sent by facsimile transmission or, if mailed, two days after the date of deposit in the United States mails, as follows:

If to the Buyer or Stover, to:

With a copy to:

Mr. W. T. Stover
PO Box 14280
Greensboro, North Carolina   27415

H. Vaughn Ramsey
TUGGLE DUGGINS & MESCHAN, P.A.
228 West Market Street (27401)
Post Office Box 2888 (27402)
Greensboro, North Carolina
Telephone: (910) 378-1431
Facsimile: (910) 274-1148

If to Seller or Bennett, to:

With a copy to:

Mr. Jack Bennett
JHB Enterprises, Inc.
1589 Punta Espada
Corpus Christi, Texas   78418
Telephone:  (512) 949-7764

Mr. Charles N. Cartwright
Prichard, Peeler & Cartwright
Suite 1170
American Bank Plaza
711 North Carancahua
Corpus Christi, Texas
Telephone:  (512) 883-6223
Facsimile:  (512) 882-1806

Any party may by notice given in accordance with this Section to the other parties designate another address or person for receipt of notices hereunder.

11.3 Entire Agreement.  This Agreement (including the Exhibits and Schedules hereto) and the collateral agreements executed in connection with the consummation of the transactions provided for hereby contain the entire agreement among the parties with respect to the purchase of certain assets described in Article I hereof and supersedes all prior agreements, written or oral, if any there be, with respect thereto.

11.4 Waivers and Amendments: Non-Contractual Remedies: Preservation of Remedies.  This Agreement may be amended, superseded, cancelled, renewed or extended, and the terms hereof may be waived, only by a written instrument signed by Buyer and Seller, or in the case of a waiver, by the party waiving compliance.  No delay on the part of any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.  Nor shall any waiver on the part of any party of any such right, power or privilege, nor any single or partial exercise of any such right, power or privilege, preclude any further exercise thereof or the exercise of any other such right, power or privilege.  The rights and remedies herein provided are cumulative and are exclusive of any rights or remedies that any party may otherwise have at law or in equity except rights and remedies in respect of claims for fraud.  The rights and remedies of any party based upon, arising out of or otherwise in respect of any inaccuracy in or breach of any representation, warranty, covenant or agreement contained in this Agreement shall in no way be limited by the fact that the act, omission, occurrence or

-32-

other state of facts upon which any claim of any such inaccuracy or breach is based may also be the subject matter of any other representation, warranty, covenant or agreement contained in this Agreement (or in any other agreement between the parties) as to which there is no inaccuracy or breach.

11.5  <u>Governing Law</u>.  This Agreement shall be governed and construed in accordance with the laws of the State of Texas.

11.6  <u>Binding Effect; No Assignment</u>.  This Agreement shall be binding upon and shall inure to the benefit of the parties and their respective personal representatives, heirs, successors and assigns; provided, however, that Seller may not assign its rights hereunder without Buyer's prior written consent.

11.7  <u>Variations in Pronouns</u>.  All pronouns and any variations thereof refer to the masculine, feminine or neuter, singular or plural, as the context may require.

11.8  <u>Counterparts</u>.  This Agreement may be executed by the parties hereto in any number of counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute one and the same instrument.  Each counterpart may consist of a copy hereof containing multiple signature pages, each signed by less than all, but together signed by all of the parties hereto.

11.9  <u>Schedules and Exhibits</u>.  The Schedules and Exhibits are a part of this Agreement as if fully set forth herein.  All references herein to sections, subsections, clauses, Exhibits and Schedules shall be deemed references to such parts of this Agreement, unless the context shall otherwise require.

11.10  <u>Headings</u>.  The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

11.11  <u>Severability of Provisions</u>. If any provision or any portion of any provision of this Agreement or the application of any such provision or any portion thereof to any person or circumstance shall be held invalid or unenforceable, the remaining portion of such provision and the remaining provisions of this Agreement, or the application of such provision or portion of such provision as is held invalid or unenforceable to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby.

11.12  <u>Buyer Maintenance of Records</u>.  After closing, Buyer shall maintain all of the files, records, plans and all other documents and records acquired from Seller for a period of six (6) years from the date of closing.

-33-