United States District Court
Southern District of Texas
FILED

MAR 0 9 2005

Michael N. Milby
Clerk of Court

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | |
|---|---|
| IN RE THE COMPLAINT AND PETITION OF BROWN WATER TOWING I, INC., AS OWNER, AND BROWN WATER MARINE SERVICE, INC., AS BAREBOAT CHARTERER OF THE BROWN WATER V, ITS ENGINES, TACKLE, ETC., IN A CAUSE OF EXONERATION FROM OR LIMITATION OF LIABILITY | C. A. NO. B-01-157 Admiralty<br><br><br><br>Consolidated with |
| IN RE THE COMPLAINT AND PETITION OF AMERICAN COMMERCIAL LINES, LLC AS OWNER, AND AMERICAN COMMERCIAL BARGE LINES, LLC AS CHARTERER OF THE BARGES NM-315, VLB-9182, ACL-9933B, VLB-9173, IN A CAUSE OF EXONERATION FROM OR LIMITATION OF LIABILITY | C. A. NO. B-02-004 Admiralty<br><br><br><br>Consolidated with |
| IN RE THE COMPLAINT AND PETITION OF DEERE CREDIT, INC., (FORMERLY SENSTAR FINANCE COMPANY), AS OWNER OF THE BARGE NM-315, AND STATE STREET BANK AND TRUST COMPANY OF CONNECTICUT, NATIONAL ASSOCIATION, AS OWNER TRUSTEE OF THE BARGE ACL-9933B AND NOT IN ITS INDIVIDUAL CAPACITY, AND GENERAL ELECTRIC CAPITAL CORPORATION, AS BENEFICIAL OWNER OF THE BARGE ACL-9933B, PRAYING FOR EXONERATION FROM AND/OR LIMITATION OF LIABILITY | C. A. NO. B-02-125 Admiralty |

**REPLY MEMORANDUM OF AMERICAN COMMERCIAL BARGE LINE LLC
IN RESPONSE TO CLAIMANTS' OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT**

MAY IT PLEASE THE COURT:

{N1256373.1}

# **TABLE OF CONTENTS**

**Page**

I.     SUMMARY OF REPLY ARGUMENT. ............................................................. 1

II.    CLAIMANTS IMPROPERLY DISMISS MARITIME TOWAGE LAW, THE
       INDEPENDENT CONTRACTOR DEFENSE, AND THE "CENTRAL GULF" CASE. . 4

III.   CLAIMANTS' "INDEPENDENT NEGLIGENCE" ARGUMENT. ................................. 5

       A.    Claimants' "Negligent Hiring" Argument Fails. ..................................... 6

       B.    Claimants' "Negligent Entrustment" Argument Fails. ........................... 16

IV.    OTHER IRRELEVANT, IMMATERIAL STATEMENTS AND ARGUMENTS OF
       CLAIMANTS. ............................................................................................ 19

       A.    Whitlock's Testimony. ...................................................................... 19

       B.    ACBL's Procedures for Hiring. .......................................................... 20

       C.    Economic Reasons for Hiring Third-Parties. ........................................ 20

       D.    Timberlake's Description of Charts Onboard the Two Vessels He Inspected. ..... 21

       E.    Hoessle and the Audit. ..................................................................... 21

       F.    Brown Water's Training of Pilots and Fowler. ...................................... 22

       G.    Meritless Horsepower Argument. ....................................................... 23

       H.    Bogus AWO Argument. ..................................................................... 24

CONCLUSION ................................................................................................. 25

# **TABLE OF AUTHORITIES**

**Page**

*Cases*

American Guarantee & Liability Ins. Co. v. 1906 Co.,
  273 F.3d 605 (5th Cir. 2001) ................................................................ 17

Anderson v. Liberty Lobby, Inc.,
  477 U.S. 242, 106 S. Ct. 2505 (1986)....................................................... 2

Arauio v. Treasure Chest Casino,
  1999 WL 219771 (E.D. La. 4/14/99) ........................................................ 13

Avera v. Florida Towing Corp.,
  322 F.2d 155 (5th Cir. 1963) ................................................................. 9

Barbetta v. S/S BERMUDA STAR,
  848 F.2d 1364 (5th Cir. 1988) ............................................................... 8

Becker v. Poling Transp. Corp.,
  356 F.3d 381 (2d Cir. 2004)................................................................... 9

Broadway v. City of Montgomery,
  530 F.2d 657 (5th Cir. 1976) ............................................................... 11

Brown v. Wal-Mart Stores, Inc.,
  976 F.Supp. 729 (W.D. Tenn. 1997).......................................................... 17

Churchill v. F/V FJORD,
  892 F.2d 763 (9th Cir. 1988), cert. denied, 497 U.S. 1025 (1988) .......................... 18

Favorito v. Pannell,
  27 F.3d 716 (1st Cir. 1994)................................................................. 18

First United Financial Corp. v. U.S. Fidelity & Guaranty Co.,
  96 F.3d 135 (5th Cir. 1996) ............................................................. 11, 12

G.D. Searle & Co. v. Chas. Pfizer & Co.,
  231 F.2d 316 (7th Cir. 1956) ............................................................... 11

Green v. CBS Broadcasting, Inc.,
  2000 WL 33243748 (N.D. Tex. 2000),
  aff'd, 286 F.3d 281 (5th Cir.), cert. denied, 537 U.S. 887 (2002) ......................... 12

Henry v. Gulf Dumar Marine, Inc.,
  2000 WL 1140493 (E.D. La. 8/10/2000)....................................................... 13

Hess v. Upper Mississippi Towing Corp., 559 F.2d 1030 (5th Cir. 1977) ..................................... 9

In re Air Crash Disaster at New Orleans, La.,
    795 F. 2d 1230 (5th Cir. 1986) ....................................................................... 12

In re Central Gulf Lines, Inc.,
    176 F.Supp.2d 599 (E.D. La. 2001) .......................................................... 4, 5, 7

In re Tasch, Inc.,
    1999 WL 596261 (E.D. La. 8/5/99) ................................................................ 13

Joyce v. Joyce,
    975 F.2d 379 (7th Cir. 1992) ......................................................................... 18

McGinnes v. Brink's, Inc.,
    60 F.Supp.2d 496 (D.MD. 1999 ...................................................................... 17

Merit Motors, Inc. v. Chrysler Corp.,
    569 F.2d 666 (D.C. Cir. 1977) ....................................................................... 12

Orthopedic & Sports Injury Clinic v. Wang Laboratories, Inc.,
    922 F.2d 220 (5th Cir. 1991) ......................................................................... 11

Owen v. Kerr-McGee Corp.,
    698 F.2d 236 (5th Cir. 1983) ......................................................................... 12

Phillips v. General Motors Corp.,
    2000 WL 1285380 (E.D. La. 9/12/2000) ......................................................... 12

Salas v. Carpenter,
    980 F.2d 299 (5th Cir. 1992) ......................................................................... 11

Specht v. Jensen,
    853 F. 3d 805 (10th Cir. 1988) ...................................................................... 12

Total Minatome Corp. v. Sundowner Offshore Services, Inc.,
    2000 WL 575933 (E.D. La. 05/11/00) ............................................................ 13

Viterbo v. Dow Chemical Co.,
    826 F.2d 420 (5th Cir. 1987) ..................................................................... 11, 13

Western Arkansas Telephone Co. v. Cotton,
    259 Ark. 216, 532 S.W. 2d 424 (Ark. Sup. Ct. 1976) ......................................... 7

Wollan v. U.S. Dept. of Interior,
    997 F.Supp. 1397 (D. Colo. 1998), appeal dismissed, 185 F.3d 876 (10th Cir. 1999) ............ 11

Wright v. Illinois Central Railroad Co.,
    868 F.Supp. 183 (S.D. Miss. 1994) ................................................................ 11

{N1256373.1}

**Other Authorities**

Section 390, <u>Restatement (Second) of Torts</u> (1965) ................................................................. 16, 17

Section 411, <u>Restatement (Second) of Torts</u> (1965) ................................................................. 6, 8, 9

**Rules**

Fed. R. Civ. P. 56 ................................................................................................. 2, 9, 11, 12

Fed. R. Evid. 702 ................................................................................................. 12

Fed. R. Evid. 703 ................................................................................................. 12

Fed. R. Evid. 704 ................................................................................................. 12

Fed.R. Evid. 705 ................................................................................................. 12

**Treatises**

Grant Gilmore & Charles L. Black, Jr., <u>The Law of Admiralty</u> (2d. ed. 1975) ............................ 18

Thomas J. Schoenbaum, <u>Admiralty and Maritime Law</u> (4th ed. 2001) ...................................... 4, 5

## I.   SUMMARY OF REPLY ARGUMENT.

Claimants have not presented any competent evidence showing that there is a genuine issue of material fact for trial or that ACBL is not entitled to summary judgment as a matter of law. Claimants have not challenged the sufficiency or adequacy of the affidavits and deposition testimony submitted by ACBL, and their opposition is misdirected both legally and factually. No Court has ever found the "tow" liable for a collision caused solely by the "tug" under the theory that the "tow" was "independently negligent" by "negligently hiring" the tower and/or by "negligently entrusting" its barges to a tower.

Instead of submitting proper affidavits and testimony that is admissible into evidence, Claimants have filed inadmissible, self-serving, conclusory affidavits which contain arguments of counsel, and impermissible and ultimate legal conclusions which invade the province of the Court. Claimants' affidavits lack the requisite evidentiary foundation and are neither relevant nor material to the issues raised in ACBL's motion.

The uncontested material facts conclusively establish that ACBL was not negligent and is entitled to be exonerated:

(1)   Brown Water was an independent contractor that provided towage services to ACBL; ACBL did not exercise operational control over Brown Water;

(2)   Brown Water alone decided to use the tug BROWN WATER V to tow ACBL's barges and controlled all aspects of the towage operation;

(3)   Prior to the collision, ACBL had offered Brown Water three barges for towage from Brownsville to Boliver and had no knowledge that the tug BROWN WATER V was underway at the time of the accident, much less than it was towing four barges;

(4)   ACBL's barges were in all respects seaworthy and did not cause or contribute to the collision;

(5)   Brown Water was an established towing company and had reliably and safely towed hundreds of ACBL's barges for ten years and

possessed the knowledge, skill, experience, and equipment necessary to tow ACBL's barges;

(6)    ACBL was not informed by any third party or learn from any industry source that Brown Water was incompetent; and,

(7)    ACBL hired an independent and certified auditor, Timberlake, to perform a vendor audit and evaluation of Brown Water in July of 2000. Timberlake recommended that ACBL should continue to use Brown Water as a third party tower.

(8)    Since its inception in 1989, Brown Water has continuously provided towage services and has never been shut down by the U.S. Coast Guard, even after the collision in suit.

Fed. R. Civ. P. 56 "[b]y its very terms, ... provides that the mere existence of **some** alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no **genuine** issue of **material** fact.... Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-248, 106 S.Ct. 2505, 2510 (1986) (emphasis in original.)

Claimants admit that ACBL is not vicariously liable for Brown Water's negligence and that ACBL's barges were seaworthy and that the barges were not a cause of the collision. Claimants' allegations as to the cause of the accident are all negligent acts or omissions attributable to Brown Water: using an underpowered tug to tow four loaded barges; hiring an inexperienced tug captain who apparently grounded and lost control of the tug; and failing to have properly updated charts and notices to mariners on the tug.[1] The law does not impose any

---

[1] The U.S. Coast Guard investigating officer, Olmsted, testified at the Coast Guard hearing that none of the minor deficiencies he found on Brown Water's tug after the collision, including issues involving charts and notices to mariners, were even collaterally related to the collision. (Ex. 28, USCG Transcript, Vol. 4, p. 207, l. 18 to 22). ACBL's exhibits to this memorandum commence with Ex. 28 to avoid confusion over the numbering of exhibits. Exhibits 1 to 27 were submitted with ACBL's Memorandum in Support of Motion for Summary Judgment.

legal duty upon ACBL to discover and remedy any alleged deficiencies of Brown Water, its tug or its personnel. Rather the law holds Brown Water liable to Claimants for its negligence.

The summary judgment evidence establishes that ACBL reasonably believed that Brown Water had the knowledge, skill and proper equipment to tow barges. There is also no evidence ACBL actually knew or had reason to believe that Brown Water, an established towing company with substantial experience towing barges in the ICW, was incompetent or otherwise lacked the knowledge, skill or equipment to tow ACBL's barges from Brownsville to Boliver. Accordingly, ACBL cannot be liable under the theory of "negligent hiring."

ACBL's confidence and experience with Brown Water is not a "subjective belief" as Claimants argue but is grounded in the undisputed fact of Brown Water's safe and competent towage of hundreds of ACBL's barges over a ten year span. It is undisputed that ACBL was never advised by anyone nor did it have any information that Brown Water was unsafe or incompetent, or used insufficient horsepower to tow barges. (Ex. 29, Hoessle Deposition, p. 360, l. 23 to p. 361, l. 5; p. 324, l. 4 to 23; p. 329, l. 8 to 13; Ex. 30, Brinkop Deposition, p. 142, l. 11 to 20; Ex. 31, Farley Deposition, p. 171, l. 2 to 14; Ex. 32, Khouri Deposition, p. 81, l. 1 to 13, p. 81, l. 22 to p. 82, l. 2.) In fact, this accident was the first accident in Brown Water's history where there was a loss of life. (Ex. 33, Mosher Testimony, USCG Transcript, Vol. 6, p. 71, l. 21 to p. 72, l. 2.)

Although Claimants contend that they are not seeking to hold ACBL "vicariously" liable for the collision, they in fact seek to do so. Claimants would have this Court apply their theory of law never before imposed upon a barge owner in a towage situation. There is no evidence of "independent negligence" of ACBL which caused Brown Water's tug to push the uncontested seaworthy barges of ACBL into the bridge. Claimants allege that "but for" the fact that ACBL contracted with Brown Water this accident would have never occurred but the evidence and law

{N1256373.1}

3

do not support such an allegation. Under Claimants' theory of liability, anyone who ever contracted with Brown Water for the towage of barges would be liable for every time Brown Water had an accident while towing their barges. Claimants would have the Court declare that Brown Water is an incompetent towing contractor, essentially putting them out of business, when the regulatory body charged with policing the towage industry, the U.S. Coast Guard, has not done so, even after this accident.

## II. CLAIMANTS IMPROPERLY DISMISS MARITIME TOWAGE LAW, THE INDEPENDENT CONTRACTOR DEFENSE, AND THE "CENTRAL GULF" CASE.

Claimants make the baseless statement that hundreds of years of towage law defining the legal duties of <u>tug</u> and <u>tow</u> "is limited to the vicarious liability of a barge owner." (Claimants' Memo at p. 9.) No authority or case supports such a ridiculous statement. As previously stated in ACBL's original memorandum at pp. 18-20, the law of towage sets forth the legal obligations of the tug and the tow not only <u>inter se</u> but to third parties.[2]

Claimants misunderstand <u>In re Central Gulf Lines, Inc.</u>, 176 F.Supp.2d 599 (E.D. La. 2001),[3] which confirms the appropriateness of exonerating by summary judgment a principal that hires an independent towage contractor and the appropriateness of a principal to rely upon its experience and course of dealings with an independent contractor, just as ACBL did with Brown Water. 176 F.Supp.2d at 622. The Fifth Circuit affirmed the district court's summary judgment that the principal, Waterman, was not liable for negligently employing an independent towage contractor, Eastern. (Ex. 3 to ACBL's Memorandum in Support of Motion for Summary

---

[2] The Court <u>In re Central Gulf Lines, Inc.</u> quotes at 176 F.Supp.2d at 615 the very passage from Professor Schoenbaum's treatise, <u>Admiralty and Maritime Law</u> (4th ed. 2001), relied upon by Claimants at pages 9-10 of their memo, and notes: **"The rights of third parties against the tug and tow are adjudicated separately in accordance with each vessel's respective fault."** 176 F.Supp.2d at 615. (emphasis added.)

[3] This decision was affirmed by the Fifth Circuit at 62 Fed. Appx. 557 (Table), 2003 WL 1202793, and a copy of the Fifth Circuit's unpublished opinion is attached to ACBL's Memorandum in Support of Motion for Summary Judgment as Ex. 3. The exoneration of Waterman is discussed by the Fifth Circuit's slip op. at pp. 22 to 25.

Judgment at p. 22.) The Fifth Circuit noted that it is well-settled that the "tow" is not liable for the acts of the "tug" and cited the same passage of Professor Schoenbaum's Admiralty and Maritime Law (4th ed. 2001), cited by ACBL in its original memorandum at p. 18. (Id. at p. 23.) See also 176 F.Supp.2d at 615. Contrary to Claimants' argument that the claimants in In re Central Gulf Lines, Inc. submitted "no proof" to support a negligent hiring claim, the case reflects that evidence of negligence was submitted but that there was "no basis upon which to conclude that Waterman was negligent in either contracting with or retaining Eastern to tow its barges...." 176 F.Supp.2d at 622. Rather, in rejecting Claimants' negligent hiring argument, the Court concluded that summary judgment was appropriate because of the parties longstanding relationship without incident and uncontroverted evidence that the principal had "no reason to suspect" that the towing company was not properly performing under its contract. Id. In affirming, the Fifth Circuit noted that the principal "had no notice of any problems. To the contrary, the KAMRUP towed barges as it did on the day of the collision many times in the past without incident. There is no evidence that Waterman or Oceanic (its Agent) instructed Eastern on the makeup or movement of the tug and tow."[4]

## III. CLAIMANTS' "INDEPENDENT NEGLIGENCE" ARGUMENT.

Claimants admit that in order for this Court to impose fault upon ACBL for the collision that the Court must find an "independent" act of negligence on the part of ACBL separate and apart from any act of negligence on the part of Brown Water, and resort to two common law theories which have never been used to impose liability upon a "tow." Claimants argue that the "independent negligence" of ACBL is its: (1) "negligent hiring" of Brown Water and/or (2) the "negligent entrustment" by ACBL of its barges to Brown Water, and contend that as a practical

---

[4] In re Central Gulf Lines, Inc., No. 01-31028, slip op. at p. 23 (5th Cir. March 3, 2003), copy attached as Ex. 3 to ACBL's Memorandum in Support of Motion for Summary Judgment.

matter there is little distinction between the two. The uncontested material facts provide this Court with sufficient evidence to find that ACBL did not "negligently hire" Brown Water and did not "negligently entrust" its barges to Brown Water.

A.    Claimants' "Negligent Hiring" Argument Fails.

Section 411 of the Restatement (Second) of Torts (1965), Ex. 34, does not provide any basis to impose liability on ACBL because the evidence establishes that Brown Water possessed the knowledge, skill, experience and available equipment to tow ACBL's barges. See Comment a to § 411 which defines a "competent and careful contractor" as one "who possesses the knowledge, skill, experience, and available equipment ..." to perform the work. (Ex. 34, p. 1.) The evidence establishes that Brown's Water negligence does not arise from its lack of knowledge and skill as to how to tow barges or that it did not have the proper equipment to tow barges (i.e., towboats). Rather, Brown Water was negligent because of its failure to properly use on this occasion its knowledge, skill or equipment.[5] It had proven its knowledge and skill and that it had the proper equipment having towed hundreds of ACBL barges (as well as the barges of others) in the past without incident.

The evidence as to what ACBL did in its selection of Brown Water to tow its barges is not in dispute and proves that ACBL was not negligent and acted reasonably in hiring Brown Water: (1) ACBL relied on its ten years experience with Brown Water during which Brown Water towed hundreds of its barges safely and reliably thus proving that it had the knowledge, skill, and equipment to safely and competently perform that towage; (2) ACBL's

---

[5] Comment b to § 411 of the Restatement (Second) of Torts provides in pertinent part: "Thus, if the incompetence of the contractor consists in his lack of skill and experience or of adequate equipment but not in any previous lack of attention or diligence in applying such experience and skill or using such equipment as he possesses, the employer is subject to liability for any harm caused by the contractor's lack of skill, experience, or equipment, but not for any harm caused solely by the contractor's inattention or negligence." (Ex. 34, p. 2.)

knowledge from its weekly, if not daily dealings with Brown Water, was that Brown Water was the most experienced tower in the far western ICW; (3) ACBL had no knowledge that Brown Water was an unsafe or incompetent tower; (4) the third party independent audit performed by Timberlake gave no reason to discontinue using Brown Water and, in fact, Timberlake recommended that ACBL continue the relationship.

Claimants cite to no case or legal principle which requires ACBL to act in the manner argued by Claimants. Arguably, a barge owner looking to hire a towing contractor for the first time might want to contact others in the industry in order to determine the "reputation" of a company before hiring them. However, that is not the case before the Court. It is unreasonable to expect a barge owner that has a longstanding relationship with an independent towage contractor, and uses that contractor on a frequent and regular basis, which has performed reliably for over ten years, to contact other sources to check their reputation, especially when it has never received any indication that the contractor was not competent.

It has been recognized that "… an employer who has had previous successful experience with an independent contractor in the performance of his work cannot be held liable on the theory of negligent selection of the contractor…." Western Arkansas Telephone Co. v. Cotton, 259 Ark. 216, 219, 532 S.W. 2d 424, 426 (Ark. Sup. Ct. 1976) (principal exonerated even though it made no inquiries to contractor or outside sources to determine if contractor was competent); see also In re Central Gulf Lines, Inc., 176 F.Supp.2d at 622 (barge owner not negligent in contracting with or retaining towage contractor where the parties two companies had a longstanding relationship without incident). The mere fact that an independent contractor may have been negligent with respect to the work it is performing "does not raise any presumption that Western Arkansas Telephone [the principal] was negligent in employing him." See, e.g., Western Arkansas Telephone Co., 259 Ark. at 219, 532 S.W.2d at 426. The fact that an

{N1256373.1}

7

independent contractor has accidents from time to time is not dispositive of the issue of whether the principal was negligent in hiring the contractor.

ACBL did more than rely upon its experience with Brown Water and its lack of any negative information from any third party. When it became aware of an incident where it did not receive proper notification of a minor accident, ACBL arranged for an independent audit to be performed. Brown Water's failure to notify ACBL of a minor grounding incident contrary to ACBL's requirements, precipitated a full vendor audit of Brown Water. Contrary to Claimants argument that ACBL's management only wanted to examine Brown Water to see if Brown Water had policies and procedures in place to notify ACBL of accidents, the auditor Timberlake was instructed to do an overall audit of Brown Water. (Ex. 35, Whitlock Deposition, pp. 120-121; Ex. 36, Kazunas Deposition, p. 36, l. 4 to p. 37, l. 24; p. 81, l. 1 to 12; p. 103, l. 2 to 10; Ex. 37, Timberlake Deposition, p. 64, l. 10 to 17.)

The cases Claimants cite do not support a negligent hiring claim against ACBL. Barbetta v. S/S BERMUDA STAR, 848 F.2d 1364 (5th Cir. 1988), involves a cruise ship operator who elected to provide a physician for the convenience of its passengers. The Fifth Circuit did not address § 411 of the Restatement (Second) of Torts and stated that although the cruise line "has no duty to furnish a doctor for its passengers' use, it does owe its sick and injured passengers a duty of 'reasonable care' [to furnish first aid.]" 848 F.2d at 1371 (citation omitted). In such circumstances reasonable care must be exercised by the cruise line in hiring a doctor to treat its passengers, who have a special relationship with the cruise line. 848 F.2d at 1371. The cruise line was determined not to be negligent in hiring a doctor and summary judgment in its favor was affirmed even though the doctor was not qualified to practice medicine within the United States but was qualified to practice medicine elsewhere, and the cruise line did not conduct an "independent investigation" of the physician prior to hiring him. Avera v. Florida Towing Corp.,

{N1256373.1}

322 F.2d 155 (5th Cir. 1963), involves a personal injury claim by a Jones Act seaman against his employer. The case does not concern the hiring of an independent contractor or the principal-independent contractor relationship. <u>Hess v. Upper Mississippi Towing Corp.</u>, 559 F.2d 1030 (5th Cir. 1977), does not concern application of § 411 of the <u>Restatement (Second) of Torts</u> because the plaintiff, an employee of the independent contractor who attempted to sue the principal, could not assert a claim under § 411. 559 F. 2d at 1033. <u>Becker v. Poling Transp. Corp.</u>, 356 F.3d 381 (2d Cir. 2004), is not a maritime case, involves New York law, and the hiring of a contractor known by the principal not to possess proper equipment (a vacuum truck) to perform an ultra-hazardous activity (removal of a flammable petroleum product from a decrepit barge).

Faced with no evidence or law to support any claim against ACBL, Claimants improperly employ experts to act as "advocates" to argue counsel's unsupportable legal arguments. The sole support of Claimants' arguments is the <u>ipse dixit</u> of the experts, primarily Disler, who improperly invades the province of the Court. Disler's affidavit is a verbatim argument of counsel and is well beyond the scope of his previously supplied report.[6] The Court should strike and disregard Claimants' affidavits and their conclusory and self-serving arguments.[7] The following are examples of Disler's argumentative legal conclusions, statements of law, and improper opinions:

- ACBL had a duty to use reasonable care in selecting a contract tower.

- ACBL breached the duty by selecting Brown Water.

---

[6] This report is not attached to Disler's or Deck's affidavits, Claimants' Ex. 4 and Ex. 20, notwithstanding the statement appearing in Deck's affidavit – Claimants' Ex. 20 at para. 2 – that the report is attached. Rule 56(e) requires that "Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith." The report is attached hereto as Ex. 38. Interestingly, the focus of this report is Brown Water and the tug's crew.

[7] The depositions of Disler and Deck have not been taken because Claimants' counsel will not produce them for deposition until Brown Water produces Captain Wilson for deposition.

- A reasonably prudent barge owner that is hiring a contract tower must have written policies and procedures, investigate Coast Guard incident reports, perform periodic audits, contact other barge owners, contact local mariners, and independently confirm that the tugs that the independent tower is using have the power.

- ACBL should have consulted the PSIX before retaining Brown Water.

- ACBL failed to act as a reasonably prudent barge owner in contracting with Brown Water.

- ACBL knew or should have known that Brown Water was not adhering to the standards based on the RCP audit. ACBL failed to act as a reasonably prudent barge owner by failing to contact any of the barge owners that had hired Brown Water.

- A reasonably prudent barge owner would not rely only on its personal history.

- A reasonably prudent barge owner would not have hired Brown Water to push its barges.

Disler is also not qualified to make the statements made in his affidavit. A review of his C.V. calls into question his qualifications to make any of the statements provided in his affidavit. (See Claimants' Ex. 4.) His C.V. reveals de minimus experience with inland river towing and the inland towing industry. The experience that he claims qualifies him to give his opinions comes from working with Brown & Root, Jackson Marine and Conoco. His C.V. reflects his work with Brown & Root and Jackson Marine as a chief engineer, mate and captain on oceangoing tugs used in the North Sea performing towing and anchor handling. He lists responsibilities regarding shipyard contracts and that he worked in the Far East and served as engineer aboard various types of offshore construction barges. For Conoco the only experience described is as a chief engineer and captain of a lightering vessel.

Fed. R. Civ. P. 56(e) requires that an affidavit in opposition to a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall affirmatively show that the affiant is competent to testify to the matters stated therein." Affidavits containing "merely expressions of affiant's opinion and his legal conclusion" are inadequate under Fed. R. Civ. P. 56(e) "must be disregarded." G.D. Searle & Co. v. Chas. Pfizer & Co., 231 F.2d 316, 318 (7th Cir. 1956). Fed. R. Civ. P. 56(e) applies to all affidavits, including expert's affidavits, submitted in connection with a summary judgment. First United Financial Corp. v. U.S. Fidelity & Guaranty Co., 96 F.3d 135, 139 (5th Cir. 1996).

"Evidence inadmissible at trial cannot be used to avoid summary judgment." Salas v. Carpenter, 980 F.2d 299, 305 (5th Cir. 1992) (quoting Broadway v. City of Montgomery, 530 F.2d 657, 661 (5th Cir. 1976)). Affidavits which are conclusory and invade the province of the Court are not properly admissible on summary judgment. Salas, 980 F.2d at 305. Unsupported affidavits setting forth ultimate or conclusory facts and conclusions of law are insufficient to defeat a motion for summary judgment. See Orthopedic & Sports Injury Clinic v. Wang Laboratories, Inc., 922 F.2d 220, 225 (5th Cir. 1991). "Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible." Viterbo v. Dow Chemical Co., 826 F.2d 420, 424 (5th Cir. 1987).

Conclusory allegations of an expert witness "fail to create a genuine issue of material fact sufficient to withstand Defendants' motion for summary judgment." Wright v. Illinois Central Railroad Co., 868 F.Supp. 183, 187 (S.D. Miss. 1994).

"When a legal opinion is given in affidavit form, it should be stricken." Wollan v. U.S. Dept. of Interior, 997 F.Supp. 1397, 1403 (D. Colo. 1998), appeal dismissed, 185 F.3d 876 (10th Cir. 1999) (Table). Expert testimony, even that of a lawyer, on an ultimate issue of law "interferes with the judge's role as 'sole arbiter of the law' and should not be allowed." Wollan,

997 F.Supp. at 1403 (discussing and quoting Fed. R. Evid. 702-703 and Specht v. Jensen, 853 F.

3d 805, 807-810 (10th Cir. 1988)).

Legal conclusions espoused by an expert witness "are not helpful for the trier of fact to

understand the evidence." Green v. CBS Broadcasting, Inc., 2000 WL 33243748 at *4

(N.D. Tex. 2000), aff'd, 286 F.3d 281 (5th Cir.), cert. denied, 537 U.S. 887 (2002). Judge Clark,

former Chief Judge of the Fifth Circuit, has noted that Fed. R. Evid. 704 "does not open the door

to all opinions. The Advisory Committee notes make it clear that questions which merely allow

the witness to tell the jury [finder of fact] what result to reach are not permitted. Nor is the rule

intended to allow a witness to give **legal** conclusions." Owen v. Kerr-McGee Corp., 698 F.2d

236, 240 (5th Cir. 1983) (emphasis on original).

The mere submission of an "expert's" affidavit in opposition to a Motion for Summary

Judgment does not render summary judgment impossible. See Merit Motors, Inc. v. Chrysler

Corp., 569 F.2d 666, 673 (D.C. Cir. 1977). Judge Emilio Garza, quoting and discussing

Merit Motors in a concurring opinion, notes: "… the Circuit Courts that have confronted the

issue agree that the sufficiency of an expert's opinion under Rule 56 is an issue distinct from the

admissibility of an expert's opinion under Rule 703 and Rule 705." First United Financial Corp.

v. U.S. Fidelity & Guaranty Co., 96 F.3d 135, 140 (5th Cir. 1996).

It is well-established that an expert's purported testimony must amount to more than the

mere argument of a lawyer employing the expert and the trial courts should not adhere to the

"let it all in" philosophy. In re Air Crash Disaster at New Orleans, La., 795 F. 2d 1230, 1234

(5th Cir. 1986) ("Our message to our able trial colleagues: it is time to take hold of expert

testimony in federal trials."); Phillips v. General Motors Corp., 2000 WL 1285380 at *3

(E.D. La. 9/12/2000); Henry v. Gulf Dumar Marine, Inc., 2000 WL 1140493 at *2 (E.D. La.

8/10/2000); In re Tasch, Inc., 1999 WL 596261 at *2 (E.D. La. 8/5/99); Arauio v. Treasure Chest Casino, 1999 WL 219771 at *1 (E.D. La. 4/14/99).

In Total Minatome Corp. v. Sundowner Offshore Services, Inc., 2000 WL 575933 (E.D. La. 05/11/00), the Court struck the affidavit of an expert witness submitted in connection with the motion for summary judgment. A brief reading of the expert's affidavit "demonstrates that it is simply a string of conclusory statements. Such affidavits are not admissible, as they lack foundation and the reliability to support expert testimony." 2000 WL 575933 at *1 (citing Viterbo v. Dow Chemical Co., 826 F.2d 420, 424 (5th Cir. 1987)).

Likewise, the Court should exclude and disregard the affidavit of Benavidez, Claimants' Ex. 19, a disgruntled former Captain of Brown Water.[8] The statements in Benavidez's affidavit lack any evidentiary foundation. His gratuitous personal opinion about Brown Water and its employees is irrelevant and immaterial to the issues raised in ACBL's motion. Benavidez says nothing about ACBL, ACBL's dealings with Brown Water, or the towage at issue. Benavidez was not employed by Brown Water at any time relevant to the collision or any other event that is relevant or material to the issues raised by ACBL's motion for summary judgment. The dates of employment with Brown Water are not provided, and his affidavit is of no assistance to the Court.[9]

Benavidez's statement that Brown Water had no repeat customers other than ACBL reflects his lack of knowledge about Brown Water and its customers. Brown Water has also done business with all of the barge lines that have equipment in the ICW since 1991 including

---

[8] Mosher, Vice President of Operations for Brown Water, testified that he hired Benavidez to work at Brown Water but that the crews had problems with him and that he was lazy. (Ex. 39, Mosher Deposition, p. 191, l. 14 to p. 194, l. 11.)

[9] "Several years prior to the allision, I worked for a period of about three months for Brown Water Marine." (Claimants' Ex. 19, p. 1, para. 2.)

Ingram and Kirby. (Ex. 39, Mosher Deposition, p. 16, l. 19 to 23; p. 116, l. 23 to p. 117, l. 21.)

Brown Water has an exclusive contract with BASF, one of the world's largest chemical

companies, to move BASF's barges (Ex. 29, Hoessle Deposition, p. 203, l. 8 to p. 204, l. 21) and

BASF is one of Brown Water's largest customers. (Ex. 40, T. Chapman Deposition, p. 96, l. 13

to p. 97, l. 22.) Brown Water has also been audited by its customers, including duPont, BP,

Exxon and Mobil. (Ex. 39, Mosher Deposition, p. 196, l. 17 to l. 24.)

Claimants cite no legal authority which requires ACBL to use the PSIX nor was it

unreasonable for ACBL not to have done so given its ten years of experience with Brown Water.

Moreover, the information on the PSIX does not reflect that Brown Water was unsafe or

incompetent or was responsible for excessive accidents. The PSIX merely reflects that certain of

Brown Water's currently owned vessels had been involved in some unspecified incidents.

The PSIX contains no information that would lead anyone to believe that Brown Water did not

possess the knowledge, skill, experience and available equipment to tow barges.

As attested to by Russell, a retired Coast Guard Officer with over 29 years experience in

marine safety, management and enforcement (Russell Affidavit, pp. 1 to 2, para. 2 to 4, Ex. 19 to

ACBL's Memorandum in Support of Motion for Summary Judgment) the PSIX is not

an accurate measure of a particular vessel's marine casualty history. (Id. at pp. 4-5 at para. (H).)

The PSIX does not give a description of what the incident investigation involved:

> The PSIX does not give any information as to whether any
> grounding was intentional or unintentional, whether any allision
> was the striking of a stationary vessel or if the vessel was
> stationary and struck by another vessel, whether any personnel
> casualty was a cut finger, heart attack, bee sting, fall overboard,
> etc., whether any sinking involved another vessel, whether the
> equipment failure was a burned out light, a steering failure or
> whether due to part failure or maintenance.

(Id. at p. 5, para. H.) Russell reviewed the PSIX for the vessels operated by Brown Water and found that it did not reflect incompetent or unsafe operation. (Id.) Khouri of ACBL also testified that the Coast Guard database is "fragmented data" that is extremely hard to figure out. (Ex. 32, Khouri Deposition, p. 87, l. 17 to p. 88, l. 24.)

Once again, the only support for Claimants' argument is the ipse dixit of Disler. But even Disler agrees that the PSIX system does not provide details of incidents (Claimants' Ex. 4, Disler Affidavit, p.5, para. 5) and that the incidents listed may not have been the fault of Brown Water. (Id.) Further proof of Disler's unreliability is his reliance on the PSIX to argue that Brown Water had a high volume of casualties in far excess of the norm specifically finding that "... The M/V BROWN WATER VIII was involved in 19 reportable marine casualties between 1992 and the incident." (Claimants' Ex. 4, Disler Affidavit, p. 5, para. 5.) In fact, the BROWN WATER VIII was not purchased by Brown Water until 2001 and all of the 19 "incidents" to which Disler refers predate Brown Water's acquisition of the vessel. The PSIX does not accurately reflect anything about the safety record of the current owner of any given vessel.

The attached Abstract of Title of the U.S. Coast Guard (Ex. 41) shows that the vessel was originally documented in 1977 as the MISS LENNIE and was owned by Chandler and Blum Towing, Inc. Over the years, the vessel changed ownership and names, from the MISS LENNIE to FORCE THREE to KRISTIE LEIGH. The vessel was not named the BROWN WATER VIII until February 7, 2001. (Id. at p. 6.) Accordingly, the 19 reported marine incidents for the BROWN WATER VIII occurred prior to Brown Water's ownership of the vessel. There are no incidents reported in the PSIX involving the M/V BROWN WATER VIII between the date of Brown Water's purchase and the collision in question. Further, the

PSIX does not list the former names of any vessel nor does it indicate the owner, much less who owned the vessel at the time of any given incident.

Even assuming that the PSIX actually reflects incident investigations involving Brown Water, removing the BROWN WATER VIII's 19 incidents which did not occur under the ownership of Brown Water from the 60 identified by Claimants leaves a total of 41 incidents for 8 vessels over an approximate 7 year period, or less than 1 incident per year per vessel. The evidence of incidents of Brown Water appearing on the PSIX establishes that they are "very minor." (Ex. 40, T. Chapman Deposition, p.114, l. 12 to 23.)

**B.    Claimants' "Negligent Entrustment" Argument Fails.**

Claimants admit that they can find no towage case to support this argument. (Claimants' Memo at p. 13.) ACBL submits that the doctrine of negligent entrustment is not applicable to towage. A tug tows a barge and does not "use" the barge as contemplated by § 390 of the Restatement (Second) of Torts, which is captioned "Chattel for Use By A Person Known to Be Incompetent." The operative word in § 390 is "use:"

> One who supplies directly or through a third person a chattel for the **use** of another whom the supplier knows or has reason to know to be likely, because of his youth, inexperience, or otherwise, to **use** it in a manner involving unreasonable risk of physical harm to himself and others whom the supplier should expect to share in or be endangered by its use, is subject to liability for physical harm resulting to them.

(Ex. 42.) (emphasis added.)

Unlike Brown Water's towage of ACBL's barges with a tug, negligent entrustment involves negligently entrusting a chattel to be "used" by a person known to be an incompetent. Negligent entrustment cases involve the entrustment of such things as fire arms, automobiles, snowmobiles, trucks, speedboats, airplanes, jet skis, machinery, and even animals, to

inexperienced, underaged, intoxicated, or other incompetent "users" where the owner of the

chattel knows or should have known that the person was not competent to use the chattel.

To hold ACBL liable under the theory of "negligent entrustment" would expose those

providing packages to Fed Ex, boxcars to railroad companies, mail to the U.S. Post Office, and

cargos and their containers to ocean carriers to liability when the Fed Ex truck, train, mail truck

or the ship are involved in an accident. As in this case, and in each of those cases, the object

"entrusted" is not being "used" but is simply being transported at the time of the accident.

The cases cited by Claimants do not support their argument that ACBL is liable for

negligent entrustment. In American Guarantee & Liability Ins. Co. v. 1906 Co., 273 F.3d 605,

614 (5th Cir. 2001), the Fifth Circuit did not approve the application of § 390 to the mere

entrustment of a "facility" to a third party who was not "using" it at the time of the incident as

implied by Claimants. In American Guarantee, the owner of a building entrusted the building

and various photographic equipment to his son who opened a studio on the premises which

concentrated on photography of young women for modeling and advertising. It was the

allegations of the Petition regarding "use" of the photography equipment on the premises which

triggered the building owner's insurer's duty to defend, namely that the equipment was special

"spy" type equipment not used in normal photography, which was "used" to photograph

unsuspecting females in the woman's dressing room. 273 F.3d at 613-614. This decision is not

instructive on the issue of whether a barge owner can possibly be liable for providing a barge for

towage.

In McGinnes v. Brink's, Inc., 60 F.Supp.2d 496 (D.MD. 1999), the allegation was that

the defendant was liable for negligently entrusting a firearm to one of its employees who in turn

entrusted it to a third-party who used it to shoot the plaintiff. Brink's was not found to be at

fault. Brown v. Wal-Mart Stores, Inc., 976 F.Supp. 729 (W.D. Tenn. 1997), concerns the sale by

{N1256373.1}

17

Wal-Mart of .357 Magnum bullets to an underage customer who later used the bullets to murder someone. The allegations were that Wal-Mart sold an inherently dangerous object to someone who was inexperienced and underage.

Claimants' citation to maritime law cases involving an action for negligent entrustment highlight the types of cases which could possibly fall under this theory. These cases do not concern towage but involve the gratuitous **use** of small self-propelled vessels (a skiff, a 22-foot pleasure craft powered by an outboard motor, and a 12-foot motorized dinghy) "entrusted" to individuals who **used them** negligently, when the owners of the vessels were alleged to have known that the parties to whom the vessels were entrusted to be "incompetent" to **use** the vessels. In <u>Churchill v. F/V FJORD</u>, 892 F.2d 763 (9th Cir. 1988), <u>cert</u>. <u>denied</u>, 497 U.S. 1025 (1988), the allegation was that the skiff owner entrusted the vessel to someone he knew (i.e., his son) was drunk and under the influence of marijuana. In <u>Joyce v. Joyce</u>, 975 F.2d 379 (7th Cir. 1992), a boat owner allegedly entrusted a 22-foot pleasure boat to a person without having any knowledge of whether that person had ever operated a boat or even knew how to operate a boat. The person drove the boat into the wake of a passing vessel causing injuries to passengers. In <u>Favorito v. Pannell</u>, 27 F.3d 716 (1st Cir. 1994), the allegation was that the owner of a yacht entrusted a 12-foot motorized dinghy to the engineer who was incompetent to operate the dinghy, and collided with another vessel while operating the dinghy at an excessive rate of speed. In each of these cases there was no finding of "negligent entrustment" and no finding of negligence.[10]

---

[10] Claimants make the unsupportable statement at p. 14 that: "It is generally recognized that towing a line of barges requires great skill and training and poses a substantial risk of harm to property and persons." Claimants cite no authority for this statement. They quote Grant Gilmore & Charles L. Black, Jr., <u>The Law of Admiralty</u> (2d. ed. 1975) at p. 515, which contains no discussion indicating that the towage of barges requires great skill and poses a substantial risk of harm to property and persons. The passage quoted by Claimants appears under the heading "Towage in Collision Cases" and provides: "The towing situation is one presenting special problems, both practical and legal. On the practical side, the combined tug and tow constitute a far less maneuverable unit than the single

Even if the Court were to find that negligent entrustment applied in this case, there is no evidence that ACBL contracted with someone whose capabilities were unknown or who was known to be an incompetent (i.e., underage, drunk, no experience, etc.)  ACBL's arguments in response to Claimants negligent hiring argument, would be the same here.  See pp. 4 to 15, supra.

## IV.    OTHER IRRELEVANT, IMMATERIAL STATEMENTS AND ARGUMENTS OF CLAIMANTS.

Claimants' memorandum is replete with other misstatements and mischaracterizations of testimony and other irrelevant arguments.  Such arguments are immaterial to the issues raised in the pending motion.  ACBL cannot possibly address all of these arguments within the page limitation of this memorandum but the following are examples:

### A.    Whitlock's Testimony.

Claimants twist Whitlock's testimony on p. 4 of their memo to argue that ACBL did not consider this accident to be a "major incident" and did not investigate or consider the accident in its continued use of Brown Water.  Whitlock's testimony is that ACBL based its use of Brown Water at the time of the incident upon its ten year history with Brown Water and its competence in towing ACBL's barges, have no negative information about Brown Water from any source, and, the independent audit of Timberlake.  Brown Water had no "major incidents" while towing ACBL's barges prior to the collision at issue.  Whitlock testified that nothing like this had ever happened before with Brown Water.  His testimony with regard to "major incidents" refers to ACBL's relationship with Brown Water prior to September 15, 2001. (Ex. 35, Whitlock Deposition, p. 155, l. 11 to p. 164, l. 6.)  When asked in his deposition about

powered vessel, and the presence of the tow makes close maneuvering more problematic for other vessels.  For these reasons, as we have seen, tugs with a tow are required by the Rules to be marked with special lights, and to sound special signals in fog...."  (Ex. 43.)  Claimants further argue that barges can cause "massive destruction" but the Claimants' do not dispute that ACBL's barges were seaworthy and were not a cause of the collision.

why ACBL had not discontinued the use of Brown Water after the collision in this case, which is irrelevant, Whitlock testified that ACBL did not have sufficient evidence to determine the cause of the collision and were awaiting the U.S. Coast Guard findings based upon 5 days of hearings. (Id.)

### B.    ACBL's Procedures for Hiring.

Claimants allege that ACBL has no procedures for hiring and/or for determining the competence of third party contractors which is also irrelevant and immaterial.  The only relevant issue here is what ACBL did with respect to hiring Brown Water.  Contrary to Claimants' argument, the evidence establishes that ACBL has procedures for hiring and retaining third party towing contractors and followed those procedures.  The towing contractors that ACBL hires are towing contractors with whom ACBL has a longstanding relationship and in whom they have confidence. (Ex. 35, Whitlock Deposition, p. 112, l. 12 to p. 113, l. 6; Ex. 31, Farley Deposition, p. 86, l. 19 to p. 87, l. 17, p. 134, l. 2 to 6.)

ACBL obtains information beyond its own experience from information that is readily available throughout the river system and the media. (Ex. 35, Whitlock Deposition, p. 116, l. 10 to 18.)

If ACBL finds it necessary to select a contractor other than one with which it has a longstanding relationship, there is a selection procedure.  Obviously, that procedure is irrelevant to this case, because ACBL was not hiring an unknown.  Before a new tower can be approved, it must have proper insurance and someone in the company must have had some "experience" with the tower. (Ex. 36, Kazunas Deposition, p. 28, l. 4 to 25.)

### C.    Economic Reasons for Hiring Third-Parties.

Claimants' make the outrageous assertion that the only reason why ACBL hires third party towers is because it saves them money.  There is no evidence that ACBL saves any money

by hiring a third party contractor to tow its barges and in fact ACBL may make less money. (Ex. 31, Farley Deposition, p. 129, l. 2 to p. 131, l. 20; p. 172, l. 14 to p. 174, l. 24.) ACBL uses third party towers only in a situation where they do not have their own towboats in the area to do the towage. (Ex. 31, Farley Deposition, p. 129, l. 2 to 11.) ACBL wants to use its own vessels where at all possible. That is the most economical way for them to tow barges. (Ex. 31, Farley Deposition, p. 129, l. 2 to p. 131, l. 20.)

The evidence establishes that ACBL does not have enough business to justify keeping its own towboat in the far western ICW and hires a third party tower when one of its towboats is not available. (Ex. 35, Whitlock Deposition, p. 144, l. 3 to p. 145, l. 2.)

**D.    Timberlake's Description of Charts Onboard the Two Vessels He Inspected.**

Claimants state at p. 20 of their memo that Timberlake found deficient charts on Brown Water's vessels during his audit and ACBL had information that Brown Water was using deficient charts at the time of the accident. Further, that Timberlake's description of the charts on Brown Water's vessels was the same as described by the Coast Guard as to what they found on the BROWN WATER V. This is false. Timberlake's testimony contains no negative information with respect to charts on board the Brown Water vessels he inspected. (Ex. 37, Timberlake Deposition, p. 181, l. 21 to p. 182, l. 13, p. 185, l. 23 to 25, p. 186, l. 1 to 5.) Timberlake did not advise ACBL of some alleged "problem" with charts in his audit.

**E.    Hoessle and the Audit.**

Claimants' argue that Hoessle should have been provided with a copy of Timberlake's audit which would have arguably prevented him from using Brown Water. This is a "red herring" because the audit revealed that ACBL should continue using Brown Water. However, the evidence is that the audit was outside the scope of his job as dispatcher and that he would not expect to get that information. It was not necessary for Hoessle to be given the Brown Water

audit because it is "truly outside of the scope of what I do ..." and therefore he does not get that information. (Ex. 29, Hoessle Deposition, p. 64, l. 9 to 25.)

**F.    Brown Water's Training of Pilots and Fowler.**

Claimants attempt to jump from Timberlake's comments in his audit about a lack of documentation with respect to Brown Water's training program to the argument that ACBL knew that Brown Water was using inexperienced captains falls flat on its face.  The testimony of Brown Water's witnesses is that they did have a training program for their deckhands and others, but did not train underlined licensed captains because their licenses certify that they have already gone through training and testing.  Brown Water's training of its personnel is irrelevant and immaterial to ACBL's motion.

Brown Water's procedure for hiring licensed captains to operate their towboats is set forth in the affidavit of Mosher submitted in the U.S. Coast Guard proceeding.  (Ex. 44.) As described by Mosher, when hiring a licensed operator, he first reviews the operator's license to ensure that it is up to date with the proper endorsements.  (Id. at pp. 1 to 2, para. 2 and 3.) He interviews the applicant with respect to their knowledge of the waterways to be traversed and their experience with other towing companies.  (Id.)  He then contacts other towing companies listed by the applicant to see if he can get any information from them.  (Ex. 39, Mosher Deposition, p. 45, l. 1 to 22, p. 103, l. 8 to 21, p. 178, l. 1 to 21.)  Brown Water relies on the Coast Guard, which is the governing body, to police the licenses of the captains and, if a captain had a bad safety record, his license would be suspended or revoked by the Coast Guard. (Ex. 39, Mosher Deposition, p. 173, l. 3 to p. 174, l. 5.)  The company does not provide training to experienced licensed captains who have successfully undergone the Coast Guard's license, testing and certification of experience procedures.  Brown Water also has a newly hired licensed

operator observed by another captain who would then report back as to whether the new hire was competent. (Ex. 39, Mosher Deposition, p. 170, l. 4 to 17.)

This was not the first time Fowler had worked for Brown Water, he had worked for them before, without any problems or incidents, and without any reports of his not having competence to handle the vessels. (Ex. 39, Mosher Deposition, p. 173, l. 3 to 18.)

This is no different than ACBL's own procedures with respect to its own captains which is also irrelevant to this motion. ACBL only trains individuals who are employed by it prior to obtaining a license. When a duly licensed individual seeks employment with ACBL, ACBL checks their references and experience, puts that person aboard a vessel and then gets input from persons on board the vessel as to whether or not there are any problems. (Ex. 30, Brinkop Deposition, p. 67, l. 15 to p. 70, l. 12.)

### G.    Meritless Horsepower Argument.

Claimants' "horsepower" argument is meritless, irrelevant and immaterial. Even assuming arguendo that the BROWN WATER V did not have 800 horsepower, ACBL did not select the tug to tow its barges, did not know which vessel was towing its barges, and did not instruct Brown Water as to how many barges its tug should tow. These decisions were made solely by Brown Water and by law ACBL had no duty in that regard. Following the industry rule of thumb of 200 horsepower per loaded barge, the same rule of thumb used by Brown Water in assigning barges to its towboats (Ex. 39, Mosher Deposition, p. 164, l. 7 to 24; Ex. 40, T. Chapman Deposition, p. 32. l. 4 to 10), whether the tug had 800 horsepower, 680 horsepower or 640 horsepower it still had sufficient horsepower to tow three barges (3 x 200 = 600), and that is the total number of barges offered by ACBL to Brown Water. The decision to take the extra barge was Brown Water's master's alone and was done

unbeknownst to ACBL and without consulting ACBL. There is no evidence that ACBL had any knowledge that any of Brown Water's vessels had horsepower other than as stated.

Claimants' mischaracterize and attempt to twist the testimony of Hoessle with respect to the horsepower issue. Hoessle did not testify that when he used an ACBL tug to tow barges that he would "require 250 horsepower per barge in the ICW" nor is there any testimony by ACBL that there "must be over 200 horsepower." The minimum horsepower tugboat that ACBL operates in the ICW is 1,000 horsepower. In answering questions about assigning barges to an ACBL 1,000 horsepower tug, Hoessle testified that because he usually has no more than four barges to tow out of Brownsville he would assign the four barges to that tug. (Ex. 29, Hoessle Deposition, p. 90, l. 4 to p. 93, l. 21.)

Claimants presented no evidence that ACBL even knew the horsepower of the engines on board any of Brown Water's vessels nor is ACBL required to know the horsepower of Brown Water's vessels, as it was Brown Water's sole responsibility to select the tug or tugs to be used to tow ACBL's barges and the number of barges to be placed into the tow.

### H.    Bogus AWO Argument.

Claimants admit that the AWO is voluntary and that companies are not required to abide the RCP. (Claimants' Memo at p. 8.) It is uncontroverted that the AWO is a voluntary trade organization and not a regulatory authority. The policies and procedures of the AWO are not a source of legal duty and have nothing to do with the collision. The Coast Guard is the regulatory authority over Brown Water and found no deficiencies that were causally related to the collision. The deficiencies noted by the Coast Guard are of a minor and insignificant nature.

Timberlake was sent by ACBL to do a vendor audit not a RCP audit. At the time of the collision, Brown Water was a member of AWO and working toward RCP certification. Brown Water became RCP certified after the collision, well within the AWO's timeframe for

certification. Claimants argument that ACBL should have sent one of its employees to audit Brown Water is ludicrous. ACBL had no employees that were AWO certified auditors. An audit by an ACBL employee would not be an independent audit of the type performed by Timberlake. Had ACBL sent one of its own employees to audit Brown Water, Claimants would no doubt argue that the employee was not an AWO certified auditor and not an independent.

## CONCLUSION

Claimants' do not dispute that Brown Water is an independent contractor and that ACBL is not liable for Brown Water's negligence. Claimants also do not dispute that ACBL's barges were seaworthy and were not a cause of the collision. There is no genuine issue of material fact in dispute and ACBL is entitled to summary judgment as a matter of law. The evidence as to what ACBL did in contracting with Brown Water is not in dispute and establishes that ACBL was not negligent and should therefore be exonerated. Accordingly, this Court should grant ACBL's Motion for Summary Judgment.

Respectfully submitted,

GLENN G. GOODIER, Attorney-in-Charge
Admitted *Pro Hac Vice*
By Order Entered 4/23/02
Jones, Walker, Waechter, Poitevent,
  Carrère & Denègre, L.L.P.
201 St. Charles Avenue - 48th Floor
New Orleans, Louisiana 70170-5100
Telephone:     (504) 582-8174
Facsimile:     (504) 582-8010

LES CASSIDY
State Bar Number 03979270
Federal Identification Number 5931
814 Leopard Street
Corpus Christi, Texas  78401
Telephone:     (361) 887-2969
Facsimile:     (361) 887-6251

OF COUNSEL:

WOOLSEY & CASSIDY, P.C.
814 Leopard Street
Corpus Christi, Texas  78401
Telephone:     (361) 887-2969
Facsimile:     (361) 887-6251

Counsel for Petitioners,
American Commercial Lines LLP and
American Commercial Barge Line LLC
Deere Credit, Inc. (formerly Senstar Finance
Company), as Owner of the Barge NM-315,
State Street Bank and Trust Company of
Connecticut, N.A., as Owner/Trustee of the Barge
ACL-9933B and Not in Its Individual Capacity, and
General Electric Capital Corporation, as Beneficial
Owner of the Barge ACL-9933B

## CERTIFICATE OF SERVICE

I do hereby certify that I have on this 8th day of March, 2005, served a copy of the foregoing pleading on counsel for all parties to this proceeding by mailing the same by United States Mail, properly addressed and first class postage prepaid.

GLENN G. GOODIER