**PANEL REPORT OF FIRST IMPRESSION OF OBSERVATIONS, RESEARCH, AND OPINION**

September 29, 2004

| | |
|---|---|
| Schirrmeister Ajamie | Watts Law Firm |
| Pennzoil Place South Tower | 1926 East Elizabeth |
| 711 Louisiana, Suite 2150 | Brownsville, TX 78521 |
| Houston, TX 77002 | |
| Attn: Mark Strawn, Esq. | Attn: Ray Marchan |

RE: Civil Action No. B-01157; In re The Complaint and Petition of Brown Water Towing I, Inc. As Owner, and Brown Water Marine Services, Inc. as Bareboat Charter of Brown Water V, Its Engines, Tackle, etc. and a Cause of Exoneration from or limitation of Liability; consolidated with Civil Action No. B-02-004; In re the Complaint and Petition of American Commercial Barge Line, LLC, as Charter of the Barges NM-315, VLB-9182, ACL-9933B, VLB-91; and in a Cause of Exoneration from or limitation of Liability; in the United States District Court for the Southern District of Texas at Brownsville.

**METHODOLOGY:** This is a panel report containing the preliminary findings of two experts who have conferred with one another through the course of the production of this report. Both experts are members and principals of the American Admiralty Bureau, Ltd. An organization committed to strict adherence to, and the promotion of the Code of Professional and Ethical Conduct of the National Forensic Center. All analytical work was performed by the undersigned examiners or staff under their direction. All analytical work was completed in conformance with the Code of Professional and Ethical Conduct of the National Forensic Center. The undersigned experts were each retained by different parties in the litigation and by mutual agreement of commissioning counsels they were allowed to confer and produce this panel report.

**STANDARDS OF PRESENTATION:** This report is produced in strict conformance with the Code of Professional and Ethical Conduct of the National Forensic Center (NFC), specifically the Standards of Presentation contained therein. Clerical and editorial assistance in the preparation of this report was provided by the staff of Maritime Consultants and Associates (MC&A) a sole proprietorship of Captain Jay Disler, one of the undersigned examiners. **The individual opinions of each examiner are identified as such within the body of the report.** Any party at interest or any officer of the court will be provided a full text of the NFC Code upon request. Any party at interest or

**EXHIBIT 38**

officer of the court who believes that either of the undersigned examiners may have violated this code may complain to:

> THE NATIONAL FORENSIC CENTER
> 17 TEMPLE TERRACE
> LAWRENCEVILLE, NJ 08648
> 1-800-526-5177

**CASE TYPE:** Allision of a towboat and barges with a bridge over a portion of the Gulf Intercoastal Waterway with multiple deaths and injuries to motorists transiting the bridge.

**QUALIFICATIONS OF EXAMINERS:**

**Commander John Deck, III:**
Commander John Deck III is a retired Coast Guard Officer with 20 years of service. He holds a Bachelor of Science from the U.S. Coast Guard Academy and a Master's of Science degree in Mechanical Engineering and a Naval Engineer's degree from the Massachusetts Institute of Technology. He has served as Chief of the Ship Design Branch, Office of Merchant Marine Safety for the Coast Guard. Commander Deck has five years of sea service aboard cutters of the U.S. Coast Guard. Since retiring from the Coast Guard, he has made a number of Western River tow trips as an observer and wheelman as well as conducting research into tow powering and configuration. Commander Deck has served as an expert witness on marine powering applications and served as chief investigator in a number of Western River tow accidents, and inland waterway bridge allisions. His experience includes investigative, analytical work in hydrodynamics and expert testimony in allisions involving the Gramercy Bridge Caisson at Gramercy, Louisiana in 1985, the Pensacola Bay Bridge in 1992, the Highway 190 Bridge in Baton Rouge Louisiana in 1998 and the I-40 Bridge in Arkansas in 2002.

**Captain Jay Disler:** Captain Disler is licensed by the U.S. Coast Guard in the dual capacity of Ocean Master and Chief Engineer. He has extensive work experience as Master and Chief Engineer aboard a wide variety of commercial work vessels, especially along the South Texas coast. This experience includes the operation of push tows on the Gulf Intercoastal Canal in South Texas and on the Western Rivers of the United States. He has previously served as an expert witness in similar cases in both State and Federal Courts.

A complete and detailed resume as well as a list of all cases participated in by either or both experts will be made available to any party at interest or officer of the court upon request.

**DOCUMENTS REVIEWED:**
1. Transcript of the Coast Guard hearing on the allision of September 15, 2001
2. Transcript of an audio tape of an interview with David Dewayne Fowler by a Coast Guard Investigator dated September 12, 2001
3. Hand written statement by David D. Fowler

4. Transcript of a Coast Guard interview with David D. Fowler by U.S. Coast Guard, transcript dated September 17, 2001 (thought to be a more formal version of document number 2).
5. Deposition Transcript of Stephen H. Mosher (reviewed by Jay Disler only)
6. Deposition Transcript of Philip S. Timberlake (reviewed by Jay Disler only)
7. Deposition Transcript of William Norb Whitlock (reviewed by Jay Disler only)
8. Cameron County Sheriff's Department Report Case No. 01-090662 dated September 16, 2001 (reviewed by Jay Disler only)
9. Coast Guard Investigative Officer's (IO) file (reviewed by John Deck III only)
10. Lake Charles Diesel report on BROWN WATER V (BW V) main engines dated 20 May 2002.
11. American Waterways Operators (AWO) Responsible Carrier Program (RCP) Administrative Procedures
12. Report pf the Towing Horsepower Task Group of the Towing Safety Advisory Committee (TSAC).

**ARTIFACTS EXAMINED:**

1. Jay Disler and John Deck III inspected the towboat BROWN WATER V on 9 May 2002 at Anahuac, Texas
2. Photographs of BROWN WATER V

**ORIENTATION:** Presented for reader orientation and not as a statement of fact the following sequence of events, circumstances, and conditions were discerned in reading the documents described above. On the night of September 15, 2001 during the hours of darkness the Towboat BROWN WATER V pushing four loaded cargo barges "strung out" (four long, one wide) was approaching the Queen Isabella Causeway across the Gulf Intercoastal waterway connecting the resort community of South Padre Island to the mainland. At the pertinent time, the three forward barges in the tow of the BROWN WATER V were loaded to an average draft of approximately nine feet while the barge closest to the towboat drew less than seven feet. The BROWN WATER V and her tow failed to transit the bridge's navigation span, and struck portions of the bridge's supporting structure. As a result of the initial structural support damage caused by the collision a portion of the bridge's roadway fell into the water. Various automobiles then fell into the gap in the road way and on into the water before motorists on the bridge finally perceived what had happened and one motorist stopped his vehicle and began alerting motorists behind him of the situation. As a result of the various automobiles falling into the gap created by the collision multiple deaths and serious injuries occurred. In the hours and days following the initial damage additional bridge structural failures occurred dropping additional bridge portions into the water complicating the search for bodies and prolonging the repair period.

**NOTE CONCERNING CITATIONS TO STATUTES AND REGULATIONS:** This is a report of a forensic examination of the above described events by technical experts. Coast Guard Officers are charged with the enforcement of Federal maritime safety regulations. Licensed Merchant Marine Officers are charged with insuring compliance

with such regulations and safety related statutes in all of the operations that they supervise. Licensed Merchant Marine Officers are examined for their knowledge of applicable regulations as outlined in 46 CFR 10.910-1.

**Minimum regulatory compliance is not the standard of good seamanship or a seaworthy vessel. The standard is higher than that.** However today marine safety regulations are so extensive that many, if not most, safe marine practices are described within the body of the Federal Maritime Safety Regulations. All officers of the court are trained in the use of such regulations and have access to them. Consequently regulatory citation is the preferred system of citation to safe work practices when such are available. However the strict application of a particular regulation or statute to a particular set of circumstances is a legal judgment. **Referral to safety statutes and regulations in this report should not be construed as legal opinion that any such regulations or statutes apply as a matter of law. Regulations and safety related statutes cited herein are provided as descriptions of guides to safe maritime operations. Should the judge determine that any particular regulation or safety related statute cited does not apply to the circumstances as a matter of law, this would in no way affect the opinion of the undersigned examiners that the cited regulation or safety related statute accurately describes the safe practices.**

This is a technical report on matters of maritime safety. Maritime safety is a heavily regulated area of human endeavor. It is impossible to describe safe operations without mention of regulations and safety related statutes. **However such mention should in no way be construed as legal opinion.** Applicability as a strict matter of law is for the judge to decide. The undersigned examiners do not intend to offer legal opinion.

The following observations and opinions were offered by Captain Disler:

**OBSERVATION/OPINION:** Four barges may be configured 2x2 or 1x4. When entering a cross current a 2x2 presentation presents less frontal area to the current and reduces the effect of the current on the motion of the barges.

**OBSERVATION:** On the approach to the Queen Isabella Causeway the BROWN WATER V had her tow "strung out".

**OPINION:** Due to the various currents present at the Causeway "strung out" is the worse possible way to configure the tow. A "strung out" tow presents twice the frontal area to the lateral effects of current increasing the lateral forces on the tow. The tow's strung out configuration played a major part in her loss of control.

**OBSERVATION:** Captain Rocky Wilson changed the configuration of the tow from 2x2 to 1x4 "strung out" during his watch prior to Captain Fowler's approach to the Queen Isabella Causeway. Captain Fowler received the tow in this "strung out" condition at the start of his watch. As of this writing, we have not found much documentation of Captain Rocky Wilson actions prior to the allision. We have not read any explanation of Capt. Rocky Wilson rational for such a tow configuration. Neither

have we read any description of orders, instructions, nor suggestions concerning this troublesome configuration that might have been passed by Captain Rocky Wilson to Captain Fowler at the watch change.

**OPINION:** We do not know at this writing why Captain Rocky Wilson changed the tow configuration before the final approach to the Queen Isabella Causeway. We do not know at this writing why Captain Fowler did not change the configuration back to the more advantageous 2x2 configuration prior to the final approach. We suspect that corporate procedures or standing orders directly or indirectly effected this decision. We must respectfully reserve the privilege of future comment on this matter when additional information becomes available. This issue is important in any consideration of limitation of liability. Corporate influence, direct or indirect on such a critical decision would be an important consideration in a limitation proceeding. Generally, companies prefer tows "strung out" to improve speed in thus increasing profit.

**OBSERVATION/OPINION:** Brown Water Marine Management in planning the manning of the BROWN WATER V simply filled in a two watch system. The idea behind the two watch system is that each licensed individual in the wheelhouse will work not more than 12 hours per day except in an emergency. Since BROWN WATER V did not carry a designated duty engineer, cook, or utility man there was no one to handle such routine tasks as extra line handler, extra look-outs in limited visibility, and daily cooking and the associated cleanup. The "12 hour rule" does not see such routine daily tasking as "emergencies". These stresses on the 12 hour rule were foreseen by management before the start of the voyage, management chose to deliberately set up the watches so that the "12 hour rule" could not be kept.

An example of this is the testimony of Deckhand Ross Baligure at the Coast Guard Hearing. He testified that on the day before the accident he came on watch at 6 AM worked the whole day making up the tow which was completed at about 7:30 PM and continued his watch until midnight, a total of 18 hours. Making tow is not considered an emergency.

The "12 hour rule" is not a single statute of regulations but a collection of regulations and statutes that provide permissive authority to owners to reduce manning to two watches under certain limited circumstances. There is no regulation requiring two watches, three are allowed and preferred by maritime labor and maritime safety professionals. The two watch system is an economy granted to vessel owners under specific circumstances to reduce operating expenses and enhance profits. This permissive authority is predicated on strict adherence to maintaining manning levels in such a way that neither watch exceeds 12 hours of duty of any sort within any 24 hour consecutive period.

The sources of the "12 hour rule include but are not limited to the following: 46 USC 8104 (a), 46 USC 8104 (b), 46 USC 8104 (g), 46 USC 8104 (h), 46 CFR 15.705 (d), 46 CFR 15.710, 46 USC 8104 (f), 46 CFR 15.1111.

Brown Water Marine management arranged the manning of the BROWN WATER V in such a way that the "12 hour rule" could not be observed by the wheel house crew. In considering contributing factors in this allision, the effects of fatigue upon the operators can not be ruled out, and in the face of observable violations of fatigue preventative regulations and/or customs it may be assumed by forensic examiners associated with the American Admiralty Bureau as described in Comment No. 6 of Volume 3 of the American Admiralty Bureau Commentator (AAB Com. No. 6, Vol. 3 (1996) ISBN 1-879778-59-9. The fatigue factors assumed in this case were the direct result of management manning level decisions, not the result of any choices by the licensed operators. Once aboard they were subjected to 24/7 operations and associated requirements imposed on only two operators to maintain 24/7 navigational operations.

**OBSERVATION:** Stephen H. Mosher, President of Brown Water Marine has stated in his deposition that shoaling was an important factor in the accident. The undersigned examiner has still not reconciled the fact dispute as to whether or not shoaling took place. However Mr. Philip S. Timberlake a safety auditor examining contract horsepower providers for ACBL noted that he had found Brown Water Marine vessels without updated Notice to Mariners. Had shoaling actually occurred, notice would have come to the pilot house by way of the Notice to Mariners.

**OPINION:** It is the duty of management to provide the vessels under their charge with all required charts, navigational references, and updating services as needed for safe navigation. Based on the documents reviewed, it appears more probable than not that Brown Marine's management in fact did not provide the most recent Notice to Mariners to the pilot house of the BW V. If indeed shoaling was a contributing factor in this accident, management failed in its duty to warn their pilot house personnel of the hazard. At present we have not found an actual Notice to Mariners regarding shoaling in the pertinent vicinity and notice some contra-indications of shoaling in the available documents. The available documents at this present time form a stack nearly five feet in height. Review is still in progress and the undersigned examiner will supplement on this issue at a later date. The reader is directed to the present observations and opinions of CDR. Deck on this subject elsewhere in this report.

**OBSERVATION:** The subject of tow powering and configuration has been marked in recent years by considerable controversy. The American Admiralty Bureau has studied the issue of tow powering and configuration in depth and the Bureau has published its finding in the AMERICAN ADMIRALTY BUREAU'S INTERIM RECOMMENDATIONS FOR TOW POWERING AND CONFIGURING FOR WESTERN RIVERS PUSH TOWS EDITED BY CDR. JOHN DECK III, USCG (RETIRED). This publication is available through Marine Education Textbooks 124 North Van Avenue Houma Louisiana 70363-5895, PH # (985) 879-3866. Publication is assigned international book binding No. ISBN 1-879778-62-9. This publication provides A decisional matrix and other guidance for the proper powering and configuration of push tows. We have examined the issue of the powering of the BROWN WATER MARINE V in conformance with these published findings. Additionally, we have examined statements within the depositions of Stephen Mosher, Philip Timberlake and

William Whitlock wherein these officials admit to minimal horsepower requirements very similar to those we describe in our publication and admit that the BROWN WATER V and its tow did not conform to these minimal guidelines.

**OBSERVATION:** Mr. Whitlock in his deposition maintained that it was his company's contractual obligation to provide adequate horsepower for the barges they contracted to deliver. Mr. Whitlock further maintained that it was the prerogative of his company to either provide the necessary horsepower by utilization of their own towboats or to provide it through boats owned by others and contracted by his company. Further, ACBL was represented on the Horsepower Working Group at TSAC which produced the report on two powering which included the following wording in the conclusions: In many cases what are believed to be inadequately powered tows may be tows that are inadequately handled. Where this is the case, Coast Guard and industry initiatives on training and licensing provide the best avenues for improved safety. However, towing companies are ultimately responsible for their safe operations; and they should be expected to develop policies which are defensible and accountable. It does not appear that any such policies were in place either at BROWN WATER MARINE OR ACBL. Further, there may be some evidence that Captain Fowler did not have all the requisite experience for this area.

**OBSERVATION:** There is at present no Coast Guard regulation specifying minimal horsepower requirements for any given size tow such written guidelines as exist for tow powering and configuration are found in Academic Studies such as the American Admiralty Bureau sited previously or company operational manuals. However companies which are signatory to the American Waterways Operators Responsible Carrier Program are required in Section II Management/Administration subsection A.2. Vessel Operating Policies/Procedures Vessel-specific operating procedures (will depend on vessel size, cargo, trade, etc.) a) procedures for making horsepower tow/size decisions. ACBL is signatory to the RCP program, however there were no written policies issued.

**OPINION:** Tow boat operating companies have the primary responsibility for providing adequate horsepower for each tow they undertake. Historically as described in the AAB reference previously cited pilot house personnel often improve the performance of underpowered tows through skillful piloting techniques that work with, and not against hydrodynamic forces. Thus it is difficult for pilot house personnel to refuse an underpowered tow since they may not cite to a Federal regulation and any refusal to push the tow the dispatcher provides is often viewed as a manifestation of a lack of skill. Against this background, it is vitally important that management train dispatchers to keep tows within the minimal powering guidelines that are discernable in authoritive literature pilot organization recommendations and company manuals. At the present state of regulation the primary duty for the avoidance of underpowered tows falls to management.

**OBSERVATION:** The horsepower of BROWN WATER V was considerably less than the minimal horsepower guidelines described by Mr. Timberlake and Mr. Whitlock in their depositions.

**OPINION:** In fact in the opinion of the undersigned, the available horsepower of the BROWN WATER V was grossly inadequate for the task at hand. Furthermore this inadequacy was within the privity and knowledge of both the management of BROWN WATER MARINE and ACBL.

**OBSERVATION:** Documents examined indicated that at least one of the engines of the BROWN WATER V was not operating to full capacity due to mechanical malfunctions. Further, there are indications that the engine horsepower was overstated. The engines in question are GM 12V71. Out of the box horsepower is 335 not 400. Due to time constraints in the preparation of this report it will be necessary to supplement on this issue at a near future date. However there is every indication in the record that BROWN WATER MARINE MANAGEMENT was aware of these deficiencies.

**ADDITIONAL FACTS DISPUTED:**

**OBSERVATION:** There were indications in the documents reviewed that short range visual aids to navigation associated with the bridge approach were in less than proper order. Some of the information concerning the short range aids to navigation found so far appears tentative, contested, or imprecise. Such conditions could be a contributing factor to this accident.

What is known is that Coast Guard Chief Ingram testified at the Coast Guard Hearing that his Executive Petty Officer accompanied the Texas DOT officials when they made their inspection the day of the accident and found that the bridge centerline green lights were not functionable.

There remain many documents yet to be examined. The undersigned reserves the privilege of supplementing on this issue as new facts become available.

**COMMANDER DECK OFFERED THE FOLLOWING OPINIONS:**

**OBSERVATION:** In the Coast Guard Hearing, Brown Water offered the testimony of David Swain, who presented findings of a shoaling area between Buoy 147 and 149. The shoaling allowing for the tide was on the order of 7 feet. Captain Fowler had indicated that he felt he grounded on his starboard stern quarter of his tow in that area. Captain Wilson testified that such grounding could cause the tow to get out of shape, swinging the bow to port and thus out of the channel. The towboat was drawing 8 feet 6 inches and the after barge was drawing less than 7 feet. The barges forward were drawing about 9 feet. If Captain Fowler was pointing up into the current, his bow should have grounded first. If his stern was swinging into the current, the towboat would have hit bottom before the after barge. There was no damage reported to the running gear (propellers, propeller shafts, and rudders) of the towboat. Further based upon Captain Wilson's testimony that when the tidal current is running, you put your bow into the tidal current keeping your propellers in the deep water i.e., the dredged part of the channel. Because you are navigating in a current which is coming from your side, you have to crab your way down

the channel. That is you have to keep your bow towards the tidal current such that the sidewise component of your speed is equal to the velocity of the tidal current. Otherwise you will get set in the direction of the tidal current.

Understand that tide refers to the rise of the water in height with high tide being the highest level for that period and low tide is the lowest level for that period. Tidal fluctuations in the Gulf of Mexico are usually two high tides and two low tides in a day. Tidal current is the velocity of the water as the water moves to create the tide. The tidal current is highest between the times of the high and low tides. There is little or no tidal current at the time of high tide or low tide. A tide rising from a low tide to a high tide is known as a flood tide, while the reverse is known as an ebb tide.

**OBSERVATION:** During the survey of the BROWN WATER V at Anahuac on 9 May 2002, it was found that the starboard engine was mechanically in good shape while the port engine had one dead cylinder on one bank and the head for the other bank was a two valve head while the design head is a 4 valve head. This reduces the horsepower available to less than rated at less than rated RPM. There will be a drag from this port engine which will require some rudder angle to keep a straight heading.

**OPINION:** It is my opinion that if indeed Captain Fowler grounded between buoys 147 and 149; he was already out of shape to make the opening in the causeway. Because of the configuration of the tow with the deeper barges forward and the unbalanced horsepower available, it would not have been possible to bring the bow back into the current.

**OBSERVATION:** Captain Wilson testified that the tow would need a quarter of a mile to stop. There is about 1800 feet from buoy 149 to the bridge. There is however an adverse current setting the tow in the direction of the bridge. There is about 200 feet of shallower water on the red side of the channel between the dredged channel and the submerged pilings which are in water depth charted as 6 feet or less. There was no red flag (dangerous or polluting cargo) being carried in the four barges.

**OPINION:** Were Captain Fowler more experienced with this area, he could have grounded the tow on the red side of the channel adjacent to buoy 146. Since he was already headed in that direction, he could have backed down, stuck his bow into the bottom and let the tidal current carry his stern over. While the tide would have set him high on the bottom, the next high tide when ebbing would have assisted him in coming off ground. There was room and sufficient time for this grounding. While this would have resulted in an inquiry by the Coast Guard with possible action against his license, the consequences of this would have been far less severe than what happened.

**OPINION:** Had the BROWN WATER V really had 800 horsepower, the ability to stem the current would have been greater as there would be a higher speed available. Further with 800 horsepower, there would have been greater backing power which if applied timely would have mitigated the effects of the allision. Barring that, it would have facilitated an intentional grounding.

**SUMMARY:** It appears to the undersigned examiners as more probable than not that the following factors contributed to the allision of the BROWN WATER V with the Queen Isabella Causeway on 15 September 2001.

1. The BROWN WATER V was underpowered for her tow size, configuration, and environmental conditions. In part, this under powering was due to mechanical problems known to management. At present, this appears to be not only a contributing factor but the primary cause of event.
2. There may or may not have been shoaling in the vicinity, which may or may not have affected the steering of the vessel.
3. There may or may not have been deficiencies in the short range aids to navigation for the bridge approach.
4. It is assumed that operator fatigue contributed to the accident based on Captain Fowler stating that he had only about five hours of sleep prior to going on watch. To the degree that fatigue played a role in the accident, it was induced by the management decision to maintain a two watch system without the necessary additional manpower to adhere to the 12 hour rule.
5. The owners and managers of BROWN MARINE had the primary responsibility of assuring the adequate horsepower of the BROWN WATER MARINE V; and ACBL had a contractual obligation of the same nature.
6. BROWN WATER MARINE and ACBL knew or should have known that the BROWN WATER MARINE V was not being provided with the latest notice to mariners. This was the main system by which the operators would have been alerted to either shoaling or aids to navigation deficiencies.

In short all causational factors were within the privity and knowledge, and to a large extent, control, of management.

Respectfully Submitted without prejudice,

*[signature]*  *[signature]*

Captain G.E. "Jay" Disler    John Deck III