## SUPPLEMENTAL PANEL REPORT OF OBSERVATIONS, RESEARCH, AND OPINION

6 June 2005

Ajamie, LLP
Pennzoil Place South Tower
711 Louisiana, Suite 2150
Houston, TX 77002

Watts Law Firm
1926 East Elizabeth
Brownsville, TX 78521

Attn: Mark Strawn, Esq.

Attn: Ray Marchan

RE: Civil Action No. B-01157: In re The Complaint and Petition of Brown Water Towing I, Inc. As Owner, and Brown Water Marine Services, Inc. as Bareboat Charter of Brown Water V. Its Engines, Tackle, etc. and a Cause of Exoneration from or limitation of Liability; consolidated with Civil Action No. B-02-004; In re the Complaint and Petition of American Commercial Barge Line, LLC, as Charter of the Barges NM-315, VLB-9182, ACL-9933B, VLB-91; and in a Cause of Exoneration from or limitation of Liability; in the United States District Court for the Southern District of Texas at Brownsville.

**METHODOLOGY:** This is a panel report containing the supplemental findings of two experts who have conferred with one another through the course of the production of this report. The report of first impression was produced on 29 September 2004. This supplemental report will supersede the preliminary report as it contained inaccurate as well as incomplete information.

Both experts are members and principals of the American Admiralty Bureau, Ltd. An organization committed to strict adherence to, and the promotion of the Code of Professional and Ethical Conduct of the National Forensic Center. All analytical work was performed by the undersigned examiners or staff under their direction. All analytical work was completed in conformance with the Code of Professional and Ethical Conduct of the National Forensic Center. The undersigned experts were each retained by different parties in the litigation and by mutual agreement of commissioning counsels they were allowed to confer and produce this panel report.

**STANDARDS OF PRESENTATION:** This report is produced in strict conformance with the Code of Professional and Ethical Conduct of the National Forensic Center (NFC), specifically the Standards of Presentation contained therein. Clerical and editorial assistance in the preparation of this report was provided by the staff of Maritime Consultants and Associates (MC&A) a sole proprietorship of Captain Jay Disler, one of


EXHIBIT "F"

JUN.07.2005 14:50 7138601699   AJAMIE LLP   #2535 P.005/016
Case 1:01-cv-00157   Document 404-7   Filed in TXSD on 06/14/2005   Page 2 of 13

2

the undersigned examiners. **The individual opinions of each examiner are identified as such within the body of the report.** Any party at interest or any officer of the court will be provided a full text of the NFC Code upon request. Any party at interest or officer of the court who believes that either of the undersigned examiners may have violated this code may complain to:

> THE NATIONAL FORENSIC CENTER
> 17 TEMPLE TERRACE
> LAWRENCEVILLE, NJ 08648
> 1-800-526-5177

CASE TYPE: Allision of a towboat and barges with a bridge over a portion of the Gulf Intracoastal Waterway with multiple deaths and injuries to motorists transiting the bridge.

## QUALIFICATIONS OF EXAMINERS:

**Commander John Deck, III:**
Commander John Deck III is a retired Coast Guard Officer with 20 years of service. He holds a Bachelor of Science from the U.S. Coast Guard Academy and a Master's of Science degree in Mechanical Engineering and a Naval Engineer's degree from the Massachusetts Institute of Technology. He has served as Chief of the Ship Design Branch, Office of Merchant Marine Safety for the Coast Guard. Commander Deck has five years of sea service aboard cutters of the U.S. Coast Guard. Since retiring from the Coast Guard, he has made a number of Western River tow trips as an observer and wheelman as well as conducting research into tow powering and configuration. Commander Deck has served as an expert witness on marine powering applications and served as chief investigator in a number of Western River tow accidents, and inland waterway bridge allisions. His experience includes investigative, analytical work in hydrodynamics and expert testimony in allisions involving the Gramercy Bridge Caisson at Gramercy, Louisiana in 1985, the Pensacola Bay Bridge in 1992, the Highway 190 Bridge in Baton Rouge Louisiana in 1998 and the I-40 Bridge in Arkansas in 2002.

**Captain Jay Disler:** Captain Disler is licensed by the U.S. Coast Guard in the dual capacity of Ocean Master and Chief Engineer. He has extensive work experience as Master and Chief Engineer aboard a wide variety of commercial work vessels, especially along the South Texas coast. This experience includes the operation of push tows on the Gulf Intracoastal Canal in South Texas and on the Western Rivers of the United States. He has previously served as an expert witness in similar cases in both State and Federal Courts.

**A complete and detailed resume as well as a list of all cases participated in by either or both experts will be made available to any party at interest or officer of the court upon request.**

## DOCUMENTS REVIEWED FOR PRELIMINARY REPORT:

1. Transcript of the Coast Guard hearing on the allision of September 15, 2001

JUN.07.2005 14:50  7138601699        AJAMIE LLP                      #2535 P.006/016
Case 1:01-cv-00157   Document 404-7   Filed in TXSD on 06/14/2005   Page 3 of 13

3

2. Transcript of an audio tape of an interview with David Dewayne Fowler by a Coast Guard Investigator dated September 12, 2001
3. Hand written statement by David D. Fowler
4. Transcript of a Coast Guard interview with David D. Fowler by U.S. Coast Guard, transcript dated September 17, 2001 (thought to be a more formal version of document number 2).
5. Deposition Transcript of Stephen H. Mosher (reviewed by Jay Disler only)
6. Deposition Transcript of Philip S. Timberlake (reviewed by Jay Disler only)
7. Deposition Transcript of William Norb Whitlock (reviewed by Jay Disler only)
8. Cameron County Sheriff's Department Report Case No. 01-090662 dated September 16, 2001 (reviewed by Jay Disler only)
9. Coast Guard Investigative Officer's (IO) file (reviewed by John Deck III only)
10. Lake Charles Diesel report on BROWN WATER V (BW V) main engines dated 20 May 2002.
11. American Waterways Operators (AWO) Responsible Carrier Program (RCP) Administrative Procedures
12. Report pf the Towing Horsepower Task Group of the Towing Safety Advisory Committee (TSAC).

### ADDITIONAL DOCUMENTS REVIEWED FOR THE SUPPLEMENTAL REPORT:

1. United States Coast Guard Formal Investigation Report dated 28 April 2005.
2. Deposition of David Fowler dated 27 April 2005.
3. Deposition of Rocky Wilson dated 20 April 2005.
4. Deposition of Chad Chapman dated 4 November 2004.
5. Deposition of Hugh Chapman dated 27 October 2004.
6. Deposition of Harvey Larsen dated 9 September 2004.
7. Deposition of Terry Elmore dated 4 November 2004.
8. Expert report of Allan R. Schultz dated 30 October 2004.
9. Expert report of Burness Corlett & Partners dated November 2004.
10. NOAA Chart 11302, 1999 edition..
11. Coast Pilot Number 5, Chapters 11 and 12, 32nd edition 2004.
12. Federal Register dated 4 November 2000, 33 CFR 164, Fire-Suppression Systems and Voyage Planning for Towing Vessels.
13. ACBL Letter dated 7 May 2001 to Coast Guard regarding Voyage Planning.
14. Earl Hatfield Marine Survey dated 27 October 2001.
15. Hargiss Marine surevy dated 27 November 2001.

### ARTIFACTS EXAMINED:

1. Jay Disler and John Deck III inspected the towboat BROWN WATER V on 9 May 2002 at Anahuac, Texas
2. Photographs of BROWN WATER V

JUN.07.2005 14:50 7138601699   AJAMIE LLP   #2535 P.007/016
Case 1:01-cv-00157   Document 404-7   Filed in TXSD on 06/14/2005   Page 4 of 13

4

**ORIENTATION:** Presented for reader orientation and not as a statement of fact the following sequence of events, circumstances, and conditions were discerned in reading the documents described above. On the night of September 15, 2001 during the hours of darkness the Towboat BROWN WATER V pushing four loaded cargo barges "strung out" (four long, one wide) was approaching the Queen Isabella Causeway across the Gulf Intracoastal waterway connecting the resort community of South Padre Island to the mainland. At the pertinent time, the two forward barges in the tow of the BROWN WATER V were loaded to an average draft of approximately nine feet while the third barge back in the flotilla had a draft of 7 feet 3 inches while the last barge had a draft of 8 feet 10 inches. The towboat drew 8 feet 4 inches. The BROWN WATER V and her tow failed to transit the bridge's navigation span, and struck portions of the bridge's supporting structure. As a result of the initial structural support damage caused by the allision, a portion of the bridge's roadway fell into the water. Various automobiles then fell into the gap in the roadway and on into the water before motorists on the bridge finally perceived what had happened and one motorist stopped his vehicle and began alerting motorists behind him of the situation. As a result of the various automobiles falling into the gap created by the allision, multiple deaths and serious injuries occurred. In the hours and days following the initial damage, additional bridge structural failures occurred dropping additional bridge portions into the water complicating the search for bodies and prolonging the repair period.

**NOTE CONCERNING CITATIONS TO STATUTES AND REGULATIONS:** This is a report of a forensic examination of the above described events by technical experts. Coast Guard Officers are charged with the enforcement of Federal maritime safety regulations. Licensed Merchant Marine Officers are charged with insuring compliance with such regulations and safety related statutes in all of the operations that they supervise. Licensed Merchant Marine Officers are examined for their knowledge of applicable regulations as outlined in **46 CFR 10.910-1**.

**Minimum regulatory compliance is not the standard of good seamanship or a seaworthy vessel. The standard is higher than that.** However today marine safety regulations are so extensive that many, if not most, safe marine practices are described within the body of the Federal Maritime Safety Regulations. All officers of the court are trained in the use of such regulations and have access to them. Consequently regulatory citation is the preferred system of citation to safe work practices when such are available. However the strict application of a particular regulation or statute to a particular set of circumstances is a legal judgment. **Referral to safety statutes and regulations in this report should not be construed as legal opinion that any such regulations or statutes apply as a matter of law. Regulations and safety related statutes cited herein are provided as descriptions of guides to safe maritime operations. Should the judge determine that any particular regulation or safety related statute cited does not apply to the circumstances as a matter of law, this would in no way affect the opinion of the undersigned examiners that the cited regulation or safety related statute accurately describes the safe practices.**

JUN.07.2005 14:50 7138601699   AJAMIE LLP                            #2535 P.008/016
Case 1:01-cv-00157   Document 404-7   Filed in TXSD on 06/14/2005   Page 5 of 13

5

This is a technical report on matters of maritime safety. Maritime safety is a heavily regulated area of human endeavor. It is impossible to describe safe operations without mention of regulations and safety related statutes. **However such mention should in no way be construed as legal opinion.** Applicability as a strict matter of law is for the judge to decide. The undersigned examiners do not intend to offer legal opinion.

**NOTA BENE:** : It should be noted that references to direction in the Coast Guard Investigation Report are wrong. NOAA Chart 11302 is not oriented with North at the top but with compass heading 330 degrees at the top. Accordingly references to current traveling from Southeast to Northwest should be properly described as traveling more East to West. Burness Corlett & Partners are the only ones that got it right.

The following observations and opinions were offered by Captain Disler:

**OBSERVATION/OPINION:** Four barges may be configured 2x2, 1x2 with 2 abreast, or 1x4. When entering a cross current a 2x2 presentation presents least lateral area to the current and reduces the effect of the current on the motion of the barges.

**OBSERVATION:** On the approach to the Queen Isabella Causeway the BROWN WATER V had her tow "strung out".

**OPINION:** Due to the various currents present at the Causeway "strung out" is the worse possible way to configure the tow. A "strung out" tow presents twice the lateral area to the effects of current increasing the lateral forces on the tow. The tow's strung out configuration played a major part in her loss of control.

**OBSERVATION:** Captain Rocky Wilson changed the configuration of the tow from 2x2 to 1x4 "strung out" during his watch prior to Captain Fowler's approach to the Queen Isabella Causeway. Captain Fowler received the tow in this "strung out" condition at the start of his watch. Captain Wilson testified in his deposition that this was the best configuration to get the best speed out of the tow.

**OBSERVATION:** In Captain Rocky Wilson deposition, it was pointed out that the Brown Water Operations Manual required that the weather be included in the log. Captain Wilson testified that he never put it in the log unless it was a factor that held up or otherwise influenced a tow. Chad Chapman, the president of Brown Water testified that it was the duty of the Captain to check the weather at the start of his watch. Captain Wilson testified that he knew that there was a tropical disturbance in the Gulf. He also testified that he had made a number of trips to the area, at least nearly a hundred. He testified that he did not listen for the weather nor asked anyone about the weather. He testified that he felt the tow was capable of handling any tidal current present. He testified at the Coast Guard Hearing that anybody that's run the area between the Queen Isabella Causeway and the Long Island swing bridge a lot would know that there was a very strong tide there. Yet he also testified at the Coast Guard Hearing that he had on previous occasions called the swing bridge operator and that he usually called them before he even got into the ship channel. He also said that this was not his normal operating procedure as

JUN.07.2005 14:50   7138601699              AJAMIE LLP                    #2535 P.009/016
Case 1:01-cv-00157   Document 404-7   Filed in TXSD on 06/14/2005   Page 6 of 13

6

he could tell if he was making good time, he was running with the tide. He also testified that he had never transited the area between the Long Island swing bridge and the Queen Isabella Causeway without knowing what the tides were before he went through the Long Island swing bridge. He did not advise Captain Fowler of the tide or the effects of the tidal current. He testified that he did not think he had to advise Captain Fowler on anything as Fowler had his license longer than he (Wilson) had.

**OBSERVATION:** It should be noted that in every standard marine VHF FM radio transceiver, there are 4 channels available for weather broadcasts from NOAA Weather Radio.

**OBSERVATION:** In his deposition, Captain Wilson testified that he thought the available width through the swing bridge was 120 feet. He had testified at the Coast Guard Hearing that it was 90 feet. He testified that with a 70 foot width, he would have a problem meeting someone in that channel. Yet he contradicted himself in later testimony when he said that he knew there was no one coming down bound when asked if he could contact another tow about the weather. The 1999 edition of NOAA Chart 11302 indicates that the Brownsville Ship Channel is 250 to 300 feet wide, the Port Isabelle Cut-Off channel is 200 feet wide and the Port Isabelle Turning basin is 1000 feet wide. The channel around Long Island appears to be narrower than the Swing Bridge horizontal clearance of 149 feet but not 90 feet. The channel out of the swing bridge widens to about 300 feet with a horizontal clearance at the Causeway of 275 feet.

**OPINION:** While there was only one rake barge in the flotilla and it makes sense to have it at the head of the tow, it was going to be dropped off at Harlingen some 40 miles away. The flotilla could have been configured with the rake forward followed by the lesser draft box barge followed by the two deeper draft barges side by side. This would have brought the center of gravity further aft with greater ability to slide in a turn. This would have presented less lateral area to the current. The best of all worlds would have been a 2 x 2 configuration with the rake and lesser draft barge forward and the two deeper draft barges aft. With this few barges, making and breaking tow is not complicated.

**OBSERVATION:** In the preliminary report, the human factor of fatigue was discussed. However, it was found in the Coast Guard Investigation Report, that a fatigue analysis was made and that the result indicated that fatigue was not an issue.

**OBSERVATION:** Stephen H. Mosher, President of Brown Water Marine has stated in his deposition that shoaling was an important factor in the accident. The undersigned examiner has still not reconciled the fact dispute as to whether or not shoaling took place. However, the Coast Guard Investigation Report does not give it much weight. There is no evidence that the stern of the towboat did in fact ground. Captain Wilson testified that he took the towboat to drydock for an inspection by the Coast Guard and that the inspection did not reveal any damage. Captain Fowler believes that it was more a situation where the strong tidal current got him out of shape rather than being precipitated by a momentary grounding. The Coast Guard concluded that when he grounded, if he did, he was already

JUN.07.2005 14:51 7138601699 AJAMIE LLP #2535 P.010/016
Case 1:01-cv-00157 Document 404-7 Filed in TXSD on 06/14/2005 Page 7 of 13

7

out of shape because of the combined currents from the channel and from the flats. They also concluded that if he grounded, he was out of the channel.

**OBSERVATION:** The subject of tow powering and configuration has been marked in recent years by considerable controversy. The American Admiralty Bureau has studied the issue of tow powering and configuration in depth and the Bureau has published its finding in the AMERICAN ADMIRALTY BUREAU'S INTERIM RECOMMENDATIONS FOR TOW POWERING AND CONFIGURING FOR WESTERN RIVERS PUSH TOWS EDITED BY CDR. JOHN DECK III, USCG (RETIRED). This publication is available through Marine Education Textbooks 124 North Van Avenue Houma Louisiana 70363-5895, PH # (985) 879-3866. Publication is assigned international book binding No. ISBN 1-879778-62-9. This publication provides a decisional matrix and other guidance for the proper powering and configuration of push tows. We have examined the issue of the powering of the BROWN WATER MARINE V in conformance with these published findings. Additionally, we have examined statements within the depositions of Stephen Mosher, Philip Timberlake and William Whitlock wherein these officials admit to minimal horsepower requirements very similar to those we describe in our publication and admit that the BROWN WATER V and its tow did not conform to these minimal guidelines. Chad Chapman testified that he adhered to the 200 horsepower per barge rule and that the tow was adequately powered. Mr. Elmore testified that even though the engines were less than 400 horsepower, they were called "four hundreds".

**OBSERVATION:** Mr. Whitlock in his deposition maintained that it was his company's contractual obligation to provide adequate horsepower for the barges they contracted to deliver. Mr. Whitlock further maintained that it was the prerogative of his company to either provide the necessary horsepower by utilization of their own towboats or to provide it through boats owned by others and contracted by his company. Further, ACBL was represented on the Horsepower Working Group at TSAC which produced the report on tow powering which included the following wording in the conclusions: "In many cases what are believed to be inadequately powered tows may be tows that are inadequately handled. Where this is the case, Coast Guard and industry initiatives on training and licensing provide the best avenues for improved safety. However, towing companies are ultimately responsible for their safe operations; and they should be expected to develop policies which are defensible and accountable." It does not appear that any such policies were in place either at BROWN WATER MARINE OR ACBL.

Further, Captain Fowler testified that he had told Stephen Mosher that he was not familiar with Brownsville, that he did not like it down there as the wind blew too hard and it was just too hard to navigate. He also testified that he told Captain Wilson that he was not too familiar with the area. Records in his deposition show that he had made two passages previous, one with two barges, an empty and a load and another with an empty. Both during daylight hours.

**OBSERVATION:** There is at present no Coast Guard regulation specifying minimal horsepower requirements for any given size tow. Such written guidelines as exist for tow

JUN.07.2005 14:51  7138601699  AJAMIE LLP  #2535 P.011/016
Case 1:01-cv-00157  Document 404-7  Filed in TXSD on 06/14/2005  Page 8 of 13

8

powering and configuration are found in Academic Studies such as the American Admiralty Bureau cited previously or in company operational manuals. However companies which are signatory to the American Waterways Operators Responsible Carrier Program are required in Section II Management/Administration subsection A.2. Vessel Operating Policies/Procedures Vessel-specific operating procedures (will depend on vessel size, cargo, trade, etc.) a) procedures for making horsepower tow/size decisions. ACBL is signatory to the RCP program, however there were no written policies issued.

**OPINION:** Tow boat operating companies have the primary responsibility for providing adequate horsepower for each tow they undertake. Historically as described in the AAB reference previously cited pilot house personnel often improve the performance of underpowered tows through skillful piloting techniques that work with, and not against hydrodynamic forces. Thus it is difficult for pilot house personnel to refuse an underpowered tow since they may not cite to a Federal regulation and any refusal to push the tow the dispatcher provides is often viewed as a manifestation of a lack of skill. Against this background, it is vitally important that management train dispatchers to keep tows within the minimal powering guidelines that are discernable in authoritive literature, pilot organization recommendations and company manuals. At the present state of regulation, the primary duty for the avoidance of underpowered tows falls to management.

**OBSERVATION:** The horsepower of BROWN WATER V was considerably less than the minimal horsepower guidelines described by Mr. Timberlake and Mr. Whitlock in their depositions.

**OPINION:** In fact in the opinion of the undersigned, the available horsepower of the BROWN WATER V was grossly inadequate for the task at hand. Furthermore this inadequacy was within the privity and knowledge of both the management of BROWN WATER MARINE and ACBL.

**OBSERVATION:** There were indications in the documents reviewed that short range visual aids to navigation associated with the bridge approach were in less than proper order. However, review of NOAA Chart 11302 indicates that certain buoys are away from the edge of the channel. The Coast Guard Investigation Report indicates that the buoys were properly on station at the time of the accident.

Coast Guard Chief Ingram testified at the Coast Guard Hearing that his Executive Petty Officer accompanied the Texas DOT officials when they made their inspection the day of the accident and found that the bridge centerline green lights were not functionable.

Captain Fowler testified that the buoys were in their proper place and that he had not reached the point where he would be shaping up for the bridge opening. He did not see the center line lights but he did see the fender perimeter lights. He testified that the missing lights had no bearing on the accident.

JUN.07.2005 14:51 7138601699 AJAMIE LLP #2535 P.012/016
Case 1:01-cv-00157 Document 404-7 Filed in TXSD on 06/14/2005 Page 9 of 13

9

**OBSERVATION:** ACBL responded to a Notice of Proposed Rulemaking which was intending to require towing companies to develop voyage plans. ACBL strongly and sharply opposed such rulemaking. Noteworthy is the sentence "Unlike blue-water operators, when confronted with inclement weather or difficult river stages, an inland towing vessel always has the option of quickly finding a safe place to secure the tow and wait for improved conditions." The underline was in the ACBL letter. I submit that there was no safe place available to Captain Fowler.

## COMMANDER DECK OFFERED THE FOLLOWING OPINIONS:

**OBSERVATION:** In the Coast Guard Hearing, Brown Water offered the testimony of David Swain, who presented findings of a shoaling area between Buoy 147 and 149. The shoaling allowing for the tide was on the order of 7 feet. Captain Fowler had indicated that he felt he grounded on his starboard stern quarter of his tow in that area. However, he felt he was in the channel when he bumped bottom. Captain Wilson testified that such grounding could cause the tow to get out of shape, swinging the bow to port and thus out of the channel. The towboat was drawing **8 feet 6 inches** and the after barge was drawing 8 feet 6 inches. The barges forward were drawing about **9 feet**. If Captain Fowler was pointing up into the current, his bow should have grounded first. If his stern was swinging into the current, the towboat would have hit bottom before the after barge. There was no damage found to the running gear (propellers, propeller shafts, and rudders) of the towboat when it was hauled according to Captain Wilson's testimony.

Further based upon Captain Wilson's testimony that when the tidal current is running, you put your bow into the tidal current keeping your propellers in the deep water i.e., the dredged part of the channel. Because you are navigating in a current which is coming from your side, you have to crab your way down the channel. That is you have to keep your bow towards the tidal current such that the sidewise component of your speed is equal to the velocity of the tidal current. Otherwise you will get set in the direction of the tidal current. With the flotilla making 5 MPH and assuming a current in the order of 2 KNOTS, the flotilla would be crabbing at an angle of 25 degrees to her direction of travel. The head and stern of the 851 foot long tow would be well out of the channel.

It is noted in the CG-2692 Report of Marine Accident, Injury or Death that Stephen Mosher described the current as being 3 ½ to 4 knots. Chapter 11 of Coast Pilot 5 describes the tidal current as being as high as 6 knots. Between buoys 147 and 149, the current as described by multiple testimony in the Coast Guard Hearing would be directly on the starboard beam during that transit. The higher the current speed, the greater the angle to over come the current. Even with using the current to help swing the bow to port to facilitate the turn, there still has to be some crabbing angle to keep the flotilla from moving laterally across the channel.

Understand that tide refers to the rise of the water in height with high tide being the highest level for that period and low tide is the lowest level for that period. Tidal fluctuations in the Gulf of Mexico are usually two high tides and two low tides in a day. Tidal current is the velocity of the water as the water moves to create the tide. The tidal

JUN.07.2005 14:51  7138601699          AJAMIE LLP                #2535 P.013/016
Case 1:01-cv-00157   Document 404-7   Filed in TXSD on 06/14/2005   Page 10 of 13

10

current is highest between the times of the high and low tides. There is little or no tidal current at the time of high tide or low tide. A tide rising from a low tide to a high tide is known as a flood tide, while the reverse is known as an ebb tide.

**OBSERVATION:** The Burness Corlett & Partners report has some conclusions which appear to be based upon faulty information. They conclude that the towboat engines were at 2/3 throttle to make 4.5 MPH and that the top speed of the flotilla was 6 knots. They concluded that the towboat would squat. They used a current speed of 4 knots when yet they indicated that no one measured the current speed. They concluded that the current would be directly behind the tow increasing it's speed over the ground when in fact the current is for the most part lateral to the tow. They concluded that 2 feet of depth was to be added to the DWS soundings as that was the range of the high tide. However, the flood current is greatest between tides not at high and low tide.

Captain Fowler testified that when he left the swing bridge, he hooked up the engines putting them at full. Both Captain Wilson and Captain Fowler indicated that the top speed of the tow was 4 ½ to 5 MPH. The only current speed mention that I could find was 3 to 4 1/2 in the CG-2692.

Towing vessels despite their shallow water operation squat very little. Two feet of squat would have brought the water level close to the deck edge.

One conclusion that is probably correct is that the bottom is quite hard to the east of the channel as there is steep gradients which a soft muddy bottom would not be able to support. This is consistent with the bathymetry that I have observed along the Gulf Coast.

**OPINION:** Couple the hard bottom with no damage to the running gear of the BROWN WATER V makes the grounding scenario highly unlikely.

**OBSERVATION:** It had been represented on the CG-2692 that the BROWN WATER V had 800 horsepower. During Mr. Larsen's deposition, it was brought out that the Detroit Diesel Propeller Selection Guide listed the GM12V71 engines with N55 injectors rated by the American Bureau Of Shipping and Lloyd's Registry (two classification societies) as having 360 brake horsepower. Brake horsepower is the output of the engine without regard to the auxiliaries that it is using such as the water pump and alternator. The horsepower at the crank shaft will be less than the brake horsepower. It also listed the same engines with Twin Disc MG514 transmissions as having 340 shaft horsepower. Shaft horsepower is the power delivered to the propeller. It is less than brake horsepower due to losses through the transmission. It was also brought out in the deposition that the BROWN WATER engines had neither turbochargers or after coolers which would increase the brake horsepower and subsequently increase the shaft horse power.

**OBSERVATION:** During the survey of the BROWN WATER V at Anahuac on 9 May 2002, it was found that the starboard engine was mechanically in good shape while the port engine had one dead cylinder on one bank and the head for the other bank was a two valve head while the design head is a 4 valve head. This reduces the horsepower available

JUN.07.2005 14:51 7138601699 AJAMIE LLP #2535 P.014/016
Case 1:01-cv-00157 Document 404-7 Filed in TXSD on 06/14/2005 Page 11 of 13

11

to less than rated at less than rated RPM. There will be a drag from this port engine which will require some rudder angle to keep a straight heading. However, in Captain Fowler's Deposition, he testified that he thought the starboard engine had less performance than the port. Indeed, there were notations in the daily log prior to the allision where it was recorded that at full throttle, the port engine indicated 1800 RPM on the tachometer while the starboard engine registered 1100 RPM on the tachometer. Still further, Lake Charles Diesel, who conducted the examination indicated that the out of the box horsepower was 335. In Mr. Elmore's deposition it was learned that the port engine had been swung out in January 2002 prior to our survey. Mr. Hugh Chapman indicated in his deposition that the engines that were surveyed on 9 May 2002 were not the engines that were in the boat at the time of the accident.

**OBSERVATION:** In Mr. Larsen's deposition, it was pointed out that on 22 August 2001, the port engine had been overhauled while the starboard engine had been overhauled on 29 April 2000.

**OPINION:** It is my opinion that if indeed Captain Fowler grounded between buoys 147 and 149; he was already out of shape to make the opening in the causeway. Because of the configuration of the tow with the deeper barges forward and the lack of horsepower available, it would not have been possible to bring the bow back into the current.

**OBSERVATION:** Captain Wilson testified that the tow would need a quarter of a mile to stop. There is about 1800 feet from buoy 149 to the bridge. There is however an adverse current setting the tow in the direction of the bridge. There is about 200 feet of shallower water on the red side of the channel between the dredged channel and the submerged pilings which are in water depth charted as 6 feet or less. There was no red flag (dangerous or polluting cargo) being carried in the four barges.

**OPINION:** Were Captain Fowler more experienced with this area, he could have grounded the tow on the red side of the channel adjacent to buoy 146. Since he was already headed in that direction, he could have backed down, stuck his bow into the bottom and let the tidal current carry his stern over. While the tide would have set him high on the bottom, the next high tide when ebbing would have assisted him in coming off ground. There was room and sufficient time for this grounding. While this would have resulted in an inquiry by the Coast Guard with possible action against his license, the consequences of this would have been far less severe than what happened.

**OBSERVATION:** Review of the expert report of Alan Schultz indicates that he had made calculations based upon the damage of the striking barge that the velocity at impact was 0.37 knots or 0.43 MPH. This relatively low impact velocity is consistent with Captain Rocky Wilson's testimony that he did not feel or hear the allision. While the actual horsepower of the engines is not known, it can be no more than 340 horsepower per shaft. There is evidence that the starboard engine was not developing full horsepower by log entries of low RPM's at full throttle and Captain Fowler's testimony that he did not feel it was putting out full power by observing the wheel wash.

JUN.07.2005 14:52   7138601699        AJAMIE LLP                          #2535 P.015/016
Case 1:01-cv-00157   Document 404-7   Filed in TXSD on 06/14/2005   Page 12 of 13

12

**OBSERVATION:** Allan R Schultz in his expert report calculated that the speed of impact was on the order of 0.37 Knots or 0.43 MPH. The level of damage as reported by Hatfield and Hargiss to the head log of the lead barge is supportive of this low impact speed. Captain Wilson testified that it took about a quarter of a mile to bring the flotilla to stop. This is about 1320 feet. The distance from the point where Captain Fowler thinks he may have touched bottom adjacent to Buoy 149 to the point of impact is about 700 yards or 2100 feet. Subtracting the length of the tow 851 feet yields about 1250 feet of available stopping distance. The current coming down the channel will have diminished as the channel widens out. The current coming across the tidal flats will have it's greatest impact on the lateral area of the tow when the head of the tow clears Long Island before it gets to Buoy 149. As the flotilla turns to port the effect of the current longitudinally increases but never comes full on the stern.

**OPINION:** Had the BROWN WATER V really had 800 horsepower, the ability to stem the current would have been greater as there would be a higher speed available. Further with 800 horsepower, there would have been greater backing power which if applied timely would have mitigated the effects of the allision. Barring that, it would have facilitated an intentional grounding.

**SUMMARY:** It appears to the undersigned examiners as more probable than not that the following factors contributed to the allision of the BROWN WATER V with the Queen Isabella Causeway on 15 September 2001.

1. The BROWN WATER V was underpowered for her tow size, configuration, and environmental conditions. In part, this under powering was due to mechanical problems known to management. At present, this appears to be not only a contributing factor but the primary cause of event.

2. There may or may not have been shoaling in the vicinity, which may or may not have affected the steering of the vessel. However, if there was a grounding, the flotilla was already out of shape and the stern was out of the channel.

3. The owners and managers of BROWN MARINE had the primary responsibility of assuring the adequate horsepower of the BROWN WATER V; and ACBL had a contractual obligation of the same nature.

4. It was Captain Rocky Wilson's complacency in not checking on weather conditions and not advising Captain Fowler of the weather conditions when he was relieved of watch that set up the accident. BROWN WATER MARINE knew or should have known that Captain Wilson was not checking on weather because it was never logged.

In short all causational factors were within the privity and knowledge, and to a large extent, control, of management.

Respectfully Submitted without prejudice,

13

_[signature]_  
Captain G.E. "Jay" Disler

_[signature]_  
John Deck III