United States District Court
Southern District of Texas
FILED

JUN 1 5 2005

Michael N. Milby
Clerk of Court

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | |
|---|---|
| IN RE THE COMPLAINT AND PETITION OF BROWN WATER TOWING I, INC., AS OWNER, AND BROWN WATER MARINE SERVICE, INC., AS BAREBOAT CHARTERER OF THE BROWN WATER V, ITS ENGINES, TACKLE, ETC., IN A CAUSE OF EXONERATION FROM OR LIMITATION OF LIABILITY | C. A. NO. B-01-157<br>Admiralty<br><br><br><br>Consolidated with |
| IN RE THE COMPLAINT AND PETITION OF AMERICAN COMMERCIAL LINES, LLC AS OWNER, AND AMERICAN COMMERCIAL BARGE LINES, LLC AS CHARTERER OF THE BARGES NM-315, VLB-9182, ACL-9933B, VLB-9173, IN A CAUSE OF EXONERATION FROM OR LIMITATION OF LIABILITY | C. A. NO. B-02-004<br>Admiralty<br><br><br>Consolidated with |
| IN RE THE COMPLAINT AND PETITION OF DEERE CREDIT, INC., (FORMERLY SENSTAR FINANCE COMPANY), AS OWNER OF THE BARGE NM-315, AND STATE STREET BANK AND TRUST COMPANY OF CONNECTICUT, NATIONAL ASSOCIATION, AS OWNER TRUSTEE OF THE BARGE ACL-9933B AND NOT IN ITS INDIVIDUAL CAPACITY, AND GENERAL ELECTRIC CAPITAL CORPORATION, AS BENEFICIAL OWNER OF THE BARGE ACL-9933B, PRAYING FOR EXONERATION FROM AND/OR LIMITATION OF LIABILITY | C. A. NO. B-02-125<br>Admiralty |

## TRIAL MEMORANDUM
## SUBMITTED ON BEHALF OF AMERICAN COMMERCIAL BARGE LINE LLC

## MAY IT PLEASE THE COURT:

{N1304353.1}

In their claim against ACBL, the Claimants are like farmers who sued the owners of boxcars because the separately owned locomotive struck their cow. Claimants, ignoring towage law, make an unprecedented attempt to pin liability on ACBL, the owner of dumb, unmanned seaworthy barges which were pushed into a bridge by an experienced third party independent towing contractor which had sole, care, custody and control of the barges. ACBL had no one on board the tug of barges, had no operational control over the tug or tug owner and made no decision as to when or how its barges were to be towed, which towboat was to be used to tow its barges and had no idea where its barges were at the time of the accident. But why are Claimants making a claim against ACBL when no court, including the Fifth Circuit, has ever imposed liability on the owner of dumb barges for this type of accident. Why? Because Claimants perceive that the towboat owner, Brown Water, does not have sufficient insurance coverage for their claims. If it did, the barge owners would have never been in this case.

ACBL's towboat did not push the barges into the bridge – it was Brown Water's towboat. ACBL's employees were not on the tug or barges and did not operate the BROWN WATER V at the time of the accident – Brown Water's crew was operating the vessel at that time. ACBL did not select the BROWN WATER V to tow its barges – Brown Water made that decision. ACBL did not decide to tow four barges with the BROWN WATER V – Brown Water's crew made that decision. ACBL had only offered three barges for towage. ACBL did not decide how the tow was to be configured – Brown Water's crew made that decision. ACBL did not determine when the tow was to leave Brownsville and whether or not it could proceed under the prevailing weather conditions – Brown Water's crew made that decision. It was not ACBL who failed to determine the current conditions in the area of the accident by failing to listen to the available weather forecasts on the BROWN WATER V radio

or by calling the Long Island Swing Bridge – it was David Fowler, Brown Water's Captain who made that decision.  ACBL's employees did not ground the BROWN WATER V just prior to the accident – it was David Fowler.  There is not a single act of negligence causally related to this accident attributable to ACBL.  This accident was caused by the negligence of Brown Water's crew.

ACBL has submitted detailed Proposed Findings of Fact and Conclusions of Law, as well as previous memoranda relating to its pending Motion for Summary Judgment.  See (R. Doc. 307 and R. Doc. 375).[1]  ACBL does not want to repeat everything contained in those materials and simply adopts those herein.

## Towage Law Is Applicable to This Case

From the various memoranda and other papers filed by the Claimants in this case, it is very clear that they do not dispute over 100 years of towage law and independent contractor law which is applicable to this case.  Under the law, Brown Water and its tug masters (Fowler and Wilson) were responsible for all aspects of the towage of ACBL's barges:

"The master of a tug towing an unmanned barge must know all conditions essential to the safe accomplishment of the undertaking or voyage.  This knowledge includes the depth of the water, the ordinary obstructions, the state of the tides and water levels in the channel, and the clearance of bridges to be negotiated. [citations omitted.]  …  The tug master, moreover, must obtain knowledge from personal cognizance, or avail himself of the means of knowledge, of conditions likely to produce or contribute to a loss, unless appropriate means are adapted to prevent it. [citations omitted.]  "[C]aptains [are] held to a standard of prudent navigation, including the knowledge they should have had." *Houma Well Service v. Capt. O'Brien*,

---

[1] Copies of legal treatises and non-federal cases were attached to the memoranda filed in support of ACBL's Motion for Summary Judgment and, therefore, are not duplicated here.

312 F.Supp 257, 262 (E.D. La. 1970). (Emphasis added) Ryan Walsh Stevedoring Co. v. James Marine Service, Inc., 557 F. Supp. 457, 461 (E.D. La. 1983), aff'd, 729 F.2d 1457 (5th Cir.), cert. denied, 469 U.S. 981 (1984); see also Parks and Cattell, The Law of Tug, Tow, and Pilotage, pp. 144-157; 160-166 (3d ed. 1994).

"When a tower (such as Brown Water) undertakes a contract of towage the law implies that he possess sufficient skill to perform the task safely." Naviera Tabago S.A. v. Sprigg Carroll, 394 F. Supp. 1354, 1357 (S.D. Fla. 1975). "The tower has an obligation to exercise reasonable care and skill." Id. (citing Hart v. Blakemore, 410 F.2d 218, 221 (5th Cir. 1969)). The tug owes the tow an implied warranty of workmanlike service, "[t]hat is, an implied obligation to tow properly and safely ... -- the very nature of the towing agreement necessarily implies an obligation to tow properly and safely, and competency and safety are essential elements of the towing service undertaken." Singer v. Dorr, 272 F. Supp. 931, 934 (E.D. La. 1967) (citations omitted).

By law, Brown Water warranted (and ACBL is entitled to rely upon that warranty) that it possessed knowledge and skill and equipment to safely tow ACBL's barges, that it would furnish a seaworthy towboat, properly equipped and manned, and of sufficient capacity and power to perform the service undertaken under the conditions which were to be reasonably anticipated, and that its tug and crew would navigate itself and the tow properly and prudently, and to exercise its best endeavors, skill and diligence for the safe completion of the towage contract. See, e.g., Parks and Cattell, The Law of Tug, Tow, and Pilotage, pp. 127-128 (3d ed. 1994), (Ex. 26.)

ACBL, as the tow, only owed a duty to provide Brown Water with seaworthy barges for towage. Kenny Marine Towing, Inc. v. M/V JOHN R. RICE, 583 F. Supp. 1196, 1198 (E.D. La.

1984).  Claimants do not dispute that the ACBL barges were seaworthy and were not a cause of the accident.

When damage is caused by a casualty involving the tow or by the whole flotilla, the courts employ the concept of "dominant mind" to place liability on the tug and to absolve the tow from liability.  This doctrine holds that only that vessel is liable whose people are actually in control of the operation, even though the whole flotilla causes the damage.  T. Schoenbaum, Admiralty and Maritime Law at § 10-6, p. 730 (West 4th ed. 2003) (citations omitted).

Under maritime law, a principal, such as ACBL, is not liable for negligent acts committed by an independent contractor, such as Brown Water, while the independent contractor is performing its assigned duties.  Wallace v. Oceaneering International, Inc., 727 F. 2d 427, 437 (5th Cir. 1984), and Bartholomew v. CNG Producing Co., 832 F. 2d 326, 329 (5th Cir. 1987).  Moreover, Claimants concede that ACBL did not exercise operational control over Brown Water.

Therefore, based upon well established principles of maritime law, ACBL is not liable for any negligence of Brown Water.  ACBL exercised no control over the activities of Brown Water.  ACBL merely offered barges for towage from Brownsville to Houston.  Brown Water and its employees made all decisions as to towage, including which tug to use, timing of the towage, how many barges to tow, what route to take, how to build the tow, the suitability of the weather, tide and current to be encountered, and assignment of a crew to the tug.

### Claimants' "Independent Negligence" Argument Fails

Claimants admit that in order for this Court to impose fault upon ACBL for the collision that the Court must find an "independent" act of negligence on the part of ACBL separate and apart from any act of negligence on the part of Brown Water.  Claimants were unable to find any

{N1304353.1}

independent negligent acts related to the towage and therefore resort to two common law theories which have never been used to impose liability upon a "tow." Claimants argue that the "independent negligence" of ACBL is its: (1) "negligent hiring" of Brown Water and/or (2) the "negligent entrustment" by ACBL of its barges to Brown Water, and contend that as a practical matter there is little distinction between the two. Claimants admit they could find no towage cases to support their argument. Because it is the law of towage which defines the obligations of the barge owner when turning its barges over to an independent contractor tower and of the tower when accepting the towage. It is the law of towage which delineates who is responsible for the safe navigation of the tug and tow. This is not a case where ACBL hired someone other than a towage contractor, that owned towboats, to push its barges. ACBL did not hire a shrimper, a tour boat company or a jet ski operator to tow its barges. Nor is it a case where ACBL hired an unknown company, or a start-up company, or a company it had never used before or one that was known to be an incompetent. ACBL did not give any orders to Brown Water which were in any way causally related to the accident.

Even if the Court were to conclude that there are viable theories under maritime law, the facts provide this Court with sufficient evidence to find that ACBL did not "negligently hire" Brown Water and did not "negligently entrust" its barges to Brown Water. The evidence as to what ACBL did in its selection of Brown Water to tow its barges is not in dispute and proves that ACBL was not negligent and acted reasonably in hiring Brown Water: (1) ACBL relied on its ten years experience with Brown Water during which Brown Water towed hundreds of its barges safely and reliably thus proving that it had the knowledge, skill, experience and equipment to safely and competently perform that towage; (2) ACBL's knowledge from its weekly, if not daily dealings with Brown Water, was that Brown Water was the most

experienced tower in the far western ICW; (3) ACBL had no knowledge that Brown Water was an unsafe or incompetent tower; (4) the third party independent audit performed by Timberlake gave no reason to discontinue using Brown Water and, in fact, Timberlake recommended that ACBL continue the relationship.

Claimants cite to no case or legal principle which requires ACBL to act in the manner argued by Claimants. Arguably, a barge owner looking to hire a towing contractor for the first time might want to contact others in the industry in order to determine the "reputation" of a company before hiring them. However, that is not the case before the Court. It is unreasonable to expect a barge owner that has a longstanding relationship with an independent towage contractor, and uses that contractor on a frequent and regular basis, which has performed reliably for over ten years, with an excellent safety record to contact other sources to check their reputation, especially when it has never received any indication that the contractor was not competent.

It has been recognized that "… an employer who has had previous successful experience with an independent contractor in the performance of his work cannot be held liable on the theory of negligent selection of the contractor…." Western Arkansas Telephone Co. v. Cotton, 259 Ark. 216, 219, 532 S.W. 2d 424, 426 (Ark. Sup. Ct. 1976) (principal exonerated even though it made no inquiries to contractor or outside sources to determine if contractor was competent; see also In re Central Gulf Lines, Inc., 176 F.Supp. 2d at 622 (E.D. La. 2001), aff'd., 62 Fed. Appx. 557 (Table), 2003 WL 1202793 (5th Circuit No. 01-31028, 03/03/03) (barge owner not negligent in contracting with or retaining towage contractor where the parties two companies had a longstanding relationship without incident). The mere fact that an independent contractor may have been negligent with respect to the work it is performing "does not raise any

presumption that Western Arkansas Telephone [the principal] was negligent in employing him."
See, e.g., Western Arkansas Telephone Co., 259 Ark. at 219, 532 S.W.2d at 426. The fact that
an independent contractor has accidents from time to time is not dispositive of the issue of
whether the principal was negligent in hiring the contractor.

No court has ever applied the theory of negligent entrustment or negligent hiring to
impose liability on the owner of an unmanned barge who contracts with an established
independent tower. See In re Central Gulf Lines, Inc., 176 F.Supp.2d 599.

In a strikingly similar case, In re Central Gulf Lines, Inc., 176 F.Supp.2d 599 the court
granted exoneration by summary judgment to Waterman, the bareboat charterer of dumb,
unmanned barges, for a collision that occurred when its barges were being towed by a third-party
independent towing contractor, which collided with an oceangoing ship and sank the ship.

The theory of liability expressed by the Claimants here was espoused by the claimants in
Central Gulf, 176 F. Supp. 2d 599. As in this case, the  tug master decided how many barges the
tug would take on any given trip based upon his experience, considering weather, wind, tide and
draft of the barges. 176 F. Supp. 2d at 606. As is this case, the tower was an experienced
contractor, and the tug master was properly licensed and had been employed on inland tugs for
12 years. As in this case, the Claimants argued that the Petitioners "negligently hired" the tower.
In exonerating Waterman, the court noted:

> The party moving for limitation here is the tow, not the tug....
>
> Quite succinctly, there is simply an absence of evidence in the
> record establishing that either Waterman, its local agent, Oceanic, or its
> general agent in Singapore, Marco were aware, or should have been
> aware, of the likelihood of this accident after the tug was underway.
> *Kristie Leigh*, 72 F.3d at 481-482. No personnel of Waterman or Oceanic
> boarded the tug after it took control of the LASH barge once it was placed
> in the water by the GREEN ISLAND's crane. No personnel of Waterman
> or Oceanic instructed Eastern's supervisors or tugmaster on the proper
> method of constructing the tow, or the maximum load the KAMRUP

could push under the weather, wind, and tide conditions existent at the time. There is no evidence that Waterman or Oceanic even observed Eastern personnel constructing the tow,....

The record is similarly devoid of evidence that Waterman and Oceanic had any knowledge or reason to know that Captain Dutta in particular or Eastern in general were incompetent or inadequate to perform the job. Nothing in Oceanic's experience, 8 years, and Waterman's experience, 27 years, with Eastern would have put it on notice of any problems concerning the specific practice which Baron vilifies, the KAMRUP's towage of five loaded barges from Haldia to Calcutta....

176 F. Supp. 2d at 614-615.

The court in Central Gulf concluded:

The liability of the tow ... and Waterman's right to exoneration and/or limitation of liability, must be decided independently of the liability of the tug. Baron seeks a determination that Waterman, as the barge owner, is not entitled to limitation because of navigational errors of the tugboat operator in configuring the tow and using a tugboat which was underpowered. There is simply no legal authority for doing so. The maritime law governing the allocation of liability between the tug and tow and exoneration and limitation of liability applicable to these facts weigh against the claim that Baron/U.K. Club asserts here.

Assuming for the purposes of these motions only that the tug boat master was negligent in arranging the five barge tow and using the KAMRUP, because it had insufficient power, and further assuming that it was in the navigational channel at the time of the collision, none of these acts can be imputed to Waterman. Waterman discharges LASH barges in ports across the world. It cannot be, nor should it be, expected to follow each tug and tow to its destination to ensure that the tug does its job safely and properly.

176 F. Supp. 2d at 615-616.

The Fifth Circuit affirmed the District Court's analysis and the exoneration of Waterman at 62 Fed. Appx. 557 (Table). The Fifth Circuit noted that the Claimants had the burden to show that the owner *pro hac* vice/bareboat charterer of the barges was negligent, "independent of possible negligence" by the towage contractor or its tug. (See Ex. 3, p. 23, to R. Doc. 307.)

Section 411 of the Restatement (Second) of Torts (1965), relied upon by claimants, does not provide any basis to impose liability on ACBL because the evidence establishes that Brown Water possessed the knowledge, skill, experience and available equipment to tow ACBL's barges. See Comment a to § 411 which defines a "competent and careful contractor" as one "who possesses the knowledge, skill, experience, and available equipment ..." to perform the work. The evidence establishes that Brown's Water negligence does not arise from its lack of knowledge and skill as to how to tow barges or that it did not have the proper equipment to tow barges (i.e., towboats) or that it was not an experienced operator. Rather, Brown Water was negligent because of its failure to properly use on this occasion its knowledge, skill, experience or equipment.[2] Brown Water had proven its knowledge and skill and that it had the proper equipment and that it was an experienced towage contractor having safely towed hundreds of ACBL barges (as well as the barges of others) for over ten years.

ACBL submits that the doctrine of negligent entrustment is also not applicable to towage. A tug tows a barge and does not "use" the barge as contemplated by § 390 of the Restatement (Second) of Torts, which is captioned "Chattel for Use By A Person Known to Be Incompetent." The operative word in § 390 is "use:"

> One who supplies directly or through a third person a chattel for the **use** of another whom the supplier knows or has reason to know to be likely, because of his youth, inexperience, or otherwise, to **use** it in a manner involving unreasonable risk of physical harm to himself and others whom the supplier should expect to share in or be endangered by its use, is subject to liability for physical harm resulting to them.

(emphasis added.)

---

[2] Comment b to § 411 of the Restatement (Second) of Torts provides in pertinent part: "Thus, if the incompetence of the contractor consists in his lack of skill and experience or of adequate equipment but not in any previous lack of attention or diligence in applying such experience and skill or using such equipment as he possesses, the employer is subject to liability for any harm caused by the contractor's lack of skill, experience, or equipment, but not for any harm caused solely by the contractor's inattention or negligence."

Unlike Brown Water's towage of ACBL's barges with a tug, negligent entrustment involves negligently entrusting a chattel to be "used" by a person known to be an incompetent. Negligent entrustment cases involve the entrustment of such things as fire arms, automobiles, snowmobiles, trucks, speedboats, airplanes, jet skis, machinery, and even animals, to inexperienced, underaged, intoxicated, or other incompetent "users" where the owner of the chattel knows or should have known that the person was not competent to use the chattel.

To hold ACBL liable under the theory of "negligent entrustment" would expose those providing packages to Fed Ex, boxcars to railroad companies, mail to the U.S. Post Office, and cargos and their containers to ocean carriers to liability when the Fed Ex truck, train, mail truck or the ship are involved in an accident. As in this case, and in each of those cases, the object "entrusted" is not being "used" but is simply being transported at the time of the accident.

## ACBL Is Entitled to Exoneration and Alternatively to Limitation

A vessel owner is entitled to exoneration where it is free from fault. Tittle v. Aldacosta, 544 F. 2d 752, 756 (5th Cir.), reh. denied, 546 F. 2d 907 (5th Cir. 1977); In Re Caribbean Sea Transport, Ltd., 748 F. 2d 622, 626 (11th Cir.), amended on other grounds, 753 F. 2d 948 (11th Cir. 1985). The court should exonerate ACBL from all claims and liability arising out of the Accident and find that ACBL is entitled to recover its damages resulting from the Accident from Brown Water. Alternatively, the court should find that ACBL's negligence was not within the privity and knowledge of its management and, therefore, ACBL is entitled to limit its liability to the value of its four barges and their pending freight, at the time of the Accident. 46 U.S.C. app. § 183; In Re Kristie Leigh Enterprises, Inc. 72 F.3d 479, 480-481 (5th Cir.), reh'g denied, 81 F.3d 159 (5th Cir. 1996).

### Superceding Negligence

Even if ACBL was negligent, any alleged negligence was not the proximate cause of the collision or any resulting damages and Brown Water's negligence was the superseding cause of the Accident. See Fournier, 665 F. Supp. at 486; American River Transportation Co., 148 F.3d at 450. The Fifth Circuit has recognized that under admiralty law "Fault which produces liability must be a contributory and proximate cause of the collision, and not merely fault in the abstract." American River Transportation Co. v. KAVO KALIAKRA, 148 F.3d 446, 450 (5th Cir. 1998) (Judge Benavides quoting and following Inter-Cities Navig. Corp. v. United States, 608 F.2d n. 79, 1081 (5th Cir. 1979)). The Fifth Circuit also noted in American River Transportation Co. that "To give rise to liability, a culpable act or omission must have been 'a substantial and material factor in causing the collision.'" Id. Claimants have failed to prove any fault on the part of ACBL.

### ACBL Is Entitled to Indemnity and/or Contribution

In the further alternative, the Court finds, as a matter of law, that ACBL is entitled to indemnity and/or contribution from Brown Water in that Brown Water breached its obligation to ACBL to perform the towage in a safe, workmanlike manner. Singer v. Dorr, 272 F. Supp. 931, 934 (E.D.La. 1967); Parks and Cattell, The Law of Tug, Tow and Pilotage, pp. 127-128 (3d ed. 1994).

### Pre-Judgment Interest

If any damages are awarded against ACBL, pre-judgment interest should not be awarded against it as it is bankrupt and the final liquidation of any judgment that may be rendered against ACBL is subject to the jurisdiction of the U.S. Bankruptcy Court. ACBL is subject to the jurisdiction of the U.S. Bankruptcy Court, any award of interest accruing after the filing of its bankruptcy petition on January 31, 2003, whether pre-judgment or post-judgment interest, is not

{N1304353.1}

11

properly allowable under bankruptcy law where the Bankruptcy Court allows claims to proceed

to judgment in another court for purposes of liquidating a claim. See In re United States Lines,

Inc., 199 BR 476, at *p. 8-11 (S.D.NY 1996).

### Maritime Law Applies to Death Claimants and They Can Only Recover Pecuniary Loss

This case arises under the admiralty and maritime jurisdiction of this Court as set forth in

28 U.S.C. § 1333(1). Grubart v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 533-34 (1995);

Sisson v. Ruby, 497 U.S. 358, 363-67 (1990); 46 U.S.C. App. § 740. Admiralty jurisdiction is

not disputed in this case.

In order for a party to successfully invoke admiralty and maritime jurisdiction over a tort

claim, the party must satisfy conditions both of location and of connection with maritime

activity. Grubart, 513 U.S. at 534. The location test is met either if the tort occurred on

navigable water or if a vessel on navigable water caused an injury on land. Id. The connection

test is meet when (1) the general features of the incident involved indicate that the incident has a

potentially disruptive impact on maritime commerce and (2) the general character of the activity

giving rise to the incident shows a substantial relationship to traditional maritime activity. Id.

The location test has been met. The injury suffered by Claimants was allegedly caused

by a vessel on navigable water and, as such, is an injury cognizable in admiralty. Grubart, 513

U.S. at 534; 46 U.S.C. App. § 740.

The connection test has also been met. Generally described, this matter involves the

collision of a commercial vessel with an extension of land over water, in the ordinary course of

maritime business, on a waterway subject to commercial traffic. As such, the general features of

this incident indicate that it could have a disruptive impact on maritime commerce. In re

Amtrack "Sunset Limited" Train Crash in Bayou Canot, Alabama, on September 22, 1993, 121

F.3d 1421, 1426-27 (11th Cir. 1997).  More importantly, the movement of men and materials over water, the activity giving rise to the allision, has a substantial relationship to traditional maritime activity.  Id.  Under the general maritime law, non-pecuniary damages are not available to personal injury claimants or wrongful death claimants.  Miles v. Apex Marine Corp., 498 U.S. 19, (1990).

In nonfatal injury cases, state substantive liability standards are superseded by federal maritime law.  Yamaha Motor Corp., U.S.A. v. Calhoun, 516 U.S. 199, 211 (1996); Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 628 (1959).  Therefore, the claims of all claimants, except for the wrongful death claimants, are governed by the general maritime law without modification by any state law regime.  As such, the claims of Albert Leroy Moya, Antonio Salinas, Jr., Robert Espericueta, Rolando Lee Moya, Rene Mata, Bridgette Goza, and Gustavo O. Morales are limited to pecuniary damages alone.

In this case, Congress has legislated its intent that "in situations involving an allision between a vessel and a shore object", "state laws should yield to federal maritime law."  Id. at 1427.  Congress' intent is expressed in the Admiralty Extension Act which "extended admiralty jurisdiction to cover 'all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land.'"  Id. citing 46 U.S.C. App. § 740.  It is clear from its legislative history that the primary purpose of the Admiralty Extension Act was to eliminate the inconsistent and unfair results that could arise from adjudicating the cross claims in allision cases according to different and conflicting legal principles:

> As a result of the denial of admiralty jurisdiction in cases where injury is done on land, when a vessel collides with a bridge through mutual fault and both are damaged, under existing law the owner of the bridge, being denied a remedy in admiralty, is barred by contributory

> negligence from any recovery in an action at law. But the owner of the
> vessel may by a suit in admiralty recover half damages from the bridge,
> contributory negligence operating merely to reduce the recovery.... The
> bill under consideration would correct these inequities.

See Sen. Rep. No. 1593, 80th Cong., 2d Sess., reprinted in 1948 U.S.Code Cong. Serv. 1898. In

light of this legislative history, many courts subsequently have suggested, and some have

explicitly stated, that a claim cognizable in admiralty by virtue of the Admiralty Extension Act is

governed by the general maritime law. See, e.g., Gutierrez v. Waterman S.S. Corp., 373 U.S.

206, 209-210 (1963); Victory Carriers, Inc. v. Law, 404 U.S. 202, 208-11 (1971); Empire

Seafoods, Inc. v. Anderson, 398 F.2d 204, 212 (5th Cir.1968); Pryor v. American President

Lines, 520 F.2d 974, 979-80 (4th Cir.1975). The Eleventh Circuit, relying on Fifth Circuit case

law, has explicitly stated that application of state law where the Admiralty Extension Act is

involved would contravenes the essential purpose expressed by an act of Congress in violation of

Jensen's (S. Pacific Co. v. Jensen, 244 U.S. 205 (1917)) strict prohibition against application of

state law. Amtrack "Sunset Limited" Train Crash in Bayou Canot, Alabama, on September 22,

1993, 121 F.3d at 1426-27.

Moreover, application of state wrongful death remedies to this case would interfere with

the uniformity of the general maritime law as recognized by the Second Circuit, the Fifth

Circuit, and the Eleventh Circuit in violation of Miles and the general maritime law cause of

action for wrongful death based on negligence recognized in Norfolk Shipbuilding & Drydock

Corp. Tucker v. Fearn, 333 F. 3d 1216 (11th Cir. 2003), cert. denied, 124 S. Ct. 1147, 157 L.

Ed. 2d 1043 (2004); Preston v. Frantz, 11 F.3d 357 (2d Cir. 1993); Wahlstrom v. Kawasaki

Heavy Industries Ltd., 4 F.3d 1084 (2d Cir. 1993); Walker v. Braus, 995 F.2d 77 (5th Cir. 1993);

Michaels v. Carnival Cruise Lines, 2005 AMC 845 (2005); Walker v. Braus, 861 F.Supp. 527

(E.D.La. 1994); Frango v. Royal Caribbean Cruises, Ltd., 891 So. 2d 1208, 1211 (Fla. 3d Dist. Ct. App. 2005).

Furthermore, allowing the survivors of deceased non-seafarers to recover non-pecuniary damages in this situation, when the survivors of deceased seaman, the wards of the admiralty, who bring suit against third party non-employers are strictly limited to pecuniary damages, would not only create great confusion in the substantive body of maritime law but would also work material prejudice to the special and extensive maritime law protections afforded to the wards of the admiralty. Scarborough v. Clemco Industries, 391 F.3d 660, 668 (5th Cir. 2005); Guevara v. Maritime Overseas Corp., 59 F.3d 1496, 1500 (5th Cir. 1995) (describing seaman as "childlike", "improvident", "poor", and "friendless").

Accordingly, application of state wrongful death remedies to the present case would not be proper based upon the foregoing authorities. This is not a diversity case but an admiralty case. Such application would contravene the essential purpose of the Admiralty Extension Act, would interfere with the proper harmony and uniformity of the general maritime law's prohibition against non-pecuniary damages, and would work material prejudice to the characteristic features of the general maritime law in violation of all three prongs of the Jensen test. As such, the claims of William Kimbrell, Jacqueline Paddock, Betty Chase, Carol Leavell, Ricky Leavell, Gaspar Hinojosa, III, Omar Hinojosa, Clarissa Hinjosa, Rita Hinojosa, Raquel Hinojosa, Lydia Samora, Anita Harris, Victor Justin Harris, Esteban Rivas, Miriam Rivas, Hector Martinez, Sr., Soledad Gonzalez Mireles, and Juan Antonio Mireles must be limited to pecuniary damages only.

### The Contract of Affreightment Argument

From time to time Claimants have made some vague allegations that they are in some way entitled to the application of a misconstrued contract of affreightment between ACBL and

{N1304353.1}

15

its customer, Monarch, who had loaded steel coils in 3 of ACBL's barges. ACBL is not certain that Claimants are seriously going to make the argument but out of an abundance of caution shows how ridiculous it is.

When parties enter into an agreement for the transportation of goods aboard a ship, their legal arrangement is known as a contract of affreightment. Thomas G. Schoenbaum, ADMIRALTY & MARITIME LAW § 10-5 (4th ed. 2004). In the towage industry when cargo is moved pursuant to a contract of affreightment, the barge owner not only provides the barge but also either provides or pays for the tug boats to move the barge loaded with the cargo. Agrico Chemical Co. v. M/V BEN W. MARTIN, 664 F.2d 85 (5th Cir. 1981). The duties, obligations, and incidents involved in the contract of affreightment and in the performance of the contract are governed by the general maritime law. Har-Win, Inc. v. Consolidated Grain & Barge Co., 794 F.2d 985, 986-87 (5th Cir. 1986).

At the time of the Claimants' injuries, ACBL and Monarch Steel ("Monarch") had entered into a contract of affreightment whereby ACBL agreed to carry hot rolled steel coils from Brownsville, Texas to Decatur, Alabama and Nashville, Tennessee in ACBL's barges. In a provision of the contract entitled "1. EQUIPMENT", the parties acknowledged that the steel coils would be transported using "suitable cover rake hull barges with approximate dimensions of 195' x 35' with 1400 tons capacity at 9 ft. draft or cover box hull barges with appropriate dimensions of 200' x 35' with 1600 tons capacity at 9 ft. draft, together with towing power as required." (Whitlock, Exhibit 56) (emphasis added). Whitlock and others testified that "towing power" means a towboat. In other words, ACBL not only provided the barge but it also paid for

the towboat (either its own or a third party's) to tow the barge to its destination. This, of course, made this a contract of affreightment and not simply a charter of the barges.[3].

Claimants argue that, because ACBL agreed to provide towboats required by its contract of affreightment with Monarch, ACBL somehow owed Claimants the duty to provide a specific amount of "horsepower" and ACBL's alleged breach of that duty subjects it to liability to Claimants. The fallacy of this argument is immediately apparent. ACBL never entered into a contract with any of the Claimants to undertake any such duty to them, and Claimants are not the intended beneficiaries of ACBL's promised duties to Monarch. <u>Atlantic Gulf Stevedores, Inc. v. Revelle Shipping Agency, Inc.</u>, 750 F.2d 457, 459 n.3 (5th Cir. 1985). In any event, ACBL delivered the cargo in an undamaged condition to its destination and Monarch has made no claim in these proceedings.

The general maritime law does not allow a third party not privy to a contract to enforce duties or rights imposed in the contract against parties privy to the contract unless the sought to be enforced obligations were made directly for the benefit of the third party. <u>Atlantic Gulf Stevedores, Inc.</u>, 750 F.2d 457, 459 n.3; <u>Beverly v. Macy</u>, 702 F.2d 931, 940 (11th Cir. 1983); <u>Isbrandtsen Co. v. Local 291 of Int'l Longshoremen's Ass'n</u>, 204 F.2d 495, 497-99 (3d Cir. 1953); <u>Maersk Line Ltd. v. CARE & ADM, Inc.</u>, 271 F.Supp.2d 818, 826-27 (E.D. Va. 2003). An obligation is directly made for the benefit of a third party when the parties to the contract intend that the third party be a beneficiary and either (1) the performance of the obligation will satisfy an obligation of the obligee to pay money to the third party or (2) the circumstances indicate that the obligee intended to give the third party the benefit of the promised performance. <u>CGB Marine Servs. Co. at Laplace v. M/S Stolt Entente</u>, 1990 WL 134664, at * 3 (E.D. La.

---

[3] It is a wonder that Claimants did not sue Monarch claiming that they negligently hired ACBL and negligently entrusted their cargo to ACBL. They could argue the very same flawed theories argued against ACBL.

Sept. 12, 1990); RESTATEMENT (SECOND) OF CONTRACTS § 302, 315 (1981). In this case, none of the duties or obligations undertaken by Monarch or ACBL were undertaken with the intention of bestowing a benefit on Claimants or of even indirectly or incidentally benefiting Claimants.

### The Rescuers Can Have No Recovery

The Rescuers are not entitled to any recovery against ACBL. ACBL adopts and incorporates Brown Water's previous motion for summary judgment and related memorandum on this issue filed May 24, 2002. These claimants are claiming emotional injuries from witnessing the accident and from participating in the efforts to rescue survivors. They are unable to prove any significant physical injury or impact and their claims are not cognizable under the General Maritime Law. See, Geough v. Natural Gas Pipeline Co. of America, 996 F.2d 763 (5th Cir. 1993); Ainsworth v. Penrod Drilling Corp., 972 F.2d 546 (5th Cir. 1992); Plaisance v. Texaco, Inc., 966 F.2d 166 (5th Cir. 1992).

### CONCLUSION

This Court should exonerate ACBL and in the alternative grant it the other relief sought.

Respectfully submitted,

GLENN G. GOODIER, Attorney-in-Charge
Admitted *Pro Hac Vice*
By Order Entered 4/23/02
RICHARD D. BERTRAM
*Pro Hac Vice* Pending
Jones, Walker, Waechter, Poitevent,
   Carrère & Denègre, L.L.P.
201 St. Charles Avenue - 48th Floor
New Orleans, Louisiana 70170-5100
Telephone:   (504) 582-8174
Facsimile:   (504) 582-8010

LES CASSIDY
State Bar Number 03979270
Federal Identification Number 5931
814 Leopard Street
Christi, Texas  78401
Telephone:   (361) 887-2969
Facsimile:   (361) 887-6251

OF COUNSEL:

WOOLSEY & CASSIDY, P.C.
814 Leopard Street
Corpus Christi, Texas  78401
Telephone:   (361) 887-2969
Facsimile:   (361) 887-6251

Counsel for Petitioners,
American Commercial Lines LLC and
American Commercial Barge Line LLC
Deere Credit, Inc. (formerly Senstar Finance
Company), as Owner of the Barge NM-315,
State Street Bank and Trust Company of
Connecticut, N.A., as Owner/Trustee of the Barge
ACL-9933B and Not in Its Individual Capacity, and
General Electric Capital Corporation, as Beneficial
Owner of the Barge ACL-9933B

{N1304353.1}

19

## CERTIFICATE OF SERVICE

I do hereby certify that I have on this 14th day of June, 2005, served a copy of the foregoing pleading on counsel for all parties to this proceeding by mailing the same by United States Priority Mail, properly addressed and first class postage prepaid.