United States District Court
District of Texas
FILED

JUN 1 5 2005

Michael N. Milby
Clerk of Court

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | |
|---|---|
| IN RE THE COMPLAINT AND PETITION OF BROWN WATER TOWING I, INC., AS OWNER, AND BROWN WATER MARINE SERVICE, INC., AS BAREBOAT CHARTERER OF THE BROWN WATER V, ITS ENGINES, TACKLE, ETC., IN A CAUSE OF EXONERATION FROM OR LIMITATION OF LIABILITY | C. A. NO. B-01-157<br>Admiralty<br><br><br><br>Consolidated with |
| IN RE THE COMPLAINT AND PETITION OF AMERICAN COMMERCIAL LINES, LLC AS OWNER, AND AMERICAN COMMERCIAL BARGE LINES, LLC AS CHARTERER OF THE BARGES NM-315, VLB-9182, ACL-9933B, VLB-9173, IN A CAUSE OF EXONERATION FROM OR LIMITATION OF LIABILITY | C. A. NO. B-02-004<br>Admiralty<br><br><br>Consolidated with |
| IN RE THE COMPLAINT AND PETITION OF DEERE CREDIT, INC., (FORMERLY SENSTAR FINANCE COMPANY), AS OWNER OF THE BARGE NM-315, AND STATE STREET BANK AND TRUST COMPANY OF CONNECTICUT, NATIONAL ASSOCIATION, AS OWNER TRUSTEE OF THE BARGE ACL-9933B AND NOT IN ITS INDIVIDUAL CAPACITY, AND GENERAL ELECTRIC CAPITAL CORPORATION, AS BENEFICIAL OWNER OF THE BARGE ACL-9933B, PRAYING FOR EXONERATION FROM AND/OR LIMITATION OF LIABILITY | C. A. NO. B-02-125<br>Admiralty |

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW SUBMITTED ON BEHALF OF AMERICAN COMMERCIAL BARGE LINE LLC, AMERICAN COMMERCIAL LINES LLC, DEERE CREDIT, INC., STATE STREET BANK AND TRUST COMPANY OF CONNECTICUT AND GENERAL ELECTRIC CAPITAL CORPORATION

{N1292151.1}

## PROPOSED FINDINGS OF FACT[1]

1) This case arises out of the September 15, 2001 collision (or allision) that occurred between the lead barge of a four barge tow, consisting of the VLB-9182, VLB-9173, NM-315 and ACL-9933B, being pushed by the M/V BROWN WATER V and the Queen Isabella Causeway (hereinafter the "Accident").[2] A portion of the bridge collapsed resulting in 8 deaths, several personal injuries and property damage.

2) American Commercial Lines LLC ("ACL") is the registered owner of the VLB-9182 and VLB-9173. Certain financial institutions, the Petitioners in C.A. B-02-125, were the registered or beneficial owners and owner trustee of the NM-315 and ACL-9933B.

3) The value of the barges immediately following the Accident, and their pending freight, is not contested or in dispute nor do the parties dispute the form and sufficiency of security previously filed with the Court. The value of the barges and pending freight immediately following the Accident is as follows:

| Barge No. | Value | Pending Freight |
|-----------|-------|-----------------|
| VLB-9182 | $150,000.00 | $ 26,250.00 |
| VLB-9173 | $150,000.00 | $ 18,253.00 |
| NM-315 | $110,000.00 | $ 27,797.00 |
| ACL-9933B | $275,000.00 | $ 31,179.00 |

4) American Commercial Barge Line LLC ("ACBL") was the owner *pro hac vice* and bareboat charterer of the four barges in question. The barges were all unmanned river barges having no motive power of their own, and ACBL had no employees or representatives on either the barges or the towing vessel at the time of the Accident. (Ex. 4, Old Deposition, page

---

[1] For the Court's convenience, deposition page and line references, and other exhibit references are provided, and correspond to the exhibit numbers previously submitted by ACBL with its memoranda related to ACBL's Motion for Summary Judgment. See Exhibits to R. Doc. 307 and R. Doc. 375.

[2] In the inland towing industry although barges are "pushed" ahead by a tug, also called a towboat, they are referred to as being "towed" and the operation is known as "towage." The barges being towed are referred to as the "tow."

(hereinafter "p.") p. 100, line (hereinafter "l.") l. 6 to 10; Ex. 5, Mosher Deposition, p. 230, l. 7 to 20; Ex. 6, Affidavit of Foltz, p. 1-2, para. 4.) River barges are much like railroad box and tank cars. Their cargo compartments are filled with the barge owner's customer's cargoes for transport from point of origin to point of destination.

5)    At all material times, the four barges were being towed by the BROWN WATER V, a tug owned by Brown Water Towing I, Inc. and operated and crewed by Brown Water Marine Service, Inc. (hereafter collectively "Brown Water"), pursuant to a verbal contract of towage between Brown Water and ACBL.

6)    Brown Water is an independent towage contractor headquartered in Rockport, Texas which had been in the towing business for over 10 years at the time of the Accident. Claimants concede that Brown Water was an independent towage contractor.

7)    At all material times, ACBL's four barges were under the sole care, custody and control of Brown Water and were seaworthy in all respects.

8)    On September 15, 2001 Brown Water filed a complaint for exoneration from or limitation of liability, C.A. No. B-01-157.  On January 11, 2001 ACBL and ACL filed a complaint for exoneration from or limitation of liability, C.A. No. B-02-004.  On June 10, 2002 the financial institutions filed a complaint for exoneration from or limitation of liability, C.A. No. B-02-125.  These civil actions have been consolidated.

9)    Claims in the limitation proceedings have been filed by various parties.  After publication and the expiration of time to file claims set by the Court, the Court entered a default against anyone not filing a claim.  Additionally, the Petitioners filed cross-claims and/or third party complaints against the State of Texas and Cameron County.  ACBL in addition to being a

Petitioner has also filed a Claim against Brown Water for indemnity and/or contribution and for its damages sustained in the Accident.

10) The State of Texas was the owner of the Queen Isabella Causeway and the party responsible for maintaining its navigation lights.

11) Cameron County was the party responsible for maintaining the surface lighting of the bridge.

12) Several property damage claims have been settled, including the claims of the State of Texas against Brown Water and ACBL, as well as ACBL and Brown Water's claims against the State of Texas.

13) ACBL's current President (and at the time of the Accident Senior Vice President of Logistics Services), Whitlock, testified that at the time of the Accident ACBL owned and operated approximately 5000 barges and 150 towboats. (Ex. 9, Whitlock Deposition, p. 16, l. 15 to 22; p. 141, l. 22 to p. 142, l. 6.) These barges and towboats moved on all the major inland waterways of the United States and their tributaries. These would include the Mississippi River, Ohio River, Missouri River, Tennessee River, Arkansas River Tombigbee, Illinois River, Cumberland River, the Intracoastal Waterway (hereinafter sometimes referred to as "ICW"), and tributaries.

14) Farley, who at the time of the Accident was ACBL's Vice President of Marketing Services, explained that ACBL does not have enough equipment to reach all areas of the inland waterways with a frequency to service its customers. (Ex. 10, Farley Deposition, p. 33, l. 1 to p. 34, l. 19; p. 41, l. 5 to 24; p. 129, l. 2 to 11.)

15) Therefore, ACBL, like all other barge lines, contracts with independent towing contractors to move its barges when and where none of its own towboats are available. (Ex. 11,

T. Chapman Deposition, p. 45, l. 6 to 25; Ex. 9, Whitlock Deposition, p. 52, l. 5 to p. 56, l. 9; p. 142, l. 24 to p. 144, l. 12.)  The far western reach of the ICW, west of Houston, is an area where ACBL often relies upon independent towing contractors.  (Ex. 9, Whitlock Deposition, p. 142, l. 24 to p. 144, l. 12.)

16)    ACBL regularly relied upon Brown Water to tow its barges in the ICW between Brownsville and Houston.   ACBL has never had an ownership interest in or a corporate relationship with Brown Water or its vessels.  (Ex. 11, T. Chapman Deposition, p. 95, l. 19 to 24.)  There was no relationship between ACBL and Brown Water other than that of principal and independent contractor.

17)    Brown Water was founded in the late 1980's by Tim Chapman who has been in the marine transportation business since 1974.  (Ex. 11, T. Chapman Deposition, p. 9, l. 10 to p. 10, l. 7.)

18)    Brown Water had the reputation of being a competent tower having safely and reliably performed towage for ACBL and its many other customers in the ICW, including having towed hundreds of barges for ACBL in the area in which the Accident occurred without incident. Fowler, relief captain of the BROWN WATER V at the time of the Accident, testified that Brown Water was a safe company.  (Fowler Deposition, p. 209, l. 4-9).  Both Fowler and Wilson, the captain of the BROWN WATER V, testified that Brown Water has never asked them to do anything they thought was unsafe.  (Fowler Deposition, p. 286, l. 24-187, l. 3; p. 187, l. 10-16; Wilson Deposition, p. 146, l. 4-147, l. 9).

19)    Brown Water owns and operates 12 towboats (as well as various other vessels) and was (and still is) the most experienced towing company in the ICW between Brownsville

and Houston. (Ex. 5, Mosher Deposition, p. 127, l. 10 to 15; p. 228, l. 2 to 23; Ex. 12, Hoessle Deposition, p. 129, l. 3 to p. 130, l. 25.)

20)     ACBL's relationship with Brown Water began approximately 10 years before the Accident. (Ex. 17, Khouri Deposition, p. 70, l. 12 to p. 72, l. 2; Ex. 9, Whitlock Deposition, p. 95, l. 21 to p. 96, l. 7; p. 155, l. 11 to 19, p. 172, l. 17 to 24; Ex. 5, Mosher Deposition, p. 16, l. 19 to p. 18, l. 18.)

21)     During this 10-year period Brown Water towed barges for numerous other customers, including Kirby Marine, Dow Chemical, Exxon, BP Amoco, BASF, duPont and others. (Ex. 5, Mosher Deposition, p. 67, l. 20 to 23, p. 229, l. 9 to 18; Ex. 11, T. Chapman Deposition, p. 96, l. 13 to p. 97, l. 2.) ACBL was not Brown Water's largest customer. (Ex. 11, T. Chapman Deposition, p. 96, l. 13 to p. 97, l. 2.)

22)     Brown Water, like all other independent towing contractors, operates by combining the barges of more than one customer into a single tow (Ex. 5, Mosher Deposition, p. 237, l. 7 to p. 238, l. 5, Testimony of Brock) much like a railroad company combines boxcars owned by its various customers into a single train. This type of towage is most always pursuant to a verbal towage agreement, as it was in this case. (Ex. 12, Hoessle Deposition, p. 310, l. 8 to 19; Ex. 13, Kazunas Deposition, p. 93, l. 2 to 10.)

23)     The barge owner offers its barges for towage from point A to point B to the third-party tower; if the tower accepts the towage it will tow the barges for a price based upon a tariff or rate. (Ex. 12, Hoessle Deposition, p. 74, l. 1 to 25; p. 132, l. 21 to p. 133, l. 7; Ex. 9, Whitlock Deposition, p. 62, l. 10 to 24; p. 169, l. 5 to 21; Ex. 5, Mosher Deposition, p. 139, l. 19 to p. 142, l. 13; Testimony of Brock.)

24)    The barge owner's dispatcher contacts the third-party tower's dispatcher to offer the barges for towage. There is never any communication between the barge owner and the crew of the tug. (Ex. 5, Mosher Deposition, p. 137, l. 2 to 6; Ex. 12, Hoessle Deposition, p. 73, l. 10 to p. 74, l. 25; Testimony of Brock; Ex. 15, Valigura Deposition, p. 100, l. 16 to p. 102; l. 4.) The barge owner is given an update of the status of its barges once each morning. (Ex. 12, Hoessle Deposition, p. 362, l. 24 to p. 363, l. 21; Ex. 11, T. Chapman Deposition, p. 98, l. 3 to p. 99, l. 18.)

25)    The customs and practices of the towage industry are explained by various witnesses including: Captain Brock, ACBL's expert with over 40 years experience in the inland towing industry, Mr. Mosher, Brown Water's Vice President of Operations, and Mr. Brinkop, ACBL's Vice President of Gulf Coast Operations.

26)    By custom and by law, the tower is obligated to provide the barge owner with a tug of adequate horsepower, properly manned and crewed with qualified and properly licensed captains, and capable of safely navigating the barges to their destination. The barge owner has no operational control over the towage. The barge owner cannot impose a time limit on the towage and plays no role in the selection of the particular tug or crew, and does not tell the tower when, where, or how to perform the towage. The barge owner has no input into the make-up of the tow by the tower or the number of barges that will be towed by any given tug. The tower can combine barges from several customers to build its tow without telling its customers. The barge owners are often not given information as to the total number of barges in the tow and many times do not even know which tug will be towing its barges. The tower can also sub-contract the towage to another company without advising the barge owners. (Ex. 5, Mosher Deposition, p. 230, l. 7 to p. 238, l. 23; Ex. 12, Hoessle Deposition, p. 310, l. 8 to p. 319, l. 2; p. 324, l. 24 to

p. 325, l. 13; p. 333, l. 5 to p. 335, l. 7; Ex. 16, Brinkop Deposition, p. 140, l. 3 to p. 142, l. 20;

Ex. 10, Farley Deposition, p. 167, l. 10 to p. 168, l. 18, p. 172, l. 6 to 13; p. 175, l. 4 to 25;

Testimony of Brock.)

27)     Once the tower takes its customer's barges into tow it assumes the sole care,

custody, and control over the barges and makes all decisions for their safe towage.  (Ex. 16,

Brinkop Deposition, p. 140, l. 3 to p. 142, l. 20; Ex. 13, Kazunas Deposition, p. 82, l. 25 to p. 83,

l. 7; Ex. 9, Whitlock Deposition, p. 166, l. 22 to p. 168, l. 18; Ex. 10, Farley Deposition, p. 167,

l. 10 to p. 168, l. 18; Ex. 5, Mosher Deposition, p. 230, l. 7 to p. 233, l. 8; Testimony of Brock.)

28)     During the 10 year relationship that existed between ACBL and Brown Water

prior to the Accident, Brown Water towed hundreds of ACBL barges in the ICW and under the

Queen Isabella Causeway.  (Ex. 9, Whitlock Deposition, p. 172, l. 17 to p. 173, l. 17.)  ACBL

never exercised operational control over Brown Water.  Brown Water controlled and decided all

aspects of the towage of ACBL's barges, including selecting the particular tug to be used to tow

the barges, the crewing of the tug, the number of barges to be taken by the tug and their

configuration, the building of the tow, when, where and how the barges were to be towed, and

the navigation of the tug and tow.  (Ex. 5, Mosher Deposition, p. 232, l. 19 to 22.)  Claimants

admit that ACBL never exercised any operational control over Brown Water.

29)     Brown Water's safety record towing ACBL barges was excellent, with only three

minor incidents in the 10 years before the Accident, and, as described below, one of which

turned out not to be Brown Water's fault and resulted in no damage to ACBL's barge.  (Ex. 17,

Khouri Deposition, p. 70, l. 12 to p. 72, l. 2; p. 82, l. 25 to p. 83, l. 21; Ex. 13, Kazunas

Deposition, p. 103, l. 11 to p. 104, l. 18; Ex. 9, Whitlock Deposition, p. 96, l. 8 to p. 97, l. 4;

p. 154, l. 20 to p. 155, l. 19; p. 171, l. 24 to p. 172, l. 5; Ex. 12, Hoessle Deposition, p. 320, l. 23 to p. 323, l. 7.)

30)    It is uncontradicted that ACBL never received any information from any source that Brown Water was not a safe and competent operator. (Ex. 9, Whitlock Deposition, p. 96, l. 8 to p. 97, l. 4; Ex. 12, Hoessle Deposition, p. 324, l. 4 to 23; p. 326, l. 11 to p. 327, l. 22; p. 329, l. 8 to p. 330, l. 8; Ex. 10, Farley Deposition, p. 170, l. 2 to p. 171, l. 21; Ex. 16, Brinkop Deposition, p. 142, l. 5 to 20.)

31)    In early 2000, ACBL was advised by the Coast Guard of the grounding of one of its barges which ACBL had contracted with Brown Water to tow.  Brown Water had not advised ACBL of this grounding.  ACBL later learned the grounding was done by a tug of a towing company which Brown Water had subcontracted with to tow the ACBL barge because Brown Water did not have a tug available to move the barge, as was Brown Water's right. (Ex. 13, Kazunas Deposition, p. 36, l. 18 to p. 37, l. 17; Ex. 9, Whitlock Deposition, p. 93, l. 12 to p. 94, l. 15; p. 171, l. 24 to p. 172, l. 9; Ex. 12, Hoessle Deposition, p. 320, l. 23 to p. 322, l. 19.)

32)    There was no damage to the ACBL barge as a result of the grounding but ACBL was concerned because it had not been notified by Brown Water of the grounding.  As a result of the grounding incident and because ACBL had not done a vendor audit of Brown Water, ACBL arranged for a vendor audit of Brown Water.  Kazunas, ACBL's Assistant Vice President of Logistics Services, and Whitlock hired an experienced, independent auditor, Timberlake, to travel to Texas and conduct an audit of Brown Water in March of 2000 to determine, among other things, if Brown Water was the type of tower ACBL should continue to utilize.  (Ex. 13, Kazunas Deposition, p. 19, l. 7 to p. 20, l. 8; p. 37, l. 1 to 17; p. 103, l. 2 to p. 104, l. 18; Ex. 17,

Khouri Deposition, p. 82, l. 25 to p. 83, l. 11; Ex. 9, Whitlock Deposition, p. 93, l. 12 to p. 95, l. 13; Ex. 18, Timberlake Deposition, p. 63, l. 9 to p. 64, l. 17.)

33)     Timberlake had 17 years experience in the towing industry working in dispatching, distribution, as a harbor master and as operations manager until he retired from ACBL in 1997. (Ex. 18, Timberlake Deposition, p. 21, l. 7 to p. 26, l. 18.)

34)     Upon leaving ACBL, Timberlake started a marine consulting company performing audits of towing and barge companies.  He was certified as an auditor by the American Waterway Operators ("AWO").  (Ex. 18, Timberlake Deposition, p. 29, l. 3 to 8; p. 31, l. 25 to p. 32, l. 11; p. 53, l. 21 to p. 54, l. 6; p. 240, l. 2 to 15.)  ACBL hired Timberlake to do the vendor audit because they trusted him and his ability.  (Ex. 9, Whitlock Deposition, p. 122, l. 1 to 24.)

35)     The AWO is an industry trade organization.  It is purely a voluntary organization. (Ex. 5, Mosher Deposition, p. 206, l. 14 to p. 207, l. 1; Ex. 9, Whitlock Deposition, p. 111, l. 14 to 25; Testimony of Brock.)  There is no requirement to join the AWO and, in fact, a large percentage of towing companies in the United States are not AWO members.  (Ex. 5, Mosher Deposition, p. 206, l. 14 to p. 207, l. 1; Ex. 17, Khouri Deposition, p. 79, l. 2 to p. 80, l. 3; Ex. 18, Timberlake Deposition, p. 278, l. 6 to 15; Testimony of Brock.)

36)     As testified to by ACBL's expert, Russell, a retired U.S Coast Guard Officer with 20 years experience in Coast Guard matters and marine safety, the towing industry is regulated by the Coast Guard which provides the various rules and regulations to the owners and operators of barges and tugs that operate on the inland waterways and provides the requirements for and the licensing of the towboat captains.  (See generally 33 C.F.R.; Testimony of Mike Russell.)

37)    During his vendor audit of Brown Water, Timberlake used as a guide a form provided by the AWO, which is used in the AWO's Responsible Carrier Program ("RCP"). (Ex.18, Timberlake Deposition, p. 64, l. 10 to p. 66, l. 14.) The RCP is a process whereby AWO members hire independent auditors to audit their company and their vessels to certify that certain safety processes are in place, that the company has proper documentation concerning the processes, and is in compliance with certain regulations.

38)    As explained by Khouri, ACBL's former General Counsel and Head of Operations, RCP is not a set of "government regulations." (Ex. 17, Khouri Deposition, p. 10, l. 21 to p. 11, l. 8; p. 79, l. 2 to p. 80, l. 2.)

39)    Timberlake did not perform an "RCP" audit of Brown Water. (Ex. 18, Timberlake Deposition, p. 59, l. 2 to p. 60, l. 10.) At the time of the audit, Brown Water was not a member of the AWO and was not RCP certified which, of course, it did not have to be. (Ex. 18, Timberlake Deposition, p. 277, l. 8 to 14; p. 288, l. 2 to 6.)

40)    After auditing two Brown Water vessels, speaking to the crews, speaking to management and reviewing pertinent Brown Water documents, Timberlake discussed his findings and areas for improvement with Brown Water's management. (Ex. 18, Timberlake Deposition, p. 129, l. 4 to p. 131, l. 5.) Brown Water agreed to look into possible membership in the AWO and pledged that they would achieve the standards of the AWO whether they became a member or not. (Ex. 18, Timberlake Deposition, p. 170, l. 6 to p. 171, l. 25; Ex. 20, Report of Timberlake, p. 5, para. 7.)

41)    Timberlake later sent a report to ACBL (Ex. 20) and discussed his findings with ACBL. He noted a few, minor areas for improvement but nothing that would interfere with the

safe operation of towboats by Brown Water. (Ex. 18, Timberlake Deposition, p. 172, l. 16 to p. 173, l. 17; p. 279, l. 22 to p. 283, l. 10.)

42) At the end of his report, Timberlake stated the following: "Brown Water Marine works hard, smart and effectively with a small staff. There seems to be a climate of continuous improvement. I also noticed that the leadership of the organization focused on the important, that are those things which will produce the best results in such things as safety and service." (Ex. 20, Report of Timberlake, p. 5, para. 6.)

43) Timberlake advised ACBL that ACBL should continue using Brown Water as a third-party tower and that he saw no problems and that the observations that he made about areas for improvement were not a cause for concern. (Ex. 18, Timberlake Deposition, p. 172, l. 16 to p. 173, l. 9; p. 279, l. 22 to p. 280, l. 20.)

44) After auditing two other third-party towing contractors, Timberlake recommended that ACBL discontinue using them. ACBL followed his advice. One of them was RCP certified. (Ex. 18, Timberlake Deposition, p. 35, l. 24 to p. 37, l. 24; p. 286, l. 9 to p. 287, l. 1.)

45) Timberlake testified that joining the AWO and becoming RCP certified does not ensure that a towing company is a safe operating company. (Ex. 18, Timberlake Deposition, p. 273, l. 4 to 8; see also Testimony of Brock.)

46) Brown Water joined the AWO in early 2001 and began working towards RCP certification, which the AWO requires to be accomplished within two years of joining. Brown Water became RCP certified in July 2002, well within the time frame of the AWO. (Ex. 5, Mosher Deposition, p. 147, l. 4 to p. 148, l. 11; Ex. 18, Timberlake Deposition, p. 270, l. 22 to p. 271, l. 3; Testimony of Brock.)

47)     Mosher, Brown Water's Vice President of Operations, testified that, prior to the time of Timberlake's audit, Brown Water had also been audited by its customers Dow, duPont, BP Amoco, Exxon, BASF, and others, passing all audits. (Ex. 5, Mosher Deposition, p. 196, l. 21 to p. 197, l. 19.) All of these customers continued to use Brown Water.

48)     Brown Water was a member of the Coast Guard's Cooperative Towing Vessel Examination Program.    (Ex. 22, C. Chapman Deposition, p. 86, l. 14 to p. 87, l. 1.) Brown Water's vessels are considered uninspected vessels by the Coast Guard and are not required to undergo periodic, mandatory inspections by the Coast Guard.  As a proactive tower, Brown Water voluntarily participated in the Cooperative Towing Vessel Examination Program and invited the Coast Guard to board, inspect and certify its vessels despite the fact that such boardings and inspections are not required by law. (Testimony of Brock; Testimony of Russell; Ex. 22, C. Chapman Deposition, p. 86, l. 14 to p. 87, l. 1.)  Since Brown Water's inception it has operated continuously and has never been shut down by the Coast Guard or any other governmental authority, even after this accident.  Brown Water continues to operate to this day. (Ex. 11, T. Chapman Deposition, p. 126, l. 21 to 23.)

49)     Several days prior to September 15, 2001, Hoessle, ACBL's dispatcher located at ACBL's headquarters in Indiana, arranged with Brown Water's dispatcher, Chad Chapman, located in Brown Water's Rockport office, to tow three ACBL barges by verbal towage contract, west from Houston toward Brownsville.  Brown Water decided to use the BROWN WATER V to tow those three barges.  One of those three barges, the VLB-9173, was loaded with phosphate and was to be towed to Harlingen, which is east of Brownsville and east of the Queen Isabella Causeway.   The other two barges were to be delivered to Brownsville.  (Ex. 12, Hoessle

Deposition, p. 156, l. 8 to p. 165, l. 8; Ex. 22, C. Chapman Deposition, p. 87, l. 25 to p. 89, l. 10.)

50)    Hoessle later offered the NM-315, VLB-9182 and ACL-9993B to Brown Water for towage.  These three barges were located in Brownsville and were to be loaded with steel coils in Brownsville by ACBL's customer and then towed to Houston.  The exact time the barges would complete loading and be ready for towage to Houston was unknown at the time Brown Water agreed to tow the barges.

51)    Brown Water agreed to tow the NM-315, VLB-9182 and ACL-9933B east from Brownsville to Houston once loading was complete.  Brown Water, at some point, assigned the BROWN WATER V to tow the NM-315, VLB-9182 and ACL-9993B from Brownsville to Houston once the BROWN WATER V dropped the westbound VLB-9173 in Harlingen and delivered the two other west bound barges to Brownsville.  (Ex. 12, Hoessle Deposition, p. 155, l. 25 to p. 165, l. 8; Ex. 22, C. Chapman Deposition, p. 31, l. 9 to 24; p. 40, l. 11 to p. 41, l. 21.)

52)    Brown Water also had the BROWN WATER VIII, a 1000 horsepower tug, which was in route to Brownsville on September 14, 2001, available to tow the barges from Brownsville to Houston but chose to use the BROWN WATER V.  (Ex. 22, C. Chapman Deposition, p. 32, l. 9 to 21.)

53)    The BROWN WATER V developed mechanical problems as it approached Harlingen on the morning of September 14, 2001.  The BROWN WATER V's master, Captain Wilson, decided to bypass Harlingen and go to Brownsville for repairs keeping the VLB-9173 in tow instead of dropping the barge at Harlingen as ACBL anticipated Brown Water would have done.  Brown Water alone decided not to drop the VLB-9173 in Harlingen, as was its prerogative.  ACBL was not notified of this decision or of the mechanical problem with the tug.

As far as ACBL knew, the BROWN WATER V would only have three of its barges in tow. (Ex. 5, Mosher Deposition, p. 130, l. 12 to p. 133, l. 10; p. 207, l. 14 to p. 210, l. 19; Ex. 12, Hoessle Deposition, p. 155, l. 25 to p. 158, l. 8; p. 172, l. 21 to p. 176, l. 21.)

54)    Mosher testified that he told Captain Wilson that once the BROWN WATER V was repaired to take the VLB-9173 as a single barge to Harlingen, a relatively short distance, and then return to Brownsville to pick up the NM-315, VLB-9182 and ACL-9993B.  (Ex. 5, Mosher Deposition, p. 8, l. 18 to p. 9, l. 14; p. 111, l. 5 to 18; p. 130, l. 12 to p. 133, l. 10; p. 207, l. 13 to p. 208, l. 20.)  Fowler testified that he spoke to Mosher, and Mosher told him that Mosher left it up to Wilson as to how many barges to tow that night and how to perform the towage and whether to take the VLB-9173 to Harlingen as a single barge or to take all four barges.  (Fowler Deposition, p. 30, l. 20 to p. 31, l. 2.)  In any event, it is undisputed that ACBL had no knowledge of this and played no part in the decision as to how many barges to tow.

55)    Brown Water's general rule of thumb, which was the same rule of thumb of ACBL and other carriers on the ICW, was that a tug should have 200 horsepower per loaded barge in tow.  (Ex. 5, Mosher Deposition, p. 210, l. 20 to p. 211 l. 17; Ex. 9, Whitlock Deposition, p. 71, l. 15 to p. 72, l. 14.)  There are no Coast Guard regulations as to horsepower requirements for barge towage in the ICW.  The BROWN WATER V is advertised by Brown Water as having 800 horsepower.  (Ex. 5, Mosher Deposition, p. 26, l. 6 to 23; p. 229, l. 5 to 8.)

56)    Using the 200 horsepower per barge rule of thumb, the BROWN WATER V should have been capable of towing four loaded barges.  However, Mosher testified, that it was Brown Water's policy, that the BROWN WATER V never take four loaded barges. Its maximum assigned tow was three loads and one empty or two loads and two empties. (Ex. 5,

Mosher Deposition, p. 207, l. 13 to p. 211; l. 17; Ex. 11, T. Chapman Deposition, p. 103, l. 9 to 25; Ex. 22, C. Chapman Deposition, p. 90, l. 5 to p. 91, l. 11.)

57)     Wilson, on the other hand, testified that it was not unusual for the BROWN WATER V to push 4 loaded barges. (Wilson Deposition, p. 49, l. 8 to 11.) Wilson also testified that it was his decision alone to decide how many barges were safe to push under the circumstances and if he felt it was unsafe he would not push the barges. (Wilson Deposition, p. 46, l. 21 to p. 47, l. 6; p. 48, l. 15 to p. 49, l. 6.) It was also Wilson's decision alone as to whether it was safe to push barges under the prevailing weather conditions. (Wilson Deposition, p. 144, l. 25 to p. 145, l. 15.)

58)     After repairs, the BROWN WATER V got underway from Brownsville at about 9:10 p.m. on September 14, 2001 with Wilson in control.

59)     Wilson made the decision to tow the VLB-9173, NM-315, VLB-9182 and ACL-9993B from Brownsville to Harlingen where the VLB-9173 would be dropped off and that the four barges were to be placed in a single string with the towboat pushing from behind. The barges were wired together by the tug's crew. (Ex. 5, Mosher Deposition, p. 130, l. 12 to p. 132, l. 15; Ex. 15, Valigura Deposition, p. 86, l. 22 to p. 89, l. 10.)

60)     Fowler and Wilson testified that the BROWN WATER V was seaworthy that night and that all of her equipment was operating satisfactorily and that the BROWN WATER V had adequate horsepower to push its four-barge tow and that the tow was properly configured for the voyage. (Fowler Deposition, p. 166, l. 18 to 23; p. 167, l. 6 to 9 and l. 23 to 25; p. 168, l. 1 to 11; p. 169, l. 3 to 8; p. 175, l. 3 to 9; p. 185, l. 17 to 22; p. 191, l. 15 to 18; p. 192, l. 21 to 25; p. 193, l. 1 to 6; p. 193, l. 7 to 18; Wilson Deposition, p. 140, l. 4 to 23; p. 143, l. 7 to 23; p. 144, l. 8 to 21; p. 148, l. 2 to 4.)

61)    No one from ACBL was present in Brownsville.  ACBL was unaware that the VLB-9173 had not been dropped at Harlingen by the BROWN WATER V on September 14, 2001 on its way from Houston to Brownsville, did not know when its 3 barges would be picked up by Brown Water in Brownsville, and was not aware that the BROWN WATER V was preceding east with the four barge tow at the time of the Accident.  (Ex. 12, Hoessle Deposition, p. 173, l. 19 to p. 175, l. 21; p. 230, l. 18 to p. 233, l. 1; p. 263, l. 22 to p. 265, l. 1.)

62)    The BROWN WATER V carried two Coast Guard licensed operators at the time of the Accident, Fowler and Wilson.  Each stands two 6-hour watches per day.  At the time of the accident, the BROWN WATER V was being operated by Fowler, who held the proper Coast Guard license.  Prior to obtaining his license, Fowler had to undergo training, demonstrate to the Coast Guard years of experience on towboats and was then tested by the Coast Guard.  (Ex. 18, Timberlake Deposition, p. 284, l. 7 to p. 285, l. 8; 46 C.F.R. 10.464; Testimony of Brock; Testimony of Russell.)

63)    Fowler had twelve years of experience as a licensed captain at the time of the Accident and had previously navigated the waters in question several times while working for Brown Water and others.  He had navigated under the Queen Isabella Causeway in both daylight and darkness and with four barges.  (Fowler Deposition, p. 152, l. 11 to p. 153, l. 7; p. 153, l. 8 to 12; p. 153, l. 20 to 23; p. 154, l. 2 to 10; p. 156, l. 2 to 14; Ex. 23, Submission of Brown Water to USCG regarding Fowler prepared by Mosher; Ex. 5, Mosher Deposition, p. 45, l. 18 to p. 46, l. 11; p. 172, l. 1 to p. 173, l. 23.)  Fowler had never had his license suspended or revoked and at the time of the accident was in good standing with the Coast Guard.  (Fowler Deposition, p. 157, l. 11 to 21.)  Fowler testified that he was comfortable navigating in the area of the accident with the BROWN WATER V and with a 4-barge tow and knew the area well enough that he did not

need to look at the chart. (Fowler Deposition, p. 140, l. 2 to 18; p. 141, l. 14 to 17; p. 141, l. 23 to p. 142, l. 17; p. 144, l. 11 to 16; p. 189, l. 18 to p. 190, l. 25.)

64)    Fowler came on watch the evening of September 14, 2001 at about 11:45 p.m. to relieve Wilson.  At that time, the BROWN WATER V was about 5 miles from the Long Island Swing Bridge.  As was the custom, the 2 men discussed the change of watch.  Despite the fact that Wilson had checked the weather on the vessel's VHF radio by listening to the NOAA weather report before departing Brownsville, Wilson did not tell Fowler about the tropical depression in the Gulf and the predicted strong flood tides in the area of the Accident.  (Fowler Deposition, p. 31, l. 14 to 19; p. 35, l. 25 to p. 36, l. 5; Wilson Deposition, p. 124, l. 20 to p. 125, l. 10; p. 129, l. 2 to 11; p. 101, l. 15 to 23.)

65)    Fowler testified that despite the fact that he knew it was his job as a captain to know the weather and tides in the area to be navigated, he did not listen to the weather broadcasts on the vessel's VHF radio or call the Long Island Swing Bridge to find out what tides he would encounter after leaving the Long Island Swing Bridge and in his approach to the Queen Isabella Causeway.  (Fowler Deposition, p. 121, l. 24 to p. 122, l. 2; p. 121, l. 20 to 23; p. 137, l. 9 to 19; p. 175, l. 17 to 25; p. 176, l. 2 to 16; p. 177, l. 4 to 6; p. 179, l. 6 to 11.)

66)    As Fowler steered out of the Long Island Swing Bridge and turned north toward the Queen Isabella Causeway, the tug and barges encountered a strong north westerly flood tide. Fowler was not expecting this strong current striking his starboard side.  Fowler testified that had he known of the flood tide he would have steered the vessel differently and would not have had any difficulty steering through the area with the BROWN WATER V and its four-barge tow. He had the experience and know how to handle the currents and had encountered currents like

this in the past and had no problem handling them. (Fowler Deposition, p. 124, l. 17-p. 125, l. 2; p. 162, l. 3-17; p. 162, l. 19-p. 163, l. 9; p. 230, l. 12-24; p. 243, l. 13-21).

67)    As Fowler approached the Queen Isabella Causeway, he noticed that the bridge's required navigational lights were not working.  This was confirmed by Langley, the captain of another vessel transiting the area who had reported to the proper authorities that the lights were out.  (Ex. 7, Langley Deposition, p. 17, l. 4 to 19; Fowler Deposition, p. 220, l. 4 to 10.)  Fowler also noticed that the surface lights of the Queen Isabella Causeway were also not working that night.  (Fowler Deposition, p. 179, l. 12 to p. 18, l. 8.)

68)    Fowler testified that as he steered to port to make the turn toward the Queen Isabella Causeway, the starboard stern of the BROWN WATER V touched bottom causing Fowler to loose control of steering.  He then left the controls and went to the back window of the wheelhouse to see what he may have hit.  He left the controls unattended for 3-4 seconds and during that time the current pushed the tow toward the port and out of alignment with the fendered bridge channel.  (Fowler Deposition, p. 124, l. 9-13; p. 124, l. 17-125, l. 2; p. 125, l. 10-17; p. 183, l. 14-19; p. 271, l. 24, p. 272, l. 7.)

69)    Once Fowler lost control of the tow, he was not able to bring it back under control.  Fowler testified that it did not matter how much horsepower the BROWN WATER V had, once he lost control, he could not prevent the Accident.  (Fowler Deposition, p. 62, l. 24, p. 63, l. 15; p. 65, l. 17-66, l. 8, p. 66, l. 11-17; p. 128, l. 12-20.)

70)    After the Accident, Fowler told the Coast Guard that the cause of the Accident was the current, the fact that he was not aware of the current and, therefore, he did not properly judge the current and that the BROWN WATER V grounded causing him to lose control.  (Fowler Deposition, Ex. 12, 129, 130, 132, 133.)  Fowler testified that he blamed himself for the

Accident and did not blame Brown Water. (Fowler Deposition, p. 106, l. 12-14; p. 219, l. 25; p. 220, l. 3.)

71)    After the Accident, the Coast Guard inspected the BROWN WATER V and noted a few minor deficiencies which were not in any way related to the Accident. Expert witnesses, Brock and Russell, testified that the Coast Guard found the BROWN WATER V to be in perfect operating condition with all of the proper equipment and that the deficiencies noted by the Coast Guard, including the lack of a current copy of the Local Notice to Mariners aboard the tug, were minor in nature and were not causally related to the accident. (Testimony of Brock and Russell.) Fowler testified that there was no Notice to Mariners that would have helped him that night or that would have prevented the accident. (Fowler Deposition, p. 237, l. 10 to p. 238 l. 7.) In any event, it is the responsibility of Brown Water to maintain notice to mariners onboard its vessels and not ACBL. After the inspection, the Coast Guard permitted the vessel to continue to operate.

72)    There is no testimony or evidence that the four ACBL barges were in any respect unseaworthy. There is no evidence that the barges in any way caused the Accident. To the contrary, it is undisputed that the barges were seaworthy and did not cause the Accident.

73)    Brock testified at the trial as an expert witness. Brock is 62 years of age and has over 40 years of experience in the inland towing industry. Brock is well qualified and was a credible witness. His curriculum vitae was entered into evidence and he testified as to his experience in the inland towing industry in several capacities from deckhand to captain. Included in his experience are his duties as a port captain and assistant vice president and a marine superintendent for major barge lines.

74)     Brock has also had responsibility for the overall operation of numerous towboats and barges, the design and implementation of safety and training programs for vessel and shore-based personnel and various administrative and managerial responsibilities. Brock has also operated towing vessels on various rivers and inland waters of the United States, including the ICW in the waters where the Accident occurred, and was very familiar with the towage of unmanned barges. (Testimony of Brock.)

75)     Brock currently holds a U.S. Coast Guard license (7th issue) as a First Class Pilot of Steam and Motor Vessels of Any Gross Tons Upon the Lower Mississippi River from Mile 900 to Mile 950; Master of Towing Vessels Upon the Great Lakes, Inland Waters and Western Rivers, excepting waters subject to International Regulations Preventing Collisions at Sea; Master of Towing Vessels upon the Western Rivers. His license is also endorsed with a Radar Observers Endorsement (Unlimited).

76)     Brock has testified as an expert witness in a variety of cases including engagements in matters before state courts, federal courts and administrative and regulatory bodies concerning the marine and inland towing industry. The Court finds Brock to be well qualified as an expert and finds his testimony credible.

77)     In connection with his testimony, Brock reviewed the various documents and depositions. To summarize, he was of the opinion that:

(A)     Barges NM-315, VLB-9182, ACL-9933B and VLB-9173 were duly documented with the U.S. Coast Guard and were in all respects seaworthy for their intended services. These barges were by design and construction unmanned dry cargo barges having no means of self propulsion or steerage for navigation purposes. Unmanned barges of this type must rely

on an external source of propulsion and steerage for movement, such as a tug boat or a towboat.

(B)    On September 15, 2001, Barges NM-315, VLB-9182, ACL-9933B and VLB-9173 were under the care, custody and control of Brown Water, a third party tower who by towing industry custom and practice is to provide a seaworthy towing vessel to move the barges from one point to another in a reasonable time frame and with the utmost care and safety of navigation. It is expected that the barges to be towed will remain under the custody of the tower and that the tower will make all necessary decisions regarding the towage of the barges, including which towing vessel to be used, how to crew the vessel, and by whom.

(C)    Brown Water utilized the BROWN WATER V, a diesel powered towboat manned by Brown Water personnel, to tow the barges. The Captain and Relief Captain of the BROWN WATER V were appropriately licensed by the U.S. Coast Guard and were acting under the authority of their licenses to Pilot and operate the towboat at the time of the allision.

(D)    When the BROWN WATER V and its tow of barges allided with the Queen Isabella Causeway Bridge on September 15, 2001 causing damage to Barge NM-315, Brown Water did not fulfill its responsibility as a third party tower to ACBL. Barges NM-315, VLB-9182, ACL-9933B and VLB-9173 did not in any way cause or contribute to the Accident.

(E)    At the request of ACBL, Timberlake performed an independent vendor audit of Brown Water. Timberlake was an experienced auditor and the

purpose of his audit was to identify within the Brown Water organization which processes were in place and working, which areas required the implementation of a process, and to identify areas for improvement that would assist Brown Water in improving their overall service to ACBL. Timberlake was also asked by ACBL to determine if Brown Water should continue to be used as an approved vendor based on his overall findings. Timberlake reviewed Brown Water's management processes that were in place, noted areas that could be improved, and identified various deficiencies on two of Brown Water's vessels that were audited. The deficiencies noted on the vessels were of a process oriented nature or replacement of requirement equipment. None of the deficiencies identified by Timberlake on Brown Water's vessels were of a nature that would affect the operational capability of the vessels. Brock was in agreement with Timberlake's findings and his report to ACBL that while there were areas for improvement noted within the Brown Water organization, there were not serious issues identified and/or noted that would disqualify Brown Water as a viable vendor.

(F)     Brown Water and ACBL's participation in the U.S. Coast Guard's Cooperative Towing Vessel Examination Program is an indication that both companies are responsible operators. The Cooperative Towing Vessel Examination Program involves a rigorous inspection criteria and voluntary participation on the part of those companies in the industry that chose to participate. The program was designed to assist the participating

companies in identifying areas for improvement and regulatory compliance on their towing vessels. Phase One (1) participants invited the Coast Guard to board and thoroughly inspect every aspect of each of their company's vessels utilizing the in-depth Eighth Coast Guard District Boarding and Inspection format. Following successful completion of the inspection, the vessel was awarded a placard to be displayed in the Pilothouse window. The BROWN WATER V displayed a Phase One (1) placard indicating participation in and compliance with the program and inspection protocol.

(G)    Following the Accident, the U.S. Coast Guard conducted an in-depth post-casualty inspection of the BROWN WATER V. As a result of the inspection, seven (7) minor discrepancies were identified. Captain Brock testified that none of the deficiencies identified during the Coast Guard's inspection as discrepancies were related to the causality either as a causal or as a contributing factor. He further testified that each of the noted deficiencies were minor in nature and that none of the discrepancies were of a serious nature that would warrant the removing the BROWN WATER V from service.

(H)    Brock explained that the failure of the BROWN WATER V to not have on board a copy of the published document "Local Notice to Mariners," although a violation of 33 C.F.R. 164.72, is not considered a serious violation nor does it indicate that the vessel operator is irresponsible. He testified that this was a minor violation and a minor discrepancy if

noted at all by the Coast Guard Inspector or the Primary Carrier Auditor due to the ever increasing difficulty mariners encounter in obtaining a current copy because of a limited distribution network. The "Local Notice to Mariners" is published by the Coast Guard and is an informational document identifying specific issues that aids the mariner and is required to be carried on board a vessel. In his years of experience, Brock has never known of the Coast Guard removing a vessel from service because a current "Notice to Mariners" was not on board. Further, he testified that the Coast Guard "Local Notice to Mariners" broadcasts via VHF radio supplement the hard copy document. These radio broadcasts were available in 2001 and continue today, and the vessel Master and Pilot each have the opportunity twice per 24 hour period to receive current up to date local information that it is the Coast Guard's responsibility to provide. Towboat operators rely on these VHF broadcasts to stay current with changes within their area of operation. Brock explained that Brown Water was responsible for providing "Local Notice to Mariners" to its vessels and ensuring crew familiarity with the content as it relates to the route to be navigated. If the BROWN WATER V did not have on board the required documents, Brown Water is accountable to whatever degree appropriate, not ACBL. Further, Brock also reviewed the four issues of the "Local Notice to Mariners" printed document for September, 2001, which were admitted into evidence, and noted that there is no weather, current velocity, tidal action or any other type of information for the

Port Isabel, Texas area that would have aided the BROWN WATER V Pilot in navigating through this area or any other cautionary information that would have prevented this accident. He testified that unless the Coast Guard is specifically requested to publish that type of information, it will not be found in the "Notice to Mariners" as weather, tidal and current information is a National Oceanic and Atmospheric Administration Agency function. If unusual tidal height and current velocity information had been available, it was not ACBL's responsibility to make that information known to the BROWN WATER V crew.

(I) The AWO is a National Trade Organization providing a liaison between the Industry and the Regulatory Authorities. Membership in the AWO was in 2001 and is today voluntary. According to its published literature, the AWO states that as of December 31, 2001 it represented approximately 63 percent of the Towboats and Tugboats in the towing industry with a major portion of the companies represented clustered in the medium to large fleet category. A review of the published membership roster of the AWO for 2004 identifies an approximate even division between Blue Water and Inland Companies. The absence of membership in the AWO organization or non-participation in the AWO Responsible Carrier Program did not in 2001 and does not today reflect negatively on a company's operational expertise and commitment to safety. Numerous Barge and Towing Companies did not then and do not now maintain an active membership in the AWO for a variety of reasons.

Membership in the AWO or certification as a Responsible Carrier does not insulate a company from accidents. Before the Responsible Carrier Program existed and even after the program was made a mandatory condition of AWO membership, major accidents occurred involving AWO member's vessels. Brock noted that Brown Water applied for AWO membership and was accepted as a carrier member in February of 2001. Brown Water also applied for participation in the Responsible Carrier Program and received certification as an RCP participant on July 22, 2002, well within the AWO's allotted time frame for certification.

(J)    ACBL contracted for towage service with a responsible third party tower, namely Brown Water, and exercised sound business rationale in their decision to use Brown Water. Brown Water had a proven record for competence and dependable service spanning over the ten year period that Brown Water had satisfactorily performed their contractual responsibility of towing ACBL's barges to various points along the ICW in a manner consistent with industry standards. Brown Water performed the same type of towing services for numerous other liquid and dry cargo barge owners/operators along the same route and had a reputation as a competent tower throughout the industry.

78)    Michael D. Russell (USCG Ltd. Cmdr., retired) also testified as an expert witness for ACBL. He is a maritime safety consultant having specialized knowledge, training and

experience regarding marine safety and the inland towing industry and the U.S. regulations applicable to the inland towing industry.

79)    Following his retirement in 1995 after 20 years of active duty service in the U.S. Coast Guard, Russell began working as a maritime safety consultant. When he retired, Russell held the rank of Lieutenant Commander.

80)    As set forth more fully in Russell's resume, he has over 29 years of experience in several facets of marine safety enforcement and management. His educational background includes a Bachelor of Science Degree from Lamar University in Beaumont, Texas and attendance at the U.S. Coast Guard's Officer Candidate School in Yorktown, Virginia. From 1975 to January 1995, he was on active duty in the U.S. Coast Guard and retired as a Lieutenant Commander. While in the U.S. Coast Guard, he held various positions including: Chief of Vessel Inspection Division of the Coast Guard Marine Safety Office in Corpus Christi, Texas; Chief of Inspections and Investigations Department of the Coast Guard Marine Safety Office in Galveston, Texas; and Chief of the Investigations Department and Senior Investigating Officer of the Coast Guard Marine Safety Office in Houston, Texas, which is the nation's third largest port and largest foreign commerce port. As set forth in Russell's resume, he has extensive experience in investigating marine casualties and accidents and investigating and prosecuting violations by U.S. Merchant Mariners and vessel operators of U.S. and international regulations. Russell is familiar with the U.S. regulations applicable to the inland towing industry and the licensure of personnel to operate inland vessels such as tug boats and towboats which are enforced by the Coast Guard.

81)    Russell has also provided testimony, including expert testimony, regarding marine casualties and casualty investigations in numerous cases, including those pertaining to

the inland towing industry.  The Court found him to be well qualified as an expert and a credible witness.  To summarize, it was Russell's opinion that:

(A)    Brown Water qualified for participation in the Coast Guard's Cooperative Towing Vessel Examination Program ("CTVEP") by meeting federal regulations and demonstrating to the Coast Guard that they were a low risk regarding vessel safety.  Brown Water was an active participant in CTVEP and voluntarily offered itself up to examinations by the Coast Guard.

(B)    Following the incident, the Coast Guard noted certain deficiencies for the BROWN WATER V on its vessel boarding report form, known as Coast Guard Form CG-5437, but the deficiencies noted on the CG-5437 were not major safety violations.  Had they been major safety violations, they would have been required to have been corrected immediately.  Further, Russell testified that the deficiencies noted on the CG-5437, had nothing to do with the Accident.

(C)    The owner or operator of the Queen Isabella Causeway Bridge was in violation of Title 33, Code of Federal Regulations, Part 118 because the green navigation lights were not working on both the north and south side of the bridge.  Prior to the incident of September 15, 2001, a passing vessel noted that the navigation lights were not working and notified the harbor master.

(D)    Fowler had the correct Coast Guard license issued to operate the BROWN WATER V.

(E)    Fowler was on the third issue of his Coast Guard license as an operator of uninspected towboats at the time of the incident which represents approximately twelve years. Prior to this incident, Fowler had two marine casualty incidents in his Coast Guard record which were groundings on August 30, 2000, and on March 7, 2001. The incidents resulted in no damage or pollution. In Russell's opinion, two groundings in twelve years is a very low number of incidents.

(F)    The ICW is a relatively narrow and shallow body of water and is restrictive when 35 foot wide barges are doubled up abreast and meet a similar tow. Sharp bends in the ICW and intersections with major shipping channels combined with environmental conditions, barge drafts and a great deal of other commercial and recreational traffic presents challenges to the operators of towboats. Touching bottom or groundings are not unusual occurrences and are in some circumstances a prudent course of action to take to avoid a greater marine casualty.

(G)    The Coast Guard has a website called The Port State Information Exchange ("PSIX") System. Russell conducted a review of the PSIX for the vessels operated by Brown Water, including the BROWN WATER V. Russell testified, and the Court agrees, that the PSIX is not an accurate measure of a particular vessel's marine casualty history. Moreover, a review of the PSIX for vessels operated by Brown Water Marine does not reflect incompetent or unsafe operation. The PSIX does not give any information as to whether any grounding was intentional or unintentional,

whether any allision was the striking of a stationary vessel or if the vessel was stationary and struck by another vessel, whether any personnel casualty was a cut finger, heart attack, bee sting, fall overboard, etc., whether any sinking involved another vessel, whether the equipment failure was a burned out light, a steering failure or whether due to part failure or maintenance.

82)     The Court finds a matter of fact that ACBL was not at fault and is entitled to be exonerated from all liability for the Accident.

83)     The Court finds, as a matter of fact, that Claimants have not proven any act or omission of ACBL which caused or contributed to the Accident, nor have they proven that ACBL breached any duty, custom, statute, law or regulation which caused or contributed to the Accident.

84)     The Court finds, as a matter of fact, that ACBL was not negligent in contracting with Brown Water to tow its barges.

85)     The Court finds, as a matter of fact, that Brown Water possessed the knowledge, skill and equipment to safely tow ACBL's barges, and that the sole cause of the Accident was the operational negligence of Brown Water's crew in failing to properly assess the tide and current conditions and to properly navigate the BROWN WATER V and its tow  under the prevailing conditions.

86)     The Court finds that ACBL acted reasonably in contracting with Brown Water, a company that it had a 10 year experience of competent and safe towage of hundreds of its barges.    Moreover, ACBL took the extra step of having an independent audit done of

Brown Water prior to the Accident which confirmed that Brown Water was a safe and competent towage contractor.

87)    Alternatively, the Court finds that ACBL is entitled to limit its liability to the value of the barges and their pending freight as there is no evidence that any act of negligence attributable to ACBL was within the privity and knowledge of ACBL's management.

88)    The Court finds, as a matter of fact, that the State of Texas was negligent in failing to properly maintain the navigational lighting on the Queen Isabella Causeway and its negligence was a proximate cause of the Accident.

89)    The Court finds, as a matter of fact, that Cameron County was negligent for failing to properly maintain the surface lighting on the Queen Isabella Causeway and its negligence was the proximate cause of the injuries and deaths to the claimants remaining in this action.

90)    The Court finds, as a matter of fact, that ACBL sustained damages from the Accident and is entitled to recover its damages from Brown Water.

91)    In the further alternative, to the extent that any Claimant has a recovery against ACBL, ACBL is entitled to complete indemnity from Brown Water and, alternatively, contribution from Brown Water.

## PROPOSED CONCLUSIONS OF LAW

92)    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1333 and The Limitation of Liability Act, 46 U.S.C. app. § 183 *et seq.*, since the Accident involves a tort that occurred on the navigable waters of the United States. These actions are admiralty and maritime claims pursuant to Rule 9(h) of the Federal Rules of Civil Procedure, and the Petitioners have designated their actions as admiralty and maritime claims pursuant to Rule 9(h).

Further, the Court's admiralty and maritime jurisdiction extends to and includes "all cases of damage or injury to person or property, caused by a vessel on navigable waters, notwithstanding that such damage or injury be cone or consummated on land." 46 U.S.C. app. § 740.

93)    Pursuant to Rule 38(e) of the Federal Rules of Civil Procedure all issues in these consolidated cases are non-jury matters to be decided by the Court and the Claimants have no right to trial by jury. See Lewis v. Lewis & Clark Marine, Inc., 531 U.S. 438, 448, 121 S.Ct. 993, 1001 (2001).

94)    ACBL seeks to be exonerated from all liability arising out of the accident and a dismissal of all claims. Rule F(2) of the Supplemental Rules for Certain Admiralty and Maritime Claims permits ACBL to demand exoneration from liability in this case. It is also recognized that a party "need not confess liability" to file a limitation action. Lewis v. Lewis & Clark Marine, Inc., 531 U.S. 438, 453, 121 S. Ct. 993, 1003 (2001). Alternatively, ACBL seeks limitation of liability.

95)    A vessel owner is entitled to exoneration where it is free from fault. Tittle v. Aldacosta, 544 F. 2d 752, 756 (5th Cir.), reh. denied, 546 F. 2d 907 (5th Cir. 1977); In Re Caribbean Sea Transport, Ltd., 748 F. 2d 622, 626 (11th Cir.), amended on other grounds, 753 F. 2d 948 (11th Cir. 1985).

96)    ACBL is entitled to exoneration because its barges were seaworthy, it was not negligent and breached no duty imposed by law, and there is no legal basis upon which it can be held liable for the Accident.

97)    "The rights of third parties against a tug and tow are adjudicated separately in accordance with each vessel's respective fault." In Re Central Gulf Lines, Inc., 176 F.Supp.2d at 615.