**ORIGINAL**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE, TEXAS

United States District Court
Southern District of Texas
FILED

JUN 1 5 2005

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| IN RE: THE COMPLAINT AND PETITION OF BROWN WATER TOWING I, INC. AS OWNER, AND BROWN WATER MARINE SERVICE, INC., AS BAREBOAT CHARTERER, OF THE BROWN WATER V, ITS ENGINES, TACKLE, ETC., IN A CAUSE OF EXONERATION FROM OR LIMITATION OF LIABILITY | § § § § § § § § § | C.A. No. B-01-157 (Subject to Rule 9(h) of the Federal Rules of Civil Procedure) Adiralty |
| Consolidated with: | § § | |
| IN THE MATTER OF THE AMERICAN COMMERCIAL LINES LLC AS OWNER And AMERICAN COMMERCIAL BARGE LINE LLC AS CHARTERER OF THE BARGES NM-315, VLB-9182, ACL-9933B, VLB-9173, PRAYING FOR EXONERATION FROM AND/OR LIMINATION OF LIABILITY | § § § § § § § § § | C.A. NO. B-02-004 (Subject to Rule 9(h) of the Federal Rules of Civil Procedure) Admiralty |
| Consolidated with: | § § | |
| IN THE MATTER OF DEERE CREDIT, INC. (FORMERLY SENSTAR FINANCE COMPANY), AS OWNER OF THE BARGE NM 315, AND STATE STREET BANK AND TRUST COMPANY OF CONNECTICUT, NATIONAL ASSOCIATION, AS OWNER TRUSTEE OF THE BARGE ACL-9933B AND NOT IN ITS INDIVIDUAL CAPACITY, AND GENERAL ELECTRIC CAPITAL CORPORATION, AS BENEFICIAL OWNER OF THE BARGE ACL-9933B PRAYER FOR EXONERATION FROM AND/OR LIMIATION OF LIABILITY | § § § § § § § § § § § § § § § § § § | C.A. NO. B-02-025 (Subject to Rule 9(h) of the Federal Rules of Civil Procedure) Admiralty |

**CLAIMANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

1

### Findings of Fact

1. The BROWN WATER V and its barges allided with the Queen Isabella Causeway at approximately 2:00 a.m., on September 15, 2001.

2. The allision caused two 80-foot sections of the causeway to collapse.

3. As a result of the collapse of the Queen Isabella Causeway, nine vehicles drove off the causeway and into the water through the missing sections of the causeway, resulting in the deaths of Robert Victor Harris, Gaspar Saenz Hinojosa, Robin Faye Leavell, Hector Martinez, Jr., Julio Cesar Mireles, Stvan Francisco Rivas, Barry R. Welch, and Chealsa Louise Welch. Rene Francisco Mata, Gustavo Adolofo Morales and Brigette Marie Goza claim physical injuries.

4. Each of the deaths and alleged injuries arising out of the allision with the Queen Isabella Causeway occurred in Texas territorial waters and the navigable waters of the United States.

5. None of the people killed or injured as a result of the allision with the Queen Isabella Causeway were seamen.

6. Anita Harris was the wife of Robert V. Harris at the time of his death, Victor Justin Harris was the child of Robert V. Harris, and Anita Harris is Representative of the Estate of Robert V. Harris.

7. Raquel Hinojosa was the wife of Gaspar Hinojosa at the time of his death, Clarissa Hinojosa, Omar Hinojosa, and Gaspar Hinojosa II, were the children of Gaspar Hinojosa, Rita Hinojosa was a parent of Gaspar Hinojosa, and Omar Hinojosa is the Representative of the Estate of Gaspar Hinojosa.

8. Carol and Rick Leavell are the parents of Robin Faye Leavell and are the Representatives of the Estate of Robin Faye Leavell.

2

9.    Lydia Zamora and Hector Martinez, Sr. were the parents of Hector Martinez, Jr., and Lydia Zamora is the Representative of the Estate of Hector Martinez, Jr.

10.   Juan Antonio Mireles and Soledad Gonzalez Mireles were the parents of Julio Cesar Mireles and J. Antonio Mireles is the Representative of the Estate of Julio Cesar Mireles.

11.   Esteban and Miriam Rivas were the parents of Stvan Rivas and are the Representatives of the Estate of Stvan Rivas.

12.   William Eugene Kimbrell was the parent of Chealsa Welch, William B. Welch is the son of Chealsa Welch, and Jacqueline Paddock is the Representative of the Estate of Chealsa Welch.

13.   William Morris Welch was the father of Barry Welch, William B. Welch was the son of Barry Welch, and Jacqueline Paddock is the Representative of the Estate of Barry Welch.

14.   Frank Mata was the owner of the 2001 Ford Mustang that sustained damage as a result of the occurrence in question.

15.   The BROWN WATER V was owned by Brown Water Towing I, Inc. and bareboat chartered and crewed by Brown Water Marine Service, Inc.

16.   Captain David Fowler was an employee of Brown Water Marine Service, Inc. and was acting in the course and scope of such employment at all times pertinent to his conduct related to the subject allision.

17.   Captain Rocky Wilson was an employee of Brown Water Marine Service, Inc. and was acting in the course and scope of such employment at all times pertinent to his conduct related to the subject allision.

18. ACBL was the owner *pro hac vice* of the four barges being towed by the BROWN WATER V at the time they allided with the Queen Isabella Causeway.

19. ACBL is the largest barge line in North America. It owns approximately 150 tugs and over 5000 barges. Over 90% of the time, ACBL pushes its own barges with tugs that it owns and operates. In some circumstances, however, ACBL hires independent contractors to push its barges.

20. ACBL hired Brown Water, as an independent contractor.

21. The BROWN WATER V was towing/pushing four ACBL barges in a straight line.

22. The BROWN WATER V was equipped with two Detroit Diesel 12v71N engines, with N55 fuel injectors, at the time of the allision with the Queen Isabella Causeway.

23. The Intracoastal Waterway runs in a general north-south direction along the Texas coast.

24. The Queen Isabella Causeway crosses the southern end of the Laguna Madre to connect Port Isabel on the Texas mainland with South Padre Island, a barrier island on the Gulf of Mexico. It is owned by the State of Texas.

25. Towing a line of barges through a narrow channel requires great skill and experience, compared to other forms of navigation. Gilmore and Black, in their treatise, *The Law of Admiralty* note that "the combined tug and tow constitute a far less maneuverable unit than the single powered vessel, and the presence of the tow makes close maneuvering more problematic for other vessels." Gilmore & Black, *The Law of Admiralty* (2nd ed.) 7-14, p. 515.

4

26. The fact that barges can cause massive destruction has unfortunately been shown time and again, as allisions with bridges in accidents such as the Amtrak *Sunset Limited*, the allision with the IH-40 bridge over the Arkansas River in Oklahoma that caused 14 deaths, and the subject allision with the Queen Isabella Causeway, have resulted in numerous losses of life.

27. The area of the Intracoastal Waterway around the Queen Isabella Causeway is particularly difficult to navigate.

28. When navigating north along the Intracoastal Waterway, shortly after navigating under the Long Island Swing Bridge, the pilot must negotiate the Queen Isabella Causeway. Navigating a tug and its tow through this area requires experience and planning, because there are two different currents working on the tug and tow. Experienced pilots know that before setting up to navigate through this area they must know in which way and how strong the currents are running.

29. Pilots along this area of the Intracoastal Waterway can obtain information about the direction and strength of the currents by questioning other vessels that had recently transited the area, calling the Long Island Swing Bridge operator, checking the "tails" coming off the beacons, and checking the weather in the Gulf of Mexico.

30. In the Intracoastal Waterway between the Long Island Swing Bridge and the Queen Isabella Causeway there are several red and green navigational aids in the water. These aids do not define the channel. In fact, all of the aids are designated by the U.S Coast Guard Light List to be outside the surveyed channel. The aids were properly marked on the navigational charts as being outside the channel.

5

31.  On the evening of Friday, September 14, 2001, the BROWN WATER V departed Brownsville, Texas, under the control of its Master, Captain Rocky Lee Wilson. The BROWN WATER V was towing four loaded barges in a straight line. At midnight, Captain David Fowler took the helm.

32.  At approximately 1:45 a.m., Captain Fowler navigated the tug and tow under the Long Island Swing Bridge, through the channel between that bridge and the Queen Isabella Causeway.

33.  Captain Fowler was not aware of crosscurrents that run between the Long Island Swing Bridge and the Queen Isabella Causeway. Consequently, he did not set up his tow to properly navigate based on the currents that run through that area.

34.  Captain Fowler was also not aware that the navigation aids in that area do not define the edge of the channel.

35.  As the crosscurrents began to act on the barges being towed, the BROWN WATER V bumped the bottom (outside the channel). The current took the barges and pushed them to the left. Captain Fowler put its engines into reverse to stop the barges from striking the causeway. Although he was able to slow the barges, he was unable to stop them or regain control of them.

36.  In September 1993, a line of barges being towed along an Alabama river struck a railroad bridge. The Amtrak train *Sunset Limited* derailed as it went over the bridge and into the river, killing 42 passengers and 5 crew members. In the wake of this disaster, the towing industry was faced with the prospect of being subjected to substantial Congressional regulations. In an effort to avoid government regulations, the towing company, led by the American Waterways

Operators, established self-regulations in the form of the Responsible Carrier Program.

37.    A purpose of the Responsible Carrier Program is to provide minimal standards of safe practice that companies in the tow and barge industry should undertake.

38.    One of the standards of the Responsible Carrier Program is that barge owners must have written policies and procedures for evaluating contract towers on their ability to provide an acceptable level of safety.

39.    At the time it hired Brown Water to tow it barges that allided with the Queen Isabella Causeway, ACBL did not have any written policies and procedures to evaluate the competence, care, or safety of its contract towers.

40.    ACBL's Senior Vice President of Logistics, Norb Whitlock (one of the highest level executives at ACBL), discussed ACBL's subjective standards for "competence" and "safety." Mr. Whitlock testified that even after this allision – where a Brown Water tug pushed four ACBL barges into the Queen Isabella Causeway, causing a section of the bridge to collapse and causing eight deaths – ACBL still has "no basis" to question the competence of Brown Water. When further asked about ACBL's decision to continue using Brown Water after this allision, Mr. Whitlock touted Brown Water's competence, "based on their demonstrated ability over the years to provide good service without – without any major incidents."

41.    ACBL's subjective standards, which allow it to still find "no basis" to question the competence of Brown Water after this allision and allow it to believe Brown Water has provided services "without any major incidents," are not the objective standards of a reasonably prudent barge owner. In fact, the subjective standards

7

of ACBL demonstrate a complete lack of regard to whether a contract tower is providing a service with competence, care, and safety.

42.   ACBL cannot rely on Brown Water's representations that they would be competent and safe to absolve them of liability for hiring an independent contractor that is not competent, careful, or safe.  ACBL has an independent responsibility to take reasonable care to hire a contract tower that is competent, careful, and safe.

43.   According to the Coast Guard's PSIX database, Brown Water's vessels had been involved in 24 reportable marine casualties within three years before the allision with the Queen Isabella Causeway.

44.   At the time it hired Brown Water to tow the barges at issue, ACBL knew Brown Water was not Responsible Carrier Program certified.

45.   At the time of the allision, the BROWN WATER V was not carrying a current copy of the Notice to Mariners.

46.   The pilots of the BROWN WATER V had not been utilizing the marine charts at the time of the allision with the Queen Isabella Causeway.

47.   At the time ACBL hired it to tow the barges at issue, Brown Water did not have a plan in place for training its pilots.

48.   Before this allision, Captain Fowler had been involved in at least two previous incidents where he lost control of his vessel in the tide.  On August 30, 2000, he grounded the M/V JANICE CAROL in the Corpus Christi ship channel because of his inexperience with the local area and his failure to correctly judge the tidal influence.  On March 7, 2001, while piloting the M/V GOLDA PICKETT, he

allowed the tide to push his tug toward the bank causing him to hit ground, at which point the tug and tow allided with a bridge.

49. Captain Fowler trained himself to be a boat captain.

50. Before the allision, Captain Fowler had told his superiors at Brown Water that he was uncomfortable navigating barges in the area between Brownsville and the Queen Isabella Causeway.

51. At the time of the allision, this was Captain Fowler's first time to navigate under the Queen Isabella Causeway at night.

52. Captain Fowler was not expecting the strong crosscurrent that took control over his tow and had not set up his approach to the Queen Isabella Causeway in anticipation of the crosscurrent.

53. Captain Fowler did not know the red and green navigation aids between the Long Island Swing Bridge and the Queen Isabella Causeway were outside the channel and thought they marked the edge of the channel.

54. The engines on the BROWN WATER V could not produce adequate horsepower on the day of the alllision with the Queen Isabella Causeway.

55. ACBL had a rule of thumb that a towing vessel should have a minimum of 200 horsepower per barge, when navigating under ideal circumstances.

56. Even after the allision with the Queen Isabella Causeway, ACBL contends it has no basis to question the competence of Brown Water to tow its barges.

57. Even after the allision with the Queen Isabella Causeway, ACBL contends that Brown Water has provided it good service without any major incidents.

58. Brown Water was not free from fault or negligence in the allision.

59. The allision with the Queen Isabella Causeway was not an inevitable accident.

60.    Brown Water cannot overcome the *Oregon* presumption or the *Pennsylvania* Rule.

61.    It was the policy of Brown Water to not keep Notice to Mariners on board its vessels, despite Coast Guard regulations to maintain Notice to Mariners on the vessel.

62.    Brown Water's violation of Coast Guard regulations by failing to carry a current Notice to Mariners was a contributing cause of the allision.

63.    Brown Water had privity and knowledge of the acts of negligence and conditions of unseaworthiness of the BROWN WATER V that caused the allision.

64.    Captain Fowler's incompetence caused the allision.

65.    The BROWN WATER V's unseaworthiness caused the allision.

66.    Brown Water failed to meet its standard of care as a reasonably prudent owner and operator of a towing vessel, which conduct proximately caused the allision, the accidents, and the deaths and injuries.

67.    ACBL's negligence in hiring Brown Water and entrusting its barges to Brown Water.

68.    ACBL was not free from fault or negligence in the allision.

69.    ACBL had privity and knowledge of the acts of negligence that caused the allision.

70.    Brown Water and ACBL are jointly and severally responsibility for causing the allision and the Claimants' damages.

71.    As a result of the collapse of the Queen Isabella Causeway, Rolando Lee Moya, Alberto Leroy Moya, Antonio Salinas, Jr., and Roberto Espericueta sustained personal injuries.

72.  The amount of damages sustained by Claimants as a result of the allision with the Queen Isabella Causeway and the accidents.

73.  ACBL's employee in charge of hiring Brown Water for the tow at issue would have required at least 250 horsepower per barge, when navigating the Western Intracoastal Waterway, including the area where the allision occurred.

74.  At the time of the allision the red and green buoys between the Long Island Swing Bridge and the Queen Isabella Causeway were in the position charted on nautical chart 11302.

75.  The red and green buoys had been moved to their current positions in 1990, and this fact was duly published to Mariners in the United States Coast Guard Light List.

76.  Brown Water's negligence in failing to require meetings and exchanges of information at watch changes was a cause of the allision, the accidents, and the deaths and injuries of Claimants.

77.  Brown Water's negligence in failing to require that their Masters check anticipated weather, tide, and current conditions on the intended routes before configuring their tows was a cause of the allision, the accidents, and the deaths and injuries of Claimants.

78.  Brown Water's negligence in failing to require that their Masters check anticipated weather, tide, and current conditions on the intended routes before leaving port was a cause of the allision, the accidents, and the deaths and injuries of Claimants.

79.  Tim Chapman, Chad Chapman, Rocky Wilson, and Steve Mosher were managing agents, officers, and supervisory employees of Brown Water, whose

knowledge and conduct bind Brown Water, as a corporate owner of a vessel, for purposes of privity and knowledge in this case.

80.   Norb Whitlock, James Farley, Christian Brinkop, Patrick Hoessle, Philllip Timberlake, Peter Kazunas, and Norman Ivey were managing agents, officers, and supervisory employees of ACBL, whose knowledge and conduct bind ACBL, as a corporate owner of a vessel, for purposes of privity and knowledge in this case.

81.   The managing agents, officers, and supervisory employees of Brown Water personally participated in and brought about the unseaworthy condition of the BROWN WATER V.

82.   The managing agents, officers, and supervisory employees of Brown Water personally participated in and brought about the negligent conduct that proximately caused the allision, the accidents, and the deaths and injuries of Claimants.

83.   The managing agents, officers, and supervisory employees of Brown Water knew and should have known about the unseaworthy condition of the BROWN WATER V.

84.   The managing agents, officers, and supervisory employees of Brown Water knew and should have known about the negligent conduct that proximately caused the allision, the accidents, and the deaths and injuries of Claimants.

85.   The managing agents, officers, and supervisory employees of ACBL personally participated in and brought about the negligent conduct of ACBL in hiring Brown Water to tow its barges, including their day-to-day responsibility for implementing management policies, supervising the persons who made the

12

decision to hire Brown Water, logistical activities of barges and towing vessels, decisions of hiring towing vendors, including Brown Water, and management and responsibility for hiring towing vendords.

86.    The managing agents, officers, and supervisory employees of ACBL knew and should have known about the negligent conduct of ACBL in hiring Brown Water to tow its barges, including their day-to-day responsibility for implementing management policies, supervising the persons who made the decision to hire Brown Water, logistical activities of barges and towing vessels, decisions of hiring towing vendors, including Brown Water, and management and responsibility for hiring towing vendors.

### Conclusions of Law

1.    The Court has jurisdiction over the parties and property, and the subject matter is within its admiralty jurisdiction.  46 USC §183 *et seq*.

2.    To succeed on the issue of exoneration, the moving party must show it is free from fault or negligence in the allision.

3.    When a moving vessel allides with a fixed object that is properly marked, there is a presumption that the moving vessel is at fault.  *The Oregon*, 158 U.S. 186, 197 (1895).  This presumption makes a prima facie case of negligence against the moving vessel.  *Brown & Root Marine Operators, Inc. v. Zapata Off-Shore Co.*, 377 F.2d 724, 726 (5th Cir. 1967).  To overcome this presumption, the moving vessel must meet the heavy burden of proving (1) it was without fault (i.e., it used all reasonable care to avoid the collision); (2) the stationary object was at fault; or (3) the allision was the result of an inevitable accident.  *Bunge Corp. v. M/V Furness*

13

*Bridge,* 558 F.2d 790, 795 (5th Cir. 1977). The presumption applies not only to the moving vessel, but to all parties involved in the management of the vessel. *Bunge Corp. v. Freeport Marine Repair,* 240 F.3d 919, 923 (11th Cir. 2001).

4.    The *Oregon* presumption applies as to Brown Water, because its tow hit the Queen Isabella Causeway. Brown Water has failed to show that the allision was not caused by its fault or that it was an inevitable accident. Because Brown Water has failed to overcome the *Oregon* presumption, it is not entitled to exoneration

5.    Under the *Pennsylvania* Rule, if a vessel involved in an allision was in violation of a statutory or regulatory rule intended to prevent collisions or allisions, the burden shifts to the violating vessel to show that its statutory fault was not a contributing cause of the accident. *The Pennsylvania,* 86 U.S. 125, 136 (1873); *Florida East Coast Ry Co. v. Revilo Corp.,* 637 F.2d 1060, 1065 (5th Cir. 1981). The *Pennsylvania* Rule applies if the following are proven: (1) proof by a preponderance of the evidence of a violation of a statute or regulation that imposes a mandatory duty; (2) the statute or regulation must involve marine safety or navigation; and (3) the injury suffered must be of a nature that the statute or regulation was intended to prevent. *Union Pacific R.R. Co. v. Kirby Inland Marine, Inc.,* 296 F.3d 671, 674 (8th Cir. 2002). The Pennsylvania Rule may be overcome by showing another party is solely responsible for the accident and the violation was not a contributing cause.

6.    "Under the *Pennsylvania* rule, the violator of a statutory rule intended to prevent alllisions has the burden of proving not only that its transgressions were not a contributing cause of the allision, but that they could not have been a cause of the

14

allision." *Florida East Coast Ry Co. v. Revilo Corp.*, 637 F.2d 1060, 1065 (5th Cir. 1981).

7.  The *Pennsylvania* Rule applies equally to violations of statutes and regulations. T. Schoenbaum, *Admiraly & Maritime Law*, (4th ed.) 14-3, vol. II at 102.

8.  The *Pennsylvania* Rule applies to Brown Water. Brown Water was in violation of 33 CFR §164.72(b) at the time of the allision. This regulation involves marine safety and navigation and was intended to prevent collisions and allisions and resulting injuries to persons and property as occurred in this allision.

9.  Brown Water has failed to prove that the allision was the sole cause of some other party. Because Brown Water has failed to overcome the presumption of the *Pennsylvania* Rule, it is not entitled to exoneration.

10. Regardless of the presumptions, there is evidence that Brown Water was at fault in causing the allision and that it acted with negligence in causing the allision. Brown Water failed to act a as a reasonably prudent operator of a towing vessel. Consequently, Brown Water is not entitled to exoneration.

11. The pilots for BROWN WATER V were incompetent because they were unfamiliar with the waters under these conditions at night, they were not prepared to meet conditions that were likely to befall the vessel, they were inadequately trained, and they did not know the currents, the tides, or the weather in the area.

12. Brown Water was negligent in failing to properly hire its pilots, providing inadequate horsepower to tow the barges, towing too many barges, failing to use navigational maps and charts, failing to provide current Notice to Mariners,

providing inadequate information about the weather, tides, and currents, and providing inadequate training and supervision to its pilots.

13.    The standard of care for finding negligence of Brown Water is reasonable care under the circumstances, adjudged from the viewpoint of a mariner.

14.    Unseaworthiness can be demonstrated by showing insufficient manning of the vessel, an inadequately trained crew, improper maintenance of equipment, and other related failures that make the vessel ill-suited for its duties at sea. *Hercules Carriers*, 768 F.2d at 1566.

15.    The BROWN WATER V was not properly equipped to tow the four barges through the Queen Isabella Causeway. These inadequacies of the BROWN WATER V made it unseaworthy. This lack of seaworthiness was a proximate cause of the allision with the Queen Isabella Causeway, the collapse of the causeway, the accidents, and the deaths and injuries of the Claimants.

16.    Once it is determined that a vessel owner is not entitled to exoneration, the Court must then determine whether the vessel owner is entitled to limit its liability under the Limitation of Liability Act. 46 USC §183(a). This is a two step process. First, the Court must consider what acts of negligence or conditions of unseaworthiness caused the allision. Second, the Court must address whether the ship owner had privity or knowledge of the acts or conditions that caused the allision. *In re the Complaint of Hercules Carriers*, 768 F.2d 1558, 1563 (11th Cir. 1985). Once the claimant meets its initial burden of proving negligence or unseaworthiness, the burden of proof shifts to the shipowner to prove lack of privity or knowledge. *Hercules Carriers*, 768 F.2d at 1564.

17.   Privity or knowledge, for purposes of the Petitioner's burden of showing lack of
      privity and knowledge, means "personal participation of the owner in some
      fault, or act of negligence, causing or contributing to the loss, or some personal
      knowledge, of which the owner is bound to avail itself of a contemplated loss, or
      conditions likely to produce or contribute to the loss, without adopting
      appropriate means to prevent it." *Petition of M/V Sunshine, II*, 808 F.2d 762, 763-
      64 (11th Cir. 1987).

18.   The burden of proving lack of privity or knowledge "is not met by simply
      proving lack of actual knowledge, for privity and knowledge is established
      where the means of obtaining knowledge exist, or where reasonable inspection
      would have led to the requisity knowledge." *American Dredging Co. v. Lambert*,
      81 F.3d 127, 130 (11th Cir. 1996).  Thus, knowledge exists where the owner could
      have known the information by reasonably inquiry or inspection. *Id.*

19.   "When the shipowner is a corporation, privity or knowledge means the privity
      or knowledge of a managing agent, officer, or supervisory employee." *American
      Dredging Co. v. Lambert*, 81 F.3d 127, 130 (11th Cir. 1996); *Hercules Carriers*, 768 F.2d
      at 1574.

20.   Under maritime law, the owner of a vessel can be held liable for negligence in
      selecting or continuing to use an independent contractor.  *In re the Matter of
      Central Gulf Lines, Inc.*, 176 F.Supp.2d 599, 622 (E.D. La. 2001); *Barbetta v. S/S
      Bermuda Star*, 848 F.2d 1364 (5th Cir. 1988); *Becker v. Poling Transp. Corp.*, 356 F.3d
      381, 389 (2nd Cir. 2004); Restatement (Second) of Torts, §411.

21.   An employer of an independent contractor is subject to liability for physical
      harm to third persons caused by his failure to exercise reasonable care to employ

a competent and careful contractor (a) to do work which will involve a risk of physical harm unless it is skillfully and carefully done; or (b) to perform any duty which the employer owes to third persons. Restatement (Second) of Torts, §411.

22.    Under maritime law, the owner of a vessel can be held liable for negligently entrusting its vessel. *Joyce v. Joyce*, 975 F.2d 379, 384 (7th Cir. 1992) (applying the Restatement (Second) of Torts §390, negligent entrustment, to a tort claim and holding that if the shipowner knows enough for a finding of negligent entrustment it knows too much for a limitation of liability); *Churchill v. F/V FJORD*, 892 F.2d 763, 771 (9th Cir. 1988) (applying the doctrine of negligent entrustment from Restatement (Second) of Torts §390, as well as negligent hiring, to a maritime case); *Favorito v. Pannell*, 27 F.3d 716, 720 (1st Cir. 1994) (applying §390 to a maritime action); Restatement (Second) of Torts §390.

23.    ACBL had a duty to not supply its chattel (i.e., its barges) for the use by one it knew, or should have known, because of youth, inexperience, or otherwise, would likely use it in a manner involving unreasonable risk of physical harm to those whom ACBL should expect to share in or be endangered by its use. Restatement (Second) of Torts §390.

24.    A reasonably prudent barge owner in the situation of ACBL would have written policies and procedures for hiring contract towers that will allow them to make a reasoned decision whether the tower can provide the services with an acceptable level of safety (i.e., whether the tower is both competent and careful).

18

25.   ACBL has failed to act as a reasonably prudent barge owner under similar circumstances because it does not have any policies and procedures for evaluating the competence, care, and safety of contract towers.

26.   ACBL failed to meet its standard of care as a reasonably prudent barge owner, when it failed to even attempt to contact other barge owners to inquire about their experience with Brown Water's competence, care, and safety.

27.   Because ACBL failed to contact local mariners to inquire into the reputation of Brown Water, it did not have pertinent information necessary to make an informed decision whether Brown Water had the competence, care, and safety necessary to be a contract tower of ACBL's barges.

28.   The fact that Brown Water was exaggerating its vessel's capabilities so that it was pushing more barges than it should have been was a cause of this allision. The fact that Brown Water would exaggerate its vessel's capabilities raises a question of whether Brown Water was a competent, careful, and safe contract tower. ACBL breached its standard of care by hiring Brown Water under these circumstances to tow its barges on the ICW.

29.   ACBL's subjective standards, which allow it to still find "no basis" to question the competence of Brown Water after this allision and allow it to believe Brown Water has provided services "without any major incidents," are not the objective standards of a reasonably prudent barge owner. In fact, the subjective standards of ACBL demonstrate a complete lack of regard to whether a contract tower is providing a service with competence, care, and safety.

30.   The same problems that ACBL knew, or should have known, about Brown Water were the same things that caused this occurrence.

31. One of the factors that indicated Brown Water's lack of competence, care, and safety was its history of reportable marine casualties. These reportable marine casualties were incidents that involved losses of property and/or personal injury. Although all of the casualties might not have involved allisions with bridges, there is evidence that Brown Water was involved in incidents with towing barges that resulted in loss of property and personal injury. It is not necessary that Brown Water have been involved in a reportable marine casualty just like this allision for the foreseeability of personal injury to arise. *Consolidated Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 68 (5th Cir. 1987) (foreseeability of injury does not require that the defendant could foresee the exact injury that occurred, but rather, that it be able to foresee an injury to this class of persons).

32. Another factor that indicated Brown Water's lack of competence, care, and safety was its reputation among local mariners for hiring inexperienced crewmembers and crewmembers that had a history of problems. This allision was caused by a new employee to Brown Water who had little experience navigating in this area of the ICW. Captain Fowler had navigated through this area of the ICW only three or four times and never with four loaded barges and never at night. He expressly told Brown Water that he did not feel comfortable navigating this area. His inexperience in the area is a cause of the accident, as he was not accustomed to the strong currents in that area, and once he lost control of the barges, did not have enough experience to know where he could have intentionally grounded his vessel without striking the causeway.

33. The fact that Brown Water failed to keep a current copy of the Notice to Mariners and failed to properly utilize its charts is relevant to this allision, because Fowler

20

contends he lost control of the barges because of a sand bar. The location of submerged obstacles, such as sand bars, are annotated onto charts through experience, and can be the subject of Notice to Mariners. Captain Folwer also testified that he did not know the buoys were located outside the channel at this area (which he would have known if he had been looking at the maps and charts), which was causally related to his losing control of the barges. Consequently, evidence that the BROWN WATER V did not have current copies of Notice to Mariners and had not been utilizing the charts, is related to the reason Fowler initially lost control of the barges.

34.    Under the maritime doctrine of the *Pennsylvania* Rule, Claimants are entitled to a presumption that the violation was a cause of the allision unless there is proof not only that the violation was not one of the contributory causes but that it could not have been a cause. *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 136, 1998 AMC 1506, 1512 (1873). The Notice to Mariners requirement is part of the U.S. Coast Guard's Navigation Safety Regulations, which are by definition regulations intended to allow safe navigation in the area, to prevent colliding with objects. 33 C.F.R. §164.72(b).

35.    Another factor that indicated Brown Water's lack of competence, care, or safety involved its underutilitzation and misrepresentation of horsepower. At the time of the allision, the BROWN WATER V had less than 800 horsepower, yet was towing four barges. Consequently, even though the BROWN WATER V was pushing four barges in less than ideal conditions, it was in violation of ACBL's rule of at least 200 horsepower per barge in ideal conditions and was operating unsafely. According to Captain Fowler, he did not have enough horsepower to

regain control over the barges once the current grabbed them. Further, Commander John Deck III, a retired Coast Guard Officer, with expertise in tow power, testified that if the BROWN WATER V had been capable of 800 horsepower at the time of the incident, Fowler could have stopped the barges from collapsing the causeway or at least could have slowed the barges enough so that it would have facilitated an intentional grounding, so that the allision would not have occurred. There is a causal relationship between the lack of horsepower of the BROWN WATER V (an issue a reasonably prudent barge owner would have known before hiring Brown Water) and the allision with the causeway.

36.

37. Non-seamen who are killed or injured in an accident in state territorial waters may supplement their damage claims under general maritime law with applicable state law. *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 215 (1996).

38. The Claimants, who are all non-seamen killed or injured in Texas territorial waters, are entitled to the elements of damages allowed under Texas law. *Yamaha Motor Corp.*, 516 U.S. at 215.

39. Under Texas law, wrongful death beneficiaries are entitled to damages, if any, for pecuniary loss sustained in the past and that, in reasonable probability, will be sustained in the future; loss of companionship and society sustained in the past and that, in reasonable probability, will be sustained in the future; and mental anguish sustained in the past and that, in reasonable probability, will be sustained in the future. Tex. Civ. Prac. & Rem. Code 71.001-71.012; Texas Pattern Jury Charge 9.2-9.5.

40.   Under Texas law, pecuniary loss means the loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value that the parent, spouse, or child, in reasonable probability, would have received from the deceased had he or she lived.  Texas Pattern Jury Charge 9.2-9.5.

41.   Under Texas law, loss of companionship and society means the loss of positive benefits flowing from the love, comfort, companionship, and society that the parent, spouse, or child, in reasonable probability, would have received from the deceased had he or she lived.  Texas Pattern Jury Charge 9.2-9.5.

42.   Under Texas law, mental anguish means the emotional pain, torment, and suffering experienced by the parent, spouse, or child because of the death of the deceased.  Texas Pattern Jury Charge 9.2-9.5.

43.   Under Texas law, estates asserting survival claims are entitled to damages, if any, for pain and mental anguish, meaning the conscious physical pain and emotional pain, torment, and suffering experienced by the deceased before his or her death as a result of the occurrence in question, reasonable expenses for the necessary medical and hospital care received by the deceased for treatment of injuries sustained by him or her as a result of the occurrence in question, and funeral and burial expenses incurred because of the occurrence in question.  Tex. Civ. Prac. & Rem. Code 71.021-71.022; Texas Pattern Jury Charge 10.2.

44.   Under Texas law, personal injury victims are entitled to damages, if any, for physical pain and mental anguish sustained in the past and that, in reasonable probability, will be sustained in the future; loss of earning capacity sustained in the past and that, in reasonable probability, will be sustained in the future;

23

disfigurement sustained in the past and that, in reasonable probability, will be sustained in the future; physical impairment sustained in the past and that, in reasonable probability, will be sustained in the future; and medical care expenses sustained in the past and that, in reasonable probability, will be sustained in the future as a result of the occurrence in question. Texas Pattern Jury Charge 8.2.

45.   Under Texas law, property damage victims are entitled to the difference in market value in the county where the accident occurred immediately before and immediately after the occurrence, where market value means the amount that would be paid in cash by a willing buyer who desires to buy, but is not required to buy, to a willing seller who desires to sell, but is under no necessity of selling. Texas Pattern Jury Charge 11.2.

46.   The State of Texas is not a settling party and its responsibility, if any, should not be allocated by the fact finder.

Respectfully submitted,

Ray R. Marchan
State Bar No.: 12969050
Federal ID No.: 9522
Mikal Watts
State Bar No.: 20981820
Federal ID No.: 12419
1926 E. Elizabeth
Brownsville, TX 78520
Phone: 956.544.0500
Fax:  956.541.0255
*Attorneys for Claimants Lydia Zamora, Individually and as Representative of the Estate of Hector Martinez, Jr., Gustavo Morales, Bigo's International, L.L.C.; Jacqueline Paddock, Individually and as Representative of the Estate of Chelsea Welch and as Next Friend of William B. Welch and Bridgette Goza*

24

\* *Richard L. Harrell* w/perm.

Richard Leo Harrell
Attorney-in-Charge
State Bar No.: 09041320
Federal ID No.: 12325
802 N. Carancahua, Suite 1400
P. O. Box 480
Corpus Christi, TX 78403-0480
Phone: 361.698.7600
Fax:    361.698.7614
*Attorney for Claimant William Eugene*
*Kimbrell, Individually as Surviving Father*
*of Chealsa Welch, Deceased*

*Eddie Medrano w/perm.*

Heriberto "Eddie" Medrano
State Bar No.: 13897800
Federal ID No.: 5952
Law Offices of Heriberto "Eddie" Medrano
2009 East Harrison, Ste. B
Harlingen, TX 78550
Phone: 956.428.2412
Fax:    956.428.2495
*Attorney for Claimant Anita Harris, Individually, as Next Friend of Victor Justin Harris and as Representative of the Estate of Robert V. Harris*


*John D. Franz w/perm.*

John David Franz
State Bar No.: 07389200
Federal ID No.: 1190
400 North McColl
McAllen, TX 78501
Phone: 956.686.3300
Fax:    956.686.3578
*Attorney for Claimants Esteban Rivas and Miriam Rivas, Individually and as Representatives of the Estate of Stvan F. Rivas*


*S- Mark Strawn w/perm*

S. Mark Strawn
State Bar No.: 19374325
Federal ID No.: 9996
Thomas R. Ajamie
State Bar No. 00952400
Federal I.D. No. 6165
Pennzoil Place – South Tower
711 Louisiana, Suite 2150
Houston, TX 77002
Phone: 713.860.1600
Fax:    713.860.1699
*Attorneys for Claimants J. Antonio Mireles, as Personal Representative of the Estate of Julio Cesar Mireles, Juan Antonio Mireles and Soledad Gonzales Mireles*

26

\* _Juan A. Megallanes_ w/pem.

Juan A. Magallanes
State Bar No.: 12879500
Federal ID No.: 2258
Carlos Escobar
State Bar No.: 24025351
1713 Boca Chita
P.O. Box 4901
Brownsville, TX 78520
Phone: 956.544.6571
Fax: 956.544.4290
*Attorney for Laguna Madre Water District of Port Isabel*

\* _Pamela St. John_ w/penn.

Pamela St. John
State Bar No.: 01918090
Legal Department
175 East Houston, 14th Floor
San Antonio, TX 78205
Phone: 210.351.3495
Fax: 210.351.3458
*Attorney for Southwestern Bell Telephone Company*

\* _Raymond L. Thomas_ w/pem.

Raymond L. Thomas
State Bar No.: 19865350
Federal ID No.: 10715
Rebecca Vela
State Bar No.: 24008207
Federal ID No.: 23179
Kittleman, Thomas, Ramirez & Gonzalez
4900-B North Tenth Street, Suite 204
McAllen, TX 78504-1416
Phone: 956.686.8797
Fax: 956.630.5199
*Attorney for Rene Mata and Frank Mata*

\* *Jim Hart w/perm*

Jim Hart
State Bar No.: 09147400
Federal ID No.: 14548
Williams Bailey Law Firm, L.L.P.
8441 Gulf Freeway, Ste. 600
Houston, TX 77017-5001
Phone: 713.230.2312
Fax:    713.643.6226
*Attorney for Hector Martinez, Sr.*

\* *Julian Rodriguez, Jr.*

Julian Rodriguez, Jr.
State Bar No.: 17146770
Federal ID No.: 15112
Julian Rodriguez, Jr. & Associates, P.C.
10113 N. 10th Street, Ste. C
McAllen, TX 78504
Phone: 956.287.0088
Fax:    956.287.0098
*Attorney for Raquel Teran Hinojosa, Individually*
*and on behalf of the Estate of Gaspar Hinojosa;*
*Clarissa Hinojosa, Omar Hinojosa, Gaspar*
*Hinojosa, III, each individually; Claimants Martin*
*D. Hinojosa and Rita S. Hinojosa, Individually and*
*as Heirs of the Estate of Gaspar Hinojosa*

\* *Steve Q. McManus w/perm*

Steve Q. McManus
State Bar No.: 13784700
Federal ID No.: 5889
William Q. McManus
State Bar No. 24008619
Law Office of McManus & Crane, L.L.P.
209 West Juan Linn
P.O. Box 2206
Victoria, TX 77902-2206
Phone: 361.575.6764
Fax:    361.575.8454
*Attorneys for Claimants Ricky Leavell and Carol*
*Leavell, Individually and as Representatives of the*
*Estate of Robin Faye Leavell*

28

\* _Frank Enriquez_ w/perm.
Frank Enriquez
State Bar No.: 06630500
Federal ID No.: 3734
Robert Puente
4200-B North Bicentennial
McAllen, TX 78504
Phone: 956.686.5291
Fax:    956.618.5064
_Attorney for Claimants Roberto Espericueta, Albert Leroy Moya, Rolando Lee Moya and Antonio Salinas, Jr._

\* _James B. Manley_ w/perm.
James B. Manley
State Bar No.: 12915000
Federal ID No.: 3286
200 William Barnett
Cleveland, TX 77327
Phone: 281.593.1100
Fax:    281.593.1700
_Attorney for Claimant William Morris Welch_

\*    SIGNED BY PERMISSION

29

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Claimants' Response to Motion for Summary Judgment of American Commercial Barge Line LLC has been served upon all Petitioners' Counsel by certified mail, return receipt requested and on all other counsel of record, by regular US mail on the 2nd day of February, 2005.

Ray R. Marchan

## CERTIFIED MAIL RETURN RECEIPT REQUESTED

Glen Goodier, Esq.
JONES, WALKER, WAECHTER, POITEVENT,
CARRERE & DENEGRE, L.L.P.
201 St. Charles Ave., 48th Floor
New Orleans, LA 70170-5100
CM/RRR # 7004 2510 0000 8913 8688

Leslie D. Cassidy, III, Esq.
WOOLSEY & CASSIDY
500 N. Water Street, Ste. 1020
Corpus Christi, Texas 78471
CM/RRR # 7004 2510 0000 8913 8695

## REGULAR MAIL

Heriberto "Eddie" Medrano, Esq.
LAW OFFICES OF HERIBERTO MEDRANO
2009 East Harrison, Ste. B
Harlingen, Texas 78550

Thomas E. Quirk, Esq.
AARON & QUIRK
901 NE Loop 410, Ste. 903
San Antonio, Texas 78209-1307

Mark J. Spansel, Esq.
ADAMS & REESE, L.L.P.
4500 One Shell Square
New Orleans, LA 70139

Ray R. Marchan, Esq.
WATTS LAW FIRM, L.L.P.
1926 E. Elizabeth
Brownsville, Texas 78520

James B. Manley, Esq.
ATTORNEY AT LAW
200 William Barnett
Cleveland, Texas 77327

J. Chad Guantt, Esq.
GUANTT & KRUPPSTADT, L.L.P.
1400 Woodloch, Ste. 575
The Woodlands, Texas 77380

30

John David Franz, Esq.
THE LAW OFFICES OF JOHN DAVID FRANZ
400 N. McColl
McAllen, Texas 78501

Pamela St. John, Esq.
SBC TEXAS LEGAL
175 E. Houston, 4th Floor
San Antonio, Texas 78205

J.A. Magallanes, Esq.
Carlos Escobar, Esq.
MAGALLANES, HINOJOSA & MANCIAS, PC
1713 Boca Chica Blvd.
P.O. Box 4901
Brownsville, Texas 78520

Thomas R. Ajamie, Esq.
S. Mark Strawn, Esq.
SCHIRRMEISTER AJAMIE, L.L.P.
711 Louisiana Street, Ste. 2150
Houston, Texas 77002

Frank Enriquez, Esq.
Robert Puente, Esq.
LAW OFFICES OF FRANK ENRIQUEZ
4200-B North Bicentennial
McAllen, Texas 78504

Julian Rodriguez, Jr., Esq.
JULIAN RODRIGUEZ, JR. & ASSOC., P.C.
10113 N. 10th Street, Ste. "C"
McAllen, Texas 78504

William Q. McManus, Esq.
Steve Q. McManus, Esq.
LAW OFFICE OF MCMANUS
     & CRANE, L.L.P.
209 West Juan Linn
P.O. Box 2206
Victoria, Texas 77902-2206

Raymond Thomas, Esq.
Andres Gonzales, Esq.
KITTLEMAN, THOMAS, RAMIREZ
     & GONZALES
4900-B N. 10th Street
McAllen, Texas 78504

Jack F. Gilbert, Esq.
Michael Ratliff, Esq.
OFFICE OF THE ATTORNEY GENERAL
TRANSPORTATION DIVISION
P.O. Box 12548
Austin, Texas 78714-2548

Jim S. Hart, Esq.
Nejd Yaziji, Esq.
WILLIAMS BAILEY LAW FIRM, L.L.P.
8441 Gulf Freeway, Ste. 600
Houston, Texas 77017

Veronica Farias, Esq.
LAW OFFICE OF VERONICA FArias
2854 Boca Chica
Brownsville, Texas 78521

Dino Esparza
WILLETTE & GUERRA, L.L.P.
1534 East 6th Street, Suite 200
Brownsville, Texas 78520

David H. Crago
BRIN & BRIN, P.C.
1202 Third Street
Corpus Christi, Texas 78404

Will W. Pierson, Esq.
Keith Uhles, Esq.
James Hunter, Esq.
ROYSTON, RAYZOR, VICKERY
& WILLIAMS, L.L.P.
1700 Wilson Plaza West
606 N. Carancahua
Corpus Christi, Texas