1.    Several days prior to September 15, 2001, Hoessle, ACBL's dispatcher located at ACBL's headquarters in Indiana, arranged with Brown Water's dispatcher, Chad Chapman, located in Brown Water's Rockport office, to tow three ACBL barges, by verbal towage contract, west from Houston toward Brownsville. Brown Water decided to use the BROWN WATER V to tow those three barges.

2.    One of those three barges, the VLB-9173, was loaded with phosphate and was to be towed to Harlingen, which is east of Brownsville and east of the Queen Isabella Causeway. The other two barges were to be delivered to Brownsville.

3.    Hoessle later offered the NM-315, VLB-9182 and ACL-9993B to Brown Water for towage.

4.    The above three barges were located in Brownsville and were to be loaded with steel coils in Brownsville by ACBL's customer and then towed to Houston.

5.    The exact time the above three barges would complete loading and be ready for towage to Houston was unknown at the time Brown Water agreed to tow the barges.

6.    Brown Water agreed to tow the above three barges east from Brownsville to Houston once loading was complete.

7.    Brown Water, at some point, assigned the BROWN WATER V to tow the NM-315, VLB-9182 and ACL-9993B from Brownsville to Houston once the BROWN WATER V dropped the westbound VLB-9173 in Harlingen and delivered the two other west bound barges to Brownsville.

8.    Brown Water also had the BROWN WATER VIII, a 1000 horsepower tug, which was in route to Brownsville on September 14, 2001, available to tow the barges from Brownsville to Houston but chose to use the BROWN WATER V.

9.    The BROWN WATER V developed mechanical problems as it approached Harlingen on the morning of September 14, 2001.

10.    The BROWN WATER V's master, Captain Wilson, decided to bypass Harlingen and go to Brownsville for repairs, keeping the VLB-9173 in tow instead of dropping the barge at Harlingen.

11.    Brown Water alone decided not to drop the VLB-9173 in Harlingen.

12.    ACBL was not notified of this decision or of the mechanical problem with the BROWN WATER V.

13.    There are no Coast Guard regulations as to horsepower requirements for barge towage in the ICW.

14.    The BROWN WATER V is advertised by Brown Water as having 800 horsepower.

15.    After repairs were made, the BROWN WATER V got underway from Brownsville at about 9:10 p.m. on September 14, 2001 with Captain Wilson in control.

16.    Captain Wilson made the decision to tow the VLB-9173, NM-315, VLB-9182 and ACL-9993B from Brownsville to Harlingen and that the four barges were to be placed in a single string with the towboat pushing from behind. The barges were wired together by the tug's crew.

17.    No one from ACBL was present in Brownsville, or on the tug or tow at any relevant time.

18.    ACBL was unaware that the VLB-9173 had not been dropped at Harlingen, did not know when its 3 barges would be picked up by Brown Water in Brownsville and was not aware that the BROWN WATER V was preceding east with the four barge tow at the time of the accident.

19.    At the time of the accident, the BROWN WATER V had two operators onboard, Fowler

and Wilson, who were employees of Brown Water and who held the proper Coast Guard licenses.

20.   Fowler and Wilson stood two 6-hour watches per day.

21.   At the time of the Accident, the BROWN WATER V was being operated by Fowler, who held the proper Coast Guard license.

22.   Prior to obtaining his license, Fowler had to undergo training, demonstrate to the Coast Guard years of experience on towboats and was then tested by the Coast Guard.

23.   Fowler had twelve years of experience as a licensed captain at the time of the accident and had previously navigated the waters in question several times while working for Brown Water and others.

24.   Prior to this collision, Fowler had never had his license suspended or revoked and at the time of the accident was in good standing with the Coast Guard.

25.   Fowler came on watch the evening of September 14, 2001 at about 11:45 p.m. to relieve Wilson.

26.   At the time Fowler came on watch, the BROWN WATER V was about 5 miles from the Long Island Swing Bridge.

27.   As was the custom, Wilson and Fowler had a discussion at the change of watch.

28.   Despite the fact that Wilson had checked the weather on the vessel's VHF radio by listening to the NOAA weather report before departing Brownsville, Wilson did not tell Fowler about the tropical depression in the Gulf and the predicted strong flood tides in the area of the accident.

29.   Fowler did not check the weather or tide conditions in the area of the Accident before or after he came on watch.

30.   Fowler did not contact the Long Island Swing Bridge to inquire about weather or tidal conditions.

31.   The fault and/or negligence and/or unseaworthiness of the tug BROWN WATER V and/or Brown Water and/or its employees.

32.   The negligence, if any, of any party and whether such alleged negligence was the proximate cause of the collision or of any damages resulting therefrom.

33.   Acts of independent and/or intervening negligence and whether they supersede the negligence, if any, of any party.

34.   Damages and/or injuries claimed by Claimants and/or proper damage elements comprising any recovery and the cause and extent thereof.

35.   Whether Claimants can sustain their burden of proof.

36.   Whether any alleged negligence and/or unseaworthiness was causally related to the collision and was within the privity or knowledge of any Petitioner.

37.   Whether ACBL is free from fault and entitled to exoneration from liability and/or alternatively limitation of liability

38.   Allocation of fault, if any.

39.   Damage mitigation and/or failure to mitigate damages.

37.   ACBL's four barges were seaworthy and did not cause or contribute to the allision.

38.   On September 15, 2001, the tow of the tug M/V BROWN WATER V consisted of four dumb, unmanned steel barges, namely, NM-315, VLB-9182, ACL-9933B, and VLB-9173, each of which had no motive power of its own.

39.   American Commercial Barge Line LLC was and is a separate and distinct corporation from American Commercial Lines LLC ("ACL").

40.    There was no written contract between Brown Water and ACBL for the towage at issue and the barges were being towed at law.

41.    At all material times, ACBL's four barges were under the sole care, custody and control of Brown Water and were seaworthy in all respects.

42.    There was no relationship between ACBL and Brown Water other than that of principal and independent contractor.

43.    ACBL never exercised operational control over Brown Water.

44.    Brown Water controlled and decided all aspects of the towage of ACBL's barges, including selecting the particular tug to be used to tow the barges, the crewing of the tug, the number of barges to be taken by the tug and their configuration, the building of the tow, when, where and how the barges were to be towed, and the navigation of the tug and tow.

45.    ACL, Deere Credit Inc. (formerly Senstar Finance Company), State Street Bank and Trust Company of Connecticut, National Association, and General Electric Capital Corporation had no contract or dealings with Brown Water and their exoneration is not opposed.

46.    Barges NM-315, VLB-9182, ACL-9933B, and VLB-9173 did not cause the collision with the Queen Isabella Causeway which is the subject of these proceedings.

47.    No employees agents or representatives of ACL, ACBL, Deere Credit, Inc., State Street Bank and Trust Company of Connecticut, National Association, and General Electric Capital Credit Corporation were aboard the tug BROWN WATER V and/or its tow on September 15, 2001.

**Cameron County's Contested Issues of Fact**

49477>3026513                                    42

1.   Whether Third-Party Defendant Cameron County was responsible for maintaining the street lights on the Queen Isabella Causeway;

2.   Whether Third-Party Defendant Cameron County was negligent in the maintenance and/or operation of the street lights on the Queen Isabella Causeway;

3.   Whether the street lights on the Queen Isabella Causeway caused or contributed to the allision between a barge being towed by Petitioner Brown Water and the Queen Isabella Causeway;

4.   Whether the street lights on the Queen Isabella Causeway caused or contributed to the several subsequent deaths and personal injuries that occurred as a result of the collapse of the Queen Isabella Causeway that was caused by the allision;

5.   Whether the allision was caused by the sole, joint, and/or concurrent negligence and fault of the Petitioners, their officers, agents, servants, employees, masters and crews, and by the unseaworthiness of the Petitioners' vessels, and whether such negligence and fault was within the privity and knowledge of the owners and management of Petitioners;

6.   Whether the Petitioners are entitled to exoneration from liability and/or alternatively limitation of liability.

7.   The State of Texas is responsible for maintaining the navigational lighting system on the Queen Isabella Causeway.

8.   The street lights on the Queen Isabella Causeway are not used as navigational aids in navigating a vessel through the channel and Queen Isabella Causeway.

9.   Petitioners have plead a cause of action for negligence based on the allegation that the street lights on the Queen Isabella Causeway were not working at the time of

the allision.

8.    **AGREED PROPOSITIONS OF LAW:**

1.    This Court has jurisdiction of the parties, and the subject matter is within its admiralty jurisdiction.  46 USC §183 *et seq.*

2.    Brown Water and ACBL have complied with the procedural requirements of the Limitation of Liability Act (46 USC §183 et seq.), so that this Court has jurisdiction to determine whether they are entitled to exoneration from liability or, in the alternative, limitation of their liability.

3.    Under the *Pennsylvania* Rule, if a vessel involved in an allision was in violation of a statutory or regulatory rule intended to prevent collisions or allisions, the burden shifts to the violating vessel to show that its statutory fault was not a contributing cause of the accident.  *The Pennsylvania*, 86 U.S. 125, 136 (1873); *Florida East Coast Ry Co. v. Revilo Corp.*, 637 F.2d 1060, 1065 (5th Cir. 1981).  The *Pennsylvania* Rule applies if the following are proven: (1) proof by a preponderance of the evidence of a violation of a statute or regulation that imposes a mandatory duty; (2) the statute or regulation must involve marine safety or navigation; and (3) the injury suffered must be of a nature that the statute or regulation was intended to prevent.  *Union Pacific R.R. Co. v. Kirby Inland Marine, Inc.*, 296 F.3d 671, 674 (8th Cir. 2002).  The Pennsylvania Rule may be overcome by showing another party is solely responsible for the accident and the violation was not a contributing cause.

9.    **CONTESTED PROPOSITIONS OF LAW:**

**The Claimants' contested propositions of law:**

1.   To succeed on the issue of exoneration, the moving party must show it is free from fault or negligence in the allision.

2.   When a moving vessel allides with a fixed object that is properly marked, there is a presumption that the moving vessel is at fault. *The Oregon*, 158 U.S. 186, 197 (1895). This presumption makes a prima facie case of negligence against the moving vessel. *Brown & Root Marine Operators, Inc. v. Zapata Off-Shore Co.*, 377 F.2d 724, 726 (5th Cir. 1967). To overcome this presumption, the moving vessel must meet the heavy burden of proving (1) it was without fault (i.e., it used all reasonable care to avoid the collision); (2) the stationary object was at fault; or (3) the allision was the result of an inevitable accident. *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 795 (5th Cir. 1977). The presumption applies not only to the moving vessel, but to all parties involved in the management of the vessel. *Bunge Corp. v. Freeport Marine Repair*, 240 F.3d 919, 923 (11th Cir. 2001).

3.   "Under the *Pennsylvania* rule, the violator of a statutory rule intended to prevent alllisions has the burden of proving not only that its transgressions were not a contributing cause of the allision, but that they could not have been a cause of the allision." Floriday East Coast Ry Co. v. Revilo Corp., 637 F.2d 1060, 1065 (5th Cir. 1981).

4.   The Pennsylvania Rule applies equally to violations of statutes and regulations. T. Schoenbaum, *Admiraly & Maritime Law*, (4th ed.) 14-3, vol. II at 102.

5.   Unseaworthiness can be demonstrated by showing insufficient manning of the vessel, an inadequately trained crew, improper maintenance of equipment, and other related failures that make the vessel ill-suited for its duties at sea. *Hercules Carriers*, 768 F.2d at 1566.

6.    Once it is determined that a vessel owner is not entitled to exoneration, the Court must then determine whether the vessel owner is entitled to limit its liability under the Limitation of Liability Act. 46 USC §183(a). This is a two step process. First, the Court must consider what acts of negligence or conditions of unseaworthiness caused the allision. Second, the Court must address whether the ship owner had privity or knowledge of the acts or conditions that caused the allision. *In re the Complaint of Hercules Carriers*, 768 F.2d 1558, 1563 (11th Cir. 1985). Once the claimant meets its initial burden of proving negligence or unseaworthiness, the burden of proof shifts to the shipowner to prove lack of privity or knowledge. *Hercules Carriers*, 768 F.2d at 1564.

7.    Privity or knowledge, for purposes of the Petitioner's burden of showing lack of privity and knowledge, means "personal participation of the owner in some fault, or act of negligence, causing or contributing to the loss, or some personal knowledge, of which the owner is bound to avail itself of a contemplated loss, or conditions likely to produce or contribute to the loss, without adopting appropriate means to prevent it." *Petition of M/V Sunshine, II*, 808 F.2d 762, 763-64 (11th Cir. 1987).

8.    The burden of proving lack of privity or knowledge "is not met by simply proving lack of actual knowledge, for privity and knowledge is established where the means of obtaining knowledge exist, or where reasonable inspection would have led to the requisity knowledge." *American Dredging Co. v. Lambert*, 81 F.3d 127, 130 (11th Cir. 1996). Thus, knowledge exists where the owner could have known the information by reasonably inquiry or inspection. *Id.*

49477>3026513                                          46

9.  "When the shipowner is a corporation, privity or knowledge means the privity or knowledge of a managing agent, officer, or supervisory employee." *American Dredging Co. v. Lambert*, 81 F.3d 127, 130 (11th Cir. 1996); *Hercules Carriers*, 768 F.2d at 1574.

10. Under Texas law, wrongful death beneficiaries are entitled to damages, if any, for pecuniary loss sustained in the past and that, in reasonable probability, will be sustained in the future; loss of companionship and society sustained in the past and that, in reasonable probability, will be sustained in the future; and mental anguish sustained in the past and that, in reasonable probability, will be sustained in the future. Tex. Civ. Prac. & Rem. Code 71.001-71.012; Texas Pattern Jury Charge 9.2-9.5.

11. Under Texas law, pecuniary loss means the loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value that the parent, spouse, or child, in reasonable probability, would have received from the deceased had he or she lived. Texas Pattern Jury Charge 9.2-9.5.

12. Under Texas law, loss of companionship and society means the loss of positive benefits flowing from the love, comfort, companionship, and society that the parent, spouse, or child, in reasonable probability, would have received from the deceased had he or she lived. Texas Pattern Jury Charge 9.2-9.5.

13. Under Texas law, mental anguish means the emotional pain, torment, and suffering experienced by the parent, spouse, or child because of the death of the deceased. Texas Pattern Jury Charge 9.2-9.5.

14. Under Texas law, estates asserting survival claims are entitled to damages, if any, for pain and mental anguish, meaning the conscious physical pain and emotional pain, torment, and suffering experienced by the deceased before his or her death as a result of

the occurrence in question, reasonable expenses for the necessary medical and hospital care received by the deceased for treatment of injuries sustained by him or her as a result of the occurrence in question, and funeral and burial expenses incurred because of the occurrence in question. Tex. Civ. Prac. & Rem. Code 71.021-71.022; Texas Pattern Jury Charge 10.2.

15.    Under Texas law, personal injury victims are entitled to damages, if any, for physical pain and mental anguish sustained in the past and that, in reasonable probability, will be sustained in the future; loss of earning capacity sustained in the past and that, in reasonable probability, will be sustained in the future; disfigurement sustained in the past and that, in reasonable probability, will be sustained in the future; physical impairment sustained in the past and that, in reasonable probability, will be sustained in the future; and medical care expenses sustained in the past and that, in reasonable probability, will be sustained in the future as a result of the occurrence in question. Texas Pattern Jury Charge 8.2.

16.    Under Texas law, property damage victims are entitled to the difference in market value in the county where the accident occurred immediately before and immediately after the occurrence, where market value means the amount that would be paid in cash by a willing buyer who desires to buy, but is not required to buy, to a willing seller who desires to sell, but is under no necessity of selling. Texas Pattern Jury Charge 11.2.

17.    Under maritime law, the owner of a vessel can be held liable for negligence in selecting or continuing to use an independent contractor. *In re the Matter of Central Gulf Lines, Inc.*, 176 F.Supp.2d 599, 622 (E.D. La. 2001); *Barbetta v. S/S Bermuda Star*, 848 F.2d 1364 (5th Cir. 1988); *Becker v. Poling Transp. Corp.*, 356 F.3d 381, 389 (2nd Cir. 2004);

Restatement (Second) of Torts, §411.

18.    An employer of an independent contractor is subject to liability for physical harm to third

persons caused by his failure to exercise reasonable care to employ a competent and

careful contractor (a) to do work which will involve a risk of physical harm unless it is

skillfully and carefully done; or (b) to perform any duty which the employer owes to third

persons.  Restatement (Second) of Torts, §411.

19.    Under maritime law, the owner of a vessel can be held liable for negligently entrusting its

vessel.  *Joyce v. Joyce*, 975 F.2d 379, 384 (7th Cir. 1992) (applying the Restatement

(Second) of Torts §390, negligent entrustment, to a tort claim and holding that if the

shipowner knows enough for a finding of negligent entrustment it knows too much for a

limitation of liability); *Churchill v. F/V FJORD*, 892 F.2d 763, 771 (9th Cir. 1988)

(applying the doctrine of negligent entrustment from Restatement (Second) of Torts

§390, as well as negligent hiring, to a maritime case); *Favorito v. Pannell*, 27 F.3d 716,

720 (1st Cir. 1994) (applying §390 to a maritime action); Restatement (Second) of Torts

§390.

20.    ACBL had a duty to not supply its chattel (i.e., its barges) for the use by one it knew, or

should have known, because of youth, inexperience, or otherwise, would likely use it in a

manner involving unreasonable risk of physical harm to those whom ACBL should

expect to share in or be endangered by its use.  Restatement (Second) of Torts §390.

21.    Non-seamen who are killed or injured in an accident in state territorial waters may

supplement their damage claims under general maritime law with applicable state law.

*Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 215 (1996).

22.    The Claimants, who are all non-seamen killed or injured in Texas territorial waters, are

entitled to the elements of damages allowed under Texas law. *Yamaha Motor Corp.*, 516 U.S. at 215.

23.    The State of Texas is not a settling party and its responsibility, if any, should not be allocated by the fact finder.

**The Brown Water Petitioners' contested propositions of law:**

1.    Whether under admiralty law, a political subdivision of the state may not invoke sovereign immunity as a defense against maritime tort claims. *Connone v. Transport Desgagnes, Inc.*, 976 F.Supp. 1111, 1112 (N.D. Ohio 1996); *Principe Compania Naviera, S.A. v. Board of Commisioners*, 333 F.Supp. 353, 355-56 (E.D. La. 1971).

2.    Whether the Texas Tort Claims Act provides a waiver of state law sovereign immunity for the failure to maintain and operate lights on the Queen Isabella Causeway. *County of Cameron v. Brown*, 80 S.W.3d 549, 555 (Tex.2002).

3.    Whether each instance of an automobile driving off the causeway is a separate occurrence that gives rise to a separate damages limit for the purposes of the Texas Tort Claims Act. *See Goose Creek Consol. v. Continental Cas. Co.*, 658 S.W.2d 338 (Tex.App.1983, no writ).

4.    Whether the General Maritime Law of the United States preempts application of any claim seeking damages based upon state law, including any claims for non-pecuniary damages. *See In Re Amtrak "Sunset Limited" Train Crash in Bayou Canot Alabama on September 22, 1993*, 121 F.3d 1421, 1426-27 (11th Cir. 1997), *cert. denied*, 522 U.S. 1110 (1998); *East River SS Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864, 106 S. Ct. 2295, 2298-2299 (1986) (with admiralty jurisdiction comes application of General Maritime Law); *Miles v. Apex Marine Corp.*, 498 U.S. 19 (1990); *Scarborough v. Clemco*

*Industries*, 391 F. 3d 660, 668 (5ᵗʰ Cir. 2005) *cert. denied*, ___ U.S. ___ (2005), 125 S. Ct. 1932, 73 USLW 3514, 3629, and 3630 (2005).

5.   Whether Jacqueline Paddock can bring a claim for the death of Chealsa Welch if her parental rights were terminated. *Go International, Inc. v. Lewis*, 601 S.W.2d 495 (Tex.Civ.App. – El Paso 1980, writ ref'd n.r.e.); *In the Interest of McAda*, 780 S.W.2d 307, 312 (Tex. App. – Amarillo 1989, pet. den.); See *Transport Insurance Co. v. Faircloth*, 898 S.W. 2d 269, 275 (Tex. 1995).

6.   Whether William Welch the father of decedent Barry Welch's pleadings, support a claim for wrongful death considering William Welch's subsequent death. *Johnson v. City of Houston*, 813 S.W.2d 227, 230 (Tex. App. – Houston [14th Dist.] 1991, writ denied).

7.   Whether Martin Hinojosa's pleadings support a claim for wrongful death considering his subsequent death. *Johnson v. City of Houston*, 813 S.W.2d 227, 230 (Tex. App. – Houston [14th Dist.] 1991, writ denied).

8.   Whether the Claimants' liability experts Deck and Disler can rely upon the United States Coast Guard report to formulate their opinions. 46 U.S.C. § 6308; *Orgulf Transp. Co. v. Magnolia Marine Transp.*, 1999 U.S. Dist. LEXIS 4888 (E.D. La Apr. 9, 1999); *Conagra v. Weber Marine*, 1999 U.S. Dist. LEXIS 14221 (E.D. La. Sept. 8, 1999).

9.   Whether the Claimants Roberto Espericueta, Albert Leroy Moya, Rolando Lee Moya and Antonio Salinas, Jr. are entitled to recover damages as a matter of law.

10.  In this case there is a Petition for both limitation and exoneration. The burden of proof in an action seeking exoneration from or limitation of liability is divided. The first step of the process concerns exoneration from liability. The Court must first determine whether any acts of negligence or conditions of unseaworthiness proximately caused the

occurrence in question. If the Court so finds, it must make a second determination of whether the ship's owner had privity or knowledge of those same acts of negligence or conditions of unseaworthiness. *Keys Jest Ski, Inc. v. Kays*, 893 F.2d 1223, 1230 (11th Cir. 1990); *Farrell Lines, Inc. v. Jones*, 530 F.2d 7, 10 (5th Cir. 1976).

11.    "Privity" means fault or neglect in which the ship owner personally participates, and "knowledge" means personal cognizance or means of knowledge, of which the ship owner is bound to avail himself, of a contemplated loss or condition likely to cause loss, unless proper means are adopted to prevent it. *Matter of Texaco, Inc.*, 570 F. Supp, 1272, 1278 (E.D. La. 1983)(*citing* 3 Benedict of Admiralty section (7th ed. 1981)).

12.    The Court must without a jury decide all the issues pertaining to the exoneration or limitation of liability action.

13.    The Claimants have the initial burden of proving negligence or unseaworthiness and causation. *Bankers Trust Co. v. Bethlehem Steel Corp.*, 761 F.2d 943, 948, n.14 (3rd Cir. 1985); *In re Brasea, Inc.*, 583 F.2d 736, 738 (5th Cir. 1978). Standards of reasonableness pervade the determination of both the negligence and unseaworthiness issues. *Farrell Lines, Inc. v. Jones*, 530 F.2d 7,10, n.2 (5th Cir. 1976). A seaworthy vessel is one which is reasonably fit for its intended use. *Mithcell v. Trawler Racer, Inc.*, 362 U.S. 539, 550, 80 S.Ct. 926, 933, 4 L.Ed.2d 941 (1960). If negligence or unseaworthiness has been shown to be the cause of the occurrence in question, the burden of proof then shifts to the owner of the vessel to prove lack of privity or knowledge of those same acts or conditions which caused the injury or damage. *Coryell v. Phipps*, 317 U.S. 406, 409, 63 S. Ct. 291, 293, 87 L.Ed.2d 363 (1943); *Farrell Lines*, 530 F.2d at 7; *Coleman v. Jahncke Service, Inc.*, 341 F.2d 956, 958 (5th Cir. 1965), *cert. denied*, 382 U.S. 974, 86 S. Ct. 538, 15

L.Ed.2d 465 (1966).

**ACBL's contested propositions of law:**

1.   A vessel owner is entitled to exoneration where it is free from fault.  <u>Tittle v. Aldacosta</u>,
     544 F. 2d 752, 756 (5th Cir.), <u>reh. denied</u>, 546 F. 2d 907 (5th Cir. 1977); <u>In Re Caribbean
     Sea Transport, Ltd.</u>, 748 F. 2d 622, 626 (11th Cir.), <u>amended on other grounds</u>, 753 F. 2d
     948 (11th Cir. 1985).

2.   The owner *pro hac vice* of dumb, unmanned barges, having no motive power of their
     own, in the tow of an independent contractor's tug has no liability for a collision that
     occurs during the navigation of the barges by the tug.  <u>Agrico Chemical Co. v. M/V BEN
     W. MARTIN</u>, 664 F. 2d 85, 90 (5th Cir. 1981), <u>reh. denied</u>, 669 F. 2d 733 (5th Cir.
     1982).  <u>In Re Central Gulf Lines, Inc.</u>, 176 F.Supp. 599, 615-616 (E.D. La. 2001), <u>aff'd.</u>,
     62 Fed. Appx., 557 (Table), 2003 WL 1202793 (5th Circuit No. 01-31028, 03/03/03).

3.   "The rights of third parties against a tug and tow are adjudicated separately in accordance
     with each vessel's respective fault."  <u>In Re Central Gulf Lines, Inc.</u>, 176 F.Supp.2d at
     615.

4.   The liability of the tow and its right to exoneration and/or limitation of liability "must be
     decided independently of the liability of the tug."  <u>In Re Central Gulf Lines, Inc.</u>, 176
     F.Supp.2d at 615.

5.   Towage is defined as a service rendered by one vessel to aid the propulsion and expedite
     the movement of another vessel.  The vessel that supplies the power in such an
     arrangement is typically called the tug.  <u>Stevens v. THE WHITE CITY</u>, 285 U.S. 195,
     200, 52 S. Ct. 347, 349 (1932); T. Schoenbaum, <u>Admiralty and Maritime Law</u> at § 10-1,

p. 717 (West 4th ed. 2003).

6.      A principal who hires an independent contractor over whom it exercises no operational control is not liable for any negligence of the independent contractor. <u>See Wallace v. Oceaneering International, Inc.</u>, 727 F. 2d 427, 437 (5th Cir. 1984), and <u>Bartholomew v. CNG Producing Co.</u>, 832 F. 2d 326, 329 (5th Cir. 1987).

7.      Under the "dominant mind" doctrine, the tug is the "dominant mind" and supplies "power" to tow the unmanned, powerless barges, and is in all respects responsible for the safe navigation of the tow. The tug, and <u>not</u> the tow, is thus legally responsible for damages done by the flotilla. T. Schoenbaum, <u>Admiralty and Maritime Law</u> at § 10-6, p. 730-731 (West 4th ed. 2003).

8.      If the tug and the tow are separately owned, the negligence of the tug cannot be imputed to the tow, and there is neither *in personam* nor *in rem* liability on the part of the tow." T. Schoenbaum, <u>Admiralty and Maritime Law</u> at § 10-6, p. 731 (citing the principle of <u>Sturgis v. Boyer</u>, 65 U.S. (24 How.) 110, 16 L. Ed. 591 (1860), and <u>THE EUGENE F. MORAN</u>, 212 U.S. 466, 29 S. Ct. 339, 53 L. Ed. 600 (1909)); <u>see also</u> Parks and Cattell, <u>The Law of Tug, Tow, and Pilotage</u>, p. 24 (3d ed. 1994).

9.      "It is the duty of the towing vessel to see that the tow is properly made up and that her lines are sufficient and securely fastened. <u>The Quickstep</u>, 9 Wall. 665, 76 U.S. 665, 19 L. Ed. 767." <u>W. Horace Williams Co. v. The WAKULLA</u>, 109 F. Supp 698, 700 (E.D. La. 1953), <u>aff'd</u>, 213 F.2d 27 (5th Cir. 1954); Parks and Cattell, <u>The Law of Tug, Tow, and Pilotage</u>, pp. 133 to 136 (3d ed. 1994).

10.      The master of a tug towing an unmanned barge must know all conditions essential to the safe accomplishment of the undertaking or voyage. This knowledge includes the depth of

the water, the ordinary obstructions, the state of the tides and water levels in the channel, and the clearance of bridges to be negotiated. [citations omitted.] ... The tug master, moreover, must obtain knowledge from personal cognizance, or avail himself of the means of knowledge, of conditions likely to produce or contribute to a loss, unless appropriate means are adapted to prevent it. [citations omitted.] "[C]aptains [are] held to a standard of prudent navigation, including the knowledge they should have had." *Houma Well Service v. Capt. O'Brien*, 312 F.Supp 257, 262 (E.D. La. 1970).  Ryan Walsh Stevedoring Co. v. James Marine Service, Inc., 557 F. Supp. 457, 461 (E.D. La. 1983), aff'd, 729 F.2d 1457 (5th Cir.), cert. denied, 469 U.S. 981 (1984); see also Parks and Cattell, The Law of Tug, Tow, and Pilotage, pp. 144-157; 160-166 (3d ed. 1994).

11.    "When a tower undertakes a contract of towage the law implies that he possess sufficient skill to perform the task safely." Naviera Tabago S.A. v. Sprigg Carroll, 394 F. Supp. 1354, 1357 (S.D. Fla. 1975).  "The tower has an obligation to exercise reasonable care and skill." Id. (citing Hart v. Blakemore, 410 F.2d 218, 221 (5th Cir. 1969)).

12.    The tug owes the tow an implied warranty of workmanlike service, "[t]hat is, an implied obligation to tow properly and safely ... -- the very nature of the towing agreement necessarily implies an obligation to tow properly and safely, and competency and safety are essential elements of the towing service undertaken." Singer v. Dorr, 272 F. Supp. 931, 934 (E.D. La. 1967) (citations omitted).

13.    ACBL, as the tow, owed a duty to provide Brown Water with seaworthy barges for towage.  Kenny Marine Towing, Inc. v. M/V JOHN R. RICE, 583 F. Supp. 1196, 1198 (E.D. La. 1984).

14.    Whether ACBL was negligent in contracting with or entrusting its barges to Brown

Water. (NOTE: No court has ever applied the theory of negligent entrustment or negligent hiring to impose liability on the owner of an unmanned barge who contracts with an established independent tower.) See In Re Central Gulf Lines, Inc., 176 F.Supp.2d 599 (E.D. La. 2001), aff'd., 62 Fed. Appx. 557 (Table), 2003 WL 1202793 (5th Circuit No. 01-31028, 03/03/03);

15.   Whether the General Maritime Law of the United States preempts application of any claim seeking damages based upon state law, including any claims for non-pecuniary damages. See In Re Amtrak "Sunset Limited" Train Crash in Bayou Canot Alabama on September 22, 1993, 121 F.3d 1421, 1426-27 (11th Cir. 1997), cert. denied, 522 U.S. 1110 (1998); East River SS Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 864, 106 S. Ct. 2295, 2298-2299 (1986) (with admiralty jurisdiction comes application of General Maritime Law; Miles v. Apex Marine Corp., 498 U.S. 19 (1990); Scarborough v. Clemco Industries, 391 F.3d 660, 668 (5th Cir. 2005), cert. denied, ___ U.S. ___ (2005), 125 S.Ct. 1932, 73 USLW 3514, 3629, and 3630 (2005).

16.   The relevancy and materiality of the AWO, RCP program and whether that program constitutes a legal duty.

**Cameron County's contested propositions of law**

1.   Cameron County is entitled to assert its governmental immunity defenses and applications of the Texas Tort Claims Act.

2.   The fact that Petitioners' claims arise under federal maritime law does not preclude the applicability of the Texas Tort Claims Act.

3.   Petitioners allegations do not create a waiver of immunity under the Texas Tort Claims Act.

4.          Petitioners cannot recover directly or indirectly from Third-Party Defendant
Cameron County because the Texas Tort Claims Act and the laws of the State of
Texas do not allow any state law claims unless Cameron County's governmental
immunity has been waived, and Cameron County's governmental immunity has
not been waived.

5.          The limitation of liability and the exclusion of exemplary damages in the Texas
Tort Claims Act can be applied to an admiralty cause of action brought under
maritime law. *See Port of Houston Auth., et al. v. Guillory*, 814 S.W.2d 119, 123
(Tex.App.–Houston[1st Dist.] 1991, writ granted), *aff'd*, 845 S.W.2d 812 (Tex.
1993) (citing *Trinity River Auth. v. Williams*, 689 S.W.2d 883, 884 (Tex. 1985)).

6.   .      Third-Party Defendant Cameron County is subject to the statutory limits on
liability and damages set forth in the Texas Tort Claims Act, Chapter 101 of the
TEX. CIV. PRAC. & REM. CODE, including those set forth in §§ 101.023, 101.024,
and 101.025.

7.          Petitioners and Claimants seek damages outside the scope of the Texas Tort
Claims Act, specifically the limitation on the amount of liability set forth in TEX.
CIV. PRAC. & REM. CODE § 101.023.  For a unit of local government, such as
Cameron County, the Texas Tort Claims Act limits the amount of money
damages to a maximum of $100,000.00 for each single person and $300,000.00
for each single occurrence for bodily injury or death.

8.          Any claim for damages against Cameron County are subject to the single
occurrence limitation of damages in the amount of $300,000.00.

9.          Third-Party Defendant Cameron County is entitled to governmental immunity.

10.    Third-Party Defendant Cameron County enjoys governmental immunity from tort liability unless immunity has been waived. *See* TEX. CIV. PRAC. & REM. CODE §§ 101.001(3)(A)-(B), 101.025; *Texas Dep't of Transp. v. Able*, 35 S.W.3d 608, 611 (Tex. 2000).

11.    Under the Texas Tort Claims Act, "a governmental unit in the state is liable for: (1) property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if: (A) the property damage, personal injury or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment; and (B) the employee would be personally liable to the claiming according to Texas law; or (2) personal injury and death so caused by a condition or use of tangible personal or real property if the government unit would, were it a private person, be liable to the claimant according to Texas law." TEX. CIV. PRAC. & REM. CODE § 101.021.

12.    In order to plead a cause of action for negligence against Cameron County, the Petitioners must plead facts that waive the County's governmental immunity.

13.    "Failure to maintain and operate" do not fall within the limited waiver of the Texas Tort Claims Act. TEX. CIV. PRAC. & REM. CODE § 101.021.

14.    Any alleged damages suffered by any claimant in their individual capacity are derivative claims and subject to the statutory limitations on damages set forth in TEX. CIV. PRAC. & REM. CODE § 101.023.

15.    When a moving vessel allides with a stationary object, there is a presumption that the moving vessel is at fault. *The Oregon*, 158 U.S. 186, 197 (1895). This

presumption makes a prima facie case of negligence against the moving vessel. *Brown & Root Marine Operators, Inc. v. Zapata Off-Shore Co.*, 377 F.2d 724, 726 (5th Cir. 1967). To overcome this presumption, the moving vessel must meet the heavy burden of proving (1) it was without fault (i.e., it used all reasonable care to avoid the collision); (2) the stationary object was at fault; or (3) the allision was the result of an inevitable accident. *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 795 (5th Cir. 1977). The presumption applies not only to the moving vessel, but to all parties involved in the management of the vessel. *Bunge Corp. v. Freeport Marine Repair*, 240 F.3d 919, 923 (11th Cir. 2001).

10.   **EXHIBITS:**

The Exhibit Lists of Brown Water are attached as Exhibit "1."
The Exhibit Lists of ACBL are attached as Exhibit "2."
The Exhibit Lists of Claimants are attached as Exhibit "3."
The Exhibit Lists of Cameron County are attached as Exhibit "4."

11.   **WITNESSES:**

The Witness Lists of Brown Water are attached as Exhibit "5."
The Witness Lists of ACBL are attached as Exhibit "6."
The Witness Lists of Claimants are attached as Exhibit "7."
The Witness Lists of Cameron County are attached as Exhibit "8."

12.   **SETTLEMENT:**

The parties are still discussing settlement.

13.   **TRIAL:**

It is estimated the trial will take 20 days.

14.   **ATTACHMENTS:**

Each party has filed its proposed findings of fact, proposed conclusions of law, and/or

jury charges as separate documents.

Signed this _____ day of _____, 2005.


_____
**United States District Judge**

Approved:

_____
Mikal Watts
State Bar No.: 20981820
Federal ID No.: 12419
Ray R. Marchan
State Bar No.: 12969050
Federal ID No.: 9522
1926 E. Elizabeth
Brownsville, TX 78520
Phone: 956.544.0500
Fax: 956.541.0255
*On behalf of all Claimants*


_____
Will W. Pierson
State Bar No. 16003100
Federal I.D. 1931
Jack C. Partridge
State Bar No. 15534600
Federal I.D.10470
Christopher Lowrance
State Bar No. 00784502
Federal I.D. 15481
Royston, Rayzor, Vickery & Williams, L.L.P.
1700 Wilson Plaza West
606 N. Carancahua
Corpus Christi, Texas 78476
Phone : 361.884.8808
Fax:    361.884.7261
and
Keith N. Uhles
State Bar No. 20371100

49477>3026513

60

Federal I.D. No. 1936
Royston, Rayzor, Vickery & Williams, L.L.P.
55 Cove Circle
Brownsville, Texas 78521
Phone: 956.542.4377
Fax:    956.542.4370
*Attorneys for Petitioners, Brown Water Towing I, Inc. and Brown Water Marine Service, Inc.*
Mr. Glenn G. Goodier
Federal I.D. No. 06130
Admitted *Pro Hac Vice*
By Order Entered 4/23/02
Richard D. Bertram
*Pro Hac Vice* Pending
Jones, Walker, Waechter, Poitevent, Carrere & Denegre, L.L.P.
201 St. Charles Ave., 48th Floor
New Orleans, LA 70170-5100
Phone: 504.582.8174
Fax:    504.582.8010
and
LES CASSIDY
State Bar No. 03979270
Federal I.D. 5931
Woolsey & Cassidy, P.C.
814 Leopard Street
Corpus Christi, Texas  78401
Phone: 361.887.2969
Fax:    361.887.6251
*Attorneys for Petitioners, American Commercial Lines LLC and American Commercial Barge Line LLC, Deere Credit, Inc. (formerly Senstar Finance Company), as Owner of the Barge NM-315, State Street Bank and Trust Company of Connecticut, N.A., as Owner/Trustee of the Barge ACL-9933B and Not in Its Individual Capacity, and General Electric Capital Corporation, as Beneficial Owner of the Barge ACL-9933B*


Eileen M. Leeds, w perm.
—————————————————————
Eileen M. Leeds, Attorney-in-Charge
State Bar No. 00791093
USDC Adm. No. 16799
Heather Scott
State Bar No. 24046809
USDC Adm. No. 575294
WILLETTE & GUERRA, L.L.P.
1534 E. 6th  Street, Suite 200
Brownsville, Texas 78520

49477>3026513                                       61

(956) 541-1846 Telephone
(956) 541-1893 Facsimile
*Attorneys for Third-Party Defendant Cameron County*