**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| **IN RE THE COMPLAINT AND** | § | **CIVIL ACTION NO. B-01-157** |
| **PETITION OF BROWN WATER** | § | **Consolidated with** |
| **TOWING I, INC., ET AL.** | § | **CIVIL ACTION NO. B-02-004** |
| | § | **and** |
| | § | **CIVIL ACTION NO. B-02-125** |
| | § | |
| | § | **ADMIRALTY** |

**OPINION AND ORDER**

BE IT REMEMBERED that on June 17, 2005, the Court considered petitioner American Commercial Barge Lines, Inc.'s ("ACBL") motion for summary judgment. Dkt. No. 306.

I.      **Procedural Background**

This admiralty case concerns the allision of the lead of four barges, in tow of the BROWN WATER V, with the Queen Isabella Causeway located between Port Isabel and South Padre Island, Texas, on September 15, 2001.[1] On the same day of the allision, Brown Water Towing I, Inc., as owner and Brown Water Marine Service, Inc., as bareboat charterer (collectively "Brown Water") of the BROWN WATER V, filed a cause of Exoneration from or Limitation of Liability pursuant to the Limitation of Shipowners' Liability Act ("Limitation Act"), 46 App.U.S.C. §§ 181-89.  Dkt. No. 1.  Subsequently, on January 11, 2002, American Commercial Lines, LLC ("ACL"), as registered owner of two of the barges involved, barges

_____

[1]As will be seen *infra*, the BROWN WATER V was pushing, rather than pulling, the barges.  Accordingly, the BROWN WATER V should be referred to as a towboat instead of a tugboat.  THOMAS J. SCHOENBAUM, ADMIRALTY & MARITIME LAW § 12-1, at p.49 n.3 (4th ed. 2004) ("A tug that pushes a barge is properly called a towboat; one that pulls a barge is called a tugboat.").

1

VLB-9182 and VLB-9173, and ACBL, as bareboat charterer and owner *pro hac vice* of all four barges involved,[2] also filed a cause of Exoneration from or Limitation of Liability. Dkt. No. 1 in C.A. No. B-02-004. These two cases were subsequently consolidated on February 1, 2002. Dkt. No. 47. On June 10, 2002, Deere Credit, Inc. (formerly Senstar Finance Co.), as the registered owner of barge NM-315, and State Street Bank and Trust Company of Connecticut, National Association, as owner trustee, and General Electric Capital Corp., as the beneficial owner trustee of barge ACL-9933B, filed their cause of Exoneration from or Limitation of Liability. Dkt. No. 1 in C.A. No. B-02-125. This last petition was consolidated with this present litigation on June 14, 2002. Dkt. No. 9 in C.A. No. B-02-125.

    To this end, petitioners filed Letters of Undertaking, which set the value of their interests in the vessels. Dkt. No. 3 in C.A. No. B-01-157 & Dkt. No. 3 in C.A. No. B-02-004. Thereafter, on September 24, 2001, the Court issued an Order Directing all Claimants to File and Make Proof of Claims, and Directing the Issuance of Monition and Restraining Prosecution of Claims. Dkt. No. 13. Essentially, this Order required that all potential claimants file their claims in this Court by March 14, 2002, and that any litigation pending in connection to the Causeway incident be stayed. By the March 14, deadline, numerous claimants[3] filed answers and claims with this Court. As to ACBL, the claimants' answers and

_____

[2] Barges VLB-9182, VLB-9173, NM-315, and ACL-9933B.

[3] The term "claimants" incorporates all remaining claimants with pending claims in these consolidated cases. The claimants include Jacqueline Paddock, individually and as next friend of William B. Welch, and as representative of the Estate of Chelsea Welch; William Morris Welch; Gustavo Morales; Bigo's International, L.L.C.; William E. Kimbrell, individually as surviving father of Chelsea Welch, deceased; Rene Mata; Frank Mata; Hector Martinez, Sr.; Lydia Zamora, individually and as representative of the estate of Hector Martinez, Jr., deceased; Bridgette Goza; Anita Harris, individually and as next friend of Victor Justin Harris, and representative of the estate of Robert V. Harris; Esteban F. Rivas and Mari Miriam Rivas, individually and as representative of the estate of Stvan F, Rivas; J. Antonion Mireles, as personal representative of the estate of Julio Cesar Mireles, Juan Antonion Mireles, and Soledad Gonzales Mireles; Laguna Madre Water District; Southwestern Bell Telephone Company; Raquel Teran Hinojosa, individually and on behalf of the estate of Gaspar Hinojosa, deceased; Clarissa Hinojosa, Omar Hinojosa and Gaspar Hinojosa, III, each individually; Martin D. Hinojosa and Rita S. Hinojosa, individually

claims allege that it was both negligent in hiring Brown Water to tow its barges, and negligent in entrusting its barges to Brown Water.

On December 13, 2004, the parties associated with the barges involved in the allision (ACL, Deere Credit, and ACBL) all moved for summary judgment claiming no fault and seeking exoneration from liability. Dkt. Nos. 305, 306, & 308. Claimants filed notices of non-opposition to the summary judgment motions submitted by ACL and Deere Credit. Dkt. Nos. 347 & 348. The claimants, however, filed an adversarial response and supporting memorandum to ACBL's motion for summary judgment. Dkt. Nos. 345 & 346. The claimants argue that genuine issues of material fact preclude this Court from granting ACBL's motion for summary judgment.

## II.    Standard of Review

Granting a motion for summary judgment is proper only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.Pro. Rule 56(c). "The substantive law determines which facts are material." Kee v. City of Rowlett, 247 F.3d 206, 210 (5th Cir. 2001). A genuine dispute about a material fact exists "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" In re Cooper/T. Smith, 929 F.2d 1073, 1076 (5th Cir. 1991) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "An issue is material if its resolution could affect the outcome of the action" under the governing law. Roberts v. Cardinal Services, Inc., 266 F.3d 368, 373 (5th Cir. 2001); Anderson, 477 U.S. at 248. In assessing whether a genuine issue of material fact exists, the Court views the evidence in the light most favorable to the non-moving party, here the claimants. BP Oil Intern., Ltd. v. Empresa Estatal Petroleos de Ecuador, 332 F.3d 333, 336 (5th Cir. 2003).

---

and as heirs of the estate of Gaspar Hinojosa, deceased; Ricky Leavell and Carol Leavell, individually and as representatives of the estate of Robin Faye Leavell, deceased; and Rolando Lee Moya, Alberto Leroy Moya, Antonion Salinas, Jr., and Robert Espericueta.

To adequately motion for summary judgment, the moving party must inform the Court of the basis of its motion and demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also Kee, 247 F.3d at 210 ("The moving party bears the burden of showing the district court that there is an absence of evidence to support the nonmoving party's case."). The moving party, however, need not "support its motion with affidavits or other evidence . . . ." Pavone v. Mississippi Riverboat Amusement, Corp., 52 F.3d 560, 565 (5th Cir. 1995). Rather, the moving party "may meet its burden by simply 'pointing to an absence of evidence to support the nonmoving party's case.'" Boudreaux v. Swift Transp. Co., 402 F.3d 536, 544 (5th Cir. 2005) (quoting Armstrong v. Am. Home Shield Corp., 333 F.3d 566, 568 (5th Cir. 2003)). If the moving party meets its initial burden, the burden then "shifts to the nonmovant to set forth specific facts showing the existence of a genuine issue" of material fact. Racal Survey U.S.A., Inc. v. M/V COUNT FLEET, 231 F.3d 183, 187 (5th Cir. 2000).

The non-moving party "must present evidence sufficient to establish the existence of each element of his claim as to which he will have the burden of proof at trial." Pavone, 52 F.3d at 565; see also Lloyd's Leasing Ltd. v. Conoco, 868 F.2d 1447, 1449 (5th Cir. 1989) ("The [Supreme] court has stated that Fed.R.Civ.P. 56(c) mandates summary judgment in any case where a party fails to establish the existence of an element essential to this case on which he bears the burden of proof. A complete failure of proof on an essential element renders all other facts immaterial because there is not longer a genuine issue of material fact.'" (quoting Washington v. Armstrong World Indus., 839 F.2d 1121, 1122 (5th Cir. 1988))). Submitted affidavits must be based on personal knowledge, "shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.Pro. Rule 56(e); see also Duplantis v. Shell Offshore, Inc., 948 F.2d 187, 191 (5th Cir. 1991) ("It has long been settled law that a plaintiff must respond to an adequate motion for summary judgment with admissible evidence."). The nonmoving party cannot satisfy its burden "with conclusional allegations, unsubstantiated assertions, or only a scintilla of evidence." Pavone, 52 F.3d at 565. Furthermore, the Court will not "assume that the nonmoving party could or would prove the necessary facts." Little v.

4

Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (emphasis omitted).

III.    **Undisputed Facts**

   A.    **The Marine Transportation Industry**

   Marine transportation industry custom concerning  towage[4] contracts dictates that a barge owner will, through its dispatcher, offer its barges to a third-party independent contractor's dispatcher to tow from point A to point B.  ACBL SJM, Dkt. No. 307, Ex.12, p.74; Ex.14 at ex.A, p.10.  If the independent contractor accepts, the barges will be towed for a price determined by a tariff or specific rate.  Id. at Ex.12, pp.132-33.  Towage contracts are usually verbal.  Id. at 310; Ex.13, p.93; Ex.14 at ex.A, p.10.

   The barge owner exercises little or no control over the tow company.  Id. at Ex.5, p.230; Ex.12, pp.311-12; Ex.14, pp.10-11.  For example, the barge owner never communicates with nor has operational control over a vessel's crew.  Id. at Ex.5, pp.137, 232; Ex.12, pp.73-74, 334-35; Ex.14 at ex.A, pp.9-11; Ex.15, pp.100-02; Ex.16, pp.140-42.  ACBL's motion for summary judgment summarizes the undisputed evidence as follows.[5] The tow company

> is obligated to provide a tug of adequate horsepower, properly manned and crewed with qualified and properly licensed captains, and capable of safely navigating the barges to their destination. . . .  The barge owner cannot impose a time limit on the towage and plays no role in the selection of the particular tug or crew, and does not tell the tower when, where, or how to perform the towage. The barge owner has no input in the make-up of the tow by the tower [i.e., the towing company] or the  number of barges that will be towed by any given tug. . . .  The barge owners are often not given information as to the total number of barges in the tow and many times do not even know which tug will be towing its barges.  The tower can also sub-contract the towage to another company without advising the barge owners.  Once the owner takes its customer's barges into tow it assumes the sole care, custody, and control over the barges and makes all decisions for their safe towage.

---

   [4]"A contract for a tug to move a barge is one of towage."  Agrico Chem. Co. v. M/V BEN W. MARTIN, 664 F.2d 85, 90 (5th Cir. 1981).

   [5]Submitted depositions and affidavits support the statement.  See  ACBL SJM, Dkt. No. 307, Ex.5, pp.230-39; Ex.9, pp.166-68; Ex.10, pp.167-68, 172, 175; Ex.12, pp.310-19, 324-25, 333-35; Ex.13, pp.82-83;  Ex.14. at ex.A, pp.8-11; Ex.16, pp.140-42.

Id. at Summary Judgment Motion, p.9 (emphasis in original).  Despite the lack of control, the tower nonetheless provides the barge owner a daily status report.  Id. at Ex.12, pp.313-14.

The American Waterway Operators ("AWO") is a trade organization in the marine transportation industry.  Id. at Ex.14, p.7.  Importantly, the marine transportation industry is regulated not by the AWO, which is not a governmental entity, but rather by the United States Coast Guard, which also provides the requirements for and the licensing of towboat captains. See generally 33 C.F.R.  Membership in the AWO is completely voluntary.  ACBL SJM, Dkt. No. 307, Ex.5, pp.206-07; Ex.9, p.111; Ex.14, p.7.

In order to "improve marine safety and environmental protection in the tugboat, towboat and barge industry," the AWO implemented the "Responsible Carrier Program" ("RCP"). Claims.Resp., Dkt .No. 346, Ex.5, at "Disclaimer."  The RCP is a set of guidelines that "does not attempt to catalogue or . . . duplicate that which is already required by federal law or regulation." Id. at I-2.  Instead, "the program seeks to complement and build upon existing law and regulation and to identify sound operating principles and practices that will enhance the safety of a company's operations . . . ." Id.

To implement the RCP, the AWO required all members to achieve certified RCP compliance by January 1, 2000.  Id. at I-4.  An independent AWO auditor issues the certification.  Id.  If a company failed to meet the audit requirement, their membership was terminated.  Id.  A new AWO member, however, has two years to achieve RCP certification. Id.

The RCP recommends enhanced procedures in three main areas of the industry: management/administration, equipment/inspection, and "human factors."  Id. at I-2.  One provision within the management/administration area requires each member to "develop and document written policies and procedures" evaluating "subcontractors and vendors providing towing . . . on their ability to provide an acceptable level of safety." Id. at II-1, II-4.

B.    The Parties

ACL[6] is the registered owner of two of the barges involved in the Causeway allision, VLB-9182 and VLB-9173.  ACBL SJM, Dkt. No. 307, Ex.6, ¶9.  Furthermore, at the time of the incident, Deere Credit Inc. (formerly known as Senstar Finance Company) was the registered owner of barge NM-315, while State Street Bank and Trust Company of Connecticut, National Association, was the owner trustee and General Electric Capital Corporation was the beneficial owner of barge ACL-9933B.  Id. at ¶6.  By agreement with these parties, ACBL was the bareboat charterer and owner *pro hac vice* of all four barges.[7] Id. at ¶¶6, 10.

ACBL engages in the business of transporting goods along all of the major inland waterways of the United States.[8]  Claims.Resp., Dkt .No. 346, Ex.14, p.142; Ex.25.  Its fleet consists of approximately 5000 barges and 150 tow and tugboats.  Id. at Ex.14, p.141-42. Although it will normally tow its own barges, ACBL does not have an adequate number of vessels to reach all areas of the inland waterways with a frequency to meet its customers' demands.  ACBL SJM, Dkt. No. 307, Ex.10, p.129.  Accordingly, ACBL regularly employs the

_____

[6]ACL is the parent corporation of ACBL.  ACBL SJM, Dkt. No. 307, Ex.6, ¶9.  ACL and ACBL are "separate and distinct companies."  Id.

[7]"In a demise [or bareboat] charter, the vessel owner transfers full possession and control to the charterer, who in turn furnishes the crew and maintenance for the vessel (thus the term 'bareboat').  Consequently, the bareboat charterer . . . is the owner *pro hac vice* of the vessel for the duration of the contract.  The demise charterer is therefore responsible *in personam* for the negligence of the crew and the unseaworthiness of the vessel." Forrester v. Ocean Marine Idem. Co., 11 F.3d 1213, 1215 (5th Cir. 1993).  Such agreements need not be in writing.  Agrico Chem., 664 F.2d at 91.  This distinction between a registered owner and the owner *pro hac vice* is the basis of ACL's and Deere Credit's summary judgment motions and the claimants' associated notices of non-opposition.  Dkt. Nos. 305, 308, 347, & 348.  Furthermore, the status of ACL, Deere Credit, and ACBL concerning the ownership of the barges is not in dispute.  Dkt. Nos. 305, 308, 347, & 348.

[8]These would include the Mississippi, Ohio, Missouri, Tennessee, Arkansas, Tombigbee, Illinois, and Cumberland rivers, plus the Intracoastal Waterways.  Claims.Resp., Dkt. No. 346, Ex.25 (under "Territories").

tow services of third party independent contractors in areas like the far western reach of the Intracoastal Waterway ("ICW"), west of Houston, Texas.  Id. at Ex.9, pp.53-56, 144, Ex.14 at ex.A, pp.9-11.  The Queen Isabella Causeway is located within this area.

ACBL has been an AWO member and RCP certified at all pertinent times.  Id. at Ex.17, pp.80-82.  At the time of the allision, however, ACBL did not have the AWO promoted written policies and procedures for evaluating a subcontractor's ability to provide towing services at "an acceptable level of safety."  Claims.Resp., Dkt .No. 346, Ex.11, pp.47-49.

Brown Water is a tug/tow company that was founded during the 1980s by Tim Chapman, an individual associated with the marine transportation business since 1974.  ACBL SJM, Dkt. No. 307, Ex.11, pp.9-10.  Brown Water owns and operates 12 vessels, including the BROWN WATER V, and works the ICW between Brownsville and Houston, Texas.  Id. at 127, 228; Ex.14 at ex.A, p.3.

Brown Water was not RCP certified at the time of the allision in September, 2001.  Id. at Ex.5, pp.147-48.  However, in the earlier part of that same year, Brown Water joined the AWO and began working towards RCP certification.  Id.  In July 2002, within the AWO prescribed 2 year allotment, but after the allision, Brown Water achieved RCP certification.  Id. at 148.  Brown Water also qualified to participate in the United States Coast Guard's Cooperative Towing Vessel Examination Program ("CTVEP") by satisfying certain federal regulations and demonstrating that it constituted a low risk when it came to vessel safety.  Id. at Ex.14, p.5.  The CTVEP is a voluntary program where tow companies allow the Coast Guard to inspect its vessels.  Id.  Although Brown Water's vessels are not required to undergo periodic or mandatory inspections by the Coast Guard, Brown Water "invited the Coast Guard to board and thoroughly inspect every aspect of each of their company's vessels."  Id.  The Coast Guard has never prohibited Brown Water from operating.  Id. at Ex.11, p.126.

Brown Water's policy, like other companies that worked the ICW, requires that each vessel provide at least 200 horsepower per loaded barge.  Id. at Ex.5, p.211.  Brown Water's Vice-President of Operations, Stephen H. Mosher ("Mosher"), testified that if a customer asked the horsepower rating of the BROWN WATER V, the towboat involved in the allision, he would say 800 horsepower.  Id. at 26, 229.  With 800 horsepower, the towboat should have

been able to tow up to four loaded barges. In fact, the BROWN WATER V possessed two "12V-71N" engines. Id. at 26. The claimants produce evidence that two "12V-71N" engines only yield 680 horsepower and that such knowledge is common in the industry. Claims.Resp., Dkt. No. 346, Ex.16, p.33. Furthermore, Brown Water policy prohibited the BROWN WATER V from towing four loaded barges, allowing a maximum tow of three loaded barges and one empty; or two loaded and two empty. ACBL SJM, Dkt. No. 307, Ex.5, pp.207-08; Ex.11, p.103; Ex.22, pp.90-91.

Captain Fowler was hired by Brown Water on April 27, 2001, and at the time of the allision held the appropriate Coast Guard License. Id. at Ex.14, p.3; Claims.Resp., Dkt. No. 346, Ex.16, p.172. Besides having experience as a licensed captain for 12 years, Captain Fowler piloted a towboat through the Brownsville area around 50 times and previously navigated the Causeway at least three or four times. ACBL SJM, Dkt. No. 307, Ex.8, pp.12, 14; Claims.Resp., Dkt .No. 346, Ex.3, p.3.

ACBL regularly hired Brown Water as an independent contractor for the 10 years[9] prior the allision.[10] ACBL SJM, Dkt. No. 307, Ex.17, pp.70-72; Ex.9, pp.172-73; Ex.22, pp.40, 41. ACBL was not Brown Water's largest customer. Id. at Ex.11, pp.96-97. During this 10 year relationship, Brown Water towed "hundreds" of ACBL barges. Id. at Ex.9, pp.172-73. Importantly, before the allision, ACBL only experienced two mishaps with Brown Water's service. Id. at Ex.9, pp.96-97,171-72; Claims.Resp., Dkt .No. 346, Ex.9, p.140. The first incident occurred on March 19, 2000, and involved the grounding of an ACBL barge. Claims.Resp., Dkt .No. 346, Ex.9, pp.145-46. Brown Water, however, was exonerated from fault. ACBL SJM, Dkt. No. 307, Ex.9, pp.96-97, 171-72. As it turns out, Brown Water had permissibly sub-contracted the barge to another towing company and was not in control of the barge at the time of the grounding. Id. at Ex.12, pp.320-22. The second incident, which

_____

[9]Furthermore, during those 10 years, Brown Water towed for numerous other customers, including Kirby Marine, Dow Chemical, Exxon, BP Amoco, BASF, duPont, and others. ACBL SJM, Dkt. No. 307, Ex.5, at pp.67, 196-97, 229; Ex.11, pp.96-97.

[10]ACBL has never had an ownership interest in or corporate relationship with Brown Water or its vessels. ACBL SJM, Dkt. No. 307, Ex.11, p.95.

occurred on September 13, 2001 (two days before the subject allision), involved the BROWN WATER V bumping an ACBL barge into a dock resulting in damage to the barge.[11] Claims.Resp., Dkt .No. 346, Ex.9, p.140; Ex.29.

### C.    Brown Water's Audit

Although the barge involved in the March 19, 2000, grounding was undamaged and Brown Water was found not at fault, ACBL became concerned.  ACBL SJM, Dkt. No. 307, Ex.9, pp.171-72; Ex.13, pp.36-37.  ACBL requires notification from hired tow companies when barges stop moving for any extended period of time.  Id. at Ex.13, pp.103-04. Customers desire this information and it aids ACBL in the logistics of planning which barge will be towed where and by which vessel. Id.; Ex.9, pp.93-94. However, in this incident, ACBL was notified of the grounding by the United States Coast Guard and not by Brown Water.  Id. at Ex.13, p.37;  Claims.Resp., Dkt. No. 346, Ex.28.   Thereafter, ACBL conducted an independent audit of Brown Water to ascertain whether it had the appropriate notification procedures in place.  Claims.Resp., Dkt .No. 346, Ex.14, pp.93-95, 120.

Philip S. Timberlake ("Timberlake"), an AWO certified auditor, conducted the audit in March of 2000.  ACBL SJM, Dkt. No. 307, Ex.18, pp.53-54, 63-64.  Before he started a marine consulting company, Timberlake worked with ACBL for 17 years in a multitude of areas, including dispatching, distribution, harbor master, and as an operations manager.  Id. at 21-26.  Although Timberlake did not perform an RCP audit of Brown Water, he did utilize a form provided by the AWO in its RCP program as a guide. Id. at 59-60.  Timberlake's audit consisted of an inspection of two Brown Water vessels, speaking with crew members and management, and the review of pertinent documents.  Id. at 64-66; Ex.20.  During the audit, Brown Water employees represented that the two audited vessels possessed 800 horsepower (400 per engine).  Claims.Resp., Dkt. No. 346, Ex.10, pp.83-85, 112-13, 198. Timberlake discussed his findings with Brown Water's management and illuminated areas Brown Water needed to improve if it desired RCP certification.  ACBL SJM, Dkt. No. 307,

---

[11]The damaged barge, NMS-1497, was not involved in the September 15 allision.

Ex.18, pp.129-31.  Brown Water, in turn, agreed to achieve AWO standards and to look into the possibility of actually becoming an AWO member, which it subsequently did.  Id. at 170-71; Ex.20; Ex.5, p.148.

Timberlake also discussed his written report with ACBL.  Id. at Ex.18, pp.172-73, Ex.20.  In this meeting with ACBL, Timberlake did not have his "field notes".  Claims.Resp., Dkt. no. 346, Ex.10, p.165.  When asked by ACBL officials whether they should continue using Brown Water, Timberlake answered in the affirmative.  ACBL SJM, Dkt. No. 307, Ex.18, p.172.  Timberlake further opined that  Brown Water was a safe operator.  Id.

The written audit report consisted of Timberlake's brief observations of Brown Water's vessels, the vessels' equipment, including the navigation, communication, and safety equipment, environmental controls, and training.  Id. at Ex.20.  The observations further provided suggestions for improvements in each area.  Id.  The report recognized that Brown Water's vessels did not have a copy of the current "Notice to Mariners" on board and that the company needed to "develop a shore side and on board training program to fulfill" the AWO's RCP requirements.  Id.  Lastly, the audit contained a "Summary of Management Audit" and "Audit Notes."  Id.  The Summary of Management Audit outlined specific areas that Brown Water's management needed to improve.  Specifically, the Summary of Management Audit stated:

> Need to do a re-write of the Brown Water Marine Operations Manual to reflect current management and vessel practices and to fulfill the requirements of the AWO RCP.
> Need to develop new check list to cover the items required by the AWO RCP and a system to verify their use.
> Need to document required training programs including orientation and refresher training.
> Develop an evaluation system for vessel employees.
> Document vessel maintenance program.

Id. The Audit Notes provided the following appraisal of Brown Water.

> Brown Water Marine Service is currently in the process of updating their Operations Manual.  They have committed to begin a consolidation of many of their manuals to parallel AWO's program.
>     . . . .

11

Brown Water Marine works hard, smart and effectively with a small staff. There seems to be a climate of continuous improvement. I also noticed that the leadership of the organization focus [sic] on the important, that is those things that will produce the best results in such things as safety and service.

Id.

When asked during deposition testimony how Brown Water's audit compared to others audits generally, Timberlake stated that it ranked "[b]etter than some, as good as many. . . . Average or – or better." Id. at Ex.18, p.280. When asked how Brown Water's audit compared to other "small companies," Timberlake noted that its audit was "[p]robably better than average." Id. Furthermore, Timberlake declared that Brown Water's involvement in the Causeway allision did not alter his evaluation of the company.[12] Id. at 283.

ACBL, on two other occasions, asked Timberlake to perform audits of other independent contractor towing companies. Id. at 286. Like the Brown Water audit, the requested audits were not RCP audits. Id. After those audits, ACBL followed Timberlake's recommendation and ceased utilizing those companies, one of which was RCP certified. Id. at 286-87.

Mosher testified that prior to Timberlake's audit, Brown Water had been audited by some of its other customers, including "duPont, BASS, BP Chemical – BP Oil Expiration, Exxon, Mobil. . . . just about anybody who you can think of that's out there [doing business] in the Gulf coast." Id. at Ex.5, pp.196-97. These audits "didn't conform to AWO standards [since] [e]verybody had their own curriculum." Id. at 197. All of these companies continued to employ Brown Water's services. Id.

## D.    The Allision

A few days before September 15, 2001, Brown Water's dispatcher verbally accepted ACBL's dispatcher's offer to tow three ACBL barges from Houston towards Brownsville.

_____

[12]Norb Whitlock, ACBL's Senior Vice President of Logistic Services, also stated that the Causeway allision gave him no basis to question Brown Water's competence as a towing company. Claims.Resp., Dkt. No. 346, Ex.14, p.156.

ACBL SJM, Dkt. No. 307, Ex.12, pp.156-63. One of the barges, VLB-9173,[13] was loaded and destined for Harlingen, Texas, while the other two unidentified barges were scheduled for delivery in Brownsville, Texas. Id. at 158; Ex.22, p.88; Ex.14 at ex.A, p.3. Brown Water chose the BROWN WATER V for the job. Id. at Ex.14 at ex.A, p.3.

Subsequently, ACBL's dispatcher offered barges NM-315, VLB-9182, and ACL-9933B for towage to Brown Water. Id. at Ex.6, ¶8; Ex.14 at ex.A, p.3. These barges were located in Brownsville, Texas, and were to be loaded with steel coils and towed to Houston. Id. at Ex.12, p.159-65. Brown Water accepted the offer and scheduled the BROWN WATER V to tow the three barges to Houston once the original three barges arrived at their respective destinations. Id.

As the BROWN WATER V approached Harlingen on the morning of September 14, it developed mechanical problems. Id. at Ex.5, p.130. As a result, the towboat's master, Captain Rocky Wilson, chose to bypass Harlingen without relinquishing VLB-9173 as planned and continued on to Brownsville for repairs. Id. at 130-33. This was contrary to ACBL's expectation that Brown Water was to leave VLB-9173 in Harlingen before proceeding to Brownsville. Id. at Ex.12, pp.173-76. The decision to bypass the Harlingen rendezvous was solely Brown Water's. Id. ACBL was not informed of this decision nor of the towboat's mechanical problems. Id. ACBL expected no more than three of its barges would be in tow of the BROWN WATER V at any given time. Id. at 172-75.

Mosher told Captain Wilson to tow VLB-9173 as a single barge to Harlingen after the BROWN WATER V was repaired. Id. at Ex.5, pp.130-33. Captain Wilson was directed to return to Brownsville and gather barges NM-315, VLB-9182, and ACL-9933B, for the Houston journey. Id. Nonetheless, Captain Wilson chose to tow the three barges destined for Houston and VLB-9173 to Harlingen. Id. The towboat's crew wired the barges together in a single file for the BROWN WATER V to push. Id. at Ex.15, pp.86-87. The barges were dumb, unmanned, and possessed no motive power. Id. at Ex.5, p.230; Ex.14 at ex.A, pp.6-7.

No ACBL personnel were present in Brownsville at the time Captain Wilson made his

---

[13]ACL is the registered owner of this barge. ACBL SJM, Dkt. No. 307, Ex.6, ¶9.

decision. Id. at Ex.4, p.100.  Furthermore, ACBL's dispatcher testified that he was unaware that the Harlingen bound barge, VLB-9173, had never been dropped off. Id. at Ex.12, pp.172-76.  He also testified that he did not know that the BROWN WATER V was headed for Harlingen with four of ACBL's barges. Id.

In the early morning hours of September 15, an "offshore depression" caused the ICW to be approximately two feet deeper than usual. Claims.Resp., Dkt. No. 346, Ex.16, pp.56, 60.  Apparently, the additional water created a strong current between the Causeway and the Long Island Swing Bridge located about a mile away. ACBL SJM, Dkt. No. 307, Ex.24, p.20.  Because Captain Wilson, the Master of the vessel, was asleep at the time, relief Captain Fowler was at the helm of The BROWN WATER V. Claims.Resp., Dkt. No. 346, Ex.3.  After traversing the Long Island Swing Bridge, Captain Fowler began turning to port towards the Causeway along a channel marked by buoys and noticed that the navigational and some street lights of the Causeway were not illuminated. ACBL SJM, Dkt. No. 307, Ex.8, pp.4-5.  As the flotilla turned, the stern of the towboat hit "some kind of bump." Id. at 5. Captain Fowler initially believed the bump was the result of the towboat running over one of the marker buoys. Id. at 5-6. Captain Fowler then "stood up, . . . turned around and went and looked out the back window at the buoy and . . . noticed that [he] wasn't even close to the buoy." Id.  Captain Fowler testified that apparently the towboat had come into contact with the sea floor. Claims.Resp., Dkt. No. 346, Ex.3.  Then, Captain Fowler looked back towards the Causeway and "noticed the head of the tow was still swinging to the left [port]." ACBL SJM, Dkt. No. 307, Ex.8, p.6. Captain Fowler attempted to counter-steer to starboard, but to no avail. Id.  He next threw the engines in reverse, but again, was unable to correct the trajectory of the flotilla. Id. at 6-7.  The lead barge struck a pillar of the Queen Isabella Causeway. Id.  As a result of the impact, a portion of the span collapsed and several individuals were killed or injured when the vehicles they occupied fell into the channel.

## IV.    Discussion

The federal courts are vested with the power to adjudicate  "all Cases of admiralty and maritime Jurisdiction." U.S. Const. art. III, § 2.  This grant of original jurisdiction was codified

14

at 28 U.S.C. § 1333(1), which currently reads: "The district courts shall have original jurisdiction [over] . . .[a]ny civil case of admiralty or maritime jurisdiction . . . ." Id. There is no question that admiralty jurisdiction extends to these limitation proceedings. Sisson v. Ruby, 497 U.S. 358 (1995); Scarborough v. Clemco Indus., 391 F.3d 660, 663 (5th Cir. 2004); see In re Amtrak "Sunset Limited" Train Crash in Bayou Canot, 121 F.3d 1421, 1426-27 (11th Cir. 1997); 46 App.U.S.C. § 740; S.C. Loveland v. East West Towing, Inc., 415 F. Supp. 596, 604 (S.D.Fla. 1976); see also In re Magnolia Marine Trans. Co., 366 F.3d 1153 (10th Cir. 2004); Folkstone Maritime, Ltd. v. CSX Corp., 64 F.3d 1037 (7th Cir. 1995); In re Complaint Taira Lynn Marine Ltd. No. 5, L.L.C., 349 F. Supp. 2d 1026 (W.D.La. 2004); In re American Milling Co., 270 F. Supp. 2d 1068 (E.D.Mo. 2003); Complaint of J.E. Brenneman Co., 782 F. Supp. 1021 (E.D.Pa. 1992).

Pursuant to the Limitation Act, a vessel's owner may limit its liability for damage or injury arising from a maritime accident to the value of the vessel and its freight, if occasioned without the owner's privity or knowledge. 46 U.S.C. § 183(a); In re Hellenic, Inc., 252 F.3d 391, 394 (5th Cir. 2001). Initially, the claimant must establish that the owner's negligence or vessel's unseaworthiness caused its damages. In re Hellenic, 252 F.3d at 394. "An owner will be exonerated from liability when he, his vessel, and crew are found to be completely free from fault." Caribbean Sea Transp., Ltd. v. Russo, 748 F.2d 622, 626 (11th Cir. 1984); see also Tittle v. Aldacosta, 544 F.2d 752, 755 (5th Cir. 1977) ("[F]or the order of exoneration to survive appellate review Owner, his vessel and crew must be shown to have been free from fault."). If the claimant is successful in establishing negligence or unseaworthiness, however, the burden then shifts to the owner to prove that such misdeeds were not within its privity or knowledge. In re Hellenic, 252 F.3d at 394. If the Court finds negligence or unseaworthiness, but that it was effected without the owner's privity or knowledge, then it shall proceed to distribute the limitation fund pro rata amongst all legitimate claimants. In the Matter of Beiswenger Enter., 86 F.3d 1032, 1036 (11th Cir. 1996). The resolution of whether a party may limit its liability is within the exclusive jurisdiction of the federal courts. Ex parte Green, 286 U.S. 437, 439-40 (1932); see also Waring v. Clarke, 46 U.S. (5 How.) 441, 459 (1847) (holding that there is no right to a jury trial in an admiralty case).

15

Here, the claimants do not assert that ACBL's barges were unseaworthy.  Rather, the claimants allege that ACBL was negligent in hiring Brown Water and negligent in entrusting its barges to Brown Water.  ACBL argues that the "dominant mind" doctrine, as a matter of law, absolves it from liability.  Notwithstanding the "dominant mind" doctrine, ACBL further argues, the claimants fail to raise a genuine issue of material fact concerning the negligent entrustment and negligent hiring claims.  Therefore, ACBL contends that it is entitled to exoneration from liability.

### A.    Dominant Mind Doctrine

"A contract for a tug to move a barge is one of towage."  Agrico Chem., 664 F.2d at 90.[14]  Towage law is peculiar to general maritime law and defines the duties and liabilities of parties who enter into such contracts.

Towage law views the towboat as an independent contractor and neither as bailee nor insurer of the tow.  SCHOENBAUM, ADMIRALTY & MARITIME LAW § 12-1, at p.50; Agrico Chem., 664 F.2d at 90.  The vessel owes the tow, however, a duty "to use 'such reasonable care and maritime skill as prudent navigators employ for the performance of similar service.'"  Agrico Chem, 664 F.2d at 90 (quoting First Mississippi Corp. v. Fielder Towing Co., 469 F. Supp. 1080, 1084 (N.D.Miss. 1979)).  Furthermore, the towboat "is charged with knowledge of navigational conditions, including knowledge of channels, depth of water, obstructions, pipelines and other dangers to her tow."  Dow Chem. Co. v. TUG THOMAS ALLEN, 349 F. Supp. 1354, 1363 (E.D.La. 1972).  The tow, on the other hand, owes the towboat a duty "to provide a seaworthy vessel with equipment and structural characteristics that are reasonably necessary to undertake the voyage."  SCHOENBAUM, ADMIRALTY & MARITIME LAW § 12-5, at p.60.

When, as here, a third party is injured, "the courts employ the concept of 'dominant mind' to place liability on the tug and to absolve the tow from liability."  Id. at § 12-6, at p.62.

---

[14]The parties do not dispute that the contract between ACBL and Brown Water was one for towage as opposed to a contract of affreightment.

"The general rule is that, in the absence of an agreement to the contrary, when the tug supplies the motive power she becomes the dominant mind, and the tow is required to follow directions from the tug." Dow Chem., 349 F. Supp. at 1363. As such, "if the tug is in sole charge of the navigation, the tow is not liable for the tug's fault. In other words, when an independent contractor has undertaken to tow another vessel, the tow is not liable for the tug's fault." Walker v. Tug DIANE, 350 F. Supp. 1388, 1389 (D.V.I. 1972); Sturgis v. Boyer, 65 U.S. (24 How.) 110 (1860); see SCHOENBAUM, ADMIRALTY & MARITIME LAW § 12-6, at p.63 ("If the tug and the tow are separately owned, the negligence of the tug cannot be imputed to the tow, and there is neither *in personam* nor *in rem* liability on the part of the tow." (citing Sturgis, 65 U.S. (24 How.) at 110)).

Examining the dominant mind doctrine as explicated by the Supreme Court in Sturgis, its progeny, and lower court decisions, it is clear that the navigational errors of one vessel, which undertakes the conveyance of another vessel lacking a master, crew, and any navigational control over the flotilla (e.g., a towage contract), cannot be imputed to the conveyed vessel and its owners unless an agency relationship exists between the towing vessel and the towed vessel's owners. Sturgis, 65 U.S. (24 How.) at 122; The MABEY & COOPER, 81 U.S. (14 Wall.) 204 (1871); The CLARITA & The CLARA, 90 U.S. (23 Wall.) 1 (1874); The GALATEA, 92 U.S. 439 (1875); The ALABAMA, 92 U.S. 695 (1875); The VIRGINIA EHRAN & The AGNESE, 97 U.S. 309 (1877); The EUGENE F. MORAN, 212 U.S. 466 (1909); see Monongahela River Consol. Coal & Coke Co. v. O'Neil, 144 F. 74 (5th Cir. 1906); The DE GAMA, 150 F. 323 (5th Cir. 1907); In re Central Gulf Lines, Inc., 176 F. Supp. 2d 599, 615-18 (E.D.La. 2001); Chesapeake Bay Bridge & Tunnel District v. Oil Screw Prince, 298 F. Supp. 881, 885 (E.D.Va. 1968) (finding that towed unmanned barge and owner not negligent or liable for damages to bridge caused by barge during gale where certificate of inspection attested to sufficiency of barge and its equipment for towing); Dow Chem., 349 F. Supp. at 1363 ("If the tow is the 'dominant mind', the tug is not liable provided the tug has obeyed the tow's orders and has not herself been guilty of negligence, *either in the manner of executing the orders or by participating in an obviously dangerous maneuver.*" (emphasis added)) ; Marathon Pipe Line Co. v. Drilling Rig ROWAN/ODESSA, 527 F. Supp. 824, 833-

17

34 (E.D. La. 1981); In re TT Boat Corp., 1999 WL 123810, at *3 (E.D. La. 1999); Seacarriers Enterps. v. Tugboat "Lady Michele", 1992 WL 28073, at *2-3 (E.D. La. 1992); see also Richard J. Nikas, Skimming the Surface: A Primer on the Law of Collision, 9 U.S.F. Mar. L.J. 225, 227 (1996) ("A shipowner's personal liability may rest upon the doctrine of respondeat superior. If the persons at fault for the collision are not the servants of the shipowner, the owner is not liable in personam. Thus, a shipowner is neither liable for the fault of an independent towage contractor who exercises the dominant mind . . . ." (citations omitted)); Joseph C. Sweeney, Collisions Involving Tugs & Tows, 70 Tul. L. Rev. 581, 597-98 (1995) ("When a vessel other than the tug or its tow . . . is damaged by the negligence of the tug, the tow, or both, the question arises whether the fault of the tug should be imputed to the tow, or whether the fault of the tow should be imputed to the tug. Tort law concepts of imputed liability are not used in this situation. Thus, the negligence of a tug is not imputed to a tow or vice versa. Whether the tug or tow is liable to the third party depends on the presence of the dominant mind." (citations omitted)).

The dominant mind presumption is, however, rebuttable. In re TT Boat Corp., 1999 WL 123810, at *3 (citing Chevron U.S.A. Inc. v. Progress Marine Inc., 1980 A.M.C. 1637 (E.D. La. 1979)). If the tow's negligence contributes to the collision, the tow will also be held liable. Cody v. Phil's Towing Co., 247 F. Supp. 2d 688, 692 (W.D. Pa. 2002). The tow's negligence must be, however, separate from and independent of the towboat's. Chevron U.S.A., 1980 A.M.C. 1637.

In the present case, the claimants do not allege that ACBL's barges were in any way unseaworthy or that ACBL negligently provided navigational assistance or exacted any control whatsoever over the BROWN WATER V, her crew, or tow. The barges in tow of the BROWN WATER V were unmanned, dumb, and without any motive power of their own. No ACBL employees were aboard any of the vessels. ACBL played no part in drawing up the tow. ACBL did not direct the sequence in which the barges would be dropped off at their respective destinations. In fact, ACBL had no communication with the BROWN WATER V. The evidence is undisputed that ACBL had absolutely nothing to do with the navigation or management of the BROWN WATER V. In addition, Brown Water acted as an independent

contractor.  Therefore, the claimants produce no evidence that ACBL in any way contributed to or was the cause of the BROWN WATER V veering off course on the night of the allision.

Assuming, for the purposes of this motion, that the allision was the result of Brown Water's negligence, as the claimants argue, such conduct cannot be imputed to the owners of the barges involved in the allision.  Dow Chem., 349 F. Supp. at 1363; Chesapeake Bay Bridge & Tunnel District, 298 F. Supp. at 885; In re Central Gulf Lines, 176 F. Supp. 2d at 615-16.  When a towed vessel does not contribute to a casualty through navigational error, as the ACBL's barges here did not, "third persons suffering damage through the fault of those in charge of the vessels [(i.e., Brown Water)] must, under such circumstances, look to the tug, her master or owners, for the recompense which they are entitled to claim for any injuries . . . ."  Sturgis, 65 U.S. (24 How.) at 122; Dow Chem., 349 F. Supp. at 1363.  Therefore, the claimants' causes of action against ACBL must fail.[15]

Conceding that the dominant mind doctrine precludes imputing Brown Water's negligent acts to ACBL, the claimants argue that the doctrine applies only to prevent the imposition of vicarious liability.  The claimants contend that the doctrine allows ACBL to be held liable for its independent acts of negligence.  Because negligent entrustment and hiring are considered independent acts of negligence, the claimants argue, the dominant mind doctrine is inapplicable.  The Court disagrees.

First, the dominant mind doctrine assesses liability by determining which vessel (or vessels) committed the casualty causing navigational error.  See, e.g., The CLARITA, 90 U.S. (23 Wall.) at 11-12; Dow Chem., 349 F. Supp. at 1363; N.M. Paterson & Sons Ltd. v. M/V ETHEL E., 2004 WL 2123307, at *7 (N.D.Ill. 2004) ("The 'dominant mind' doctrine provides

---

[15]Although the parties could not provide, nor could this Court locate, a case deciding the precise issue of whether towage law allows for a claim of negligent hiring or entrustment, the Court finds persuasive the abundance of non-towage cases (e.g., rentals) that preclude recovery against the owner of an unmanned barge or vessel who relinquishes the care, custody, and control of that barge to another vessel.  See Burns Bros. v. Long Island R. Co., 176 F.2d 406 (2d Cir. 1949); Earles v. Union Barge Line Corp., 486 F.2d 1097 (3d Cir. 1973); The Pillsbury Co. v. Midland Enters., 715 F. Supp. 738 (E.D.La. 1989); Van Nood v. Federal Barge Lines, Inc., 282 F. Supp. 890 (E.D.La. 1968); United States v. Powell Bros. Barge No. 128, 249 F. Supp. 553 (S.D.Fla. 1965).

that the vessel that is liable is the vessel whose people are actually in control of the operation."). When the maneuver that caused the accident is attributed to a particular vessel, only the parties in the position of principal to the wrongdoing vessel may be held liable. When fault is charged to a flotilla, liability falls on the dominant mind vessel and its principals because they were in charge of navigation (assuming, of course, that the dominant mind crew and vessel are employed and owned by the same entity).

Second, although the torts of negligent entrustment and hiring are considered independent acts of negligence,[16] these claims would still place derivative liability upon ACBL for the navigational errors of Captain Fowler. Rosell, 89 S.W.3d at 656 (Although the claims for negligent hiring and entrustment are "considered independent acts of negligence, these causes are not actionable unless a third party commits a tort. In that respect, these causes are similar to the respondeat superior theory of recovery where, unless the employee commits a tort in the scope of employment, the employer has no responsibility."); id. at 657("The causes of action for negligent entrustment and hiring are a means to make a defendant liable for the negligence of another."); Loom Craft Carpet Mills, Inc. v. Gorrell, 823 S.W.2d 431, 432 (Tex.App.- Texarkana 1992, no writ); see Gonzales v. Willis, 995 S.W.2d 729, 739 (Tex.App.- San Antonio 1999, no pet.) ("In the context of negligent hiring claims, if the employee did not commit an actionable tort, the plaintiff has not been injured in the eyes of the law; therefore, the employer's negligence has not caused a legally compensable injury."). As noted earlier, towage law precludes ACBL from being held liable for Brown Water's alleged negligent acts that led to the allision. Chevron, 1980 A.M.C. 1637. Therefore, because ACBL exercised no navigational control and no defects concerning its barges are alleged to have contributed to

---

[16]See, e.g., Wrenn v. G.A.T.X. Logistics, Inc., 73 S.W.3d 489, (Tex.App.- Fort Worth 2002, no pet. h.) (finding the tort of negligent hiring "is based on an employer's direct negligence instead of the employer's vicarious liability for the torts of its employees"); Builder's Transport, Inc. v. Grice-Smith, 2005 WL 552486, at *5 (Tex.App.- Waco 2005), rev'd on other grounds, 2005 WL 1244540 (Tex.App.-Waco 2005), (same for negligent entrustment); Rosell v. Central West Motor Stages, Inc., 89 S.W.3d 643, 656 (Tex.App.- Dallas 2002, pet. denied) (noting that negligent entrustment and negligent hiring are considered independent acts of negligence).

the loss of control of the flotilla, the dominant mind doctrine precludes a finding, as a matter of law, that ACBL either negligently hired or entrusted its barges to Brown Water.[17]

**B.    The Claimants' Negligent Entrustment and Negligent Hiring Claims Against ACBL**

Notwithstanding the analysis *supra*, the Court finds that the claimants fail to raise a genuine issue of material fact precluding summary judgment on their claims that ACBL negligently entrusted its barges to Brown Water and that ACBL negligently hired Brown Water.

"'With admiralty jurisdiction, . . . comes the application of substantive admiralty law.'" Yamaha Motor Corp., U.S.A. v. Calhoun, 516 U.S. 199, 206 (1996) (quoting East River S.S. Corp. v. Transamerica Delaval Inc., 476 U.S. 858, 864 (1986)). "Absent a relevant statute, the general maritime law, as developed by the judiciary, applies." East River, 476 U.S. at 864.[18]

_____

[17]The claimants cite In re Central Gulf Lines, Inc., 176 F. Supp. 2d 599 (E.D.La. 2001), for the proposition that maritime law recognizes a claim for negligent hiring in the towage context. In that case, the district court explicitly held that the "dominant mind" doctrine precluded recovery for a third-party claimant against a barge owner for the navigational errors of a tugboat operator acting as the dominant mind pursuant to a towage contract. Id. at 615-16. Although the opinion addresses whether the barge owner should be held liable for negligently hiring the tugboat company, the barge owner's alleged duty to use reasonable care in that case arose from the subject towage contract's provisions. See id. at 621-22. The present case is easily distinguishable because there is no relevant contractual term between ACBL and Brown Water that would generate such a duty on the part of ACBL.

[18]An admiralty claim does not arise under the laws of the United States as defined in 28 U.S.C. § 1331, and therefore is not considered a federal question claim. Lewis v. Lewis & Clark Marine, Inc., 531 U.S. 438, 455 (2001) ("[The Supreme Court has] refused to hold that admiralty claims, such as a limitation claim, fall within the scope of federal question jurisdiction . . . ." (citing Romero v. Int'l Terminal Operating Co., 358 U.S. 354, 371-72 (1959))); SCHOENBAUM, ADMIRALTY & MARITIME LAW § 3-2, at p.79. Furthermore, a "federal court sitting in admiralty does not sit as a diversity court . . . where state substantive law must be ascertained and applied." St. Hilaire Moye v. Henderson, 496 F.2d 973, 980 (8th Cir. 1974) (internal quotations omitted); Cf. Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state.").

Maritime law acknowledges the claims of negligent entrustment[19] and negligent hiring.[20] When silent, however, maritime law may be supplemented by state law. Coastal Iron Works, Inc. v. Petty Ray Geophysical, 783 F.2d 577, 582 (5th Cir. 1986) (citing Continental Oil Co. v. Bonanza Corp., 677 F.2d 455, 461 (5th Cir. 1982), on reh'g, 706 F.2d 1365 (1983) (en banc)).

### 1.     Negligent Entrustment

The claimants allege that ACBL negligently entrusted its barges to Brown Water. The Court holds that a claim for negligent entrustment does not lie in a towage contract. Negligent entrustment applies to bailments and to the sale of certain chattels. Nat'l Convenience Stores, Inc. v. T.T. Barge Cleaning Company, 883 S.W.2d 684, 686 (Tex.App. - Dallas 1994, writ denied) (citing Rush v. Smitherman, 294 S.W.2d 873 (Tex.App. - San Antonio 1956, writ ref'd)); West v. E. Tenn. Pioneer Oil Co., 2004 WL 1606983, at *8-10 (Tenn. Ct. App. 2004); Rains v. Bend of the River, 124 S.W.3d 580,597 (Tenn. Ct. App. 2000); VIC Potamkin Chevrolet, Inc. v. Horne, 505 So. 2d 560, 562 n.1 (Fla. Dist. Ct. App. 1987); Seaboard Coast Line R.Co. v. Zeigler, 170 S.E.2d 60, 64 (Ga. Ct. App. 1969). However, as noted above, towage is neither a bailment nor the sale of a good. The parties and the Court were unable to locate a towage case allowing the claim of negligent entrustment. Because claimants fail to argue why an exception should be carved out from the facts of this case, the Court declines to extend the limits of a negligent entrustment claim.

### 2.     Negligent Hiring

The general principles of negligence law guides maritime tort analysis. Consol. Aluminum Corp. v. C.F. Bean Corp., 833 F.2d 65, 67 (5th Cir. 1987). As such, maritime

---

[19]Joyce v. Joyce, 975 F.2d 379, 385 (7th Cir. 1992); Restatement (Second) of Torts § 390; see also Favorito v. Pannell, 27 F.3d 716, 719 (1st Cir. 1994) (citing Rhode Island common law); Pritchett v. Kimberling Cove, Inc., 568 F.2d 570, 575 (8th Cir. 1978).

[20]Becker v. Poling Transp. Corp., 356 F.3d 381, 388-91 (2d Cir. 2004) (citing New York common law and Restatement (Second) of Torts § 411 (1965)).

negligence incorporates the usual elements of duty, breach, causation, and injury.  Canal Barge Co. v. Torco Oil Co., 220 F.3d 370, 376 (5th Cir. 2000); In re Cooper/T. Smith, 929 F.2d 1073, 1077 (5th Cir. 1991).

In general, an employer does not have a duty to see that its independent contractor performs the work in a non-negligent manner.  Redinger v. Living, Inc., 689 S.W.2d 415, 418 (Tex. 1985); see also Karim v. Finch Shipping Co. Ltd., 374 F.3d 302, 308-09 (5th Cir. 2004) (Courts sitting in admiralty "'may adopt state law by express or implied reference or by virtue of the interstitial nature of federal law.'" (quoting Palestina v. Fernandez, 701 F.2d 438, 439 (5th Cir. 1983))).  Furthermore, as a general rule, an employer is not liable for the negligent acts of its independent contractor committed in the prosecution of the work.  Wallace v. Oceaneering Int'l, 727 F.2d 427, 437 (5th Cir. 1984); Cage v. Creed, 308 S.W.2d 78, 80 (Tex.App.- Waco 1957, no writ).  However, an employer can be held liable for negligently hiring an independent contractor.  Wasson v. Stracener, 786 S.W.2d 414, 422 (Tex.App.- Texarkana 1990, writ denied); Becker v. Poling Transp. Corp., 356 F.3d 381, 388 (2d Cir. 2004); Reuben I. Friedman, *When Is Employer Chargeable with Negligence in Hiring Careless, Reckless, or Incompetent Independent Contractor*, 78 A.L.R.3d 910 (2005).  Maritime law recognizes the tort of negligent hiring.  Becker, 356 F.3d at 388-91 (citing New York state common law and Restatement (Second) of Torts § 411 (1965)).

"One hiring an independent contractor may be held responsible for the contractor's negligent acts if the employer knew or should have known that the contractor was incompetent and a third person was injured because of the contractor's incompetency."  King v. Assoc. Commercial Corp., 744 S.W.2d 209, 213 (Tex.App.- Texarkana 1987, writ denied).  Importantly, the independent contractor must be found incompetent before liability will attach.  See, e.g., Wasson, 786 S.W.2d at 422; see also Gonzales, 995 S.W.2d at 739 ("In the context of negligent hiring claims, if the employee did not commit an actionable tort, the plaintiff has not been injured in the eyes of the law; therefore, the employer's negligence has not caused a legally compensable injury."); see also  Restatement (Second) Torts § 411, comment a (1965) (stating that in order to hold an employer liable for negligently hiring an independent contractor, the independent contractor must be found incompetent due to a lack of knowledge,

skill, experience, or appropriate equipment.).  Additionally, the employer is not subject to liability for harm caused solely by the contractor's "inattention or negligence."  Restatement (Second) Torts § 411 (1965), comment b.  Lastly, "an employer cannot be liable for negligent hiring unless the same condition that made the hiring negligent also caused the injury." Geedman v. Rush Transp. Inc., 2000 WL 704978, at *3 (Tex.App.- Houston [Dist. 1] 2000, no pet.) (citing Bell v. Campbell, 434 S.W.2d 117, 120 (Tex. 1968)); Malone v. Ellis Timber, Inc., 990 S.W.2d 933, 936 (Tex.App.-Beaumont 1999, no pet.) (finding in negligent hiring suit irrelevant the fact that if employer had investigated independent contractor's background, it would have revealed a conviction for driving under the influence where no evidence suggested driver was intoxicated at the time of the accident); Western Stock Center, Inc. v. Sevit, Inc., 578 P.2d 1045, 1049 (Colo. 1978) ("To recover [on a negligent hiring claim], it must be shown that the employer's negligence was the proximate cause of the injury to the third person.  More specifically, it must be demonstrated that the harm resulted from some quality in the contractor which made it negligent for the employer to entrust the work to him.").

### a.    ACBL's Duty

A party can only be held liable to whom he owed a duty.  Consol. Aluminum, 833 F.2d at 67; see also Garcia v. Cross, 27 S.W.3d 152, 155 (Tex.App.- San Antonio 2000, no pet.) (stating that the "threshold inquiry in a negligence case is duty"); see also Robert Michael Ey, Causes of Action for Negligent Selection of Independent Contractor, 17 COA 863, §4 (2004) ("The plaintiff in an action for negligent selection of an independent contractor must show that the defendant had a duty to exercise care in selecting an independent contractor."). "The doctrine of Palsgraf v. Long Island R. Co., 248 N.Y. 339, 162 N.E. 99 (1928), that an actor is not answerable in tort to a person to whom he owed no duty, was adopted in admiralty in Sinram v. Pennsylvania R. Co., 61 F.2d 767, 770 (2d Cir. 1932)."  Spinks v. Chevron Oil Co., 507 F.2d 216, 222 n.8 (5th Cir. 1975).  Whether ACBL owed the claimants a legal duty is a question of law determined by the facts surrounding this particular case.  Canal Barge, 220 F.3d at 376-77; Greater Houston Transp. Co. v. Phillips, 801 S.W.2d 523, 524-27 (Tex. 1990) Porter v. Nemir, 900 S.W.2d 376, 386 (Tex.App.- Austin 1995, reh'g denied); Garcia,

27 S.W.3d at 156; see also Stanford v. Kuwait Airways Corp., 89 F.3d 117, 123 (2d Cir. 1997) ("'The duty which one person may owe in a particular situation for the protection of another person is measured by the exigencies of the occasion.'" (quoting Stuart M. Speiser, et al., 2 The American Law of Torts, § 9:4, at 1011 (1985))). In assessing whether a party owes another a duty depends on a number of factors, "most notably the foreseeability of the harm suffered by the complaining party." Consol. Aluminum, 833 F.2d at 67. Accordingly, ACBL's duty is defined by what it knew, or should have known, at the time of the allision. Diamond State Tel. Co. v. Atlantic Refining Co., 205 F.2d 402, 407 (3d Cir. 1953); see also S.C. Loveland, Inc., 415 F. Supp. at 606 ("The duty of a barge to a bridge is based on negligence; however, the duty to exercise reasonable care is circumscribed by the fact that the barge was unmanned and under the exclusive custody, care and control of the tug . . . pursuant to a contract of towage."). Courts have held that in the negligent hiring context, under certain circumstances, the employer has a duty to investigate the independent contractor before hiring it. See Friedman, 78 A.L.R.3d 910, §6 (citing cases); Verhelst v. Michael D's Restaurant San Antonio, 154 F. Supp. 2d 959, 967-68 (W.D.Tex. 2001) (construing Texas law).

The towage contract at the heart of this case was not the first agreement between Brown Water and ACBL. The evidence is undisputed that the companies had weekly dealings resulting in Brown Water towing hundreds of ACBL barges over a ten year relationship with only two incidents. Brown Water was exonerated of any wrongdoing in the grounding because another towing company, not Brown Water, was permissibly in control of the barge. Accordingly, the incident did not put ACBL on notice of any alleged deficiency in Brown Water's towing ability. The second incident involved the damaging of an ACBL barge by a Brown Water vessel two days before the subject allision. It is unclear, however, whether ACBL even knew of the incident prior to hiring Brown Water or at the time of allision. Assuming that ACBL did possess such information, there is no indication that the incident should have alerted ACBL to Brown Water's alleged incompetence. In addition, the towage contract at issue required nothing extraordinary from Brown Water that it had not done in the past for ACBL (i.e., towing barges). Brown Water and its pilots possessed the appropriate

licensing. ACBL never received information that Brown Water was an unsafe or incompetent tower. The Coast Guard never precluded Brown Water from operating. ACBL possessed no information suggesting that the BROWN WATER V ever did or ever would move more than three barges at a time. ACBL was uninformed of the BROWN WATER V's schedule deviation and mechanical problems before the allision. No ACBL employees were located in Brownsville at any relevant time and ACBL played no part in making up the tow of the BROWN WATER V. ACBL's barges were seaworthy, unmanned, dumb, and with no motive power of their own. Brown Water was an independent contractor. Lastly, ACBL also had the right to rely on Brown Water's expertise in fulfilling the terms of the towage contract with reasonable care and skill. Hart v. Blakemore, 420 F.2d 218, 221 (5th Cir. 1969).

The Court is hard-pressed in generating a better inquiry into the abilities of an independent contractor than weekly dealings over a ten year period. Due to ACBL and Brown Water's long and successful relationship, and ACBL's extensive knowledge of the marine transportation industry, ACBL had the right to rely on Brown Water's expertise and its own familiarity with Brown Water, and thus was under no duty to the claimants to investigate Brown Water before hiring it to tow the barges involved in the allision. See In re Central Gulf Lines, 176 F. Supp. at 621-22; S.C. Loveland, Inc., 415 F. Supp. at 606; Cooper v. Metro. Gov't of Nashville & Davidson County, 628 S.W.2d 30, 31-32 (Tenn. Ct. App. 1981) (precluding a finding that employer negligently hired an independent contractor that had performed similar work for the employer for 20 years without incident); Western Arkansas Tel. Co v. Cotton, 532 S.W.2d 424, 426 (Ark. 1976) (holding that "an employer who has had previous successful experience with an independent contractor in the performance of his work cannot be held liable on the theory of negligent selection of the contractor" (citing Kueckel v. Ryder, 66 N.Y.S. 522 (N.Y. App. Div. 1900)); Maristany v. Patient Support Servs., 693 N.Y.2d 143, 145 (N.Y. App. Div. 1999) (finding that independent contractor who previously worked for employer and gave no indication of incompetence precluded a finding that employer was negligent in hiring independent contractor); Greater Houston Transp. Co., 801 S.W.2d at 524-27 (holding no duty existed because a cab company could not reasonably foresee an employee's criminal act based upon one prior incident in a twenty year period for which the employee had been

exonerated); <u>Sievers v. McClure</u>, 746 P.2d 885, 889 (Ak. 1987) ("The employer [of an independent contractor] should not be compelled to become familiar with the routine aspects of the contractor's work and safety practices, when the contractor is already aware of the hazards and is in a better position to take preventative action . . . ."); <u>see also</u> Robert Michael Ey, *Cause of Action for Negligent Selection of Independent Contractor*, 17 COA 863, §11 (2004) (citing cases); <u>Yeager v. Drillers, Inc.</u>, 930 S.W.2d 112, 117 (Tex. App. - Houston [ Dist. 1] 1996, no pet.); Restatement (Second) Torts § 411, comment c ("[T]here is no duty to take any great pains to ascertain whether [the independent contractor's] reputation is or is not good.  The fact that [the independent contractor possesses a special expertise (e.g., a plumber)] is sufficient, unless the employer knows that the contractor's reputation is bad or knows of facts which should lead him to realize that the contractor is not competent."); <u>La Esperanza De P.R., Inc. v. Perez Y CIA. De Puerto Rico, Inc.</u>, 124 F.3d 10, 18-19 (1st Cir. 1997) (finding that shipowner had right to rely on shipyard's expertise); <u>Hoechst Celanese Corp. v. Compton</u>, 899 S.W.2d 215, 227-28 (Tex. App. - Houston [Dist. 14] 1994, writ denied) (rejecting negligent hiring claim against chemical plant that hired off-duty police officers to direct traffic near plant without investigating their specific training since plant was justified in relying on licensed Texas peace officers).

Although the parties do not address the issue of whether under the theories of negligent entrustment and negligent hiring the claimants' injuries were foreseeable to ACBL, the Court feels compelled to do so.  The Court finds the sequence of events too attenuated for ACBL to reasonably foresee the injuries suffered by the claimants.  Specifically, it was not reasonably foreseeable to ACBL when it hired Brown Water to tow its barges that the effects of the weather, combined with the manner in which the tow was conducted, would result in an allision with and the eventual collapse of the Causeway.  <u>See</u> <u>Porter</u>, 900 S.W.2d at 386 (finding duty existed in a negligent retention action where out-patient program employer had policy against employees dating participants within two years of completing the program and the employer knew of employee's previous inappropriate relationship with former patient but failed to investigate whether employee had become involved with other patients); <u>see</u> <u>also</u> <u>Garcia</u>, 27 S.W.3d at 156-57 (holding no duty existed because it was not reasonably

foreseeable that when defendant lent his car to a friend, that friend would pick up two individuals, one of which would be carrying a weapon, that the friend would get into an accident and the impact would cause the firearm to discharge, striking the passenger decedent). Therefore, the amalgamation of the undisputed facts, though tragic, is insufficient to create a duty on the part of ACBL to the claimants.

### b.    ACBL's Breach of the Standard of Care

Even if ACBL had a duty to investigate Brown Water before hiring it, any duty that could have arisen would have been severely limited by the circumstances of the towage contract. S.C. Loveland, Inc., 415 F. Supp. at 606 ("The duty of a barge to a bridge is based on negligence; however, the duty to exercise reasonable care is circumscribed by the fact that the barge was unmanned and under the exclusive custody, care and control of the tug . . . pursuant to a contract of towage."). Coupled with the aforementioned facts regarding duty, ACBL posits that it met its standard of care. Brown Water had been in business for over 10 years when ACBL hired it to tow the barges involved in the allision. Brown Water towed barges for numerous other customers. Although it was not required to, ACBL had Brown Water audited by a qualified, independent, and AWO certified auditor. The audit revealed no issues in the mind of the auditor and led him to recommend the continued use of the towing company.[21] Furthermore, Brown Water was a voluntary member of the CTVEP.

The Court concludes that ACBL, through the facts set forth in its motion, carries its burden in establishing that it met its standard of care. The burden in raising a genuine issue of material fact, therefore, shifts to the claimants. Racal Survey U.S.A., 231 F.3d at 187. Claimants provide the following evidence in an attempt to raise a triable issue of material fact. The Court addresses each in turn.

––––––––––––––––––––

[21] The Court recognizes that ACBL ordered the audit to determine whether Brown Water had the appropriate policies and procedures in place to notify ACBL of any incidents with its barges. Claims.Resp., Dkt. No. 346, Ex.14, pp.93-95, 120. The evidence demonstrates, however, that the audit far exceeded this narrow aim.

###### i.    Notice to Mariners

The claimants provide evidence that Timberlake's audit disclosed to ACBL that Brown Water was violating Coast Guard regulations by failing to carry a current copy of the Coast Guard's "Local Notice to Mariners." Claims.Resp., Dkt. No. 346, Ex. 10, pp. 86, 113-14; ex. 18; see 33 C.F.R. § 164.72.  The "Local Notice to Mariners" is an informational document published by the Coast Guard identifying specific issues that could aid mariners in navigating. ACBL SJM, Dkt. No. 307, Ex. 14, ¶ H, p. 6.  The BROWN WATER V lacked the Notice on the evening of the allision.  Claims.Resp., Dkt. No. 346, Ex. 2.  The claimants maintain that the lack of the Notice, which may identify "submerged obstacles, such as sand bars," is causally related to the allision since there is evidence that part of the reason Captain Fowler lost control of the flotilla was the towboat's contact with the sea floor.  Id. at Resp.Memo., p. 31. Furthermore, the claimants assert, the statutory violation entitles them to the presumption of causation afforded by the Pennsylvania Rule.

The Pennsylvania Rule presumption, aptly named after the Supreme Court's decision in The PENNSYLVANIA, 86 U.S. (19 Wall.) 125 (1874), imposes on a party who violates a safety or navigational statute, the burden of demonstrating that its violation of the statute did not and could not possibly have caused the maritime accident.  See also Trico Marine Assets Inc. v. Diamond B Marine Servs., 332 F.3d 779, 786 (5th Cir. 2003) (finding Pennsylvania Rule applies in both maritime collisions and allisions).  The parties do not dispute the Pennsylvania Rule's applicability to 33 C.F.R. § 164.72 as a safety statute.  See id. ("Part 164 – Navigation Safety Regulations").  The Pennsylvania Rule presumption is rebuttable.[22]  For example, a party in violation of a statute may offer expert testimony illustrating that the violation

---

[22]The Court recognizes that when a moving vessel allides with an anchored vessel or a fixed object (e.g., a bridge) a presumption arises that the moving vessel is at fault. The OREGON, 158 U.S. 186 (1895).  The presumption is rebuttable by proof demonstrating that the moving vessel is without fault.  Bunge Corp. v. Freeport Marine Repair, 240 F.3d 919, 923 (11th Cir. 2001).  The claimants have failed to address this presumption.  Nonetheless, the Court finds because ACBL was not at fault for the navigational error that led to the allision (i.e., exerted no navigational control over the BROWN WATER V or its tow), it has rebutted this presumption.

could not have caused the collision.  See Hess Shipping Corp. v. SS. Charles Lykes, 417 F.2d 346, 350 (5th Cir. 1969).  The Pennsylvania Rule applies, however, to the vessel or party in violation of the applicable statute.  See In re Luhr Bros., Inc., 325 F.3d 681, 688 (5th Cir. 2003) (finding that Pennsylvania Rule applies to the "offending vessel"); see also Tokio Marine & Fire Ins. Co. v. FLORA MV, 235 F.3d 963, 966 (5th Cir. 2001) (stating that the Pennsylvania Rule applies to the party violating the safety regulation).

At all relevant times, Brown Water owned and controlled the BROWN WATER V, the vessel in violation of the Coast Guard regulation, *not* ACBL.  Thus, considering ACBL exercised no control over Brown Water or the BROWN WATER V, the Pennsylvania Rule presumption does not apply to it.  In any event, ACBL's expert witness, Daniel E. Brock, provides competent proof that the lack of the current Notice was a minor violation in nature and, more importantly, not causally related to the allision.  ACBL SJM, Dkt. No. 307, Ex.14, pp.5-7.  Specifically, Mr. Brock noted that review of the four issues of the Notice printed for September, 2001, revealed "no weather, current velocity, tidal action or any other type of information for the Port Isabel, Texas area that would have aided the M/V BROWN WATER V Pilot in navigating through this area or any other cautionary information that would have prevented this accident."  Id. at 7.  The  claimants, on the other hand, fail to point to any evidence that the presence of an updated "Notice to Mariners" guide could have prevented the allision.  Therefore, the proffered evidence is immaterial since the absence of the Notice was not the condition that led to the allision.  See, e.g., Malone, 990 S.W.2d at 936.

### ii.    Audited Vessel's Maps

Immediately after the allision, the Coast Guard boarded the BROWN WATER V and found the vessel's marine charts appeared to be unused.  Claims.Resp., Dkt. No. 346, Ex.2.  Timberlake, ACBL's auditor, "testified that the Coast Guard's description of a tightly folded . . . Marine Chart that did not appear to have been recently used and had no corrections on it was consistent with what he found when he inspected other Brown Water vessels."  Id. at Resp.Memo., p.20 (citing to Ex.10, pp.179-81).    ACBL disputes the claimants' characterization of Timberlake's testimony.  See ACBL Reply, Dkt. No. 375, Ex.37, pp.181-

82, 185, 186. Even if the claimants' interpretation of Timberlake's testimony is correct, they fail to provide any evidence that Timberlake reported this alleged deficiency to ACBL. Furthermore, there is no argument or evidence that Timberlake was ACBL's agent. Therefore, ACBL cannot be charged with actual or constructive notice of the state of Brown Water's vessels' maps because Timberlake, who possessed that information, conducted the audit as independent contractor. See Ribitzki v. Canmar Reading & Bates, Ltd., 111 F.3d 658, 663 (9th Cir. 1997) (holding that independent contractor's knowledge of dangerous condition could not be imputed to employer). Lastly, there is no evidence that ACBL's lack of knowledge concerning the state of Brown Water's vessels' maps violated any standard of care.

### iii.    Brown Water's RCP Certification

The claimants provide evidence that ACBL and other members of the AWO believed that all towing entities should become, and that barge owners were expecting their contract towers to be, RCP certified. Claims.Resp., Dkt. No. 346, Ex.10, p.131; Ex.14, pp.89-90. The claimants further present evidence that ACBL was aware that Brown Water was not RCP certified before the audit and that after the audit Timberlake informed ACBL that Brown Water could not meet RCP requirements. Id. at Ex.11, pp.40, 108. The claimants do not elucidate how Brown Water failed to meet RCP certification standards and how that deficiency rendered Brown Water incompetent and caused the allision.

### iv.    Brown Water's Training of Experienced Pilots

Christian Brinkop, a vice-president at ACBL, testified that he would not hire a pilot to push barges in an area with which the pilot is unfamiliar. Claims.Resp., Dkt. No. 346, Ex.13, pp.56-57, 70-75. The claimants further present evidence that ACBL obtained notice that Brown Water did not train its experienced pilots. Id. at Ex.10, p.170; Ex.18. The claimants argue that Captain Fowler's inexperience piloting tugs through the Brownsville area in part led to the allision. Accordingly, the claimants appear to aver, albeit unclearly, that if Brown Water had implemented a training program, Captain Fowler would have gained the necessary

experience to safely traverse the Causeway on the night of the allision.  See id. at Resp.Memo., p.21.

Mr. Brinkop's statement merely relates that he would not allow an individual to pilot an area with which he was unfamiliar and fails to refer to any sort of training requirement.  There is no evidence that ACBL knew that Brown Water was employing generally experienced pilots who lacked specific experience piloting in the Brownsville area.  Nothing in their ten year relationship would indicate to ACBL that failing to have this training program was an incompetent practice by Brown Water.  Lastly, the claimants do not specifically provide evidence that would support a finding that a training program could have prevented the allision.[23]

**v.    Horsepower to Loaded Barge Ratio**

---

[23]When discussing Brown Water's reputation among local mariners for hiring inexperienced crew members, the claimants aver that Captain Fowler's inexperience was "a likely cause of the accident."  Claims.Resp., Dkt. No. 346, at Resp.Memo., p.31.  To support this assertion, the claimants cite to Exhibits 2, 3, attached exhibit "2" of Exhibit 4, and attached exhibit "2" of Exhibit 20.  The first two exhibits do not support the claimants' causal assertion.  Furthermore, the claimants' Exhibits 4 and 20 lack the attached exhibits.  Therefore, the claimants fail to produce any admissible evidence concerning how Brown Water's failure to train experienced pilots caused the allision.  See Fed.R.Civ.Pro. Rule 56(e) ("Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith."); see also Little, 37 F.3d at 1075 (The Court will not "assume that the nonmoving party could or would prove the necessary facts.").

Nonetheless, ACBL subsequently supplied the Court with the attached exhibit 2 of Claimants' Response, Exhibit 20, in its reply brief.  ACBL Reply, Dkt. No. 375, Ex.38.  This exhibit, which is a report written by Gerald Disler and John Deck III, as attached, twice refers to Captain Fowler's experience as a pilot.  First, the document states that "there may be some evidence that Captain Fowler did not have all the requisite experience for [the Brownsville area]."  Id. at 7.  Second, the report, after describing the channel waters near the Causeway, states that "[w]ere Captain Fowler more experienced with this area, he could have grounded the tow . . . ."  Id. at 9.  The report merely describes Captain Fowler as inexperienced.  Nothing in the report refers to or mentions how a training program could have averted the allision.  Therefore, notwithstanding the report's procedural defect, the evidence contained therein is insufficient.  See Fed.R.Civ.Pro. Rule 56(e) (Party responding to summary judgment motion must set forth "specific facts showing that there is a genuine issue for trial.").

The claimants argue that Brown Water overstated its vessels' horsepower. The claimants further assert that this exaggeration, in part, caused the allision since the BROWN WATER V did not have enough power to regain control of the barges once the vessel hit the ocean floor. The claimants also argue that Timberlake's audit revealed this fact to ACBL and therefore provided it with notice of Brown Water's incompetence.

During Timberlake's audit, Brown Water employees represented that the two audited vessels, each bearing two "12V-71N" engines, possessed 800 horsepower (400 per engine). Claims.Resp., Dkt. No. 346, Ex.10, pp.83-85, 112-13, 198. Employing the industry standard of 200 horsepower per loaded barge, the audited vessels should have had sufficient horsepower to tow four loaded barges. The claimants produce evidence, however, that two "12V-71N" engines only yield 680 horsepower (340 horsepower per engine) and that such knowledge was common in the industry. Id. at Ex.16, p.33. Therefore, the audited vessel's 680 horsepower rating would be insufficient for a tow of four loaded barges.

Mosher testified that if a customer asked for the horsepower rating of the BROWN WATER V, the towboat involved in the allision, he would say 800 horsepower. ACBL SJM, Dkt. No. 307, Ex.5, p.229. Furthermore, after the allision, Captain Fowler stated that the BROWN WATER V possessed 800 horsepower. Claims.Resp., Dkt. No. 346, Ex.3. This vessel also contained, however, two "12V-71N" engines. ACBL SJM, Dkt. No. 307, Ex.5, p.26. It is reasonable to infer that the BROWN WATER V was only capable of 680 horsepower and should not tow four loaded barges.

Brown Water policy precluded the BROWN WATER V from towing four loaded barges. Id. at 207-08; Ex.11, p.103; Ex.22, pp.90-91. The maximum load for this vessel was three loaded barges and one empty, or two loaded and two empty. Id. at Ex.5, pp.207-08. There is no evidence with respect to how much horsepower is appropriate for three loaded barges and one empty barge. Even if Brown Water's policy for the BROWN WATER V violated the industry horsepower to loaded barge ratio, it is of no consequence as it pertains to ACBL.

As noted above, when the BROWN WATER V developed mechanical problems and bypassed Harlingen without relinquishing barge VLB-9173 as planned and continued on to Brownsville for repairs, Mosher told Captain Wilson to tow VLB-9173 as a single barge to

33

Harlingen after the repairs.  Id. at 130-33.  Captain Wilson was then directed to return to Brownsville and gather barges NM-315, VLB-9182, and ACL-9933B, for the Houston journey. Id.  On the night of the allision, therefore, the BROWN WATER V was to only push a maximum of three barges.  Considering the vessel's 680 horsepower output, a three barge tow was consistent with the industry "rule of thumb."  Captain Wilson, contrary to Mosher's instructions, towed all four barges to Harlingen.  Id.  ACBL cannot be held liable for the "inattention or negligence" of Brown Water's crew.  See Restatement (Second) Torts § 411, comment b. Furthermore, there is no evidence that ACBL knew Brown Water's policy concerning the number of barges any of its vessels were allowed to tow.  There is also no evidence that ACBL knew that Brown Water intended to tow four loaded barges with the BROWN WATER V.  ACBL only offered up three barges for tow to Houston, believing that the fourth barge involved in the allision would be dropped off, as agreed, in Harlingen prior to the night of the allision.

Even if Brown Water's exaggeration of the BROWN WATER V's horsepower rating renders it incompetent, the claimants' response lacks any evidence that ACBL knew Brown Water was overstating its vessels' faculties.  Timberlake did discuss his audit's findings with ACBL, however, the evidence is undisputed that Timberlake discussed only his written report with ACBL.  ACBL SJM, Dkt. No. 307, Ex. 18, pp. 172-73.  This report contains no information concerning the make of the engines on the audited vessels.  See id. at Ex. 20.  The only evidence the claimants point to that purports to establish that ACBL possessed knowledge of the make of the engines is contained in the affidavit of their expert witness, Gerald Disler. Claims.Resp., Dkt. No. 346, Ex. 4, ¶8.  Mr. Disler states that "ACBL knew or should have known that Brown Water Marine was not adhering to [the 200 horsepower to loaded barge ratio] based on the RCP audit.  The 'vessel particulars' page for the audit of the M/V BROWN WATER VII, one of two vessels that ACBL audited bears this out.  This is the page where the auditor records the specifications ('particulars') of the vessel.  Under the 'main engines' section the auditor recorded that the vessel had '1271 GM' engines. . . ."  Id.  The mentioned documents, however, were not part of the written report reviewed by Timberlake and ACBL employees.  Cf. id. at Ex. 32, 33, with ACBL SJM, Dkt. No. 307, Ex. 20.  The claimants fail to

34

provide any admissible evidence that Timberlake ever showed or gave an ACBL employee these additional documents.[24]   Therefore, the claimants fail to produce any evidence that ACBL possessed actual knowledge of the make of Brown Water's vessels' engines.  Lastly, as noted *supra*, ACBL cannot be charged with notice of Brown Water's alleged deficiency because Timberlake, an independent contractor, possessed that information and did not relate it to ACBL.  See Ribitzki, 111 F.3d at 663.

The claimants argue that a "reasonably prudent barge owner would have had some procedure in place to assure that its contract tower was abiding" by the 200 horsepower per barge ratio.  Claims.Resp., Dkt. No. 346, at Resp.Memo., p.24 (citing to Ex.4, ¶8; Ex.5, II.G.1 at II-4).[25]   However, the supporting affidavit of Mr. Disler merely repeats the allegations of claimants' response memorandum.  Id. at Ex.4, ¶8.  The Court strikes paragraph 8 of the affidavit because it fails to set forth specific facts upon which his opinion rests and merely provides conclusory legal arguments.   See Hayter v. City of Mount Vernon, 154 F.3d 269, 273-74 (5th Cir. 1998) (In determining a summary judgment motion, "[t]rial courts have broad discretion in rulings on the admissibility of expert opinion evidence, which the court of appeals will not disturb unless manifestly erroneous."); Orthopedic & Sports Injury Clinic v. Wang Lab., Inc., 922 F.2d 220, 225 (5th Cir. 1991) (finding that "affidavits setting forth ultimate or conclusory facts and conclusions of law are insufficient to . . . defeat a motion for summary judgment"); Galindo v. Precision Am. Corp., 754 F.2d 1212, 1216 (5th Cir. 1985); Richardson v. Oldham, 811 F. Supp. 1186, 1197 (E.D. Tex. 1992) (striking affidavit that failed to cite specific facts in determining summary judgment motion); Anderson v. Siemen's Westinghouse

---

[24]The claimants' evidence establishes that Timberlake did *not* have his "field notes" during his meeting with ACBL to discuss the audit's results.  Claims.Resp., Dkt. No. 346, Ex.10, p.165.

[25]For further evidence concerning the standard of care with respect to ACBL's knowledge of Brown Water's engines, the claimants cite to the AWO's RCP manual, which states that each member of the AWO should have "[p]rocedures for evaluation of subcontractors and vendors providing towing . . . services on their ability to provide an acceptable level of safety."  Claims.Resp., Dkt. No. 346, Ex.5., at p.II-4 (II.G.1).  For reasons stated *infra*, §viii, the Court disregards this evidence as immaterial.

<u>Power Corp.</u>, 2002 WL 31928492, at *5 (D.Kan. 2002) (finding affidavit stating "that the boards were laid and secured 'consistent with industry custom and practice'" was conclusory and lacking factual foundation). Therefore, the claimants further fail to offer any evidence that ACBL should have possessed information about Brown Water's vessels' engines.

### vi.    The PSIX Reports

The claimants argue that ACBL breached the standard of care for a reasonably prudent barge owner by not pulling the Coast Guard incident reports on Brown Water before hiring it. <u>Claims.Resp.</u>, Dkt. No. 346, Ex.14, pp.112-13, 115-16. This information, which outlines the number of casualties each vessel has been involved in, can be downloaded from the Coast Guard Port State Information Exchange ("PSIX") database at no charge. <u>Id.</u> at Ex.1. If ACBL had pulled this report on Brown Water's vessels, the claimants argue, ACBL would have discovered that Brown Water vessels had been involved in a "significant" number of casualties. The Court disagrees. The PSIX reports do not identify who owned the vessel at the time of each casualty. For example, the BROWN WATER VIII is listed as owned by Brown Water and involved in 19 reportable marine casualties between 1992 and the subject allision. <u>Id.</u> However, Brown Water did not purchase the vessel until 2001 and all of the reported incidents predate the vessel's acquisition. <u>ACBL Reply</u>, Dkt. No. 375, Ex.41. The inherently unreliable and inconclusive nature of the reports would not have put ACBL on notice of Brown Water's alleged deficiency.

The claimants rely on the affidavit of their expert witness, Mr. Disler, in support of the proposition that the prudent barge owner would pull the PSIX reports. However, because paragraph 5 of Mr. Disler's affidavit again fails to set forth specific facts upon which his opinion rests and merely provides conclusory legal arguments that the reasonably prudent barge owner would pull the reports, the Court strikes that portion of the affidavit as well. <u>Claims.Resp.</u>, Dkt. No. 346, Ex.4, ¶5. <u>See</u> <u>Hayter</u>, 154 F.3d at 273-74; <u>Orthopedic & Sports Injury Clinic</u>, 922 F.2d at 225; <u>Galindo</u>, 754 F.2d at 1216; <u>Richardson</u>, 811 F. Supp. at 1197; <u>Anderson</u>, 2002 WL 31928492, at *5. Moreover, examining the PSIX report for Brown Water, its vessels were involved in approximately 60 reportable marine casualties in the seven years

36

before the allision.  The claimants cite paragraph 5 of Mr. Disler's affidavit, which opines that 60 casualties is significant for such a small operation.  Claims.Resp., Dkt. No. 346, Ex.4, ¶5. Again, the opinion is not supported by evidence concerning what the number of any other tower's reportable casualties are over the same seven year period.  Mr. Disler's statement offers nothing to assist the trier of fact in assessing whether 60 accidents over a 7 year period of time is in fact significant, but rather offers an unsubstantiated opinion.  Therefore, because the PSIX reports lack probative value due to their unreliable nature, the claimants' failure to provide any evidence demonstrating that ACBL was required to utilize the database, and Mr. Disler's unsubstantiated opinion that 60 accidents over a 7 year span is a significant number, the evidence is insufficient to raise a genuine issue of material fact.

### vii.    RCP Audits

ACBL did not specifically request an RCP audit of Brown Water.  Claims.Resp., Dkt. No. 346, Ex.14, p.120.  Rather, ACBL decided to audit Brown Water to determine whether it retained the appropriate policies and procedures in place to notify ACBL of any incidents with its barges.  Id. at 93-95, 120.  Although not explicit, the  claimants seem to argue that ACBL's audit of Brown Water, since it was not an RCP audit, was deficient and fails to meet the standard of care required by the reasonably prudent barge owner.  Id. at Resp.Memo., pp.18-19.  However, the claimants fail to point to evidence that ACBL was required to audit Brown Water according to RCP guidelines (or audit Brown Water at all for that matter).  No statute requires RCP audits.  In fact, there is no proof that any entity used RCP audits.  As ACBL's evidence demonstrates, Brown Water's other employers, such as "duPont, BASS, BP Chemical – BP Oil Expiration, Exxon, Mobil," did not utilize RCP audits.  ACBL SJM, Dkt. No. 307, Ex.5, pp.196-97.  Furthermore, Timberlake did not utilize RCP audits in the two previous audits he performed for ACBL.  Id. at Ex.18, p.286.  Although ACBL had Brown Water audited for a narrow reason, Timberlake's investigation far exceeded this limited initial purpose as evidenced by his written report.  Id. at Ex.18.  The claimants fail to argue, let alone present evidence, that an RCP audit is superior to Timberlake's audit and, more importantly, that an RCP audit would have disclosed information that Timberlake's audit failed to reveal.

Lastly, the claimants provide no evidence concerning how ACBL's failure to audit Brown Water pursuant to the RCP caused the allision.

### viii.    Written Policies and Procedures for Hiring Towers

The claimants produce evidence concerning ACBL's failure to have written policies and procedures for hiring towing companies in violation of AWO regulations.  Claims.Resp., Dkt. No. 346, Ex.11, pp.47-48. The claimants argue that a "reasonably prudent barge owner's policies and procedures for deciding or evaluating the competence, care, and safety of a contract tower will include investigations or inquiries in the following regards: (1) investigation of United States Coast Guard incident reports; (2) periodic RCP audits; (3) contacting other barge owners that have hired the contract tower; (4) contacting local mariners regarding the reputation of the contract tower; and (5) independently verifying the tugs have the power the contract tower has represented."  Id. at Resp.Memo., p.17.   To support the evidence's applicability the claimants offer the affidavit of Mr. Disler, which asserts in conclusory fashion that the "reasonably prudent barge owner that is hiring a contract tower will have written policies and procedures" to investigate and employ the aforementioned considerations. Claims.Resp., Dkt. No. 346, Ex.4, ¶4.  The Court strikes paragraph 4 of Mr. Disler's affidavit for failing again to provide any factual support for his contentions and merely providing legal assertions.

To further support the need for written procedures and polices, the claimants cite to the actual RCP regulations as authority.  Id. at Ex.5, pp.II-1, II-4.  Initially, the Court notes that the RCP manual states that AWO members "should," and therefore are not required to, "develop and document written policies and procedures . . . ."  Id.  Furthermore, the claimants fail to provide any evidence establishing the pervasiveness of such "written policies and procedures" so as to establish a customary or industry requirement.    Smeragulio v. United States, 205 F. Supp. 486, 489 (E.D.N.Y. 1962) ("The existence of a usage or custom can only be proved by numerous instances of actual practice and not by the opinion of a witness." (internal quotations omitted)).  Specifically, no evidence indicates what portion, if any, of the industry utilizes these written policies.  In fact, no evidence before the Court establishes that a single

entity abides by these guidelines.  Therefore, there is no evidence that ACBL breached a standard of care by not implementing written policies or procedures.[26]

### ix.    Contacting Barge Owners and Local Mariners

The claimants provide evidence that ACBL did not contact local mariners or other barge owners to inquire about Brown Water's reputation.  Claims.Resp., Dkt. No. 346, Ex.4, ¶6, pp.6-7; Ex.19, ¶3.  It is the position of the claimants that if ACBL had so inquired, it would have discovered that Brown Water had a reputation for hiring inexperienced pilots.  The claimants assert, therefore, that ACBL breached its duty of care by not inquiring and thereby caused the allision by hiring a tower that employs inexperienced pilots.  As noted in footnote 23, see *supra*, the claimants fail to provide any evidence that Captain Fowler's alleged inexperience led to the allision.  In any event, assuming ACBL was required to investigate Brown Water's reputation, and considering all of the previous analysis of the claimants' submitted evidence, the two submitted affidavits would only constitute a scintilla of evidence permitting this Court to grant ACBL's motion for summary judgment.[27]  Pavone,  52 F.3d at 565.

## V.    Conclusion

The Court sympathizes with the claimants who have suffered much as a result of this tragedy.  Under the circumstance, however, the facts and the law simply preclude a finding that

---

[26]The Court notes that ACBL does not blindly hire their third-party towers.  ACBL employs towers, like Brown Water, with whom it had previous a relationship.  ACBL Reply, Dkt. No. 375, Ex.35, pp.112-13; Ex.31, pp.86-87, 134.

[27]With respect to the claimants' argument that ACBL was required to contact barge owners about Brown Water before hiring it, the Court notes that the claimants fail to provide any evidence concerning what ACBL would have discovered.  Thus, the evidence lacks a causal relationship.  Furthermore, the only evidence the claimants provide that ACBL was required to conduct such an inquiry is the affidavit of Mr. Disler.  Claims.Resp., Dkt. No. 346, Ex.4, ¶9.  The relevant portion of the affidavit, paragraph 9, is factually deficient and conclusory in nature.  Therefore, the Court strikes the paragraph thereby rendering the claimants' assertion unsubstantiated.

ACBL was negligent in hiring or entrusting its barges to Brown Water.

Premises considered, the Court holds that: (1) the dominant mind doctrine precludes recovery by the claimants against ACBL; (2) ACBL was under no duty to investigate Brown Water; (3) the injuries to claimants were not reasonably foreseeable so as to create a duty; and (4) the claimants failed to set forth any competent evidence raising a genuine issue of material fact concerning ACBL's alleged negligence in hiring Brown Water.  The affidavit of Gerald Disler, paragraphs 4, 5, 8, and 9, are **STRICKEN**.  Claims.Resp., Dkt. No. 346, Ex. 4, ¶¶4, 5, 8, & 9.  Therefore, the Court **GRANTS** ACBL's motion for summary judgment.  Dkt. No. 306.

 ACL and Deere Credit have also filed for summary judgment.  Dkt. Nos. 305 & 308. Claimants have filed notices of non-opposition to these motions.  Dkt. Nos. 347 & 348. Accordingly, the Court **GRANTS** ACL's and Deere Credit's motions for summary judgment. Dkt. Nos. 305 & 308. See Forrester v. Ocean Marine Idem. Co., 11 F.3d 1213, 1215 (5th Cir. 1993).

Therefore, it is hereby  **ORDERED** that American Commercial Barge Lines, Inc., American Commercial Lines, L.L.C., Deere Credit, Inc. (formerly Senstar Finance Co.), State Street Bank and Trust Company of Connecticut, National Association, and General Electric Capital Corp., are **EXONERATED** from any liability to the claimants who have and who have not filed claims in this case for loss or damage resulting from the allision of the BROWN WATER V and her tow, barges VLB-9182, VLB-9173, NM-315, and ACL-9933B, with the Queen Isabella Causeway on September 15, 2001.  All claims against the aforementioned parties are hereby **DISMISSED WITH PREJUDICE**.

DONE at Brownsville, Texas, this 17th day of June, 2005.

_____
Hilda G. Tagle
United States District Judge

40